## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. SOUTHEASTERN OKLAHOMA
STATE UNIVERSITY, and

2. THE REGIONAL UNIVERSITY
SYSTEM OF OKLAHOMA,

        Defendants.

Case No. CIV-15-324-C

Jury Trial Demanded

## COMPLAINT

Plaintiff, the United States of America, alleges:

1.      This action is brought on behalf of the United States to enforce Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). As set forth below, the United States alleges that Defendants Southeastern Oklahoma State University ("Southeastern") and the Regional University System of Oklahoma ("RUSO") subjected Dr. Rachel Tudor, a professor who is transgender, to unlawful sex discrimination and retaliation in violation of Title VII.

## PARTIES

2.      Dr. Rachel Tudor is a male-to-female transgender English professor who worked for Southeastern as a tenure track Assistant Professor from 2004 to 2011.

3.      Defendant Southeastern is a member of the Oklahoma state system of higher education and is part of the Regional University System of Oklahoma ("RUSO").

4.     Defendant RUSO's Board of Regents is the governing board for several Oklahoma state universities, including Southeastern.  RUSO's Policy Manual explains how the operations of RUSO and Southeastern interrelate.  RUSO has the power to fix compensation and duties of personnel at its regional universities, including Southeastern. RUSO has the power and duty to adopt rules and regulations to govern its regional universities, including Southeastern.  Southeastern's President has to report to RUSO on all matters related to employment, discipline, and termination of faculty.  For these reasons, Southeastern and RUSO are a single employer for all relevant purposes.

### JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1345.

6.     Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C § 1391(b).  Both Southeastern and RUSO are agencies of the State of Oklahoma.  At all relevant times, RUSO's principal place of business has been in Oklahoma City, Oklahoma, and Southeastern's principal place of business has been in Durant, Oklahoma.

7.      Southeastern and RUSO are "persons" within the meaning of 42 U.S.C. § 2000e(a) and "employers" within the meaning of 42 U.S.C. § 2000e(b).

8.     On or about September 9, 2010, Dr. Tudor filed a timely charge of discrimination alleging, among other things, that Southeastern subjected her to sex discrimination when it denied her application for promotion and tenure during the 2009-10 academic year.  Dr. Tudor filed this charge with the U.S. Department of Education

Office for Civil Rights ("DOE").  After notifying Southeastern of the charge, DOE

referred the charge to the U.S. Equal Employment Opportunity Commission ("EEOC")

for investigation of Dr. Tudor's Title VII claim.

9.      On or about July 12, 2011, Dr. Tudor supplemented her charge of

discrimination filed with the EEOC.  She alleged, among other things, that Southeastern

subjected her to sex discrimination and retaliated against her because she complained

about Southeastern's discrimination.  Specifically, Dr. Tudor alleged that Southeastern

unlawfully refused to permit her to re-apply for promotion and tenure during the 2010-11

academic year.  Dr. Tudor's supplemented charge was simultaneously filed with the

EEOC and with the Oklahoma Human Rights Commission.

10.      Pursuant to Section 706 of Title VII, the EEOC notified the Defendants of

Dr. Tudor's supplemented charge of discrimination.  After conducting an investigation of

Dr. Tudor's charges, the EEOC found reasonable cause to believe that Southeastern

discriminated against Dr. Tudor because of her sex and retaliated against her because she

engaged in protected activity.  The EEOC notified the Defendants of its reasonable cause

findings, unsuccessfully attempted to conciliate the charges, and subsequently referred

the charges to the U.S. Department of Justice.

11.      All conditions precedent to the filing of suit have been performed or have

occurred.

## FACTS

### *Dr. Tudor's Employment at Southeastern*

12.     In 2004, Dr. Tudor began working at Southeastern as a tenure track Assistant Professor in the Department of English, Humanities, and Languages (the "English Department").  At that time, she presented as a man and went by a traditionally male name.

13.     Dr. Tudor was the first transgender professor ever to work at Southeastern.

14.     In the summer of 2007, Dr. Tudor notified Southeastern that she planned to transition from male to female and begin to present as a woman at work during the 2007-08 academic year.

15.     After she informed Southeastern about her transition, Dr. Tudor received a phone call from an employee of Southeastern's human resources office to discuss various issues related to her gender transition.  During that time, the human resources employee warned Dr. Tudor that Southeastern's Vice President for Academic Affairs, Dr. Douglas McMillan, had inquired whether Dr. Tudor could be fired because her "transgender lifestyle" offended his religious beliefs.  The human resources employee told Dr. Tudor that Vice President McMillan had been told that Southeastern could not fire her because she was transgender.

16.     During the 2007-08 academic year, Dr. Tudor began to present as a woman at work by, among other things, wearing women's clothing, styling her hair in a feminine manner, and going by the traditionally female name Rachel.

17.     After Dr. Tudor began presenting as a woman, Jane McMillan, the director of Southeastern's Counseling Center, told her that she should take safety precautions because some people were openly hostile towards transgender people.  She also told Dr. Tudor that Vice President McMillan (who is her brother) considered transgender people to be a "grave offense to his [religious] sensibilities."

***Southeastern's Process for Promotion and Tenure***

18.     At Southeastern, Assistant Professors must obtain tenure before the end of their seventh year as an Assistant Professor or else their employment is terminated.

19.     The process governing applications for promotion and tenure is set forth in Southeastern's "Procedure for Granting Promotion and Tenure."  First, the applicant must submit a written application to her Department Chair, along with a portfolio that contains documentation pertinent to an assessment of her qualifications.  Second, the applicant is reviewed by a Promotion and Tenure Review Committee ("P&T Review Committee") comprised of tenured faculty in the applicant's Department.  Next, the application is reviewed sequentially by the Department Chair, the Dean of the applicant's school, and the Vice President for Academic Affairs, each of whom must consider whether to recommend the applicant to receive  promotion and tenure and then forward his or her recommendation to the next reviewing official.  Following the Vice President for Academic Affairs' review, the President of SOSU decides whether to approve or deny the application for promotion and tenure and, if the President approves the application, he submits his recommendation to the RUSO Board of Regents for their approval.

20.     It is Southeastern's policy to notify applicants of the intermediate decisions

in the process as they occur.  On a candidate's request, administrators may provide explanations of negative recommendations so that candidates for promotion and tenure can address deficiencies before the next level of review.

21.     According to Southeastern's Academic Policies and Procedures, to attain a promotion to the position of Associate Professor an applicant must have:  (1) an earned doctorate relevant to the teaching field awarded by a regionally accredited or internationally recognized institution of higher learning; (2) five years of successful higher education teaching experience in full-time appointments; (3) five years of experience at the Assistant Professor rank; (4) demonstrated effective classroom teaching, research/scholarship, contributions to the institution and profession (also referred to as "service"), and, in appropriate instances, successful performance of non-teaching or administrative duties; and (5) noteworthy achievement in classroom teaching, research/scholarship, and service, or, in appropriate instances, performance of non-teaching or administrative duties.

22.     According to Southeastern's Academic Policies and Procedures, to attain tenure a professor must have:  (1) five years of service at Southeastern in a tenure-track appointment as an Assistant Professor, Associate Professor, or Professor; (2) demonstrated effective classroom teaching, research/scholarship, service, and, in appropriate instances, successful performance of non-teaching or administrative duties; (3) demonstrated ability to work cooperatively to strengthen the academic quality of the institution; and (4) noteworthy achievement in classroom teaching and on at least one

other criterion: research/scholarship, service, or, in appropriate instances, performance of non-teaching or administrative duties.

23.     Southeastern's Academic Policies and Procedures state that, "[f]aculty status and related matters are primarily faculty responsibility; this area includes…promotions [and] the granting of tenure."  The Academic Policies and Procedures further state that, in considering applications for promotion and tenure, the "governing board and president should…concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail."

*Dr. Tudor Prepares to Apply for Promotion and Tenure*

24.     In the summer of 2009, as Dr. Tudor was about to enter her sixth year as an Assistant Professor, she made preparations to apply for tenure and promotion to the position of Associate Professor.

25.     At the end of August 2009, Dr. Tudor met with the Dean of the School of Arts and Sciences, Dr. Lucretia Scoufos.  It was Dean Scoufos's customary practice to meet with professors applying for promotion and tenure to discuss the format and content of the portfolio that they had to prepare in support of their applications.

26.     At this meeting, Dean Scoufos learned for the first time that Dr. Tudor was a transgender woman.  Despite being informed of this fact, Dean Scoufos intentionally referred to Dr. Tudor by male pronouns such as "he" and "him."

27.     During this meeting, Dr. Tudor told Dean Scoufos that she believed another faculty member in her Department had been discriminating against her since she had begun to present as a woman at work.  Dr. Tudor said that she would prefer if this faculty

member did not serve on the Faculty Committee that would review her portfolio. Dean

Scoufos did not report Dr. Tudor's concern to Southeastern's Affirmative Action

Officer—the person at Southeastern responsible for investigating discrimination

complaints.

*Dr. Tudor's Application for Promotion and Tenure*

28.    In October 2009, Dr. Tudor submitted her application for tenure and

promotion to the position of Associate Professor to the Chair of the English Department,

Dr. John Mischo.

29.    Both the P&T Review Committee assigned to review Dr. Tudor's

application and portfolio as well as Dr. Mischo recommended that she receive promotion

and tenure.

30.    On or about November 29, 2009, Dr. Mischo notified Dean Scoufos that he

and the P&T Review Committee recommended that Dr. Tudor receive a promotion to the

tenured position of Associate Professor.

31.    In January 2010, Dean Scoufos sent Dr. Tudor a letter informing her that,

despite the recommendations of Dr. Tudor's Department Chair and the P&T Review

Committee, she had decided to oppose Dr. Tudor's application for promotion and tenure.

Dean Scoufos's letter contained no explanation for her decision.

32.    Dean Scoufos passed her recommendation that tenure and promotion be

denied and Dr. Tudor's portfolio along to Vice President McMillan.

33.    In February 2010, Vice President McMillan sent Dr. Tudor a letter

informing her that he also had decided to oppose her application for promotion and

tenure.  Like Dean Scoufos's letter, Vice President McMillan's letter contained no explanation for his decision.

34.     Shortly afterwards, Vice President McMillan forwarded Dr. Tudor's portfolio to the President of Southeastern, Dr. Larry Minks.  He also forwarded to President Minks his own negative recommendations for Dr. Tudor's promotion and tenure, as well as the recommendations of the P&T Review Committee, the Chair of the English Department, and Dean Scoufos.

35.     Dr. Tudor asked Vice President McMillan and Dean Scoufos to explain why they had decided to oppose her application.  That information would have enabled Dr. Tudor to supplement her portfolio before the President reviewed it.

36.     Both Vice President McMillan and Dean Scoufos refused to explain to Dr. Tudor why they decided to oppose her application.

37.     In refusing to discuss with Dr. Tudor why he opposed her application, Vice President McMillan treated Dr. Tudor differently than a similarly-situated, non-transgender male English professor.  Vice President McMillan met with the other professor to discuss how that professor could strengthen his portfolio.  The other professor followed Vice President McMillan's advice and supplemented his portfolio before it was submitted to the President of Southeastern for a final decision on his application.  Based on his supplemented portfolio—and the guidance that he received from Vice President McMillan—the non-transgender professor received promotion and tenure.

38.     In February 2010, Dr. Tudor filed a grievance with President Minks and requested a hearing before Southeastern's Faculty Appellate Committee ("FAC").  In her grievance, she alleged that Dean Scoufos and Vice President McMillan had denied her the due process provided by Southeastern's policies when they refused to explain why they had opposed her application for promotion and tenure.

39.     The following month, the FAC ruled in Dr. Tudor's favor and recommended to President Minks's designee that Vice President McMillan and Dean Scoufos explain to Dr. Tudor why they had opposed her application.

40.     Pursuant to Southeastern policy, President Minks designated the Assistant Vice President for Academic Affairs ("Assistant Vice President") to communicate to Dr. Tudor both the FAC's recommendation and his decision whether to comply with that recommendation. Southeastern policy also required that Dr. Tudor receive this information within ten workdays.  Dr. Tudor would have the right to appeal the Assistant Vice President's decision to President Minks.

41.     The Assistant Vice President decided not to follow the FAC's recommendation.  Vice President McMillan directed the Assistant Vice President to wait until after President Minks made his decision on Dr. Tudor's promotion and tenure application before informing her that he had decided not to follow the FAC's recommendation.  Thus, Dr. Tudor received no notification within the ten workday deadline.

42.     By violating Southeastern policy and withholding timely notification of the Assistant Vice President's decision, Southeastern denied Dr. Tudor the ability to appeal

Vice President McMillan's and Dean Scoufos's refusals to provide explanation of their negative recommendations prior to President Minks's ultimate decision on her tenure and promotion application. Thus, she was deprived of the opportunity to supplement her portfolio to address their reasoning prior to President Minks's decision.

43. In April 2010, President Minks sent Dr. Tudor a letter informing her that he had decided to deny her application for promotion and tenure. In that letter, President Minks did not explain why Dr. Tudor's application was denied, but he did let her know that Vice President McMillan would inform her of the reasons for the denial in a separate communication.

44. President Minks's decision was the first time Southeastern had denied an English professor's application for tenure and promotion after he or she had obtained a favorable tenure recommendation from a P&T Review Committee and the Department Chair.

45. In June 2010, Dr. Tudor received a letter from Vice President McMillan. That letter—which purported to be dated over a month earlier, on April 30, 2010—stated that President Minks had denied Dr. Tudor's application because her record in the areas of "research/scholarship" and "university service" were deficient.

46. Dr. Tudor's qualifications for promotion and tenure were comparable, if not superior to, the qualifications of at least three other similarly-situated, non-transgender English professors who were considered for, and received, tenure during Dr. Tudor's time at Southeastern. For example, the number of publications Dr. Tudor had in her portfolio was greater than the number of publications that another successful applicant

had in hers.  One applicant received promotion and tenure even though she, unlike Dr.

Tudor, had no peer-reviewed publications.  Likewise, in the area of university service,

Dr. Tudor's performance was also comparable to her non-transgender departmental peers

who successfully applied for promotion and tenure.

47.     Vice President McMillan's criticisms of Dr. Tudor's record in the area of

scholarship also rested on his assertion that the Southeastern administration had been

unable to verify that Dr. Tudor had served as an editor for two symposia listed in her

portfolio.  However, no one in the Southeastern administration ever requested that Dr.

Tudor provide additional documentation to verify that she had served as an editor of the

symposia.  Moreover, copies of the published proceedings from the symposia were

available in a reading room on Southeastern's campus and Dr. Tudor's role as editor was

prominently displayed on the covers of both publications.

### Dr. Tudor's Re-application and Grievances

48.     Southeastern permits faculty members who have been denied promotion or

tenure to reapply as long as they remain within their seven year term of initial

employment.  In at least one other RUSO institution, professors have re-applied for

promotion and tenure the year after the President denied their applications.

49.     In August 2010, Dr. Tudor informed her Department Chair that she

intended to re-apply for promotion and tenure during the 2010-11 academic year.

50.     That same month, Dr. Tudor also filed a grievance in which she requested a

hearing with the FAC so that she could dispute Southeastern's decision to deny her 2009-

10 application for promotion and tenure.  In September 2010, the FAC informed Dr.

Tudor that it had no authority to overrule the President's decision to deny her promotion and tenure.

51.     A few weeks later, in October 2010, Vice President McMillan sent Dr. Tudor a letter stating that Southeastern would not permit her to re-apply for promotion and tenure during the 2010-11 academic year.  In the letter, which had been approved by President Minks, Vice President McMillan recognized that Southeastern policy did not prohibit Dr. Tudor from re-applying.  But he nevertheless announced that he had decided that it was not in the "best interests of the university" to permit her to re-apply.

52.     In his letter, Vice President McMillan offered several explanations for denying Dr. Tudor's request to re-apply for promotion and tenure.  Among his reasons was his belief that deficiencies in Dr. Tudor's application from the prior academic year could not be corrected that quickly.  Vice President McMillan also expressed concern that if the administration once again overruled positive recommendations from the P&T Review Committee and the Department Chair, its action would potentially "inflame the relationship between faculty and administration."

53.     In October 2010, Dr. Tudor filed a grievance with the FAC and President Minks challenging Southeastern's decision not to let her re-apply for promotion and tenure during the 2010-11 academic year.

54.     In response to Dr. Tudor's grievance, Vice President McMillan sent a letter to the FAC stating that he had opposed Dr. Tudor's 2009-10 application for promotion and tenure because she had submitted "the poorest portfolio [he had] ever reviewed in the

20 years" he worked at Southeastern, and there was "very little chance" that Dr. Tudor could have corrected the deficiencies in the period since the initial decision.

55.     In support of her grievance, Dr. Tudor submitted four letters of recommendation from tenured English professors at Southeastern detailing their positive assessments that Dr. Tudor was qualified for promotion and tenure.

56.     Another tenured English professor submitted a letter to the FAC, in support of Dr. Tudor's grievance, which pointed out that "Dr. Tudor ha[d] published more research than any other member of the [English] department, tenured or untenured."  The letter writer therefore maintained that Vice President McMillan was "clearly mistaken in his opinion that consideration of Dr. Tudor's tenure file would be a waste of time."

57.     In December 2010, the FAC recommended that Southeastern permit Dr. Tudor to re-apply for promotion and tenure during the 2010-11 academic year.

58.     President Minks designated Southeastern's Vice President for Business Affairs, Ross Walkup, to respond to the FAC's decision.  In January 2011, Vice President Walkup sent a letter to the FAC stating that Southeastern would not comply with the FAC's recommendation because Southeastern policy prohibited professors from re-applying for promotion and tenure after the President denied their applications.  In his letter, Vice President Walkup indicated that President Minks agreed with this interpretation of Southeastern policy.

### Dr. Tudor's Discrimination Complaint

59.     In August 2010—at the same time she was seeking to re-apply for promotion and tenure—Dr. Tudor also filed a written discrimination complaint with

14

Southeastern's Affirmative Action Officer, Dr. Claire Stubblefield.  In that complaint,

she alleged, among other things, that Southeastern had discriminated against her on the

basis of her sex when it denied her 2009-10 application for promotion and tenure.  Dr.

Tudor filed a similar discrimination complaint with DOE; and DOE informed

Southeastern of the complaint in a letter dated September 15, 2010.

60.     In October 2010, Dr. Tudor supplemented the discrimination complaint that

she had filed with Dr. Stubblefield.  She alleged that Southeastern had retaliated against

her because of her discrimination complaints when it refused to permit her to re-apply for

promotion and tenure during the 2010-11 academic year.

61.     Dr. Stubblefield issued a report ostensibly addressing Dr. Tudor's

discrimination and retaliation complaints in January 2011.  Dr. Stubblefield found that

Southeastern had not discriminated against or retaliated against Dr. Tudor.

62.     Dr. Stubblefield's report did not address all of Dr. Tudor's allegations of

discrimination and retaliation.  For example, the report did not mention Southeastern's

decision not to permit Dr. Tudor to re-apply for promotion and tenure during the 2010-11

academic year, even though Dr. Tudor had expressly complained that this decision to not

let her re-apply was retaliatory.  Similarly, Dr. Stubblefield's report did not address Dr.

Tudor's allegation that Vice President McMillan had treated her differently from one of

her peers by meeting with a non-transgender English professor to discuss his portfolio

before the President rendered a decision on his application for promotion and tenure,

while denying Dr. Tudor the opportunity to have such a meeting.

### Dr. Tudor's Employment with Southeastern is Terminated

63.    Since Dr. Tudor failed to attain tenure before the end of her seventh year as an Assistant Professor, Southeastern terminated her employment on May 31, 2011.

64.    Before Dr. Tudor's employment ended, Southeastern's Faculty Senate awarded her with the Faculty Senate Recognition Award for Excellence in Scholarship for the 2010-11 academic year.

### Sex and gender identity

65.    Individuals are typically assigned a sex at birth solely on the basis of the appearance of the external genitalia.  Only in cases of infants born with ambiguous genitalia are any of the additional aspects of sex (for example, an individual's chromosomal makeup) assessed and considered at that time.

66.    An individual's "sex" consists of multiple factors.  Beyond an individual's genitalia (external or internal) and chromosomes, sex includes, among other things, a variety of hormonal factors, sexual differentiation within the brain, the sex of assignment and rearing, and an individual's gender identity.

67.    Although there is not yet one definitive explanation for what determines gender identity, recent research points to the influence of biological factors, most notably the role of sexual differentiation in the brain in gender identity development.

68.    Transgender individuals are persons who have a gender identity (that is, an internal sense of being male or female) that does not match the sex they were assigned at birth.

69.     Transgender individuals will often undertake some level of gender

transition, which is the process of bringing external manifestations of their gender into

conformity with their gender identity.  A core aspect of gender transition is that

individuals present themselves in the gender role that is consistent with their gender

identity.

<u>**COUNT ONE**</u>
<u>**Title VII, 42 U.S.C. § 2000e-2(a)**</u>
<u>**Unlawful Discrimination Based on Sex (Gender Identity, Gender Transition, and**</u>
<u>**Gender Stereotypes)**</u>

70.     The United States repeats and re-alleges each and every allegation

contained in paragraphs 1-69 as if fully set forth herein.

71.     Defendants denied Dr. Tudor's application for promotion and tenure during

the 2009-10 academic year and refused to permit her to re-apply during the 2010-11

academic year because of Dr. Tudor's gender and gender identity, which constitutes

unlawful sex discrimination in violation of Title VII.  The Defendants also denied Dr.

Tudor's 2009-10 application for promotion and tenure and refused to permit her to re-

apply during the 2010-11 academic year because she changed her gender, which

constitutes sex discrimination in violation of Title VII.

72.     In addition, Defendants denied Dr. Tudor's application for promotion and

tenure during the 2009-10 academic year and refused to permit her to re-apply during the

2010-11 academic year because Dr. Tudor did not conform to traditional gender

stereotypes, which constitutes unlawful sex discrimination in violation of Title VII.

73.     Defendants' purported reasons for denying Dr. Tudor's application for promotion and tenure during the 2009-10 academic year and for refusing to allow her to re-apply in the 2010-11 academic year are a pretext for sex discrimination.

74.     As a direct and proximate result of Defendants' unlawful sex discrimination, Dr. Tudor incurred damages including, but not limited to, lost income, loss of enjoyment of life, and damage to her professional reputation.

### COUNT TWO
### Title VII, 42 U.S.C. § 2000e-3(a)
### Unlawful Retaliation

75.     The United States repeats and re-alleges each and every allegation contained in paragraphs 1-74 as if fully set forth herein.

76.     By refusing to permit Dr. Tudor to re-apply for promotion and tenure during the 2010-11 academic year, Defendants retaliated against Dr. Tudor in violation of Title VII because she (a) opposed their discrimination against her that she reasonably believed violated Title VII; and (b) participated in a Title VII proceeding by filing a complaint with DOE.

77.     Defendants' purported reasons for not allowing Dr. Tudor to re-apply for promotion and tenure in the 2010-11 academic year are a pretext for unlawful retaliation.

78.     As a direct and proximate result of Defendants' unlawful retaliation, Dr. Tudor incurred damages including, but not limited to, lost income, loss of enjoyment of life, and damage to her professional reputation.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that the Court grant the following

relief:

    (a)    enjoin Defendants from subjecting employees to unlawful sex

discrimination (including on the basis of gender identity) and

retaliation that violates Title VII;

    (b)    order Defendants to institute and carry out new policies, practices,

and programs to prevent unlawful sex discrimination (including on

the basis of gender identity) and retaliation that violates Title VII;

    (c)    order Defendants to institute and carry out policies, practices, and

programs to report, investigate, and effectively address complaints

about unlawful sex discrimination (including on the basis of gender

identity) and/or retaliation that violates Title VII;

    (d)    order Defendants to train their employees on Title VII's prohibitions

against unlawful sex discrimination (including on the basis of gender

identity) and retaliation;

    (e)    order Defendants to train their employees who investigate

complaints of Title VII violations on how to conduct effective

investigations;

    (f)    order Defendants and their managers and supervisory employees to

refrain from engaging in retaliation against any individual for giving

testimony in this matter or participating in this matter in any way;

(g)     order Defendants to compensate Dr. Tudor with monetary relief for

        the damages she has suffered including, but not limited to, lost

        income, loss of enjoyment of life, and damage to her professional

        reputation;

(h)     order Defendants to award Dr. Tudor the position of Associate

        Professor with tenure;

(i)     order any further relief necessary to make Dr. Tudor whole; and

(j)     award such additional relief as justice may require, together with the

        United States' costs and disbursements in this action.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant

to Rule 38 of the Federal Rules of Civil Procedure and § 102 of the Civil Rights Act of

1991, 42 U.S.C. § 1981a.

                        Respectfully Submitted,

Date:  March 30, 2015           VANITA GUPTA
                                Acting Assistant Attorney General
                                Civil Rights Division

                                By:

                                /s/ Delora L. Kennebrew
                                DELORA L. KENNEBREW (GA Bar No. 414320)
                                Chief
                                Employment Litigation Section

                                /s/ Meredith L. Burrell
                                MEREDITH L. BURRELL (MD no number issued)
                                Deputy Chief
                                Employment Litigation Section

<u>/s/ Allan K. Townsend</u>
ALLAN K. TOWNSEND (ME Bar No. 9347)
Senior Trial Attorney
Employment Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Patrick Henry Building, Fourth Floor
Washington, DC  20530
Telephone: (202) 616-9100
Facsimile:  (202) 514-1005
Allan.Townsend@usdoj.gov

Attorneys for Plaintiff United States