### Expert Report of Robert Dale Parker, Ph.D.

*U.S. et al. v. Southeastern Okla. St. Univ. et al.*, 5:15-cv-00324-C (W.D. Okla.)

This report compares the qualifications for promotion and tenure of Professor Rachel Tudor of Southeastern Oklahoma State University (which I will refer to as "Southeastern") to the qualifications of other faculty in Professor Tudor's department who were granted tenure and promotion. The comparison is based on the materials in the list attached to this report. They include the promotion portfolios of Professor Tudor and of four other faculty in the Department of English, Humanities, and Languages at Southeastern: Professors Janet Leigh Barker, Margaret Cotter-Lynch, Virginia A. Parrish, and Mark Spencer. (Professor Tudor's complete 2009 portfolio was not available. I reviewed those portions of her 2009 portfolio that were available, and I also reviewed her 2010 portfolio.)

I recognize and respect that Professors Barker, Cotter-Lynch, Parrish, and Spencer each earned promotion and tenure at Southeastern. In no way do I question their qualifications or Southeastern's decision to recognize their qualifications. Rather, I take it as self-evident that Southeastern's decision to award Professors Barker, Cotter-Lynch, Parrish, and Spencer promotion and tenure defines a level of qualifications that Southeastern, by its own standards, has decided merits promotion and tenure. My charge in this report is to address whether, in my carefully considered professional judgment, Professor Tudor met Southeastern's standards for promotion and tenure, based on a comparison between her qualifications and the qualifications of her colleagues. Therefore, my assignment was not to question the qualifications of any of Professor Tudor's colleagues. Instead, my assignment was to apply Southeastern's official written policies for promotion and tenure to a comparison between the qualifications of Professor Tudor and the qualifications of her colleagues whose achievements were recognized as meriting promotion and tenure. In the end, I believe Tudor's portfolios indicate that she was more qualified for promotion and tenure than some of her colleagues who received promotion and tenure, but that opinion should not be interpreted to mean that any of her colleagues whose portfolios I have reviewed here should not have received promotion and tenure.

**Credentials of the Reviewer**

I have been asked to begin this report by summarizing my credentials. I am a professor of English at the University of Illinois, where I have taught since 1984. After completing a PhD in English in 1980 at Yale University, I taught at Yale and then at the University of Michigan. A widely published scholar and a recipient of the University of Illinois's highest awards for both undergraduate and graduate teaching, I have also received our Department of English's award for distinguished service, been named as a University Scholar, and been awarded a named appointment (a recognition for the university's most distinguished faculty). My teaching and scholarship have focused on the study of American literature, including Native American literature, the specialty of Professor Tudor, and on the overall study of how we can best teach about literature, interpret it, and research about it. I have participated in the deliberations for over a hundred promotions at my own university and served a two-year term on the appeals committee for promotions in the College of Liberal Arts and Sciences (serving as acting chair for part of the first year and as chair in the second year). Several times the Dean of the College or



the Provost (who oversees the entire university's faculty) have asked me to serve on special appeals committees to advise them regarding rejected cases for promotion. Colleges and universities across the United States routinely ask me to review the records and publications of faculty under consideration for promotion. I have also been elected to five-year terms on the Executive Committee of the Division on Twentieth-Century American Literature and the Division on American Indian Literatures of the Modern Language Association, and have served as chair of each of those committees. I have served as well on the faculty board of the University of Illinois Press, the scholarly book publisher housed at my university, and on the editorial or advisory boards of 5 different scholarly journals, including such distinguished journals as *American Literary History, Modern Fiction Studies,* and *Studies in American Fiction.* Editors working for scholarly book publishers and for scholarly journals routinely ask me to review the work of scholars whose manuscripts they are considering for possible publication. I therefore have a wide acquaintance with the expectations for college and university faculty in departments of English, with the protocols for faculty promotions, and with the evaluation of scholarship in English.  (For more information about my experience and background, please see the copy of my curriculum vitae attached to this report as Exhibit 1.[1])

**Faculty Ranks, Tenure, and the Criteria for Faculty Promotions**

According to Southeastern's Academic Policy and Procedures Manual, "The academic ranks of the University are professor, associate professor, assistant professor, and instructor" (section 4.5.1 Academic Rank). While some colleges and universities have more than just the "instructor" rank for non-professorial faculty, Southeastern's distribution of faculty ranks conforms to national standards. Professorial faculty at Southeastern (assistant professors, associate professors, and professors) are on what is called the tenure track (4.6 Tenure), meaning that they either have tenure or may eventually become eligible for tenure (4.6.2 Periods of Appointment and Tenure). Nationally, promotion from assistant professor to associate professor ordinarily includes the awarding of tenure. While Southeastern does not require promotion to associate professor to accompany the award of tenure, its policies make it likely that promotion to associate professor and tenure would come together. The policies stipulate that faculty members must serve for 5 years before receiving tenure, and they normally serve those 5 years in a professorial rank (4.6.2 and 4.6.5), which for beginning professors means the rank of assistant professor. The criteria for promotion (4.5.2 Promotion in Rank) and for achieving tenure (4.6.1 Academic Tenure) are similar (although the "noteworthy achievement" standards in 4.6.5 and 4.5.2.1 differ), and the same "Promotion and Tenure Review Committee" considers candidates for promotion and for tenure (4.6.3). In each of the cases under review in this report, a decision to promote an assistant professor to associate professor has accompanied a decision to award tenure, and the same portfolio was submitted for both purposes.

According to Southeastern's Policy and Procedures Manual, "Tenure is defined as continuous reappointment which may be granted to a faculty member in a tenure-track position" (4.6.1 Academic Tenure). At Southeastern, therefore, as at other colleges and universities in the United States, when faculty earn tenure, that means that they cannot be dismissed except in the

---

[1] For information about my hourly rate for services in connection with this case, please see Exhibit 2.


**Exhibit 1**

rare case of extreme circumstances (4.6.7 Causes for Dismissal or Suspension of Tenured Faculty). Tenure provides job security, but job security is not the ultimate purpose of tenure. Instead, in the American university system, tenure provides job security so that faculty will feel free to experiment and take risks in their teaching and scholarship without fearing that their experiments will put their employment at risk. For that reason, tenure lies at the foundation of the bold, innovative teaching and ambitious academic standards that have made American colleges and universities the envy of the world.

College and university professors work in three areas: teaching, research/scholarship, and service. This standard national practice matches the stated policy of Southeastern, which says that "Teaching, research, and service are the triad of professional responsibilities at the University" and that "Evaluation of faculty performance considers these three areas" (4.4.1). In that vein, Southeastern's policies base promotions on "the faculty member's performance in the categories of (1) effective classroom teaching, (2) scholarship, (3) service to institution, profession, and public, and (4) performance of non-teaching/administrative duties/assignments" (4.4.2 Faculty Evaluation System). Similarly, "all evaluations for tenure shall address at a minimum whether each candidate has achieved excellence in (1) teaching, (2) research or creative achievement, (3) professional service, and (4) University service" (4.6.1 Academic Tenure). As at any other school, therefore, when Southeastern considers a candidate for promotion from assistant professor to associate professor with tenure, or from associate professor to full professor, it reviews the candidate's record in teaching, research/scholarship, and service.

Some schools define themselves as teaching schools. In teaching schools, the faculty usually teach more classes and have more modest expectations for research. Teaching schools focus decisions about promotion and tenure primarily on teaching and secondarily on research and service.

Southeastern's "Faculty Development and Evaluation Policies" define it as "primarily a teaching University" (4.4.1 Introduction), which is the norm for regional universities. Except for faculty who are assigned non-teaching administrative duties, Southeastern faculty are supposed to be evaluated primarily on teaching. The written policies say that 15-25% of the evaluation should be based on scholarship and 15-25% on service, with the exact percentages to be negotiated, and with the remaining 50-70% of the evaluation based on teaching (4.4.2.1 Procedures). Southeastern's policy statement consistently and repeatedly lists teaching as the first criterion for decisions about promotion and tenure. For example, it says that faculty appointed to associate professor must show "Demonstrated effective classroom teaching, research/scholarship, contributions to the institution and profession, and, in appropriate instances, successful performance of non-teaching or administrative duties" (4.5.2.1 General Guidelines). The same policy statement includes a review of the principles of "Effective Classroom Teaching" (4.5.2.2) before its parallel sections reviewing the principles of "Research/Scholarship" (4.5.2.3) and service, which it describes under the two categories of "Contributions to the Institution and Profession" (4.5.2.4) and "Performance of Non-Teaching or Administrative Duties" (4.5.2.5). The Guidelines for Achieving Tenure also list teaching first, naming "Demonstrated effective classroom teaching" before "research/scholarship, contributions to the institution and profession, and, in appropriate instances, successful performance of non-teaching or administrative duties" (4.6.5). Indeed, the same section of the Guidelines (4.6.5)


Exhibit 1

requires "Noteworthy achievement in classroom teaching," while only requiring "at least one" of "research/scholarship, contributions to the institution and profession, or, in appropriate instances, performance of non-teaching or administrative duties." By making noteworthy achievement in teaching a requirement without requiring noteworthy achievement in each of the other categories, Southeastern's policies underline the central role of teaching over every other category of faculty work.

The central focus on teaching is repeated many times across the Academic Policy and Procedures Manual, with teaching always listed first, as it is in every document that I have seen from Southeastern and relating to this process. For example, the "Southeastern Oklahoma State University Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet" form begins with a section for teaching before it provides sections for scholarship and service. Southeastern's central focus on teaching more than on scholarship and service is standard for a regional university.

**Comparing the Portfolios: An Overview**

How then does the picture of Tudor's teaching, scholarship, and service, as represented by her 2009 and 2010 portfolios, compare to the picture of teaching, scholarship, and service in the promotion portfolios of the other candidates? To make that comparison, we must take into account the results of the promotion process for each candidate.

Overall, Cotter-Lynch's portfolio indicates the strongest case for promotion and tenure among all the portfolios. After that, with Tudor's 2009 portfolio as a gauge for comparison, I rank Professor Spencer's and Tudor's portfolios tied for second strongest, followed closely by Professor Barker's portfolio. Spencer's portfolio indicates the strongest service record, with a record equal to Tudor on teaching and below Tudor on scholarship.

As I will indicate below, Barker's portfolio presents a slightly less convincing case for the strength of her teaching than we see in the portfolios of Tudor or Spencer. It also presents a scholarly profile stronger than Spencer's, roughly equivalent to or slightly stronger than Tudor's in 2009, while not nearly as strong as Tudor's in 2010.

Next, I rank Parrish's portfolio fifth out of the five portfolios (or sixth out of six, when we include Tudor's 2010-2011 portfolio). Parrish ranks roughly in the same range as Barker, Spencer, and Tudor in the factual information provided about teaching, lower than Spencer in service, and lower than all the others in scholarship. As noted above, I do not question Parrish's qualifications for promotion and tenure. Quite the contrary. I trust Southeastern's decision to award her the promotion and tenure that she earned. But the portfolios show an even stronger record for Tudor than they show for Parrish. Given that Parrish's record was recognized as worthy of promotion and tenure, it follows logically that a reasonable observer of the portfolios would conclude that Tudor's even stronger record would also win recognition as worthy of promotion and tenure.

The comparisons change when Tudor's 2010 portfolio, with its additional publications and testimonials from colleagues, is considered in place of her 2009 portfolio. While Cotter-



Lynch still ranks first, I see Tudor as a strong second, well above Spencer, Barker, and Parrish. I see no reasonable grounds for ranking Tudor's 2010 portfolio anywhere below second. The comparisons below will explain the observations and logic behind these conclusions.

| Summary of rankings | | | |
|---|---|---|---|
| **Overall** | **Teaching** | **Scholarship** | **Service** |
| 1 | Cotter-Lynch | Cotter-Lynch | Cotter-Lynch | Cotter-Lynch |
| 2 | Tudor 2010-2011 | Tudor 2010-2011 | Tudor 2010-2011 | Spencer |
| 3 | Spencer, Tudor 2009-2010 | Parrish, Spencer, Tudor 2009-2010 | Barker, Tudor 2009-2010 | Everyone else, roughly |
| 4 | (tie, as noted in row 3 above) | (tie, as noted in row 3 above) | (tie, as noted in row 3 above) | (tie, as noted in row 3 above) |
| 5 | Barker | (tie, as noted in row 3 above) | Spencer | (tie, as noted in row 3 above) |
| 6 | Parrish | Barker | Parrish | (tie, as noted in row 3 above) |

**Teaching**

   None of the documents anywhere in the array of documents I have been provided questions the high quality of Tudor's teaching. In Tudor's 2010 promotion portfolio, there is extensive documentation of her effective teaching from before the date of the 2009 portfolio, including two very favorable letters reporting classroom observations of her teaching by her department chair, Professor John Brett Mischo, one from February 2007 and one from March 2009. The 2010 portfolio also includes very favorable reports of classroom visits by Professor Randy Prus from April 2006 and February 2009 as well as an unsigned 2008 department chair's summary of student evaluations, presumably written by Mischo. The summary is very favorable. For example, it twice reports that "Responses were overwhelmingly positive."

   The 2010 portfolio also provides yet more testimony in praise of Tudor's teaching in a very favorable letter reporting a May 2010 classroom observation from Professor F. Daniel Althoff, as well as extremely favorable letters from September 2010 reporting on Tudor's



teaching (and on her scholarship and service) from Professors Paula Smith Allen, Parrish, and Spencer and from the director of the Honors Program, Professor Lisa L. Coleman. Collectively, these letters and evaluations, along with nominations for a teaching award in both 2008 and 2009, present an extremely strong picture of Professor Tudor's excellence in teaching at Southeastern.

The question arises, then, how the record of Tudor's teaching, as represented by her 2009 and 2010 portfolios, compares to the record of teaching in the portfolios of the other candidates for promotion, namely, Professors Barker, Cotter-Lynch, Parrish, and Spencer. While I have done my best to compare the different portfolios' records of teaching, the evidence in their portfolios does not point to large differences between most of the candidates. All the candidates show strong teaching records.

Cotter-Lynch

I rank Cotter-Lynch's teaching more highly than Tudor's primarily because Cotter-Lynch was nominated for a teaching award each year she has taught at Southeastern, and in 2007 she also won the teaching award. The nominations and the award seem like a strong sign of excellent teaching. Other evidence also testifies to a strong record of teaching for Cotter-Lynch. The letters from senior colleagues who have observed her teaching are strong, as they are for Tudor. Like many of the other candidates' portfolios, Cotter-Lynch's portfolio includes sample syllabi. (Syllabi are course plans distributed to the students. They typically describe course goals, procedures, assignments, schedules, and other information about the course.) Cotter-Lynch's sample syllabi, representing 3 of the 9 different courses she has taught, are excellent. They are professionally composed and clearly, practically organized. They show a convincing sense of how to address her students at the point where the students begin and then bring them into the goals of her courses. The printouts of her computerized course evaluations show consistently high ratings, above institutional averages. While printouts are provided for only a small number of her courses, and only from one semester (Spring 2007), leaving open the question of how representative they may be, the printouts nevertheless show that she has attracted extremely high student evaluations for at least some of her courses. I attach little significance to the individual student evaluation forms selected from many different courses, because submitting only selected evaluation forms allows the instructor to pick and choose evaluations, whether they are representative or not. Similarly, I attach little significance to testimonies from a small number of individual students, because with so many students taught over a number of years, individual student testimonies could easily be unrepresentative.

Tudor

Similarly, we have ample evidence that Tudor is an excellent teacher. Unlike Cotter-Lynch's portfolio, Tudor's 2009 portfolio provides considerable information about her teaching for each course, in the form of substantial paragraphs of description. These ==impressively written== paragraphs ==reveal a carefully reasoned teaching imagination== and an impressive depth and breadth of thought and knowledge about teaching and about the humanities. They also show an ==admirable adaptability,== both in general and regarding the needs of the particular students who enroll in her courses and at Southeastern in general. Her courses look extremely well adapted to



the specific population of students who take each different course. Tudor's portfolio documents an unusually extensive pattern of seeking out training in the use of technology for teaching, and the descriptions of her courses, both from her and from her colleagues, back up her extensive use of teaching technologies. The commitment to seek out additional training shows an impressive dedication to teaching. Tudor says that she "welcomed any interested colleagues to observe my classrooms." She also says that reports from those observations are included in her portfolio, but they are not included in the version of the 2009 portfolio that I was provided, which I understand is incomplete. They do appear in the 2010 portfolio, and—as noted above—they are very favorable and convincing. Like Cotter-Lynch, Tudor includes selected individual student evaluations, but again, I attach little significance to selected individual evaluations, as compared to a complete set of evaluations from every student in a course, or still better, from every student in every course. But none of the portfolios under review provides complete sets of evaluations. Tudor explains that she asked to have her classes evaluated by "statistical data analysis" but was told by Professor Mischo "that the department could not afford it." She acknowledges that "statistical data . . . is available from" her "first year of teaching at Southeastern," but says that it "does not accurately present my present skills or abilities and will not be included in my application." That seems reasonable, because statistical data reporting student evaluations from a teacher's first year of teaching at a new institution do not provide a reliable picture of that teacher's effectiveness in future years. None of the other candidates' portfolios provide statistical data reporting student evaluations from their first year at Southeastern. Barker and Cotter-Lynch include such data from a later year, but only for one semester, which (as noted above) puts in question whether the data they provide is representative. Tudor's 2009 portfolio includes no syllabi, perhaps because she includes an extensive description of each course, as noted above, or perhaps because the version of the portfolio that I have is incomplete. Her 2010 portfolio includes 2 syllabi. While the font of the ==syllabi is too small,== they are ==extraordinary syllabi, among the best I have ever seen== and certainly the best I have seen from Southeastern (with no disrespect to the others). They do not include the reading schedule, which she provides online, but they are extremely well-pointed to the particular body of students, to their level of experience, to what will help them learn procedurally and intellectually, and to what will help them learn to understand the value of what they study.

<u>Spencer</u>

Like Tudor, Spencer has an excellent teaching record. He provides helpful descriptions of each course, as Tudor does in her 2009 portfolio. While the descriptions ==do not show the depth of thought and imagination visible in Tudor's descriptions,== they indicate a responsible, successful, hard-working teacher. He also provides a letter reporting a favorable classroom observation by Assistant Professor Caryn M. Witten. It seems unusual to rely on an evaluation from another professor of the same rank. The letter may be sincere, but one assistant professor evaluating another assistant professor could find that their shared circumstances make it difficult to provide a frank evaluation. Spencer also submits several selected individual student evaluation forms. As noted above for the other portfolios, selected individual evaluations are nice, but they are not very meaningful, because there is no way to tell whether they accurately represent other students' experience. Nevertheless, Spencer also lists two teaching award nominations and provides strong summaries from the department chair of the course evaluations for two different courses. Spencer's portfolio includes excellent sample syllabi. They are well-thought-through



**Exhibit 1**

and clear. In the courses that focus on novels, however, he may assign too much reading for students to complete and absorb in one course. He also gives a large proportion of class time to student presentations and to essays that the students write while in class. The student presentations and essays written during class may leave too little time for class discussion of the large number of books that Spencer requires the students to read. If I were evaluating his teaching, I would ask him to make sure that he had thought through the advantages and disadvantages of assigning so much reading and using so much class time for student presentations and writing, but I would also defer to his judgment about how to design a course that best matches his teaching style with the material for the course. Overall, both Tudor and Spencer have strong teaching records, without sufficient information in their portfolios to rank either above the other.

Parrish

        Like Tudor and Spencer's portfolios, Parrish's portfolio shows a strong teaching record. Parrish was nominated once for a teaching award. She fills out her list of courses with itemized, bulleted, brief descriptions. Later in the portfolio, she also provides extremely detailed, professional descriptions of each course. In the realm of supporting documents, she provides a selection of seemingly unsolicited emails testifying to her good teaching, including 4 from students and one from a teacher of her past students. As indicated above, I do not put much weight on such documents, because with so many students taught over a number of years, individual student testimonies could easily be unrepresentative. They are like the selected individual student evaluation forms that I also put little weight on. Parrish provides several of those as well. Perhaps a poor teacher would not have such documents to submit, but I would expect that any decent teacher would have many documents like that to choose from. You can have one appreciative student in an otherwise unsuccessful class, so a letter or evaluation from one student does not prove much. Nevertheless, Parrish also submits reports of teaching evaluations by Professor Allen and Professor Witten (who by the time of her report is an associate professor). Both reports are confidently favorable and indicate high competence in Parrish's teaching. Parrish provides a large selection of extremely thorough syllabi. Her syllabi are well-designed to speak to the population of business-oriented students who typically take her classes in technical and professional writing. She also shows an appealing range as a teacher, for she skillfully adapts her thorough organization and sense of her students' needs to the very different needs of the students who take her screen-writing classes.

Barker

        Barker's portfolio includes concrete, favorable reports about her teaching from Professors Allen, Mischo, Parrish, and Witten. Like her colleagues, she provides individual student evaluations and complimentary emails from students. But as described above, such documents cannot reliably testify to an overall record of good teaching. Barker has taught only 3 different courses during her years at Southeastern, far fewer than her colleagues. Tudor has taught 13 different courses, Cotter-Lynch 9 different courses, and Parrish and Spencer have each taught 7 different courses. Barker's portfolio includes syllabi and accompanying materials for 2 of her 3 courses. The materials for her course in Technical and Professional Writing are clear and practical. Her syllabus seems to think through every concern and issue without getting heavy-



handed about its foresight and advice. The materials for her Children's Literature course are imaginative, rigorous, and demanding. They skillfully address an audience of students who may not be experienced with as much reading as she assigns and may have difficulty fitting it into their schedules. She gives them precise directions while still leaving them space to use their imagination to work within those directions. The sample assignments look helpful for inexperienced students, and Barker even provides a handout of advice from previous students about how to do the work. The range and quantity of assigned reading are impressive. I wonder what would happen with a looser structure, but I much respect the careful thought that went into the design of this course. Students should learn a great deal from Barker's classes.

Like Cotter-Lynch, Barker provides statistical printouts of teaching evaluations, but also like Cotter-Lynch, she provides such statistics for only a small selection of courses. In a letter recommending Barker for promotion with tenure, Lucretia C. Scoufos, Dean of the School of Arts and Sciences, writes that Barker's "student ratings are consistently excellent, well above the university and national norms." The data in the portfolio are not consistent with this claim. The portfolio provides two sets of evaluation statistics, each following a different set of questions and a different pattern of reporting the results. For one course from 2010, the printouts report responses to two key questions. Specifically, for the "overall evaluation of this class," they report a mean (an average) of 4.56 on a scale of 1 to 5. For "Overall, I would rate the teaching ability of the instructor," they report a mean of 4.88. These are extremely high numbers, though no information is provided to indicate how they compare to university or national norms. For 3 courses in 2007, a different system of printouts reports responses to one key question, "Overall, I rate this instructor a good teacher." On that question, Barker's 3 courses had a mean of 4.50. Course by course, they received a 4.53, 4.33, and 4.55. ( The printouts also report a unit mean (presumably referring to Barker's department) for that question of 4.62, higher than Barker's mean, and they report an institutional mean (presumably referring to Southeastern) of 4.46, just under Barker's mean. All these numbers are remarkably high for Barker as well as for the unit and the institution, which raises a question about whether enough faculty members' courses were surveyed to produce a reliable sample for comparison. Regardless, these numbers do not match Scoufos's claim that Barker's "ratings are consistently . . . well above the university and national norms." 4.50 is not "well above" 4.46, and it is lower than the mean for Barker's own departmental colleagues.

Scoufos also repeats a claim that appears in a letter recommending promotion and tenure from department chair Randy Prus, who writes that "In the department's recent Assessment Report for Distance Learning, Dr. Barker's on-line classes have the highest rate of retention." As in the case of isolated course evaluations that may not represent a consistent pattern, the information provided here is too selective for us to determine its value. When we have information about only one candidate, from only one short period (in this case, one isolated detail from a "recent" report), we cannot tell whether the information carries weight, or whether unrepresentative information has been cherry-picked so that, intentionally or not, it misrepresents the larger picture.

Amid the uncertainty caused by the inconsistent statistics, I do not feel confident about ranking Barker's teaching compared to the other candidates. There is no doubt that Barker's portfolio presents a strong teaching record. Even so, I would cautiously rank her teaching below



**Exhibit 1**

the teaching of most of her colleagues, so far as one can see from the limited evidence of the portfolios. Specifically, the comparative statistics indicate that Barker's courses attracted evaluations slightly below the unit mean. And unlike Cotter-Lynch, Parrish, Spencer, and Tudor, Barker was not nominated for a teaching award. I am therefore inclined to rate Barker's teaching highly, but not as highly as the teaching of the other faculty in this pool of portfolios.

**Scholarship**

For research/scholarship (which I will refer to as scholarship), I will review the portfolios of Professors Cotter-Lynch, Barker, Spencer, and Parrish and then compare them to the portfolio of Professor Tudor.

It may help to review the standards for judging scholarship before looking at the scholarly records of the individual candidates. When a college or university considers a candidate for promotion and tenure, it judges the record of scholarship on the basis of what the candidate has done since arriving at that college or university. Earlier work may serve as a potential predictor of future work and, in that light, may help an institution decide to hire someone. But when it comes to deciding whether to award a professor promotion or tenure, an institution considers what the candidate has done since arriving at that institution.

In contemporary college and university English departments, scholarship is an umbrella term that includes publishing critical discussions about literature, publishing research about literature or related topics, or publishing creative writing. It also includes presenting such work at professional conferences. These standard procedures for characterizing scholarship match Southeastern's written policies, which describe faculty scholarship as "research or creative achievement" (4.6.1 Academic Tenure; see also 4.5.2.3  Research/Scholarship). We can judge scholarship by considering one or more of five different markers of scholarly accomplishment:

    1) <u>Number and length of publications and presentations</u>.

        • Books. A book counts far more than an article, not only because it includes more writing but also because it requires more research and a larger scale of thinking.

        • Articles. A substantial article counts more than a brief, minor article.

        • Conference presentations. A conference presentation counts far less than an article, because conference presentations are unpublished, so that they are not available for other scholars to consult. They are presented orally and heard only by whoever happens to show up for the presentation, sometimes a very small number of people. They are also typically shorter than articles and not as fully backed up with cited evidence, because cited evidence is difficult to provide orally. While they are usually peer-reviewed (see #2 below), peer reviewers for conference presentations typically review only a short summary of the presentation, in part because at the time of peer review the full presentation has often not yet been written.



**Exhibit 1**

• Book reviews. A book review that simply reports on a book may prove useful for readers but carries almost no value as a scholarly accomplishment and as a credential for promotion and tenure. A book review that includes a serious scholarly discussion may count for a little more but does not usually represent original scholarship.

2) <u>Peer-review</u>. Peer-reviewed publication is the gold standard of scholarly achievement. When scholars complete a manuscript of their writing, they submit it to a scholarly journal or a scholarly book publisher. If the editors at a journal or publisher that uses peer review believe that the manuscript is promising, then they will send it to scholarly experts to review. Often, to ensure the experts' objectivity, they include no indication of who wrote the manuscript. The scholarly experts, known as peer reviewers, review the manuscript to determine if it meets the standards of the journal or publisher, and then to recommend that the journal or publisher publish the manuscript or decide not to publish it. Typically, at least two experts must agree that the manuscript deserves publication before the editors will decide to accept it for publication. Publications that are not peer-reviewed usually receive little or no credit for a promotion unless they are invited (as in number 3 below) or actually read (as in number 4 below) and seriously responded to by other scholars (as in number 5 below). More prestigious journals and book publishers tend to set higher standards and conduct more intense peer review. Most peer-reviewed manuscripts are not accepted for publication, because they do not survive the process of peer review successfully. Proposals for conference presentations also go through peer review, except, sometimes, when they are invited. By contrast, book reviews are not peer-reviewed.

In this report, I provide documented evidence, whenever it is available, to indicate whether a journal or other publication uses peer review, taking such evidence from the *Modern Language Association Directory of Periodicals* (as described below) or from a journal's own website. All such documents (including websites) are itemized in the list of accompanying documents attached to this report.

3) <u>Invitations to contribute</u> to a scholarly journal, to a book that includes chapters or articles by different scholars, or to a scholarly conference. For well-established scholars, that is to say, scholars who have published extensively and whose publications have attracted widespread respect from other scholars, invitations can replace peer review.

4) <u>Actually reading the work and judging its quality and importance</u>.

5) <u>Published responses</u> by other scholars.

Numbers 3 and 5 do not apply to the portfolios under consideration for this report, as none of them provides any evidence of invitations to contribute or of published responses to the work under examination. I will therefore compare the candidates' scholarship by focusing on categories 1, 2, and 4.


**Exhibit 1**

<u>Cotter-Lynch</u>

At the time she submitted her portfolio in 2009, Professor Cotter-Lynch's scholarship seemed to be on an upward trajectory, though it had not yet led to much publication. She had published one article about teaching, published without peer review by an online education company that I was not familiar with, a company that nevertheless gave the article an award. She provides a web address for the article, but the link is dead, and the article no longer appears elsewhere on that website. I found it, nevertheless, on the Wayback Machine (https://web.archive.org/web/20080509122634/http://ablemedia.com/ctcweb/consortium/cotterlynchancientbiography.html), an online archive of websites removed from their original locations and otherwise no longer available. This article reports Cotter-Lynch's day-by-day teaching strategy, including lesson plans and lecture notes, for part of one course, a part that focuses on the ancient historians Plutarch and Suetonius. While it makes no original scholarly contribution, it is an exceptional report and model of teaching, as good as any report of a professor's teaching strategy that I have seen. It speaks in sympathetic and practical terms to Southeastern freshman at the skill and knowledge level they bring to her class, and it also stretches them to develop skills of reading, interpretation, and reflection on writing and on civics that they can take with them to other courses and to the remainder of their lives. I learned several teaching strategies about how to get beginning students to expand their curiosity and their skill at interpretation. While it is unfortunate that this article is not easier to find, a publication of this kind suits a teaching-centered university such as Southeastern especially well. When Southeastern's policies describing faculty scholarship list what counts as scholarship at Southeastern, they begin with "adaptations of knowledge to the learning environment" (4.5.2.3 Research/Scholarship). Cotter-Lynch's article does not provide original scholarship, but it skillfully adapts already existing knowledge to the learning environment.

In 2009, when Cotter-Lynch submitted her portfolio, she was also the coeditor of a nearly complete book that collects scholarly essays from ten different scholars, a book that had a contract with Palgrave-Macmillan, a very respected publisher. When her promotion was under consideration, the book manuscript was scheduled to go through peer review soon. The contract reflects the publisher's expectation that the manuscript would pass successfully through peer review, but that process had not yet taken place when Cotter-Lynch was under consideration for promotion. She lists her own article in the book as peer-reviewed, but says the book had not yet gone through peer review, so it is not clear whether the peer review for the article was completed or anticipated. Most schools would not count an article in a book edited by the candidate as a credential toward that candidate's own promotion, but if the article successfully passes through peer review, then it seems to me worth crediting. Cotter-Lynch had another article manuscript undergoing peer review at the time she submitted her portfolio. She also reports that a Palgrave-Macmillan editor had expressed interest in the book manuscript she was working on. Such interest is a good thing, but the project had not yet reached the concrete stage of a finished book manuscript, let alone a manuscript that had gone through peer review and been accepted for publication. Therefore, it was far too early for that manuscript to count as a publication. Cotter-Lynch had also published one additional article and one book review, but they were published before she arrived at Southeastern. Her only publication since arriving at Southeastern was thus the article about teaching Plutarch and Suetonius.


**Exhibit 1**

Without any published work included in the portfolio for me to read and evaluate, I read the series of unpublished manuscripts included in the portfolio. They are excellent work. They offer a concrete, imaginative, and professional contribution to active discussions in current scholarship. As specialized studies of the history of early medieval women, early medieval women's writings, and the interpretation of early medieval accounts of dreams, they would require a specialist in those areas to provide a full evaluation of exactly how they fit into recent scholarship. But even someone such as myself, a non-specialist in those areas who has a more general acquaintance with medieval studies and a broad acquaintance with the history of literary criticism and with contemporary literary criticism, can see that these are very promising works. They consist of 3 conference presentations, somewhat repeating each other and not in the final forms they might eventually take in published work, plus the manuscript of the article to be included in the book that Cotter-Lynch was co-editing, and the other article manuscript then under consideration at a journal. Here and there they have a minor rough passage, especially (as one might expect) in the conference papers. For example, the article for the co-edited book confuses the theoretical concept of interpellation with another term, interpolation, which has a completely different meaning. (A peer reviewer should catch such things.) Nevertheless, Cotter-Lynch understands the concept well and uses it rigorously, and all her work seems imaginatively and constructively keyed to advancing active interests in the contemporary scholarly study of medieval women, their writings, and other writings about them, key areas in contemporary medieval studies.

Through the South Central Modern Language Association, Cotter-Lynch received a grant for a one-month residency at the Newberry Library, a major research library. Such a grant is an indicator of serious scholarship in progress. Since her arrival at Southeastern, she presented her work at 7 different conferences (her statement says she gave 4 presentations, but 7 appear on her list of presentations), including such major conferences as the International Medieval Congress, which is the major conference for medieval studies, and the conferences of the American Comparative Literature Association and the Modern Language Association. She also took a leadership role by organizing sessions at the Medieval Congress and leading a seminar at the Comparative Literature Conference. No one else in this set of portfolios has nearly so strong a record of presenting work at conferences. That record of strong conference presentations contributes to the impression that Cotter-Lynch's work was on an upward trajectory, with publications perhaps about to appear, even though, during her years at Southeastern, and by the time of this promotion, she had only one publication.

Barker

During her time at Southeastern, Professor Barker presented 4 papers at the major conference for the study of children's literature and volunteered to chair a session at that same conference. She does not provide her actual conference papers, but she does provide summaries of them. Her paper on the popular novel *Holes* is clever, smart, and well-informed. Her paper on three historical novels by Christopher Paul Curtis shows a keen understanding of the novels' racialized contexts. And her paper on Curtis's novel *The Watsons Go to Birmingham—1963,* which she expanded into an article, shows an excellent sense of the novel's tone and its changes in tone. The earliest of these conference papers, on girls in nineteenth-century fiction, seems less



**Exhibit 1**

original and rather forced into the theme of the conference, but otherwise relatively soundly conceived.

During her time at Southeastern, Barker also published a deeply researched, deeply thought-through article, "Racial Identification and Audience in *Roll of Thunder, Hear My Cry* and *The Watsons Go to Birmingham—1963*." This article appeared in *Children's Literature in Education,* an established education journal and a good venue for a scholar from a teaching-focused university such as Southeastern. ==Barker's article is slow-moving and too long,== but it is thorough and useful. Drawing on a wide range of surprisingly detailed research, Barker builds well-observed interpretations of the two novels she discusses. Noting that African American readers have received more attention in discussions of these novels, she also attends to white and, more broadly, non-black readers, and she compares the different contexts of response for differently positioned readers. Unlike many other critics who write about racially-inflected topics, Barker genuinely has read and understood the body of scholarship known as "critical race theory," and she imaginatively brings it to bear on strategies for interpreting children's literature. She concludes with a thoughtful, practical discussion of strategies for teaching racially conscious children's literature to readers who may believe that we live, or should live, in an age of race-blind teaching. This article will serve as a valuable reference for teachers from middle school through high school, and for university teachers of future teachers.

Barker's portfolio includes a letter testifying to the strength of her scholarship from Professor Lynne Vallone, a distinguished scholar of children's literature at Rutgers University—Camden. Dean Scoufos's letter recommending promotion and tenure for Barker makes much of the letter from Vallone, and the Faculty Promotion and Tenure Evaluation worksheet names the letter from Vallone, along with Barker's published article, as the two facts testifying to Barker's outstanding scholarship. But Vallone's letter notes frankly that Barker was Vallone's student, and that Vallone directed Barker's dissertation, which disqualifies the letter as a reliable indicator of Barker's credentials. Relying on that letter is the academic equivalent of relying on a parent testifying to the wonders of her own child. Vallone has a conflict of interest, because Barker's success in winning promotion and tenure would provide a credential testifying to Vallone's own success.

Spencer

Professor Spencer published a 326-page scholarly book and a 20-page scholarly article before arriving at Southeastern, but publications from before his arrival at Southeastern are not relevant to his consideration for promotion and tenure at Southeastern. When he applied for promotion and tenure, he had published only one book review during his time working at Southeastern. His portfolio provides a link for the review. The link no longer works, but I found it at another address (https://scholarworks.iu.edu/journals/index.php/tmr/article/view/16706/22824). It is professional and thoughtful work, but as a brief and modest book review, it does not represent a substantial contribution to original scholarship.

He also had 2 articles accepted for publication and scheduled to appear. His portfolio does not provide copies of the articles, but I acquired them through my university library. They


**Exhibit 1**

appeared in peer-reviewed journals, *The Explicator* and *Eureka Studies in Teaching Short Fiction.* According to the *Modern Language Association Directory of Periodicals, Eureka Studies* accepts a high percentage (60%) of the manuscripts submitted for its consideration, making it a comparatively easier journal to publish in, and thus making an article in *Eureka Studies* a less impressive credential than an article in most other journals. (For more about the *Modern Language Association Directory,* see below.) *The Explicator* had a certain vogue in the 1940s and 1950s, when it was new and represented a new trend sometimes known as "explication," but for many decades now it has had a reputation for publishing undistinguished work. Department chair Mischo writes, in his December 1, 2006 letter to Dean Mangrum about Spencer: "there is a question as to the research significance of a venue such as *Explicator* and its standards of scholarly depth." I believe that most informed scholars share that skepticism. It is difficult for a journal that publishes extremely short articles, as *The Explicator* does, to publish scholarship with ambition and depth.

Spencer's article in *The Explicator,* a short, thoughtful reading of a famous poem by Emily Dickinson, argues skillfully for a new interpretation of the poem's understanding of the Christian afterlife. The article is only one page long, however, and it does not address any other critics' interpretations of the poem, even though a great many previous critics have written about the poem, as Spencer acknowledges. My own view is that Spencer's plausible interpretation needlessly narrows the poem to one model of the Christian afterlife, but I would like to see the advantages and disadvantages of Spencer's interpretation played out, in relation to other critics' interpretations, at greater length.

The other article works on a larger scale both in length (10 pages) and in research. It offers a point-by-point comparison of William Faulkner's most famous short story, "A Rose for Emily," Robert Bloch's novel *Psycho*, and Alfred Hitchcock's film made from the novel. Spencer notes that others have mentioned similarities among these works, but he sets out to describe the similarities more extensively. He suggests that Hitchcock's film makes few changes to the novel, but that those few changes heighten the film's similarity to Faulkner's story. Spencer grounds the article in his own experience teaching the 3 works together and implies that others might try the same in their own teaching, an approach that makes the article speak to the teaching-centered focus of Southeastern. As a Faulkner scholar myself, I would like to see a little more engagement with other critics' interpretations of the story, but this is a reasonably well-researched article, proficiently executed with modest but interesting and plausible claims.

As I will indicate in the next paragraph, Spencer had a third article accepted while he was under consideration for promotion and tenure, an article about George Garrett's novel *Death of the Fox.* In this article, Spencer draws on wide knowledge and research but has nothing new to say about his topic. Most of the article summarizes the novel's plot. We teach our students not to summarize plot, because if people want plot, they can just read the novel. The task of the critic is not to describe the novel, but to interpret it. When Spencer is not describing plot, he mostly just describes the novel's approach to its topic or focuses on recounting what Garrett himself or others have said about the novel, sometimes noting whether he agrees, but not providing any fresh or extended interpretation. Spencer shows a vast knowledge of materials and issues in and around *Death of the Fox* and a vast knowledge of other novels to compare it to. While this article shows more knowledge than Spencer's other articles, it is nevertheless weaker work.



According to a May 18, 2016 letter from the Department of Justice to the writer of this report, "In the Spring of 2007, Dr. Spencer sent out four articles for publication and supplemented his portfolio with that information." These 4 article manuscripts "were all ultimately published." After Spencer submitted the article manuscripts, Southeastern President "Snowden, based on Dr. Spencer's supplemented portfolio, recommended that Dr. Spencer receive tenure and promotion." Only one of the 4 articles was accepted before Snowden's decision, the article on *Death of a Fox,* though Spencer "is not sure whether he informed President Snowden" of that acceptance before Snowden's decision. One of the articles was published by a journal that Spencer submitted to after Snowden's decision.

After this precedent was set, providing decisive credit to Spencer's submission of 4 article manuscripts, Tudor's 2009 portfolio listed 11 submitted article manuscripts. It looks extremely peculiar that Spencer would be given so much credit for 4 submitted manuscripts, reported late in the process, that the mere report of submitting those manuscripts would reverse a recommendation against promotion and turn it into a recommendation for promotion, and yet Tudor was not given the same credit for nearly 3 times as many submitted manuscripts, reported 4-6 months earlier in the promotion-and-tenure-review process.

One could understand if Tudor were not credited for submitting article manuscripts, so long as the same standard had applied to Spencer. But it appears that Spencer was given a great deal of credit for a category of scholarly production when Tudor was not given the same credit for a great deal more production in the same category. That glaring contradiction stands out even when we consider only Tudor's 2009 portfolio, without even taking into account her far more extensive 2010 portfolio.

<u>Parrish</u>

During her time as an assistant professor at Southeastern, Professor Parrish produced nothing that can count for a record of scholarly publication within Southeastern's definition of "Scholarship/Research" (4.5.2.3). Like many of her colleagues, she published a number of items before she arrived at Southeastern, but after she began working at Southeastern she did not publish work that would count as scholarship. She did write 2 government reports, together totaling 4 pages. They are not peer reviewed, and they are not items I would consider scholarship or publications. They are work done on the side, not as part of her job as a professor. She also reviewed a textbook manuscript and a textbook proposal for commercial publishers. Being asked to do those reviews is not a sign of scholarly distinction. Textbook publishers do not ordinarily ask professors to review such things based on the distinction of the professors. Rather, they look for people who teach courses that might assign the published textbooks, trying to find professors at all different types of schools in different regions of the country. They hope to get useful suggestions for the manuscripts from a variety of different markets, but they also hope that the manuscript reviewers will themselves assign the books if they are published. In that context, Parrish's completion of those manuscript reviews may indicate good citizenship, but it does not count as scholarship. Parrish lists 10 presentations at conferences or other events before she arrived at Southeastern, but only one since arriving at Southeastern, and that one is a local presentation at Southeastern itself, which usually disqualifies a presentation from counting as



scholarship in a promotion portfolio. A presentation of that kind counts as service, not as scholarship.

Parrish's sole publication from her time at Southeastern that comes even close to being scholarship consists of one three-page, non-peer-reviewed book review that merely summarizes the book. As noted earlier, in line with standard procedures, a book review that simply reports on a book does not count as scholarship. That standard procedure for judging book reviews matches Southeastern's written definition of scholarship, which describes scholarship as "the pursuit of new knowledge," and which provides a list of the different kinds of faculty scholarship, a list that does not include book reviews. It does include "articles in refereed [meaning peer-reviewed] or editor-evaluated publications" (section 4.5.2.3 Research/Scholarship). But book reviews are not articles, are not refereed or peer-reviewed, and are rarely editor-evaluated. Parrish's book review, which simply describes the book she reviews without providing any notable research or thinking of her own, does not advance the pursuit of new knowledge. Because Parrish's record shows no scholarship produced during her time at Southeastern, I see no reasonable cause for rating her record of scholarship above the record of scholarship for Professor Tudor, whose record as a scholar is far stronger both in quantity and in quality.

As noted earlier, I am not suggesting that Parrish did not deserve to receive promotion to associate professor with tenure. I have described her record of scholarship here merely so that I could compare her record to the record of Tudor and the other professors whose portfolios I have reviewed.

<u>Tudor</u>

In comparing Professor Tudor's record of scholarship to the scholarly records of her colleagues, I will first consider her 2009 portfolio and then her 2010 portfolio. In her 2009 portfolio, Tudor reports one presentation at a regional conference and one at Southeastern. The presentation at Southeastern would count toward service rather than scholarship. She also reports one article accepted for publication by *The Texas Review,* "Romantic Voyeurism and the Idea of the Savage." *The Texas Review* is not well-known outside its region, but it is a peer-reviewed journal. It is also a selective journal, meaning that it accepts a low percentage of submissions. I was not provided a copy of that article for the 2009 portfolio. (I was provided a copy for the 2010 portfolio, which I will address below.) As noted above, she also lists an unusually large number of articles submitted but not yet accepted. I was provided a copy of one of those articles, "Historical and Experiential Postmodernism: Native American and Euro-American," published in a peer-reviewed journal, the *Journal of Contemporary Thought* in 2009 (and added to Tudor's 2009 portfolio in February, 2010, according to emails from Southeastern provided by the Department of Justice). Just as a matter of counting, let us put these two peer-reviewed articles from the 2009 portfolio into comparative perspective. Aside from Tudor, only Barker had a published, peer-reviewed article. Cotter-Lynch had one accepted and published article, not peer-reviewed. Spencer had 2 accepted and not yet published articles (or 3, if we count the supplementary information that, as noted above, Spencer cannot recall whether he provided), each of them peer-reviewed, one of them extremely short, and none of them in highly selective journals. Spencer also had a book review. Parrish, with only a book review that merely



summarizes the book under review, had no publications that count as scholarly publication within Southeastern's definition of "Scholarship/Research" (4.5.2.3).

In that context, it is hard to see any good reason why the worksheets from the Dean of the School of Arts and Sciences, Lucretia Scoufos, and the Interim Executive Vice President for Academic Affairs, Douglas N. McMillan, assign Tudor's scholarship the possibly fatal rating of "needs improvement" (3 on a scale of 1 to 5). Granted, Scoufos dated her worksheet on January 14, 2010, before the news of Tudor's second accepted article in February, 2010. Scoufos writes in her January 12, 2010 letter that "there appears to be only one peer-reviewed paper . . . accepted, but not yet published." (In an English department, it could sound demeaning to refer to an article as a "paper," as if it were only a conference paper, but that is not the case in all fields, and I do not know Scoufos's field.) As noted above, Cotter-Lynch had no peer-reviewed articles. Barker had only one. And Spencer, at the same point in the process, had two accepted but not yet published peer-reviewed articles, short enough so that together they total less production than Tudor's one article, even without taking into account Tudor's report of many submitted articles. Less than a year earlier, on February 12, 2009, Scoufos recommended Parrish for promotion and tenure, even though Parrish had no articles.  In those comparative contexts, I find Scoufos's evaluation of Tudor puzzling.

McMillan's evaluation of Tudor stands out as even more puzzling. McMillan signed the transmittal form for Tudor's 2009 portfolio on February 10, 2010. The next day, February 11, an email from Scoufos indicates that McMillan approved the decision to add to Tudor's portfolio the new information that she had a second accepted article. Indeed, McMillan's April 30, 2010 letter purporting to explain the reasons for the decision to deny Tudor's application for promotion and tenure acknowledges that Tudor has "two publications" that "do appear to be examples of work which meet[s] the excellent and noteworthy standard" required for promotion and tenure. As noted above, McMillan's worksheet, which is undated, assigns Tudor's scholarship the same possibly fatal rating assigned by Scoufos. Either McMillan completed the worksheet before learning of Tudor's additional publication, in which case the comparatively low rating on the worksheet should not have been relevant to McMillan's decision reached after learning the new information, or he completed the worksheet later and yet gave Tudor's scholarship the same rating that Scoufos gave it even though by that point Tudor had doubled her production of accepted, peer-reviewed articles.  Either way, the rating and the decision are strikingly inconsistent with the decisions reached about the other candidates.

I have also seen one worksheet for Barker (undated and unsigned, so that I cannot tell whose ratings it records). Barker published less than Tudor, but this worksheet gives Barker an "outstanding" for scholarship (5 on a scale of 1 to 5). I have not seen worksheets for the other candidates, and reasonable people could debate the comparison between Tudor's 2009 and Barker's, and possibly Spencer's, records of published scholarship or scholarship accepted for publication. But even though different evaluators could reasonably rank Barker's, Spencer's, and Tudor's 2009 records of scholarship in different sequences, they could not reasonably put them in entirely different categories. And by no reasonable measure can Tudor's scholarship in 2009 rate lower than Parrish's scholarship, let alone so much lower that it lands in an entirely different category. And all that applies only if we simply *count* the publications.



**Exhibit 1**

If we take the more responsible path of actually reading Tudor's publications, then her scholarship stands out still more for its serious substance. The article about "Historical and Experiential Postmodernism" does not break major new ground, and it was published in a journal published in India that does not appear to be very selective and is not widely distributed in the United States. But it provides a sophisticated and well-informed synthesis, very valuable for teachers, and a more convincing sign of Tudor's own preparation for teaching than the usual pattern of articles that say something more original but not very meaningful. I appreciate the way that this article provides a genuinely critical yet still sympathetic distance on what other scholars and critics of Native American writing have said before Tudor. It has a substance equaled in these portfolios only in the article by Barker and in Cotter-Lynch's excellent work in progress, which at the time of her portfolio was not yet completed or accepted for publication. It is exactly the kind of scholarship that best serves a faculty member at a teaching-centered university.

While Tudor's 2009 portfolio already places her scholarly record second (roughly tied with Barker) among the 5 candidates' portfolios, her 2010 portfolio shows an even much stronger scholarly profile, stronger than Cotter-Lynch's in terms of actual accomplished publication, and far stronger than Parrish's and Spencer's portfolios, if still not as strong as Cotter-Lynch's, in terms of my own judgment of the actual written work. In addition to the 2 articles mentioned above, the 2010 portfolio includes another 6 articles published or accepted for publication, making a total of 8 articles. (It also includes a ninth article that editors asked her to revise for additional consideration, a standard practice that most accepted article manuscripts go through before they are accepted for publication.) Nothing in the pool of portfolios compares to this burst of publication from Tudor. The articles are relatively rather than completely up-to-date with current scholarship. Nevertheless, she did the work and had the skill and talent to do it well, both according to my own judgment and according to the judgment of objective peer reviewers. The journals (and in one case, edited book of essays) where these articles were slated to appear vary, and none of them is a top-flight journal. It is difficult for a scholar with the limited scholarly resources of a teaching-centered university like Southeastern to publish with a top-flight publisher or journal. The only publisher or journal in the entire set of portfolios that is even in the realm of a distinguished place to publish would be Palgrave-Macmillan, where Cotter-Lynch has a contract for her not yet peer-reviewed co-edited book manuscript. At the same time, 7 of the 8 places where Tudor has published articles or had articles accepted for publication rely on peer review (*ASEBL Journal, The Atrium, Diesis, Journal of Contemporary Thought, Research and Criticism, Teaching American Literature,* and *The Texas Review*). The remaining article was published in a book called *Diasporic Consciousness,* published by a German publisher, VDM Verlag, which does not use peer review, though the editor of the book would still have done her own review before deciding whether to accept the article. The peer review that Tudor's publications went through provides an objective standard of outside judgment unparalleled across the pool of portfolios under consideration. And it provides that objective standard of outside judgment for a total of 7 different publications. Perhaps someone could get lucky once or maybe even twice and slip an unworthy manuscript through the process of peer review. But that could not happen repeatedly. It could not happen 7 times.

I am extremely familiar with the process of peer review. I regularly peer review scholarly manuscripts for distinguished academic journals and book publishers. My own scholarly writing has gone through peer review numerous times, and I have coached and advised numerous less



**Exhibit 1**

Report of Dr. Robert Dale Parker  20

experienced colleagues and former graduate students through the process. But I do not ask you merely to rely on my professional judgment. Instead, to illustrate the process of peer review in objective terms that do not rely on my own professional judgment, I have consulted the Modern Language Association Directory of Periodicals, the largest and most authoritative database of information about scholarly journals of literature and language. The Modern Language Association is the premier professional organization for the study of languages and literatures, and I have access to their database through EBSCO (a collection of electronic databases) at our library at the University of Illinois. EBSCO is also available at Southeastern, as I know because Tudor's syllabi indicate that she requires her students to use it through the Southeastern Library. Of Tudor's 8 articles, one appears in a book collection, which would not be listed in a directory of periodicals. The other 7 articles were published or accepted for publication in journals. Five of those journals appear in the directory. Of the remaining 2 articles, one appears in *Research and Criticism,* which is not listed in the directory, but which says on its website (http://www.pencraftinternational.com/bookclub.htm) that it conducts blind peer review (meaning that the reviewers do not see the names of the scholars whose work they review, the most objective form of peer review).  The other appears in *Diesis,* which says on its website that it conducts blind peer review (http://www.diesisjournal.org/submissions). The Modern Language Association Directory of Periodicals also includes the 3 journals where Spencer had work accepted for publication and the one journal where Barker published.

The charts below show the directory's information about peer review for the 5 listed journals where Tudor has published, followed by the journals where Spencer and Barker have published. As neither Cotter-Lynch nor Parrish published in any journals between the time they arrived at Southeastern and the time they submitted their applications for promotion and tenure, the charts below are complete. I have calculated the acceptance rate based on the number of articles published per year divided by the number of article manuscripts submitted per year. Attached to this report, you will find copies of the printouts from the directory, the source of the information in the charts below, as well as copies of the websites listed above for *Research and Criticism* and *Diesis.*



| Journals for Tudor's published articles | Article manuscripts submitted per year | Articles published per year | Acceptance rate | Number of peer readers |
|---|---|---|---|---|
| ASEBL Journal | 13 | 3 | 23% | 2 |
| The Atrium | 100 | 24 | 24% | 4 |
| Journal of Contemporary Thought | 30-40 | 25 | 63-83% | 2 |
| Teaching American Literature | 100 | 20-25 | 20-25% | 2 |
| The Texas Review | 250 | 6 | 2% | 5 |

| Journals for Spencer's published articles | Article manuscripts submitted per year | Articles published per year | Acceptance rate | Number of peer readers |
|---|---|---|---|---|
| Eureka Studies in Teaching Short Fiction | 50 | 30 | 60% | 3 minimum |
| Explicator | 300 | 100 | 33% | 2-3 |
| Lamar Journal of the Humanities* | 50 | 10 | 20% | 4 |

*As described earlier, Spencer had an article accepted in *Lamar Journal of the Humanities* late in the process of his consideration for promotion and tenure, and he does not remember whether he notified administrators of the acceptance. Therefore, it is not clear whether this journal is relevant for the chart above, but it is included, nevertheless, in the interest of considering the full range of possibly relevant data.



Exhibit 1

Report of Dr. Robert Dale Parker  22

| Journal for Barker's published article | Article manuscripts submitted per year | Articles published per year | Acceptance rate | Number of peer readers |
|---|---|---|---|---|
| Children's Literature in Education | "Varies" | 20 | Not calculable without information about the number of manuscripts submitted per year. | 2 |

The information in these charts is far more reliable as an objective measure of Tudor's scholarship than the hunch of an administrator at Southeastern, who may not know the field and who may bring non-objective considerations into the decision-making process.

As an experienced scholar in the field, I will also provide brief evaluations of the 5 additional publications included in Tudor's 2010 portfolio and not in her 2009 portfolio, as well as brief evaluations of her other 2 new articles listed in the 2010 portfolio but not provided in that portfolio.)

- "Latin American Magical Realism and the Native American Novel." This article is knowledgeable, intelligent, and wise. It has a narrow focus, zeroing in on a critique of one particular scholarly book that may not need such a careful consideration, but the consideration is very well done.

- "*Pearl:* A Study in Memoir and First Person Narrative Poetry." This is an intelligent and proficient article, well researched through 2000. Some individual comments in the article could use revision to point them better at a scholarly audience, but the work overall shows genuine promise for a young scholar.

- "Romantic Voyeurism and the Modern Idea of the Savage." This article is intelligent, knowledgeable, and wide-ranging, more useful for teachers than we might find in the tight focus of a typical scholarly article. A few individual points could use revision, but again, the wisdom and ability stand out.

- In "The Ethics and Ethos of Eighteenth-Century British Literature" Tudor compares two eighteenth-century novels, *Pamela* and *Evelina,* to a postcolonial twentieth-century novel, *Wide Sargasso Sea,* which itself revises the nineteenth-century novel *Jane Eyre.* Tudor discusses how differences in social power shape these novels, focusing on gender, class, and race, a fairly predictable approach in contemporary criticism. The distinctiveness of the article comes in the comparison across centuries, including the argument that ideas made explicit in the later novel also play a large role in the earlier novels, even though the earlier novels show less awareness of those ideas.


**Exhibit 1**

Report of Dr. Robert Dale Parker  23

- "A Reading of Jonathan Swift's 'A Modest Proposal' Using Roman Jakobson's Poetic Function" offers a skillful, intelligent, and sophisticated reading of Swift's rhetoric and style. The grafting of Jakobson's famous essay with Swift's most famous essay comes across like a teaching exercise by a smart and ambitious beginner, though in that sense it helpfully addresses strategies for teaching Swift to undergraduates. I would like to see the impressively detailed reading of Swift's language complemented by more dialogue with what other critics have said about it, but this is smart and imaginative work.

- "The Memoir as Quest: Sara Suleri's *Meatless Days*." A very solid article that can prove useful to people who teach or write about Suleri's popular memoir. While this article is published in a South Asian journal that few readers in the United States will find, it makes sense to publish there about Suleri's memoir of growing up in South Asia.

- "*The Ancient Child* and *House Made of Dawn:* A New Interpretation." This article about N. Scott Momaday, a Pulitzer-Prize-winning, widely taught Native American novelist, is Tudor's best work. It provides a strong interpretation deeply engaged with other critical responses. With updating, a more specific title, and perhaps an occasional cut of more personal reflections, this article definitely has the potential to appear in a distinguished journal of literary criticism.

Overall, Tudor's articles move across a wide range of materials, with a focus on Native American studies and fiction. They also address related topics such as colonial and postcolonial writers, including Suleri and the Irish writer Jonathan Swift, in line with the common tendency of scholars to interpret Native American writing together with other postcolonial writing.

The charts below illustrate the number of accepted articles and the number of accepted, peer-reviewed articles for each candidate. (These charts include Spencer's third article even though the administrators at Southeastern may not have known of its acceptance when they decided to recommend him for promotion and tenure.)



**Exhibit 1**

Report of Dr. Robert Dale Parker  24





**Service**

Based on the portfolios available for consideration, it is difficult to draw meaningful distinctions among the service records of the 5 different candidates for promotion. The only meaningful differences I can readily identify come from Cotter-Lynch's nomination for an award for excellent service, and her service beyond Southeastern in organizing conference panels and leading a seminar of other scholars. I do not know how difficult it is to receive a nomination for excellent service, but the other candidates have not listed such a nomination or provided leadership in national settings beyond campus. Much of Barker's service seems to follow from



her classroom role as a teacher of future teachers of English, but I do not have enough information to judge how much such work goes routinely with the courses she taught or indicates an extra contribution on her own initiative, except to say that she also volunteered at the community elementary schools. Apart from those considerations, all the candidates seem to have similar records of service. Except for Barker, they all played roles on their department's Assessment, Planning, and Development Committee, which both Spencer and Tudor have chaired. Barker and Tudor also served on the Five-Year program Review committee, while Spencer and Tudor played key roles in organizing Southeastern's biannual Native American Symposium. Tudor's 2010 portfolio also indicates that she began working to organize a Gay Straight Alliance on campus and to provide other support and resources for LGBT students at Southeastern. Tudor and Cotter-Lynch both served on committees that hire new faculty, a crucial and extremely time-consuming task. All the candidates pitched in to help with the Honors program or other more or less routine tasks here and there. Spencer served as faculty advisor for the local chapter of Sigma Tau Delta, the international English Honor Society. Parrish and Tudor each served on the Faculty Senate, elected by their colleagues from across the University.

Given the difficulty of making meaningful distinctions among the service records of the various candidates, it seems perplexing that all the candidates except Tudor were considered by the administrators beyond their department to have served the University with distinction. Probably no one was better qualified to judge Tudor's service than those colleagues who worked with her most closely. Here is what they say.

- Professor Paula Smith Allen's 2010 letter says that "As a colleague, Dr. Tudor endeavors to carry (at least) her share of the workload within the department. I recall that, while still a relative newcomer . . . , Dr. Tudor led an assessment effort by the department with alacrity and foresight over a several-year period. She participates on committees and participates actively in planning and assessment. She works effectively with both faculty and staff members, and her demeanor is always professional regardless of the circumstances."

- Professor Lisa L. Coleman's 2010 letter praises Tudor's contribution to designing new courses, working on the Native American Symposium, serving the community, serving as a Faculty Senator, and working on department committees.

- Parrish's 2010 letter says that "Dr. Tudor has been instrumental in the preparation of assessment documents," praises her work on department committees, and says that "She is a vital member of the department through her service, astute thinking, contributions, and collegiality." She also praises Tudor for service "beyond the department as she currently serves on the Faculty Senate, has served and participated in the Oklahoma Scholar Leadership Enrichment Program . . . , and has been a tireless supporter, worker, and committee member for the Native American Symposium."

- Spencer's letter joins the chorus of praise for Tudor's service. "She is in her second year," he writes, "as a member of the Southeastern Faculty Senate, and before that she served for three years as chair of our Assessment, Planning, and



**Exhibit 1**

Development Committee, compiling and writing the annual assessment report. This is by far the most important departmental committee, as it oversees all aspects of curriculum development and assessment, potentially charting the course for years to come." Spencer calls Tudor "one of the key members of the Native American Symposium Committee," which he chairs. He praises her for "helping to plan and stage the event every other year. For the 2005 and 2007 symposia," he adds, Tudor "served as co-editor with me of the published proceedings, reading and commenting on all the papers submitted, and joining in the selection of those to include."

Surely it means a great deal that these colleagues who have worked so closely with Tudor think so highly of her contributions to service. The evidence in the portfolios indicates that Tudor and her colleagues work together to distribute the service more or less equally among themselves. Indeed, the similarity among the different candidates' service records throws into doubt the very possibility of seeing Tudor's service as less than the service of her colleagues. To judge her service as deficient would require a similar conclusion for at least 3 of the 4 other candidates who were deemed qualified for promotion and tenure. Therefore, I see no reasonable grounds for ranking Tudor's service in such a way that it would contribute to denying her the promotion and tenure that her colleagues were granted for the same level of work for the University that they all served.

Once we put all this information and all these comparisons together across the 5 candidates' records of teaching, scholarship, and service, the facts speak for themselves. The facts show no reasonable, objective, or fair grounds for denying Professor Tudor the same promotion that was granted to her colleagues.

Robert Dale Parker
Professor of English
University of Illinois

June 6, 2016

**Exhibit 1**

**List of Documents Considered for This Report**

This report was based on the following documents.

- Article by R. J. Tudor, "Historical and Experiential Postmodernism: Native American and Euro-American."  OAG/DLC/USA v. SOSU – CIV-15-324/004931-50.

- Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet, evaluating Rachael J. Tudor, submitted by Lucretia C. Scoufos,1/14/10.  OAG/DLC/USA v. SOSU – CIV-15-324/001137-38.

- Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet, evaluating Rachel J. Tudor, submitted by John Brett Mischo, 11/29/09.  OAG/DLC/USA v. SOSU – CIV-15-324/001133-34.

- Memorandum on the subject of promotion and tenure recommendation (regarding Virginia A. Parrish), submitted by Lucretia C. Scoufos, 2/12/09.  OAG/DLC/USA v. SOSU – CIV-15-324/007384.

- Memorandum of notification of promotion and tenure status (regarding Virginia A. Parrish), submitted by Larry Minks, 2/16/09.  OAG/DLC/USA v. SOSU – CIV-15-324/007383.

- Letter approving promotion of Virginia Parrish, from Michael D. Turner, 4/20/09.  OAG/DLC/USA v. SOSU – CIV-15-324/007381.

- Letter recommending Margaret W. Cotter-Lynch for promotion and tenure, from Lucretia C. Scoufos, 1/14/10.  PI001960.

- Memorandum of notification of promotion status (regarding Margaret Cotter-Lynch), submitted by Douglas N. McMillan, 2/15/10.  OAG/DLC/USA v. SOSU – CIV-15-324/007437.

- Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet, evaluating Virginia Parrish, submitted by John Brett Mischo, 11/30/08.  OAG/DLC/USA v. SOSU – CIV-15-324/007389-90.

- Letter recommending tenure and promotion for Virginia Parrish, from John Brett Mischo, 11/26/08.  OAG/DLC/USA v. SOSU – CIV-15-324/007386-87.

- Letter recommending tenure and not promotion for Mark Spencer, from John Brett Mischo, 12/1/06.  OAG/DLC/USA v. SOSU – CIV-15-324/007506-07.

- Letter recommending tenure and promotion for Mark Spencer, from C. W. Mangrum, 1/11/07.  OAG/DLC/USA v. SOSU – CIV-15-324/007505.



Report of Dr. Robert Dale Parker  28

- Letter recommending tenure and not promotion for Mark Spencer, from Douglas McMillan, 2/12/07.  OAG/DLC/USA v. SOSU – CIV-15-324/007504.

- Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet, evaluating Rachel J. Tudor, submitted by Douglas N. McMillan, not dated. OAG/DLC/USA v. SOSU – CIV-15-324/007703-04.

- Letter not recommending tenure and promotion for Rachel J. Tudor, from Lucretia C. Scoufos, 1/12/10.  EEOC000855.

- Faculty Promotion and Tenure Evaluation Summary Confidential Analysis Worksheet, evaluating Janet Barker, not attributed or dated.  OAG/DLC/USA v. SOSU – CIV-15-324/007470-71.

- Letter notifying Janet Barker of the decision to approve her promotion to associate professor with tenure, from  Larry Minks, May 1, 2011.  DOJ000156-57.

- Excerpt from Southeastern Academic Policies and Procedures Manual regarding the "Role of the Faculty" and "Faculty Participation."  EEOC000300-01.

- Letter recommending tenure and not promotion for Mark Spencer, from Douglas McMillan, 2/12/07. A different version of the other letter on the same topic from the same day.  OAG/DLC/USA v. SOSU – CIV-15-324/012992.

- Excerpt from Southeastern Academic Policies and Procedures Manual regarding "Rank and Promotion" and "Tenure."  EEOC000327-35.

- Memorandum to Rachel Tudor from Douglas N. McMillan regarding denial of application for tenure and promotion, 4/30/10.  EEOC000892-93.

- Promotion and Tenure Portfolio of Virginia A. Parrish.  EEOC001676-2238.

- Promotion and Tenure Portfolio of Margaret Cotter-Lynch.  EEOC002239-2474.

- Promotion and Tenure Portfolio of Rachel Tudor, 2010.  EEOC003086-3271.

- Promotion and Tenure Portfolio of Mark Spencer.  EEOC003521-3576.

- Portions of Promotion and Tenure Portfolio of Rachel Tudor, 2009.  PI001308-35.

- Promotion and Tenure Portfolio of Janet L. Barker, 2010.  DOJ000158-330.

- Letter recommending tenure and promotion for Margaret Cotter-Lynch, from John Brett Mischo, 11/29/09.  PI001959.



Report of Dr. Robert Dale Parker  29

- Letter recommending tenure and promotion for Margaret Cotter-Lynch, from Douglas McMillan, 1/14/10.  OAG/DLC/USA v. SOSU – CIV-15-324/007437.

- Excerpt from Southeastern Academic Policy and Procedures Manual regarding "Faculty Development and Evaluation Policies."  EEOC000317-21.

- Letter approving tenure and promotion of Mark Spencer, from Jesse O. Snowden, 4/18/07.  OAG/DLC/USA v. SOSU – CIV-15-324/007503.

- Letter to Robert Dale Parker from the Department of Justice, 5/18/16.

- Copies of emails from Prafulla Kar, Rachel Tudor, John Mischo, and Lucretia Scoufos documenting  a new publication by Tudor, February 4 and February 11, 2010, and November 30, 2010.  EEOC000063-64.

- Letter to Robert Dale Parker from the Department of Justice, 6/2/16.

- Southeastern's "Faculty Senate Awards Policy," Southeastern PDF provided by the Department of Justice.

- Article by Mark B. Spencer, "Dickinson's Because I Could Not Stop for Death."

- Article by Mark B. Spencer, "William Faulkner's 'A Rose for Emily' and *Psycho*."

- Article by Mark B. Spencer, "Recreating the Early Modern in the Postmodern: George Garrett's *Death of the Fox.*"

- Article by Rachel Tudor, "A Reading of Jonathan Swift's 'A Modest Proposal' Using Roman Jakobson's Poetic Function."

- *The Atrium* (journal) Fall 2010.

- Article by Rachel Tudor, "The Ethics and Ethos of Eighteenth-Century British Literature."

- Article by Margaret Cotter-Lynch, "Teaching Ancient Biography."

- Article by Jani L. Barker, "Racial Identification and Audience in *Roll of Thunder, Here My Cry* and *The Watsons Go to Birmingham—1963*."

- Entries from the *Modern Language Association Directory of Periodicals* for the following journals: *ASEBL Journal, The Atrium, Journal of Contemporary Thought, Teaching American Literature, The Texas Review, Explicator,* and *Eureka Studies in Teaching Short Fiction,* accessed March 2, 2016



**Exhibit 1**

Report of Dr. Robert Dale Parker  30

- Entry from the *Modern Language Association Directory of Periodicals* for *Children's Literature in Education,* May 4, 2016

- Entry from the *Modern Language Association Directory of Periodicals* for *Lamar Journal of the Humanities,* accessed May 18, 2016

- Website of journal *Research and Criticism,* http://www.pencraftinternational.com/bookclub.htm, accessed May 10, 2016

- Website of journal *Diesis,* http://www.diesisjournal.org/submissions, accessed May 10, 2016

- *The Atrium* (journal) website from 2013, accessed June 4, 2016.

- *Diesis* (journal) website from 2010, accessed June 4, 2016.

- *Teaching American Literature* website (journal) from fall 2009, accessed June 4, 2016.

# Exhibit 1