## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| RACHEL TUDOR, | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | |
| v. | ) | CASE NO. 5:15-cv-00324-C |
| | ) | |
| SOUTHEASTERN OKLAHOMA | ) | |
| STATE UNIVERSITY, and | ) | |
| | ) | |
| THE REGIONAL UNIVERSITY | ) | |
| SYSTEM OF OKLAHOMA | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE
## <u>THE TESTIMONY OF DR. ROBERT PARKER</u>

# TABLE OF CONTENTS

I.   Background ............................................................................................................. 3

II.  Argument ................................................................................................................ 6

  A.   Legal standard ..................................................................................................... 6

  B.   Tenure decisions are neither exempt from Title VII, nor insulated from expert
  scrutiny. ...................................................................................................................... 6

  C.   Dr. Parker is qualified under FRE 702 because of his extensive experience with
  tenure review of English faculty. ................................................................................ 10

  D.   Dr. Parker's methodology is sound and reliable. ................................................. 12

    1.   Dr. Parker's testimony regarding a partially subjective decision is nevertheless
    sufficiently objective and reliable. ........................................................................... 14

    2.   Dr. Parker considered all relevant information and analogous comparators. .. 15

  E.   Dr. Parker's contemplated testimony is relevant. ............................................... 16

    1.   The anticipated testimony bears directly on the prima facie case. ................... 16

    2.   Dr. Parker's testimony will unquestionably assist the jury. ............................ 19

III.  Conclusion ............................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Babbar v. Ebadi*, 36 F. Supp. 2d 1269 (D. Kan. 1998) .......................................................9

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 (10th Cir. 2005) .................................. 12, 16

*Blasdel v. Northwestern University*, 687 F.3d 813 (7th Cir. 2012)................................. 18

*Carlile v. S. Routt Sch. Dist. RE-3J*, 739 F.2d 1496 (10th Cir. 1984).................................7

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006) ............................ 11

*Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) ..................................... 6, 12

*El-Ghori v. Grimes*, 23 F. Supp. 2d 1259 (D. Kan. 1998) ...............................................9

*Goodship v. Univ. of Richmond*, 860 F. Supp. 1110 (E.D. Va. 1994) .............................9

*Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1019 (N.D. Ill. 2014)............................. 8, 9, 18

*Graham by Graham v. Wyeth Labs., Div. of Am. Home Prod. Corp.*, 906 F.2d 1399 (10th
    Cir. 1990) ................................................................................................................. 19

*Gupta v. Bd. of Regents of Univ. of Wisc. Sys.*, 63 F. App'x 925 (7th Cir. 2003) ............. 8

*Hollander v. Sandoz Pharma. Corp.*, 289 F.3d 1193 (10th Cir. 2002)............................ 12

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ....................................... 6, 12

*Namenwirth v. Bd. of Regents of Univ. of Wis. Sys.*, 769 F.2d 1235 (7th Cir. 1985)........ 17

*Siring v. Oregon State Bd. of Higher Educ. ex rel. Eastern Oregon Univ.*, 927 F. Supp. 2d
    1069 (D. Or. 2013)................................................................................................. 9, 21

*United States v. Baines*, 573 F.3d 979 (10th Cir. 2009)................................................. 14

*United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009) ...............................................6

*Wells v. Allergan, Inc.*, No. 12-cv-973, 2013 WL 7208330, at *1 (W.D. Okla. Feb. 7,
    2013) ..........................................................................................................................6

**Rules**

Fed. R. Evid. 702 (emphasis added)........................................................................ 9, 10, 11

Plaintiff United States of America ("Plaintiff" or "United States") hereby opposes Defendant Southeastern Oklahoma State University's ("SEOSU") and Defendant Regional University System of Oklahoma's ("RUSO") (collectively, "Defendants") Motion to exclude the testimony of Dr. Robert Dale Parker ("Motion").[1]  Defendants would have the Court believe that the tenure process is immune to scrutiny from those outside of it, and that the reasons decisionmakers give for their tenure decisions must never be questioned.  But Dr. Parker's report and anticipated testimony fully satisfy the standards set forth by Federal Rule of Evidence 702 and cases interpreting that Rule, including those in this Circuit, and his testimony will greatly assist the jury in understanding the complex, highly specialized process involved in assessing an English professor's tenure and promotion application.

Indeed, the Defendants' own Affirmative Action Officer, Dr. Claire Stubblefield, has testified that it would be a "textbook perfect" approach to have a "qualified, objective, third party," with experience "reviewing portfolios" of tenure candidates, compare Dr. Tudor's portfolio to relevant comparators' portfolios to assist in determining whether Dr. Tudor was discriminated against.  (Ex. 1 [Stubblefield Dep.] 178:11-82:3 and Ex. 2 [Dep. Ex. 111].)  Dr. Stubblefield did not follow this "textbook perfect" approach when she investigated Dr. Tudor's internal complaint (Ex. 1 [Stubblefield Dep.]

---

[1]  The scheduling order in this case, ECF No. 57, dictates that *Daubert* motions were due September 1, 2016.  Defendants filed their motion to exclude Dr. Parker's testimony on August 11, 2016, and titled it a "Motion in Limine."  Because it is actually a *Daubert* motion, the United States accordingly is responding within the time set under Local Rule 7.1(g), rather than the time set for responses to motions in limine in ECF No. 57, as suspended by the intervening stay in this case.  *See* ECF No. 123; ECF No. 142.

180:8-182:8; Ex. C [Dep. Ex. 17]; Ex. 2 [Dep. Ex. 111]) but, by obtaining the expert

opinion of Dr. Parker, the United States has.  *See also* Ex. 4 [Snowden Dep.] 41:5-42:8

(explaining that submitting portfolios for external peer review is "really the proper way to

do it.").  For the reasons discussed below, the Court should deny Defendants' Motion.

## I.    <u>Background</u>

The process governing applications for promotion and tenure is set forth in

Southeastern's "Procedure for Granting Promotion and Tenure."  (Compl. (ECF No. 1) ¶

19; Answer (ECF No. 21) ¶ 19; Ex. 3 [Dep. Ex. 7] at EEOC000332-333.)  That process

starts with the applicant submitting a written application to her Department Chair, along

with a portfolio that contains documentation pertinent to an assessment of her

qualifications.  *Id.*  Second, the applicant is reviewed by a Promotion and Tenure Review

Committee ("P&T Review Committee") made up of tenured faculty in the applicant's

Department.  *Id.*  Next, the application is reviewed sequentially by the Department Chair

(in this case, Dr. John Mischo), the Dean of the applicant's school (here, Dr. Lucretia

Scoufos), and the Vice President for Academic Affairs (here, Dr. Douglas McMillan),

each of whom must consider whether to recommend the applicant to receive promotion

and tenure and then forward his or her recommendation to the next reviewing official.  *Id.*

Following the Vice President for Academic Affairs' review, Southeastern's President

decides whether to approve or deny the application for promotion and tenure and, if the

President approves the application, he submits his recommendation to the RUSO Board

of Regents for their approval.  *Id.*

According to Southeastern's Academic Policies and Procedures, to attain

3

tenure a professor must have: (1) five years of service at Southeastern in a tenure-track appointment as an Assistant Professor, Associate Professor, or Professor; (2) demonstrated effective classroom teaching, research/scholarship, service, and, in appropriate instances, successful performance of non-teaching or administrative duties; (3) demonstrated ability to work cooperatively to strengthen the academic quality of the institution; and (4) noteworthy achievement in classroom teaching and on at least one other criterion: research/scholarship, service, or, in appropriate instances, performance of non-teaching or administrative duties.  (Compl. ¶ 21; Answer ¶ 21; Ex. 3 [Dep. Ex. 7] at EEOC000332-333.)

In October 2009, Dr. Tudor submitted her application for tenure and promotion to the position of Associate Professor to the Chair of the English Department, Dr. John Mischo.  (Compl. ¶ 28; Answer ¶ 28.)  Both the P&T Review Committee assigned to review Dr. Tudor's application and portfolio as well as Dr. Mischo recommended that she receive promotion and tenure.  (Compl. ¶ 29; Answer ¶ 29.)  On or about November 29, 2009, Dr. Mischo notified Dean Scoufos that he and the P&T Review Committee recommended that Dr. Tudor receive a promotion to the tenured position of Associate Professor.  (Compl. ¶ 30; Answer ¶ 30.)  Dean Scoufos recommended that Dr. Tudor be denied promotion and tenure.  (Compl. ¶¶ 31 & 32; Answer ¶¶ 31 & 32.)  Dr. Mischo has testified that this was the only instance he was aware of in which a professor in the EHL Department was recommended for tenure by the department chair and then the dean disagreed with that recommendation.  (Ex. 6 [Mischo Dep.] 110:25-111:12.)

4

When Dr. Tudor attempted to re-apply for tenure and promotion during the 2010-2011 School Year, Vice President of Academic Affairs Doug McMillan denied her that opportunity, explaining that deficiencies in Dr. Tudor's application from the prior academic year could not be corrected that quickly.  (Compl. ¶ 52; Ex. 7 [Dep. Ex. 129].)

The United States has timely designated an expert on tenure and promotion in the field of English to testify in this case.  Dr. Robert Dale Parker, who is a professor of English at the University of Illinois at Urbana-Champaign, has prepared a report on his opinion and will testify at trial.  In requesting Dr. Parker's opinion, the United States identified the faculty members who applied for promotion and tenure from the English, Humanities and Languages Department at Southeastern in the years leading up to (and one year following) Dr. Tudor's 2009-2010 application.  The United States then provided Dr. Parker with the comparator portfolios that Defendants submitted to the EEOC during its investigation, and Dr. Tudor's reconstructed portfolio for 2009-2010 for 2010-2011, as well as an additional comparator's portfolio that had not been a part of the EEOC investigation.

Dr. Parker was asked to examine the portfolios and Southeastern policies and, using those materials as a basis to determine the qualifications necessary for promotion and tenure at Southeastern, to provide an opinion about where Dr. Tudor stood among her colleagues who had been granted tenure and promotion.  Dr. Parker reviewed the materials he was provided, and he used them to prepare a detailed analysis of each candidate's scholarship, service and teaching based on the materials he had, his experience in reviewing tenure and promotion portfolios in the field of English, and his

knowledge of the criteria used to evaluate scholarship, service and teaching among English faculty nationwide.

## II.     Argument

### A.     Legal standard

As the proponent of expert testimony, the United States bears the burden of demonstrating that Dr. Parker's proposed testimony is admissible under Federal Rule of Evidence 702.  *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).  As this Court has explained, "[t]o be admissible under Rule 702, the witness must be qualified as an expert and the testimony must be both relevant and reliable."  *Wells v. Allergan, Inc.*, No. 12-cv-973, 2013 WL 7208330, at *1 (W.D. Okla. Feb. 7, 2013); *see generally Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993).  Dr. Parker's proposed testimony meets all of these criteria.  It is also important to note that at this stage, it is not the United States' burden to show that Dr. Parker's proposed testimony is not subject to criticism, as Defendants imply in their brief.  Thus, while many of the concerns raised by Defendants are proper subjects for cross-examination, they do not provide bases for excluding Dr. Parker's testimony altogether.

### B.     Tenure decisions are neither exempt from Title VII, nor insulated from expert scrutiny.

The suggestion that tenure decisions are effectively unreviewable under Title VII permeates Defendants' motion.  This suggestion is contrary to law, rests on a misconstruction of the purpose of Dr. Parker's testimony, relies primarily on case law

that does not involve evaluation of expert testimony under Rule 702, and misconstrues both the standard applicable to evaluation of an expert's qualifications and the factual record in this case.  As one judge put it, "[t]he notion that tenure decisions must be accorded special deference was put to rest in 1972, when Congress, expressing concern about widespread discrimination against women in academia, removed academia's exemption from Title VII scrutiny." *Namenwirth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 769 F.2d 1235, 1244 (7th Cir. 1985) (Swygert, J., dissenting) (citing Pub.L. No. 92-261 § 3 (codified at 42 U.S.C. § 2000e-1 (1982)); H.Rep. No. 238, 92d Cong., 2d Sess.).

The Tenth Circuit -- in an opinion relied on by Defendants in their brief -- has made clear that tenure decisions in an academic setting "are not exempt under Title VII." *Carlile v. S. Routt Sch. Dist. RE-3J*, 739 F.2d 1496, 1500 (10th Cir. 1984).  While the Tenth Circuit has noted that "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions in general[,]" it clearly explained that "[p]laintiffs seeking to show discriminatory purposes in tenure or reappointment decisions ought to have available the means of challenging such decisions." *Id.*

Defendants make a cursory argument about Dr. Parker's qualifications but primarily rest their Motion on an oversimplification or misunderstanding of his proposed testimony.  Specifically, Defendants argue that Dr. Parker seeks to testify that Dr. Tudor "merited," "deserved" or "should have been granted" tenure.  Defs.' Br. (ECF No. 98) at 1-2.  Defendants are wrong.  Dr. Parker's proposed testimony cannot be reduced to professing a subjective belief that Dr. Tudor should have been granted tenure.  Rather,

7

Dr. Parker's charge was "to address whether, in [his] carefully considered professional judgment, Dr. Tudor met Southeastern's standards for promotion and tenure, based on a comparison between her qualifications and the qualifications of her colleagues."  Parker Report, Defs.' Br. Ex. 1 (ECF No. 98-1) at 1 (emphasis added).  Dr. Parker's proposed testimony about these comparisons will assist the trier of fact in evaluating:  (1) whether Dr. Tudor was qualified for tenure; (2) the veracity of Defendants' reasons for rejecting her application; and (3) the veracity of Defendants' reasons for refusing to permit Dr. Tudor to reapply for tenure.  Therefore, Dr. Parker's testimony is not subject to the same criticisms as would be an expert who is testifying about the ultimate question in the case, which is whether Defendants discriminated and retaliated against Dr. Tudor, or one who is substituting his subjective judgment for the actual tenure and promotion committee who reviewed the decision about Dr. Tudor's application.  As discussed further below, Dr. Parker's expert opinion regarding Dr. Tudor's comparative qualification for promotion and tenure is relevant, reliable evidence here.

Without direct citations, Defendants argue that courts have consistently rejected similar "tenure experts."  (ECF No. 98 at 6; *see also id.* at 7, 11, 16).  In fact, only one case cited by Defendants in the entirety of their brief directly confronted, analyzed and excluded expert testimony regarding a tenure candidate's qualifications.  *See Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1019 (N.D. Ill. 2014).[2]  And the holding in *Goswami* is far

---

[2] Another case excluded deposition testimony from the plaintiff's former colleague, not an expert, since the testimony did not provide information relating to the motivations of the defendants.  *See Gupta v. Bd. of Regents of Univ. of Wisc. Sys.*, 63 F. App'x 925 (7th Cir. 2003).  Several cases in Defendants' brief actually permitted expert testimony on a

narrower than Defendants' suggest – the court evaluated only Rule 702's relevance criterion in an inapposite factual situation where a professor's department colleagues unanimously deemed her unqualified for tenure. *See id.* and *see* discussion *infra* at Section II.E.

Contrary to Defendants' blanket assertion about the propriety of expert testimony in a tenure denial case, a district court case recently admitted expert testimony regarding the tenure process and aspects of the candidates' qualifications. In *Siring v. Oregon State Bd. of Higher Ed. ex rel. Eastern Oregon Univ.*, the district court admitted expert testimony that "there were significant deficiencies in the tenure review process with respect to [the plaintiff] and that there was 'no scholarly reason for [the plaintiff]'s dismissal' that was apparent from the materials reviewed" by the expert. 927 F. Supp. 2d 1069, 1073 (D. Or. 2013).

Defendants apparently also believe that a tenure decision should be insulated from judicial review under Title VII because there is no professional field that studies tenure practices specifically. This argument is a red herring and has no bearing on Dr. Parker's qualification to serve as an expert in this case. Dr. Parker has years of experience in

---

professor's qualifications for tenure, but deemed the evidence irrelevant or unpersuasive without engaging in any Rule 702 analysis. *See Babbar v. Ebadi*, 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998); *aff'd*, 216 F.3d 1086 (10th Cir. 2000); *El-Ghori v. Grimes*, 23 F. Supp. 2d 1259, 1268-69 (D. Kan. 1998); *Goodship v. Univ. of Richmond*, 860 F. Supp. 1110, 1112 (E.D. Va. 1994). And while the Tenth Circuit did affirm the district court's ruling in *Babbar* on defendant's motion for summary judgment, it did not specifically speak to the district court's decision to exclude expert testimony; in any event, *Babbar* is distinguishable because Babbar's colleagues had not voted in favor of his application, as Dr. Tudor's voted in favor of hers.

evaluating tenure portfolios, and is a highly accomplished English professor at a major research university.  *See* Dr. Parker Report (ECF No. 98-1) at 1-2.  He is routinely called upon to advise on tenure and promotion decisions by many colleges and universities and by his own university, as his report makes clear.  *Id.* at 2.[3]  The fact that his career does not focus on tenure review as a standalone field of study in no way undermines his qualification as an expert witness in this case.  Defendants also, in a highly conclusory manner, claim that Dr. Parker does not use a method "that has been generally accepted by the tenure-review community."  ECF No. 98 at 13.  Actually, Dr. Parker is providing exactly the type of information that Defendants' administrators have testified is the ideal of the academic (and thus, tenure-review) community: peer review by an expert outside the applicant's own institution.  (Ex. 4 [Snowden Dep.] 41:5-42:8; Ex. 1 [Stubblefield Dep.] 178:11-82:3 and Ex. 2 [Dep. Ex. 111].)  Dr. Parker's testimony is fully appropriate in this case.

### C.    Dr. Parker is qualified under FRE 702 because of his extensive experience with tenure review of English faculty.

Dr. Parker is qualified to review the academic qualifications of Dr. Tudor and her comparators based on his extensive experience reviewing tenure portfolios in the field of English.  An expert may be qualified "by knowledge, skill, *experience*, training, or education to render an opinion."  Fed. R. Evid. 702 (emphasis added).  "The Tenth

---

[3]  The United States will cite to the version of Dr. Parker's report filed by Defendants as an exhibit to their Motion, but the United States notes that yellow highlighting in that version did not appear in the original version the United States provided to Defendants.

Circuit and other courts have held that this standard should be construed and applied liberally." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1084 (D. Colo. 2006).

In an attempt to minimize the effect of Dr. Parker's conclusions, Defendants completely dismiss Dr. Parker's extensive experience with academic tenure decisions in the field of English literature. To be clear, Dr. Parker has participated in deliberations for "over a hundred promotions" and has served on multiple appeals committees for promotions at the University of Illinois. Parker Report, Defs.' Br. Ex. 1 (ECF No. 98-1) at 1. In addition, Defendants suggest that Dr. Parker must be a specialist or consultant in the same narrow subfields as Dr. Tudor and her colleagues, e.g., early medieval women's writings, in order to offer a reliable opinion about the quality of their work. Defs.' Br. (ECF No. 98) at 8. They make this argument at the same time they contend that Southeastern administrators, who do not even share the same general discipline of English, are qualified to opine about the quality of work in entirely different fields.[4] But, having reviewed the records of dozens of faculty under consideration for promotion at universities nationwide, Dr. Parker is perfectly suited to review the accomplishments of Dr. Tudor and her colleagues. (*See* ECF No. 98-1 at 1-2; *see also* Ex. 5 [Dr. Parker's CV].)

---

[4] Dr. Scoufos has a bachelor's degree in education, a master's degree in human relations, and a Ph.D. in communications. (Ex. 10 [Scoufos Dep.] 16:2-16:8.) Dr. McMillan has a bachelor's degree in education and master's and doctoral degrees in counseling psychology. (Ex. 8 [McMillan Dep.] 19:20-20:23.) Dr. Minks, the former Southeastern President who held that office when Dr. Tudor applied for promotion and tenure in 2009, holds bachelor's and master's degrees in business administration and a doctorate of education and business teaching (Ex. 11 [Minks Dep.] 13:21-15:2.)

D.    **Dr. Parker's methodology is sound and reliable.**

Under FRE 702, expert testimony must be based on sufficient facts or data, and it must be the product of reliable principles and methods.  Fed. R. Evid. 702.  Further, the expert must have reliably applied the principles and methods to the facts of the case.  *Id.* Dr. Parker's expert opinion has "a reliable basis in the knowledge and experience of his [or her] discipline."  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993); *see also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005). Recognizing that "there are many different kinds of experts, and many different kinds of expertise," the Supreme Court has stressed that the reliability determination is "flexible." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999).  According to the Tenth Circuit, "[r]egardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always the same: '[t]o make certain that an expert whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Hollander v. Sandoz Pharma. Corp.*, 289 F.3d 1193, 1206 (10th Cir. 2002) (second alteration in original) (citation omitted).  Here, Dr. Parker's rigorous, thorough analysis of the information provided to him more than satisfies these criteria.  *See* Section I, *supra*.

An expert's reliability can be rooted in his or her experience.  The Advisory Committee's Notes to Federal Rules of Evidence 702 states that, "[n]othing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training, or education—may not provide a sufficient

foundation for expert testimony." Fed. R. Evid. 702 advisory committee's notes (2000 amendments). Indeed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*

When an expert report is based on experience, the court's reliability inquiry is necessarily different than when an expert report is based on scientific proof or clear professional standards. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 amendments).

Defendants argue that a decision whether to grant tenure is wholly subjective and, therefore, any expert report concerning tenure is also necessarily and impermissibly subjective in nature. Not so. Anticipated trial testimony will establish that there were clear expectations about the number and type of publications a successful tenure candidate needed and what types of service to the University were considered sufficient, among other things. (*See, e.g.*, Ex. 10 [Scoufos Dep.] 72:22-73:3 (there are objective criteria to determine if a Southeastern faculty member's scholarship is excellent, and the objective criteria may vary department to department); Ex. 8 [McMillan Dep.] 80:23-81:17 (in determining whether scholarship was noteworthy, one could look at whether the scholarship was refereed; for grants, whether they were reviewed by a panel or board, and for a presentation or publication, whether it was local, regional, national or international)). Thus, there is no basis to conclude the Defendants' tenure process was entirely subjective.

1. ***Dr. Parker's testimony regarding a partially subjective decision is sufficiently objective and reliable.***

Defendants overstate the impact of subjectivity in an expert's opinion, but it is far from fatal to a finding of reliability. When evaluating an expert in fingerprint analysis, the Tenth Circuit recognized that "[c]ritical steps in the process depend on the subjective judgment of the analyst." *United States v. Baines*, 573 F.3d 979, 991 (10th Cir. 2009). The Tenth Circuit "hasten[ed] to add that subjectivity does not, in itself, preclude a finding of reliability." *Id.* The Tenth Circuit looked instead to the record for "evidence of standards that guide and limit the analyst in exercise of these subjective judgments." *Id.*

While Dr. Parker's expert report necessarily includes subjective elements, his opinion is reliable due to the existence of standards that guide and limit his analysis. Specifically, he reviewed Dr. Tudor and her colleagues within clear categories established by Defendants' own written policies, with specifically enumerated evidence such that he can be cross-examined about his conclusions at trial. In addition, Dr. Parker "review[ed] the standards for judging scholarship before looking at the scholarly records of the individual candidates," and provided "five different markers of scholarly accomplishment." Parker Report, Defs.' Br. Ex. 1 (ECF No. 98-1) at 10. For the criterion of peer-reviewed publications, Dr. Parker presented and evaluated the characteristics of publications by which experts in the field would determine prestige. *Id.*

14

###### 2.    *Dr. Parker considered all relevant information and analogous comparators.*

Defendants also discount Dr. Parker's analysis by criticizing his decision to disregard scholarship that tenure candidates completed before their arrival at Southeastern.  But witnesses, including the Dean and Department Chair that reviewed Dr. Tudor's promotion and tenure portfolio, will testify that at Southeastern, scholarship that preceded a candidate's arrival at Southeastern did not count towards promotion and tenure.  (*See, e.g.*, Ex. 10 [Scoufos Dep.] 109:4-11 and Ex. 6 [Mischo Dep.] 82:10-83:6.)  For that reason, there is no merit to Defendant's criticism.

The sample size Dr. Parker used was also completely appropriate given the facts of this case, contrary to Defendants' assertions.  Dr. Parker examined the qualifications of all of Dr. Tudor's comparators:  all of her fellow tenure and promotion applicants from the EHL Department two years before and one year after her own 2009-2010 application.  (*See* Defs.' Resp. to United States' Interrog. 10.)  Among the evidence amassed in this case are statements that the EHL Department employed department-specific criteria during at least some of the relevant time period here.  (Ex. 9 [Prus Dep.] 57:2-58:21; Ex. 6 [Mischo Dep.] 75:13-76:10.)  Thus, tenured EHL professors are the best sample available.  If the United States had compared Dr. Tudor to, for example, a Chemistry or Theatre professor, surely Defendants would protest that the comparisons were inapt.  Dr. Parker's examination of the EHL faculty members who received promotion and tenure in close temporal proximity to Dr. Tudor is entirely justified.

Defendants' criticism that Dr. Parker did not look at those who were denied tenure also falls flat. As Defendants well know, no other EHL professor, since at least the 2006-2007 school year, was recommended for tenure and promotion by the department and department chair only to be denied at subsequent levels of review. (Defs.' Response to United States' Interrog. 8.) Thus, Dr. Tudor was treated differently than every other comparator in her discipline. Even so, this criticism is something the factfinder may weigh in determining how persuasive they find Dr. Parker's opinion in light of the entire factual context of the case, and it is not a disqualifying fact under *Daubert* review.

### E.    Dr. Parker's contemplated testimony is relevant.

#### 1.    *The anticipated testimony bears directly on the prima facie case.*

Dr. Parker's report reveals that his testimony is demonstrably relevant. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004) (citing FRE 401). When analyzing the "fit" of a proposed expert's testimony, this Circuit has directed district courts to "look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Id.*

As explained above, Dr. Parker's comparative analysis of the qualifications of Dr. Tudor and successful tenure and promotion candidates is a reliable method of demonstrating Dr. Tudor's objective qualifications. This, in turn, is relevant to the *prima facie* case. *See Namenwirth v. Bd. of Regents of Univ. of Wis. Sys.*, 769 F.2d 1235, 1240

16

(7th Cir. 1985).  By the same rationale, Dr. Parker's testimony provides undeniably relevant evidence for Dr. Tudor's *prima facie* case of discrimination.

Beyond the *prima facie* case, Dr. Parker's expert opinion is also directly relevant to determining whether Defendants' stated reasons for denying Dr. Tudor tenure were a pretext for discrimination.  Specifically, Dr. Parker's report provides evidence that the stated reasons for denying Dr. Tudor tenure -- that her research and service were not only deficient, but the "poorest" seen in twenty years (Ex. 7 [Dep. Ex. 129, Memo from VP McMillan]) -- were not true.  Dr. Parker's opinion that Dr. Tudor was as qualified as or more qualified than the candidates who received tenure and promotion is particularly probative of pretext due to Defendants' hyperbolic assertions about Dr. Tudor's alleged lack of qualifications.  Dr. McMillan's statement that Dr. Tudor's portfolio was the "poorest" he had seen in twenty years is exposed as baseless, which in turn casts doubt on the veracity of Dr. McMillan's other statements, his overall rationale for recommending against tenure and promotion, and whether he and other decisionmakers actually believed Dr. Tudor was not qualified.  Indeed, if Dr. McMillan lied about Dr. Tudor's portfolio being the poorest, a jury could reasonably infer that he lied about other things as well.  And that, by Defendants' own admission, is the focus of a pretext inquiry.  Defs.' Br. (ECF No. 98) at 12.

In claiming that Dr. Parker's testimony is not relevant, Defendants rely heavily on one district court case from another circuit that barred expert testimony regarding a candidate's qualifications for promotion and tenure where -- unlike Dr. Tudor -- the candidate had been rejected at every level in the tenure review process.  *See Goswami*, 8

F. Supp. 3d at 1035.  Most notably, the *Goswami* court distinguished its case from situations in which the expert's testimony is directly relevant to pretext, as Dr. Parker's testimony is here.  *Id.* at 1030.  But the *Goswami* court's conclusions are also easily differentiated from the case at bar because the majority of the tenured department faculty voted against Goswami, which would make it far more likely that an expert's testimony about Goswami's qualifications could encourage a factfinder to substitute its judgment for those of the academic professionals who originally reviewed the portfolio.

That sets *Goswami* very much apart from the facts presented here, where the reasoned judgment of the experts in the relevant field (i.e., Dr. Tudor's tenured departmental colleagues and Chair) was that tenure should have been granted.  And the *Goswami* court actually carefully distinguished its holding from circumstances in which "the issue relates to deviations from university procedures," when expert testimony regarding the tenure process may be relevant.  *See id.* at 1035.  This distinction comes into play here, where the Plaintiffs allege that many university procedures were violated during Dr. Tudor's tenure review.   On these facts, Dr. Parker's testimony as an actual independent reviewer is crucial in understanding what the outcome would have been had the proper procedures been followed.

The instant case is also factually different from the types of cases Defendants rely upon in arguing that Dr. Parker should be excluded.  Defendants cite *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815-17 (7th Cir. 2012), at length for the proposition that tenure decisions made by departmental colleagues may be influenced by "friendships and enmities, envy and rivalry," or "disagreements on what are the most promising areas

of research."  Defs.' Br. at 13.  *Blasdel* also lists "hypersensitivity to criticism," "office

politics," and "professional jealousy" as bad, but not illegal, reasons to deny tenure.  *Id.*

(citing *Blasdel* at 815-17).  But this long list of legal reasons to deny tenure only

highlights the fact that none of these factors could have been at play in Dr. Tudor's case:

Dr. Tudor was recommended for tenure and promotion by her own department's tenure

committee as well as her department chair.  It was administrators, distanced from the day-

to-day problems of an academic department, relying (allegedly) only on Dr. Tudor's

qualifications as set forth in her portfolio, who made the decision not to award her tenure

and promotion.  (Compl. (ECF No. 1) at ¶¶ 29, 31, 33 and 43; Answer of Defendant

SEOSU (ECF No. 21) at ¶¶ 29, 31, 33 and 43.)

### 2.     *Dr. Parker's testimony will unquestionably assist the jury.*

In the Tenth Circuit, the subject matter of expert testimony "must be closely

related to a particular profession, business or science and not within the common

knowledge of the average layman . . . . "  *Graham by Graham v. Wyeth Labs., Div. of Am.*

*Home Prod. Corp.*, 906 F.2d 1399, 1408 (10th Cir. 1990) (internal citations and quotation

marks omitted).  In an about-face from their position earlier in their Brief that Dr. Parker

is unqualified to evaluate comparator portfolios because he does not, for example,

specialize in early medieval women's writings, Defendants conclude by arguing that Dr.

Parker's testimony will not assist the jury because a review of tenure portfolios is easily

accomplished by anyone with a grade-school education.  *Cf.* Defs.' Br. (ECF No. 98) at

13 with Defs.' Br. (ECF No. 98) at 14.  Defendants cannot have it both ways.  Nor do

Defendants offer any support for their claim that Dr. Parker's testimony will unduly

prejudice the jury (indeed, Defendants do not even list a single fact to support that assertion).[5]  In reality, testimony from an individual with expertise in both the discipline of English and the tenure process will offer tremendous assistance to the average juror, who will likely be unfamiliar with both the details of academic career paths and academic qualifications in the field.

Defendants themselves acknowledge that the process can involve reviewing "sometimes arcane" scholarship.  Defs.' Br. (ECF No. 98) at 1 (parentheses omitted).  In fact, Dr. Stubblefield, the University's Affirmative Action Officer, herself a tenured professor who is familiar with academic tenure standards and has been trained to investigate discrimination complaints – felt she was not adequately equipped to determine whether Dr. Tudor was treated differently than her peers in the English Department.  (Ex. 1 [Stubblefield Dep. 178:11-82:3] and Ex. 2 [Dep. Ex. 111].)  If Dr. Stubblefield was not up to this task, Defendants cannot reasonably contend that a jury could properly accomplish it on its own.  Further, Defendants cannot credibly argue that expert testimony would not help the factfinder when it is what the University Affirmative Action Officer thought was needed.  Certainly to the extent Defendants might challenge the quality of Dr. Tudor's scholarship, a jury would be assisted by an experienced academic whose credentials lie in the same area as Dr. Tudor and her EHL colleagues.

---

[5]  Further, the fact that an expert's conclusions are helpful to the plaintiff and not to the defendant does not render the expert's testimony unfairly prejudicial.  *See Siring v. Oregon State Bd. of Higher Ed.*, 927 F. Supp. 2d, 1069, 1080 (D. Or. 2013).

When it suits their argument, Defendants take a reductionist approach to Dr. Parker's report: they say he is simply counting publications or awards, and that his work is merely repeating objective facts. Defs.' Br. (ECF No. 98) at 8. But they admit later in their brief that "it is obvious that tenure decisions are not primarily made by stacking up the publications of candidates and seeing which one is taller." *Id.* at 12. Defendants cannot convincingly argue that a layperson can easily understand the types of work a professor must have done to earn tenure. An accomplished English professor who has analyzed dozens of portfolios from universities throughout the nation is well positioned to assist the factfinder by providing the types of analyses in Dr. Parker's report.

Courts have consistently recognized that opinions on qualifications in the unique setting of academia require specialized knowledge beyond lay opinions. In this case, the prestige of relevant journals, the evaluations of course descriptions, and the reception of various articles in the academic community is an assessment that Dr. Parker is uniquely qualified to make and with which the trier of fact needs assistance.

Similarly, the district court which recently admitted the testimony of a "tenure expert" had no difficulty finding that the testimony would assist the trier of fact. *See Siring v. Oregon State Bd. of Higher Educ. ex rel. Eastern Oregon Univ.*, 927 F. Supp. 2d 1069, 1076 (D. Or. 2013). The court explained that "[p]rofessorial tenure is a unique system, and the Court finds that as an expert in the field of tenure-track evaluation, review, and promotion, Dr. Stockard's opinion addresses issues beyond the common knowledge of the average layperson and will aid a jury in making its determination." *Id.*

Here, with respect to evaluating comparators' relative qualifications, Dr. Parker's experience enables him to provide insight about quality of scholarship on subjects with which the average layperson is not acquainted.  Indeed, in his report, Dr. Parker has—as his background and experience make him eminently qualified to do—evaluated the substance of articles published, and compared the merits of journals where they were published.  He has carefully assessed the syllabi prepared by each candidate, a task a jury lacks the specialized knowledge to perform.  Nor will a jury be well-positioned to distinguish peer-reviewed journals from others, to weigh the quality of one manuscript against another, or to evaluate the contribution of one article as compared to another.  Dr. Parker is qualified to do more than merely count publications or awards; for example, he can look at the teaching syllabi and provide useful commentary on their substance and arrangement and the extent to which that is reflective of overall teaching abilities.  Parker Report, Defs.' Br. Ex. 1 (ECF No. 98-1) at 5-10.  With respect to service, as a member of academia he is uniquely situated to explain the finer points of service activities.  *Id.* at 24-26.  Thus, Dr. Parker's ability to elucidate these topics for the jury cannot be given short shrift, as Defendants have attempted to do.

## III.    <u>Conclusion</u>

For the foregoing reasons, the Court should deny the Defendants' Motion and permit Dr. Parker's report to be used for all pre-trial purposes and during trial.

Date:  August 14, 2017                    GREGORY B. FRIEL
                                          Deputy Assistant Attorney General
                                          Civil Rights Division

DELORA L. KENNEBREW
Chief
Employment Litigation Section

MEREDITH L. BURRELL (MD, no number issued)
Deputy Chief
Employment Litigation Section

*/s/* Shayna Bloom
ALLAN K. TOWNSEND (ME Bar No. 9347)
SHAYNA BLOOM (D.C. Bar 498105)
VALERIE MEYER (AZ Bar No. 023737)
Senior Trial Attorneys
Employment Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Patrick Henry Building, Fourth Floor
Washington, DC  20530
Telephone: (202) 616-9100
Facsimile:  (202) 514-1005
Allan.Townsend@usdoj.gov
Shayna.Bloom@usdoj.gov
Valerie.Meyer@usdoj.gov

Attorneys for Plaintiff United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served this document on all counsel of record through the Court's electronic filing system on the date below.

Date:  August 14, 2017          _/s/_  Shayna Bloom _____