Jury Trial – Volume 1
November 13, 2017

1           UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF OKLAHOMA

3

4
DR. RACHEL TUDOR,                )
5                                )
        Plaintiff,               )
6                                )
                vs.              )   Case No. CIV-15-324-C
7                                )
SOUTHEASTERN OKLAHOMA STATE      )
8  UNIVERSITY and THE REGIONAL   )
UNIVERSITY SYSTEM OF             )
9  OKLAHOMA,                     )
                                 )
10      Defendants.              )
                                 )
11

12

13                  VOLUME 1

14            TRANSCRIPT OF JURY TRIAL

15      BEFORE THE HONORABLE ROBIN J. CAUTHRON

16      MONDAY, NOVEMBER 13, 2017; 9:00 a.m.

17            OKLAHOMA CITY, OKLAHOMA

18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography,
transcript produced by computer.
25

Jury Trial – Volume 1
November 13, 2017

1                      A P P E A R A N C E S

2

3    For the Plaintiff:

4        Ezra I. Young
         Law Office of Ezra Young
5        30 Devoe 1A
         Brooklyn, New York 11211
6        ezraiyoung@gmail.com

7        Brittany M. Novotny
         401 North Hudson Avenue
8        Oklahoma City, Oklahoma 73102
         brittany.novotny@gmail.com

9

10       Marie E. Galindo
         1500 Broadway
11       Suite 1120
         Wellsfargo Building
12       Lubbock, Texas 79401
         megalindo@thegalindolawfirm.com

13

14   For the Defendants:

15       Dixie L. Coffey
         Jeb E. Joseph
16       Attorney General's Office
         313 NE 21st Street
17       Oklahoma City, Oklahoma 73105
         dixie.coffey@oag.ok.gov
18       jeb.joseph@oag.ok.gov

19       Timothy M. Bunson
         1215 Classen Drive
20       Oklahoma City, OK 73103
         tim.bunson@oag.ok.gov

21

22

23

24

25

Jury Trial – Volume 1
November 13, 2017

```
 1              C O N T E N T S

 2                                   VOLUME  PAGE

 3   PLAINTIFF WITNESSES:

 4   RACHEL TUDOR, Ph.D.
     DIRECT EXAMINATION BY MR. YOUNG.............    1    37
 5   CROSS-EXAMINATION BY MS. COFFEY.............    1   130
     CONTINUING CROSS-EXAMINATION BY MS. COFFEY..    2   205
 6   REDIRECT EXAMINATION BY MR. YOUNG...........    2   209

 7   ROBERT PARKER, Ph.D.
     DIRECT EXAMINATION BY MR. YOUNG.............    2   212
 8   CROSS-EXAMINATION BY MR. JOSEPH.............    2   275
     REDIRECT EXAMINATION BY MR. YOUNG...........    2   291
 9   RECROSS-EXAMINATION BY MR. JOSEPH...........    2   294

10   MEG COTTER-LYNCH, Ph.D.
     DIRECT EXAMINATION BY MR. YOUNG.............    2   297
11   CROSS-EXAMINATION BY MR. JOSEPH.............    2   353
     REDIRECT EXAMINATION BY MR. YOUNG...........    2   371
12
     JOHN MISCHO, Ph.D.
13   DIRECT EXAMINATION BY MS. NOVOTNY...........    3   384
     CROSS-EXAMINATION BY MR. BUNSON............    3   409
14   REDIRECT EXAMINATION BY MS. NOVOTNY.........    3   427
     RECROSS-EXAMINATION BY MR. BUNSON...........    3   430
15
     MARK SPENCER, Ph.D.
16   DIRECT EXAMINATION BY MR. YOUNG.............    3   431
     CROSS-EXAMINATION BY MR. BUNSON.............    3   450
17   REDIRECT EXAMINATION BY MR. YOUNG...........    3   459

18   RANDY PRUS, Ph.D.
     DIRECT EXAMINATION BY MS. NOVOTNY...........    3   464
19   CROSS-EXAMINATION BY MR. JOSEPH.............    3   470
     REDIRECT EXAMINATION BY MS. NOVOTNY.........    3   481
20   RECROSS-EXAMINATION BY MR. JOSEPH...........    3   486

21   JAMES KNAPP, Ph.D.
     DIRECT EXAMINATION BY MR. YOUNG.............    3   488
22   CROSS-EXAMINATION BY MR. BUNSON.............    3   504
     REDIRECT EXAMINATION BY MR. YOUNG...........    3   507
23
     MELINDA HOUSE
24   DIRECT EXAMINATION BY MR. YOUNG.............    3   508
     CROSS-EXAMINATION BY MR. BUNSON.............    3   529
25   REDIRECT EXAMINATION BY MR. YOUNG...........    3   547
```

Jury Trial – Volume 1
November 13, 2017

1               C O N T E N T S

2                                           VOLUME  PAGE

3   DEFENSE WITNESSES:

4   LUCRETIA SCOUFOS, Ph.D.
    DIRECT EXAMINATION BY MS. COFFEY..............    4   561
5   CROSS-EXAMINATION BY MS. GALINDO..............    4   597

6   CATHY CONWAY, Ph.D.
    DIRECT EXAMINATION BY MS. COFFEY..............    4   635
7   CROSS-EXAMINATION BY MS. NOVOTNY..............    4   656

8   DOUG McMILLAN, Ph.D.
    DIRECT EXAMINATION BY MR. JOSEPH..............    4   671
9   CROSS-EXAMINATION BY MS. NOVOTNY..............    4   689

10  CLAIRE STUBBLEFIELD, Ph.D.
    DIRECT EXAMINATION BY MR. JOSEPH..............    4   700
11  CONTINUING DIRECT EXAMINATION BY MR. JOSEPH...    5   726
    CROSS-EXAMINATION BY MS. GALINDO..............    5   734
12  REDIRECT EXAMINATION BY MR. JOSEPH............    5   754
    RECROSS-EXAMINATION BY MS. GALINDO...........    5   756
13
    JESSE SNOWDEN, Ph.D.
14  DIRECT EXAMINATION BY MR. JOSEPH..............    5   758
    CROSS-EXAMINATION BY MR. YOUNG................    5   777
15

16  PLAINTIFF REBUTTAL WITNESS:

17  CHARLES WEINER, Ph.D.
    REBUTTAL EXAMINATION BY MR. YOUNG............    5   806
18  CROSS-EXAMINATION BY MR. BUNSON..............    5   811

19  PLAINTIFF CLOSING STATEMENT...................    5   827

20  DEFENSE CLOSING STATEMENT.....................    5   846

21  VERDICT......................................    6   869

22

23

24

25

Sherri Grubbs, CSR, RPR, RMR, RDR, CRR
United States District Court, Western District of Oklahoma
(405) 609-5203 – sherri_grubbs@okwd.uscourts.gov

1      (Proceedings had on November 13, 2017.)

2           THE COURT:  We are here in Tudor vs. Southeastern

3   outside the presence of the jury.  I've raced through three

4   motions this morning, which may need to be addressed before we

5   start and they may not.

6      I'll start with plaintiff's motion to admit Conway by

7   deposition.

8      Defendants have a response?

9           MS. COFFEY:  Your Honor, yes.  The defendants oppose

10   plaintiff's motion.

11      This matter was resolved by the Court at docket call on

12   November 1st when defendants asked permission to present

13   Ms. Conway via remote.

14      Ms. Conway is comfortable with presenting herself via

15   remote.  There are no difficulties.  Plaintiff's counsel

16   raised a question or difficulty of providing exhibits to the

17   witness, all of which can be handled very easily either via

18   e-mail or via Federal Express if necessary.  There literally

19   is no basis for plaintiff's motion.

20           THE COURT:  Well, do you concede that the witness is

21   unavailable?

22           MS. COFFEY:  No, Your Honor.

23           THE COURT:  So if she is subpoenaed, she will appear

24   here?

25           MS. COFFEY:  We raised that with Your Honor a couple

Jury Trial – Volume 1
November 13, 2017

1   of weeks ago.

2              THE COURT:  The problem --

3              MS. COFFEY:  Yes?

4              THE COURT:  -- is that plaintiffs are entitled to

5   put on their case in chief before you put on yours, and they

6   are not required, if she's unavailable, to put her on by video

7   conference.  They can use her deposition for that purpose if

8   she's unavailable.

9        That doesn't mean you can't call her by video conference.

10  You would be limited in what your -- you can't repeat

11  yourselves, but you can cross-examine based on the direct

12  examination.  That's how I see the resolution of this.

13       I assume that the portions you have designated are only

14  those necessary to support your case in chief and what you

15  want to present on plaintiff's behalf.

16             MR. YOUNG:  Yes, Your Honor.

17             THE COURT:  I will permit you to do that.  You

18  cannot do it today.

19             MR. YOUNG:  Okay, Your Honor.

20             THE COURT:  You can look at those designations,

21  object, counterdesignate, whatever you want to do.  Again, you

22  won't be able to question her about anything that comes out in

23  her deposition.  We're not going to repeat it.

24             MS. COFFEY:  Your Honor, if Ms. Conway indicates

25  that, because of her health, that she would be willing to come

Jury Trial – Volume 1
November 13, 2017

1  up here and testify live Tuesday or Wednesday, whichever day
2  plaintiff wanted her, would that be acceptable?
3          THE COURT:  Of course.  If she's available, that
4  deposition can't be used, but you-all need to work that out
5  and know what you're facing because you only have a day or two
6  to look at their designation and counterdesignate or object.
7          MS. COFFEY:  Thank you, Your Honor.
8          THE COURT:  The defendants' motion to strike trial
9  exhibits, I'm not sure that I understand this.
10      Is the only absence that you're complaining of the case
11  number?
12          MS. COFFEY:  Your Honor, there's no identification
13  on plaintiff's exhibits that they've provided, so that if I
14  were to utilize one of plaintiff's exhibits to cross-examine a
15  witness, when you look at the bottom, it has the discovery
16  Bates number on it.  It has no identification.
17          THE COURT:  No exhibit number?
18          MS. COFFEY:  No exhibit number.
19          THE COURT:  Okay.  I'm not concerned about the case
20  number.  We all know what case this is, even though local
21  rules require it.
22          MR. YOUNG:  Yes, Your Honor.
23          THE COURT:  But they have to have exhibit numbers.
24      Has that been done?
25          MR. YOUNG:  Well, this is the first time the

Jury Trial – Volume 1
November 13, 2017

1  defendants have raised this issue.

2          THE COURT:  It's a rule.

3          MR. YOUNG:  I understand, Your Honor.  But both

4  sides have struggled getting the exhibits to each other.  In

5  good faith, we agreed to tell each other if we saw

6  deficiencies.  We have corrected defendant's exhibits multiple

7  times.

8      Today is the very first time they have said that the

9  exhibit number is missing.  I apologize.  We can attempt to

10  reprint them all and give them to them.  We can attempt to

11  send them new electronic copies, all marked with an exhibit at

12  the bottom of them.

13          THE COURT:  Do you have sticker numbers on each

14  exhibit?

15          MR. YOUNG:  I have stickers in my bag we can place

16  on there, Your Honor.

17          THE COURT:  That should have been done days if not

18  weeks ago.

19          MR. YOUNG:  Yes, Your Honor.

20          THE COURT:  Well, do it.  Until it is done, none of

21  your exhibits are admissible.

22          MR. YOUNG:  Okay.

23          THE COURT:  Plaintiff's motion to strike, have you

24  had a chance to look at this, Ms. Coffey?

25          MR. BUNSON:  I'm sorry, Your Honor.

Jury Trial – Volume 1
November 13, 2017

1                THE COURT:  "No"?

2                MR. BUNSON:  Yes, we have had a chance to review it.

3                THE COURT:  As to the first issue, the failure to

4     mitigate, do you have any objection?

5                MR. BUNSON:  Your Honor, yes, actually, we do have

6     an objection.

7          One, though the Court's order of 11-2 indicates that they

8     could withdraw this claim, thereby making the failure to

9     mitigate moot, unfortunately, they failed to document that --

10    the Collins College documents serve more than just a

11    failure-to-mitigate purpose.  They are, in fact, relevant for

12    two very important purposes.

13         First, it goes to Dr. Tudor's credibility as to her own

14    assessment of her teaching abilities, and it also demonstrates

15    that Dr. Tudor has a pattern of claiming discrimination

16    whenever a decision is made that doesn't benefit her.

17         Furthermore, the entire motion is a motion in limine,

18    which, according to this Court's scheduling order, was due

19    October 10th.  None of the issues raised in plaintiff's motion

20    was in any way new or novel.

21               THE COURT:  Well, this is a response to a ruling I

22    made last week, and, because of that, it's certainly timely.

23    Or it's not untimely.  I'll say it that way.

24         I'm not really prepared to rule on the second one of

25    these.

Jury Trial – Volume 1
November 13, 2017

1        The one I am ready to rule on is the fourth issue that

2   asks me to strike your defense, that transgender persons are

3   not protected by Title VII.  To the contrary, I have cited the

4   Tenth Circuit law that says they are not simply by means of

5   being transgender.  Gender is protected.

6        Your theory of this case throughout has been that you are

7   not complaining that transgender persons were treated

8   differently, but that Dr. Tudor, once she was a woman, was

9   treated differently.  That's permissible, but I'm not going to

10  strike that defense because I have agreed with it.

11       As to the others, if something comes up today that you

12  need a ruling on these, approach the bench before you go any

13  further.

14            MR. YOUNG:  Yes, Your Honor.

15            THE COURT:  How long do you want for opening

16  statement?

17            MR. YOUNG:  Less than 15 minutes, Your Honor.

18            THE COURT:  Is 15 minutes sufficient?

19            MS. COFFEY:  15 minutes, Your Honor.

20            THE COURT:  All right.  Call for the jury, please.

21            MR. JOSEPH:  Your Honor, may we invoke the rule at

22  this time before the jury gets here?

23            THE COURT:  Yes.

24            MR. JOSEPH:  Thank you, Your Honor.

25            THE COURT:  Are there persons in the courtroom

Jury Trial – Volume 1
November 13, 2017

 1  expected to be called as witnesses in this case?

 2          MR. YOUNG:  Just Dr. Tudor, Your Honor.

 3          THE COURT:  Of course, she's exempted from the rule.

 4      No one else?  All right.

 5      Counsel, I'll ask you to look to your own witnesses.  If

 6  somebody comes in that you know will be a witness, let me know

 7  or you go tell them to leave.

 8      (Jury enters courtroom.)

 9          THE COURT:  Be seated.

10      I don't think I probably told you to sit in the same

11  seats you were in when you left, because you're not doing that

12  right now.

13      So I have my seating chart, which is no good where you're

14  sitting now.

15      Ms. Taylor, I need you back here, Mr. Payton next to her,

16  Ms. Hall in the third seat, and Ms. Fields in the fourth.

17  Ms. Norton, you're in the third seat, Mr. Mallory in the

18  fourth.

19      Now, let me say good morning to you, now that I know

20  who's who.  I'm going to call the roll just to make sure for

21  the record that you're all here.

22      Ms. Taylor.  Mr. Payton.  Ms. Hall.  Ms. Fields.

23  Mr. Mallory.  Ms. Norton.  Ms. Morse.  And Ms. Rogers.

24      If you would, please, take those same seats every time

25  you come back in the courtroom.

Jury Trial – Volume 1
November 13, 2017

```
 1        Good morning to you.
 2        Let me ask you first if any of you have had any
 3   experience, since we were here last week, that would interfere
 4   with your ability to be a fair and impartial juror.  Any
 5   answer to give me that would be different from one that you
 6   gave me last week?
 7        I'll ask you to stand, raise your right hands, and be
 8   sworn by the clerk to try this case.
 9        (Impaneled jury duly sworn.)
10             THE COURT:  Be seated.
11        Now that you have been sworn, I am going to give you some
12   preliminary instructions to guide you in your participation in
13   this trial.
14        It will be your duty to find from the evidence what the
15   facts are.  You and you alone are the judges of the facts, but
16   you have to apply to those facts the law as I give it to you.
17   You must follow that law whether you agree with it or not.
18   Nothing I may say or do during the course of this trial is
19   meant to indicate what I think your verdict should be.  That
20   is entirely for you to decide.
21        The evidence from which -- the evidence from which you
22   will find the facts consists of testimony that you hear here
23   in the courtroom, any documents or other things received into
24   evidence, and any facts that the lawyers agree to or stipulate
25   to.
```

Jury Trial – Volume 1
November 13, 2017

1      Certain things are not evidence and must not be

2  considered.  First, statements, arguments, and questions by

3  lawyers are not evidence.  Second, objections to questions are

4  not evidence, and you shouldn't be influenced by any lawyer's

5  objections or by my rulings on them.

6      If I sustain an objection, ignore the question.  If I

7  overrule the objection, treat the answer as you would any

8  other.

9      Any testimony that I may exclude or tell you to disregard

10  is not evidence.  Finally, anything you see or hear outside

11  the courtroom is not evidence and shouldn't be considered in

12  deciding this case.

13      There are two kinds of evidence, direct and

14  circumstantial.  Direct evidence is direct proof of a fact,

15  like the testimony of an eyewitness.  Circumstantial evidence

16  is proof of a chain of facts or circumstances from which you

17  can infer that facts exist.

18      The classic law school example of this is, if you see

19  someone walking on the beach, that's direct evidence.  If you

20  see footprints in the sand, that's circumstantial evidence

21  that someone has been walking there.

22      Keep in mind that you can consider both kinds of

23  testimony or evidence equally and also that it will be

24  entirely up to you to decide how much of any witness's

25  testimony to accept or reject.

Jury Trial – Volume 1
November 13, 2017

1    This is a civil case, and the plaintiff has the burden of

2    proving her case by what is called a preponderance of the

3    evidence.   That means the plaintiff has to produce evidence

4    which, considered in light of all the facts, leads you to

5    believe that what she claims is more likely true than not

6    true.

7        To put it differently, if you were to put the plaintiff's

8    evidence and the defendants' evidence on opposite sides of the

9    scale, the plaintiff has to make that scale tip somewhat in

10   her favor.   If she does not, your verdict must be for the

11   defendants.

12       Those of you who have sat on criminal cases or watched TV

13   will know –– will have heard of "proof beyond a reasonable

14   doubt."   That is not the standard in this case, and you should

15   put it out of your mind.

16       As to your conduct as jurors, as I have explained to you,

17   you must decide this case based solely on the evidence

18   presented right here in this courtroom.   This means you can't

19   conduct any independent research, you shouldn't consult

20   dictionaries or reference materials, you shouldn't search the

21   internet or websites.

22       Until you retire to deliberate, you may not discuss the

23   case with anyone, not among yourselves or with anyone else,

24   and you should expose yourself to absolutely no media accounts

25   of this trial.

Jury Trial – Volume 1
November 13, 2017

```
 1        I don't think I told you last week, when I gave you most
 2   of this instruction, that you also shouldn't blog or use
 3   social media about your experience as jurors.  That can
 4   possibly compromise any verdict that is reached by this jury.
 5        We want to keep you in a little bubble, and we can't do
 6   that, but we're going to get as close to that as we can.  It
 7   requires your cooperation.
 8        This case is what happens inside this courtroom, and we
 9   don't want you reaching out to anybody else to talk about the
10   case or anyone else to talk to you.
11        If you want to take notes during the trial, you may.
12   There are implements and instruments under your chairs or
13   maybe at the end --
14             THE CLERK:  They're under there.
15             THE COURT:  Under your chairs.  Okay.
16        Taking notes is a very personal issue.  It helps some
17   people pay attention; other people, it's a total distraction.
18        So if you take notes, please remember these things:
19        Don't pay so much attention to your notes that you forget
20   to listen to the witness.  When you get to the jury
21   deliberation room, don't pay too much attention to any one
22   juror's notes.  You should consult your collective memory, and
23   the fact that somebody has it in their notes doesn't
24   necessarily make it so.
25        If you take notes, always leave the pads under your chair
```

Jury Trial – Volume 1
November 13, 2017

1   in the courtroom.  Don't ever walk out with them.  We will

2   maintain their security.

3        If you choose not to take notes, that's perfectly fine.

4   Sometimes even doodling helps you listen.  So just make sure

5   you're paying attention is all I want you to do.

6        I want to introduce my staff.

7        Over here is Jeff Lynch.  He is a lawyer.  He works for

8   me.  He will act as your bailiff when you retire to

9   deliberate.

10        Linda Goode is the court clerk assigned to my courtroom.

11   As you have seen, she administers oaths; she keeps up with the

12   exhibits.

13        Over here, Sherri Grubbs, who takes down every word on

14   her magic machine.  She will occasionally throw her hands up

15   when people are talking at the same time.

16        I'm Judge Cauthron, by the way.

17        We are the people you will see throughout this trial.  We

18   would like to make this as pleasant as we can for you.  If

19   there's anything at all you need, please let one of us know,

20   and we will help you if we can.

21        My schedule is roughly 9:00 to 4:00 or 4:30.  I like to

22   get you out of here before the worst of the traffic.  We will

23   take an hour for lunch at midday and a 15-minute break morning

24   and afternoon.  If you need a break, if you can't hear, if you

25   need anything while we're in the courtroom, just let me know,

 1    and I will accommodate you if I possibly can.

 2         The participants in the trial all have water available to

 3    them.  It's only fair that you do too.  So you may bring water

 4    in with you.  I'd ask that it's only water because it's very

 5    easily tipped over at your feet, where it's necessary to keep

 6    it.  So a bottle or a cup of water is fine to bring back.

 7         Finally, as you saw during jury selection, there are

 8    times when the lawyers come to the bench to have a

 9    conversation with me outside of your hearing.

10         I encourage you to stand and stretch whenever that

11    happens or when we're waiting for a witness or at any pause in

12    the trial.  You will be amazed at how hard it is to sit still

13    all day long.  That's really the hardest part of jury service,

14    is sitting all day long.  So when you get a chance, stand up,

15    stretch, and you'll feel a lot better at the end of the day.

16         The trial begins with each side making an opening

17    statement.  An opening statement is not evidence and it's not

18    argument.  It's a blueprint of what that lawyer intends to

19    prove during the trial, aided for your assistance.

20         After the plaintiff and defendant have made an opening

21    statement, the plaintiff will present her witnesses, whom the

22    defendant may cross-examine.  At the close of plaintiff's

23    case, defendant may present witnesses, who plaintiff may

24    cross-examine.

25         After all the evidence is in, I will instruct you as to

Jury Trial - Volume 1
November 13, 2017

1  the law, and then the lawyers will argue -- make their closing

2  arguments, attempting to persuade you to their point of views.

3       At that point, the case will be yours to deliberate.

4       That is how a trial proceeds.  We are now ready for

5  opening statement from plaintiff.

6            MR. YOUNG:  Thank you, Your Honor.

7       We're all here today because the government broke the

8  law.  They violated rules.  They changed rules so that they

9  could break the law.  They made up new rules that were only

10  imposed on Rachel Tudor.

11       Last week, when you were selected for this jury, my

12  colleague, Marie Galindo, told you that we were all here to

13  right wrong.

14       Ultimately, you're going to be asked to answer three very

15  simple questions.

16       The first one:  Is it okay to make someone miserable at

17  work just because they are different?

18       The second one:  Is it okay to deny someone something

19  they earned just because they are different?

20       Third question:  Is it okay to attack someone because

21  they complain when they were mistreated?

22       Now, at Southeastern Oklahoma State University -- I'll

23  say right now that I'm going to call it Southeastern.  It's a

24  mouthful.  Okay?

25       So at Southeastern Oklahoma State University, a handful

Jury Trial – Volume 1
November 13, 2017

 1  of new professors are hired on something called tenure track.

 2  Being on tenure track means that a university sees promise in

 3  a professor.  After a few years, a tenure track professor can

 4  apply for tenure.

 5      Tenure is a huge promotion if you're an academic.  It's

 6  the thing that you go to grad school for, that you work really

 7  hard for, that you yearn to get.  It is a huge, huge deal.

 8      Now, if you get tenure, it means a lot of things.  It

 9  means a pay raise.  It means a lot of pride.  It's an event

10  you celebrate with your family and friends and loved ones.

11  It's something you post about on Facebook, that sort of thing.

12      But it also means something more.  It means that you've

13  become a permanent part of the university, your stability,

14  your family.

15      With the exception of one time in all of Southeastern's

16  history, when a department committee and a department chair

17  voted to grant tenure to a professor, the professor got it.

18  One exception.

19      Now, let me tell you a story.

20      My client, Rachel Tudor, is a different kind of woman.

21  She is transgender.  That fact right there is why we're all

22  here today.

23      Now, Rachel was born in Oklahoma.  She moved around a bit

24  as a kid.  She was the first person in her family to go to

25  college.  Rachel had really big dreams for someone who came

Jury Trial – Volume 1
November 13, 2017

1   from a family like hers.  She grew up really poor, but she

2   wanted to do well.  Let me tell you about what it meant for

3   her to do well.

4        She wanted to buy her older sissy a house one day.

5   Rachel thought that maybe after she bought Rosie a house, she

6   might get her own house one day.  She didn't need anything

7   big.  She just wanted something with a backyard big enough

8   that a couple of dogs would be happy in it.

9        Most importantly, Rachel wanted to make her family proud.

10       Now, Rachel got her Ph.D. at the University of Oklahoma,

11  the state's flagship school.  It's at O.U. where Rachel fell

12  in love with Native American literature and took the first big

13  steps on her path towards becoming an English professor.

14       In 2004 Rachel took a tenure track job at Southeastern.

15  Rachel was beloved at Southeastern.  She worked hard.  She

16  wrote thoughtful articles that her colleagues liked.  She was

17  passionate in the classroom.  Indeed, you'll hear later on in

18  this trial that many students who took English classes with

19  Rachel decided to major in English, even a few who hated it

20  going in.  So she was a good professor.  That's pretty rare.

21       Now, Rachel put roots down in Durant, the small city

22  where Southeastern sits.  She put roots down there because she

23  loves Oklahoma and she wanted nothing more but to live her

24  life here and serve her students.

25       Frankly, Rachel is exactly the kind of passionate

1   educator we all want in a classroom.

2        Fast-forward a bit, 2007.  In 2007 Rachel took a brave

3   step out.  She transitioned from male to female.  Now, Rachel

4   went through this transition because she wanted her colleagues

5   and her students to know the real her.  That's it.  Pretty

6   simple.

7        Rachel didn't want much here.  She wanted to be known as

8   Rachel, and she wanted to continue to do her job.  It's pretty

9   simple to call someone by a new name.  We all do it all the

10  time with married women, pretty quick change.

11       It's also pretty simple to let a hard worker just do

12  their job in peace.  Those are the two things Rachel Tudor

13  asked for.  That's all she has really ever asked for.

14       Now, folks that don't know Oklahomans might think that

15  Rachel's gender transition was a big deal for her colleagues

16  and students.  It was Durant, Oklahoma, in 2007.  But I think

17  you and I both know how Oklahomans deal with differences.

18  They just don't care even if you stick out a bit.

19       That's essentially what Rachel experienced at

20  Southeastern for the most part.  Rachel's colleagues in the

21  English department and all of her students welcomed her

22  despite her difference.  No one complained.  They just told

23  her she was welcome there.

24       They all understood that she was just a different type of

25  woman now, a little bit different, but easy enough, handled in

Jury Trial – Volume 1
November 13, 2017

1  true Oklahoman fashion.  None of them had to overthink things

2  too much because good Oklahomans welcome folks even if their

3  differences show.

4      Now, not everyone reacted well.  Of course, that's why

5  we're all here today.  Even though the professors and students

6  continued to love Rachel, respect Rachel, want to work with

7  Rachel, things were not perfect at Southeastern.

8      Once Rachel told human resources –– human resources, the

9  folks who are supposed to help you through personal matters,

10  the folks you're supposed to report discrimination to, once

11  Rachel told human resources about her gender transition, some

12  of Southeastern's administrators decided to circle the wagons.

13  They didn't like her difference.  They didn't want Rachel to

14  stay at Southeastern.  They wanted to make Rachel so miserable

15  that she would leave.

16      So in 2007, Cathy Conway, Southeastern's human resources

17  director, called Rachel, told her that the vice president for

18  academic affairs, Doug McMillan –– and I want you to remember

19  that name, Doug McMillan –– told –– Doug McMillan wanted

20  Rachel gone because she's transgender.

21      Conway told Rachel that she wouldn't be fired immediately

22  if she followed some special rules.

23      If Rachel didn't follow these special rules, Rachel was

24  told she would be fired immediately.  These are the three

25  rules that Rachel was given.

Jury Trial — Volume 1
November 13, 2017

1          Rachel couldn't use any women's restroom on campus.

2          Second rule that Rachel was given:  She couldn't wear

3    clothes that other women on campus could wear.

4          Third rule:  Rachel had to get her makeup right.

5          I'll be honest with you there.  I'm not really sure what

6    that last rule really means, but it seems like a trap, doesn't

7    it?

8          Now, Rachel was told if she broke any of those three

9    rules -- restrooms, clothes, or makeup -- she would be fired.

10          What Southeastern did to Rachel in 2007 was not right,

11   wasn't fair.  It wasn't how Oklahomans should treat each

12   other.  But Rachel was determined to push through.  She needed

13   her job.

14          There's something else I need to share with you about

15   Rachel Tudor.  She is an unassuming English professor type,

16   which works out really well when you're an English professor,

17   a little bit quiet, a little bit shy, bookish.  She loves

18   books.

19          But Rachel also has a quiet confidence about her.  Rachel

20   also follows rules.

21          So even though Southeastern imposed those unfair rules on

22   Rachel, she pushed on.  For every single day she worked at

23   Southeastern onward until she left, she followed those rules

24   daily.  Even though she hated them, even though she knew she

25   shouldn't have to, she followed those rules.  Rachel didn't

Jury Trial – Volume 1
November 13, 2017

1    quit.

2         Flash forward a little bit, a couple years forward to

3    2009.  In 2009, Rachel applied for tenure.  Now, Rachel's

4    department committee and department chair voted in favor of

5    her tenure application.  As I mentioned before, up to that

6    time, in all of Southeastern's history, the rules had been

7    that two votes -- one from the department committee and one

8    from the department chair -- meant the professor got tenure.

9    That's just how it worked.

10        But, of course, we're all here today because a few

11   administrators decided they didn't want to follow those rules,

12   they didn't want to follow those rules for Rachel Tudor.

13        In quick succession, three administrators -- Dean

14   Lucretia Scoufos, Doug McMillan -- remember him? -- and Larry

15   Minks voted to deny Rachel tenure.

16        Scoufos and McMillan refused to even tell Rachel why they

17   voted against her.  That violated another rule at

18   Southeastern.

19        If, in the rare circumstance you weren't going to follow

20   what the department did, you had to, at the very least, give

21   an explanation for it.  Someone deserves a little bit of

22   explanation, right, if they're going to at least break the

23   rules?

24        Well, they wouldn't tell Rachel.  She asked, she begged,

25   she complained.  They would not even tell her why they did

Jury Trial – Volume 1
November 13, 2017

1    what they did.

2        Months later, after refusing and refusing and refusing to

3    tell Rachel why they did what they did, some of those

4    administrators fabricated reasons for why they denied her

5    tenure.  They made up reasons that they said she wasn't

6    qualified for tenure.

7        Now, later this week, I'm going to introduce you to

8    someone, Dr. Robert Parker.  He is an expert on tenure.

9    Dr. Parker will explain to you why the reasons the

10   administrators fabricated do not even make sense.  So even if

11   we accepted the reasons they fabricated after the fact, those

12   reasons don't even make sense for what they did.

13       Now, there are also a lot of irregularities in the 2009

14   application.  Later today, Rachel Tudor is going to tell you a

15   little bit about those irregularities; and, later this week,

16   some of the professors from Southeastern, professors who still

17   to this day support her, are going to explain to you what

18   those irregularities are.

19       But, frankly, the whole thing stank.  Suffice it to say,

20   Rachel didn't get tenure from her 2009 application.

21       Unfortunately for Rachel, after the 2009 application was

22   over, the Southeastern administration wasn't done messing with

23   her.  Under Southeastern's rules, Rachel had one more shot at

24   tenure in 2010.

25       Now, just a few days before Rachel's new application was

Jury Trial – Volume 1
November 13, 2017

1    supposed to go to the department for another vote, just like
2    it did before, Doug McMillan jumped in Rachel's way again.  I
3    told you to remember that name.
4         Now, in a totally unprecedented letter, Doug McMillan
5    banned Rachel from applying for tenure again.  In that October
6    2010 letter -- and this is the most important thing I want you
7    to remember about it -- Doug McMillan told Rachel that
8    Southeastern's rules allowed Rachel to reapply for tenure, but
9    he wasn't going to follow those rules, not for Rachel Tudor.
10        Because Rachel was banned from applying for tenure in
11   2010, she was automatically fired at the end of the spring
12   2011 semester.  She packed up her office and she left.
13        Now, as you might all imagine, during this whole process,
14   Rachel was living in a waking nightmare.  She had gone from
15   the high of receiving what should have been the biggest
16   promotion of her entire career, something she worked her
17   entire life for, to witnessing the administrators break rule
18   after rule after rule.
19        Rachel went from being treated, just like everybody else
20   at Southeastern, on her merits, as a human being, to being
21   punished just because she was different.
22        Now, Rachel did her best to fight for herself when she
23   was at Southeastern.  She filed complaints at the school.  She
24   filed complaints outside of the school.  She wrote letters.
25   She kept documentation.  Near the end, she even put together a

Jury Trial – Volume 1
November 13, 2017

1  blog documenting what was happening just so that the world

2  could see it.

3       Throughout this trial, myself and my colleagues sitting

4  at the table with me are going to show you a few of the things

5  that Rachel did to try to document what was happening to her,

6  and it's not all of it.  She documented a lot.

7       The one thing I want you to remember, though, is that

8  when you get to those things is why Rachel did them.  Rachel

9  documented things because it became clear to her midway

10  through this process that Southeastern was never going to

11  follow the rules.  It didn't matter what she did.  It didn't

12  matter if she followed the rules.  They were never going to

13  follow those rules.

14       She knew that her only hope to get this wrong righted was

15  to have evidence for fair-minded folks outside of Southeastern

16  to see for themselves what happened.  In essence, Rachel left

17  us all a trail of bread crumbs so that we can see with our own

18  eyes the truth of what happened at Southeastern.

19       Now, Rachel is depending on us all to step in, to be

20  fair-minded, and ultimately to come to her aid.  Once both

21  sides present you with the evidence, I'm going to come back up

22  here and talk with you again; but before I come back to chat

23  with you for one last time, I'm going to leave you with a few

24  things to think about.

25       The first thing, people change over time.  That's just

1    the nature of life.  We all change.  Some people change

2    religions.  Some people, like Rachel, change genders.

3    Regardless of what the change is, though, sometimes change is

4    necessary.  It's just something that has to happen.  You can't

5    stop it.

6         When you can't stop something like change and it's

7    necessary, it's just not fair to punish someone for being

8    different, for having to go through that change because

9    they're at work.  It's not okay to punish someone at work, to

10   take food off their table, just because they're a little bit

11   different.

12        The second thing I'm going to leave you with:  If you

13   work hard for something and you follow all the rules, you

14   deserve to get what you earned.  If you're a scout and you

15   follow the rules to earn a badge, it's not fair to not give

16   you that badge.  You earned it.  It doesn't matter if someone

17   doesn't want to give it to you; you earned it.

18        The third thing I want to leave you with:  Oklahomans are

19   a good, fair people.  I have no doubt about that.  Rachel

20   knows it to be true too.  But sometimes you come across a few

21   bad apples, folks who don't want to follow the rules, who just

22   don't want to be nice to people who are different.

23        Rachel is depending on you all this week to be good and

24   fair people.  She's depending on you all to do the right

25   thing, to stand up and right a wrong.

Jury Trial – Volume 1
November 13, 2017

1    The last thing I want to leave you with:  The government
2  over there is going to try to whisper to you a lot during this
3  trial.  They're going to try to get you to overlook evidence,
4  to think bad things about Rachel, not because of what kind of
5  worker she is, not because of what kind of professor she is.
6  All the evidence shows that she is a great person, great
7  professor.
8    They're going to try to tilt you in their direction
9  because her differences show.  They're counting on you to not
10 like transgender people.  They're counting on you to overlook
11 a whole lot of things in a mountain of evidence.  They're
12 betting on it.
13   Well, ladies and gentlemen, I'm betting that you aren't
14 going to look the other way.  I am betting that you take this
15 seriously, that you will do the right thing, and that you are
16 going to give Rachel Tudor the fair shake that Southeastern
17 denied her so many years ago.
18   I have faith in you all.  Thank you.
19        THE COURT:  Ms. Coffey?
20        MS. COFFEY:  Ladies and gentlemen, we've all heard
21 the story of the little shepherd boy who cried wolf.  He
22 wanted attention, he wanted excitement, so he cried wolf.  But
23 there was no wolf.  The people came to his aid, but they soon
24 discovered there was no wolf.  They became wise to his games.
25 And, in the end, the shepherd boy had to live with the

 1    consequences of his actions.

 2         For five years Rachel Tudor was at Southeastern with no

 3    claims.  She never cried wolf.  But then, after she rejected

 4    the wise counsel of her dean, a vice president, and the

 5    president, after she rejected the offer that Southeastern gave

 6    her to further her career at Southeastern and to obtain

 7    tenure, after she was denied tenure, she cried wolf.  And she

 8    cried and cried wolf, but there was never any wolf.

 9         We're not here today because of transgender

10    discrimination; we're here because Dr. Tudor simply did not

11    want to earn her tenure.  When she was faced with the

12    likelihood of tenure denial, she refused to take the -- to

13    take advantage of the opportunity that Southeastern gave her,

14    to have more time so that she could strengthen her tenure

15    application and obtain tenure.

16         Two well-respected tenured professors -- Dean Lucretia

17    Scoufos and Vice President Doug McMillan -- both individually

18    reviewed Dr. Tudor's portfolio, both determined it was

19    deficient in two areas:  scholarship and service.

20         So, as a result, both of them recommended that she be

21    denied tenure.  Nobody told her that she would never get

22    tenure.  In fact, it was just the opposite.  She was told that

23    she needed more time.  She needed more time to earn her

24    tenure.

25         So in April of 2010, President Minks, a long-time

 1   academian [sic] and president of Southeastern Oklahoma State

 2   University, he was faced with the decision of denying Rachel

 3   Tudor tenure.  And if he denied her tenure, he would deny her

 4   career.  And he didn't want to do that.

 5        So he created a scenario in which she would be given the

 6   opportunity for more time, because, in order to improve in

 7   these two areas of scholarship and publication, you need more

 8   time than the five months that Dr. Tudor would have between

 9   this April 2010 and the next year's tenure process.

10        It takes a long time to obtain publications.  It takes a

11   long time to write.  It takes a long time to get published.

12   To increase your service, which is service to the Southeastern

13   community, it takes a long time to get involved in committees

14   and to make a difference there on campus.  So, therefore,

15   Dr. Minks wanted her to have more time.  But in order to do

16   it, she had to agree to withdraw her tenure application,

17   because, if she wouldn't withdraw it, he would have no choice

18   but to deny it.

19        Now, Southeastern had a policy that was the norm around

20   the country with colleges and universities.  Anybody could

21   withdraw a tenure application at any place during the process.

22   However, if you were to allow it to go to the very end and the

23   president ultimately denied tenure, you're done.  You had no

24   other opportunity to reapply for tenure.

25        And that is what Southeastern was trying to avoid with

Jury Trial — Volume 1
November 13, 2017

1   Dr. Tudor.  Her dean, Lucretia Scoufos, presented the
2   president's offer to Dr. Tudor.  She told her it was a gift.
3   Had Dr. Tudor taken that gift, she would have had the ample
4   time and the resources that Southeastern was willing to give
5   her so that she could obtain her career goal of tenure.
6        So the evidence is going to make you question, why would
7   she turn it down?  There's really no justifiable reason except
8   that she wanted a fight.  And the problem is, she placed her
9   fight in front of her career.  And, as a result, she has no
10  career today.  And because she has no career today, she will
11  ask you at the conclusion of this trial to award her money.
12       You'll hear evidence that she never takes responsibility
13  for her actions -- for her own actions.  Dr. Tudor just
14  doesn't do it.  She won't take responsibility for submitting
15  two deficient portfolios in years 2008 and 2009.  She won't
16  take responsibility for that.
17       She won't take responsibility for not following the
18  tenure advice given to her by her department colleagues.  And
19  she won't take responsibility for turning down the significant
20  opportunity that Southeastern gave her so that she could
21  obtain tenure.
22       She won't take responsibility for losing a subsequent
23  job.  She sits here today, she's not writing, she's not
24  working, she's not publishing.  And she blames it all on
25  transgender discrimination.

Jury Trial – Volume 1
November 13, 2017

1     You may hear faculty members that –– I'm sorry.

2     You may hear faculty members testify that they disagree

3  with some of the decisions made by Southeastern's

4  administration.  That's no surprise.  It happens everywhere in

5  colleges and universities.  It happens in every workplace,

6  lots of disagreements, disagreements on tenure decisions.

7     You won't hear evidence that this was the only instance

8  in which a dean or anybody else at the administrative level

9  disagreed with a recommendation from a tenure committee or

10  from a department chair.  It didn't happen all the time, but

11  it certainly happened at various times.  And Rachel Tudor's

12  situation was no exception.

13     You may hear that faculty members think that she was

14  qualified in 2009 to obtain tenure, but you will see and you

15  will hear the evidence of why she wasn't qualified.  You will

16  see the tenure letter that she submitted in support of her

17  application.  Nobody that was serious about wanting to obtain

18  tenure would submit in their support a letter that goes on and

19  on about the merits of a department secretary and why it was

20  so sad and unfortunate that that department secretary couldn't

21  apply for tenure.

22     You heard Dr. Tudor's counsel tell you in his opening

23  statement how she was a rule follower, how this was so

24  important to her, how she documented this trail.

25     Dr. Tudor's 2009 application couldn't have been very

1   important to her because she didn't save it.  You will not see

2   in this courtroom all week -- you will never see a complete

3   2009 portfolio.  At Southeastern, once somebody applies for

4   tenure and the tenure process is over, the portfolio is

5   returned to the professor.  So Southeastern didn't have a

6   copy.  Dr. Tudor didn't have a copy.  She piecemealed what,

7   from her recollection, was her portfolio.

8        The tenure witness that her counsel told you about, he'll

9   be in later this week.  And he's going to tell you that he

10  reviewed an incomplete 2009 portfolio application, and, based

11  on that incomplete portfolio, he believed she was really

12  qualified.

13       Against the advice of her English department colleagues,

14  Dr. Tudor chose to submit her tenure application in 2008.  And

15  that committee voted.  They voted 5 to 0 against recommending

16  tenure for Dr. Tudor.

17       And several of them -- maybe not several.  Some of them

18  had told her before she submitted it not to submit it.  She

19  knew she shouldn't submit it.  She knew she didn't meet the

20  qualifications, but she submitted it anyway in hopes that the

21  fact that she had transitioned a year ago might be the

22  motivating factor for her colleagues to vote to recommend

23  tenure for her.  But it didn't work.

24       For the 2009 tenure process, Dr. Tudor set the backdrop

25  early to cry wolf.  Before her tenure committee was even

Jury Trial - Volume 1
November 13, 2017

1    appointed, she went to her dean.  She talked with her dean

2    about what the requirements were for her portfolio, what would

3    be -- what would give her strengths.

4        She also, though, during that meeting, accused Dr. Lisa

5    Coleman of transgender discrimination.  Dr. Lisa Coleman is a

6    tenured, well-respected professor in the English department at

7    Southeastern.  She's open-minded, she's liberal, and Dr. Tudor

8    accused her of transgender discrimination.  And why?  She

9    specifically asked that Dr. Coleman not be placed on her

10   tenure review committee.

11       The evidence will be that there was no base, no base

12   whatsoever, for those accusations.  And Dr. Tudor never even

13   apologized to Dr. Coleman for making these meritless

14   accusations.

15       Dr. Tudor also accuses Cathy Conway, the HR director that

16   plaintiff's counsel mentioned.  She accuses her of transgender

17   discrimination.  This was all based on a single phone call in

18   June of 2007 soon after Ms. Conway heard of Dr. Tudor's

19   transition.  Cathy Conway will testify that everything she did

20   in dealing with Dr. Tudor was to help Dr. Tudor ease her

21   transition, to do what was best for Dr. Tudor.  She'll tell

22   you that she dealt with kindness and with empathy for

23   Dr. Tudor.

24       She was highly trained in affirmative action and in

25   compliance and employment laws.  She will tell you that, when

Jury Trial – Volume 1
November 13, 2017

 1    she learned Dr. Tudor was transitioning, her concern was how
 2    this would affect Dr. Tudor.
 3         She dealt with her fairly.  And in their 2007 phone call,
 4    there was no discussion of dress.  There was no discussion of
 5    makeup.  There is not a single document you will see that was
 6    ever submitted to Southeastern to suggest what plaintiff's
 7    counsel mentioned.  Cathy Conway will tell you that was never
 8    even brought up.  I mean, it's a college campus.  Seriously?
 9         She will tell you they talked about the bathroom issue.
10    It was a significant issue because she brought it up with
11    Dr. Tudor and Dr. Tudor seemed concerned in this one phone
12    call.  So they talked about the various options.
13         Before she had called Dr. Tudor, she had asked about
14    whether there were other -- whether there were single-stall
15    bathrooms on campus, single-stall unisex bathrooms that
16    anybody could use.  And she gave that option to Dr. Tudor in
17    that phone call.  There was no requirement, there was no
18    mandate; it was just an option as to what Dr. Tudor would feel
19    comfortable with.
20         They ended the phone call on a really good note.  There
21    was no threat of "You must live by these conditions in order
22    to stay at Southeastern."  And you'll see the evidence doesn't
23    support that claim that you heard during opening.  They ended
24    it on a good note, and Dr. Tudor thanked Cathy Conway for her
25    professionalism.

1    Cathy Conway will tell you that at no time after this one

2    call in June of 2007 did she ever hear another word from

3    Dr. Tudor, no complaints, no whimper of any problems she was

4    having with her transition.

5    Dr. Tudor will tell you that she has silently suffered

6    these horrendous conditions at Southeastern, but there is no

7    evidence of it.  Nobody will testify that they observed

8    anything.  If that had really happened, Dr. Tudor would have

9    complained.

10    Now, she's going to tell you –– she's going to ignore

11    that Cathy Conway will tell you that she specifically told

12    Dr. Tudor about Southeastern's discrimination policy and

13    southeastern's sexual harassment policy.  And she did it so

14    that if Dr. Tudor had any of these problems, she would know

15    how to address them.  And she never did.

16    But if that really had happened, Dr. Tudor would have

17    complained.  She filed at least three grievances and two

18    discrimination complaints while she was at Southeastern.  She

19    claimed racial discrimination because of her Native American

20    heritage.  She claimed gender discrimination because she's

21    female.  And she claimed transgender discrimination.  But she

22    never complained of these supposed hostile work environments

23    because they just didn't exist.  After several years of

24    investigation, two and a half years of litigation, there is

25    still no evidence of discrimination.

Jury Trial – Volume 1
November 13, 2017

1    Dr. Tudor sits here today without a job and without

2 tenure but not because of transgender discrimination, simply

3 because she did not want to earn her tenure.  She did not want

4 to take advantage of the opportunity that Southeastern gave

5 her.

6    What is a university if it is not a place that fosters

7 ideas, encourages personal growth, encourages difference,

8 supports change?  That was the campus of Southeastern.  That

9 is the environment that Rachel Tudor worked in.  Southeastern

10 gave her an opportunity to accomplish –– to work in that

11 environment and to accomplish her career goal, and she simply

12 refused and cried wolf.

13    So at the end of this trial, ladies and gentlemen, I will

14 ask that you find in favor of our defendants, Southeastern

15 Oklahoma State and the Regional University System of Oklahoma.

16    Thank you.

17         THE COURT:  Plaintiff, call your first witness.

18         MR. YOUNG:  Dr. Rachel Tudor.

19 (Witness duly Rachel.)

20         THE COURT:  Be seated.

21    WHEREUPON, RACHEL TUDOR, Ph.D., after having been first

22 duly sworn, testifies in reply to the questions propounded as

23 follows:

24                    **DIRECT EXAMINATION**

25 BY MR. YOUNG:

Jury Trial – Volume 1
November 13, 2017

 1  Q.   Good morning, Rachel.

 2  A.   Good morning.

 3  Q.   Okay.  So I know that you're a quiet speaker, so I'm just

 4  going to remind you, if I can't hear you, I'm going to tell

 5  you to lean a little bit forward.  Okay?

 6  A.   Okay.

 7  Q.   Thank you.

 8       Rachel, can you tell me a little bit about what you loved

 9  about Southeastern?

10  A.   There are so many things.  I really loved the students

11  because they reminded me of me when I was a student.  Many of

12  them came from the same background that I came from.  Many of

13  them were the first in their families to attend college.  They

14  had families who sacrificed, as my family did, so that they

15  may be able to attend college.  They wanted nothing more than

16  their families to be proud of them.

17       And I really enjoyed helping them reach their goals and

18  attending graduation, seeing their families smiling, proud of

19  their accomplishments.

20       I really loved working with my colleagues.  They're some

21  of the best people I've ever known in my life.  They're very

22  wonderful and supporting friends.

23  Q.   Can you tell me about your favorite class that you taught

24  at Southeastern.

25  A.   I enjoyed teaching all of my classes.  I particularly

Jury Trial – Volume 1
November 13, 2017

```
 1   enjoy teaching Early Humanities, I would say.
 2   Q.   Is there a particular reason why you loved Early
 3   Humanities?
 4   A.   Many of my favorite books come from that period; for
 5   instance, Homer's Odyssey and the Iliad.
 6   Q.   Okay.  Well, I wasn't a huge fan of the Odyssey when I
 7   read it, but is there something in particular that you loved
 8   about teaching the Odyssey?
 9   A.   Yeah.  It's actually become more meaningful, perhaps
10   sustaining for me, because it's the story of a person,
11   Odysseus, trying -- his long journey home and the many
12   obstacles and difficulties that he has to overcome to make his
13   way home.
14   Q.   Is there something in particular that you loved about
15   teaching the Iliad?
16   A.   Oh, yes.  A lot of -- I think perhaps some people's view
17   of the Iliad may be colored by the film "Troy" and that.  They
18   may think of it as a war story or a story about vengeance, but
19   it's really a story about love is more important than
20   vengeance and the strength of love over vengeance.
21        And that's -- it's particularly meaningful for me because
22   I really -- I think of Southeastern as my home.  And the love
23   I have for my friends and the students, that is what's
24   important to me.  And the Iliad inspiration because it's --
25   it's a very poignant example of the -- of the power of love
```

Jury Trial – Volume 1
November 13, 2017

1    over vengeance.

2    Q.    Rachel, is this lawsuit for you about vengeance?

3    A.    No, not at all.

4    Q.    What is this lawsuit about for you?

5    A.    It's about doing the right thing.  It's about fairness

6    and justice.  It's about giving me a chance to contribute and

7    to give back to so many who have made my accomplishments

8    possible.

9    Q.    Rachel, I'm going to take you back.  When did you first

10   start working at Southeastern?

11   A.    In the fall of 2004.

12   Q.    Okay.  What was your job title when you were hired?

13   A.    Tenure track assistant professor.

14   Q.    Okay.  Can you explain to us all what exactly being on

15   tenure track means.

16   A.    It means that all of your work is part of a process, with

17   the end goal being tenure.

18   Q.    Do all of the folks who teach at Southeastern, are all of

19   them on tenure track or tenured?

20   A.    Not all of them.

21   Q.    Okay.  So is it significant if someone is hired on tenure

22   track?

23   A.    Yes, it's very significant.

24   Q.    Okay.  Can you explain to us all in your own words -- and

25   I know that there's a technical meaning, but just in your own

Jury Trial – Volume 1
November 13, 2017

1  words so we can all understand –– what exactly is tenure?

2  A.   It's a promotion based on merit.

3  Q.   Okay.  Now, Rachel, we're obviously all here today

4  because you went through a gender transition.  So I need to

5  ask you some questions.

6       Can you explain in your own words why you went through a

7  transition in 2007.

8  A.   Because it's who I am.  I'm Rachel Tudor.  I'm a woman.

9  Q.   Was it hard having to tell people in your life that you

10  were going through that gender transition?

11  A.   Well, you never know how someone is going to react.  So

12  there's some anxiety.  No one wants to lose friends or have

13  anyone think poorly of them or –– so there is some anxiety,

14  but I have to say my colleagues in my department and my

15  students, they were very welcoming and accepting.

16       And it's one of my best memories at Southeastern, is how

17  warm and accepting they were.

18  Q.   Now, when you went through this gender transition in

19  2007, were there any other transgender professors at

20  Southeastern?

21  A.   No.

22  Q.   To your knowledge, have there, since you –– outside of

23  you, have there ever been any transgender professors at

24  Southeastern?

25  A.   No.

Jury Trial – Volume 1
November 13, 2017

1   Q.   What about any other worker at Southeastern, any person

2   employed at Southeastern, out as transgender?

3   A.   No.

4   Q.   So you were the first?

5   A.   Yes.

6   Q.   At the time you were there, had you ever heard of there

7   being any transgender students at Southeastern?

8   A.   At the time, no.

9   Q.   So it was just you?

10  A.   Yes.

11  Q.   How did that feel?

12  A.   I tried not to make a big deal of it.  I just wanted to

13  do my job.  And I think that I had proved myself.  I had

14  several years of service there.  And I had earned the respect

15  of my colleagues and my students.  They allowed me to continue

16  and be welcome.

17  Q.   Can you explain to us all how you went about telling the

18  Southeastern administration you were going to go through this

19  gender transition?

20  A.   Yes.  I gave a letter from my therapist to human

21  resources.

22  Q.   Okay.  What happened after that?

23  A.   I received a call at home in the -- later in the evening,

24  which was very unusual.  That's simply not the way things are

25  normally done.

Jury Trial – Volume 1
November 13, 2017

1          Normally, if -- say, for instance, somebody from HR

2    wanted to visit with a professor about something, they would

3    e-mail us and then would schedule a time to meet either at the

4    HR offices or in our offices.  So to receive a phone call at

5    home in the evening was very unusual.  And I was very anxious

6    about -- to receive such an unusual phone call under unusual

7    circumstances as that.

8    Q.    So who was it that called you?

9    A.    Cathy Conway.

10   Q.    Okay.  Can you tell me a little bit about what was said

11   during that call?

12   A.    She told me that Doug McMillan, when he discovered that

13   I'm transgender, that he wanted to summarily fire me.  And she

14   told me that she told him that he couldn't do that.  And she

15   told me that if I agreed to follow certain rules, that I would

16   be allowed to continue to work at Southeastern.

17   Q.    I take it from your voice it was a hard phone call?

18   A.    It was -- it was not pleasant.  It was frightening.  I

19   had -- before that phone call, I had -- I had no idea that I

20   might lose my job because simply being here I am.  I thought

21   maybe some people may not like me or that -- you know,

22   something like that.

23          But I had -- it was very frightening to be confronted at

24   home in a phone call late at night from the head of H.R. and

25   told that the vice president of academic affairs wanted to

 1   summarily fire me.  That was truly frightening.  That's how
 2   I'd describe it.
 3   Q.   I'm going to ask you a few more questions about that
 4   call, but it comes to me now that she probably explained what
 5   exactly the vice president for academic affairs is to a
 6   professor.
 7        So what is that position?
 8   A.   That's a very important position.  For example, whenever
 9   the president is off campus, he's acting president.  He has a
10   great deal of authority and power on the campus.
11        So when the president is not there, he acts as the
12   president.  So it's a very powerful position.
13   Q.   And in the, I guess, Southeastern hierarchy, are
14   professors under the vice president for academic affairs?
15   A.   Yes, we are.
16   Q.   Okay.  Now, I'm going to ask you a few more questions.
17   You mentioned that Cathy Conway brought up some rules.
18        Can you take me through those rules a little bit?
19   A.   Yeah.
20   Q.   Okay.
21   A.   She said that I was not allowed to use the women's
22   restroom.
23        She –– I'm so sorry.  I have such a bad cold.  That's why
24   I have the cough drops.  I'm really sorry.
25   Q.   That's okay, Rachel.

Jury Trial – Volume 1
November 13, 2017

1   A.    That I wasn't allowed to use the women's restroom, that I

2   could only use the single-occupant restroom.  That was on the

3   second floor of the building I work in, which is Morrison.

4         She also talked about my appearance, the clothes -- my

5   clothes and makeup, for instance.

6   Q.    Okay.  I'm going to take you through those three rules

7   one by one.  Okay?

8   A.    Okay.

9   Q.    So about the restrooms.  So Cathy Conway told you that

10  you couldn't use the women's restroom?

11  A.    Correct.

12  Q.    And what was the restroom that you were supposed to use?

13  A.    So single-occupant restroom on the second floor.

14  Q.    Okay.  So what building did you teach your classes in?

15  A.    Morrison.

16  Q.    Okay.  And the restroom is in Morrison?

17  A.    Yes.

18  Q.    Was it on the same floor where you taught classes?

19  A.    I taught my classes on the third floor.  That's where the

20  English department offices are as well.

21  Q.    Is that where your office was?

22  A.    Yes.

23  Q.    Were there women's restrooms on that floor?

24  A.    Yes.

25  Q.    Were there men's restrooms on that floor?

Jury Trial – Volume 1
November 13, 2017

1   A.   Yes.

2   Q.   Okay.  Did you ever teach classes in a building other

3   than Morrison after your gender transition?

4   A.   Yes.

5   Q.   Was there a bathroom in that other building that you

6   could use?

7   A.   Not to my knowledge.

8   Q.   Okay.  What was it like to work at Southeastern with that

9   type of restriction on your restroom use?

10  A.   It was –– it was humiliating.  It was –– there are some

11  practical difficulties.  For instance, in the morning, I often

12  taught back-to-back classes all morning long, sometimes from

13  9:00 until noon, and I'd only get a 10-minute break between

14  classes.

15       So by the time I made it down to the second floor, if

16  there was somebody in there, I may not be able to use the

17  bathroom until after my next class.

18       And there's –– and if there's someone else –– an occupant

19  in it then, it may –– I may not be able to use the restroom

20  all morning long.

21  Q.   Did you change anything about your routines to deal with

22  this?

23  A.   Well, I've never been a big coffee drinker.  I know that

24  coffee –– a lot of people have to go to the bathroom after

25  drinking coffee, but I did enjoy orange juice with my

Jury Trial – Volume 1
November 13, 2017

1   breakfast, and I had to cut that out because orange juice made

2   me -- I needed to use the restroom after having orange juice.

3   I had to cut down on just the amount of fluids in general that

4   I consumed.

5   Q.   So you had to plan your workday around how much liquid

6   you drink?

7   A.   Well, I had to -- well, it affected my -- yes.  It was

8   part of my -- before, I would usually carry a bottle of water

9   to class, because talking and lecturing and answering

10   questions for an hour or so at a time, and you had to take

11   sips of -- before, I used to drink maybe a whole bottle of

12   water through the morning.

13       So I had to -- you know, I couldn't do that so much.  So

14   I was -- there was -- it was -- there was accommodations I had

15   to make to my work in order to follow the rules about the

16   restroom.

17   Q.   Have you ever used a women's restroom at Southeastern?

18   A.   No, I never did.

19   Q.   Never?

20   A.   Never.

21   Q.   During this same time period, I guess, between 2007, when

22   you transitioned, and 2011, when you left, when you weren't at

23   Southeastern, you were at a shopping mall or, I don't know,

24   not a coffee shop because you don't drink coffee, but just

25   out, what restroom did you use?

Jury Trial – Volume 1
November 13, 2017

```
 1   A.    I use the women's restroom.

 2   Q.    Were there ever any problems?

 3   A.    I've never had any problem in my life using a women's

 4   restroom.

 5   Q.    So when you were out about Durant, where Southeastern is,

 6   you used the women's restroom, so long as you weren't on

 7   campus?

 8   A.    As long as I wasn't on campus, correct.

 9   Q.    No one complained?

10   A.    No one ever complained.

11   Q.    Okay.  Let's talk about these other rules.  Let's try to

12   make this a little more efficient.  We'll talk about the

13   makeup and clothing together.

14         Can you tell me a little bit about what Cathy Conway told

15   you about your makeup and clothing?

16   A.    She talked about the length of my skirts or dresses,

17   about -- and about my makeup.

18         She said -- it was rather vague, but I -- in general, I

19   think that she was concerned that I not look like -- I hate to

20   use the word "drag queen," but that's not me.  I'm just an

21   English professor.  I'm just, you know, a woman.

22   Q.    So did you complain about these rules -- the restroom,

23   makeup, and clothing -- right away?

24   A.    No, no.

25   Q.    Can you tell me why?
```

Jury Trial – Volume 1
November 13, 2017

1  A.    It was quite frightening to get that phone call at home

2  at night telling me that Doug McMillan would like to see me

3  summarily fired and then be told by the head of human

4  resources that I had to follow these certain rules.

5        I really love my job, and I was afraid to complain.  Who

6  would I complain to?  These are very important, powerful

7  people.

8  Q.    Did you feel comfortable after this to complain to Cathy

9  Conway about the rules she imposed?

10  A.    No.

11  Q.    Why --

12        THE COURT:  Let me stop you here.  We're going to

13  take our midmorning break.  I will instruct you not to discuss

14  the case or permit others to discuss it with you.  Don't be in

15  a position to overhear conversations regarding the case.

16        To make that instruction easier for both you and all

17  participants in the trial, I'm going to ask you to take your

18  break in the -- what will ultimately be your jury deliberation

19  room.  You don't have to stay there.  You can go anywhere you

20  want to, but try to avoid that front hall so -- everyone else

21  can use those restrooms and congregate there.

22        The elevators are the same no matter which hall you're

23  on.  So everyone in the courtroom, please be careful about

24  what you say around the elevators.

25        I'll ask you to be back in the jury assembly room -- our

Jury Trial – Volume 1
November 13, 2017

1   totally unnecessary security prevents you from getting back

2   into this hallway once you leave.  So we will need to --

3   someone will need to pick you up down there and get you back

4   into this hallway.  If you stay there and don't go anywhere,

5   just stay there.

6       But wherever you are, please be back at 20 till.  We'll

7   be in recess until then.

8       I need to see counsel at the bench, I guess, before the

9   jury leaves.

10      (The following proceedings were had at the bench and out

11  of the hearing of the jury.)

12          THE COURT:  In this courtroom, everyone is referred

13  to by an honorific.  Dr. Tudor, Ms. Tudor, Judge Tudor,

14  whatever you want to call her, but not Rachel.  That goes for

15  every witness, every lawyer, everyone else.

16      This is painful.  You need to get in, get the facts you

17  want to get, and get out.  I always give anyone a little

18  leeway in getting some background from the witness or a party,

19  10 or 15 minutes, to learn who you are, where you're from.

20      You've done that with the Iliad and the Odyssey.  So, you

21  know, we need to be relevant, we need to be efficient, and we

22  need to be in recess.

23          MR. YOUNG:  Yes, Your Honor.

24          MS. COFFEY:  Thank you, Your Honor.

25      (The following proceedings were had in open court with

Jury Trial – Volume 1
November 13, 2017

1  all parties present and within the hearing of the jury.)

2       (In recess from 10:21 a.m. to 10:45 a.m.)

3       (Jury enters.)

4          THE COURT:  Be seated.

5       Please continue.

6          MR. YOUNG:  Thank you, Your Honor.

7  Q.  (BY MR. YOUNG)  Dr. Tudor, before the break, we were

8  talking about some rules that you were given by Cathy Conway,

9  just to refresh your memory.

10      At any point did any of your colleagues in the English

11 department complain to you about your transition?

12 A.   No.  I never heard any complaints.

13 Q.   What about any of your students or former students?

14 A.   No, no complaints whatsoever.

15 Q.   At any point in Southeastern were you ever apprised of a

16 complaint about you?

17 A.   No.

18 Q.   Okay.  Dr. Tudor, when did you first -- when did you

19 first start to prepare to apply for tenure?

20 A.   Tenure track professors start preparing as soon as they

21 start working.  All of our work is counted toward our --

22 toward tenure.

23 Q.   Okay.  Are there particular areas that a professor is

24 evaluated in for tenure?

25 A.   Yes.  Teaching, scholarship, and service.

Jury Trial – Volume 1
November 13, 2017

1   Q.    I'm going to take you to those -- back through those one
2   by one.   Okay?
3         Can you tell me what sort of things one would do to
4   demonstrate good teaching?
5   A.    Yes.  Design courses, effectively teach those courses,
6   get feedback from peer reviews.  That's when our colleagues
7   would come and visit our classroom and evaluate how well we're
8   teaching.  There's student evaluations as well.
9   Q.    What sort of things would someone do to demonstrate good
10  scholarship?
11  A.    Publish articles, submit articles for publication,
12  presentations at academic conferences, creative work such as,
13  in my case, open mic chatbook, which is poetry that's meant to
14  be performed orally, and visual art.
15  Q.    Okay.  Can you tell me a little bit about what goes into
16  writing a scholarly article?
17  A.    It takes -- first, it takes many years of preparation,
18  studying -- graduate degrees in literature, a Ph.D. in your
19  specialization.  It takes years of working with leading
20  scholars in the field getting feedback, submitting work,
21  editing the work.
22        It's a profession.  It takes many years of practice,
23  engagements, study, research.
24  Q.    So could a professor just sit down at their kitchen table
25  one day and just write an article?

Jury Trial - Volume 1
November 13, 2017

1   A.   No.  That's not the way it works.

2   Q.   I think the last thing you talked about was service.  Can

3   you tell me what sorts of things one would do in the area of

4   service?

5   A.   Yes.  We would serve on committees within our department

6   and also university-wide.

7       We would serve on committees such as the Native American

8   Symposium committee, which I was pretty much involved in.

9   Serve, for instance, in the faculty senate.  For instance, I

10  served in the faculty senate on the personnel policies

11  committee, also on the planning committee.

12  Q.   What's the Native American Symposium?

13  A.   It's the -- it's the premiere conference at Southeastern.

14  Actually, it is their only conference.  It's a regional

15  conference.  We'd have scholars from all over the country,

16  even the world, attend, and students are also active

17  participants in it.  It's a -- it's also -- we also invite the

18  community.  It's how Southeastern contributes to our community

19  and to scholarship.

20  Q.   Okay.  So I'm going to talk to you a little bit about the

21  2009-10 application process.

22      So can you tell me just generally, when does a tenure

23  application start in the school year?

24  A.   Well, we notify our dean and department chair in the very

25  early part of the fall semester.

Jury Trial – Volume 1
November 13, 2017

1    Q.    Okay.  So who did you notify in the early 2009 tenure

2    application process?

3    A.    I notified Dean Scoufos and my department chair, John

4    Mischo.

5    Q.    Did you meet with Dean Scoufos?

6    A.    Yes.  All tenure applicants are required to meet with the

7    dean.

8    Q.    Can you tell me a little bit about your meeting with Dean

9    Scoufos?

10   A.    Yes.  I was -- I was hoping to get some feedback on my

11   portfolio.  That's what we were -- that's what we were

12   supposed to go over during the meeting, and asked her a lot of

13   questions, but, unfortunately, I didn't get a lot of answers.

14   Q.    Dr. Tudor, can you explain to the jury what the purpose

15   of the meeting with the dean is?

16   A.    Yes.  It's to help the candidate succeed in their tenure

17   application.

18   Q.    So what is the dean supposed to do during a meeting like

19   that?

20   A.    Supposed to give -- well, supposed to answer the

21   questions a candidate has and give some concrete and specific

22   feedback in the construction and content of the portfolio.

23   Q.    Was there anything odd about this meeting to you?

24   A.    Yes.  As I said, I asked quite a few questions, and I

25   didn't -- I didn't receive the answers that I needed to my

1    questions.

2    Q.    Did you bring up any concerns to Dean Scoufos during this

3    meeting?

4    A.    At some point, Dean Scoufos asked who I'd like to be on

5    my meeting, and I mentioned some names, as well as a concern

6    that I -- well, I was asked if there was anybody perhaps I may

7    not want on the committee.

8         I said I had a concern, but it's just a concern, that

9    perhaps one -- perhaps one of my colleagues may not -- that

10   may not be comfortable.  That was Lisa Coleman.

11   Q.    Was there a reason why you thought Lisa Coleman might not

12   be comfortable?

13   A.    It turns out it was just a misunderstanding, a

14   miscommunication, and we worked it out.

15        As a matter of fact, she wrote an outstanding letter for

16   my -- for a subsequent portfolio recommending me for tenure.

17   Q.    Okay.  But you told Dean Scoufos that you were concerned

18   about Coleman.  Yes?

19   A.    Yes, I had a concern.

20   Q.    Do you know what Dean Scoufos did with that concern?

21   A.    I found out later, when I talked to my department chair

22   about who would actually be on my committee, I found out that

23   Dean Scoufos had placed Lisa Coleman as the chair of my tenure

24   committee.

25   Q.    Dr. Tudor, can you explain to the jury what the

Jury Trial – Volume 1
November 13, 2017

1  significance of being the chair of the committee is?

2  A.   The chair is the person responsible for directing the

3  committee members, the tenure committee members, their

4  activities.  It's like the head of a department, a manager, a

5  team leader, a very important and formative role on the

6  committee.

7  Q.   Okay.  To your knowledge, did Dean Scoufos ever talk to

8  Lisa Coleman about your concern?

9  A.   Not to my knowledge.

10  Q.   So the only thing that Dean Scoufos did was make Lisa

11  Coleman the chair?

12  A.   Correct.

13  Q.   Dr. Tudor, can you explain very generally to the jury

14  what a tenure portfolio is.

15  A.   A tenure portfolio is a collection of evidence

16  documenting the worthiness of a candidate for tenure.

17  Q.   What is a tenure portfolio?  How is it composed?  Is it

18  in a binder?  Is it loose documents?

19  A.   It's in a binder with specific sections.

20  Q.   Okay.  Can you tell me, just very generally, some of the,

21  you know, kinds of –– like, the pieces of paper that would go

22  in a tenure portfolio?  What goes in it?

23  A.   Yes.  Our CV, which is a –– a CV is a very detailed

24  résumé.  It's many, many pages in length.  Also, a cover –– a

25  cover letter.  It would also have copies of letters of

Jury Trial – Volume 1
November 13, 2017

1  recommendation, for instance, from my colleagues and peers.

2  It would also contain copies of articles that had published.

3  It would contain programs where I have made presentations at

4  conferences.  Mine contained evidence of my open mic chatbook.

5  For instance, it would contain student evaluations and peer

6  evaluations.

7  Q.   So Dr. Tudor, your 2009-2010 portfolio, did you include

8  evidence of the three criteria:  teaching, scholarship, and

9  service?

10  A.   Yes, I did.

11  Q.   Did you yourself put together that portfolio?

12  A.   Yes, I did.

13  Q.   Do you remember how long it took you to put that

14  together?

15  A.   It's a very time-consuming process, gathering all of

16  those materials, asking for letters of reference, revising my

17  CV, et cetera, composing my cover letter.  It's -- it's -- it

18  would have been weeks.

19  Q.   Okay.  I'm going to touch on something very briefly, and

20  then we'll move on.

21       Dr. Tudor, during defendants' opening, they mentioned

22  that you wrote a cover letter where you talked about the

23  department secretary.

24  A.   Yes.  Theresa Anderson.

25  Q.   Can you tell the jury why you talked about Theresa

Jury Trial - Volume 1
November 13, 2017

1   Anderson?
2   A.   Yes.  She's a department secretary.  She was -- that
3   title really doesn't say the service that she rendered to the
4   department.
5        She was the reason why we could all do our jobs.  She
6   kept the trains running on time.  And she had been there for
7   many years, and I had -- her office is right next to mine.  I
8   had the highest degree of respect for her.  And I did allude,
9   in my cover letter, that I wished there was an option for her
10  to be tenured as well so she could have that type of security.
11       It was -- I did not mean to be disrespectful to the
12  process.  It was purely out of my respect and admiration for
13  her work and her contributions to our department.
14       And I really do wish there was some sort of policy at
15  Southeastern so -- so people like Theresa Anderson could have
16  the same type of security that professors do.
17  Q.   Okay.  Dr. Tudor, just one clarification.  As to your
18  scholarship, did you continue to work on scholarship
19  throughout the 2009 application process after you put together
20  that, what I assume, is a very big portfolio?
21  A.   Yes, I did.
22  Q.   Okay.  Can you explain sort of why someone continues to
23  work on scholarship?
24  A.   Yes.  Because tenure, it's -- well, it's awarded for your
25  cumulative work.  And I -- I love scholarship.  I love

Jury Trial – Volume 1
November 13, 2017

1  research and writing, even -- I would continue no matter what.

2  I just love learning.

3  Q.   Off the top of your head, how many articles have you

4  written, scholarly articles?

5  A.   Approximately a dozen.

6  Q.   Okay.  So after you meet with Dean Scoufos, who did you

7  meet with next?

8  A.   My department chair, John Mischo.

9  Q.   Do you remember what was said during that meeting, more

10  or less?

11  A.   Yes.  He examined my portfolio and handed it back to me.

12  He seemed -- he seemed pleased with the composition of the

13  portfolio.

14  Q.   Okay.  Does a department chair have a special role in the

15  tenure application process?

16  A.   Yes.  The department chair gets a vote.

17  Q.   Okay.

18  A.   And the department chair also allows the process to move

19  forward.

20  Q.   So what happened after meeting with John Mischo?  What

21  was the next step in the process?

22  A.   I gave my portfolio back to John to give to the tenure

23  committee.

24  Q.   Okay.  When about did you learn what the tenure committee

25  did on your portfolio?

Jury Trial — Volume 1
November 13, 2017

```
 1   A.    Right before the Christmas break.

 2   Q.    How did the tenure committee vote?

 3   A.    The tenure committee voted to award me tenure.

 4   Q.    How did that feel?

 5   A.    It was like the best Christmas gift ever.  I was -- I

 6   was -- I was -- it was -- it's hard to explain.  It's

 7   something that I worked for my entire -- entire life.  And

 8   it's -- however hard I worked for it, actually having it -- I

 9   mean, actually the anticipation of having it at hand, it was

10   surreal.  It was -- it was just, as I said, the best Christmas

11   ever.

12   Q.    Was getting tenure going to change your life?

13   A.    Yes.  And not only -- and more importantly, not only my

14   life, but my family made quite substantial sacrifices to help

15   me get my education, especially my oldest sister.  And I

16   wanted to help her also to get a home.  And I was thinking --

17   also, I would like to have a home in Durant.

18   Q.    Did you start looking for a home?

19   A.    Yes.  I started looking online at houses near campus.  I

20   like living by campus.  I could just walk to campus.

21   Q.    At this point, when you heard from the department that

22   they were going to award you tenure, had you ever heard of

23   anyone who was granted tenure by the department who didn't

24   ultimately get tenure?

25   A.    No.  To my knowledge, that had never happened in all of
```

Jury Trial – Volume 1
November 13, 2017

1    Southeastern's history.

2    Q.   At that point, were you concerned at all that the

3    administrators wouldn't honor the department's decision?

4    A.   I had –– I was still hearing the echo from the

5    conversation with Cathy Conway where Doug McMillan said he

6    wanted me summarily fired, but I –– I thought they would

7    follow the rules and the 100–plus–year tradition that

8    Southeastern had of honoring the decision of their tenure

9    committees.

10           MR. YOUNG:  Your Honor, plaintiffs exchanged

11   exhibits with defendants during the break that are properly

12   marked.  My understanding is, they will object if they have a

13   substantive objection.

14       At this time, I'm going to proffer Plaintiff's Exhibit

15   No. 72.

16       Your Honor, may I approach the witness and hand her ––

17           THE COURT:  Yes.

18           MR. YOUNG:  Thank you.

19   Q.   (BY MR. YOUNG)  Dr. Tudor, do you recognize Plaintiff's

20   Exhibit No. 72?

21   A.   Yes.

22   Q.   What is it?

23   A.   This is the notification I received from Lucretia Scoufos

24   that she was recommending denying –– denying my application

25   for tenure, as well as –– well, effectively fire me,

Jury Trial – Volume 1
November 13, 2017

1  recommending that I be given a one-year terminal appointment

2  that would end that year.

3  Q.   So you were up for a promotion, and Dean Scoufos wanted

4  to deny it and she wanted you fired?

5  A.   Yes.

6  Q.   Had you ever heard of something like that happening

7  before?

8  A.   No, no.  This was -- it was really -- it was shocking

9  and, again, very, very frightening because I had never heard

10  of anyone, not only being denied tenure after the tenure

11  committee had recommended for it, but also to be -- to be

12  terminated like this, for their appointment to be canceled.

13  Q.   Can you tell me how you felt when you got that letter?

14  A.   I -- I remember -- I remember the very day when I read

15  it.  It's one of those events where everything's --

16  crystallizes in your memory, because, after I read this, I was

17  in a state of shock, really.

18       I was -- I read it right before I was scheduled to teach

19  a class.  I remember walking past Theresa Anderson's desk into

20  the hallway.  And Randy Prus, one of my colleagues, was coming

21  into the office.  And he said hi to me.  And I couldn't even

22  say hi to him.  I was just in a state of shock.

23       And I just look -- I remember the expression on his face

24  because I always say hi to my colleagues when I pass them.

25  I'm never rude like that.  But I was -- that was the state of

1   mind that I had when I received this -- this letter.

2   Q.   So did this letter from Dean Scoufos explain why she was

3   recommending that you be denied tenure?

4   A.   No, it doesn't explain.

5   Q.   What did you do after you got this letter?

6   A.   Excuse me if I have a cough drop.

7        I contacted Dean Scoufos via e-mail to ask if she could

8   give me some information, some rationale for why she was

9   denying me tenure, and why she was recommending my

10  termination.

11  Q.   What did Dean Scoufos do?

12  A.   She said that she did not discuss these things via

13  e-mail, that I should make an appointment with her assistant,

14  Mindy House.  And so I did.  I contacted Mindy House and made

15  an appointment to speak with Dean Scoufos in person.

16  Q.   Okay.  And did you meet with Dean Scoufos?

17  A.   Yes.  And John Mischo, my department chair, he came with

18  me to meet with Dean Scoufos.

19  Q.   So can you tell the jury what happened during that

20  meeting.

21  A.   Yes.  It was very odd, because she had -- she had

22  e-mailed me -- a response to my e-mail saying she didn't

23  discuss these issues via e-mail, that I had to make an

24  appointment with Mindy House to talk to her in person.

25       So my expectation -- and also my department chair's

1  expectation, John Mischo –– was that we –– was that –– the

2  expectation was we would get an explanation from her about why

3  she was denying me tenure.

4       But, instead, she told us that she –– that she was not

5  going to give us an explanation until after President Minks

6  made his decision.

7  Q.   Can you explain to the jury, Dr. Tudor, why it was

8  important –– if Dean Scoufos had denied your application, why

9  you needed to know her rationale at that point in time?

10 A.   Yes.  If there was something missing from the portfolio,

11 if there was something that I could do to supplement it or to

12 answer any questions she may have if she was confused by

13 something or misunderstood something in my portfolio, I'd

14 hoped that I would be given the opportunity to explain or to

15 understand what was happening because my tenure portfolio

16 would then be going –– would be going to other people to see,

17 and I wanted to correct anything that was correctable.

18 Q.   Dr. Tudor, at any point did you learn of any professors

19 at Southeastern who were given the opportunity to make

20 corrections or have a conversation with someone midstream?

21 A.   Yes, my colleague, Mark Spencer.  I visited with him, as

22 I did with the other colleagues in my office after receiving

23 this notification.  And we were all equally shocked.

24      And Mark Spencer encouraged me to talk to ––

25           MS. COFFEY:  Objection, Your Honor.  The witness is

1  testifying about hearsay.  Mr. Spencer can come and testify

2  about their conversation.

3              THE COURT:  Do you have an argument this falls

4  outside the hearsay rule?

5              MR. YOUNG:  One moment, Your Honor.

6        Excited utterance, Your Honor.

7              THE COURT:  Sustained.

8              MR. YOUNG:  Okay.

9  Q    (BY MR. YOUNG)  Why don't we move on, Dr. Tudor.

10       So, at this point, you couldn't get an explanation from

11  Dean Scoufos.  What happened next in the tenure process?  What

12  was the next step?

13  A.    The application would go to Douglas —— Doug McMillan, the

14  vice president of academic affairs.

15  Q.    Okay.

16              MR. YOUNG:  Your Honor, I'm going to —— may I

17  approach the witness to give her Plaintiff's Exhibit 167?

18              THE COURT:  Yes.

19              MR. YOUNG:  Thank you, Your Honor.

20  Q.    (BY MR. YOUNG)  Dr. Tudor, do you recognize Plaintiff's

21  Exhibit 167?

22  A.    Yes.

23  Q.    What is it?

24  A.    This is the notification that I received from Doug

25  McMillan notifying me that he was not recommending me for a

1    promotion and tenure.

2              MR. YOUNG:  Your Honor, may I propose that

3    Plaintiff's Exhibit 167 be admitted into evidence?

4              THE COURT:  Any objection?

5              MS. COFFEY:  No objection, Your Honor.

6              THE COURT:  Admitted.

7    Q.  (BY MR. YOUNG)  So, Dr. Tudor, does Doug McMillan's letter

8    give you any explanation?

9    A.   No, there's no explanation whatsoever.

10   Q.   At this point in time, had you ever heard of the vice

11   president for academic affairs not following the

12   recommendation of the department before on a tenure

13   application?

14   A.   No.  To my knowledge, this had never happened before.

15   Q.   What did you do next after you got this letter?

16   A.   I contacted Doug McMillan to ask for an explanation.

17   Q.   How did you contact Doug McMillan?

18   A.   Via e-mail.

19   Q.   Did he respond?

20   A.   That I needed to set an appointment.  And I contacted his

21   assistant to set up an appointment to visit with him as well.

22   Q.   Okay.  Did you ever have that meeting with Doug McMillan?

23   A.   No, I didn't.  He canceled it a few -- just a few minutes

24   before it was supposed to occur.  He told me that he wouldn't

25   meet with me until after -- after the faculty appellate

Jury Trial – Volume 1
November 13, 2017

1   committee had reached a decision.
2   Q.   Okay.  So why don't we help the jury here, Dr. Tudor.
3        At some point, did you file a grievance with the faculty
4   appellate committee?
5   A.   Yes, the faculty –– yes, I filed a grievance with the
6   faculty appellate committee.
7   Q.   Okay.  Let me help the jury again.
8        Did you file more than one grievance with the faculty
9   appellate committee?
10  A.   Yes, I did.
11  Q.   Okay.  So let's talk about the first grievance.  When did
12  you file the first grievance?
13  A.   When –– after Lucretia Scoufos refused to give me the
14  reasons for denying me tenure, I filed a grievance because the
15  rules state very clearly that an applicant is entitled to an
16  explanation if an administrator disagrees with the tenure
17  promotion committee.
18       And since I had made a good faith effort to get that
19  explanation and she had refused to provide one, my only
20  alternative was to file with the faculty appellate committee
21  to –– to get that explanation, to follow the rules.
22  Q.   Do you remember what happened after you filed that
23  grievance?  What was the next big thing?
24  A.   In reference to the faculty appellate committee?
25  Q.   In reference to your tenure process in 2009–10.

1        Well, let me word this differently.

2        Did you meet with Dean Scoufos in early April 2010?

3   A.   Yes.  In April, yes, we did.

4   Q.   Okay.  Can you tell me who was at that meeting?

5   A.   Yes.  It was, again, John Mischo.  John Mischo and I, we

6   were called to a meeting in Dean Scoufos's office, and neither

7   one of us had an idea of what that was about.  And when we

8   arrived, Dean Scoufos demanded that I withdraw my application

9   for tenure and promotion.

10  Q.   Had you ever heard of such a thing before?

11  A.   No, no.  It was -- it was a complete surprise.  I had no

12  expectation of that ever happening.

13  Q.   So in April 2010 at the time of this meeting, was your

14  application still live?

15  A.   Yes, it still had not -- I still had not heard from

16  President Minks yet.

17  Q.   Okay.  And Dean Scoufos asked you to withdraw it?

18  A.   I wouldn't say "asked"; it was more in the form of a

19  demand and even a threat.

20  Q.   Why did it feel like a demand or a threat?

21  A.   Well, at some point, I asked her if -- if the demand to

22  withdraw my application, if this was her idea or if it was

23  Doug McMillan's idea.

24       And, in response, she said that she met with Doug

25  McMillan and also Larry Minks, and the three of them decided

Jury Trial – Volume 1
November 13, 2017

1  that I should -- decided to demand that I withdraw my

2  application for tenure.

3       And when I requested further explanation, she told me --

4  well, I made mention of the fact that even if -- well, of

5  course, Minks hadn't ruled on it yet, so it made it seem that

6  I still have another year, my seventh year, to apply for

7  tenure.  And she said the rules say that you may apply; it

8  doesn't mean that we have to let you apply.  And I took that

9  as a threat.

10 Q.   Did you fear retaliation?

11 A.   Yes.  That was -- I felt that if I didn't accede to the

12 demand to withdraw my application, that there would be a

13 retaliation as she had stated.

14 Q.   Was there anything that you asked for during that meeting

15 from Dean Scoufos?

16 A.   Yes, I asked -- well, she said, in return for withdrawing

17 my application, that, in the following year, I could -- I may

18 be allowed to apply for tenure, and then the year after that,

19 for promotion.  And I asked for that offer in writing, asked

20 for it in writing, and she refused to put the offer in

21 writing.  And so I feared, under the -- many unusual

22 circumstances that had been happening, that wasn't a

23 legitimate offer.

24       And, also, because, you know, earlier, she had

25 recommended that I be terminated at the end of the year.  And

Jury Trial – Volume 1
November 13, 2017

1   so it was very important to me to get something in writing, to

2   get that offer in writing, so I would have some security, some

3   proof of what had happened in that office.  And she refused to

4   put anything in writing.

5   Q.   Did you ever explain to Dean Scoufos why you didn't

6   accept her offer?

7   A.   Yes.  I wrote to her later, and I told her that -- that I

8   couldn't -- I couldn't -- that I didn't view it as a

9   legitimate offer if it wasn't in writing.  And she -- and

10  since she refused to put it in writing, I was going to go

11  ahead and let the -- I was not going to withdraw my tenure

12  application.

13  Q.   Did Dean Scoufos ever respond to you?

14  A.   No.  That was the end of that.

15  Q.   Okay.  What was the next big step in the tenure and

16  promotion process, Dr. Tudor?

17  A.   It would go -- it went to President Larry Minks.

18  Q.   Do you recall when about you heard a decision from Larry

19  Minks?

20  A.   Yes.  I believe it was near the end of the semester,

21  perhaps late April.  I was notified that he was also denying

22  my application for tenure.

23          MR. YOUNG:  Your Honor, may I approach the witness?

24          THE COURT:  Yes.

25          MR. YOUNG:  Thank you.

Jury Trial – Volume 1
November 13, 2017

1    Q.   (BY MR. YOUNG)  Dr. Tudor, I've handed you an exhibit

2    marked Plaintiff's Exhibit 168.  Do you recognize this

3    document?

4    A.   Yes.  This is the notification I received -- this is the

5    notification I received from Larry Minks that he was denying

6    my application for tenure.

7              MR. YOUNG:  Your Honor, may I propose that this

8    exhibit be admitted as Plaintiff's Exhibit 168?

9              MS. COFFEY:  No objection, Your Honor.

10             THE COURT:  Admitted.

11             MR. YOUNG:  Thank you.

12   Q.   (BY MR. YOUNG)  Dr. Tudor, to your mind, was there

13   anything unusual about this letter?

14   A.   Yes.  It states that Doug McMillan will be giving me

15   his -- President Minks's rationale for denying me tenure but

16   that President Larry Minks would not be giving me that.  It

17   would be -- it would be via Doug McMillan.

18        And I thought that was very strange that one

19   administrator would write the rationale for another

20   administrator.

21   Q.   At this point in time when you got this letter from Larry

22   Minks, had Doug McMillan ever given you his rationales for why

23   he voted against you?

24   A.   No, he had not.  And he had also failed to reschedule the

25   appointment that he had promised me after the faculty

Jury Trial – Volume 1
November 13, 2017

1   appellate committee had reached their decision.

2   Q.   Why don't we talk about that, that first grievance with

3   the faculty appellate committee, Dr. Tudor.

4        What did the faculty appellate committee decide?

5   A.   The faculty appellate committee decided that Dean Scoufos

6   and Doug McMillan both should follow the rules, that the rules

7   stated that they are obligated to give a candidate for tenure

8   their reasons for denying that application when it goes --

9   particularly when it goes against the decision of the tenure

10  committee.

11  Q.   Did Doug McMillan and Lucretia Scoufos comply with that

12  order?

13  A.   No.  I never received an explanation from Lucretia

14  Scoufos or Doug McMillan for their reasons for denying me

15  tenure that year.

16          MR. YOUNG:  Your Honor, may I approach the witness?

17          THE COURT:  Yes.

18          MR. YOUNG:  Thank you.

19  Q.   (BY MR. YOUNG)  Dr. Tudor, I've handed you Plaintiff's

20  Exhibit No. 30.

21       Do you recognize this document?

22  A.   Yes.

23  Q.   What is it?

24  A.   It is a letter that I received from Charles Weiner, the

25  assistant vice president for academic affairs.

Jury Trial – Volume 1
November 13, 2017

```
1   Q.   Okay.  Can you tell me --
2            MR. YOUNG:  Once again, Your Honor, may I propose
3   that this be admitted as Plaintiff's Exhibit 30?
4            MS. COFFEY:  I'm sorry, Your Honor.  It's just that
5   the way they handed us the exhibits, I'm having difficulty
6   finding the exhibit that they're referring to.
7        I don't see an Exhibit 30, a marked Exhibit 30.  I
8   apologize.
9            No objection, Your Honor.
10           THE COURT:  Admitted.
11  Q.   (BY MR. YOUNG)  Now, Dr. Tudor, I want you to tell me very
12  generally about this letter.
13       What does Dr. Weiner say in it?
14  A.   Well, he informs me -- and this is the first notification
15  I had of the decision of the faculty appellate committee --
16  that they had decided that Scoufos and McMillan owed me an
17  explanation.  He said, however, they're not going to provide
18  that explanation.  Instead, McMillan is going to give me
19  Minks's -- the rationale for Minks's decision, but they're not
20  going to give me their reasons.
21  Q.   At the time you got this letter, did the things it said
22  in it make any sense to you?
23  A.   It was -- it was -- I was -- well, first, I was very,
24  very shocked that they wouldn't honor the decision of the
25  faculty appellate committee.
```

Jury Trial — Volume 1
November 13, 2017

 1        I'm sorry.  It's -- could you please ask that again.  I'm
 2   not sure if I --
 3   Q.   Yeah.
 4        I mean, at the time you got this letter --
 5   A.   Uh-huh.
 6   Q.   -- did you believe that you were entitled to rationales
 7   from Doug McMillan and Lucretia Scoufos?
 8   A.   According to the rules, I did, yes.
 9   Q.   So did you believe that the rules required that the
10   administration comply with the faculty appellate committee's
11   decision?
12   A.   Yes, and so did the faculty appellate committee.
13   Q.   When about did you get the letter from Dr. Weiner?
14   A.   It's dated April 29th.
15   Q.   What year?
16   A.   Oh, I'm sorry.  2010.
17   Q.   Do you remember getting the letter on or about that date?
18   A.   Approximately.
19   Q.   Okay.  So, Dr. Tudor, you talked earlier about a letter
20   that you were supposed to get from Larry Minks that was
21   supposed to contain -- I'm sorry.
22        You talked earlier about a letter you were supposed to
23   get from Doug McMillan which contained Larry Minks's
24   rationales; right?
25   A.   Yes.

Jury Trial – Volume 1
November 13, 2017

1        MR. YOUNG:  Your Honor, may I approach the witness?

2   I'd like to hand her Plaintiff's Exhibit 79.

3        THE COURT:  Yes.

4        MR. YOUNG:  Thank you.

5   Q.  (BY MR. YOUNG)  Dr. Tudor, do you recognize Plaintiff's

6   Exhibit 79?

7   A.   Yes.  It's a memorandum to me from Doug McMillan.

8        MR. YOUNG:  Your Honor, may I propose that this be

9   admitted as Plaintiff's Exhibit 79?

10        MS. COFFEY:  No objection, Your Honor.

11        THE COURT:  Admitted.

12   Q.  (BY MR. YOUNG)  So, Dr. Tudor, can you tell me what the

13   date is on this letter.

14   A.   April 30th, 2010.

15   Q.   When did you get this letter?

16   A.   I believe this was the letter that I received in June,

17   sometime in June 2010.

18   Q.   Before this, had you ever gotten a letter that had a date

19   that was so old from a Southeastern administrator?

20   A.   No.  No, I had never -- I had never had that experience,

21   and I'd never heard of such a thing.

22   Q.   Okay.  Other than the date, was there anything else that

23   was odd about this letter, to you?

24   A.   Just the purported rationales for denying me tenure and

25   promotion seemed very odd.

1  Q.   What were the particular things that you found odd about

2  those rationales?

3       I'm sorry.  These were the first rationales you had ever

4  received; right?

5  A.   Yes.

6  Q.   So what was odd about them?

7  A.   Well, for instance, in terms of research and scholarship,

8  he says that two publications and one presentation at a

9  regional symposium, that those things certainly merit -- or

10 meet the standard, but then he looks at other activities.  So

11 it could be considered bonus activities that he claimed didn't

12 quite meet the bar and cited those as a supposed rationale to

13 deny me tenure and promotion.

14 Q.   So, Dr. Tudor, at this point in time, did you know other

15 professors in the English department who had received tenure?

16 A.   Yes.

17 Q.   How many publications did those professors have when they

18 got tenure on average?

19 A.   Fewer than mine.

20 Q.   How few?

21 A.   As little as one.

22 Q.   Okay.  But Doug McMillan told you that two publications

23 wasn't enough?

24 A.   Correct.

25 Q.   And it wasn't enough because your bonus activities

Jury Trial – Volume 1
November 13, 2017

1   weren't good enough, even though your two publications were
2   good enough?
3   A.    Correct.
4   Q.    Okay.  Dr. Tudor, does Doug McMillan talk about your
5   service in this letter?
6   A.    Yes.
7         May I elaborate?  There's one other peculiar thing about
8   the scholarship --
9   Q.    Sure.
10  A.    -- that really stood out to me as well.
11        I edited two of the proceedings from the symposium in
12  2006 and 2008, and he -- and there's a claim here that they
13  couldn't find -- that they couldn't verify those publications.
14  But those publications are on display in a display case in the
15  library which is literally next door to the administration
16  building in full view.
17        So I had been very -- it had struck me as very odd that
18  they -- he couldn't verify that I'd actually edited those --
19  those proceedings from the symposium.
20  Q.    Dr. Tudor, can you explain to the jury, what symposium
21  are you talking about?
22  A.    The Native American Symposium.
23  Q.    The very big symposium, the only conference at
24  Southeastern?
25  A.    Correct.  Our regional conference.

Jury Trial – Volume 1
November 13, 2017

1  Q.   Dr. Tudor, I don't know how many folks in the room might

2  know this, but what does the cover of a proceeding publication

3  look like?

4  A.   The -- the cover would state the year in which the

5  proceeding occurred.  It would state the theme of the

6  proceedings.  We had different themes for different years.

7       And then it would state who edited the proceedings.  All

8  of those were displayed very prominently on the front cover of

9  the journal.

10 Q.   After you edited a proceeding, were any copies of it sent

11 out to administrators at Southeastern?

12 A.   Yes, copies were sent directly to the different

13 administrators.

14      So, once again, it struck me as very -- very peculiar

15 that Doug McMillan was unfamiliar with who edited the

16 proceedings from our only conference when, not only was there

17 a copy on display in our library, but also a copy had been

18 sent personally to Doug McMillan.

19      And while he's writing -- perhaps I'm -- again,

20 purportedly on behalf of Larry Minks, and, certainly, Larry

21 Minks would have received a copy of the proceedings as well

22 with my name prominently displayed on the cover.

23 Q.   Dr. Tudor, are you a member of the Chickasaw Nation?

24 A.   I'm sorry.

25 Q.   It's okay.  I'll repeat the question.

Jury Trial — Volume 1
November 13, 2017

1          Dr. Tudor, are you a member of the Chickasaw Nation?
2     A.   Yes, I am.
3     Q.   Did you take pride in being a professor of Chickasaw
4     heritage at Southeastern?
5     A.   I would phrase it as it was an honor to represent
6     Chickasaw Nation in my service at Southeastern.
7     Q.   Was it important to you to participate in the Native
8     American Symposium?
9     A.   Yes, it was important.
10    Q.   Okay.  Dr. Tudor, let's try to move on.
11         Was there anything odd about McMillan's critique of your
12    service in this letter?
13    A.   Yes.  It does not —— it doesn't —— it doesn't acknowledge
14    my service on the Native American Symposium committee.
15         It also fails to note my service on —— there's a
16    statewide program in Oklahoma called the Oklahoma —— it was
17    OSLA, Oklahoma Scholarship Leadership Enrichment program,
18    which is a very prestigious —— it's a very prestigious honor
19    for all the universities in Oklahoma.  It's hosted at
20    different universities on different years and different
21    occasions.  And the year that Southeastern hosted it, I was
22    honored to teach with the renowned scholar Rennard Strickland,
23    who was a dean of law at the University of Oklahoma.
24         And I consider that one of the highlights of my service.
25    It was just a tremendous honor to participate in that.

Jury Trial – Volume 1
November 13, 2017

1  Q.   Now, Dr. Tudor, so you talked about some oddities and
2  some criticisms that didn't make sense to you.  I want to ask
3  you something more specifically.
4       Was there anything in Doug McMillan's letter that made
5  you believe that you would not be allowed to reapply for
6  tenure the next year?
7  A.   No, nothing.
8  Q.   So it doesn't say there's a rule that says you can't
9  apply?
10 A.   No.
11 Q.   Okay.  Did you have any concerns at this point in time,
12 in June when you got this letter dated in April, that you
13 wouldn't be allowed to reapply?
14 A.   Well, I was -- I was confident that the rules allowed me
15 to reapply.
16      After what had happened the past year, I was -- there was
17 some anxiety that the administration may not follow those
18 rules.  And I was still -- the veiled threat from Scoufos was
19 still echoing in my mind.
20      But the rules are the rules.  And so I was moving forward
21 and I was hoping that they would follow the rules and I'd be
22 allowed to reapply and put all this behind me.
23 Q.   At this point in time, Dr. Tudor, had you ever heard of a
24 rule at Southeastern that if you didn't get tenure one year at
25 any stage, that you couldn't try the next year?

Jury Trial – Volume 1
November 13, 2017

1   A.    No, never.

2   Q.    Dr. Tudor, I think you mentioned that you served on the

3   faculty senate at one point at Southeastern?

4   A.    Yes, that's correct.

5   Q.    Did you ever serve on the rules committee at

6   Southeastern?

7   A.    There's -- it's a type of -- yes.  Yes, it could be --

8   could be construed that.  It's faculty policies and procedures

9   committee, which deals with rules governing faculty.

10  Q.    And rules governing tenure processes for faculty; right?

11  A.    Yes, absolutely.

12  Q.    If there had been a rule, would you have known?

13  A.    Yes.

14  Q.    Did you work hard on that committee?

15  A.    Yes.  Yes, that was a very labor-intense committee.

16  Q.    By chance, did Doug McMillan recognize your service on

17  that committee in that letter?

18  A.    No.

19  Q.    And, Dr. Tudor, I'm going to fast-forward a little bit.

20  Okay?

21        Did you file some complaints in August 2010?

22  A.    Yes.

23  Q.    Okay.  Multiple complaints?

24  A.    Yes.

25  Q.    Okay.  Did you file a discrimination complaint with

Jury Trial – Volume 1
November 13, 2017

1   Claire Stubblefield?

2   A.   Yes.

3   Q.   Did you file a complaint with the faculty appellate

4   committee?

5   A.   Yes.

6   Q.   Did you file a complaint with the U.S. Department of

7   Education?

8   A.   Yes.

9   Q.   Dr. Tudor, can you tell the jury why you filed so many

10  complaints in August 2010?

11  A.   Well, there's a couple of reasons.  So I wanted there to

12  be a record of what had happened.  I wanted to let the

13  responsible parties know that rules had been -- rules had been

14  egregiously broken.  I wanted things to be fixed.  I mean, it

15  seems to me that things were very broken there and they needed

16  to be fixed.

17  Q.   Were you hurt at that point?

18  A.   Yes.

19  Q.   Can you explain to the jury why you were hurt?

20  A.   I'd always -- I had followed the rules.  I had done

21  everything that was expected of me, even more.  I'd worked

22  very, very hard for something.  And in spite of -- in spite of

23  that, I was -- I was denied my reward for my -- for my work.

24       What else?

25       I was -- sorry.  Can you -- I got lost a little bit in my

Jury Trial – Volume 1
November 13, 2017

1    explanation.

2    Q.   I asked you if you were hurt.

3    A.   Yeah.

4    Q.   Is it painful for you to talk about this?

5    A.   Yes.  I was -- I was hurt for myself.  I was hurt for my

6    colleagues.  I was hurt for Southeastern.  I was -- it was a

7    very painful disappointment all around.

8    Q.   Okay.  Now, Dr. Tudor, so those three complaints you

9    filed, were they all different, the substance of them?

10   A.   The substance of them was the same.

11   Q.   So you were basically sending this same complaint to a

12   bunch of different folks?

13   A.   Yes.  Each one had their own responsibilities, and I

14   believe that they needed to be notified so they could provide

15   the appropriate fixes.

16   Q.   So, Dr. Tudor, let's again fast-forward a little bit.

17        Did you try to apply for tenure in the 2010-11 cycle?

18   A.   Yes, I did.

19   Q.   When did you start preparing to apply?

20   A.   Well, applying for tenure is a continuous process, but I

21   started putting my portfolio together when I -- when it was

22   returned to me at the -- right before the beginning of the

23   fall semester 2010.

24   Q.   You got that portfolio back from -- would it have been

25   Larry Minks's office or somewhere else?

Jury Trial – Volume 1
November 13, 2017

1   A.    From Larry Minks's office, yes.

2   Q.    Okay.  Can you tell me a little bit about how you started

3   assembling that 2010-11 portfolio?

4   A.    Yes.  Since a portfolio is based upon all of your work, I

5   simply -- to prepare the next portfolio, what I needed to do

6   was update my CV, which is that long, detailed résumé.  So I

7   needed to include the other work and publications that I

8   had -- had done since the previous application.

9        I updated my cover letter.  I added some new reference

10  letters, for example, from Mark Spencer; from Lisa Coleman --

11  she wrote me, as I mentioned earlier, a very powerful

12  recommendation for tenure -- from Virginia Parrish, another

13  colleague; and from Kim McGehee.  They all wrote me new

14  letters.

15       I removed some of the old letters.  For instance, Theresa

16  Anderson, our secretary, not only had I wrote about her in my

17  previous cover letter, but I also included a letter of

18  reference from her.  I thought it was relevant because she sat

19  right next to me and she heard my interaction with students

20  and how well that I got along with students.  And I thought

21  that was very important information, but some administrators

22  didn't.  Well, as you heard in the opening, Theresa

23  Anderson -- they took it as disrespectful that I included

24  Theresa Anderson in my cover letter and as a reference.

25       So I removed a reference to her, a new cover letter, and

Jury Trial – Volume 1
November 13, 2017

1  I also removed her letter of recommendation for me in my
2  updated portfolio.
3      Let's see.  What else?
4      I added new publications and just a few miscellaneous
5  other things that would go in a portfolio, but those are the
6  main things that I did.
7  Q.  Let me ask you a specific question.  You said you added
8  new publications.
9  A.  Yes.
10 Q.  That's the same thing as articles?
11 A.  Yes.  Yes, articles.
12 Q.  How many articles did you have at that point?  Do you
13 remember?
14 A.  Well, there was a number -- well, there were several that
15 had -- there were more that had been accepted for publication.
16 And there was also, actually, published articles.  So during
17 that -- during the course of the 2010-2011 cycle, I had
18 approximately a dozen publications during that cycle.
19     I'm not sure at any given time what the number was during
20 that period.  But, cumulatively, it turned out, during that
21 cycle, to be approximately a dozen.
22 Q.  Okay.  At that point in time, did you know anyone in the
23 English department, tenured or untenured, who had that number
24 of published articles?
25 A.  No.  No.

Jury Trial – Volume 1
November 13, 2017

 1          MR. YOUNG:  Okay.  Your Honor, may I approach the

 2  witness?

 3          THE COURT:  Yes.

 4  Q.  (BY MR. YOUNG)  Dr. Tudor, I've handed you what has been

 5  marked as Plaintiff's Exhibit 164.

 6      Do you recognize the front page of this document?

 7  A.  Yes.

 8  Q.  What is it?

 9  A.  It's my -- my tenure portfolio for the year 2010-2011.

10  Q.  Did you assemble that document?

11  A.  Yes.

12          MR. YOUNG:  Your Honor, may I propose this be

13  admitted as Plaintiff's Exhibit 164?

14          MS. COFFEY:  Objection, Your Honor.  Dr. Tudor's

15  2010-2011 portfolio was never submitted for tenure review at

16  Southeastern.  She compiled it, but it was never admitted.

17  And, therefore, there is no relevancy to this document.

18          THE COURT:  Overruled.  I will admit it.

19  Q.  (BY MR. YOUNG)  So I think earlier you testified,

20  Dr. Tudor -- you don't need to look at it right now.

21  A.  Okay.

22  Q.  Earlier, you testified -- I know you know it well.

23      Earlier, you testified that you took your 2009-10

24  application -- I assume it was in a binder -- and you composed

25  the new application; right?

Jury Trial – Volume 1
November 13, 2017

1  A.   Correct.

2  Q.   When you were in the process of doing that, did you

3  discover anything?

4  A.   Yes.  One of the things which I removed from the old

5  portfolio was the denial letters from Lucretia Scoufos, Doug

6  McMillan, and Larry Minks.

7  Q.   And did you notice anything about Lucretia Scoufos's

8  letter that was in the portfolio?

9  A.   Yes.  It was a different letter than the one that John

10 Mischo and myself had received.

11 Q.   Okay.

12        MR. YOUNG:  Your Honor, I'd like to use the document

13 projector to publish a document to the jury.

14        THE COURT:  Only if it's been admitted.

15        MR. YOUNG:  Okay.  Let me bring it -- thank you,

16 Your Honor.

17     Your Honor, may I approach the witness?

18        THE COURT:  Yes.

19        MR. YOUNG:  Thank you, Your Honor.

20 Q.   (BY MR. YOUNG)  Dr. Tudor, do you recognize what has been

21 marked as Plaintiff's Exhibit 77?

22 A.   Yes.

23 Q.   What is it?

24 A.   This is authored by Lucretia Scoufos, and it has the

25 reasons, rationales, why she denied my tenure application.

Jury Trial – Volume 1
November 13, 2017

1   Q.   Had you ever seen this letter before you got back the

2   portfolio?

3   A.   No, I had not.

4   Q.   Is there anything about the date on this letter that you

5   find interesting?

6   A.   Yes.  The date is exactly the same as the letter which

7   she sent to me and my department chair, John Mischo.  So it

8   appears that this letter is backdated.

9   Q.   Were you concerned when you discovered this letter?

10  A.   Yes, I was concerned and shocked.

11  Q.   Do you remember what you did?

12  A.   I contacted John Mischo and shared with him this

13  information, and he shared my concern and dismay.

14  Q.   Had you ever heard of this happening before?

15  A.   No, never.

16  Q.   Did you reach out to anyone else to talk about this

17  letter?

18  A.   Yes.  I informed Claire Stubblefield about the existence

19  of this backdated letter, and I talked to my colleagues in my

20  department about its existence as well.

21  Q.   Did Claire Stubblefield respond to you at all when you

22  reached out to her?

23  A.   She simply acknowledged that she received the

24  information, but she didn't -- but otherwise, no.

25  Q.   Okay.  So, Dr. Tudor, let's put our focus back on the

Jury Trial – Volume 1
November 13, 2017

1    2010-11 application.  Okay?

2         After you assembled the portfolio, what happened?  What

3    was the next step in the process?

4    A.   I notified Dean Scoufos, Lucretia Scoufos, that I would

5    be applying for tenure in 2010-2011.

6    Q.   Did Dean Scoufos respond to you?

7    A.   She sent me an e-mail saying that since we have -- I'm so

8    sorry.  I'm coughing so much.

9    Q.   That's okay.

10   A.   She sent me an e-mail that said since we had met the

11   previous year to discuss the portfolio, she saw no need to

12   meet with me again to discuss this year's portfolio.  And so

13   we wouldn't -- so we would not be meeting in person to discuss

14   it.

15   Q.   Did you find that odd?

16   A.   Well, yes.  I mean, the purpose of the meeting was to

17   discuss the content of the portfolio and to make sure that an

18   applicant -- that the applicant succeeds; right?  And I had

19   added -- I had added quite a bit to my portfolio.  And it

20   would have been helpful to discuss those issues with her.

21   Q.   Did you meet with anyone else about your 2010-11

22   application?

23   A.   Yes.  Randy Prus.  He became the new department chair

24   after John Mischo stepped down.

25   Q.   Okay.  Did you talk to Randy Prus about your application

1   in 2010-11?

2   A.   Yes.  I gave him a copy of my portfolio for his review.

3   Q.   Did he give you any feedback?

4   A.   Yes.  I --

5           MS. COFFEY:  Objection, Your Honor.  Hearsay.

6   Dr. Prus is noticed as a witness, can come in and testify

7   about what he told Dr. Tudor.

8           THE COURT:  Are you going to ask her what he said?

9           MR. YOUNG:  No.  I was just asking if he gave her

10  any feedback.

11          THE COURT:  All right.  Overruled.

12  Q.   (BY MR. YOUNG)  Did Randy Prus give you any feedback?

13  A.   Yes.

14  Q.   Did he send you any edits on your portfolio?

15  A.   Yes.

16  Q.   Was the feedback helpful to you?

17  A.   Yes, it was very helpful.

18  Q.   Can you tell me why it was helpful?

19  A.   Well, I always appreciate the feedback from any of my

20  colleagues, and especially my department chairs.  And he had

21  seen many of my colleagues -- a number of people succeed in

22  their tenure application.

23      So I respected -- I respected the changes that he wanted

24  me to make, and we talked through them.  And by the time I was

25  finished, I think we were both very confident that my tenure

Jury Trial – Volume 1
November 13, 2017

1    application 2010–2011 would succeed.

2    Q.   Do you trust Randy Prus's judgment?

3    A.   Yes.

4    Q.   Is he a truthful person?

5    A.   Yes.

6    Q.   Dr. Tudor, why don't we move forward in time.

7         Do you know what happened after you met with Randy Prus?

8    What was the next step in your 2010–11 application?

9    A.   Randy Prus began assembling the tenure review committee

10   to look at my portfolio and to make a decision on my tenure

11   application for that year.

12   Q.   Dr. Tudor, did something significant happen in early

13   October 2010?

14   A.   Yes.  Randy Prus and myself received –– we received

15   notice to go to Dean Scoufos's office.

16   Q.   Did Dean Scoufos tell you what that meeting was about

17   before you arrived?

18   A.   No.  We –– she did not tell me, and she did not tell

19   Randy Prus either.  When I went to his office, we walked over

20   to Dean Scoufos's office together.  Her office is in a

21   different building.  He had no idea what the meeting was

22   about.

23   Q.   Was that unusual?

24   A.   I believe so, yes.  He's the department chair.  I believe

25   that he should be kept in the loop about –– and –– about

```
 1   anything that happens with the faculty that he's responsible
 2   for in his department.
 3   Q.   Before you went to this meeting, did you have any idea
 4   what it could possibly be about?
 5   A.   No.
 6           MR. YOUNG:  Your Honor, may I approach the witness?
 7           THE COURT:  Yes.
 8   Q.  (BY MR. YOUNG)  Dr. Tudor, I've handed you what I've
 9   marked as Plaintiff's Exhibit 84.
10       Do you recognize this document?
11   A.   Yes.
12   Q.   What is it?
13   A.   This is the letter that I received when I went -- when
14   Randy Prus and I went to Lucretia Scoufos's office.  She
15   presented this memo from Doug McMillan to us.
16           MR. YOUNG:  Your Honor, may I propose this be
17   admitted as Plaintiff's Exhibit 84?
18           MS. COFFEY:  No objection, Your Honor.
19           THE COURT:  Admitted.
20   Q.  (BY MR. YOUNG)  Okay.  Without reading this letter,
21   Dr. Tudor, tell the jury generally what it says.
22   A.   It says that --
23           MS. COFFEY:  Objection, Your Honor.  The document
24   speaks for itself.  There's no need for a witness to summarize
25   the document.
```

Jury Trial – Volume 1
November 13, 2017

1          THE COURT:  Sustained.

2          MR. YOUNG:  Okay.

3   Q.   (BY MR. YOUNG)  Dr. Tudor, what was discussed at this

4   meeting with Dean Scoufos, Randy Prus, and yourself?

5   A.   About how the rules allowed me to reapply.  Doug McMillan

6   had made the decision that I was not to be allowed to reapply

7   for tenure promotion in 2010-2011.

8   Q.   Was there anything odd about the fact that it was Doug

9   McMillan who made that decision?

10  A.   Yes.  It seemed -- it seemed very peculiar that he would

11  make that decision.  It was also very peculiar that Lucretia

12  Scoufos would be handing -- would be giving me a memo from him

13  instead of going to his office.

14         There's a number of -- it was all peculiar.  Randy and I,

15  we were both blindsided by this.

16  Q.   So you've had a lot of interactions with Doug McMillan by

17  this point.  At any point did Doug McMillan reach out to you

18  and offer to meet with you in person to just talk it out?

19  A.   No, he never did.

20  Q.   Did you ever see Doug McMillan during the 2010-11 school

21  year?

22  A.   No, I did not.

23  Q.   When was the last time you saw Doug McMillan?

24  A.   I think it was at a deposition.

25  Q.   For this case?

Jury Trial – Volume 1
November 13, 2017

1    A.    For this case.

2    Q.    Dr. Tudor, was –– this meeting with Dean Scoufos, was

3    this the first time you were told you would not be allowed to

4    reapply for tenure?

5    A.    Yes, it was.

6    Q.    Did being barred from reapplying for tenure make any

7    sense to you?

8    A.    No.  No, not only did it not make any sense, it –– I

9    wonder what the opposite of not making sense is.  It flew in

10   the face of the way things –– of the rules and the way things

11   should have been handled.

12   Q.    Had you ever heard at this point in time of a professor

13   being barred from reapplying for tenure?

14   A.    No.  No, I had not.  And I asked around.  And nobody

15   that –– you know, people had been there many, many years

16   longer than I.  They had never heard of such a thing either

17   ever.

18   Q.    Was any explanation given to you for why you weren't

19   being allowed to reapply for tenure?

20   A.    That it would tear the university apart, inflame

21   tensions, something to that effect.

22   Q.    It would inflame tensions?

23   A.    Yes.  I –– I believe that was referring to what had

24   happened in the previous year when that –– the administration

25   had violated the rules and also violated the orders of the

Jury Trial – Volume 1
November 13, 2017

1   faculty appellate committee.

2        It did raise tensions between the faculty and the

3   administration for them to so egregiously violate the rules

4   and also the outcome of the body –– the faculty appellate

5   committee, whose mission –– whose purpose on campus was to

6   make sure that any disagreements between faculty and the

7   administration were resolved amicably.

8        So there were –– I believe those are the tensions he was

9   referring to.

10  Q.   So around the time you got this letter in early October

11  2010, had Doug McMillan seen your 2010-11 tenure application?

12  A.   No.

13  Q.   Did he have any way of knowing what was inside of it?

14  A.   No.

15  Q.   Was it different from your previous application?

16  A.   Yes.

17  Q.   Can you just briefly summarize for the jury significant

18  differences.

19        MS. COFFEY:  Objection, Your Honor.  Between the two

20  portfolios, each speak for themselves.  There's no need for

21  Dr. Tudor to summarize the differences between the two.

22        THE COURT:  I believe she already has.  If there's

23  anything that you haven't already testified to that's

24  different, please tell us.

25        To that extent, you're overruled.

Jury Trial – Volume 1
November 13, 2017

1         THE WITNESS:  Uh-huh.  Well, there are a number of
2    articles that had been published or accepted for publication.
3    Since scholarship was one of the purported areas of weakness,
4    that was a very substantial -- I think that was a very
5    substantial difference.  It -- although, I met -- the standard
6    before this was far in excess of what was required by then.
7    Q.  (BY MR. YOUNG)  Just generally, you made other changes to
8    it; correct?
9    A.   Yes, as I had mentioned earlier.
10   Q.   Okay.  Now, Dr. Tudor, what did you do when you got this
11   letter from Doug McMillan?
12   A.   I notified Claire Stubblefield of this latest
13   development.  It's self-evident that this was retaliation.  So
14   I added that to my complaint.
15       I also filed another grievance with the faculty appellate
16   committee because this was another egregious violation of the
17   rules.  The rules allow me to apply in my seventh year.  And
18   so I took to the faculty appellate committee so that they
19   could make a decision whether or not I should be allowed to
20   reapply.
21   Q.   So, Dr. Tudor, can you explain to the jury why it was a
22   big deal, why you had to reapply the seventh year?
23   A.   Yes.  Tenure-track faculty are only given seven years to
24   be granted tenure or else we're fired.  That's the end of our
25   career.

Jury Trial – Volume 1
November 13, 2017

 1  Q.    So your livelihood was on the line?
 2  A.    Yes, my livelihood, my future.  And a tenure-track
 3  professor, if we don't -- if we don't get tenure, it's a huge
 4  black mark on our reputation.  It's almost -- it's really
 5  impossible to overcome that kind of black mark on our
 6  reputation.
 7      So not only would I lose my livelihood, but my career and
 8  what I had worked for my whole life, it would have been over.
 9  Q.    When this was happening, did you tell your sisters what
10  was happening at Southeastern?
11  A.    No.  I -- even though -- no.  Even though I knew that I
12  qualified and my colleagues -- you know, they voted.  I was
13  qualified.  I was still -- I was too ashamed and humiliated,
14  and I didn't know how to explain it to people like my sisters
15  who had never had the opportunity to attend college.  To
16  them -- you know, it's -- universities and colleges, they're
17  almost a magical place.  You can't imagine this type of
18  mischief going on.
19      But mostly I was -- I was just embarrassed.  I was
20  embarrassed for Southeastern.  I was embarrassed for myself.
21  It was humiliating.  I know it would be very -- I couldn't
22  bring that kind of hurt to them.
23  Q.    Did you ever tell your sisters what happened at
24  Southeastern?
25          MS. COFFEY:  Objection, Your Honor.  This is kind of

Jury Trial – Volume 1
November 13, 2017

1  getting into an extremely irrelevant area regarding who she

2  told about her experiences at Southeastern.

3           THE COURT:  You need to turn that mic toward you.

4           MS. COFFEY:  I apologize.

5           THE COURT:  I heard you, but speak up.

6      I don't understand the relevance to this.

7           MR. YOUNG:  She is seeking damages to compensate her

8  for harm to professional reputation as well as garden-variety

9  emotional distress damages.  Her testimony is relevant to how

10 these events impacted her.

11          MS. COFFEY:  Your Honor, what she told her sisters

12 has no effect on her professional reputation.

13          THE COURT:  I'll permit it.

14          MR. YOUNG:  Thank you, Your Honor.

15 Q.  (BY MR. YOUNG)  Dr. Tudor, I'll repeat my question.

16     Did you ever tell your sisters what happened to you at

17 Southeastern?

18 A.   No.  They -- they both passed away before -- they passed

19 away during the -- while -- during these years I've been

20 trying to get my job and reputation back.  I never told them.

21 Q.   Okay.  Dr. Tudor, I'm going to quickly go through your

22 complaint with Claire Stubblefield.

23     You said that you filed a complaint, I think, in the

24 beginning of the fall semester, and then you supplemented it

25 after that letter from Doug McMillan; is that right?

Jury Trial – Volume 1
November 13, 2017

1   A.   Yes.

2   Q.   Okay.  Let's talk a little bit about that complaint.

3        To your knowledge, what did Claire Stubblefield do with

4   your complaints?

5             MS. COFFEY:  Objection, Your Honor.  This witness

6   can't testify what Claire Stubblefield did with --

7             THE COURT:  If you know.  To your knowledge.

8             THE WITNESS:  It's -- I -- to my -- to my knowledge,

9   she failed to investigate the retaliation claim.  She failed

10  to --

11            MS. COFFEY:  Objection, Your Honor.  Again, she's

12  testifying about something she --

13            THE COURT:  Do you know what happened?  Do you know

14  what she did?

15            THE WITNESS:  It was in her report.

16            MR. YOUNG:  Well, here, let me withdraw that

17  question, Your Honor, and ask her a different question.

18            THE COURT:  All right.

19  Q.   (BY MR. YOUNG)  Dr. Tudor, did you converse with Claire

20  Stubblefield during the pendency of her investigation?

21  A.   On a couple of occasions.

22  Q.   Did you exchange e-mails with Claire Stubblefield during

23  the pendency of her investigation?

24  A.   Yes.

25  Q.   Okay.  Was there anything, from your perspective, based

Jury Trial – Volume 1
November 13, 2017

1   on your interactions –– personal interactions with Claire

2   Stubblefield, was there anything that was odd during this

3   investigation?

4           MS. COFFEY:  Objection.  Relevancy, Your Honor.

5           THE COURT:  Overruled.

6           THE WITNESS:  Yeah.  Well, she didn't seem to know

7   how to handle a complaint involving a transgender person.  For

8   instance, when I mentioned to her that Lucretia Scoufos had

9   used a male pronoun in reference to me, she didn't seem

10  concerned.  She didn't seem very interested in asking

11  follow-up questions.

12      I was very concerned about the amount of time that was

13  elapsing.  The substance of my complaint, for instance, in

14  2010-11, about being allowed to reapply, there's a lot of

15  things that have to be done.  The tenure committee has to

16  meet; they have to vote.  So that's deadlines are passing.

17  Q.  (BY MR. YOUNG)  Okay.  Dr. Tudor, at any point did you try

18  to help Claire Stubblefield learn more about transgender folks

19  who experience discrimination?

20  A.  I forwarded a letter to her from the Department of

21  Education with specific guidance.

22  Q.  Why did you forward that to her?

23  A.  To familiarize her with the issues and to help her

24  investigation.

25  Q.  So you were trying to help her?

Jury Trial – Volume 1
November 13, 2017

1   A.    Yes.

2   Q.    Okay.  Did Claire Stubblefield ever talk to you about the

3   documents that you sent her to try to help her?

4   A.    No.

5   Q.    Did you have any particular concerns about Claire

6   Stubblefield's investigation in November 2010?

7   A.    Yes, I -- I knew that the deadlines for the tenure

8   committee meeting, the department chair review of my

9   portfolio, were approaching.  There was a lot of work to be

10  done.  And I became increasing concerned about the expiration

11  of those deadlines, and I -- and I contacted her to express

12  those concerns.

13        And she -- she gave me different -- she led me to believe

14  she was almost finished.  And then she kept on delaying and

15  delaying and delaying, and I was becoming increasingly

16  alarmed.

17  Q.    Did you have any particular concerns about Claire

18  Stubblefield's investigation in December 2010?

19  A.    December was -- that was the deadline for the tenure

20  promotion committee to make their recommendation.

21  Q.    Did you hear from Claire Stubblefield in December 2010?

22  A.    I still had not received her -- she still had not

23  completed her report.  She had still not concluded her

24  investigation.

25  Q.    Okay.  Dr. Tudor, while Claire Stubblefield's

Jury Trial – Volume 1
November 13, 2017

1  investigation was going on, did she ever tell you that she was

2  friends with Doug McMillan?

3  A.    No, she never mentioned that.

4  Q.    If you had been told that Claire Stubblefield was friends

5  with Doug McMillan, would you have asked for someone else to

6  have done that investigation?

7  A.    Yes, of course.  Someone who could be objective.

8  Q.    Why is that?

9  A.    Because everybody is entitled to a fair hearing from a

10  neutral party to look at the evidence and consider it.

11  Q.    Do you think Doug McMillan was entitled to a fair

12  investigator?

13  A.    Everybody's entitled to a fair investigator.

14  Q.    If someone had accidentally chosen one of your friends to

15  investigate a complaint, would you have asked for a different

16  investigator to be chosen?

17  A.    I would have expected a different investigator to be

18  chosen.  That's only fair.

19  Q.    Okay.  At any point during the investigation, did Claire

20  Stubblefield talk to you about whether you, as a transgender

21  person, were protected from sex discrimination?

22  A.    No.

23  Q.    Okay.  Let's fast-forward a bit to January 2011.

24         You eventually heard from Claire Stubblefield about her

25  decision?

Jury Trial – Volume 1
November 13, 2017

```
 1  A.   Yes.
 2  Q.   Very generally, can you tell me what the final decision
 3  was from Claire Stubblefield.
 4  A.   Well, her final decision made no mention of my complaint
 5  about retaliation.  Her final report made no mention of me
 6  being denied the opportunity to apply in 2010-2011.  It didn't
 7  address the -- the substance of my complaint about the
 8  2009-2010 application inasmuch as she didn't consider the
 9  testimony of members of my tenure committee or my department
10  chair.
11       It's -- her conclusions seemed to be based entirely upon
12  the testimony of the people who discriminating --
13  discriminated against me saying they didn't discriminate
14  against me and not on the evidence.
15  Q.   Did you give Claire Stubblefield evidence?
16  A.   Yes.
17  Q.   Now, let me -- I messed up.  So let's go back a little
18  bit.
19       When the investigation was still going on with Claire
20  Stubblefield, did you tell her that things felt hostile at
21  Southeastern?
22  A.   Yes.
23  Q.   Did you two discuss that a bit?
24  A.   A bit, yes.
25  Q.   Did Claire Stubblefield ever give you a finding on
```

Jury Trial – Volume 1
November 13, 2017

 1   whether you were experiencing hostilities at Southeastern?

 2   A.   No, no.  Again, when I said that, I mean I would complain

 3   to her, but then she wouldn't ask follow-up questions or seem

 4   interested in my -- in my complaint.

 5   Q.   Did you do your best to tell Claire Stubblefield

 6   everything that she asked of you?

 7   A.   Yes.

 8   Q.   If she'd asked you more questions, would you have

 9   answered them honestly?

10   A.   Of course.

11   Q.   Okay.  So when you got Claire Stubblefield's decision,

12   what did you do?

13   A.   The only thing the rules allowed me to do, which was

14   appeal to President Minks.

15   Q.   Did you complain about President Minks in your complaint

16   to Claire Stubblefield?

17   A.   Yes.

18   Q.   So the rules required you to let President Minks make a

19   decision as to whether he was the one who discriminated

20   against you?

21   A.   That -- that's correct.  That's -- yes.

22   Q.   What did President Minks decide?

23   A.   President Minks decided that he had not discriminated

24   against me.

25   Q.   Did the rules allow you to do anything else after that?

Jury Trial – Volume 1
November 13, 2017

1   A.    No.

2   Q.    Okay.  Let's talk about the third faculty appellate

3   complaint.  I think you mentioned earlier you filed that

4   around the time you got that October 2010 letter from Dr. Doug

5   McMillan.  Is that correct?

6   A.    That's correct.

7   Q.    Okay.  Can you just briefly say what you complained about

8   in that complaint.

9   A.    That complaint was based on Doug McMillan not allowing me

10  to apply for tenure in 2010–2011.

11  Q.    Okay.  Did you ever find out what the faculty appellate

12  committee decided on that third complaint?

13  A.    Yes.  The faculty appellate committee decided that the

14  rules allowed me to apply in 2010–2011 and that I should be

15  allowed to apply in that year.

16  Q.    And that's all you were asking for, the opportunity to

17  apply?

18  A.    Yes, that's correct.

19  Q.    You wanted to be judged on your merits?

20  A.    Yes, absolutely.

21  Q.    That's it?

22  A.    Yes.

23  Q.    Okay.  What happened after the faculty appellate

24  committee ordered the administration to let you reapply?

25  A.    The president's designee, Ross Walkup, disagreed with the

Jury Trial – Volume 1
November 13, 2017

```
 1   faculty appellate committee's decision.
 2   Q.   What happened after that?
 3   A.   Well, there was an impasse because this had never --
 4   there was an impasse.  Bryon Clark made up new rules.
 5   Q.   Why don't you explain who Bryon Clark is first.  Who was
 6   he at the time?
 7   A.   He -- he worked under Doug McMillan.
 8   Q.   Someone who worked under Doug McMillan made up rules?
 9   A.   About -- yes.  Yes, he made up the rules to apply to my
10   case.
11   Q.   For a complaint about Doug McMillan?
12   A.   For a complaint about Doug McMillan, correct.
13   Q.   Okay.
14           MR. YOUNG:  Your Honor, may I approach the witness?
15           THE COURT:  Yes.
16   Q.   (BY MR. YOUNG)  Dr. Tudor, I've handed you an exhibit
17   marked Plaintiff's Exhibit 54.
18       Do you recognize this document?
19   A.   Yes.
20   Q.   What is it?
21   A.   I'm sorry.  It's from Bryon Clark, informing -- to me,
22   right.
23   Q.   I'm sorry.  What type of --
24   A.   So Bryon Clark informing me of the -- just a moment -- of
25   what had happened with the impasse between the president's
```

Jury Trial – Volume 1
November 13, 2017

1   designee, Ross Walkup, and the –– what he was going to do
2   next, the new rules.
3   Q.   Okay.
4             MR. YOUNG:  Your Honor, may I propose that this be
5   admitted as Plaintiff's Exhibit 54?
6             MS. COFFEY:  No objection, Your Honor.
7             THE COURT:  Admitted.
8             MR. YOUNG:  Okay.  Your Honor, if I may approach
9   the witness one more time?
10            THE COURT:  Yes.
11            MR. YOUNG:  Thank you.
12  Q.   (BY MR. YOUNG)  Dr. Tudor, I've handed you a document
13  that's marked Plaintiff's Exhibit 55.
14       Do you recognize this document?
15  A.   Yes.
16  Q.   Just very briefly, what is it?
17  A.   I believe these are the new rules that Bryon Clark had
18  made up.
19  Q.   Okay.
20            MR. YOUNG:  Your Honor, may I propose that this be
21  admitted as Plaintiff's Exhibit 55?
22            MS. COFFEY:  Objection, Your Honor.  Lack of
23  foundation.  It's extremely unclear what this document is.
24            THE COURT:  Do you want to follow up?
25            MR. YOUNG:  Yes, Your Honor.  May I ask the witness

Jury Trial – Volume 1
November 13, 2017

```
1   a question to provide that foundation?
2             THE COURT:  Yes.
3             MR. YOUNG:  Thank you.
4   Q.  (BY MR. YOUNG)  Dr. Tudor, what is Plaintiff's Exhibit 54,
5   that earlier document?  Is it a letter? an e-mail?  What is
6   it?
7   A.    It appears to be an e-mail.
8   Q.    Okay.  Below the date part of that document, is there any
9   attachment icon?
10  A.    Yes.
11  Q.    And what does an attachment icon indicate?
12  A.    That there is an attachment to the e-mail that is the
13  subject of the e-mail.
14  Q.    Having looked at that document, Plaintiff's Exhibit 54,
15  do you recall receiving an attachment to the e-mail you got
16  from Bryon Clark?
17  A.    Yes.
18  Q.    Okay.  Now, having refreshed your recollection, what is
19  Plaintiff's Exhibit 55?
20  A.    The attachment to the e-mail in Exhibit 54.
21  Q.    Okay.
22            THE COURT:  Any objection?
23            MS. COFFEY:  No objection, Your Honor.
24            THE COURT:  It will be admitted.
25            MR. YOUNG:  Thank you, Your Honor.
```

Jury Trial – Volume 1
November 13, 2017

```
 1              THE COURT:  And we will break for lunch.
 2         Don't discuss the case.  Don't permit anyone to discuss
 3    it with you.  Don't expose yourselves to any discussions.
 4    Don't blog.  Don't tweet.  Don't Facebook.
 5         I think I'll have you report to the jury assembly room
 6    instead of upstairs so we can bring you-all up together.  And
 7    please report back there at the jury assembly room on the
 8    first floor at 1:15.
 9         Until that time, we'll be in recess.
10         (Jury exits.)
11         (Lunch break from 12:15 p.m. to 1:15 p.m.)
12         (Jury enters.)
13              THE COURT:  Be seated.
14         Please continue.
15              MR. YOUNG:  Thank you, Your Honor.
16    Q.  (BY MR. YOUNG)  Dr. Tudor, before we broke for lunch, I
17    was asking you about your third faculty appellate committee
18    complaint, and we were talking a little bit about Plaintiff's
19    Exhibit 54 and 55, the rules, and Bryon Clark.
20         Do you recall that?
21    A.   Yes.
22    Q.   Okay.  So can you tell me just a little bit about what
23    these rules were supposed to do, these new rules?
24    A.   They were supposed to address what happens when an
25    impasse between the president's designee occurs and the
```

Jury Trial – Volume 1
November 13, 2017

1    faculty appellate committee.

2    Q.    Now, I think you previously testified that you were on

3    the faculty senate?

4    A.    Correct.

5    Q.    And you were on some committee in the faculty senate that

6    had something to do with rules; right?

7    A.    Correct.  The faculty –– yes.  Yes.

8    Q.    Okay.  Were new rules at Southeastern supposed to be

9    approved by the faculty senate committee that you were on?

10   A.    Yes, they were.

11   Q.    Were these rules that Bryon Clark imposed on you run

12   through the faculty senate committee?

13   A.    No, the committee never saw these rules.  We were

14   never –– we never discussed them.  They were never brought to

15   us.

16   Q.    To your knowledge, was that the correct way for new rules

17   to be made at Southeastern?

18   A.    No, it was actually against the rules to make new rules

19   this way.

20   Q.    Yet again.  Okay.

21         Dr. Tudor, did you complain to Bryon Clark about these

22   rules?

23   A.    Yes, I –– yes, I did.

24   Q.    Why did you complain?

25   A.    Because there's a procedure to create new rules, which

1    was –– which involved the faculty senate and also the

2    committee that I –– that I served on.  And these rules were

3    not being followed.

4         It was also the substance of the new rules, which

5    basically made –– not basically –– it made Minks the decider

6    in a case involving him as a person who was complained against

7    once again.

8    Q.   So what happened when you complained to Bryon Clark about

9    these new rules?

10   A.   He implemented them anyway.  I had to abide by these new

11   rules despite my objections to fairness and procedure and

12   established rules and practices.

13   Q.   To your knowledge, did Southeastern ever use these new

14   rules for anyone other than you?

15   A.    No.  To my knowledge, I'm the only person these rules

16   ever applied to.

17   Q.   Did you follow these new rules?

18   A.    Yes.  Yes, I always follow the rules.

19   Q.    Yeah.  So you followed the rules.

20        So, under these new rules, your faculty appellate

21   committee decision, the favorable one, was sent to Larry

22   Minks; is that right?

23             MS. COFFEY:  Objection, Your Honor.  He's leading

24   the witness.

25             THE COURT:  Sustained.  Avoid leading your own

Jury Trial – Volume 1
November 13, 2017

1    witness.

2              MR. YOUNG:  Yes, Your Honor.

3    Q.  (BY MR. YOUNG)  Dr. Tudor, under these rules, what was the

4    next step in your faculty appellate grievance, this third one

5    we've been talking about?

6    A.   It was sent to Larry Minks.

7    Q.   Okay.  But you won at the faculty appellate committee

8    level; correct?

9    A.   Correct.

10   Q.   So, under these rules, did you have to appeal a decision

11   you won?

12             MS. COFFEY:  Same objection.  Leading.

13             THE COURT:  Overruled.

14             THE WITNESS:  Yes.  Yes, I had to appeal a ruling I

15   had won to the person I complained about.

16   Q.  (BY MR. YOUNG)  Had you ever heard of anything like that

17   happening before?

18   A.   No.  No, never.

19   Q.   What did President Minks ultimately do?

20   A.   He decided that he was -- that he was right in the

21   beginning.  He decided for himself, in other words.  He

22   decided for himself.

23   Q.   Did the new rules allow you to do anything else after

24   Larry Minks made that decision?

25   A.   No.

Jury Trial – Volume 1
November 13, 2017

1   Q.   There was nowhere else you could go to?

2   A.   No.

3   Q.   Dr. Tudor, I want to fast-forward a little bit to April

4   2011.

5        When did the school year end at Southeastern?

6   A.   It ends in May.

7   Q.   Okay.  So about a month before the school year ended,

8   your last year at Southeastern, after all of your complaints

9   were done and all of the appeals were over, did you do

10  anything else to complain?

11  A.   I started a blog.  And there was a petition that was

12  started online to go to RUSO, the Regional University System

13  of Oklahoma, and I posted a link to that on my blog.

14  Q.   Okay.  Let's take those a little bit apart.  Okay?

15  A.   Okay.

16  Q.   Let's talk about your blog first.

17       Can you tell me a little bit about why you started a

18  blog.

19            MS. COFFEY:  Objection, Your Honor.  Relevancy.

20            THE COURT:  Overruled.

21            THE WITNESS:  I thought at -- well, for

22  Southeastern, it's a public institution, I thought it's very

23  important for the public to know what is happening, so we

24  can -- when there's problems and rules are being broken, so

25  those rules can be fixed so that we can move forward.

Jury Trial – Volume 1
November 13, 2017

```
 1   Q.   (BY MR. YOUNG)   Was your blog only about what happened at
 2   Southeastern?
 3   A.   To my recollection, yes.
 4   Q.   Okay.  Is what you posted on that blog true?
 5   A.   Yes.
 6   Q.   Okay.  I think you mentioned a petition to the Regional
 7   University System of Oklahoma.
 8        For the jury, I'm just going to say I'm going to call the
 9   Regional University System of Oklahoma RUSO so we can save
10   time and it's easier, just like Southeastern.
11        Okay.  So you mentioned a petition to RUSO.
12   A.   Yes.
13   Q.   Can you tell me a little bit about how you learned about
14   this petition.
15   A.   That's -- my colleagues at Southeastern, one of my -- one
16   in particular started the blog, but more than one was
17   interested in trying to do something to try to right the
18   wrong.  And they started this petition.
19        And a number of faculty members, former faculty members,
20   for instance, the professor who was on the hiring committee
21   who hired me back in 2004, who is now retired, he and his wife
22   both signed the petition.  Numerous students, members of the
23   community, professors in my field around the country, they all
24   signed the petition as well.
25   Q.   Was this an online petition?
```

Jury Trial – Volume 1
November 13, 2017

```
 1   A.    Yes, it was.

 2   Q.    Okay.  Do you know what happened with that petition?

 3   A.    Yes.  One of my -- one of my colleagues at Southeastern

 4   printed the -- printed out the petition and delivered a copy

 5   to RUSO.

 6   Q.    Okay.  What was the name of that colleague?

 7   A.    Dr. Meg Cotter-Lynch.

 8   Q.    And she was in the English department with you?

 9   A.    Yes.

10   Q.    Are you close with Meg Cotter-Lynch?

11   A.    We're friends.

12   Q.    Were you good friends?

13   A.    Yes, yes.

14   Q.    Okay.  Do you know what happened with that petition

15   ultimately?

16   A.    I know it was delivered to RUSO, and they received it.  I

17   don't know what they did with it after they received it.

18   Q.    Did anyone from RUSO ever reach out to you, talk to you,

19   ask you what happened?

20   A.    Not to my recollection.

21   Q.    Your entire time at Southeastern, had you ever heard of a

22   petition being sent to RUSO asking it to do something on

23   behalf of a professor?

24             MS. COFFEY:  Objection, Your Honor.  Leading.

25             THE COURT:  Sustained.
```

Jury Trial – Volume 1
November 13, 2017

1    Q.   (BY MR. YOUNG)   Okay.  Dr. Tudor, did anyone else at

2    Southeastern, in the spring 2011 term, do anything to try to

3    help you?

4         Let me ask you a slightly different question.

5         Did the faculty senate at Southeastern do anything on

6    your behalf in the spring 2011 term?

7              MS. COFFEY:  Objection.  Leading, Your Honor.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.  The faculty senate was very

10   concerned about the rules being violated.  And, also, they

11   were very concerned that the faculty appellate committee,

12   their decision had been ignored, and that new rules had been

13   made that just applied to me.

14        And some, they -- they passed a resolution ordering the

15   president to honor their -- the decision of the faculty

16   appellate committee, and that was sent to President Larry

17   Minks.

18   Q    (BY MR. YOUNG)   Do you know what Larry Minks did in

19   response to that order from the faculty senate?

20   A.   He ignored it.

21   Q.   Had you ever heard of something like that happening

22   before?

23             MS. COFFEY:  Objection, Your Honor.  Leading.

24             THE COURT:  Overruled.

25             THE WITNESS:  No.  To my knowledge, that had never

Jury Trial – Volume 1
November 13, 2017

1   happened before.
2   Q.   (BY MR. YOUNG)   Okay.   When you were at Southeastern, were
3   there any specific rules protecting transgender people from
4   sex discrimination?
5   A.   No.
6   Q.   While you were at Southeastern, did anyone ever try to
7   pass any such rules?
8   A.   Yes.   The faculty senate amended the policies, the rules,
9   and -- to include gay and transgender people.   And that was
10  sent to Doug McMillan, but he did not include it in our policy
11  handbook.
12  Q.   Can you just explain to the jury why the faculty senate
13  would send something like that to Doug McMillan.
14  A.   As the vice president of academic affairs, he was the
15  person who was responsible to receive -- to receive rules from
16  the faculty senate.
17  Q.   But he didn't honor that decision?
18  A.   Correct.
19  Q.   When about did the faculty senate try to add those
20  protections at Southeastern?
21  A.   It was in spring 2011.
22  Q.   So after all this had happened?
23  A.   Yes.
24  Q.   Dr. Tudor, are you familiar with Southeastern's
25  excellence in scholarship award?

Jury Trial – Volume 1
November 13, 2017

1  A.   Yes.  It's a very high honor that the faculty senate
2  awards to faculty.
3  Q.   Did you ever get the excellence in scholarship award?
4  A.   Yes.  I was very, very honored to receive the faculty
5  senate award for excellence in scholarship.
6  Q.   When did you get that award?
7  A.   In 2011.
8  Q.   Dr. Tudor, I want to talk to you a little bit about what
9  it was like for you to leave Southeastern.  So fast-forward to
10  May 2011.
11      What was it like working at Southeastern once you knew
12  that you weren't being allowed -- you weren't allowed to
13  reapply for tenure and that you would have to leave?
14  A.   It was very hard.  I never imagined that I wouldn't
15  continue working there throughout my working life.
16      I had envisioned my future there.  I spent a lot of days
17  in my office just -- so that's -- that's a grieving -- leaving
18  my jobs, leaving my friends.  It was very hard to say goodbye
19  to them and to my students.
20      Perhaps one of the most difficult parts of leaving,
21  people knowing that I'm leaving, my students -- they had heard
22  that I would be leaving.  They would come by to comfort me.
23  Many -- a number of them shed tears.  And I tried -- it was
24  very hard to put on a brave face and say -- I ended up
25  comforting them.  That was the hardest part, because I love my

Jury Trial – Volume 1
November 13, 2017

1   students so much.

2        It was very hard, but it's also one of my best memories

3   as to -- because it's not often that faculty professors get to

4   hear from their students how much they've meant in their

5   lives.  So even though it's one of the most painful memories

6   for me, it's also -- it's also one of the memories I treasure

7   the most, saying goodbye to my students.

8   Q.   Dr. Tudor, did you keep following Southeastern's rules

9   the rest of your time there?

10  A.   Yes, I did.

11  Q.   Every single day?

12  A.   Yes.

13  Q.   You kept teaching your classes?

14  A.   Yes.

15  Q.   Did you turn in your grades on time?

16  A.   Yes.

17  Q.   Is that important to you?

18  A.   Yes.  Yes, it's -- yes, of course.  Yes, I -- I tried to

19  do my best and utmost for my students to the very last minute

20  I was there.

21  Q.   Dr. Tudor, how did you talk to your colleagues in the

22  English department about the circumstances under which you

23  were leaving Southeastern?

24  A.   I had talked to them from the beginning about what was

25  happening, and so they were well aware.  So it didn't -- so

Jury Trial – Volume 1
November 13, 2017

1   they were very supportive all along, and they were always

2   trying to help me.

3       As a matter of fact, near the end, Meg Cotter-Lynch came

4   to me.  She said that some of the faculty -- for instance,

5   Virginia Parrish, they wanted to have a --

6               MS. COFFEY:  Objection, Your Honor.  Hearsay.

7               THE COURT:  Sustained.

8               THE WITNESS:  Well --

9   Q.  (BY MR. YOUNG)  I'll ask you a different question,

10  Dr. Tudor.

11      Did you have a goodbye party at Southeastern?

12  A.  Meg Cotter-Lynch asked me if I wanted a goodbye party.

13  She said some of the faculty wanted to do that for me.  And I

14  said let's delay the party until I return.  We'll have --

15  we'll have the party when I get back.

16  Q.  So even at the very end, you had hope that you'd return?

17  A.  Yes.  Yes, I did.  I knew what happened was against the

18  rules.  I knew that I had very carefully documented what had

19  happened.  I knew that everybody in my department and the

20  faculty senate, colleagues across campus, everybody knew what

21  had happened to me and how wrong it was.

22      I had every confidence that eventually -- eventually, the

23  rights -- the wrongs would be righted, and I would be able to

24  return to my home in Durant.

25  Q.  At some point, did you reach out to the U.S. Equal

Jury Trial – Volume 1
November 13, 2017

1   Employment Opportunity Commission?

2   A.   Yes.  Yes.

3   Q.   Why did you do that?

4   A.   Because the law had been broken.  What they did was sex

5   discrimination.

6   Q.   Did you tell the U.S. Equal Employment Opportunity

7   Commission the truth?

8   A.   Yes, I did.

9   Q.   Okay.  Dr. Tudor, let's talk a little bit more about how

10   this has affected you.

11        How did losing your job at Southeastern financially

12   affect you?

13   A.   It was my only source of income.  So, financially, you

14   know, I was devastated.

15   Q.   At the time you left Southeastern, were you supporting

16   family members?

17   A.   I tried to help my sisters and their children whenever

18   I -- whenever I was able, of course.

19   Q.   Do you remember about what you were making a month when

20   you left Southeastern, what your final salary was?

21   A.   Approximately $5,000 a month.

22   Q.   Okay.  Did you lose your benefits when you left

23   Southeastern?

24   A.   Yes, I lost all my benefits and retirement.

25   Q.   So can you just name some of those benefits for me that

Jury Trial – Volume 1
November 13, 2017

1    you lost.

2    A.    Health, vision, dental, and retirement.

3    Q.    Can you tell me a little bit about how it felt to lose

4    those benefits.

5    A.    No longer having health insurance, I was concerned if I

6    got ill or if I was in an accident, what would I –– what would

7    I do?  How could I afford the cost of hospitalization or

8    medicine?  I was very concerned.  I was 48 years old, I

9    believe, when I was fired.  So I was worried about my

10   retirement.

11        Oklahoma has something called vestment.  So you have to

12   be vested.  You have to work so many years to get retirement

13   benefits.  And I had seven years at Southeastern and some

14   additional time as a teaching fellow at the University of

15   Oklahoma, but it wasn't enough to be vested, to my

16   understanding.  And so I was worried what was going to happen

17   to me in my retirement years.

18   Q.    Were you worried at all that you wouldn't be able to find

19   another job again with retirement benefits?

20   A.    Yes, extremely worried, because anyone who is denied

21   tenure, that's –– that is usually the end of their career.

22   It's a black mark that, professionally, you really can't

23   recover from.

24   Q.    Did you eventually find a new job?

25   A.    I'm so sorry.

Jury Trial – Volume 1
November 13, 2017

1   Q.   It's okay.  I'll repeat the question.

2   A.   I heard what you asked.

3   Q.   Okay.

4   A.   Yes, I eventually did find another job.  Well, I found a

5   job teaching at a community college.  That did not include

6   tenure.

7   Q.   Dr. Tudor, can you explain to the jury what the

8   difference is teaching at a four-year school and teaching at a

9   community college for a professor?

10  A.   Yes.  Community colleges, their minimum requirement for

11  faculty is ordinarily a master's degree, not a -- whereas

12  universities usually require a Ph.D.

13      The expectations are also very different.  For example,

14  at Southeastern, faculty members with the Ph.D.s are expected

15  to teach courses in their specialization, what we went to

16  school for, what we spent many years studying, so we could

17  pass that on to our students.

18      Community colleges, generally, it's composition and

19  perhaps an introductory literature course, very different

20  skill set between a university faculty and a community college

21  faculty.

22  Q.   At that community college, were you able to teach the

23  kinds of courses that you had loved to teach at Southeastern?

24  A.   I was -- no.  No, I taught some introductory literature

25  courses, which, of course, I -- I think I'm -- that my Ph.D.

Jury Trial – Volume 1
November 13, 2017

1  studies qualify me for, but mostly it was composition.  And I

2  never had the opportunity to teach upper-level courses in my

3  field, what my training and education prepared me for.

4  Q.   Do you recall when about you got that new job?

5  A.   It was in the fall of 2012, approximately 18 months after

6  the last date that I worked at Southeastern.

7  Q.   So you were unemployed for a big chunk of time?

8  A.   For 18 -- approximately 18 months.

9  Q.   Can you tell me a little bit about what it was like to

10  try to make ends meet.

11  A.   Well, it was -- it was very tough.  I mean, I didn't know

12  when or if I would ever be employed again.  I -- just some

13  practical matters, such as not using the air-conditioning in

14  the summer or turning on the heat in the wintertime, not

15  traveling.

16      I have a 2001 Saturn.  I was always afraid if I -- afraid

17  of breaking down, I couldn't afford to get it repaired.  So I

18  couldn't travel.

19      I certainly couldn't afford to go out to eat with

20  friends.

21  Q.   Did you change the kinds of food you ate?

22  A.   Yes.  I cut -- I cut down from three meals to two meals a

23  day.  Mostly, it was, like, oatmeal, rice, beans, a lot -- was

24  a large part of my diet.

25      When I had to get new clothes, I usually got them at

Jury Trial – Volume 1
November 13, 2017

1   Goodwill.

2   Q.   Did you develop any health problems when you were

3   unemployed?

4   A.   Yes.  I couldn't afford to see a dentist regularly, and I

5   developed cavities in my wisdom teeth, which -- I had to have

6   my wisdom teeth removed, which is not easy when you're 50

7   years old.

8   Q.   Dr. Tudor, you mentioned before that not getting tenure

9   is a black mark.  And I want you to sort of explain that a

10  little bit more for all of us nonacademics.

11       Why is not getting tenure a black mark?  What does that

12  broadcast to people?

13  A.   It's usually assumed that the person didn't receive

14  tenure because of something that they did, that -- it's not --

15  people don't think that maybe there was rules being broken,

16  that maybe something askew was happening.  They usually think

17  it's the person who didn't get tenure, that somehow they're

18  unworthy, unqualified.  There's -- it's just almost impossible

19  to recover your reputation once that happens.

20  Q.   How does it feel to you as a scholar and academic to have

21  to navigate looking for jobs with a CV that shows you didn't

22  get tenure?

23  A.   It's -- well, there -- I'm thinking of two things:

24  humiliating and frustrating.  I don't know which one is

25  more.

Jury Trial – Volume 1
November 13, 2017

1    It's frustrating to send out literally 100

2    applications –– more than 100 applications and not receive a

3    single job interview.  It's humiliating to have that on my

4    résumé that –– on my CV as a résumé that I had been denied

5    tenure because everyone who sees it will simply think that

6    somehow I'm unqualified or unfit.

7    Q.   Dr. Tudor, I'm going to ask you a little bit how you felt

8    working at Southeastern between 2007 and 2010, so around when

9    you first had to endure those rules we talked about earlier.

10    But before you learned about being denied tenure by those

11    administrators, how did it feel to be at work?

12    A.   Well, on the one hand, I was always anxious because I

13    felt like I was under surveillance about my appearance after

14    that conversation with Cathy Conway.  And I was also anxious

15    knowing that Doug McMillan had wanted me fired to begin with.

16    But, on the other hand, I loved my colleagues, I loved the

17    students, I loved doing research.

18    I had a –– I was –– I had a very –– I was very engaged

19    with activities such as –– I was sort of a fitness enthusiast.

20    I liked to run, and I attended Pilates and yoga classes.  I

21    liked to go bike riding early in the morning.  I liked to take

22    my dog out to the –– take her out to the park.  I enjoyed

23    having lunch with my –– with my colleagues.  So I –– of

24    course, there was anxiety, but, overall, it was a pretty good

25    quality of life.

Jury Trial – Volume 1
November 13, 2017

1  Q.   Dr. Tudor, the last period you were at Southeastern –– so
2  after you learned about the tenure denial from those
3  administrators to your very last day –– how did it feel?
4  A.   That was very different.  I became extremely depressed.
5  I was –– I stopped exercising.  I stopped doing those
6  activities that I had –– that I had engaged in before.  I
7  developed chronic insomnia.  I felt anytime I was sleeping, I
8  wasn't working, I wasn't doing more.  I became somewhat
9  concerned for –– that after I was retaliated, that maybe my
10  friends and colleagues may be retaliated against as well on
11  campus.  So I stopped socializing as much.
12      I live just a few blocks from Southeastern, and the park
13  that I went to was very close by.  Maybe it was the depression
14  or just because of –– I stopped going to the dog park during
15  the day.  I used to take my dog out in the morning, when it
16  was still dark, before I went to work, then in the evening
17  after dark.
18      I think that sort of symbolizes how I felt.  It was a
19  very dark and sad time for me.
20  Q.   Did you cry at all?
21  A.   I –– I did.  It's not something that –– I'm not
22  usually –– I don't usually like to emote in public, but it
23  became increasingly hard for me not to.  Sometimes tears just
24  ran down my cheeks and I couldn't stop them.
25  Q.   Did you ever cry at work?

Jury Trial – Volume 1
November 13, 2017

1    A.    Sometimes.

2    Q.    Did you cry in your office at work?

3    A.    Sometimes.

4    Q.    That hadn't really happened before all of this stuff

5    happened?

6    A.    No.  No, it's very unusual for me.

7    Q.    So, Dr. Tudor, did you feel ashamed about the fact that

8    you were unemployed after you left Southeastern?

9    A.    Yes, even though -- even though I followed all the rules,

10   I felt that people would look at me as if I hadn't followed

11   the rules, as if I had done something wrong, and that I was

12   being -- that I was somehow being justly punished for breaking

13   rules.

14   Q.    I think you said when you worked at Southeastern, you

15   lived in a little house near campus; is that right?

16   A.    Correct.

17   Q.    When did you move out of that little house?

18   A.    About 18 months after my last day at Southeastern.

19   Q.    Because you had gotten a new job?

20   A.    Correct.

21   Q.    Okay.  What was it like packing up your house?

22   A.    Well, I had lived there in that same house, in the shadow

23   of Southeastern, for eight and a half years, which is the

24   longest I had lived anywhere in my life.

25         So it was very hard.  I was moving to a one-bedroom

Jury Trial – Volume 1
November 13, 2017

1    apartment, so I couldn't take a lot of the things that were in

2    my house.  So I had to give a lot of things away to my

3    neighbors and just put something -- putting other things just

4    out for anyone who needed them.  They could just come by and

5    take them off the curb.  Other things, I packed up in boxes

6    and I -- a lot of those boxes, I still haven't unpacked to

7    this day.

8         The other part is it's just painful, opening those boxes,

9    and part of it is also because I still have the hope and

10   expectation of returning to Durant and to Southeastern.

11   Q.   After all this, after everything you went through there,

12   you still want to go back; is that right?

13   A.   Yes, yes.

14   Q.   So can you explain to the jury why it is, this many years

15   later, after all that happened to you, that you want to go

16   back?

17   A.   Yes.  Well, the people who broke the rules -- Lucretia

18   Scoufos, Doug McMillan, and Larry Minks -- are no longer at

19   Southeastern.

20        The people who supported me, the people who care about

21   me, my colleagues in my department, almost all of them are

22   still there.  And I still -- I still keep in contact with

23   them, and they are still my best friends.  And I know that

24   they would -- they would have that party they talked about

25   those years ago to welcome me back.

Jury Trial – Volume 1
November 13, 2017

1      And I –– I loved everything about teaching at
2  Southeastern, and I would like nothing more than to go back
3  and do the job that I did so well for so many years.
4  Q.   Dr. Tudor, the State brought up money during their
5  opening.
6      For you, what is this case about?
7  A.   This case is me getting my job back.  I want to work.
8  I've always just wanted to be able to do my job, just like I
9  think anybody else would want to, especially if you've trained
10  for something, you've worked for something your entire life.
11  You just want to –– and my students and my colleagues, they
12  all told me I did a great job while I was there.  It was never
13  a question of my being a good teacher there.  So that's –– I
14  just want to do what I love doing.
15  Q.   After all of this, do you think, truthfully, if given the
16  opportunity to go back and teach, you could put this all
17  behind you and teach?
18  A.   Yes.  Yes, of course.  Yes.  The classroom, it's –– I
19  call it my clean, well-lighted place.  It's where I feel safe
20  and secure.  My department is a place where I feel welcome and
21  at home.
22      The students were always –– were always welcoming, and I
23  see no downside to it.  It's –– I can't think of any reason
24  not to return.
25  Q.   Dr. Tudor, is there anything else that you want to say

Jury Trial – Volume 1
November 13, 2017

1    before I pass you off to Attorney Coffey?

2    A.    I would just like to reiterate that this is not about

3    money.  I just want my job back.  I just want to go home and

4    see my friends again.

5            MR. YOUNG:  Okay.  Thank you.  That's it for my

6    direct examination.

7            THE COURT:  Ms. Coffey.

8                          **CROSS-EXAMINATION**

9    BY MS. COFFEY:

10   Q.    Good afternoon, Dr. Tudor.

11        You just finished telling the jury about a lot of things

12   that you lost after you left Southeastern, didn't you?

13   A.    Yes.

14   Q.    And how hard it was on you and what the pain and

15   suffering that you've gone through.

16        If you had accepted that offer, though, that President

17   Minks asked Dean Scoufos to make you, to give you another year

18   for tenure, you wouldn't have lost any of that, would you?

19   A.    Are you referring to the offer that I asked to be put in

20   writing so -- is that the offer --

21   Q.    Yes.  I think you know I'm referring to the April 2010

22   offer that was made to you that "Please withdraw your

23   application so that we don't have to deny you tenure, so that

24   we don't have to say that next year is your terminal year, so

25   that we can give you the time to bolster your portfolio and

1   apply for tenure."

2        That's the conversation that I'm talking about.

3        Had you accepted President Minks' offer, none of these

4   things that you lost would have existed, would they?

5             MS. NOVOTNY:  Objection to the characterization of

6   that as an offer.

7             THE COURT:  Overruled.

8             THE WITNESS:  I'm sorry.  I'm a little bit confused.

9   Could you please explain the question to me?

10  Q.  (BY MS. COFFEY)  Back when you received your offer in

11  April of 2010.  You just indicated that it was the offer that

12  you had asked to be in writing.

13       When you rejected that offer that same afternoon, on

14  April 6th of 2010, when you rejected that offer, you didn't

15  mention anything about asking that offer to be in writing, did

16  you?

17  A.  I asked for the offer to be in writing if it was

18  legitimate.

19  Q.  So when you rejected -- when you wrote to Dr. Scoufos,

20  indicating that you were rejecting the offer she had made that

21  afternoon, are you telling this jury that in that written

22  rejection, you asked that that offer be made in writing?

23  Because you didn't.  You didn't ask for it in writing.  If you

24  had wanted it in writing, why wouldn't you have indicated that

25  in your rejection?

Jury Trial – Volume 1
November 13, 2017

1           MS. NOVOTNY:  Objection.  The counsel is testifying

2   here.

3           THE COURT:  Ms. Novotny, this is Mr. Young's

4   witness.  Only Mr. Young may make the objections.

5           MR. YOUNG:  Your Honor, I respectfully make the same

6   objection.

7           THE COURT:  Sustained.

8   Q.  (BY MS. COFFEY)  When is it that you asked for that offer

9   to be put in writing?

10  A.   When my department chair and I were in the office with

11  Scoufos, I asked for the offer to be put in writing if it was

12  legitimate.

13  Q.   You're aware that Dean Scoufos has testified previously

14  in this case and indicated there was never an offer –– you

15  never requested that offer be in writing; right?

16      You sat there in her deposition and you heard her testify

17  to that, didn't you?

18          MR. YOUNG:  Objection, Your Honor.  Counsel is

19  seeking hearsay.

20          THE COURT:  Overruled.

21          MS. COFFEY:  I'm trying to pull up an exhibit, Your

22  Honor.

23          THE COURT:  Has it been admitted?

24          MS. COFFEY:  No, Your Honor, it has not.

25          THE COURT:  Nothing can be shown to the jury until

Jury Trial – Volume 1
November 13, 2017

1   it is admitted.

2          MS. COFFEY:  Your Honor, would you like me to

3   approach to get one of the exhibits to show the witness?  Our

4   copy for the witnesses are, I think, up there.

5          THE COURT:  How many?  Oh, yes, yes.  Absolutely.

6          MS. COFFEY:  May I hand these to the witness, Your

7   Honor?

8          THE COURT:  Yes.

9   Q.  (BY MS. COFFEY)  All right.  Dr. Tudor, I've handed you

10  what's been marked as Defendants' Exhibit 59.  It is a memo

11  written from you to Dean Scoufos on April 6th of 2010.

12         Do you recognize this as the memo that you wrote, absent

13  Dean Scoufos's handwriting?

14  A.  Excuse me.  Could you ask the question again?

15  Q.  Is this the memo that you wrote to Dean Scoufos on

16  April 6th of 2010 regarding the April 6th, 2010, meeting?

17  A.  It appears so.

18         MS. COFFEY:  I move for the admission of Defendants'

19  Exhibit 59.

20         THE COURT:  Any objection?

21         MR. YOUNG:  No objection, Your Honor.

22         MS. COFFEY:  It doesn't appear to be working.  Can I

23  stand over here?

24         THE COURT:  Uh-huh.  Just speak up.

25         MS. COFFEY:  All right.

Jury Trial – Volume 1
November 13, 2017

```
1   Q.  (BY MS. COFFEY)  Dr. Tudor, this memo of yours written to

2   Dean Scoufos, it doesn't say anything in there about you

3   asking that that offer be made in writing, does it?

4   A.   This particular memo does not.

5   Q.   Is there another memo that you wrote regarding that

6   meeting in which you indicate that you requested it be in

7   writing?

8           MR. YOUNG:  Objection, Your Honor, to this exhibit.

9   This is not the exhibit that plaintiffs received.  This has

10  additional handwriting and markings on it.

11          MS. COFFEY:  I disagree, Your Honor.

12          THE COURT:  Well, you asked her to identify it

13  absent --

14          MS. COFFEY:  She did.

15          THE COURT:  -- Dr. Scoufos's handwriting, which I'm

16  assuming that is; correct?

17          MS. COFFEY:  Correct.

18          THE COURT:  Just cover that up for now.  We'll get

19  it straightened out later.

20  Q.  (BY MS. COFFEY)  All right.  Dr. Tudor, again I ask you,

21  where in this memo does it indicate that you had asked for

22  that offer to be put in writing

23  A.   As I answered that question before, it doesn't appear in

24  this particular memo.

25  Q.   But you told this jury that that was one of the reasons
```

Jury Trial – Volume 1
November 13, 2017

1    why you didn't want to accept that offer, that it was so
2    important to you that it be put in writing and they refused.
3        But if that had been the case, you would have put that in
4    the memo in which you rejected your offer, wouldn't you?
5    A.   Not necessarily.
6    Q.   I mean, had you put that in the memo and they had
7    understood that that was the basis for the rejection, they
8    would have had an opportunity to put it in writing for you,
9    wouldn't they?
10   A.   Dean Scoufos was very clear that one of their objections
11   to the offer was because it was not in writing.  I said that
12   to her in person.
13   Q.   I'm sorry.  I thought you said that Dean Scoufos was very
14   clear, that she made it clear.  You're not saying that Dean
15   Scoufos made it clear to you that she wouldn't put it in
16   writing, are you?
17   A.   Yes.  She said that she would not put it in writing.
18   Q.   Again, I mean, you didn't think that was important enough
19   to put that in your rejection of the offer?
20        MR. YOUNG:  Objection, Your Honor.  Asked and
21   answered.
22        THE COURT:  Overruled.
23   Q.   (BY MS. COFFEY)  Now, Dr. Tudor, you also said that you
24   had some concerns, and one of the reasons you asked for it in
25   writing is because perhaps they wouldn't stand by that offer.

Jury Trial – Volume 1
November 13, 2017

1        Is that what you testified to earlier?

2   A.   I believe I testified if it wasn't in writing, it was not

3   a legitimate offer.

4   Q.   So the fact that they offered you the opportunity to

5   withdraw your tenure application, withdraw it before President

6   Minks denied it, and they would give you another year, that

7   that was not a legitimate offer, in your mind?

8   A.   Well, the entire meeting with Lucretia Scoufos was

9   very -- very, very bizarre.  I had doubts as to the legitimacy

10  of that offer, and Scoufos said that she had met with McMillan

11  and Minks, and yet Minks had not yet ruled on my application.

12  Q.   Your department chair, John Mischo, was there with you,

13  wasn't he?

14  A.   I believe so.

15  Q.   So certainly he could have backed up any offer that was

16  made to you, couldn't he?

17  A.   (No response.)

18  Q.   Do you recall Dean Scoufos telling you, after she

19  presented President Minks' offer, telling you that it was a

20  gift?

21  A.   May I answer the previous question?

22       I believe that John -- no.  I know John Mischo agreed

23  with me that the offer should have been in writing, any

24  legitimate offer would be in writing.

25  Q.   Dr. Tudor, Dr. Mischo, if he believes that, can come and

Jury Trial – Volume 1
November 13, 2017

1   testify to that, but Dr. Mischo was there with you when the

2   offer was made; correct?

3       I'm sorry.  You answered that previously.  He was there

4   with you?

5   A.   Yeah.

6   Q.   So -- but you recall when Dean Scoufos told you that it

7   was a gift, this offer; right?

8   A.   I do not recall that term "gift," and I would not

9   characterize it as a gift.

10  Q.   You're aware that Dr. Mischo has testified that he

11  concurred that she did indicate that that was a gift?

12  A.   My recollection -- Dr. -- I believe Dr. Mischo

13  characterized it as a, quote, ultimatum.

14  Q.   And the ultimatum was -- the ultimatum was you needed to

15  withdraw your tenure application so the president wouldn't

16  have to deny it; right?  That was the ultimatum, if you would

17  withdraw it, resubmit in 18 months, they wouldn't have to deny

18  it; right?

19  A.   I believe John Mischo is best qualified to explain what

20  he meant when he used -- described this offer as ultimatum.

21  Q.   Now, Dr. Tudor, you indicated that you filed so many

22  complaints because you needed to make a record to get things

23  fixed; right?

24  A.   That was one of the reasons I believe I testified to.

25  Q.   Okay.  You have testified probably five or six times

Jury Trial – Volume 1
November 13, 2017

1  today that you were told that Dr. McMillan wanted to fire you,

2  haven't you?

3  A.   I don't recall the exact number of times, but I have

4  testified that he wanted fire me.

5  Q.   Yet in not a single complaint that you filed at

6  Southeastern, not a single complaint of yours mentions you

7  were threatened with the fact that Dr. McMillan indicated he

8  wanted to fire you.

9       Why not?

10  A.   I'm not sure that's accurate.

11  Q.   Well, there's no written complaint that you submitted to

12  Southeastern in which you are complaining about one of these

13  poor work conditions or work rules that Cathy Conway placed on

14  you; right?

15  A.   I'm not sure that's accurate either.

16  Q.   All right.  Can you identify a complaint that you

17  submitted to Southeastern in which you are complaining about

18  the work conditions that Cathy Conway placed on you during

19  that phone call in June of 2007?

20  A.   I recall using the term "hostile" in one or more

21  complaints.  I'd have to see the complaints to refresh my

22  memory.

23  Q.   I will submit to you there isn't a single written

24  complaint that you have filed at Southeastern that complains

25  about these supposed work conditions that Cathy Conway placed

Jury Trial – Volume 1
November 13, 2017

 1  on you.

 2       But what I asked you earlier is where did you complain

 3  about this threat that Doug McMillan wanted to fire you?

 4  A.   Again, I'd need to refresh my memory by looking at my

 5  complaints.

 6  Q.   Well, isn't it the real reason why you can't recall it is

 7  because Cathy Conway never told you that?

 8            MR. YOUNG:  Objection, Your Honor.  Attorney Coffey

 9  is testifying.

10            THE COURT:  I'm sorry?  I didn't hear that.

11            MR. YOUNG:  Ms. Coffey is testifying for the

12  witness.

13            THE COURT:  Overruled.

14  Q.   (BY MS. COFFEY)  Would you like me to repeat the question?

15  A.   Yes, please.

16  Q.   Isn't the reason why you never complained that

17  Dr. McMillan supposedly wanted to fire you is because Cathy

18  Conway never told you that?

19  A.   No.  That's absolutely untrue.

20  Q.   Now, you sat through Cathy Conway's deposition, didn't

21  you?

22  A.   Yes.

23  Q.   You heard Cathy Conway testify that she never told you

24  that?

25  A.   I don't specifically recall her testimony.

Jury Trial – Volume 1
November 13, 2017

1  Q.   You heard Doug McMillan testify he never told Cathy
2  Conway, he never told her, he never asked her whether you
3  could be fired?
4  A.   Is that a question?
5  Q.   Yes.  You heard that testimony by Doug McMillan, didn't
6  you?
7           MR. YOUNG:  Objection, Your Honor.  Again, these are
8  witnesses that are going to be called.  They can testify as to
9  what they believe to be true.
10          THE COURT:  She's allowed to impeach with others'
11  testimony.  Overruled.
12          MR. YOUNG:  Yes, Your Honor.
13          THE WITNESS:  He may have testified –– he may have
14  said that, but I don't recall.
15  Q.   (BY MS. COFFEY)  Okay.  So you have testified that you
16  filed all these complaints, again, because you wanted to make
17  a record, you wanted to get things fixed.
18       Well, if in 2007, as soon as Southeastern is notified of
19  your transition, you are threatened with the idea that a vice
20  president of academic affairs is asking if you can be fired,
21  don't you think that would have been something significant to
22  make a record of?
23  A.   Are you asking in reference to a formal complaint?  As I
24  testified earlier, who would I –– he was the head of H.R. and
25  vice president of academic affairs.  Who would I complain to

Jury Trial — Volume 1
November 13, 2017

1   at that time?

2   Q.   Dr. Tudor, you testified about your family earlier and

3   that you wanted to help your sisters, didn't you?

4   A.   Yes.

5   Q.   At any time while you were at Southeastern, were you

6   supporting your sisters?

7   A.   On occasion.

8   Q.   Okay.  You wanted the jury to hear that testimony because

9   you wanted them to understand the financial burden that you

10  were undergoing.  Is that why?

11  A.   I believe the reason was so that the jury could

12  understand what the job -- that job meant not only to me, but

13  my relatives who had helped me get my education and my desire

14  to repay their sacrifices when I could.

15  Q.   You wanted to repay their sacrifices, but you didn't pay

16  child support, did you?

17             MR. YOUNG:  Objection, Your Honor.  Relevance.

18             THE WITNESS:  That's absolutely --

19             THE COURT:  Sustained.

20  Q.   (BY MS. COFFEY)  Dr. Tudor, who makes up the faculty

21  appellate committee?

22  A.   Tenured faculty members.

23  Q.   It's all faculty, isn't it?  No administrators; right?

24  A.   As far as I know.

25  Q.   All right.  Well, is there some reason why you think

Jury Trial – Volume 1
November 13, 2017

1  there would be an administrator on the faculty appellate

2  committee?

3  A.   Faculty members perform many roles.  So sometimes faculty

4  members are appointed to administrative roles and then they

5  return to becoming a teacher and educator, like me.

6      Others -- so I don't know if a member of the faculty

7  appellate committee may have been designated administrator at

8  some time and then returned to faculty or an administrator may

9  have performed faculty duties.

10 Q.   Okay.  So it's fair to say, though, that while they're

11 serving on the faculty appellate committee, they are serving

12 in the role of faculty; right?

13 A.   That's -- in general, I'd say that characterization is

14 accurate.

15 Q.   All right.  So it's not very often the faculty appellate

16 committee finds against a faculty member, is it?

17 A.   The faculty appellate committee raise the evidence.  If

18 the faculty member was at fault, then they would rule against

19 the faculty member.  If they broke the rules -- if the

20 administration broke the rules, they'd find against the

21 administration.  Whoever broke the rules, they would find

22 against.

23 Q.   You have referred at least a few times that the faculty

24 appellate committee orders, that they issued orders.

25      That's not really true, is it?  All they do is issue --

Jury Trial – Volume 1
November 13, 2017

1    they come down with a recommendation; right?

2    A.    The way that -- the way that the administration has

3    always responded to it has been --

4    Q.    I'm sorry.

5    A.    -- as if they were directives.

6    Q.    But my question to you -- yeah.  My question is that the

7    faculty appellate committee -- I mean, they issue a nonbinding

8    recommendation to the administration; right?

9    A.    Obviously, the administration did not honor their

10   decision, so it's nonbinding.

11   Q.    Well, it's not a directive.  The administration is not

12   required to follow it; right?

13   A.    It's true that the faculty appellate committee has no --

14   has no way to enforce its decisions, what it's decided as

15   findings of fact.

16   Q.    Let's jump to the tenure review process.  You've never

17   sat on a tenure review committee; right?

18   A.    That's correct.

19   Q.    So you can't testify as to what's required with respect

20   to the review and the vote of denial or recommendation of

21   tenure, can you, from the committee's perspective?

22   A.    From the committee's perspective?

23   Q.    I'm sorry.  That was really a bad question.  I apologize.

24         Because you've never sat on a tenure review committee,

25   you can't testify about exactly what takes place during a

Jury Trial – Volume 1
November 13, 2017

1    tenure review committee, can you?

2    A.    Since I have not sat on a tenure review committee,

3    that's –– it's accurate to say that I can't testify to what

4    occurs in a tenure review committee.

5    Q.    When you applied for tenure in 2008 and the committee

6    voted 5-0 against recommending you for tenure, you chose to

7    withdraw your tenure application that year, didn't you?

8    A.    I'd say that's a mischaracterization.

9    Q.    You didn't withdraw it?  So you sent it on up for further

10   consideration?

11   A.    No.  You said a vote of 5-0.  The tenure committee has

12   one vote; the department chair has one vote.

13   Q.    Dr. Tudor, let's go back.  You've never sat on a tenure

14   review committee, as you just testified; right?

15   A.    Correct.

16   Q.    There are five members on a tenure review committee at

17   Southeastern, or at least there was at the time you submitted

18   your ––

19            MR. YOUNG:  Objection, Your Honor.  Assumes facts

20   not in evidence.

21            THE COURT:  Just a moment.  She's asking.  He can

22   answer if he knows.

23   Q.    (BY MS. COFFEY) When you submitted your portfolio for

24   review in 2008 and again in 2009, there were five members each

25   year that sat on that tenure and review committee; right?

Jury Trial – Volume 1
November 13, 2017

1   A.    Correct.

2   Q.    And each one of those committee members had a vote;

3   right?

4   A.    That's incorrect.

5   Q.    But, again –– and what do you base that on?

6   A.    The testimony of my department chairs in their

7   depositions, they stated that the tenure committee has one

8   vote.

9   Q.    I'm not sure which depositions you're referring to, but

10  you sat in the deposition of Randy Prus?

11  A.    And John Mischo, both of them.

12  Q.    And John Mischo.  And both of them talked about the

13  tenure review votes in 2008 of 5-0 and 2009 of 4-1; correct?

14  A.    I believe they explained that the tenure committee has

15  one vote and the department chair has one vote.

16  Q.    Well, that one vote is determined, though, then by

17  everybody in the committee votes, right, and the majority

18  wins?  Is that how the one vote is determined?

19  A.    Again, as you stated, I have not served on one, so I ––

20  John Mischo or Randy Prus would be the people to ask how the

21  process actually works within the close confines of the tenure

22  review committee.

23  Q.    Then let's go back to 2008.  So the five members vote no,

24  which results in a vote at a tenure review denying

25  recommendation of tenure for you.

Jury Trial — Volume 1
November 13, 2017

1    So at that point you withdrew your tenure application,

2 didn't you?

3 A.   It's accurate to say that I —— that I took back my

4 application in 2008-2009, as I testified to.

5 Q.   Okay.  So you withdrew after it didn't pass a particular

6 level.

7    Why didn't you do the same in 2010?  You knew it hadn't

8 passed at least two levels.  You knew that Dean Scoufos and

9 Dr. McMillan had both indicated they would recommend tenure

10 denial; right?

11 A.   I think there's two questions there.

12 Q.   Okay.  There are.

13    You knew in 2010, before that April meeting, that

14 Dr. Scoufos had denied tenure recommendation for you; right?

15 A.   I had received notification from Lucretia Scoufos that

16 she was denying my tenure application and recommending my

17 termination at the end of that current year.

18 Q.   You also learned that Vice President McMillan was

19 recommending tenure denial for that year; correct?

20 A.   I had also received notice from Doug McMillan that he was

21 also denying my tenure application.

22 Q.   Dr. Tudor, is there a difference when I said that you

23 knew that they had recommended tenure denial versus you

24 receiving a notice?

25    I mean, are you suggesting there's something suspicious

Jury Trial – Volume 1
November 13, 2017

 1   about receiving a notice as opposed to just learning that they
 2   had recommended your tenure denial?
 3   A.   I'm -- I'm not following why you're confused.
 4   Q.   Well, I'm asking you what I think is a yes-or-no
 5   question.
 6        Did you know that Dean Scoufos had recommended tenure
 7   denial, and instead of saying yes, you said, "Well, I had
 8   received notice."
 9        So you knew; right?
10   A.   Yes, I was confirming that.
11   Q.   Okay.  So at either one of those levels, after you knew
12   that Dr. Scoufos had denied your tenure -- or was going to
13   recommend tenure denial, why didn't you withdraw it then?
14   A.   They refused to give me any rationale or reasons for the
15   denial of tenure.
16   Q.   Okay.  And is the same thing true, then, for that's why
17   you didn't withdraw when Dr. McMillan -- when you learned that
18   Dr. McMillan was recommending tenure denial?
19   A.   Dr. McMillan also failed to follow the rules by giving me
20   any reason or rationale for his decision.
21   Q.   Dr. Tudor, you have told this jury a few times today that
22   they failed to follow the rules because they failed to give
23   you an explanation.
24        The rule -- the policy is that at the end of the tenure
25   process, the president may provide an explanation for tenure

Jury Trial – Volume 1
November 13, 2017

1    denial.  That's the rule, isn't it?

2    A.   That is not the way that the faculty appellate committee

3    interprets the rules or that I interpret the rules, or that —

4    the rules.

5    Q.   It is certainly the way that — a document that you have

6    testified about earlier, that's certainly the way Chip Weiner

7    interpreted that rule, isn't it, that the president has the

8    option at the end of tenure denial to provide an explanation?

9         Do you remember being told that?

10   A.   Dr. Weiner said that even though the faculty appellate

11   committee had decided that Lucretia Scoufos and Doug McMillan

12   were obliged to give me their explanations under the rules,

13   that instead — instead, Douglas McMillan would write a letter

14   to me on behalf of Larry Minks, giving Larry Minks's reasons

15   for denying me tenure.

16        That's my recollection of the Weiner letter.

17   Q.   And that wasn't my question.

18        My question was, the rule is that the president, at his

19   discretion, may provide an explanation for tenure denial.

20        That's the rule, isn't it?

21   A.   I don't believe that's accurate.

22   Q.   Well, when your attorney is asking you questions and you

23   kept referring to "the rule, the rule," if there really was a

24   rule that required at each step of the process to provide an

25   explanation, where is it?

Jury Trial – Volume 1
November 13, 2017

1       There isn't any rule.  There is no rule that requires

2   Dean Scoufos or Dr. McMillan to provide an explanation to you

3   in the middle of the process; right?

4   A.   Is that -- I lost the question in there with --

5   Q.   I think back -- can you identify the rule that you keep

6   claiming existed that required an explanation during the

7   middle of the tenure process?

8   A.   Yes.  It's the rule that the faculty appellate committee

9   ruled on.  They said that they were obliged under the rules to

10  give me those explanations.

11  Q.   And when it was all said and done, when you refused to

12  withdraw your tenure application so the president had no

13  choice but to deny you tenure, you then were given an

14  explanation for the tenure denial, weren't you?

15  A.   Was there two questions there?  It's hard for me to

16  follow you.  I'm sorry.

17  Q.   After you were denied tenure, you let it go all the way

18  through the process, you refused to withdraw, and President

19  Minks denied your tenure, you were then provided an

20  explanation, weren't you?

21  A.   By Douglas McMillan of Minks's rationale.

22  Q.   All right.  Now, you indicated earlier that the reason it

23  was important that you had known somewhere through the process

24  would be so that you could change something.

25       Am I correctly characterizing your testimony?

Jury Trial – Volume 1
November 13, 2017

```
 1   A.    I think my testimony was more substantial than that.

 2   Q.    Well, change or correct anything if it needed to be done.

 3   A.    Well, I think I also referenced that I could clarify any

 4   misunderstanding; that I could answer any question that, for

 5   instance, Lucretia Scoufos or Doug McMillan would have at any

 6   point; that if they needed any more information, that I could

 7   provide it.

 8         So there was -- again, I don't recall everything I

 9   testified to earlier, but it was more than simply the one

10   thing that you asserted.

11   Q.    But isn't the process set up in this manner:  That a

12   candidate submits their tenure portfolio, and, once it's

13   submitted, there can't be any changes, you don't make

14   additions?  If the portfolio that you submitted is

15   insufficient, it stands on its own; right?

16   A.    No, that's absolutely false.  That's incorrect.

17   Q.    So you think you could have added things to your

18   portfolio in 2009?  Is that what you're claiming, that you

19   could have added or changed things to your portfolio after you

20   learned of the reason for a denial at any level?

21   A.    Portfolios have been amended before.  So it's perfectly

22   permissible, yes.

23   Q.    After you submitted your portfolio, you were allowed --

24   in 2009, you were allowed to add to that portfolio another

25   publication, weren't you?
```

Jury Trial – Volume 1
November 13, 2017

1   A.   There was additional publications.  I believe John Mischo

2   included it as well.

3   Q.   I'm sorry.  Was it your publication or John Mischo's

4   publication?

5   A.   You asked if it was -- I believe the question was, was it

6   allowed to be amended?

7   Q.   Yeah.

8   A.   And that's why I was talking about John Mischo, who was

9   the department chair and who I submitted my portfolio to.

10  Q.   No.  I'm sorry, Dr. Tudor.

11       I mean, my question was, after you submitted your

12  portfolio at the beginning of the process in 2009, you were

13  allowed to add another publication to it somewhere in the

14  process, weren't you?

15  A.   I believe -- I can't recall specifically.  If you could

16  refresh my memory, I'd be happy to answer that question.

17  Q.   That's okay.  The individual that was involved in that

18  submission can testify that you were permitted to do that.

19       When you submitted your portfolio in 2008, you did it

20  with the advice of Mark Spencer telling you that you needed

21  two publications, didn't you?

22  A.   I don't recall that.

23  Q.   You didn't have any publications when you submitted your

24  portfolio in 2008, did you?

25  A.   I believe that's inaccurate.

1   Q.    Why?

2   A.    The University of Oklahoma has a journal called World

3   Literature Today, and I had published a book review in that.

4   That's a publication.

5         There's different types of publications.

6   Q.    You agree with me, wouldn't you, that what's really

7   important about publication is that they're quality,

8   peer-reviewed publications; right?

9   A.    I'm sorry.  Could you ask the question again.

10  Q.    Do you understand what a peer-reviewed publication is?

11  A.    Yes.

12  Q.    And it's important in your portfolio, each candidate,

13  that they have peer-reviewed publications; correct?

14  A.    That's a part of a larger portfolio, correct.

15  Q.    Are you suggesting it's not required?

16  A.    I'm simply trying to give you an accurate picture of a

17  portfolio, which is a cumulative -- which is the cumulative

18  work of a tenure-track faculty member that has many, many

19  components, including peer-reviewed articles.

20  Q.    You testified about the meeting that Dean Scoufos had

21  with you before you submitted your 2009 tenure portfolio.

22        Do you remember that?

23  A.    Yes.

24  Q.    Okay.  So when Dean Scoufos met with you, she went

25  through a sample portfolio packet with you, didn't she, trying

1    to -- explaining to you how your portfolio was supposed to be

2    submitted, what order, and what needs to be in there; right?

3    A.   I'd say that's a mischaracterization of what she actually

4    did.

5    Q.   So are you telling the jury that she didn't go over this

6    packet with you?

7    A.   The way that you described the packet, I believe, is

8    inaccurate.

9    Q.   Describe the packet for me.

10   A.   I think what you're referring to is a list of technical

11   requirements for the portfolio, such as font size and the size

12   of the binder, perhaps the different -- the packet refers to

13   technical requirements, not substantive requirements.  I

14   believe that's why we're -- I believe your question was -- may

15   have confused the jury.

16   Q.   Well, I'll tell you what, since it took me so long to

17   pull the last exhibit out of the notebook, I'll wait until a

18   break to pull out the promotion packet so we can talk about it

19   so I won't be so confusing.  So I apologize.

20        During this meeting with Dean Scoufos, did you take notes

21   about what was needed for your portfolio?

22   A.   I don't recall.

23   Q.   Do you recall in your deposition that you testified that

24   you took notes at the meeting but you didn't save them?

25   A.   That would be -- if it -- that would be helpful to

Jury Trial – Volume 1
November 13, 2017

1    refresh my memory.  Thank you.

2    Q.   Did you not think it was important to save notes that you

3    had taken during this meeting?

4    A.   Any substantive comments about the portfolio would have

5    been extremely valuable.  I wish I had received them.

6    Q.   Can you identify a single question that you asked Dean

7    Scoufos that she refused to answer during that meeting?

8    A.   Does that -- the gist of the questions, yes.

9    Q.   Do you remember when I asked you that same question

10   during your deposition?

11        Of course, it's been a while, March of 2016, but I asked

12   you that same question, if you could recall a single specific

13   question that you're claiming she wouldn't answer.  You

14   couldn't recall a single one.

15   A.   Thank you for the clarification, as I just answered the

16   gist, but not any specific, concrete question.  That's why I

17   said "the gist."  But any specific question...

18   Q.   And your recollection is the gist of the conversation is

19   that Dean Scoufos refused to answer any substantive questions

20   you posed to her about what your portfolio needed to contain?

21   A.   I'm sorry.  Could you ask me that again.

22   Q.   Yeah.  I mean, you keep saying that you can't recall

23   specifics but you recall the gist of the conversation with

24   Dean Scoufos when she's meeting with you to tell you what you

25   need to do to submit your portfolio.

Jury Trial – Volume 1
November 13, 2017

1        And the gist of that conversation, as you recall, is that

2    she refused to answer any substantive questions you posed to

3    her?

4    A.    Correct.

5    Q.    You were present at Dean Scoufos's deposition, weren't

6    you?

7    A.    Yes.

8    Q.    Is it safe to say that her recollection and her testimony

9    regarding her over-one-hour session with you is significantly

10   different than your recollection?

11   A.    I think there's two questions there.  I don't know how --

12   there's a question about how long her session was with me when

13   you say "over an hour," and then --

14   Q.    You heard Dean Scoufos testify that she met with you for

15   at least an hour to discuss what you needed in your 2009

16   portfolio; right?

17   A.    That she testified to that?

18   Q.    Yes.

19   A.    She may or may not.  The deposition lasted, as you know,

20   many of them, all day.  And they occurred over several years.

21   If you'd like to refresh my memory with an excerpt from the

22   deposition, I'd be happy to answer it.

23   Q.    What I'm asking you is, is your recollection of that

24   meeting significantly different than Dean Scoufos's

25   recollection?

Jury Trial – Volume 1
November 13, 2017

1   A.   I remember that we testified that different –– that

2   different things occurred during that meeting.

3   Q.   That's the same meeting where you accused Dr. Coleman of

4   discrimination, isn't it?

5   A.   I ––

6   Q.   Yes or no, was that the same meeting that you accused

7   Dr. Coleman of discrimination?

8           MR. YOUNG:  Objection.  Mischaracterizes testimony.

9           THE COURT:  He can answer for himself.  Overruled.

10          MR. YOUNG:  Herself, Your Honor.

11          THE COURT:  I'm sorry.

12          MR. YOUNG:  Thank you, Your Honor.

13          THE WITNESS:  I would not characterize it that way.

14  Q    (BY MS. COFFEY)  Are you claiming that you didn't accuse

15  Lisa Coleman of discrimination?

16  A.   I believe I raised a concern, but I think that's

17  different than the way that you had characterized it.

18  Q.   Dr. Tudor, do you remember in your deposition when you

19  indicated that you voiced a concern?

20  A.   Yeah.

21  Q.   And then, though, do you remember me showing you

22  discovery responses where you said, "I was informing Dean

23  Scoufos of her responsibility to determine whether or not Lisa

24  Coleman was discriminating against me"?

25  A.   If you could refresh my ––

Jury Trial – Volume 1
November 13, 2017

1   Q.   Is that correct?

2       Is that -- as you sit here today, is that how you depict

3   your conversation with Dean Scoufos, that you were informing

4   her of her responsibility to determine whether or not Lisa

5   Coleman had discriminated against you?

6   A.   And it would help if you could refresh my memory with

7   that document you're looking at.  I don't have that.

8   Q.   Well, what I'm looking at are my notes.  I'm asking you

9   if my statement is an accurate depiction of your conversation

10  with Dean Scoufos.

11  A.   Okay.

12  Q.   Were you or were you not asking her to look into

13  discrimination by Lisa Coleman because you're transgender?

14  A.   I voiced a concern that there may be possible -- that may

15  be a possibility.

16  Q.   Okay.

17          THE COURT:  Let me stop you here.  We'll take our

18  afternoon break.  Please don't discuss the case, don't allow

19  others to discuss it with you.

20      Dr. Tudor, to you, counsel, jury, everyone, I apologize.

21  I often get my gender pronouns mixed up.  It just matters more

22  in this case, and I need to be more careful.

23      We'll be in recess until three o'clock.

24      (Jury exits.)

25      (In recess 2:45 p.m. until 3:00 p.m.)

Jury Trial – Volume 1
November 13, 2017

1    (Jury enters.)

2         THE COURT:  Be seated.

3    Proceed.

4         MS. COFFEY:  May I approach the witness, Your Honor?

5         THE COURT:  Yes.

6         MS. COFFEY:  I've handed the witness what's been

7    marked as Defendants' Exhibit 82.

8    Q    (BY MS. COFFEY)  Dr. Tudor, can you identify that

9    document?

10   A.   It says it's an application portfolio for promotion to

11   associate professor rank with tenure status.

12        MS. COFFEY:  I move for the introduction of

13   Defendants' Exhibit 82.

14        THE COURT:  Mr. Young, any objection?

15        MR. YOUNG:  No objection, Your Honor.

16        THE COURT:  Admitted.

17   Q.   (BY MS. COFFEY)  Dr. Tudor, we had talked a little while

18   ago, and I could not get exhibits pulled quickly enough, so I

19   waited until the break.  But what I've presented to you is the

20   tenure packet we had discussed earlier.

21        This is the packet that Dean Scoufos gave to you when she

22   met with you in 2009; right?

23   A.   It contains the technical aspects of the portfolio:

24   where our name should be, the font size, the table of

25   contents.

Jury Trial – Volume 1
November 13, 2017

1    THE COURT:  Dr. Tudor, let me ask you to listen

2  carefully to the question that is asked and answer that

3  question.  Many of these can be answered with yes or no, which

4  would make this process very much faster.

5    THE WITNESS:  Yes.

6    THE COURT:  This, for example, is a yes-or-no

7  question.

8    THE WITNESS:  Yes, Your Honor.  I apologize.  Thank

9  you.

10 Q.  (BY MS. COFFEY)  Dr. Tudor, it does, it sets forth several

11 sections that are required to be in your portfolio packet;

12 right?

13 A.   Yes.

14 Q.   For instance, there's a table of contents that shows

15 Sections 1, 2, 3, and 4, which require credentials, teaching

16 achievements, research and scholarship, and service

17 proceedings; right?

18 A.   Yes.

19 Q.   Are these the technical matters that you had testified

20 about earlier that Dean Scoufos went over with you?

21 A.   Yes.

22 Q.   And you talked about a letter of application to be

23 included in your portfolio, didn't you?

24 A.   Yes.

25 Q.   The transmittal form, that's a department form; that's

Jury Trial – Volume 1
November 13, 2017

```
 1   not something that's prepared by the candidate.  Right?
 2   A.   Yes.
 3   Q.   Then there's a section to be included, not in order, of
 4   credentials; correct?
 5   A.   Yes.
 6   Q.   And there's a Section 2 for teaching achievements; right?
 7   A.   Yes.
 8   Q.   Research and scholarship section; correct?
 9   A.   Yes.
10   Q.   Section 4, service proceedings; right?
11   A.   Yes.
12   Q.   When Dean Scoufos provided you this packet, did you have
13   questions or concerns about what needed to be provided in each
14   section?
15   A.   Yes.
16   Q.   Did she answer those concerns?
17   A.   No.
18   Q.   Without asking you -- retreading over old testimony, are
19   these the questions and concerns that you claim that you posed
20   to her that you can't remember but you're certain that she
21   didn't answer them?
22   A.   With this exhibit refreshing my memory, I certainly do
23   recall what these headings -- asking questions about various
24   headings, what they referred to, what would be good examples,
25   and how those different examples would be evaluated by her and
```

Jury Trial – Volume 1
November 13, 2017

1    others reviewing my portfolio.

2    Q.   Okay.  And is it your testimony that you posed each of

3    those questions to her and she refused to answer them?

4    A.   Those types of questions.

5    Q.   Now, before the break, we were discussing your -- this

6    same session with Dean Scoufos, but we were discussing the

7    issue of accusing Lisa Coleman of discrimination.

8         Do you remember that testimony?

9    A.   Yes.

10   Q.   You told Dean Scoufos that you didn't want Lisa Coleman

11   on your tenure committee, didn't you?

12   A.   That's incorrect.

13        That's a mischaracterization, let's say, to be precise.

14   It's a mischaracterization.

15   Q.   Did you tell her that you did want Lisa Coleman on your

16   tenure review committee?

17   A.   She asked me who I wanted on the committee and who I

18   would prefer not to be on the committee.

19        And, in reference to the question, who would you prefer

20   not to be, so it's not -- do not -- I'm sorry.  I don't mean

21   to quibble about --

22             THE REPORTER:  Excuse me.

23        (Brief interruption.)

24   Q.   (BY MS. COFFEY)  So you told Dean Scoufos that you would

25   prefer that Lisa Coleman not be on your tenure and review

Jury Trial – Volume 1
November 13, 2017

1   committee; correct?

2   A.   I responded to her question, who would I prefer not to

3   be.

4   Q.   And you told her that Lisa Coleman had discriminated

5   against you ever since your transition because she wasn't

6   including you on bus trips that the honors college was taking;

7   right?

8   A.   That's incorrect.

9   Q.   Okay.  Were you accusing Lisa Coleman of discrimination

10  because you were being excluded from honors trips?

11  A.   My concern was that pretransition, I was attending the

12  trips with the honors classes, and posttransition I hadn't

13  been invited.  And that was my concern.

14  Q.   So that concern was enough to ask Dean Scoufos to look

15  into whether or not Lisa Coleman was discriminating against

16  you; right?  That was your purpose?

17  A.   Again, I was responding to Dean Scoufos's question, who I

18  would prefer not to be on my -- not to be on my committee.

19  Q.   Do you remember at your deposition when I posed this

20  question, "So were you or were you not suggesting that Lisa

21  Coleman discriminated against you?"

22       Answer:  "I was informing Dean Scoufos of her

23  responsibility to determine whether or not Lisa Coleman was

24  discriminating against me."

25  A.   I don't recall that particular exchange.  If you could

 1   refresh my memory, I would --

 2   Q.   Would you like to see your deposition?

 3            MS. COFFEY:  May I approach the witness?

 4            THE COURT:  Please provide the page number and line

 5   number for counsel.

 6            MS. COFFEY:  This would be Dr. Tudor's deposition,

 7   page 183, lines 22 through 25, page 184, line 1.

 8        May I approach?

 9            THE COURT:  Yes.

10   Q.   (BY MS. COFFEY)  Dr. Tudor, if you would please turn to

11   page 183 of your deposition -- 183, line 22.

12   A.   I found it.

13   Q.   Beginning on line 24, wasn't this your testimony?

14        "I was informing Dean Scoufos of a responsibility to

15   determine whether or not Lisa Coleman was discriminating

16   against me."

17   A.   That's a mischaracterization in context.

18   Q.   Okay.  But that's what your testimony was that day;

19   right?

20   A.   That is very misleading to the jury without the context.

21   Q.   You later learned that the honors trips had stopped --

22   I'm sorry.  I'm through with your deposition for now, if you

23   wouldn't mind closing it.

24        Thank you.  I'm sorry.  I just don't want you to be

25   distracted and think I'm referring to it when I'm referring to

Jury Trial – Volume 1
November 13, 2017

1   papers down here.

2       So you later discovered that the honors trips stopped

3   because the bus wasn't running; isn't that right?  There had

4   been no honors trips for at least a few years; correct?

5   A.   There was -- there was some problem with -- the honors

6   trips had ceased.

7   Q.   Okay.  And it wouldn't have been that hard for you to

8   find out whether those trips had been taking place before you

9   accused Dr. Coleman of discrimination, would it?

10  A.   That's a gross mischaracterization.  It was a concern.

11  Q.   Okay.  But it wouldn't have been very hard for you to

12  find out whether your concern was legitimate, would it?

13      Couldn't you have asked Dr. Coleman about whether the

14  honors trips were taking place?

15  A.   Yes.

16  Q.   Okay.  But you didn't, did you?

17  A.   At some point, I did.

18  Q.   Now, when you finished your meeting with Dean Scoufos

19  that day, there was no agreement from Dean Scoufos that Lisa

20  Coleman would not serve on your committee, was there?

21  A.   It was my understanding.

22  Q.   Okay.  And then that misunderstanding was cleared up

23  through a series of e-mails with your department chair and

24  then a subsequent meeting between you and Dean Scoufos and

25  Dr. Mischo, wasn't it?

Jury Trial – Volume 1
November 13, 2017

1    A.    So could you ask that question again.

2    Q.    Was your understanding, when you left that meeting, that

3    Dr. Coleman would not serve on your committee?  And that's

4    what you told Dr. Mischo, isn't it?

5    A.    I believe that -- I believe the reason she asked me the

6    question at the time --

7    Q.    I'm sorry.  What -- that wasn't my question.  I don't

8    even remember what it was.

9         You told Dr. Mischo through an e-mail that Dean Scoufos

10   had assured you that Lisa Coleman -- that you-all had agreed

11   that Lisa Coleman would not serve on your committee and that

12   instead Mark Spencer would be your chair; right?

13   A.    I believe I e-mailed or talked to Dr. Mischo when I

14   learned that Lucretia Scoufos had appointed Lisa Coleman as a

15   chair of my tenure committee after asking me if there's anyone

16   I'd prefer not to be on my committee.

17   Q.    And then that was all cleared up, and Dean Scoufos made

18   it clear in a meeting with you and Dr. Mischo that that had

19   never been an agreement between you; right?

20   A.    That's incorrect.

21   Q.    Okay.  There was never any discussion in your meeting

22   with Dean Scoufos either that Dr. Althoff would serve on your

23   committee; right?

24   A.    That's incorrect.

25   Q.    Are you saying that Dean Scoufos agreed that Dr. Althoff

1   would be on your tenure review committee?

2   A.   He was one -- I believe that he was one of the people I

3   mentioned in reference to the question who would I prefer to

4   be on my committee.

5   Q.   You never apologized to Lisa Coleman for having that

6   concern or for accusing her of discriminating against you

7   because you're transgender, did you?

8   A.   Lisa and I talked at length, and there was no -- it was

9   simply a concern and a misunderstanding.  There was no need

10  for an apology, and she wrote me an excellent letter

11  recommending me for tenure.  And the committee that she

12  chaired recommended me for tenure as well.

13       We are Facebook friends.

14  Q.   Did you ever tell Dean Scoufos that you had cleared up

15  the issue of the honors trips?

16  A.   I don't recall if I told her or if Mischo -- I don't

17  recall how -- I don't recall.

18  Q.   Okay.  Let's go back to this June 2007 -- the phone call

19  that you had with Cathy Conway.

20       Did you complain in 2007 to the EEOC about that phone

21  conversation?

22  A.   In 2007?

23  Q.   Yes.

24  A.   No.

25  Q.   Well, you testified earlier that you didn't believe that

Jury Trial – Volume 1
November 13, 2017

1  Southeastern's discrimination policies protected transgenders.

2      Am I stating your prior testimony correctly?

3  A.   I believe that's what I was told.

4  Q.   Well, I'm not asking what -- are you claiming that Cathy

5  Conway told you that Southeastern's policies don't protect

6  transgenders?

7  A.   I'm sorry.  What was the --

8  Q.   Did Cathy Conway tell you in that June 2007 phone call

9  that Southeastern's discrimination policies do not protect

10  transgenders?

11  A.   That was my understanding.

12  Q.   She specifically gave you the sexual harassment policy

13  and the discrimination policy, and she discussed them with you

14  and told you that if you had any problems, these were the

15  policies, this is how you could address them.

16  A.   Is that a question?

17  Q.   Didn't you think that was odd if she's also suggesting to

18  you that they don't protect transgenders?

19  A.   She raised the question -- she raised the policy of

20  sexual harassment in reference to restricting me from using

21  the women's restroom and the rules about my dress.  She said

22  that would be construed as sexual harassment and I could be

23  fired immediately.

24  Q.   So now you're claiming that, when she placed these work

25  conditions on you of how you dress and your makeup and the

Jury Trial – Volume 1
November 13, 2017

1   bathroom usage, that she told you that if you -- that if you

2   didn't follow those rules, that it can be viewed as you

3   sexually harassing somebody else?

4   A.   Words to that effect.

5   Q.   Tell me what those words are.

6   A.   I don't recall the exact words, but that was my

7   understanding.

8   Q.   When you testified in March of 2016, you never mentioned

9   anything like that that Cathy Conway told you.  You never

10  said, "She told me that if I wore makeup a certain way, I

11  would be sexually harassing others."  You never testified that

12  she told you, if you wore short skirts or other inappropriate

13  dress, from what you're saying today, that that would be

14  sexually harassing others -- other colleagues, other students.

15  I don't know.

16       You never testified to that back then.  Did you just

17  forget it?

18  A.   It was in my understanding.  It was in context.

19  Q.   Because she never said, "If you dress this way or if you

20  wear makeup in a certain way or if you use a certain bathroom,

21  you will be sexually harassing someone else."  She never said

22  that to you, did she?

23  A.   I don't remember the precise words after all these years,

24  but it was my understanding.

25  Q.   How is it that you have a different understanding as you

Jury Trial – Volume 1
November 13, 2017

1   sit here today than you ever did in 2016 or when you filed

2   your EEOC complaint?

3   A.   I don't believe --

4   Q.   None of those accusations are there, but you're just

5   remembering them today?

6   A.   I don't believe that's an accurate characterization.

7   Q.   You agreed in your deposition when I said you thanked --

8   when the conversation ended with Cathy Conway, you thanked her

9   "for your professionalism."

10      You agreed that you thanked her "for your

11   professionalism."

12      Do you remember that?

13  A.   And not firing me, as McMillan had asked her to do.  That

14  was specifically in reference to that.

15  Q.   So you're claiming that you thanked her for not firing

16  you?  You thanked -- "Thank you for your professionalism.

17  Thank you for not firing me."  Was that the context?

18  A.   I believe the job of a person who's in charge of H.R. is

19  not to allow administrators to break the rules and summarily

20  fire faculty or employees.

21  Q.   Dr. Tudor, that wasn't my question.  I understand that's

22  your belief, but my question, though, was specific.

23      You thanked Cathy Conway for her professionalism because

24  she wasn't going to fire you.  Is that what you're claiming

25  you said?

Jury Trial – Volume 1
November 13, 2017

1   A.   It was in reference to that specific act.

2   Q.   So in your deposition when I asked you if you recall

3   thanking Cathy Conway for her professionalism in discussing

4   with you these transgender issues, including the use of a

5   particular bathroom, you said, "I don't recall stating those

6   words."

7        And I said, "Something to that effect?"

8        Your answer was, "I may have complimented her on her

9   professionalism."

10       Is your testimony different today?

11  A.   May I refresh my memory with that deposition?

12  Q.   You may.

13  A.   What page are we on?

14  Q.   Please turn to page 309 of your deposition.  309, line 14

15  through 23.

16  A.   This ends on page -- this ends on page 232.

17  Q.   I'm sorry.  What?

18  A.   This ends on page 232.

19  Q.   Oh, okay.  I'm sorry.  Volume II.

20           MS. COFFEY:  May I approach the witness?

21           THE COURT:  Yes.

22           THE WITNESS:  What was the page number again?

23  Q.   (BY MS. COFFEY)  All right.  Page 309, line 14 through 23.

24       So line 22 and 23, your answer is, "I may have

25   complimented her on her professionalism."

Jury Trial – Volume 1
November 13, 2017

1    That's what you said, isn't it?

2  A.   Yes, yes.

3  Q.   And then on lines 24, 25, and 26, I said, "Okay.  Just

4  now when I asked you that question, you didn't want to admit

5  that.  You acknowledged that you thanked her for her

6  professionalism.  Is that true?"

7    "Answer:  And I said I may or may not."

8    Is that your testimony?

9  A.   Yes.

10  Q.   You didn't testify in March of 2016 that you thanked

11  Cathy Conway for her professionalism for not firing you

12  because you didn't say that, did you?

13  A.   This is –– in context you'll notice that attorneys ––

14  Q.   No.  Dr. Tudor, my question now is not what you said in

15  your deposition in context.  Nowhere in that deposition does

16  it say, "I thanked her for her professionalism for not firing

17  me."

18    So my question to you is you didn't testify about it in

19  March 2016 because Cathy Conway didn't say that to you, did

20  she?

21  A.   That's ––

22  Q.   Nobody thanks somebody for not firing –– no one says,

23  "Thank you for your professionalism.  Thank you for not firing

24  me."

25  A.   That's inaccurate.  There's objections in here.  So I was

Jury Trial – Volume 1
November 13, 2017

1    not allowed –– there's –– there seems to be legitimate reasons

2    why there are objections here, and it's very confusing, the

3    questions that you're asking and my responses.  People were

4    talking over each other.  So I'm ––

5    Q.   Dr. Tudor, the question is very simple.  The question is

6    you thanked Cathy Conway for her professionalism.

7         And you said, "I may have complimented her" ––

8         MS. GALINDO:  Objection, Your Honor.  May we

9    approach?

10   Q.   (BY MS. COFFEY)  –– "on her professionalism."

11        What is confusing about that question?

12        THE COURT:  Approach the bench.

13        (The following proceedings were had at the bench and out

14   of the hearing of the jury.)

15        MR. YOUNG:  She's not letting the witness answer the

16   question.  She keeps interrupting.

17        THE COURT:  If this witness would only answer a

18   question, I would stand up and cheer.  This is painful.  I

19   don't know if you-all are watching the jury, but it's equally

20   painful for them.

21        You do have to let her answer the question even if she's

22   never going to answer a question.

23        And Sherri has now thrown her hands up once.  Once she

24   starts, it keeps going.  So don't talk over her.

25        MS. COFFEY:  All right.

Jury Trial – Volume 1
November 13, 2017

1          THE COURT:  While I've got you up here, Jeff and I
2   are working on instructions.  We believe that this needs a
3   verdict form with special interrogatories.  You-all have not
4   submitted a proposal.  We would like to have one from you
5   tomorrow morning.
6          MS. GALINDO:  We may have one additional request for
7   an instruction based on the defendants' opening with respect
8   to what the remedial -- what the remedy is.
9          THE COURT:  Submit away.  They're not final until
10  they're final.
11         MS. GALINDO:  Thank you, Your Honor.
12         THE COURT:  But they will become final.  So do it
13  quickly.  I mean, do it by tomorrow.
14         MR. YOUNG:  Just to clarify, Your Honor, because I
15  know we have other mutual issues of the jury instructions.  By
16  tomorrow, it's only the requirement that we have the verdict
17  form with the special interrogatories?  Or are you seeking all
18  of the jury instructions finalized?
19         THE COURT:  Well, we plan -- the way I do it is you
20  begin with Jeff and he mediates just to the extent you can
21  agree.  We were planning on starting that process either
22  tomorrow afternoon or Wednesday morning.
23      You can still submit additional instructions, but we'd
24  like to get --
25         MR. YOUNG:  Just wanted to clarify.  Thank you, Your

Jury Trial – Volume 1
November 13, 2017

```
 1    Honor.
 2              THE COURT:  Uh-huh.
 3         (The following proceedings were had in open court with
 4    all parties present and within the hearing of the jury.)
 5    Q.  (BY MS. COFFEY)  Dr. Tudor, let's talk about some other
 6    things that you discussed with Cathy Conway in that 2007
 7    telephone call.
 8         She discussed with you the option of using a unisex,
 9    single-stall bathroom, but she never told you that that's the
10    only bathroom you could use at Southeastern, did she?
11    A.  That's incorrect.
12    Q.  If she made the demands such as you say, tell me what she
13    said.
14    A.  She said I was not allowed to use the women's restroom,
15    that I may only use the single-occupant restroom on the second
16    floor of Morrison.
17    Q.  So you couldn't use any other unisex bathroom on campus?
18    A.  I don't believe there was another single-occupant
19    bathroom on campus at that time.
20    Q.  Dr. Tudor, of course there was.  Are you familiar with
21    the student union?
22    A.  I believe the student union was under construction at
23    that time.
24    Q.  There's been a student union.  You're referring now to
25    the new student union.
```

Jury Trial – Volume 1
November 13, 2017

1      As you sit up there today, you can't testify that there

2  were no other unisex bathrooms on campus, can you?

3  A.   At that time, I had no knowledge of other

4  single-occupant --

5  Q.   Did you ever go back to Cathy Conway --

6      I apologize.  Are you done?  Dr. Tudor, I didn't let you

7  finish.  I started talking.

8      At no point did you go back to Cathy Conway and tell her

9  this was causing a problem, did you?

10 A.   No.

11 Q.   Did you ever ask about using other bathrooms?

12 A.   To Cathy Conway?

13 Q.   Yes.

14 A.   No.

15 Q.   Now, you know Cathy Conway testified that that's not the

16 conversation that she claims that she had with you and that,

17 instead, it was a conversation to assist you in using a

18 bathroom that you were most comfortable with.  And during that

19 conversation, the two of you agreed that perhaps the unisex

20 bathroom might be the most beneficial bathroom to you as you

21 began your transition; right?

22 A.   Are you asking me if that's her testimony or is that --

23 Q.   No.  I'm asking you -- yes, that's Cathy Conway's --

24 that's what you heard Cathy Conway testify to, isn't it?

25 A.   It would help if I could see her testimony to refresh my

Jury Trial – Volume 1
November 13, 2017

1   memory.

2           THE COURT:  If you don't know the answer, the answer

3   would be "I don't know."

4           THE WITNESS:  Thank you.  I don't recall.

5   Q.  (BY MS. COFFEY)  Okay.  When Cathy Conway called you, did

6   you bring up any issues that you thought you might have to

7   face as you began your transition?

8   A.  I don't recall.

9   Q.  It took you a long time to come to the decision, didn't

10  it?  Meaning, the decision to transition was a process that

11  you had been going through for at least a few months, if not

12  several months, before you notified Southeastern.

13          Is that an accurate description?

14  A.  It's something that a person lives with their entire

15  life.

16  Q.  Okay.  So when you gave those documents to the human

17  resources department that indicated you were going to begin

18  presenting as a female in the fall of 2007, had you given any

19  thought to the issues that you might face there at

20  Southeastern, specifically, you know, whether there would be

21  any questions about bathrooms, whether you needed to give any

22  explanation to students or to faculty members?

23          Had you given any thought to those issues?

24  A.  I gave thought to many, many issues.  Those are probably

25  among them.

Jury Trial – Volume 1
November 13, 2017

 1   Q.    So did you make any suggestions to Cathy Conway regarding
 2   the bathroom that you would feel comfortable using?
 3   A.    No.
 4   Q.    Why not?
 5   A.    Because she called me at home in the late evening and, I
 6   mean, that's --
 7   Q.    Excuse me real quick.  You keep referring to "late
 8   evening."  What time was that phone call?
 9   A.    It was -- I recall it was dark outside.  I don't know
10   precisely what time it was.
11   Q.    Okay.
12   A.    I had been -- it was enough time for me to be off work,
13   to come home, to walk my dog in the park, to eat our dinner.
14   So that was -- for me, it was late.  I'm usually a very early
15   riser.
16   Q.    So my question, though, you didn't bring up any issues,
17   give any assistance to Cathy Conway regarding problems that
18   you thought you might face; right?
19   A.    Under the circumstances, I was frightened and alarmed.
20   No.
21   Q.    And you never reported -- you never submitted any
22   complaint about the conditions that Cathy Conway placed on you
23   to Southeastern?
24   A.    At that time, no.
25   Q.    At any time before you left the university in May of

Jury Trial – Volume 1
November 13, 2017

1  2011, you never submitted any complaint talking about these

2  conditions that Cathy Conway supposedly placed on you in that

3  June 2007 call, did you?

4  A.    I'd have to refresh my memory with my complaints.

5  Q.    Dr. Tudor, you've had a lot of time to prepare for your

6  testimony today, haven't you?

7  A.    Yes.

8  Q.    And you can't think of a single written complaint that

9  you submitted to Southeastern concerning those conditions, can

10  you?

11  A.    Excuse me.  I was coughing.  I didn't hear all of your

12  question.

13  Q.    You cannot think of a single written complaint that you

14  submitted to Southeastern to address these conditions that

15  you've been testifying about, can you?

16  A.    I can't recall the specifics of every complaint.

17  Q.    You, earlier this afternoon -- maybe it was this

18  morning -- that you applied to over 100 colleges and

19  universities to find a job when you left Southeastern; right?

20  A.    Correct.

21  Q.    Can you explain why, through discovery, over 70 of those

22  colleges notified us that they had not received any job

23  application from you?

24          MR. YOUNG:  Objection, Your Honor.  That assumes

25  facts not in evidence.

Jury Trial – Volume 1
November 13, 2017

```
 1              THE COURT:  The witness may answer if she knows.
 2              THE WITNESS:  I have no idea why you would suggest
 3   that.
 4   Q.  (BY MS. COFFEY)  Well, I would suggest it -- do you
 5   remember in your deposition when you testified that you had
 6   applied to over 100 colleges and universities but that you had
 7   minimal, if any, documentation to verify those applications?
 8   A.   They're online applications, and I submitted my
 9   application online.
10   Q.   Do you remember telling me during your deposition that
11   your computer had been destroyed and, therefore, you didn't
12   have any of those documents?
13   A.   I -- I don't recall using the word "destroyed."  There
14   was --
15   Q.   Corrupted?
16   A.   I'm not sure what --
17   Q.   Let me make it quick then.  Do you recall saying that the
18   reason that you didn't have most of these job applications or
19   responses from these universities is because something went
20   wrong with your computer, so you had lost a lot of it?
21   A.   I don't recall that.
22   Q.   Do you have any idea how many of those universities you
23   applied to were for tenure-track positions?
24   A.   I don't know.
25   Q.   But you testified earlier how important tenure-track
```

Jury Trial – Volume 1
November 13, 2017

1    position is.  Wouldn't it be important to know whether you

2    were applying for a tenure-track position?

3    A.    I was applying for employment.  I was unemployed.  Every

4    job was important to me.

5    Q.    Okay.  So you obtained a job at Collin College, and you

6    talked about the classes you were teaching there.

7          Did you dislike teaching the English comp classes?

8    A.    No.

9    Q.    And you taught English comp classes while at

10   Southeastern; right?

11   A.    Yes.

12   Q.    And you were nonrenewed for your job at Collin College;

13   right?

14          MR. YOUNG:  Objection, Your Honor.  We believe this

15   evidence has been excluded.

16          THE COURT:  Sustained.

17   Q.  (BY MS. COFFEY)  Dr. Tudor, since you've left

18   Southeastern, have you ever been criticized for your teaching

19   abilities?

20   A.    Everybody's criticized, so, yes.

21   Q.    In fact, Collin College students criticized you greatly

22   for your teaching, didn't they?

23          MR. YOUNG:  Objection, Your Honor.  Again, this

24   evidence has been excluded.

25          May we approach?

Jury Trial – Volume 1
November 13, 2017

1          THE COURT:  Sustained.  Yes.

2          MR. YOUNG:  Thank you.

3      (The following proceedings were had at the bench and out

4  of the hearing of the jury.)

5          THE COURT:  Ms. Coffey, I sustained this objection

6  to all this testimony this morning, didn't I?

7          MS. COFFEY:  No, you didn't, Your Honor.

8          MR. JOSEPH:  Your Honor, my notes from this morning

9  say that with regard to the defendant -- the motion in limine

10  in that, that you were going to hold it in abeyance.

11          THE COURT:  Yes.  I've thought about what you said,

12  the reasons that you want it in.  In my mind, I sustained it.

13  I just forgot to announce it.

14      I believe that Southeastern succeeds or fails on what it

15  knew at the time it failed to renew tenure.  What happened

16  later opens a whole slew of rebuttal evidence and other things

17  that are wasting time.  Given today's testimony, I don't think

18  we need any more of that.

19      I think there are other ways to attack her credibility

20  and her view of her teaching short of going to the job and

21  opening up all the details.

22      So I am sorry.  I thought I had already ruled on it.

23  That's all out.

24          MS. COFFEY:  May we then make sure that on redirect

25  he doesn't allow Dr. Tudor to testify about today how she

Jury Trial – Volume 1
November 13, 2017

```
 1   loves to teach, she's a good teacher, she feels like she can
 2   go back in the classroom and perform well, because that's what
 3   she testified to on direct.  She's proven otherwise.
 4            THE COURT:  Well --
 5            MR. YOUNG:  Your Honor -- sorry to interrupt you,
 6   Your Honor.
 7       Respectfully, we need the decision to cut off her back
 8   pay at your invitation for a strategic reason that was very
 9   clear.  We filed it with the Court so they would have time in
10   advance to be aware of it so they could prepare.
11            THE COURT:  I do want to make sure all of you
12   agree -- let me ask if all of you agree that both front pay
13   and reinstatement come from me.
14            MS. COFFEY:  Yes.
15            MR. YOUNG:  Yes, Your Honor.
16            THE COURT:  If I want more testimony about that once
17   they have returned a verdict, I can get it.  I am going to
18   instruct them any evidence regarding Collin County
19   performance -- not the job itself, the performance -- should
20   be disregarded.  Okay?
21            MR. YOUNG:  Thank you, Your Honor.
22            THE COURT:  There's a reason for this rule.
23            MR. BUNSON:  I understand, Your Honor.  The question
24   I have, though, is, we have Collin College and we have
25   Seminole State College, or Holly Newell.  Does that also --
```

Jury Trial – Volume 1
November 13, 2017

1          THE COURT:  Yes.

2          MR. BUNSON:   –– Holly Newell?

3          THE COURT:  Yes.

4          MR. BUNSON:  Thank you, Your Honor.

5          MR. YOUNG:  Thank you, Your Honor.

6      (The following proceedings were had in open court with

7  all parties present and within the hearing of the jury.)

8          THE COURT:  It turns out I had not made a ruling I

9  thought I had made.

10     I'm going to instruct the jury that any evidence

11 regarding the plaintiff's performance while at Collin County

12 College or Collin College is irrelevant, shouldn't be

13 considered by you.

14     Please proceed.

15 Q.  (BY MS. COFFEY)  Dr. Tudor, you should have in front of

16 you Plaintiff's Exhibit 84 that was introduced earlier.

17 A.  I've found it.

18 Q.  I believe you testified earlier ––

19          MR. YOUNG:  Objection, Your Honor.  This exhibit has

20 hearsay markings on it.  This is not the marked exhibit the

21 defendants gave us or that we entered.

22          THE COURT:  Do you have a clean copy?

23          MS. COFFEY:  Do we have a clean copy?

24     I'll go back to this one.

25          THE COURT:  Well –– okay.

Jury Trial – Volume 1
November 13, 2017

1    MS. COFFEY:  I'm sorry.  If the machine was working,
2  we could do it electronically.
3    THE COURT:  The wonders of modern technology.  Here
4  they are.
5    MS. COFFEY:  Yes.  While you're at it, will you pull
6  Exhibit 30?
7  Q.  (BY MS. COFFEY)  Dr. Tudor, Exhibit 84, I think you
8  previously had identified as a memo that you received from
9  Doug McMillan on October 5th of 2010.  Is that correct?
10 A.   Yes, yes.
11 Q.   Let me draw your attention, Dr. Tudor, to the first --
12 the first line -- first three, four lines in the second
13 paragraph.
14     Dr. McMillan told you that "After reviewing the academic
15 policy and procedure manual, I find no policy that allows for
16 an application for tenure in a subsequent year after being
17 denied tenure and promotion in the previous year."
18     That's what it says; right?
19 A.   That's what Doug wrote.
20 Q.   Now, you testified that the rule -- that there is no
21 rule -- in fact, that the rule allows you to continue
22 resubmitting every year if you want to during your fifth,
23 sixth, and seventh year; right?
24 A.   One of the rules, yes, we're allowed to do that.
25 Q.   Dr. McMillan is informing you he finds no rule that would

Jury Trial – Volume 1
November 13, 2017

1    allow for that after it's denied through the full process;

2    right?

3    A.    That is his –– what he wrote.

4    Q.    Is it your understanding that Dr. McMillan came to that

5    conclusion based on the policies and procedures that had been

6    followed in the past by Southeastern?

7    A.    I don't know how he came to that conclusion.  It's

8    inaccurate.

9    Q.    As you sit here today, you are completely familiar with

10   the fact that tenure –– I'm sorry –– that faculty members can

11   withdraw their tenure portfolio at any step in the process;

12   right?

13   A.    Applicants, yes.

14   Q.    Okay.  But you can't identify a single person that has

15   allowed it to go all the way to the top and the president

16   denied it and then they were allowed to reapply, can you?

17   A.    I believe that's because administration usually honors

18   the tenure and promotion committee's decision.

19   Q.    I'm sorry.  Dr. Tudor, my question was, as you sit here

20   today, you cannot identify a single person that went through

21   the entire tenure process and was denied at the president's

22   level and then was allowed to reapply for tenure, can you?

23   A.    I know of no other case like mine.

24   Q.    The answer is no to my question, though, isn't it?

25   A.    (No response.)

Jury Trial – Volume 1
November 13, 2017

```
 1   Q.   Now, is it fair to say that nobody really knows,
 2   including you, what happens in other faculty members' tenure
 3   processes?
 4   A.   The tenure --
 5   Q.   Let me ask you a more specific question.
 6        It's possible that professors withdraw their tenure
 7   application and other faculty members may not know that they
 8   have ever applied; right?
 9   A.   That's possible.
10   Q.   Okay.  And you testified that yours is the only situation
11   in which the administration disagreed with a decision by the
12   tenure and review committee.  That's what you testified to;
13   right?
14   A.   I believe it was to the -- I'm sorry.
15        I believe my testimony was that no one who had been
16   approved for tenure by their department had been denied tenure
17   by the administration.
18   Q.   Okay.  Now, your counsel had discussed or had you discuss
19   earlier, but there are five levels, right, of the tenure
20   review process:  the tenure review committee, the department
21   chair, then the dean of the college, the vice president of
22   academic affairs, and then the president; right?
23   A.   Yes.
24   Q.   And you're familiar with the term "shared governance";
25   right?
```

Jury Trial – Volume 1
November 13, 2017

1   A.    Yes.

2   Q.    And is it fair to say that that term partly relates to

3   sharing the governing of the university between both the

4   faculty and the administration?

5   A.    Very complex concept.  That's part of it.

6   Q.    Okay.  That's part of it.

7         So if what you're trying to tell the jury is that the

8   tenure committee is the one that gets to decide who gets

9   tenure, there would be no purpose for the next level of the

10  dean, the next level higher of the VP of academic affairs, or

11  the president; right?

12  A.    I think that's an inaccurate characterization of what I

13  said.

14  Q.    Are you suggesting they should just rubber-stamp those

15  applications when they come out of the committee?

16  A.    That's inaccurate.

17  Q.    Each person or each level, whoever is doing that review

18  at each of those levels, has an independent obligation to

19  Southeastern and to that candidate to thoroughly review the

20  portfolio to determine if it is sufficient for tenure; right?

21  A.    Yes.

22  Q.    If you will turn to Plaintiff's Exhibit 30.

23        I'll tell you what, Dr. Tudor, while we're waiting to put

24  the exhibit up, let me ask you, this is the April 29th letter

25  to you from Charles Weiner; correct?

1    A.    Yes.

2    Q.    This is the one that you testified about earlier where

3    you talked about the rule, that there was a rule that you be

4    provided reasons.  But let me direct you to the second

5    paragraph after the word "provided" and semicolon.

6         "However, it needs pointed out that there is no policy

7    that stipulates that the vice president and/or the dean is

8    compelled to provide reasons as to why tenure and promotion

9    were denied.  The president's authority, as delegated to him

10   from the RUSO board of regents, is clearly spelled out in

11   Section 3.7.3 in the policies and procedures manual.

12        "This section, and I quote, states that it is the duty of

13   the president to see to it that the standards and procedures

14   in operational use within the college or university conform to

15   the policy established by the governing board and to the

16   standards of sound academic practice."

17        He's telling you that there is no rule that you be

18   provided an explanation in the middle of the tenure process;

19   right?

20   A.    This is advice –– this is Charles Weiner, who worked

21   under Doug McMillan's interpretation.

22   Q.    But that is what Charles Weiner's letter to you is

23   telling you, correct, that there is no rule that has the

24   interpretation that you testified to; right?

25   A.    These are his words.  This is what he says, yes.

1    Q.   If you'll look to, in the third paragraph, where he says,

2    he "reviewed all the pertinent facts and noted that in

3    Section 3.7.4 there is no requirement for anyone, including

4    the president, to state their reasons if their recommendation

5    is different than the recommendation of the department tenure

6    and promotion committee."

7         That's what it says; right?

8    A.   That's what it says.

9    Q.   But it's your testimony that there's a different rule

10   that specifically says the reason should be provided; is that

11   right?

12   A.   Yes.

13   Q.   Okay.  Where is that rule?

14   A.   It's in the policy and procedures handbook.  It's what

15   the faculty appellate committee ruled on.

16   Q.   Okay.  Well, this jury hasn't been presented that rule,

17   have they?

18   A.   I believe we have a professor who served on the faculty

19   appellate committee who will be testifying, Dr. Knapp.

20          MS. COFFEY:  May I have a moment to consult with

21   counsel, Your Honor?

22          THE COURT:  Yes.

23      Well, we'll just take an early day.  I know the first day

24   is always the hardest.

25      Don't discuss this case.  Don't permit others to discuss

Jury Trial – Volume 1
November 13, 2017

1   it with you.  Don't expose yourself to any media accounts of

2   this case.  If there's something in the paper, just have

3   somebody else cut it out and you can read it afterward.

4        Don't do any independent internet or other research about

5   this case.  Don't blog, don't tweet, don't Instagram, don't

6   Facebook, or whatever else I don't even know to tell you.

7        Please be in the jury assembly room.  I believe we'll try

8   to start at 9:15.  We won't try to start; we will start at

9   9:15.  That gives us a little bit of wiggle room.

10       Please be in the jury assembly room before 9:15.  We will

11  start at that time.

12       I will excuse you now and see you tomorrow.

13       (Jury exits.)

14            THE COURT:  I understand that defendants have been

15  at a disadvantage without having marked exhibits.  I take it

16  from the exchange a few minutes ago that you now have them.

17       No?

18            MR. BUNSON:  They are not all marked, Your Honor.

19  We'll just have to give them some back.

20            MR. YOUNG:  We are almost there.

21            THE COURT:  This is just not acceptable.  You have

22  to be able to put your fingers on those documents.  I think

23  this thing works.  I think it's just not hooked up somehow

24  between your computer and it.  I don't know what you-all are

25  going to do, but we have got to be more efficient with

Jury Trial – Volume 1
November 13, 2017

1    exhibits.

2         Dr. Tudor, you have got to answer a question directly or

3    it's just going to keep on being asked, and that's going to

4    take a lot more time than it needs to take.

5         Counsel, have your instructions with regard to proposed

6    jury instructions and verdict forms.

7         And we'll be adjourned until 9:15 tomorrow.

8         (In recess at 4:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Trial – Volume 1
November 13, 2017

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, SHERRI GRUBBS, Federal Official Court Reporter in

 4     and for the United States District Court for the Western

 5     District of Oklahoma, do hereby certify that pursuant to

 6     Section 753, Title 28, United States Code that the foregoing

 7     is a true and correct transcript of the stenographically

 8     reported proceedings held in the above-entitled matter and

 9     that the transcript page format is in conformance with the

10     regulations of the Judicial Conference of the United States.

11

12            Dated this 13th day of November, 2017.

13

14            /S/ SHERRI GRUBBS_____

15            SHERRI GRUBBS, RPR, RMR, RDR, CRR
              State of Oklahoma CSR No. 1232.
16            Federal Official Court Reporter

17

18

19

20

21

22

23

24

25
```