```
 1                UNITED STATES DISTRICT COURT

 2                WESTERN DISTRICT OF OKLAHOMA

 3

 4
   DR. RACHEL TUDOR,                )
 5                                  )
        Plaintiff,                  )
 6                                  )
               vs.                  )   Case No. CIV-15-324-C
 7                                  )
   SOUTHEASTERN OKLAHOMA STATE      )
 8 UNIVERSITY and THE REGIONAL      )
   UNIVERSITY SYSTEM OF             )
 9 OKLAHOMA,                        )
                                    )
10      Defendants.                 )
                                    )
11

12

13                    VOLUME 2

14              TRANSCRIPT OF JURY TRIAL

15      BEFORE THE HONORABLE ROBIN J. CAUTHRON

16      TUESDAY, NOVEMBER 14, 2017; 9:15 a.m.

17            OKLAHOMA CITY, OKLAHOMA

18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography,
   transcript produced by computer.
25
```

Jury Trial – Volume 2
November 14, 2017

```
 1                    A P P E A R A N C E S

 2

 3     For the Plaintiff:

 4          Ezra I. Young
            Law Office of Ezra Young
 5          30 Devoe 1A
            Brooklyn, New York 11211
 6          ezraiyoung@gmail.com

 7          Brittany M. Novotny
            401 North Hudson Avenue
 8          Oklahoma City, Oklahoma 73102
            brittany.novotny@gmail.com

 9

10          Marie E. Galindo
            1500 Broadway
11          Suite 1120
            Wellsfargo Building
12          Lubbock, Texas 79401
            megalindo@thegalindolawfirm.com

13

14     For the Defendants:

15          Dixie L. Coffey
            Jeb E. Joseph
16          Timothy M. Bunson
            Attorney General's Office
17          313 NE 21st Street
            Oklahoma City, Oklahoma 73105
18          dixie.coffey@oag.ok.gov
            jeb.joseph@oag.ok.gov
19          tim.bunson@oag.ok.gov

20

21

22

23

24

25
```

Jury Trial – Volume 2
November 14, 2017

```
 1                    C O N T E N T S

 2                                        VOLUME   PAGE

 3    PLAINTIFF WITNESSES:

 4    RACHEL TUDOR, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    1     37
 5    CROSS-EXAMINATION BY MS. COFFEY.............    1    130
      CONTINUING CROSS-EXAMINATION BY MS. COFFEY..    2    205
 6    REDIRECT EXAMINATION BY MR. YOUNG...........    2    209

 7    ROBERT PARKER, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    2    212
 8    CROSS-EXAMINATION BY MR. JOSEPH.............    2    275
      REDIRECT EXAMINATION BY MR. YOUNG...........    2    291
 9    RECROSS-EXAMINATION BY MR. JOSEPH...........    2    294

10    MEG COTTER-LYNCH, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    2    297
11    CROSS-EXAMINATION BY MR. JOSEPH.............    2    353
      REDIRECT EXAMINATION BY MR. YOUNG...........    2    371
12
      JOHN MISCHO, Ph.D.
13    DIRECT EXAMINATION BY MS. NOVOTNY...........    3    384
      CROSS-EXAMINATION BY MR. BUNSON............    3    409
14    REDIRECT EXAMINATION BY MS. NOVOTNY.........    3    427
      RECROSS-EXAMINATION BY MR. BUNSON..........    3    430
15
      MARK SPENCER, Ph.D.
16    DIRECT EXAMINATION BY MR. YOUNG.............    3    431
      CROSS-EXAMINATION BY MR. BUNSON.............    3    450
17    REDIRECT EXAMINATION BY MR. YOUNG...........    3    459

18    RANDY PRUS, Ph.D.
      DIRECT EXAMINATION BY MS. NOVOTNY...........    3    464
19    CROSS-EXAMINATION BY MR. JOSEPH.............    3    470
      REDIRECT EXAMINATION BY MS. NOVOTNY.........    3    481
20    RECROSS-EXAMINATION BY MR. JOSEPH...........    3    486

21    JAMES KNAPP, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    3    488
22    CROSS-EXAMINATION BY MR. BUNSON.............    3    504
      REDIRECT EXAMINATION BY MR. YOUNG...........    3    507
23
      MELINDA HOUSE
24    DIRECT EXAMINATION BY MR. YOUNG.............    3    508
      CROSS-EXAMINATION BY MR. BUNSON.............    3    529
25    REDIRECT EXAMINATION BY MR. YOUNG...........    3    547
```

Jury Trial – Volume 2
November 14, 2017

C O N T E N T S

                                            VOLUME   PAGE

DEFENSE WITNESSES:

LUCRETIA SCOUFOS, Ph.D.
DIRECT EXAMINATION BY MS. COFFEY..............   4   561
CROSS-EXAMINATION BY MS. GALINDO..............   4   597

CATHY CONWAY, Ph.D.
DIRECT EXAMINATION BY MS. COFFEY..............   4   635
CROSS-EXAMINATION BY MS. NOVOTNY..............   4   656

DOUG McMILLAN, Ph.D.
DIRECT EXAMINATION BY MR. JOSEPH..............   4   671
CROSS-EXAMINATION BY MS. NOVOTNY..............   4   689

CLAIRE STUBBLEFIELD, Ph.D.
DIRECT EXAMINATION BY MR. JOSEPH..............   4   700
CONTINUING DIRECT EXAMINATION BY MR. JOSEPH...   5   726
CROSS-EXAMINATION BY MS. GALINDO..............   5   734
REDIRECT EXAMINATION BY MR. JOSEPH............   5   754
RECROSS-EXAMINATION BY MS. GALINDO...........   5   756

JESSE SNOWDEN, Ph.D.
DIRECT EXAMINATION BY MR. JOSEPH..............   5   758
CROSS-EXAMINATION BY MR. YOUNG................   5   777


PLAINTIFF REBUTTAL WITNESS:

CHARLES WEINER, Ph.D.
REBUTTAL EXAMINATION BY MR. YOUNG............   5   806
CROSS-EXAMINATION BY MR. BUNSON..............   5   811

PLAINTIFF CLOSING STATEMENT...................   5   827

DEFENSE CLOSING STATEMENT.....................   5   846

VERDICT......................................   6   869

1     (Proceedings held November 14, 2017.)

2          THE COURT:  Be seated, please.

3     I didn't get up here with it, but I've read the

4     defendants' motion to quash.

5          What is the plaintiff's response?

6          MS. NOVOTNY:  Judge, respectfully, before we get to

7     the motion to quash, I'd like to ask Your Honor, after

8     conferring with counsel shortly after adjournment yesterday,

9     the plaintiff has asked us to request a mistrial in this

10    matter on the grounds of the jury has been so prejudiced by

11    comments from the bench using male pronouns to describe

12    Dr. Tudor on two different occasions, as well as the improper

13    cross-examination regarding the Collin College evaluations,

14    that a fair and impartial jury trial is no longer possible.

15         Plaintiff's claim is inherently based on the way she was

16    treated as a woman after her transition.  By having Your Honor

17    insinuate she's a man, this completely destroys the

18    plaintiff's claim.

19         I trust it was an inadvertent mistake, but it takes

20    that -- but if just one juror takes that comment as the

21    position that the Court truly believes Dr. Tudor to be a

22    man -- and I saw visible reactions from the jurors on the

23    second time -- then Dr. Tudor cannot succeed.

24         Whether you call it unringing the bell or putting the

25    toothpaste back in the tube, there's just no way that a

Jury Trial – Volume 2
November 14, 2017

1    limiting instruction can undo the damage that's now been done.

2         Considering the gravity of the situation and that this

3    means justice delayed for our plaintiff, we needed to recess

4    yesterday afternoon to confer with Dr. Tudor before asking for

5    this relief.  And we're bringing this to the Court as soon as

6    practicable so as to protect the jury's time and the Court's

7    time.

8         We ask that a mistrial be ordered and that this case be

9    set for preferential setting on the next possible trial

10   docket.

11        THE COURT:  I truly apologize, and I did apologize

12   yesterday.  I tend to think it tends to prove your case more

13   than disprove it, frankly.

14        But as to the Collin County, I instructed the jury to

15   disregard that.  As to the -- my misspeaking of pronouns, I

16   don't think that needs an instruction.  I think it's clear.  I

17   would gladly limit that, if you want me to, but I've already

18   apologized for it.

19        I'm not going to grant a mistrial.  I don't believe it

20   rises to that.

21        MS. NOVOTNY:  Well, in that case, Your Honor, I'd

22   like to move that I be withdrawn as local counsel due to

23   irreparable differences between counsel and strategy and ask

24   that the plaintiff be given time to obtain new local counsel.

25        THE COURT:  Well, I will allow you to withdraw if

Jury Trial – Volume 2
November 14, 2017

```
 1   you wish, but I'm not going to continue this.  We'll just
 2   proceed with nonlocal counsel.
 3              MS. GALINDO:  Your Honor, if I may?
 4              THE COURT:  Yes.
 5              MS. GALINDO:  Your Honor, as I see it, the Sixth
 6   Amendment requires that I not only be -- that there be due
 7   process but also the effective assistance of counsel.
 8        And, unfortunately, I believe there is a difference in --
 9   a conflict of personalities that I think will prejudice
10   Dr. Tudor in this case, and I would also respectfully ask to
11   withdraw in this matter.
12              THE COURT:  Have all of you discussed this with
13   Dr. Tudor?
14              MS. GALINDO:  Yes, Your Honor.
15              MS. NOVOTNY:  Yes, Your Honor.
16              THE COURT:  Mr. Young, are you prepared to proceed
17   on your own?
18              MR. YOUNG:  Honestly, Your Honor, I think it would
19   be too prejudicial to Dr. Tudor.  I do know this case very
20   well, but there are a great number of witnesses, a lot of
21   documents, and a lot of work, and I did not prepare to handle
22   this trial all by myself.
23        If I do not have an option, I will continue to represent
24   Dr. Tudor.
25              THE COURT:  Well, I'm not going to continue this
```

Jury Trial – Volume 2
November 14, 2017

 1   while new counsel is sought.  This is something that should

 2   have been worked out long ago.

 3       I don't know what the problem is.  I don't want to know

 4   what the problem is.  If you tell me you have a conflict, I

 5   will take your word for it.

 6       If this is with Dr. Tudor's permission and she's been --

 7   has this discussed with her, then we go forward.

 8              MS. NOVOTNY:  Just a moment, Your Honor.

 9              THE COURT:  Meanwhile, Mr. Young, you are prepared

10   to respond to the motion to quash?

11              MR. YOUNG:  Yes, ma'am.  If I may start with

12   Dr. Fridley first.

13       Apologies.

14              THE COURT:  Just come to the podium.

15              MR. YOUNG:  Okay.  Thank you, Your Honor.

16              THE COURT:  Uh-huh.

17              MR. YOUNG:  So I heard from Dr. Fridley last night.

18   I think he had a misunderstanding as to what the legalese is

19   with the subpoena.  He didn't realize he could just call me to

20   tell me there was a conflict directly.  And I believe that in

21   good faith.  We talked around, I think, midnight, so I guess

22   early this morning.

23       He explained to me that there are some scheduling issues

24   on his end, but he would be happy to come first thing

25   Thursday.  That's what he thinks the soonest is he can come

Jury Trial — Volume 2
November 14, 2017

1    without inconveniencing himself.

2            THE COURT:  All right.

3            MR. YOUNG:  He agreed to that.  He asked me to tell

4    you that directly, Your Honor.

5            THE COURT:  All right.  How about Judge Ogden?

6            MR. YOUNG:  So I heard from defendants' counsel, I

7    think, toward the end of the trial day -- I think slightly

8    after we ended yesterday -- and they advised me for the first

9    time that Judge Ogden has a scheduling issue, and they gave me

10   a number to call.  I assume it's the clerk or someone.

11       I have not yet called that number.  I planned on calling

12   that number, because I got it late in the day, at the first

13   break in the day to see if there is a way to accommodate Judge

14   Ogden's schedule.

15           THE COURT:  All right.  Well, I'll just hold it in

16   abeyance.

17           MS. COFFEY:  Your Honor, I'm sorry.  You're holding

18   in abeyance the motion to quash both deposition and notices --

19   I'm sorry -- both subpoenas?

20           THE COURT:  Yes.  As far as their being required to

21   be here today, they are not.  If I have to go that far, I will

22   grant it as to today.  But if both witnesses can be

23   accommodated so that their schedules do not prohibit them from

24   being here, then I will deny it.

25       Actually, as it stands, I'm not going to grant it because

Jury Trial – Volume 2
November 14, 2017

1  the subpoenas have been issued, and I don't want you to have

2  to do that again.  But I will say that it is not reasonable to

3  serve them at 11:00 a.m. yesterday and expect them to be here

4  today.

5      Beyond that, I won't go until I know what their future

6  difficulties are.

7          MR. YOUNG:  Thank you, Your Honor.

8          MS. COFFEY:  Your Honor, may I say I think there's

9  outstanding subpoenas, meaning subpoenas that have also been

10  filed that have not been served on witnesses, that are

11  commanding appearances on Wednesday and Thursday.

12      And again, those --

13          THE COURT:  Mr. Young, I'll just tell you that for

14  almost anyone, one day's notice would be not reasonable.  For

15  many people, two day's notice is not reasonable.

16      So if you intend on calling these people, get them served

17  or don't serve them at all.

18          MR. YOUNG:  Yes, Your Honor.

19          THE COURT:  And are counsel ready to do what?

20          MS. NOVOTNY:  Your Honor, I withdraw -- I withdraw

21  my motion to withdraw.

22          MS. GALINDO:  Your Honor, I would respectfully do

23  the same for Dr. Tudor.

24          THE COURT:  All right.  Please bring the jury in.

25      Mr. Young, did you have the proposed verdict form ready

Jury Trial – Volume 2
November 14, 2017

1  yet?

2         MR. YOUNG:  We don't quite, Your Honor.  I can –– I

3  think the soonest I could get it is this afternoon.  I believe

4  yesterday you told us on the record this afternoon, and I need

5  a little bit of extra time.

6         THE COURT:  I thought I said this morning, but as

7  long as –– as soon as you can, we need to start working on

8  these.

9         MR. YOUNG:  Understood, Your Honor.  Thank you.

10         THE COURT:  All right.  Ms. Coffey, you had not

11  given up the witness.  I believe you were conferring with

12  co-counsel.

13         MS. COFFEY:  That is correct.  I do have a few

14  questions.

15      Could I raise a couple of issues with Your Honor before

16  the jury comes in?

17         THE COURT:  Yes.

18         MS. COFFEY:  With respect to the plaintiff's

19  exhibits, the unmarked exhibit issue, we discovered this

20  morning, there are two issues.

21      While they put exhibit stickers on page 1 of all of our

22  exhibits, several exhibits have multiple pages, so that if we

23  only use portions of those exhibits, they're still not

24  identified.

25      But worse, the witness copies of the plaintiff's

1    exhibits, none of them are marked with exhibit numbers.

2            THE COURT:  Are these -- are these your exhibits up

3    here?

4            MR. YOUNG:  Those are the courtesy copies for the

5    Court, yes, Your Honor.

6            THE COURT:  Are they marked?

7            MR. YOUNG:  They are marked with tabs, Your Honor.

8    I had spoken with Ms. Goode ahead of time and I asked her, and

9    my understanding was if they were marked with tabs, that was

10   fine, the Court copies.

11           THE COURT:  Let's just make this the witness copies.

12           MR. YOUNG:  Your Honor, the witness copies that are

13   over there are also marked with tabs, as are the copies that

14   were given to defendants.  They're in binders with tabs that

15   say 1, 2, 3, 4, 5, 6.

16           MS. COFFEY:  So when we pull an exhibit, Your Honor,

17   and put it in front of the witness, this is what it looks

18   like.  This is a Bates number used in discovery.  It has no

19   identification of the exhibit number.

20           MR. YOUNG:  Well, Your Honor, respectfully, we did

21   put stickers on, I think, the first 200 and something of them.

22   I think we need 20 more stickers.

23           MS. COFFEY:  You did.  I mean, we're not -- we

24   acknowledge that.  It's just that if a document -- an exhibit

25   is more than one page, it's not marked as to an exhibit

Jury Trial – Volume 2
November 14, 2017

 1  number.

 2              THE COURT:  Well, I don't know that it ever is.

 3              MS. COFFEY:  When we do -- all of ours are because

 4  we use the case number, the trial exhibit number.  It's all on

 5  there together, and it shows that it's all applicable to that

 6  exhibit.

 7              THE COURT:  Well, I can certainly tell that the

 8  exhibit behind Tab 24 is more than one page, but it's all

 9  Exhibit 24.  You can refer to the Bates stamp number --

10              MS. COFFEY:  Okay.

11              THE COURT:  -- or the page number of the exhibit,

12  whichever is easier.  It's not the way I'd have it done, but

13  it's the way it is.  We'll do the best we can.

14      Wait a minute.

15              THE CLERK:  Okay.

16              THE COURT:  Was there something else?

17              MS. COFFEY:  Yes.  I have a question with respect to

18  the Collin College documents.

19      Would we be permitted to question Dr. Tudor about student

20  evaluations that she received there to impeach her on her

21  testimony regarding her teaching abilities?

22              THE COURT:  No.

23              MS. COFFEY:  Thank you, Your Honor.  Nothing

24  further.

25              MR. YOUNG:  Nothing further, Your Honor.

1          THE COURT:  All right.

2      (Jury enters.)

3          THE COURT:  Be seated.

4      And good morning.  Welcome back.  I hope you will forgive

5  our delay, but we were trying to take care of some matters

6  that will ultimately save your time, so we're now ready to

7  proceed.

8      Dr. Tudor, if you will resume the stand, I will simply

9  remind you that you're still under oath to testify truthfully.

10                  **CONTINUING CROSS-EXAMINATION**

11  BY MS. COFFEY:

12  Q.   Good morning, Dr. Tudor.

13  A.   Good morning.

14  Q.   I know you had a long day yesterday, and I'll do my best

15  not to keep you up here much longer.

16      Yesterday, you testified -- let me ask you:  Yesterday,

17  do you recall testifying that writing scholarly articles

18  sometimes can take many years?

19  A.   Yes.

20  Q.   So wouldn't that justify President Minks' position and

21  Dr. McMillan and Dean Scoufos's position that they believed

22  that in order to allow you to strengthen your scholarship,

23  that you needed longer than that five-month period to

24  strengthen your scholarship?

25  A.   No.

Jury Trial – Volume 2
November 14, 2017

```
 1              MS. COFFEY:  May I approach the witness, Your Honor?
 2              THE COURT:  Yes.
 3    Q.  (BY MS. COFFEY)  Dr. Tudor, I just handed you –– I've
 4    handed you what is Plaintiff's Exhibit 1.
 5         Can you identify that document?
 6    A.   It is a cover letter in support of an application for
 7    tenure promotion.
 8    Q.   This is the cover letter that you included with your 2009
 9    tenure application at Southeastern; correct?
10    A.   It appears so.
11    Q.   All right.  Thank you.  I don't have any further
12    questions about that exhibit.
13              MS. COFFEY:  May I approach the witness, Your Honor?
14              THE COURT:  Yes.
15              MS. COFFEY:  I'm sorry.  May I move for the
16    admission of Plaintiff's Exhibit 1?
17              THE COURT:  Any objection?
18              MR. YOUNG:  No objection so long as plaintiff can
19    later introduce the full version of that exhibit.
20              THE COURT:  Well, I'm assuming this is the full
21    version.  No?  This is not the entire Exhibit 1?
22              MS. COFFEY:  No, Your Honor, it is the full exhibit
23    of Exhibit 1.  I only put up page 1 on the screen.  Dr. Tudor
24    has the full letter.
25              MR. YOUNG:  Okay.  Then no objection, Your Honor.
```

Jury Trial – Volume 2
November 14, 2017

1          THE COURT:  Admitted.

2          MS. COFFEY:  May I approach the witness?

3          THE COURT:  Yes.

4  Q.  (BY MS. COFFEY)  Dr. Tudor, I hand you what has been

5  marked as Plaintiff's Exhibit 15.

6          THE COURT:  It needs to be admitted before you

7  display it.

8  Q.  (BY MS. COFFEY)  If you will look at the two pages that

9  I've handed you.  Do you recall sitting in Cathy Conway's

10  deposition, and she testified about these two pages of

11  exhibits?

12      I'm sorry.  Let me ask it this way:  Do you recall Cathy

13  Conway identifying these two pages of exhibits as her

14  handwritten notes from her phone call with you on June 1st,

15  2007, and then her typed-up version of those notes?

16  A.  I don't recall it specifically.

17  Q.  Okay.  At the top of this document, it says, "6-1-2007,

18  3:45 p.m., called Dr. Rachel Tudor."

19      Is that your phone number under that?

20  A.  I believe it was at the time.

21  Q.  All right.  And then further down it says, "Advised

22  Dr. Tudor of SOSU policies."

23      Is that correct?

24  A.  That's what it says.

25  Q.  Okay.  Is it your testimony that you do not recall ever

Jury Trial – Volume 2
November 14, 2017

1   seeing this document before?

2   A.   I do not recall.

3   Q.   Okay.  You don't have any reason to dispute Cathy

4   Conway's note, though, that this phone call took place at

5   3:45 p.m. on June 1st of 2007, do you?

6   A.   Yes, I do.

7   Q.   Do you have any documentation that would dispute it?

8   A.   No.

9   Q.   Okay.  You testified yesterday that this phone call

10  occurred late in the evening.

11       Do you recall that testimony?

12  A.   Yes.

13  Q.   And you also testified that your phone indicated that it

14  was a call from Southeastern's human resources.

15       Do you recall that?

16           MR. YOUNG:  Objection.  Mischaracterizes testimony.

17           THE COURT:  The witness can speak for herself.

18           THE WITNESS:  No, I don't.  No.

19  Q.   (BY MS. COFFEY)  So if Cathy Conway testifies that she

20  talked with you at 3:45 p.m. on June 1st, 2007, is she being

21  honest with this courtroom?

22  A.   It may have been that date, but the time is incorrect.

23  Q.   All right.

24           MS. COFFEY:  No further questions, Your Honor.

25           THE COURT:  Redirect?

1    **REDIRECT EXAMINATION**

2    BY MR. YOUNG:

3    Q.    Dr. Tudor, on cross-examination yesterday, you were asked

4    to recall a lot of conversations and deposition testimony; is

5    that correct?

6    A.    Yes.

7    Q.    Did you ask, in response to some of those questions, to

8    be provided with documents to refresh your memory?

9    A.    Yes, I did.

10   Q.    If you had been provided with the documents you had

11   requested, would that have helped refresh your memory?

12   A.    Yes, it would have helped.

13   Q.    Dr. Tudor, you were asked yesterday whether, at your

14   deposition, you thanked -- you said that you thanked Cathy

15   Conway for her professionalism; is that right?

16   A.    That's right.

17   Q.    At your deposition, were you asked why you thanked Cathy

18   Conway for her professionalism?

19   A.    No, I was not.

20   Q.    If you had been asked at your deposition why you thanked

21   Cathy Conway, would you have testified truthfully?

22   A.    Yes.

23   Q.    And yesterday, when you testified that you thanked Cathy

24   Conway for not firing you, that was the reference to

25   professionalism.

Jury Trial – Volume 2
November 14, 2017

1          Was that telling the truth?

2     A.   Yes, correct.

3     Q.   At your deposition, were you asked whether Cathy Conway

4     told you that Southeastern's policies protected you from sex

5     discrimination as a transgender woman?

6               MS. COFFEY:  Objection, Your Honor.  Leading.

7               THE COURT:  Overruled.

8               THE WITNESS:  No.

9     Q.   (BY MR. YOUNG)  If you had been asked that question at

10    your deposition, would you have told the truth?

11    A.   Yes, of course.

12    Q.   Did Cathy Conway tell you that Southeastern's sexual

13    harassment and nondiscrimination policies protected you from

14    sex discrimination as a transgender woman?

15    A.   No, she did not.

16    Q.   Did Cathy Conway tell you that transgender women were

17    protected from sex discrimination during that phone call in

18    June of 2007?

19    A.   No.

20    Q.   Now, during that phone call with Cathy Conway, when she

21    told you that you could not use the women's restroom at

22    Southeastern and you could only use single-stall restrooms,

23    did she tell you where those restrooms were located?

24               MS. COFFEY:  Objection, Your Honor.  Leading and

25    mischaracterizes the testimony.

Jury Trial – Volume 2
November 14, 2017

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  No.

 3  Q.  (BY MR. YOUNG)  Did Cathy Conway provide you with a map of

 4  Southeastern so you could find single-stall restrooms?

 5  A.  No.

 6  Q.  So after that conversation, you had to figure out on your

 7  own where those restrooms were located?

 8  A.  Yes.

 9  Q.  Dr. Tudor, a few times during your cross-examination, you

10  said you recalled some gist of the conversation with different

11  folks at Southeastern but you didn't recall the exact words;

12  is that right?

13  A.  That's correct.

14  Q.  Is there a reason why you only remembered the gist of

15  some of those conversations?

16  A.  It was many years, many years ago.  But I remember the

17  gist because they were very important, but I didn't remember

18  the exact words or phrases that may have been used.

19  Q.  But you're certain that you've consistently told the

20  truth about what you recall?

21  A.  Yes.

22  Q.  And you're certain that you remember the important parts

23  of those conversations?

24  A.  Yes.

25  Q.  Okay.
```

Jury Trial – Volume 2
November 14, 2017

1          MR. YOUNG:  Nothing further.

2          THE COURT:  Recross.

3          MS. COFFEY:  Nothing further, Your Honor.

4          THE COURT:  You may step down.

5     (Witness excused.)

6          THE COURT:  Call your next witness.

7          THE WITNESS:  Thank you.

8          MR. YOUNG:  Your Honor, we're just pulling our

9   witness from the witness room.  He's just down the hall.

10         THE COURT:  Who is your next witness?

11         MR. YOUNG:  Dr. Robert Parker.

12         THE COURT:  Please step right up here, wend your

13  through however you can, and face the clerk and be sworn.

14     (Witness duly sworn.)

15         WHEREUPON, ROBERT PARKER, Ph.D., after having been

16  first duly sworn, testifies in reply to the questions

17  propounded as follows:

18                   **DIRECT EXAMINATION**

19  BY MR. YOUNG:

20  Q.   Good morning, Dr. Parker.

21  A.   Good morning.

22  Q.   Before we get started, I'm just going to say that that

23  little binder in front of you, that white binder, there are

24  going to be a number of exhibits.  Don't look at it yet

25  because I'm going to introduce them one by one.  Okay?

Jury Trial – Volume 2
November 14, 2017

```
 1    Wonderful.
 2         Dr. Parker, what is your occupation?
 3    A.   I'm a university professor.
 4    Q.   Where do you work?
 5    A.   At the University of Illinois.
 6    Q.   Dr. Parker, can you move the microphone a little bit
 7    closer to yourself?
 8    A.   Sure.
 9    Q.   I know it's a little awkward.
10    A.   How is that?
11    Q.   Better.
12    A.   Can everybody hear me okay?  Thank you.
13    Q.   So, Dr. Parker, where are you a university professor?
14    A.   At the University of Illinois.
15    Q.   How long have you been at the University of Illinois?
16    A.   Since 1984.
17    Q.   Do you recall about how many years you've been a
18    professor?
19    A.   So that's, altogether, 35 years.
20    Q.   Okay.  Dr. Parker, do you have a particular area of
21    specialty?
22    A.   Yes, I do.  American literature, mostly post-1900, but
23    all across American literature, and what we call critical
24    theory.
25    Q.   So it's a very specific kind of English professor; is
```

Jury Trial — Volume 2
November 14, 2017

1  that right?

2  A.   Yes.  And within that, I have specialties as well.

3  Q.   Wonderful.

4       Dr. Parker, what schools have you taught at before?

5  A.   I've taught at Yale University and at the University of

6  Michigan before I came to the University of Illinois.

7  Q.   Okay.  Dr. Parker, where did you go to college?

8  A.   I went to Brown University in Rhode Island and then to

9  Yale University.

10 Q.   And what degrees did you get from Yale University?

11 A.   They have more degrees than most schools, so I got a

12 master's a degree in what they call an M.Phil., which is a

13 bigger master's degree, and a Ph.D.

14 Q.   Your Ph.D. is in the field of English?

15 A.   Yes, it is.

16 Q.   Imagine, as an English professor, you've written a lot of

17 publications.

18      How many articles or books have you published?

19 A.   Ten books and 25 articles, plus a few more in the

20 pipeline.

21 Q.   Dr. Parker, can you please explain to the jury what it

22 means for a publication to be peer-reviewed?

23 A.   Yes, yes.

24      For a publication to be peer-reviewed means that when

25 it's in manuscript, so written but not published, it's

Jury Trial – Volume 2
November 14, 2017

1   submitted to the editors.  And then if the editors think that
2   it's a likely –– or may well be worthy of publication, they
3   send it out to other experts in the area who judge it.  And if
4   usually at least two of those think that it's worthy of
5   publication for that particular either journal or publisher,
6   then it goes to the next level.  And then, based on that, the
7   editors, and possibly others with them, make the final
8   decision.
9        So when something is peer-reviewed, it's met an
10  especially high standard of outsider judgment before it gets
11  to be published.  And that's really the gold standard of what
12  makes something a respectable and a highly admired
13  accomplishment to publish in a peer-reviewed forum.
14  Q.   Do professors in the field of English have a general
15  understanding of what peer review means?
16  A.   Oh, absolutely.
17  Q.   Is that a fair universal standard?
18  A.   Absolutely.  Standard.
19  Q.   Dr. Parker, how many of your own publications would be
20  considered peer-reviewed under the definition you just gave
21  us?
22  A.   Under the definition I just gave you, seven of my
23  articles and nine of my ten books.  The reason that they're
24  not all peer-reviewed is that once you've published a lot of
25  peer-reviewed materials, then sometimes you get requested.  So

Jury Trial – Volume 2
November 14, 2017

1   that's another gold –– that's, like, the second gold standard.
2   You get requested to publish things.
3        So since I've published things through peer review, I now
4   often get requests to publish.  Sometimes those go through
5   peer review; sometimes editors give them stringent review
6   without the peer review.
7   Q.   Okay.  Thank you, Dr. Parker.
8        Now, Dr. Parker, do you have a particular area of study
9   where you work in the most?
10  A.   Yes.  As I indicated, American literature.
11       So one of my areas where I've worked the most is Native
12  American literature.  I've also written a lot on the novelist
13  William Faulkner, and a variety of other areas.  But those
14  would be the areas where I work the most.
15       I should say –– I mentioned I also write a lot about the
16  study of literature and English in general without focusing on
17  one specific period.  So that engages me with a wide variety
18  of different areas of study within English.
19  Q.   Dr. Parker, do you regularly read, write, discuss
20  publications written by professors about Native American
21  literature?
22  A.   All the time.
23  Q.   Do you regularly read publications in your field produced
24  by professors outside of your university?
25  A.   All the time.  That's mostly what I do read.

Jury Trial – Volume 2
November 14, 2017

1   Q.   Is it important that you engage with publications

2   produced by professors outside of your home university?

3   A.   Absolutely.

4   Q.   Can you explain to the jury why that's important?

5   A.   Because the conversation about the things that we study

6   is not a small conversation with the people you happen to

7   know; it's a broader conversation with other people who share

8   those interests across the United States and across other

9   countries as well.  And that's part of what makes it so

10  interesting to those of us who care a lot about it.

11  Q.   Dr. Parker, do you also publish in the field of English

12  more broadly?

13  A.   Yes, I do.

14  Q.   Do you regularly read publications written by professors

15  who write in other areas of English?

16  A.   Certainly, both for my own interest and for teaching.

17  Q.   Dr. Parker, do you have any experience serving on the

18  editorial board or advisory board of any scholarly journals?

19  A.   Yes, five different journals.

20  Q.   Have you ever been asked to help editors of scholarly

21  journals choose articles for application?

22  A.   All the time.  It keeps me busy.

23  Q.   What types of articles have you reviewed?

24  A.   I've reviewed articles all across Native American

25  literature, all across American literature.  Some editors seem

Jury Trial – Volume 2
November 14, 2017

1   to have picked me out as someone to go to when the article

2   doesn't fit into one area.

3   Q.    Do you feel fairly confident, having more than 35 years'

4   experience as an English professor, reading articles from all

5   across the board in the area of English?

6   A.    Of course.  I do it all the time.  I do it for my own

7   interest, and I do it because others ask me to do it.

8   Q.    Okay.  Dr. Parker, I'm going to ask you some questions

9   about promotion and tenure.

10  A.    Uh-huh.

11  Q.    I think it would be very helpful for our jury to sort of

12  understand these concepts better coming from an expert.

13       Dr. Tudor [sic], generally, in a university setting, can

14  you explain to me what the significance is of a professor

15  applying for promotion from assistant professor to associate

16  professor with tenure?

17  A.    That's the big one.

18       That's the -- in the humanities especially, English and

19  related fields, there are two big milestones in your career.

20  One is just getting the job, because hundreds of people apply

21  typically for one job.  So that's a big deal.

22       Then the next milestone is getting promotion to associate

23  professor and tenure.  That's when you've arrived.  It's a

24  cause for celebration, a sense of accomplishment, a sense of

25  fulfillment.  It's a marker of having done something really

1  substantial in your career.

2  Q.   Did you celebrate it when you yourself won tenure?

3  A.   Yes.  In my case –– in my case, my colleagues had made it

4  pretty clear that it was coming, so it wasn't as much of a

5  one-moment milestone, but I certainly did.  And I certainly

6  helped my colleagues celebrate theirs, yes.

7  Q.   Okay.

8  A.   And if they don't, I make sure that they do.

9  Q.   Dr. Parker, in your experience, does getting tenure more

10  or less mean the same thing at all American universities?

11  A.   Oh, yes.  It's a national standard.

12  Q.   Can you just explain again for the jury why it's

13  important for a professor to get tenure.

14  A.   Oh, sure.  Sure.

15       Part of the reason it's a national standard is that

16  there's an organization that sets up the definitions and

17  procedures for it, the American Association of University

18  Professors.

19       Why is it important?

20       Well, once somebody has tenure, they feel free to

21  experiment, to try different ways of teaching, try different

22  ways of thinking, try different ways of studying and writing

23  about what they study.

24       And that means that they can use their imagination more.

25  They can take a risk without fear that, oh, that risk didn't

Jury Trial – Volume 2
November 14, 2017

 1    go well, I could lose my job or I could make my boss angry or

 2    something like that.

 3        Instead, the idea is that tenure encourages imagination,

 4    and that's what's made the American universities so special.

 5    That's what made the American universities the envy of the

 6    world because you have faculty who can try all different

 7    things and continually move forward towards a better way to do

 8    this, a better way to think about this.  An experiment that

 9    takes us in new directions and expands what we know and

10    understand, that's founded on tenure.

11            THE COURT:  Could I ask you to slow down a little

12    when you speak?

13            THE WITNESS:  Thank you very much.  Yes, I will.

14    And, please, if I need to, ask me again.  Sorry.  Thank you.

15            MR. YOUNG:  He's wonderful to talk to, but he does

16    speak a little fast.

17    Q.  (BY MR. YOUNG)  Okay.  Dr. Parker --

18    A.  I can't really tell if this is loud enough or not.  So

19    please do let me know if it's not.

20    Q.  We will.  Thank you, Dr. Parker.

21        Dr. Parker, in your time as an English professor, have

22    you reviewed promotion portfolios?

23    A.  Many.

24    Q.  About how many portfolios do you think you've reviewed?

25    A.  Over 100, well over 100.

Jury Trial – Volume 2
November 14, 2017

1    Q.    So that's a big number, 100 portfolios.  Can you maybe
2    explain to the jury how you came up with that, because I don't
3    think I'd remember.
4    A.    I counted all those that I could remember because I
5    thought I might get asked this question.
6    Q.    Uh-huh.
7    A.    So I went down the list of all the colleagues I could
8    think of.  I went through my e-mails of reviews I've done for
9    other universities.  I added them all up.  And I didn't count
10   those that I couldn't remember, but those that I remembered
11   were well over 100.
12   Q.    So there might be even more portfolios than just the ones
13   you could find e-mails for and that you could remember?
14   A.    Right.  I counted 130 totally.
15   Q.    Okay.  That's a lot of portfolios.
16   A.    This fall --
17   Q.    Just this fall?
18   A.    -- just this fall.  It's been a busy fall.
19   Q.    Dr. Parker, when you've reviewed promotion portfolios in
20   the past, what sorts of things did you look at to make a
21   decision on that portfolio?
22   A.    You look at what we call the curriculum vitae, or the CV,
23   which is academic fancy language for résumé except it's much
24   fuller.
25        A résumé is typically concise, one page.  A CV can go any

Jury Trial – Volume 2
November 14, 2017

1  number of pages to include -- it's supposed to include

2  everything in someone's academic record.

3       So you look at that, and you read that carefully in the

4  context of your having read many, many before.  In my case,

5  thousands before.  And you look at all the supporting

6  documents.

7       You look at any records of -- people's teaching records,

8  any records of any publications they might have, any records

9  of their service to the university and to the field.

10      And if you are a principal person assigned for evaluating

11 that, as I often am, then you read the publications as well.

12 Q.   Dr. Parker, you said these portfolios have a lot of

13 documents in them.  You started with the CV.

14      Is the CV really important?

15 A.   It's the core.

16 Q.   Why is it the core?

17 A.   Because it lists everything that someone has done that

18 could possibly have any relevance to their consideration for

19 promotion and for tenure.

20 Q.   So a CV is not like -- I don't know.  Some people leave

21 things off their résumés.  Do professors leave things off

22 their CVs?

23 A.   Well, you can't -- it could go for thousands of pages if

24 you put everything in your life.  They should not leave off

25 any professional activities.  So all their professional

Jury Trial – Volume 2
November 14, 2017

```
 1   activities should be listed there, particularly if there are
 2   things that are publicly available.
 3        You don't list every meeting you've had with a student or
 4   something like that, but yes.
 5   Q.   So because everything is listed on a CV, would a more
 6   senior professor such as yourself, does your CV contain older
 7   publications from when you were just starting your career?
 8   A.   Yes.
 9   Q.   As well as recent ones; right?
10   A.   Yes.
11   Q.   Okay.  Personally, has your work improved over time?
12   A.   I think so.  I'm not always sure.  I'm not always the
13   person to judge, but I think so.
14   Q.   Okay.
15   A.   It's grown in lots of ways and expanded, yes.
16   Q.   Is that normal for a CV, to just, you know, capture a
17   snapshot over the course of your career, improvements, ups,
18   downs?
19   A.   Well, everything.
20   Q.   Okay.
21   A.   You don't leave something off if you think it's not your
22   best.  Everything's there.
23   Q.   Okay.  So it would be odd if someone left something off
24   just because they didn't think it was their absolute best
25   work?
```

Jury Trial – Volume 2
November 14, 2017

1    A.    Oh, yes.

2    Q.    Have you ever been asked to review portfolios from

3    universities outside of your own?

4    A.    Yes, routinely.

5    Q.    Do you have any estimate as to how many of those

6    portfolios you've reviewed from outside your own university?

7    A.    I counted because I thought you might ask.

8    Q.    Yes.

9    A.    So I counted 25.  I'm assuming I'm not forgetting any.  I

10   went back through my records.  I turned down three this year

11   because I wanted to be able to focus on this process.

12   Q.    By "this process," you mean this case?

13   A.    That's correct.

14   Q.    Thank you.

15         Dr. Parker, do American universities have similar

16   criteria for tenure?

17   A.    Yes.

18   Q.    Are you familiar with the tenure and promotion rules at

19   Southeastern?

20   A.    Yes.  I've read them.

21   Q.    How did you become familiar with Southeastern's tenure

22   rules?

23   A.    They were provided to me.  I read them, and I read them

24   in the context of the standard procedures that apply

25   nationally.

Jury Trial – Volume 2
November 14, 2017

1   Q.   Okay.  And, Dr. Parker, if I use the phrase –– or the

2   name Academic Policies and Procedures Manual, are you familiar

3   with what I'm talking about?

4   A.   I have read certain pages of that; I was not provided the

5   whole manual.  But I read the pages of that manual that I was

6   provided.

7   Q.   Okay.  And what is your understanding of what that manual

8   is?

9   A.   It –– the parts of it that I read lay out –– lay out the

10   procedures for what it takes to get tenure and what it takes

11   to get promotion and what it –– how Southeastern defines the

12   different ranks of faculty.

13       So, for example, assistant professor, associate

14   professor, and professor.

15   Q.   Okay.  And just going forward for my sake and for the

16   jury's sake, is it okay if I call that rule book the AAPM?

17   A.   Sure.

18   Q.   Thank you.  It will make it a little easier to get

19   through this.

20       What type of school is Southeastern?

21   A.   It's a teaching school, a teaching university, and

22   explicitly defines itself as a teaching university in that

23   manual.

24   Q.   So, Dr. Parker, can you explain to the jury what does it

25   mean for a school to be a teaching university?

Jury Trial – Volume 2
November 14, 2017

1       Does that mean it produces teachers?

2   A.   No, no.

3   Q.   What does that mean?

4   A.   It might –– it probably does –– but that's not what it

5   means.

6       It means that the faculty are expected, most of all, to

7   concentrate on their teaching among the various things they

8   do.  And it means that in consideration for promotion and

9   tenure, that their teaching is the most important

10  consideration.  That's what counts most at Southeastern and at

11  other teaching schools.

12  Q.   So, Dr. Parker, I mean, I went to college, but I don't

13  know a lot about how colleges work.

14      How would one figure out what type of school Southeastern

15  is?  What would you look for?

16  A.   Well, it's pretty ordinary for and important for a

17  regional university to be a teaching school.  It wouldn't

18  take –– someone in the field wouldn't have to figure anything

19  out; they would already know that automatically.

20      When I have my graduate –– when my graduate students are

21  applying for faculty positions at different universities, I

22  make sure that they do know, if they don't already.  And if

23  there's any doubt, I tell them to ask or to read the school's

24  procedures, to look at what the faculty do at that school

25  because it's very important they know what kind of school it

Jury Trial – Volume 2
November 14, 2017

1  is before they either go there or apply for a position there

2  or interview for a position there because that tells them

3  what's expected of them when they -- if they get the job and

4  what they should be prepared to discuss in the interview

5  process.

6  Q.   I'm going to ask you a more specific question about that.

7       So, presumably, professors at teaching universities also

8  engage in other activities other than teaching; is that right?

9  A.   Certainly.

10 Q.   But is teaching given a special weight --

11 A.   Yes.

12 Q.   -- at teaching universities?

13 A.   Yes.  In fact, those procedures actually give a

14 mathematical breakdown that emphasizes the importance and

15 centrality of teaching at Southeastern.  And that's ordinary.

16 That's easily recognizable.  It's standard.

17 Q.   So, Dr. Parker, for the purposes of your testimony today,

18 did you review some portfolios from professors at

19 Southeastern?

20 A.   Yes, I did.

21 Q.   Do you recall the portfolios that you reviewed?

22 A.   Yes, I do.

23 Q.   Which portfolios did you review?

24 A.   I reviewed -- just to go through them alphabetically, I

25 reviewed a portfolio from Dr. Barker, a portfolio from

1   Dr. Cotter-Lynch, a portfolio from Dr. Parrish, a portfolio

2   from Dr. Spencer, and a 2009-10 portfolio from Dr. Tudor, and

3   a 2010 and '11 portfolio from Dr. Tudor.

4          MR. JOSEPH:  Objection, Your Honor.  Misstates facts

5   not in evidence.

6          THE COURT:  Well, it's his answer.  You'll be

7   entitled to cross-examine him on it.

8   Q.  (BY MR. YOUNG)  I'm counting six portfolios; is that

9   right?

10  A.   That is correct.

11  Q.   Okay.  We are going to introduce the portfolios as

12  exhibits.  So bear with me one moment.

13      Actually, Dr. Parker, I believe Plaintiff's Exhibit No. 1

14  is in that stack of papers in front of you.  You can also find

15  it in the binder.  That might be easier.

16      Do you see Plaintiff's Exhibit No. 1?

17  A.   P-1?

18  Q.   P-1.

19  A.   Yes.

20  Q.   Do you recognize that document?

21  A.   It appears to be the portfolio from Dr. Tudor from 2009.

22  And I referred to it as 2009-2010 that I just referred to.  I

23  don't know what the objection was, but that's what I was

24  referring to, this document here.

25  Q.   And, Dr. Parker, do you have any understanding as to

Jury Trial – Volume 2
November 14, 2017

1  whether Plaintiff's Exhibit No. 1 is the full portfolio from

2  2009–10?

3  A.    My understanding is that it is not complete.

4  Q.    Do you know what documents are in that partial portfolio

5  there?

6  A.    Yes.

7  Q.    What documents?  You don't have to read them one by one.

8  You can just --

9  A.    Well, the core document of the CV -- and there's a letter

10  or statement or application -- various schools call it various

11  things -- from Dr. Tudor.

12      There's some letters in support of the promotion and

13  tenuring, and there was one of her articles and various

14  testimonies from various people, students primarily, about her

15  teaching.

16      I might have missed one document or so here or there, but

17  that's basically what it includes.

18  Q.    Okay.  Dr. Parker, I'm going to hand you a document that

19  I've marked as Plaintiff's Exhibit 165.

20          MR. YOUNG:  May I approach the witness?

21          THE COURT:  Yes.  Take them all up there.

22          MR. YOUNG:  Yes, Your Honor.

23  Q.    (BY MR. YOUNG)  So, Dr. Parker, can you turn to

24  Plaintiff's Exhibit 165?

25      I believe 165 is in one of those stacks, Dr. Parker.

Jury Trial – Volume 2
November 14, 2017

```
 1   A.    Oh.

 2   Q.    It will have a number on it.

 3         Dr. Parker, it's in the stack to your right.  Yeah.

 4   A.    Here it is.

 5   Q.    So can you look at the first page of Plaintiff's

 6   Exhibit 165?

 7   A.    Yes.

 8   Q.    Well, after the cover.

 9   A.    Yes.

10   Q.    Do you recognize Plaintiff's Exhibit 165?

11   A.    Yes, I do.

12   Q.    What is it?

13   A.    This is the portfolio for Dr. Mark Spencer.

14   Q.    Have you seen this portfolio prior to today?

15   A.    Yes.

16         MR. YOUNG:  Your Honor, I would like to move to

17   enter Plaintiff's Exhibit 165 into evidence.

18         MR. JOSEPH:  Your Honor, we object.  I don't think

19   he's created this document.  There's a witness available who

20   can authenticate its creation, but I don't think he can do

21   that.

22         THE COURT:  Come to the bench.

23       (The following proceedings were had at the bench and out

24   of the hearing of the jury.)

25         THE COURT:  Is Dr. Spencer going to testify?
```

Jury Trial – Volume 2
November 14, 2017

```
 1            MR. YOUNG:  He is, Your Honor, but to the extent
 2   that defendants plan on asking Dr. Parker whether he actually
 3   reviewed these documents which were discussed in his expert
 4   report, it's kind of hard for him to testify if he can't at
 5   least let the jury know that he's seen these.
 6            THE COURT:  Are you seriously debating the
 7   authenticity of this?
 8            MR. JOSEPH:  It's just the matter of fact is, he
 9   didn't create this document.
10            THE COURT:  But he reviewed it.
11            MR. JOSEPH:  Certainly.
12            THE COURT:  He can testify as to his review.  You're
13   free to cross-examine.  This, to me, is a total waste of time.
14            MR. JOSEPH:  Okay.
15            THE COURT:  What else are you going to offer and
16   let's see if we can do it without all this falderol.
17            MR. YOUNG:  Okay.  Just the other portfolios that he
18   reviewed.
19            THE COURT:  Which are which exhibits?
20            MR. YOUNG:  I believe it's 162, 163.  We already did
21   164 yesterday, 165.
22            THE COURT:  And 166?
23            MR. YOUNG:  That should be it.  They're all in a
24   row.
25            MR. JOSEPH:  And we will concede certainly that he
```

Jury Trial – Volume 2
November 14, 2017

```
 1   reviewed those documents.  I just didn't want to leave the
 2   impression that he had created those or that those were the
 3   complete documents as presented to the committees.
 4            THE COURT:  You are free to ask him all about that,
 5   but I'm going to admit all those.  That's 162 -- Linda?
 6   Linda?
 7        I'm admitting 162, 163, 165, and 166.
 8        Thank you.
 9            MR. YOUNG:  Thank you, Your Honor.
10            MR. JOSEPH:  Thank you, Your Honor.
11        (The following proceedings were had in open court with
12   all parties present and within the hearing of the jury.)
13   Q.  (BY MR. YOUNG)  Okay.  Dr. Parker, sorry about that.
14        So you've seen Plaintiff's Exhibit 165 before; correct?
15   A.  Yes.
16   Q.  That's Mark Spencer's --
17   A.  Is there some water somewhere?
18   Q.  Dr. Parker, tell me when you're ready.
19   A.  I'm ready.  Thank you.
20   Q.  Okay.  Sorry for the brief interruption.
21        So, Dr. Parker, you've seen Mark Spencer's portfolio
22   before, Exhibit 165?
23   A.  Yes, I have.
24   Q.  Okay.  And let's go through these other ones pretty
25   quickly.
```

Jury Trial – Volume 2
November 14, 2017

```
 1          Dr. Parker, have you seen Exhibit 162 before?  It's going
 2    to be in that teal binder to your right.
 3    A.    This?
 4    Q.    Yes.  And I think you can just kind of open up the first
 5    page of that.
 6    A.    162?
 7    Q.    162.
 8              THE COURT:  Remember that your right is his left.
 9              MR. YOUNG:  Oh, I'm sorry.
10              THE WITNESS:  I just figured that out.
11              MR. YOUNG:  Thank you, Your Honor.  I'm bad at that
12    even outside of this context.
13              THE WITNESS:  Yes, I have seen this.
14    Q.    (BY MR. YOUNG)  What is it?
15    A.    This is the portfolio from Dr. Parrish.
16    Q.    Can you please turn in that same binder to Exhibit 163.
17    A.    Yes, I have seen this.
18    Q.    What is it?
19    A.    This is the portfolio from Dr. Cotter-Lynch.
20    Q.    Okay.  Dr. Parker, can you go to one of those short
21    stacks of documents in front of you and find Exhibit 166?
22    A.    Yes, that's right here.
23    Q.    What is it?
24    A.    It's the portfolio from Dr. Barker.
25    Q.    And have you seen it before?
```

Jury Trial – Volume 2
November 14, 2017

1  A.   Yes, I have.

2  Q.   Dr. Parker, can you look at Exhibit 164.  It should be in

3  that larger stack in front of you.

4  A.   Yes.

5  Q.   Have you seen that one before?

6  A.   Yes, I have.

7  Q.   What is it?

8  A.   This is the 2010-11 exhibit -- or portfolio from

9  Dr. Tudor.

10 Q.   Wonderful.

11      Okay.  So I'm just going to let you know and the jury

12 know, we're done with those exhibits for right now.  The only

13 one that we're going to use is that little white binder in

14 front of you.  So you don't have to worry about the scary

15 stack of papers anymore.

16      Okay.  So, Dr. Parker, are -- all those exhibits that we

17 went through, you reviewed them prior to today?

18 A.   Yes, I did.

19 Q.   Did you review them all carefully?

20 A.   Yes, I did.

21 Q.   Okay.  And, Dr. Parker, is it your understanding that all

22 of those portfolios you reviewed except for the two portfolios

23 of Dr. Tudor were successful at Southeastern?

24 A.   Yes, it is my understanding.

25 Q.   So those are the very same portfolios, to your

Jury Trial — Volume 2
November 14, 2017

1  understanding, that other professors at Southeastern turned in

2  that won them tenure other than Dr. Tudor's two portfolios?

3  A.   That's correct.

4  Q.   Dr. Parker, are those portfolios all from professors in

5  Southeastern's English department?

6  A.   Yes.

7  Q.   Dr. Parker, do you know whether those portfolios were

8  turned in around the same time that Dr. Tudor applied for

9  tenure?

10  A.   They were.

11  Q.   Now, Dr. Parker, can you tell the jury a little bit about

12  what method you used to review these portfolios?

13      I mean, they look big and scary.  How do you go about

14  reviewing something like that?

15  A.   It's an absolutely standard method.  You begin with the

16  core document, the CV, and then that connects to all the other

17  documents, and you read the documents, you study them, and you

18  put them in the context of your familiarity with national

19  standards and national procedures.

20  Q.   Did you review every page of those documents?

21  A.   Yes, I did.

22  Q.   Did it take you a while?

23  A.   Yes.

24  Q.   Okay.  I believe you.

25      Dr. Parker, did you make any assumptions about the

Jury Trial — Volume 2
November 14, 2017

1    portfolios when you read them?

2    A.    I understood that those four portfolios from Barker,

3    Cotter-Lynch, Parrish, and Spencer were cases that won

4    promotion and tenure.  And I took it on face value that they

5    deserved the promotion and tenure that they won.  So that's an

6    assumption.

7    Q.    Okay.  Can you tell us, and tell the jury more

8    specifically, is there any significance to making that

9    assumption on your part?

10   A.    Sure.  When you see a group of portfolios that were

11   rewarded with promotion and tenure, that sets a bar, it sets a

12   standard, and it implies that other people who meet that same

13   bar would also –– if things were fair, would also be rewarded

14   with promotion and tenure.

15   Q.    Okay.  Can you just remind the jury how you went about

16   reviewing these specific portfolios?  What was your process?

17   A.    You begin with the opening document, the table of

18   contents and so on, to familiarize yourself with the rather

19   elaborate array of documents across the portfolio.

20        You study the core document, the CV, and you put it in

21   the context of understanding the story, in effect, that

22   somebody's career tells and how they move from one thing to

23   another, what different courses they teach, how those courses

24   relate to each other, how they relate to what they do in their

25   research, what they actually do in their research.  You look

1    at their service record.

2         And then you look to see that corroborated or backed up

3    or verified by the long array of additional documents, and you

4    read them all, and you read them all in the context of your

5    familiarity with having read many such documents before and

6    participated in many discussions of them, formally with

7    committees and formal proceedings and reports written in

8    response to them, and informally in constant, routine

9    discussion among other professors.

10   Q.   So when you were given those documents to review, you

11   knew what to do with them?

12   A.   Certainly.

13   Q.   Do you have any doubt about that?

14   A.   No.

15   Q.   So, Dr. Parker, I think the jury has heard before that

16   there are three areas that are considered when it comes to

17   tenure:  scholarship, teaching, and service.  And I want to

18   take you through those one by one.

19   A.   Okay.

20   Q.   What sort of information can you get if you look at the

21   scholarship sections of a portfolio?

22   A.   You see what someone's published; you see how it tells a

23   story of what their interests are; you read it; you put it in

24   the context of similar discussions.

25        And each of those discussions in a publication engages,

Jury Trial – Volume 2
November 14, 2017

1   as I said before, in a dialogue with what other people who
2   share those interests also write about, and you see how
3   someone joins that discussion or perhaps doesn't join it,
4   depending on the publication.
5        But that's what they're expected to do.  They're expected
6   to join the conversation about that particular topic and move
7   it forward and advance it.
8   Q.   So when looking at the scholarship portion of the
9   portfolio, is it correct to say that you were looking for the
10  substance of the articles, not just how many were there
11  published?
12  A.   All those things.
13  Q.   All of those things.  So substance; how many were there
14  published?
15  A.   Yes.
16  Q.   Okay.  What can you discern from looking at the teaching
17  portion of a portfolio?  What information can you glean from
18  that?
19  A.   You look at what someone's taught.  Again, you look at a
20  story, how one course leads to another.  Maybe they teach
21  similar courses at higher and lower levels.  How do they
22  change from one to another?  How do they adapt to the
23  particular circumstances?
24       You look at the documentation that describes how they
25  teach, the materials they provide to their students, the

Jury Trial – Volume 2
November 14, 2017

1   responses that the students provide, the observations and

2   reports that other faculty produce on -- based on observing

3   their teaching.

4   Q.   Okay.  And lastly, when you look at the service portion

5   of a portfolio, what sorts of things are you looking for when

6   someone looks at that service portion?

7   A.   You're looking for a good citizen.  You're looking for

8   someone who can back that up because a group of faculty have

9   to work together.  They depend on each other.

10      Each person has to pull their oar, and you look for

11  someone who contributes by working on this committee that

12  they're assigned and volunteering for that committee that

13  they're not assigned.

14      And you look to see if someone is respected, then they

15  get assigned more committees.  And you look to see the

16  importance of the committees, if there's any documentation

17  that indicates that.  Sometimes you need the description to

18  get the importance; sometimes it's self-evident.

19              THE COURT:  Slow down.

20              THE WITNESS:  Thank you.

21  Q.   (BY MR. YOUNG)  So, Dr. Parker, you use the word

22  "committees" a lot.

23  A.   Yes.

24  Q.   Are committees, like, a big deal?  Is that a big thing

25  when it comes to service as a university professor?

Jury Trial – Volume 2
November 14, 2017

1   A.    Some of them are.  Many of them are.  Some are not such a

2   big deal.  It depends on the committee.

3         But the single area of service that is most describable

4   on a CV would be committee work.

5   Q.    Okay.  And, in your experience, do most professors have a

6   general understanding similar to your own?

7   A.    Absolutely.

8   Q.    Have you served on a lot of committees?

9   A.    Yes.

10  Q.    Have you served on too many committees?

11  A.    Yes.

12  Q.    Okay.  Dr. Parker, is there any information -- let me

13  withdraw that question.

14        Dr. Parker, when reviewing a portfolio, is it appropriate

15  for someone to consider information or documents that are not

16  in that portfolio when making a tenure decision?

17  A.    No.

18  Q.    Can you explain to the jury why not?

19  A.    Well, the portfolio -- if you consider the portfolios,

20  then you consider each candidate in the same way.  That's what

21  makes it fair.

22        If you start bringing things other than the portfolio in,

23  well, that will -- ordinarily, people would immediately object

24  to that.  That would open the door to bias, to misinformation,

25  to personal whim, to all sorts of inappropriate things.

Jury Trial – Volume 2
November 14, 2017

```
 1        That's how you establish a standard of treating everybody
 2   by the same yardstick, so that you judge someone on the work
 3   that they do, which is represented in that portfolio, not on
 4   whether you like the way somebody looks or whether they had a
 5   good conversation with you three years ago or something like
 6   that.  That's not professional.
 7        You judge the candidates on the material in the
 8   portfolio.  That's the only way to produce a fair process.
 9   Q.   Dr. Parker, have you ever, before this case, in your
10   review of all of those other portfolios and with colleagues
11   you know, have you ever known a professor who has not gotten
12   tenure before and had to reapply?
13   A.   Yes.
14   Q.   Have you ever reviewed any of those portfolios?
15   A.   Yes.
16   Q.   On a committee at your university?
17   A.   On appeals committees where -- that consider appeals,
18   yes.
19   Q.   Now, would it be appropriate in a situation like that
20   one, where someone didn't get tenure one year and reapplied
21   the next year, to consider documentation that was in that
22   earlier portfolio?
23   A.   No.
24   Q.   Can you explain to the jury why not?
25   A.   That's not -- it needs to be an independent consideration
```

Jury Trial – Volume 2
November 14, 2017

1   of the material before you forward that process in that year.

2   Something was in doubt if somebody's doing it again, and

3   that's not -- that's extraneous.  That's other stuff.  That's

4   not part of the consideration.  That would be considered a

5   real violation of protocol and fairness.  I've never heard of

6   that.

7   Q.   So, Dr. Parker, is it true to say, then, that the

8   portfolio in front of the decision maker in this context,

9   tenure portfolio, should be the only thing that's considered,

10  only the things in that portfolio?

11  A.   Yes.

12  Q.   You're absolutely certain of that?

13  A.   Yes.

14  Q.   Okay.  Now, Dr. Parker, did you write a report about

15  these portfolios that you reviewed for this case?

16  A.   Yes, I did.

17  Q.   Did you spend a long time writing that report?

18  A.   Yes, I did.

19  Q.   Do you remember how many hours you spent?

20  A.   No.  Lots.

21  Q.   A lot?

22  A.   Hundreds.

23  Q.   Hundreds.

24       So you know these portfolios really well?

25  A.   There's probably -- I don't know -- 2,000 pages.  So I'm

Jury Trial – Volume 2
November 14, 2017

1    not going to say I have 2,000 pages memorized, but I think I'm

2    familiar with all the most important pages.

3    Q.    Okay, Dr. Parker.

4          MR. YOUNG:  I would like to move to enter

5    Plaintiff's Exhibit 160 for the limited purpose -- I don't

6    know, Your Honor, if this is the appropriate means of doing

7    this -- for the limited purpose for allowing him to point to a

8    chart that he made as a demonstrative to help the jury

9    understand what he's going to talk about next.

10          MR. JOSEPH:  Your Honor, I don't know that a

11    demonstrative exhibit was proposed in the pretrial report on

12    this.  I'm not exactly sure what counsel is talking about.

13          MR. YOUNG:  Well, may I move to introduce the

14    report, Your Honor?

15          THE COURT:  Do you have an objection to the report?

16          MR. JOSEPH:  We don't have an objection to that

17    admission, Your Honor, no.

18          THE COURT:  All right.  I'll admit 160.

19          MR. YOUNG:  Thank you, Your Honor.

20    Q.    (BY MR. YOUNG)  Dr. Parker, can you please use the skinny

21    binder, the white binder.  I think it's under the stacks of

22    portfolios.  Yeah, there you go.

23          If you can go to Tab P-160.  That's Plaintiff's

24    Exhibit 160.

25          Okay.  Dr. Parker, is that the report you wrote?

Jury Trial – Volume 2
November 14, 2017

```
 1  A.    Yes.
 2  Q.    Okay.  Dr. Parker, I want you to turn to page 5 of that
 3  report.  And I will do my best to use the fancy video thing.
 4        MR. YOUNG:  Does anyone know how to get rid of those
 5  green marks?
 6        MR. JOSEPH:  May I approach to help him, Your Honor?
 7        THE COURT:  Yes.
 8        MR. YOUNG:  Thank you.  Thank you.
 9  Q.    (BY MR. YOUNG)  Hopefully everyone can see that chart on
10  their screens.
11        Dr. Parker, can you see that chart on that screen next to
12  you?
13  A.    Yes.  It's a bit blurry, but I can see it.
14  Q.    Okay.  So, Dr. Parker, can you explain to the jury how
15  you created this chart?
16  A.    I —— as we said before, I studied each of the portfolios.
17  I studied them in the context of national standards and lots
18  and lots of experience of reading these kinds of materials and
19  discussing them both informally with many, many other
20  professors and through formal proceedings.  And I appraised
21  how the different portfolios and the cases made in those
22  portfolios compared to each other.
23  Q.    And, Dr. Parker, I see there's —— it says summary of
24  rankings.  Then there are numbers:  1, 2, 3, 4, 5, 6.
25        Can you explain what something ranked in the 1 row means?
```

Jury Trial – Volume 2
November 14, 2017

1  A.   Yes.  That indicates the strongest case of the six cases
2  for promotion and for tenure.
3  Q.   And does it go down from there so the No. 2 row is the
4  second strongest case, and the third row is the third
5  strongest case, and so on?
6  A.   Yes.
7  Q.   Okay.  And then no offense to you, Dr. Parker, but
8  there's some little writing that says "tie" --
9  A.   Yes.
10  Q.   -- in some of those rows.
11      Can you explain to the jury what that means?
12  A.   Yes.  Any sports fan will know, but not everybody is a
13  sports fan.  So it means that, say, in the first row on the
14  left, the overall, that -- that Spencer and Tudor, under
15  No. 3, were tied in the third position.  So there's nobody
16  else who comes in fourth, because that fourth row is, in
17  effect, taken up by one of the first four who fit into those
18  top three categories.
19      It's very complicated to explain, but it's very simple.
20  Q.   So, Dr. Parker, I notice that you don't have any
21  indications on this chart that suggests that someone at
22  Southeastern, including Dr. Tudor, didn't merit tenure; is
23  that right?
24  A.   That is correct.
25  Q.   So, in your expert opinion, this is how, if you only

Jury Trial – Volume 2
November 14, 2017

1    looked at the portfolios, someone would appropriately rank

2    these; is that right?

3    A.   Oh, definitely, yes.

4    Q.   And you're sure of that?

5    A.   This is how someone -- when you say "this is how," I want

6    to make sure I understand what you mean.

7        If you mean would someone else come up with the same

8    ranking?  I expect that someone else would come up, another

9    qualified person, would come up with either the exact same or

10   a very similar ranking.

11           MR. JOSEPH:  Objection, Your Honor.  Calls for

12   speculation.

13           THE COURT:  Sustained.

14   Q.   (BY MR. YOUNG)  Okay.  This chart represents how you would

15   rank these portfolios based on your expertise

16   A.   Based on my expertise and my understanding of standard

17   procedure, yes.

18   Q.   You wrote this report about a year ago, something like

19   that?

20   A.   Somewhat more than that.

21   Q.   Okay.  My mistake.  It's been a long case.

22       Do you still -- the chart that's here on this screen that

23   the jury is looking at, do you still stand by these rankings?

24   A.   I do.

25   Q.   You're certain?

Jury Trial – Volume 2
November 14, 2017

```
 1   A.    Yes, I am.
 2   Q.    Okay.
 3             THE COURT:  Let me stop you here, and we'll take our
 4   morning break.  Don't discuss the case or permit others to
 5   discuss it with you.  Please be back -- do I have any smokers
 6   or are you-all staying up here during the breaks?
 7        Okay.  Then if you're staying here, be back in this room
 8   at ten till.  We'll be in recess.
 9        (Jury exits.)
10        (In recess from 10:30 to 10:55 a.m.)
11        (Jury enters.)
12             THE COURT:  Be seated.
13        Please proceed.
14             MR. YOUNG:  Thank you, Your Honor.
15   Q.    (BY MR. YOUNG)  Welcome back, Dr. Parker.
16        So, Dr. Parker, I want to go with you through all of
17   these portfolios.  To make it really efficient, I'm going to
18   go with you by criteria for all of them.  So I'm going to talk
19   to you about the teaching aspects of all of these portfolios,
20   the scholarship aspects of all of these portfolios, and the
21   service aspects of all of these portfolios.
22        Just in case you need them, they're in front of you, and
23   also your report is in front of you.  But to the best of your
24   ability, I just want you to use your own words to explain to
25   the jury some of these questions I'm going to ask you.  Okay?
```

Jury Trial – Volume 2
November 14, 2017

1    Now, Dr. Parker, can you explain very generally how you
2    evaluate a professor's teaching by looking at only a
3    portfolio?
4    A.   Yes.  There's a lot of relevant material that gives you a
5    lot of information.
6        You have the syllabi that they provide that are kind of
7    like pamphlets that guides the students through the class.
8    They give the assignments, the schedules, the procedures, the
9    policies, and the understanding of what the course and how the
10   teacher approaches the course.  So you learn a lot from that.
11       Then these portfolios also have a lot of reports from
12   individual students, a lot of reports from faculty who observe
13   the teaching, a lot of sample materials that are part of the
14   course, handouts, guides, suggestions to the students,
15   assignments, things like that.
16   Q.   I just have one clarification question; then we can move
17   on.
18       So a syllabus.  I know I've received many of those in my
19   life.  Does a lot of work go into making a syllabus?
20   A.   It should.  Not everybody does, but, yes.
21   Q.   So you wouldn't just, like, list the books you have
22   someone read; there's more process to it?
23   A.   Especially today.  Computers have grown that process a
24   lot.  So a syllabus is often very long, yes.  And it
25   represents the whole concept and design of the class.

Jury Trial — Volume 2
November 14, 2017

1   Q.   Do professors all do syllabi the same way?

2   A.   No.

3   Q.   So it's normal for syllabi to look slightly different

4   from professor to professor?

5   A.   Yes.

6   Q.   Is there something that makes a particular syllabi a good

7   one?

8   A.   A lot of things.  It should be clear.  It should

9   anticipate –– students get worried.  So they sometimes create

10  unclarity where there is no unclarity.  So it should

11  anticipate the kinds of things that will worry students and

12  address them and help them with that.

13      There are often university policies that it's helpful to

14  explain:  grading, disability questions, things like that.

15  So a good syllabus has those things.

16      A good syllabus, again, tells a story of how the course

17  will develop and how the students will learn across the length

18  of the course.

19  Q.   Is a good syllabus an important part of being a good

20  professor?

21  A.   Yes.

22  Q.   Can you tell the jury a little bit about what the

23  strengths of Tudor's teaching portion of her portfolio?  Let's

24  start with the 2009 one.

25  A.   Okay.  Yes, because there are the two.

Jury Trial – Volume 2
November 14, 2017

1    There are wonderful descriptions of each of the courses

2 in the 2009 portfolio.  I really enjoyed seeing her describe

3 how she started teaching the course in one way, saw some

4 strengths and weaknesses, made some adjustments, reimagined

5 the course based on the students' responses, based on the

6 kinds of teaching materials that were available to use.

7    That was fun to me, to see someone thinking through each

8 course and thinking of the course in terms of the kinds of

9 students that that particular course was attracting.  So that

10 was really interesting.

11    Other materials included, as I said, responses from

12 individual students, responses from –– the 2009, that didn't

13 have –– so responses from individual students and things like

14 that.  There wasn't as much in the 2009 as there was in the

15 2010.

16 Q.   And your understanding is you have a partial version of

17 the 2009 portfolio; is that right?

18 A.   That is correct.

19 Q.   Okay.  Are there some things that could have been

20 improved in Tudor's teaching portion portfolios?  Take them

21 together, the 2009 and the 2010.

22 A.   The 2010 didn't do as much to describe the individual

23 courses.  I don't know why there was a change, but, for some

24 reason, there was a change there.  It wasn't that there was

25 something that I would have noticed something missing if I

Jury Trial – Volume 2
November 14, 2017

1   hadn't already read the fuller descriptions in the 2009.

2        And I thought that -- I don't want to make too big of a

3   deal of it, but I did think that the font was too small for

4   the syllabi.  That may seem like a small matter, but if you

5   have older students who have difficulty reading smaller print

6   or students with disabilities, I think that was a poor choice.

7   It's not unusual, but I wouldn't recommend it.

8   Q.   Is that something that could have been easily fixed,

9   font size?

10  A.   Oh, sure.  Also, if a student asks for -- maybe these

11  syllabi were available electronically; I don't know.  But

12  sometimes students with disabilities want them electronically,

13  and then they can easily enlarge them.

14  Q.   So a fairly minor thing?

15  A.   Fairly minor, yes.

16  Q.   Okay.  Dr. Parker, can you remind us all how important

17  effective teaching is at a teaching university like

18  Southeastern?

19  A.   It's the center and the definition of how the university

20  understands its role, as it should be.  It's there to serve

21  students primarily, and you do that through teaching.

22        That's how Southeastern defines itself in its own

23  policies in that policy manual, Section 4.4.1.  It says it

24  exactly, that Southeastern is a teaching school.  Anybody in

25  the field nationally would know and understand that.

1  Q.   So, Dr. Parker -- and if you want to make reference to

2  your chart, the jurors have it on a screen in front of them.

3  So maybe you can just describe it or you can point.

4      How did Dr. Tudor's teaching across both of her

5  portfolios compare to the other professors at Southeastern who

6  you looked at?

7  A.   Well, you could see that it's a teaching school because

8  they all did a good job with their materials.  It was really

9  impressive.

10     So each one had its own style, which is also good to have

11  variety, but I would say overall they more fully -- the

12  syllabi were more fulsome than many other syllabi at other

13  institutions.

14     In the 2010 Tudor portfolio, there were, I believe, ten

15  testimonials from other faculty to Tudor's teaching, based

16  either on direct observation or on reading and summarizing the

17  students' evaluations of her teaching.

18     So that stood out as a particular strength, but each

19  one -- I could go through them one by one if you want.  I

20  don't know what you would like.  But each one had a lot of

21  strengths and a little bit different style.

22  Q.   I have a specific question for you about Dr. Tudor's

23  specific portfolio.

24     Is it a big deal to have so many positive references from

25  peers, from other professors?

Jury Trial – Volume 2
November 14, 2017

1   A.    It's –– especially at a small school, that's a lot of
2   people.  So that seems like a pretty strong and convincing
3   indication.
4   Q.    To your knowledge, professors who do teaching reviews
5   like that –– I assume they're pretty common –– do they take
6   that job seriously?
7   A.    I come out of –– when I observe a class, I probably come
8   out with typically –– I don't know –– 1500 words of notes.
9   Then I spend several hours turning that into a written report,
10  and then my colleagues read it, and then they meet and discuss
11  it.  So, yes.
12  Q.    To your knowledge, just generally, do professors who get
13  those types of reviews take them seriously?
14  A.    It will vary from school to school whether they actually
15  see them or not.
16  Q.    Uh-huh.
17  A.    But they will discuss them with the people who wrote
18  them, whether they see the document or not.
19        So, yes, of course.  They typically get nervous when
20  they're being observed.  It's an anxious but important moment
21  for them.
22        It was unusual that in Tudor's portfolios she brought out
23  that she invited any of her colleagues to visit her classes
24  and observe them at any time.  That was unusually open.
25  Q.    Why is that unusually open?

Jury Trial – Volume 2
November 14, 2017

```
1   A.   Because it indicates that you have a willingness to get
2   input from anybody at any time and that you have the
3   confidence to be observed at any time and the confidence to be
4   able to respond to your teaching.
5        When I observe someone's teaching, I let them choose a
6   specific time, but she was open to any time.
7   Q.   Can you tell me a little bit about how Dr. Tudor's
8   teaching, as you discerned it from both of her portfolios,
9   compared to the teaching strengths of her other colleagues in
10  the English department?
11  A.   Again, they were all impressive; they were all strong.
12       One of the differences in Tudor's is that she taught more
13  courses than anybody else, more different courses.  So that's
14  especially valuable because it allows a department flexibility
15  as student enrollments change or needs change.
16       Maybe something happens to someone and they can't teach
17  in a given year or semester, someone else who can teach a lot
18  of different courses is valuable because they can plug that
19  person into different courses.  So that was one thing that
20  stood out.
21       I forget exactly what you were asking.  Sorry.  Did I
22  answer your question?
23  Q.   So, overall, Dr. Tudor's teaching, as demonstrated by the
24  portfolios you reviewed, the 2009 and 2010 one, how it
25  compared to her colleagues, the other portfolios.
```

Jury Trial – Volume 2
November 14, 2017

```
 1  A.    It was very strong, and the others were also very strong.
 2  There was not -- you didn't look at these and think this one
 3  is much weaker than the others or this one is much stronger
 4  than the others.  They were all stronger than I'm accustomed
 5  to seeing.
 6  Q.    You did, though, on that chart up there -- you did
 7  rank --
 8  A.    Oh, yes.
 9  Q.    -- the portfolios, though, according to teaching?
10  A.    Right.
11  Q.    That second column.
12  A.    That's right, yes.
13  Q.    And --
14  A.    So -- okay.  If that's what you're asking, overall, if
15  you rank them -- I was asked to rank them, so I did.  It was
16  hard to make those distinctions among the -- in the area of
17  teaching because they were all strong.
18        But, nevertheless, I thought that, amongst the -- amongst
19  all of them, as you can see on the chart, that the second
20  strongest was the 2010 portfolio from Tudor.  And I thought
21  that tied for third would be her 2009 portfolio.
22        And the difference between the -- the biggest
23  differentiation there between the 2009 and 2010 was those many
24  testimonials from her colleagues that were in the 2010 that
25  were not in the 2009.
```

1  Q.   Can you remind the jury, how at a teaching school like

2  Southeastern should Tudor's effective teaching, as

3  demonstrated through her portfolios, be weighed in the tenure

4  process?

5  A.   It's absolutely essential.

6       If that -- if there is not a strong teaching record, then

7  I would not expect the person to get promotion and tenure, and

8  it would be the most important consideration.

9  Q.   So not the only consideration, but you're certain it's

10 the most important consideration?

11 A.   That is correct.  That's what the -- that's what the

12 rules also state in that manual.

13 Q.   Okay.  That manual is the thing that we're going to call

14 the AAPM?

15 A.   Yes.

16 Q.   Okay.  Now, I'm going to take you through scholarship.

17 And, again, to speed this up, we're going to talk about all

18 the portfolios at once --

19 A.   Okay.

20 Q.   -- with obvious focus on Dr. Tudor's portfolios.

21      Can you explain to me very generally how you go about

22 evaluating a professor's scholarship just by looking at the

23 portfolio?

24 A.   Well, the portfolios often included the scholarship.

25 They always listed and describe the scholarship.

Jury Trial – Volume 2
November 14, 2017

1        So you read those items one by one, and you read any
2   descriptions of them, and you read that in the context of
3   doing this all the time.  It's a perfectly standard process.
4   And if they were provided in the portfolio, you read that.
5        There was one case where they were not provided, and I
6   went and got the publications from the library at my
7   university.  That was for Spencer.
8   Q.   So I'm going to ask you a little bit about that.
9        So you said that some of the publications for Dr. Mark
10  Spencer weren't provided to you, but, as a professor, you knew
11  how to go about getting those things?
12  A.   Yes.
13  Q.   Is that pretty standard?
14  A.   Absolutely.
15  Q.   Would it be surprising to you if someone couldn't find
16  articles if they're a tenured professor?
17  A.   Yes, that would be unimaginable.
18  Q.   Unimaginable.  Okay.
19       One clarification question:  What if it were a really
20  obscure article, like, it were published by an in-house press
21  or it was published long ago?  If it were an academic article,
22  would most tenured professors, in your experience, know how to
23  track that article down somehow?
24  A.   Oh, yes.  Some would be harder than others, but there is
25  a way to get it if it's been published.

Jury Trial – Volume 2
November 14, 2017

1  Q.   Do you think that that's an essential skill that someone

2  who's received tenure before might have, the ability to track

3  down articles?

4           MR. JOSEPH:  Objection, Your Honor.  This is outside

5  the scope of the report.

6           THE COURT:  Is it?

7           MR. YOUNG:  I think to the extent that he's

8  testifying about how he went about getting these articles and

9  it's something that's within his expertise to do, Your Honor,

10  it's within scope.

11          THE COURT:  Well, it is cumulative.  I thought that

12  was going to be your objection.

13          MR. YOUNG:  Okay.

14          THE COURT:  You've already gotten it.  Move on.

15          MR. YOUNG:  I can move on, Your Honor.  Thank you.

16  Q.  (BY MR. YOUNG)  I'm going to move on, Dr. Parker, if

17  that's okay.

18       So, Dr. Parker, to your understanding, what sorts of

19  activities count toward scholarship?

20       I think we've talked a lot about articles.  We have an

21  understanding what those have.  Are there other things other

22  than articles?

23  A.   Yes.  The most important things are the actual

24  publications.  Overwhelmingly, the most important things are

25  those publications, which could be articles or it could be

Jury Trial – Volume 2
November 14, 2017

1  books, though there are no books in any —— published books in
2  any of these portfolios.  So it's article-centered.
3      Other things could be supporting evidence but not central
4  evidence.  So those could be presentations made at conferences
5  or —— well, presentations made at conferences.  There are
6  different kinds of conferences, but, yes, that would be
7  secondary.
8  Q.   Just to clarify, when you say "conferences," are these,
9  like, academic conferences?
10  A.   Yes.  Those are conferences where professors and
11  potential professors and other interested people from —— often
12  from around the world, depending on the conference, or across
13  the nation or sometimes local conferences, get together to
14  share their research with each other.  And those are a helpful
15  way of trying out research while it's on its way to getting
16  developed to where it might get published.
17      But they are much less important than the actual
18  publication because only the people at the conference hear
19  that, whereas a publication is accessible to anyone who's
20  interested.
21  Q.   So when you're reviewing scholarship of one of these
22  portfolios, do you just look at the CV?  What do you look for
23  to evaluate its quality?
24  A.   Well, again, you look at it in the context of familiarity
25  with the patterns that academic careers follow.  And you look

 1    at it with a familiarity with the kinds of research.  You can

 2    often tell a lot just from -- a title of an article might

 3    place it in a conversation or a dialogue or a style or an

 4    approach.

 5         You look at where it was published and what kind of

 6    reputation that has and how widely accessible and known that

 7    material -- how easily accessible and known that publication

 8    might be.

 9         And you read it, ideally.  If you're evaluating something

10    in your field, you read it.

11    Q.   You clarified there, if you're evaluating something in

12    your field.

13         Are there insights that someone who's a specialist,

14    someone who's an English professor, bring special experience

15    or expertise to reading other articles in the field of

16    English?

17    A.   Oh, absolutely.  It would be almost a foreign language

18    sometimes to people who were not in the field.

19         It would vary from article to article.  Some articles are

20    written for a wider audience and some for a narrower audience.

21    Q.   So let's talk a little bit about Dr. Tudor's scholarship

22    in her 2009-10 portfolio.

23    A.   Yes.

24    Q.   Did you see any evidence of scholarship in that

25    portfolio?

Jury Trial – Volume 2
November 14, 2017

```
 1   A.   Yes.  There was a presentation at a local conference.  So
 2   that wouldn't count for much.
 3        And there were two articles that would count a good deal.
 4   Q.   Okay.  And how did you review those two articles?  Were
 5   they in that portfolio, that portfolio you got?
 6   A.   One was.  And I read it, and I judged it in that context.
 7        And the other was in the 2010 portfolio.  So I did not
 8   read that one until I read the 2010 portfolio.
 9   Q.   Can you just explain to the jury how the article was in
10   the portfolio but it wasn't physically in it?
11   A.   Excuse me.  Thank you.
12        It was listed, but it wasn't provided.
13   Q.   Listed where?
14   A.   Listed in the CV.
15   Q.   Okay.  Now, you mentioned that there were two articles in
16   that 2009-10 portfolio listed on the CV.
17        Were those two articles peer-reviewed?
18   A.   Off the top of my head, I remember definitely that one
19   was.  I believe both were, but I'd have to check.
20   Q.   Okay.  Well --
21   A.   I'm pretty sure both were.
22   Q.   Well, the jury will have the benefit of your exhibit.
23   A.   Right.  I can check here if you --
24   Q.   I'll proffer to you that both were, and you say both were
25   in your report.
```

Jury Trial – Volume 2
November 14, 2017

1   A.   Okay.  There was one somewhere in the 2010 that wasn't,

2   and I'm not sure I'm remembering which one it was.

3   Q.   It's okay.  We can move on.

4        Why are peer-review articles important evidence of

5   scholarship?

6   A.   Because it's not just based on just one person's opinion

7   or somebody's friendship with the editor or something -- if

8   there is a friendship with the editor or something like that.

9        It's other people from -- who often don't even know whose

10  work they're reviewing who are giving an independent judgment

11  based on that.  So when I peer review work, I usually don't

12  even know whose work it is; I'm just judging the work as an

13  outside observer.

14       So that's why that really establishes the credibility of

15  that publication.

16  Q.   I just want to ask you one clarification question there.

17       So you said a lot of the time that you review articles,

18  you don't know whose article that is.

19       Is that because there's no identifying information on the

20  article; you're just looking at the article?

21  A.   The editors take off the name.

22  Q.   And that, in your experience, is a good way to keep

23  things neutral?

24  A.   Oh, yes.  That's the whole reason for it.

25  Q.   So how did Dr. Tudor's scholarship in her 2009 portfolio

Jury Trial – Volume 2
November 14, 2017

```
 1   compare to the scholarship of other professors in
 2   Southeastern's English department?
 3   A.   Well, very strongly.
 4        If you -- if you look -- I don't know if you want to look
 5   at this chart, then you can see that she published more
 6   than -- I'm sorry.  In which portfolio?
 7   Q.   One moment.  Let me give you -- let me project a
 8   different page of this.
 9   A.   Okay.
10   Q.   I think I know what you're doing.
11        Are you looking for this, Dr. Parker?
12   A.   Sure.
13   Q.   Okay.
14   A.   So as you can see from this chart here, she published a
15   lot more than the other -- the other candidates published and
16   a lot more in numbers of articles, a lot more in peer-reviewed
17   articles.  And it wasn't even close.
18        And I should note here that this lists Spencer as three,
19   but actually there's no record of whether one of those was
20   included in the portfolio.  So it might be two.
21        So the numbers -- there's just a huge difference.  And
22   that seems pretty clear, something that I can't imagine how
23   someone could argue with that.  So it also then depends on
24   reading the articles and how serious were they?  How good were
25   they?  How strong were they?  How much did they advance a
```

Jury Trial – Volume 2
November 14, 2017

1    discussion forward?  And they were really good at that.

2    Q.    I'm just going to move this.  This is partially my fault.

3    I'm not great with this little projector.

4          I think the top chart is the number of accepted articles?

5    A.    Yes.

6    Q.    This other chart is the number of accepted peer-review

7    articles?

8    A.    That's correct.

9    Q.    So those charts are a little bit different; right?

10   A.    Yes.

11   Q.    What's the difference?

12   A.    The difference is -- I don't know if you can see them

13   both at once, but one -- if you can shrink it perhaps.

14         But one of the -- one of Tudor's articles was not

15   peer-reviewed, and one of Cotter-Lynch's articles -- or

16   Cotter-Lynch's only article was not peer-reviewed.

17         This is where reading the materials is also a huge part

18   of the process, because you might wonder, well, why do I rank

19   Cotter-Lynch the strongest even though she published less?

20         Her work was that good.

21   Q.    Uh-huh.

22   A.    It was truly, extremely good.  So even though she didn't

23   publish as much, I actually ranked hers even stronger than

24   those who published more because the difference was that

25   strong.

Jury Trial – Volume 2
November 14, 2017

1   Other than that, there wasn't as much difference among
2 the different articles, but I did think that Tudor's was well
3 above the others.
4 Q. Dr. Parker, in your expertise from what you know about
5 teaching universities, is it unusual for a professor at a
6 teaching university just going up for tenure to have as many
7 articles as Professor Tudor had?
8 A. Yes.  Not unheard of, but unusual.
9 Q. Okay.  Dr. Parker, did you review a worksheet evaluation
10 completed by Dean Lucretia Scoufos for Tudor's 2009–10
11 portfolio?
12 A. I did.
13 Q. Tell me about that worksheet.  What did you glean from
14 it?
15 A. I can go into more detail, if you'd like, but it ranked
16 Tudor's teaching highly, and it ranked her research and her
17 service very low.
18 Q. Well, let's talk about research.  When you say
19 "research," you mean scholarship; yes?
20 A. Yes.
21 Q. So --
22 A. Research and scholarship in this context mean the same
23 thing.
24 Q. Mean the same thing?
25 A. And that can get a little confusing to people who may not

Jury Trial – Volume 2
November 14, 2017

1   be used to that.

2   Q.   Okay.  Were -- Scoufos's criticisms of Dr. Tudor's

3   scholarship, were they consistent with how Scoufos evaluated

4   other professors in the English department?

5   A.   No.

6   Q.   How were they inconsistent?

7   A.   Well, you have someone who is publishing and rated low in

8   research.  And then you have, in other portfolios, someone who

9   is publishing either less or not significantly at all, and

10  they were rated higher.

11  Q.   In your opinion, did Scoufos's -- I'm going to focus just

12  on the scholarship evaluation she gave to Dr. Tudor.

13       Did that evaluation make sense?

14  A.   I didn't understand it.

15  Q.   Did you try hard to understand it?

16  A.   I tried to understand it by comparing it to the others,

17  and I couldn't find any consistency there.

18  Q.   Did you also review a worksheet evaluation completed by

19  Vice President Doug McMillan?

20  A.   I did.

21  Q.   Can you tell the jury a little bit about what your review

22  of that worksheet revealed to you?

23  A.   Yes.  It would be the same as what we just said about --

24  Q.   Scoufos.

25  A.   -- Scoufos's.

1      And, again, the teaching was rated highly, and the

2  service and research were rated low.  And I didn't understand

3  how one could reach those conclusions in comparison to the

4  other portfolios.  It seemed inconsistent.

5  Q.    Inconsistent because the other portfolios set a bar?

6  A.    That's correct.

7  Q.    Okay.

8  A.    A bar below what Tudor accomplished.

9  Q.    Thank you.

10      So let's talk a little bit about what you discovered when

11  you reviewed the scholarship portion of Tudor's 2010

12  portfolio.

13  A.    There was a huge burst of publication.  Those articles

14  had mostly been submitted, I should say, at the time of the

15  2009 portfolio.

16      And part of the inconsistency there was that Spencer's

17  portfolio was given credit for submitting, I believe it was,

18  four articles, not accepted for publication, not published,

19  but for submitting them.  And Tudor's was not given credit for

20  having submitted 11.  So I didn't understand that

21  inconsistency there.

22      And then when you get to the 2010 portfolio, most of

23  those articles had been accepted, and many of them had been

24  published by that point.  So they had crossed that next big

25  hurdle.

Jury Trial – Volume 2
November 14, 2017

1      It's one thing to submit something and another thing for

2  it to get accepted.  And that's the key line there.  And,

3  still, I didn't see anything to indicate that she was given

4  credit for those accomplishments.  It didn't at all match the

5  way other people were given credit for their accomplishments.

6  Q.    So can we talk a little bit about the differences between

7  Tudor's 2009 and 2010 portfolios when it comes to scholarship?

8      You said there was a huge burst?

9  A.    Yes.

10 Q.    What's the numerical breakdown?

11 A.    Well, as you can see on this chart, we're talking about

12 eight articles accepted or published –– either accepted or

13 accepted and published, and seven of those peer-reviewed.  And

14 the previous year it was two.

15     So that's a burst from two to eight.  That's a huge

16 increase, and it's a large number regardless.

17 Q.    Just to clarify things because academic stuff is weird.

18 A.    Sure.

19 Q.    What does it mean to submit an article, to have it

20 accepted, and then to have it published?

21     Just simple terms, if possible.

22 A.    So if you write it and then you send it to the editors,

23 that's submitting it.

24 Q.    Okay.

25 A.    When the editors put it through this process of reading

Jury Trial – Volume 2
November 14, 2017

1   it, studying it, comparing it to other work, having peer

2   reviewers read it, study it, report on it, then having the

3   editors consider those reports, perhaps with other editors in

4   discussion, and then decide either to accept it or not to

5   accept it.  So that's the next hurdle.

6        And then it's just an administrative process between

7   acceptance and publication.  But until it's published, no one

8   else has it to read.  So that's an important hurdle, but it's

9   not any more of an accomplishment.

10  Q.   Okay.  And professors know these things?

11  A.   Oh, yes.

12  Q.   Okay.  Now, how many of Tudor's articles in the 2010

13  portfolio would be considered to be peer-reviewed, the gold

14  standard you talked about before?

15  A.   Seven out of eight.

16  Q.   Is that significant?

17  A.   Very much.

18  Q.   Can you just remind us why that's significant?

19        MR. YOUNG:  I can move on, Your Honor.

20  Q.   (BY MR. YOUNG)  Dr. Parker, let's move on to service.

21        Can you explain to me very generally how you went about

22  evaluating a professor's service by looking at the portfolio?

23  A.   Yes.  They list what they've done for their service on

24  their CV, and then they had -- there were reports from other

25  professors evaluating their service, particularly in Tudor's

Jury Trial – Volume 2
November 14, 2017

1  case in the 2010 portfolio.  And sometimes they listed
2  nominations for an award for extraordinarily strong service.
3      And I should have said that as well for the teaching.
4  That was also the case, that some of them were nominated for
5  an award for an exceptional teaching or, in one case, even won
6  that award.
7  Q.   So when you're looking at the service section of a
8  portfolio, what kind of documents evidence good service?
9  A.   Well, primarily that list, but it's also helpful to have
10  the experience to put that list in context.
11      So when someone says, for example, that they're on the
12  committee that is in charge of hiring new faculty --
13  Q.   Uh-huh.
14  A.   -- that you know is a major committee because that's one
15  of the most important things the faculty can do.  Those are
16  the people -- the people who they hire are the people who will
17  teach the next group of students.  So that's really important.
18      So Tudor and Cotter-Lynch were both on that committee.
19  So that's an example.  You look at that and you know that
20  that's a really important committee and an extremely
21  time-consuming committee because you've got so many people who
22  want those jobs.  So it's a lot of applications to read,
23  interviews, and important decisions to make.  And you have to
24  work with other people through that process.  It's extremely
25  time-consuming.  That's a really important committee.

 1        Other times, you don't necessarily know how important the

 2    committee is unless there's testimony to it.  So there was an

 3    assessment committee that Tudor chaired for several years.

 4    And you have people --

 5              THE COURT:  Wait, wait.  Take a long, slow, deep

 6    breath.

 7              THE WITNESS:  Thank you.

 8        So there was an assessment committee that Tudor chaired

 9    for several years, and you have letters from her colleagues

10    describing that as an extremely important committee, even

11    perhaps the most important in the department.

12        That tells you, again, that that's an important committee

13    and that that work is extremely -- is the sort of work that

14    you assign to someone who you trust to do a good job.

15        And they also reported that she did do a good job.

16    Q.  (BY MR. YOUNG)  So how did Tudor's service in both the

17    portfolios, 2009 and 2010, compare to the evidence of service

18    that you saw in those other portfolios?

19    A.  I was impressed by the service records of all the

20    candidates.  It was hard to differentiate between them.

21        There was even more, I thought, for Spencer and

22    Cotter-Lynch.  So I put them a little higher, just a little

23    bit, and the nominations for the service award that they had

24    as well.

25        So it was impressive that there seemed to be a group

Jury Trial – Volume 2
November 14, 2017

1  spirit, that people pulled their oar and each took their turns

2  at the same kinds of service.  And that made it, as a group,

3  very impressive and hard to rank one above the other.

4       Tudor, for example, was elected by the faculty –– not

5  just the department, but the faculty –– to the faculty senate.

6  That suggested that other people trusted her and valued her

7  responsibility and her decision-making.

8       And other candidates –– other portfolios indicated

9  similar responsible activities by each of the candidates.  So

10  they were all very strong.  It didn't seem that you could put

11  one in a completely different category from the others.

12  Q.   So were there any meaningful differences between Tudor's

13  two portfolios and the rest of them when it comes to service?

14  A.   Not major, meaningful differences in ranking them, but

15  they did do somewhat different things from one person to

16  another.  But they all contributed impressively.  There were

17  slight differences in ranking.

18  Q.   As to your ranking?

19  A.   Yes.

20  Q.   Having reviewed all of these portfolios, do you see any

21  reason why Southeastern administrators would rank Tudor's

22  service lower than the other successful candidates you looked

23  at?

24  A.   I see no reason why they would do that.

25  Q.   Nothing?

Jury Trial – Volume 2
November 14, 2017

```
 1   A.    I don't see anything.
 2   Q.    Okay.  Dr. Parker, before I pass you off to one of my
 3   colleagues at that lovely table over there, I'm just going to
 4   ask you to tell the jury what your ultimate takeaway is here.
 5   A.    Thank you.
 6             THE COURT:  Let me have counsel at the bench,
 7   please.
 8         (The following proceedings were had at the bench and out
 9   of the hearing of the jury.)
10             THE COURT:  We have the distinct disadvantage in
11   this case of almost every witness being a Ph.D., which makes
12   them all experts even if they're not testifying as experts,
13   which means they're going to talk forever if you let them.
14         I'm not going to permit you to ask a question like this
15   of this or any other witness.  We have got to rein this thing
16   in.
17             MR. YOUNG:  Yes, Your Honor.
18             THE COURT:  You are repeating a whole lot of stuff.
19   Any question that begins, "Can you remind the jury," means
20   that it's already been said once.  I'm going to start jumping
21   in.
22             MR. YOUNG:  Yes, Your Honor.
23             THE COURT:  I don't want to embarrass you or anybody
24   else, but we've got to move this along.
25             MR. YOUNG:  Yes, Your Honor.
```

Jury Trial – Volume 2
November 14, 2017

```
 1              THE COURT:  Okay?
 2              MR. YOUNG:  Your Honor, if it's okay, may I just
 3   tell them a brief takeaway.
 4              THE COURT:  The report is in evidence.
 5              MR. YOUNG:  Okay.
 6              THE COURT:  If you have a specific question that
 7   does not repeat what he's already said, which I can't believe,
 8   then ask it.  But, no, you can't ask an open-ended question
 9   like that of a Ph.D.
10              MR. YOUNG:  Yes, Your Honor.
11              MR. JOSEPH:  If brevity is the soul of wit, let us
12   have soul today.
13              THE COURT:  Yes.
14        (The following proceedings were had in open court with
15   all parties present and within the hearing of the jury.)
16   Q.  (BY MR. YOUNG)  Dr. Parker, I'm going to withdraw that
17   last question I asked you, and I'm going ask you a different
18   final question, then I'll pass you off.
19        I believe you previously stated that you had written this
20   report about a year and a half ago or so.
21        Has anything changed in your mind since you wrote that
22   report about the evaluations or assertions you made in it?
23   A.  About the evaluations or the assertions, no.
24        As I reread it, I sometimes thought I could phrase a
25   phrase a little better or I saw a typo or two or things like
```

Jury Trial – Volume 2
November 14, 2017

1  that, but nothing of substance.
2          MR. YOUNG:  Okay.  I'm going to pass the witness.
3      Thank you, Your Honor.
4          THE COURT:  Mr. Joseph?
5          MR. JOSEPH:  Thank you, Your Honor.
6                        **CROSS-EXAMINATION**
7  BY MR. JOSEPH:
8  Q.    Dr. Parker, you've never served as a university
9  president, have you?
10 A.    No, I have not.
11 Q.    Okay.  Have you ever served as a vice president for
12 academic affairs?
13 A.    No, I have not.
14 Q.    Have you ever served as the dean of a college?
15 A.    No.
16 Q.    Okay.  Dr. Parker, do you agree that professional people
17 in the same workplace can have legitimate differences of
18 opinion without it being discriminatory?
19 A.    Yes.
20 Q.    Dr. Parker, I can't remember if you said this or not, but
21 is it your opinion that student evaluations should play a role
22 in an applicant's tenure and promotion portfolio packet?
23 A.    It depends on how they're presented.
24 Q.    Okay.  And would you agree with me that, if a professor
25 only submits positive evaluations, that may be showing a

Jury Trial – Volume 2
November 14, 2017

1   skewed picture to the committee?

2   A.   May be?

3   Q.   Okay.

4   A.   Hold it.  Excuse me.  I'm asking if that's what you're

5   asking.  It may be -- I mean, I don't understand how to answer

6   that question.

7   Q.   Let me ask --

8   A.   If you ask me whether it is or it isn't, I can answer.

9   But I don't know how to answer "may be."

10  Q.   Okay.  Let me see if I can focus it a little bit.

11  A.   Sure.

12  Q.   Would it be your opinion that it is a more accurate

13  depiction of a professor if they include both positive and

14  negative student evaluations in their promotion packet?

15  A.   Can I take a little flexibility to try and answer your

16  question?

17            THE COURT:  No.  Answer the question.

18            THE WITNESS:  I don't know how to answer that

19  question.  It's not phrased in a way that I understand as

20  matching actual circumstances.

21  Q    (BY MR. JOSEPH)  Okay.  Have you ever seen a portfolio

22  that includes both positive and negative student evaluations?

23  A.   Yes.

24  Q.   Okay.  Did you find that more helpful than a portfolio

25  that only included, for example, positive evaluations?

Jury Trial – Volume 2
November 14, 2017

```
 1   A.    Yes.
 2   Q.    Okay.  Dr. Parker, did you offer Dr. Tudor a job at your
 3   university?
 4   A.    No.
 5   Q.    Okay.  And just so we're clear, has she applied for a job
 6   at your university?
 7   A.    I don't know.
 8   Q.    Okay.  If she did, would you hire her?
 9   A.    If she did when?
10   Q.    If she applied for a job in 2009, would you hire her at
11   your university?
12   A.    No.
13   Q.    Okay.
14   A.    Well, excuse me.  It depends on the job.
15   Q.    Okay.  If she were applying for the position of tenure
16   track professor in 2009 at your university, would you hire
17   her?
18   A.    No.  She would be too advanced.
19   Q.    Okay.  In 2008 and 2009, Dr. Tudor submitted a tenure and
20   promotion portfolio, didn't she?
21   A.    I don't know.
22   Q.    Okay.  Would it surprise you to learn that she did?
23   A.    No.
24   Q.    Would it surprise you to learn that she withdrew that
25   application?
```

Jury Trial – Volume 2
November 14, 2017

1   A.   No.

2   Q.   Were you on any of Dr. Tudor's tenure and promotion

3   committees?

4   A.   No.

5   Q.   Were you given Dr. Tudor's 2008 application portfolio in

6   your review?

7   A.   No.

8   Q.   Okay.  Did you actually sit down and review Dr. Tudor's

9   tenure and promotion packet as it was submitted to the 2009

10  committee?

11  A.   I don't know.  I don't know what was submitted.

12  Q.   So it's fair to say that you don't have any idea what the

13  2009 application committee actually looked at, do you?

14  A.   It's not fair to say that I don't have any idea.

15  Q.   Would it be fair to say that you'd have an incomplete

16  idea?

17  A.   Yes.

18  Q.   Okay.  Do you have a complete copy of Dr. Tudor's 2009

19  application portfolio anywhere?

20  A.   No.

21  Q.   Okay.  Have you ever seen one?

22  A.   No.

23  Q.   Is it your testimony today that the materials that you

24  reviewed to prepare your expert report in this case looked

25  exactly like Dr. Tudor's tenure and promotion portfolio as it

Jury Trial – Volume 2
November 14, 2017

1  was received in 2009 by that committee?

2  A.   No.

3  Q.   Okay.  Dr. Parker, on page 16 of your report, you state

4  that, quote, Dr. Tudor's 2009 portfolio listed 11 submitted

5  article manuscripts.

6      But you don't actually know for certain what was in her

7  portfolio in 2009, do you?

8  A.   I know that it listed 11 submitted manuscripts.

9  Q.   How do you know that?  Because you actually saw the

10 portfolio in 2009?

11 A.   I saw that part of the portfolio that said that.

12 Q.   But, again, you don't know what the complete portfolio

13 held; correct?

14 A.   I don't know everything that was in the portfolio.

15 Q.   Okay.  Dr. Parker, does neatness and organization count

16 in tenure and promotion applications?

17 A.   I'm not sure how to even answer that question.  I –– it's

18 not an issue that I've ever heard coming up.

19     I suppose you can imagine a hypothetical case where that

20 might be –– might come up as an issue, but I would think

21 somebody would –– if that was an issue, somebody would address

22 it before a decision was made.

23 Q.   Is that because most people applying for tenure and

24 promotion understand what's expected of them?

25 A.   Most people?  Yes, most people do.

Jury Trial – Volume 2
November 14, 2017

 1   Q.   Okay.

 2   A.   "Most" meaning more than 51 percent –– 50 percent.  I

 3   don't know that everybody understands.

 4   Q.   Okay.  I would agree with you.  Most –– not necessarily

 5   everyone understands.

 6        In the review of the tenure and promotion packets, if the

 7   dean of the college in this case will testify that she

 8   expected all portfolios to match a certain format, would you

 9   agree that that's a reasonable expectation?

10   A.   If the candidates are informed of that.

11   Q.   Okay.  And if the candidates deviate from that, would it

12   be expected that that would count against them?

13   A.   In my experience, they frequently do deviate from it.

14   They're nervous, and they don't process everything they're

15   told.

16   Q.   Okay.  So mistakes happen; right?

17   A.   Yes.

18   Q.   Okay.  So without Dr. Tudor's complete 2009–10 portfolio,

19   do we have any idea whether or not Dr. Tudor's portfolio

20   complied with the dean's technical and formatting

21   requirements?

22   A.   I have not seen those requirements, so I can't comment on

23   that.

24   Q.   Okay.  Dr. Parker, did you read Dr. Tudor's candidate

25   letter in support of application for tenure and promotion?

1   A.    When?

2   Q.    Well, the one that was submitted purportedly with her

3   2009 application.

4   A.    Yes.

5   Q.    Okay.  Do you have a copy of that in front of you?  Just

6   for reference, it is Plaintiff's Exhibit 1.  I'm not sure what

7   book you have in front of you, sir.

8   A.    I believe I saw that portfolio.  I don't remember it

9   being that number.  It's one of these.

10         MR. YOUNG:  Mr. Joseph, it's the small white binder.

11   It should be the first exhibit in it.

12         THE WITNESS:  Here?

13         MR. YOUNG:  Yes.  I'm just trying to help you out.

14         MR. JOSEPH:  Thank you, Counsel.  Anything to speed

15   this along and help the witness get where he needs to be.

16         THE WITNESS:  Do you want me to find the copy?

17   Q.    (BY MR. JOSEPH)  Yes, if you don't mind, please, sir.

18         It's -- it has been entered into evidence.  So if it's

19   all right with Her Honor, I'd like to put it on the overhead.

20   This may help things -- may help you find it.

21   A.    Here it is.

22   Q.    Okay.  You found it, sir?

23   A.    Yes.  It's probably easier to read here than on the

24   screen.

25   Q.    Okay.  Now, do you know if this particular letter was

Jury Trial – Volume 2
November 14, 2017

1  included with Dr. Tudor's 2009 and '10 application?

2  A.   It's part of the application as I have the application

3  here.

4  Q.   Okay.  And just to clarify, you were provided that by

5  counsel for plaintiff; correct?

6  A.   I don't know the legal terms to be able to answer that

7  question.

8  Q.   Okay.  Let me ask you this way:  You didn't get it from

9  the university, did you?

10  A.   That is correct.

11  Q.   Okay.  Do you see in that letter, which is part of

12  Plaintiff's Exhibit 1, it says in the first line -- doesn't

13  Dr. Tudor write, "I believe that every worker deserves tenure

14  and promotion in exchange for the sacrifice of one's life,"

15  and then goes on, "opportunities, et cetera."

16      Did I read that correctly?

17  A.   Actually not.

18  Q.   Okay.  Would you like to read that for me, please?

19  A.   "I believe that every worker deserves tenure and

20  promotion in exchange for the sacrifice of years of one's life

21  and opportunities, et cetera."

22  Q.   Okay.

23  A.   Sorry.  You skipped some words and --

24  Q.   That's okay.  That's okay.  I appreciate the

25  clarification.

Jury Trial – Volume 2
November 14, 2017

1       But mere sacrifice of one's years and opportunities isn't

2   how tenure works, is it?

3   A.   You're correct.

4   Q.   Okay.  If you'll look with me at the second paragraph in

5   that letter, Dr. Tudor writes that she has requested letters

6   of support from, quote, "three colleagues whom I most admire

7   and respect at Southeastern."

8       Do you see where I am, sir?

9   A.   Yes, I do.

10  Q.   Then she goes on to list the department secretary, a

11  full-time Spanish instructor, and a full-time history

12  instructor.

13      Do you see that?

14  A.   Yes, I do.

15  Q.   Now, do you have any understanding, sir, if either of

16  those two instructors were tenured members of the faculty?

17  A.   I would expect they could not be.

18  Q.   Okay.  And why would you expect that?

19  A.   Because there's nothing to indicate that they are tenure

20  track faculty members, which would define those who are

21  eligible for tenure according to standard practice and

22  Southeastern's rules.

23  Q.   Okay.  In terms of the department secretary, do you have

24  any understanding about whether or not she was a tenured

25  member of the faculty?

Jury Trial – Volume 2
November 14, 2017

1   A.   She would not be.

2   Q.   Okay.  And why do you make that conclusion, sir?

3   A.   Because she's not a member of the faculty if she's a

4   secretary to the faculty.

5   Q.   Okay.  Now, isn't part of being a good writer knowing

6   your audience?

7   A.   Yes.

8   Q.   And who was the intended audience of this letter, as you

9   understand it?

10  A.   There would be a series of levels that would read it at

11  different parts of the process, and I don't know exactly who

12  is participating at each level.

13  Q.   Would you agree with me probably the first level would be

14  a departmental committee?

15  A.   That's typical.

16  Q.   Okay.  And who typically sits on a departmental

17  committee?

18  A.   Faculty in the department.

19  Q.   And is it restricted to tenured faculty typically?

20  A.   Yes.

21  Q.   Okay.  And above the faculty committee, do you know what

22  the next level is for review of tenure and promotion at

23  Southeastern?

24  A.   I have not seen a document laying this out.  So I could

25  surmise it from the other documents.  But various levels of

Jury Trial – Volume 2
November 14, 2017

1    administrators.

2    Q.    I don't want you to speculate.  I just was curious if you

3    had seen such a diagram.

4         If you would, drop down in that same letter where we were

5    just looking, sir, and you'll find a sentence towards the

6    bottom about three lines up that begins "their letters."

7         Would you mind reading that to the jury, please.

8    A.    The whole sentence?

9    Q.    Yes, sir.

10   A.    "Their letters in support of my candidacy for tenure and

11   promotion demonstrates a generosity of spirit that shames a

12   policy that denies them the same benefit."

13   Q.    Now, is there any grammatical error in that sentence,

14   sir?

15   A.    Yes.

16   Q.    What is that grammatical error?

17   A.    That "Their letters in support of my candidacy for

18   promotion demonstrates," so that's what we call an agreement

19   error.

20   Q.    That would be that the noun or the subject doesn't agree

21   with the verb; is that correct?

22   A.    That's correct.

23   Q.    Do you think it would have been important to a reviewing

24   member of a committee if they had seen subject/verb

25   disagreements in the candidate's opening letter?

Jury Trial – Volume 2
November 14, 2017

```
 1   A.    Important?  No.

 2   Q.    No?  Okay.

 3         Ideally, wouldn't a cover letter be free of grammatical

 4   errors in an English Ph.D.'s application for tenure?

 5   A.    Ideally, it would.

 6   Q.    Okay.  Did you find any grammatical errors in the cover

 7   letter of Dr. Cotter-Lynch?

 8   A.    I don't remember.

 9   Q.    Okay.  What about Dr. Spencer?

10   A.    I don't remember.

11   Q.    What about Dr. Barker?

12   A.    Barker, I don't remember.

13   Q.    Okay.  Now, you alluded to it earlier, but do you have an

14   understanding, sir, that the tenure and promotion review

15   process at Southeastern is a multilevel process?

16   A.    Yes.

17   Q.    And is that the case at your own university?

18   A.    Yes.

19   Q.    Okay.  Feel free to take a drink.  I don't want to rush

20   you.

21         Is that the -- is the fact that a tenure and promotion

22   process is a multilevel process pretty standard at American

23   universities today?

24   A.    Yes.

25   Q.    Okay.  Do you know, other than perhaps the departmental
```

1    committee, any of the steps of review in the process at

2    Southeastern as it stood in 2009 and '10?

3    A.   There's some descriptions of it in the policies and

4    procedures manual.  I don't remember all of those details, but

5    it goes through the department committee, then the department

6    head and then –– or chair, and then it goes to a dean, vice

7    president, and the president.  Something like that, yeah.

8    Q.   That's pretty good, sir.

9         Do you concede that an administration has a role to play

10   in the tenure and review process?

11   A.   "Concede" is a loaded word.  Do I understand or accept

12   that?  Yes.

13   Q.   Okay.  Very good.

14        And in your professional opinion, is it possible for

15   people in the same workplace at different levels to have

16   legitimate differences of opinion without it being

17   discriminatory?

18   A.   Yes, it is possible.

19   Q.   Okay.  Dr. Parker, one of the things you testified about

20   earlier was about peer review, and you said, "Outside judgment

21   is the gold standard."

22        Do you remember that testimony, sir?

23   A.   Yes.

24   Q.   Okay.  Isn't part of the reason that a tenure and

25   promotion portfolio application is judged not only by members

Jury Trial – Volume 2
November 14, 2017

 1  of the applicant's department but also by other levels above

 2  to create part of that independent review that you lauded

 3  earlier?

 4  A.   It's not part of that independent review, but that is —

 5  part of the reason is to have — I don't know about

 6  independent, but to have an additional perspective.

 7  Q.   An additional perspective is valuable in this process,

 8  isn't it, sir?

 9  A.   Sometimes — yes.  Yes, it is.

10  Q.   Okay.  I'm sorry.  Did you have something, sir?

11  A.   You said "an additional perspective."

12       It can be, let's say.  It depends on the perspective.

13  Q.   Okay.  Fair enough.

14       Dr. Parker, you testified earlier about a worksheet

15  plaintiff's counsel asked you about regarding Dean Scoufos and

16  three ratings that the dean, she gave to Dr. Tudor during that

17  2009 process.

18  A.   Yes.

19  Q.   And you remember, you also were questioned about and

20  testified about a similar worksheet by then-vice president for

21  academic affairs Dr. McMillan; correct?

22  A.   Yes.

23  Q.   I believe your testimony was that somehow those — that

24  each of those worksheets was inconsistent with the department

25  assessment; is that correct?  Or was it inconsistent with your

 1   assessment?

 2   A.   It was inconsistent with the overall university's

 3   assessment of the other candidates.

 4   Q.   Okay.  But they were consistent with one another, weren't

 5   they?

 6   A.   Those two from Scoufos and McMillan?

 7   Q.   Yes, sir, the dean and the vice president both.

 8   A.   Yes, they were.

 9   Q.   And you indicated earlier that there are a lot of

10   people -- I believe -- and correct me if I'm misquoting you,

11   but I believe you testified that there are a lot of people

12   that apply for jobs as professors in higher education and that

13   makes each position very competitive.

14        Was that a fair statement of your testimony?

15   A.   Yes.

16   Q.   Okay.  So it's really important that we get the best

17   professors for each position; isn't that correct?

18   A.   Yes.

19   Q.   Particularly if we're being good stewards of state

20   resources; correct?

21   A.   That's correct.

22        MR. JOSEPH:  If I may have a moment, Your Honor,

23   with counsel.

24        THE COURT:  Yes.

25        MR. JOSEPH:  Dr. Parker, thank you for your time.

Jury Trial – Volume 2
November 14, 2017

1       Nothing further, Your Honor.

2            THE COURT:  Redirect?

3            MR. YOUNG:  Thank you, Your Honor.  If we could

4    approach very briefly.

5            THE COURT:  All right.

6        (The following proceedings were had at the bench and out

7    of the hearing of the jury.)

8            MR. YOUNG:  So, Your Honor, during Mr. Joseph's

9    cross, he asked Dr. Parker whether it is possible for

10   administrators at a university to have a different evaluation

11   of portfolios than others without it being discrimination.

12       There's a motion in limine filed by defendants that --

13   seeking to limit Dr. Parker's testimony to not talk about the

14   ultimate issue of discrimination, simply the merits of these

15   portfolios.

16       I wanted to approach to ask permission to ask one

17   rehabilitation question, just the converse of the question

18   already asked, to balance things out, whether it's possible

19   that discrimination is a reason to deny tenure.  That's the

20   only question I would like to ask.

21            THE COURT:  Okay.

22            MR. YOUNG:  Thank you, Your Honor.

23       (The following proceedings were had in open court with

24   all parties present and within the hearing of the jury.)

25            MR. YOUNG:  We'll try to make this really quick,

Jury Trial – Volume 2
November 14, 2017

1   Dr. Parker, so you can get home.

2                    **REDIRECT EXAMINATION**

3   BY MR. YOUNG:

4   Q.    Dr. Parker, is it usual that someone would give any

5   weight to a withdrawn tenure application in the evaluation of

6   a new tenure application?

7   A.    I don't know why anyone would.

8   Q.    Have you ever evaluated a tenure case where you did that?

9   A.    No.

10  Q.    Do you know of one that your colleagues did, where they

11  did that, they gave weight to a withdrawn application from a

12  prior year?

13  A.    No.

14  Q.    Dr. Parker, have you ever recommended that someone not

15  get tenure because their application wasn't neat enough?

16  A.    No.  I would just ask them to make it neater.

17  Q.    So that's not a significant issue when it comes to tenure

18  application evaluations?

19  A.    Not at all.

20  Q.    Have you voted to grant someone tenure as part of a

21  committee or an appeals board where the application wasn't

22  neat?

23  A.    Certainly.

24  Q.    More than one?

25  A.    It's so trivial that I have no idea how many, but it's

Jury Trial – Volume 2
November 14, 2017

```
 1  not unusual.
 2  Q.   Okay.  Dr. Parker, I believe on cross you were asked
 3  questions about letters of recommendation from nontenured
 4  professors.
 5       Is it typical for a candidate to have letters of
 6  recommendation from tenured professors in a department in
 7  which they're applying for tenure?
 8  A.   Different schools have different terminology.  So there
 9  might be letters of recommendation; there might be reports.
10       So is it typical for them to have -- can you say that
11  again?  From nontenured professors?
12  Q.   Yes.
13  A.   No, it is not typical.
14  Q.   Would the existence of -- sorry.  Strike that.
15       Would the presence of letters of recommendation from
16  nontenured professors in a tenure application portfolio weigh
17  against that portfolio's overall merits?
18  A.   I -- it's just not substantive.  I would expect someone
19  would be told "Take that out and put something else in" before
20  it even got to the next level.
21       But if they didn't, it would look odd, but it wouldn't
22  be -- it wouldn't address the issues of the case.
23  Q.   And that's because there are tenured professors on the
24  actual committee that meets?
25  A.   That's right.
```

Jury Trial – Volume 2
November 14, 2017

1   Q.   Okay.  Now, you were also asked a question that I'm going

2   to ask the inverse of.

3        I believe you testified on cross that people can have

4   legitimate differences of opinion on the same portfolio;

5   correct?

6   A.   Yes.

7   Q.   Is it possible that, where there is a difference of

8   opinion, that discrimination has factored into that decision?

9   A.   Is factored into the --

10  Q.   I'm sorry.  Let me withdraw that question and ask it in a

11  way that makes sense.  Then we can finish up.  Okay.

12       Is it possible that there can be a difference of opinion

13  because a decision maker's discriminatory bias is factored

14  into their decision?

15            MR. JOSEPH:  Objection.  Calls for speculation.

16            THE COURT:  Overruled.

17            THE WITNESS:  I'm sorry.  I can answer the question?

18            THE COURT:  Yes, you may.

19            THE WITNESS:  Of course it's possible.

20  Q.   (BY MR. YOUNG)  Last question, Dr. Parker.

21       When professors in the same department go up for tenure

22  at the same time, are they in competition with each other to

23  get tenure?

24  A.   Not usually.  There might be some schools where that's

25  done sometimes.  We make a point of telling our candidates

Jury Trial – Volume 2
November 14, 2017

1   that they are not, but I've heard just in lore that sometimes

2   that happens at some schools.  I've never seen it happen, but

3   it might happen.

4   Q.   Any evidence that you were presented with that indicated

5   that professors at Southeastern in the same department, when

6   they went up for tenure, were in competition with each other?

7   A.   I don't know anything about that.

8          MR. YOUNG:  Okay.  Thank you, Dr. Parker.  That's

9   all.

10          THE COURT:  Redirect.  I mean, recross.

11          MR. JOSEPH:  Thank you, Your Honor.

12                    **RECROSS-EXAMINATION**

13   BY MR. JOSEPH:

14   Q.   Dr. Parker, one of the portfolios you indicated that you

15   reviewed as a part of your review process was Dr. Mark

16   Spencer's application; is that correct?

17   A.   That's correct.

18   Q.   Now, that was from 2006, wasn't it?

19   A.   I believe so.  I'd have to check to be sure.

20   Q.   Well, I'll represent to you that it was, according to

21   your report, 2006.  Now, that's quite a few more years before

22   Dr. Tudor's application, is it not?

23   A.   I wouldn't call three years "quite a few."

24   Q.   So you agree with me that her application in 2009 is the

25   one that you should be focusing on?

Jury Trial – Volume 2
November 14, 2017

1    A.   I didn't say that.

2    Q.   Okay.  What are you saying about that?

3    A.   I read each application and judged -- I focused on all

4    the applications that I read.

5    Q.   Okay.  And I believe, just to clarify, you said you were

6    not provided with Dr. Tudor's 2008 application which she

7    withdrew; is that correct?

8    A.   That is correct.

9    Q.   Okay.  Dr. Parker, you said it is not typical to have

10   letters from a nontenured professor in your portfolio.

11        Is that correct?

12   A.   Yes.

13   Q.   I just wanted to make sure that was clear.

14        Okay.  And you said if they had such letters, you might

15   just tell them to take it out.  Is that what you said?

16   A.   Yes.

17   Q.   Okay.  Now, who would, in that case, be the person

18   telling the applicant to take out the letters?

19   A.   I would expect it would ordinarily be other people in

20   that person's department.

21   Q.   And that would be --

22   A.   If it didn't happen at that level, I would expect it

23   would then happen at the next level.

24   Q.   The dean or something?

25   A.   Maybe a secretary before the dean, yes, or perhaps a

Jury Trial – Volume 2
November 14, 2017

1   dean.

2   Q.   Okay.  Would that be, then, something that you would

3   regard as professional advice from one educator to another?

4   A.   Yes.

5   Q.   And would not it behoove the applicant to follow that

6   professional advice?

7   A.   Yes.

8   Q.   Okay.  Dr. Parker, in your report, you didn't actually

9   make any findings of discrimination, did you?

10  A.   That is correct.

11  Q.   Okay.

12           MR. JOSEPH:  No further questions.

13       Thank you, Your Honor.

14           THE COURT:  You may step down.

15       (Witness excused.)

16           THE COURT:  Call your next witness.

17           MR. YOUNG:  Meg Cotter-Lynch.  We need to go get her

18  from the witness room, Your Honor.

19           THE COURT:  All right.

20       Please step right up here next to the witness box, face

21  the clerk, and be sworn.

22       (Witness duly sworn.)

23           THE COURT:  Be seated.

24           WHEREUPON, MEG COTTER-LYNCH after having been first

25  duly sworn, testifies in reply to the questions propounded as

Jury Trial – Volume 2
November 14, 2017

1  follows:

2  **DIRECT EXAMINATION**

3  BY MR. YOUNG:

4  Q.   Just checking to make sure.  Good afternoon.

5  A.   Good afternoon.

6  Q.   Dr. Cotter-Lynch, do you work at Southeastern?

7  A.   I do.

8  Q.   When did you first start working at Southeastern?

9  A.   I started in August of 2005.

10  Q.   I'm just going to ask you to slow down a little bit and

11  maybe move that microphone a little closer.  You don't have to

12  hunch.

13  A.   Yes, I do.  I started working there in August of 2005.

14  Q.   What was your job title at hire?

15  A.   At hire, I was hired as assistant professor of English.

16  Q.   Were you on tenure track at hire?

17  A.   Yes, I was.

18  Q.   What is your current job title?

19  A.   My current job title, I am professor of English and

20  director of the honors program.

21  Q.   Can you explain to the jury what the honors program is?

22  A.   Yeah.  It's an academic program across different majors.

23  We bring in 40 highly able students a year and give them

24  cocurricular activities, specialized curriculum, stuff like

25  that.

Jury Trial — Volume 2
November 14, 2017

1    Q.    I'm going to ask you to slow down a little bit.

2    A.    Oh, sorry.

3    Q.    I know.

4          Are you considered a member of Southeastern's

5    administration?

6    A.    I kind of have a weird hybrid position.

7          I'm a tenured full professor of English, and I have a 50

8    percent course reduction to serve as honors director.   So

9    technically I'm 50/50 faculty/administration.

10   Q.    Okay.  Do you know Rachel Tudor?

11   A.    Yes.

12   Q.    How do you know her?

13   A.    We worked together for years, we're good friends.   I

14   first met her at my interview, actually, when I first

15   interviewed for the job.

16   Q.    Was she on the hiring committee or --

17   A.    I honestly don't remember.  It's a small department, so I

18   met everybody.  But I do remember I had a -- kind of a break,

19   where I was sitting in the faculty lounge area in the

20   department, and she very kindly came in and answered some of

21   my questions about the university.  So that was the first time

22   I met her.

23   Q.    2005, that was before her gender transition?

24   A.    Yes.  Yes.

25   Q.    Okay.  To your knowledge, how many transgender people

Jury Trial – Volume 2
November 14, 2017

 1  have worked at Southeastern?  You've been there since 2005.
 2  A.   To my knowledge, Rachel is the only one.
 3  Q.   So no one before Rachel, no one after?
 4  A.   Not that I know of.
 5  Q.   Okay.  Let's talk a little bit about Rachel's gender
 6  transition.
 7       Can you tell me in your own words what you remember?
 8  A.   Sure.  Actually, I remember it pretty clearly.  It was
 9  August of 2007.  It was my first day back after maternity
10  leave.  My oldest child was born in the spring of 2007.
11       She came around and handed me a letter, which she
12  apparently handed to everyone in the department, that
13  explained that she was transgender and she would be
14  transitioning at the start of the school year.
15  Q.   Can you look in that small white notebook in front you.
16  A.   Uh-huh.
17  Q.   And there should be a little tabbie on the side that says
18  "P-201."  I think it's towards the end.
19  A.   Yes.
20  Q.   Do you recognize this document?
21  A.   Yes.
22  Q.   What is it?
23  A.   It's the letter that she gave me in August of 2007.
24       MR. YOUNG:  Your Honor, I'd like to move to enter
25  Plaintiff's Exhibit 201 into evidence.

Jury Trial — Volume 2
November 14, 2017

1           THE COURT:  Any objection?

2           MR. JOSEPH:  No objections, Your Honor.

3           THE COURT:  It will be admitted.

4           MR. YOUNG:  Okay.

5    Q.  (BY MR. YOUNG)  Now that it's been admitted, I'm going to

6    put part of the letter on the overhead.

7         Okay.  So you said that you recall that Dr. Tudor gave

8    folks in the department this letter?

9    A.   Yes.

10   Q.   Do you know if she gave everyone in the department this

11   letter?

12   A.   I believe she did.

13   Q.   Do you know how she presented the letter to other people

14   in the department?

15   A.   I don't.  I know she knocked on my office door and handed

16   it to me.  I assume she did something similar with the other

17   members of the department.

18   Q.   So I have a specific question for you.

19        Do you have any recollection of how the other female

20   members of the English department responded to Rachel's gender

21   transition?

22   A.   Yes.  When we got the letter, we all got together and

23   agreed that we wanted to invite her to lunch to show that we

24   supported her and we were on her side and make sure that she

25   felt comfortable.

 1      From the letter, you can see that she was very kind of

 2  hesitant; she didn't want to bother us; she was worried about

 3  the reaction.  And we wanted to make clear to her that she was

 4  our friend and we were all going to go to lunch together.

 5  Q.   Did you all go to lunch together?

 6  A.   Yes.

 7  Q.   Do you recall if Dr. Tudor's gender transition was an

 8  issue for anyone in the English department?

 9  A.   Not that I remember.  There was basically acceptance

10  without much discussion amongst my colleagues.

11  Q.   If there had been a problem, do you think you would

12  remember it?

13  A.   Yes.

14  Q.   Do you recall whether there were any problems with any of

15  the students that took classes in the English department with

16  regards to Dr. Tudor's gender transition?

17  A.   Not to my knowledge at all.  I did have a few students

18  come by my office and ask questions.  They had not encountered

19  a transgender person before, so they came and said, hey, what

20  is this?

21      But it was always very polite and seeking information.  I

22  never heard anyone say anything ugly at all.

23  Q.   Okay.  Let's move on and talk a little bit about

24  Southeastern's tenure policies when Dr. Tudor worked there.

25  I'm trying to give you a timeline there.

Jury Trial – Volume 2
November 14, 2017

1        Do you remember roughly what the tenure policies were

2   when Dr. Tudor was there?

3   A.    Yes.

4   Q.    When did you apply for tenure?

5   A.    The same year as Rachel.  She and I went through the

6   process at the same time in the same department.

7   Q.    So Dr. Tudor applied twice at least.

8   A.    Sorry.

9   Q.    What year did you --

10  A.    I applied in 2009-2010.

11  Q.    Okay.  And you feel like you have a pretty solid

12  recollection of what those policies were?

13  A.    Yes.

14  Q.    Okay.  In 2009-2010, what were the areas that a candidate

15  had to qualify in to get tenure?

16  A.    Teaching, scholarship, and service.

17  Q.    And, to your recollection, in how many of those areas of

18  teaching, scholarship, and service did a candidate have to be

19  excellent in?

20  A.    Two.

21  Q.    Are you sure about that?

22  A.    (Nods head).

23  Q.    Why are you so sure?

24  A.    Well, I had multiple conversations with Dr. John Mischo,

25  who was at the time department chair, prior to going up for

Jury Trial – Volume 2
November 14, 2017

1    tenure.  And that was always –– you were expected to be
2    competent in everything but to excel at two.
3    Q.   Okay.  I'm going to have you look in that binder in front
4    of you.  It's going to be towards the beginning at Plaintiff's
5    Exhibit 2.  When you get there, I want you to tell me whether
6    you recognize this document.
7    A.   Yes.
8    Q.   What is it?
9    A.   It is the qualifications or the kind of expectations to
10   earn promotion and tenure in the English department.
11       I was given this document actually at my job interview.
12   When I asked about what the expectations were, I was given
13   this.
14           MR. YOUNG:  I'm going to move to enter Plaintiff's
15   Exhibit 2 into evidence.
16           MR. JOSEPH:  I'm sorry.  What year was that?
17           THE WITNESS:  I was given it at my job interview in
18   2005.
19           MR. JOSEPH:  Okay.
20       We have no objection, then, Your Honor.
21           THE COURT:  Admitted.
22   Q.   (BY MR. YOUNG)  I'm just going to put the first page up
23   here.  That's a multipage document; is that right,
24   Dr. Cotter–Lynch?
25   A.   Yes.

Jury Trial – Volume 2
November 14, 2017

1  Q.   Okay.  So can you tell me why you got this document at

2  your job interview?

3  A.   Sure.  When you get a tenure-track job, the -- what it

4  means is that you have a probationary period, is what it's

5  called, between five and seven years, depending upon the

6  university, where you are basically being evaluated for

7  tenure.

8       And, at the end of that time, you are evaluated by your

9  colleagues, and they decide whether or not to give you

10 promotion and tenure.

11      So a pretty standard question.  I was certainly trained

12 all through school that when you interview for a job, you ask

13 for those expectations so you know what you're working towards

14 when you have the job.

15 Q.   To your understanding, were the criteria that are

16 delineated in Plaintiff's Exhibit 2 the criteria for the

17 English department in effect in 2009?

18 A.   The English department was still looking at them.

19      At some stage, Dr. Minks, who was president, put out a

20 kind of blanket statement that no one was to use departmental

21 qualifications.  We were only supposed to look at the Academic

22 Policies and Procedures Manual, which --

23           MR. JOSEPH:  Your Honor, objection.  Based on

24 hearsay as to what the president's statement was.

25           THE COURT:  Overruled.

1  Q.   (BY MR. YOUNG)   You can continue.

2  A.   Okay.

3       So that was a cause for concern amongst faculty because

4  we'd been including Rachel, but including other people on the

5  tenure track that we'd been hired and given these

6  qualifications, and then were told that the president didn't

7  want departmental specifications.

8       But, within the department, we were told that if you

9  follow these, you'll be fine.   Don't worry about it.

10  Q.   Can you explain to the jury what the relationship was, to

11  your understanding, in 2009, as to basically the relationship

12  between these department criteria and those policies in the

13  Academic Policies and Procedures Manual?

14  A.   Sure.   The Academic Policies and Procedures Manual is for

15  all faculty in all different disciplines.   And what's

16  considered, for instance, exemplary research is different

17  whether you're a chemist or an English professor or an artist;

18  right?

19       So these departmental guidelines are meant to give some

20  specificity.   The ones in the Academic Policies and Procedures

21  Manual are really general.   They're "you should be good at

22  teaching, you should be active in scholarship, you should be a

23  good citizen in the university."

24       But these give more specification that's

25  discipline-specific.   What does that look like in the case of

1   an English professor?

2   Q.   I'm going to ask you to look at another document that's

3   in that binder.  It will be marked Plaintiff's Exhibit 3.  So

4   it should be right after that.

5   A.   Uh-huh.

6   Q.   Do you recognize this?

7   A.   Yes.  This is the Academic Policies and Procedures

8   Manual.

9          MR. YOUNG:  Your Honor, I'd look to move to enter

10  Plaintiff's Exhibit 3 into evidence.

11         MR. JOSEPH:  No objection, Your Honor.

12         THE COURT:  Admitted.

13         MR. YOUNG:  Thank you.

14  Q    (BY MR. YOUNG)  And now that it's been admitted into

15  evidence --

16         MR. JOSEPH:  Actually, one point of clarification:

17  I think the witness's testimony was that it was the full

18  manual.  This appears to be just an excerpt; is that right?

19         THE WITNESS:  Yes.  I'm only looking at part of it.

20         MR. JOSEPH:  Okay.

21     No objection, Your Honor.

22  Q.   (BY MR. YOUNG)  So, Dr. Cotter-Lynch, I'm going to draw

23  your attention to -- I'm just going to be fancy here with this

24  if I'm doing this right -- to the policy that starts on page 1

25  of that exhibit and goes on to the second page, but the jury

 1   should have the benefit of both because I put them together.

 2   Okay?

 3        To your recollection, what is Policy 3.7.4?

 4   A.   It's delineating what the role of the faculty is versus

 5   the administration, where the faculty have kind of primary

 6   responsibility and where the administration has

 7   responsibility.

 8   Q.   Okay.  And I want to draw your attention to the last

 9   paragraph on that first page, and I believe it continues on

10   onto the last page.

11        Are you familiar with this section?

12   A.   Yes.

13   Q.   What does this section of the policy mean to you?

14   A.   So the policy says that "Faculty status and related

15   matters are primarily faculty responsibility.  This area

16   includes appointments, reappointments, decisions not to

17   reappoint, promotions, and granting of tenure and dismissal."

18        So this means that it's expected that you're evaluated by

19   your peers.  So when you're going up for promotion or tenure,

20   there's a committee process.  Your peers in the department --

21   and, in some cases, outside the department if your department

22   is really small -- are asked to evaluate your work because

23   they're the people who are -- they see you every day, they

24   work with you every day, they know what you're doing best.  So

25   this lays that out.

 1          It's also, I'll add, taken almost verbatim from the
 2    American Association of University Professors.  It's called
 3    the red book.  It's their book of standard practices in the
 4    profession nationwide.
 5          So this language is almost exactly what's there, and then
 6    it was put in our procedures manual, which is what you would
 7    expect.  It's a national standard.
 8    Q.    To your recollection, was Policy 3.7.4, the version I
 9    have projected right there and the one in front of you, was
10    this policy in effect in 2009?
11    A.    Yes.
12    Q.    You're pretty sure of that?
13    A.    Yeah, I'm sure it was in effect.  I'm not sure it was
14    followed.
15    Q.    We'll get to that later.
16          Under your understanding of this policy, if
17    administrators did not agree with the decision of a department
18    on a tenure application, what was supposed to happen?
19    A.    The end of that paragraph says it pretty clearly.
20          "The governing board and president should, on questions
21    of faculty status, as in other matters where the faculty has
22    primary responsibility, concur with the faculty judgment
23    except in rare instances and for compelling reasons which
24    should be stated in detail."
25          So it's rare for the administration to overturn what the

1   faculty has said.  It very rarely happens.  And if they do,

2   they're supposed to explain why.

3   Q.   To your understanding, was that the pretty universal

4   standing at Southeastern in 2009?

5   A.   Yes.  In 2009, I was not aware of any situation in which

6   the administration had overturned the faculty.

7   Q.   But in such a situation, this would be the rule of

8   governance?

9   A.   Yes.  If they did, they were supposed to explain why.

10  Q.   Okay.  Can you explain your understanding of how someone

11  would go about complying with this rule?

12       What sort of explanation is supposed to be given?

13  A.   Well, I can tell you, in my own tenure process, at every

14  stage.

15       So it was -- first, a departmental committee looks at

16  your qualifications.  Then, at that point -- things have

17  changed a bit.

18       So it started with the department committee.  Then it

19  would go to the department chair, then the dean, then the vice

20  president, then the president.

21       And at each stage there's a -- elsewhere in the Academic

22  Policies and Procedures Manual, it lays out what that process

23  is and when everybody is supposed to have their say.

24       And I got letters at each stage explaining the evaluation

25  of the people who were evaluating me.  We thought you were

1   good at this, these were areas of weakness.  I got explanatory

2   letters during that process.

3   Q.   Who were the administrators who gave you those

4   explanatory letters in 2009 and 2010?

5   A.   The department chair was John Mischo, the dean was

6   Lucretia Scoufos, and the vice president was Doug McMillan.

7   Q.   Did you get a letter from President Minks?

8   A.   I honestly –– I'm sure I did at some stage, but I

9   honestly don't remember.

10  Q.   But you do remember two detailed letters from McMillan

11  and Scoufos?

12  A.   I know I got detailed letters from Mischo and Scoufos.  I

13  don't remember, off the top of my head, what the one from

14  McMillan said.  But I certainly felt like I was getting

15  feedback along the way.

16  Q.   And you were approved at every stage?

17  A.   Yes.

18  Q.   Okay.  I want to take you back to the beginning of your

19  tenure process in 2009.

20       Did you meet initially with Dean Scoufos?

21  A.   Yes.

22  Q.   Was it one meeting?

23  A.   It was one quite long meeting.

24  Q.   Okay.

25  A.   We went maybe an hour and a half at least.

Jury Trial – Volume 2
November 14, 2017

1   Q.   Can you briefly summarize what happened during that
2   meeting?
3   A.   Yes.  She gave me exceptionally detailed instructions for
4   how to compose my tenure portfolio.
5        She kind of walked me through what basically every page
6   should have.  She told me what font to use.  She told me what
7   store to go to to buy which shade of blue binder that would
8   match the school colors.  It was really detailed.
9   Q.   Did you ask questions during that meeting?
10  A.   Yes, I did.  And I took extensive notes, which at some
11  stage the EEOC took.
12       But, yeah, I asked questions about kind of exactly what
13  should go in each section, how much detail I should provide,
14  stuff like that.
15  Q.   Would you say that you had substantive questions, things
16  beyond just how the binder looks and where the dividers go?
17  A.   My questions were mostly about stuff like she wanted me
18  to include the conference -- the conference schedules for
19  conferences that I had presented at.  And I would ask things
20  like, it's 200 pages long, do you really want all 200 pages?
21       And she kind of dialed back a little bit and said if you
22  just photocopy the parts where your name is mentioned, that's
23  good enough.
24  Q.   Do you recall asking any questions that Dean Scoufos
25  didn't answer?

1   A.   No.

2   Q.   Did you feel like Dean Scoufos was trying to help you?

3   A.   Yes.

4   Q.   Now, at the beginning of your 2009 application cycle, you

5   and Dr. Tudor were in the same department, the English

6   department; right?

7   A.   Yes.

8   Q.   Did you have any feeling that you were in competition

9   with other candidates for tenure who were going up at the same

10  time?

11  A.   Oh, no, not at all.  I mean, the expectation and hope is

12  that we all get tenure.  This year, we have two people going

13  up from the same department.  The expectation, hope is that

14  they both will get tenure.

15  Q.   Has that always been the case while you've been at

16  Southeastern?

17  A.   Yes, definitely.

18       From the department's standpoint, we would like to keep

19  good people.  So our hope is to -- our hope is to be able to

20  give tenure to our colleagues.

21  Q.   Have you ever heard an administrator at Southeastern say

22  otherwise?

23  A.   What do you mean by "otherwise"?

24  Q.   Suggest or state outright that people in the same

25  department going up for tenure at the same time are in

Jury Trial – Volume 2
November 14, 2017

1  competition with one another?

2  A.   No.

3  Q.   Have you discussed tenure issues with administrators at

4  Southeastern?

5  A.   Well, before I went up, I discussed kind of my own

6  process, what the expectations were, how that was going to go.

7       After tenure, I've been active in trying to rewrite some

8  of the policies to hopefully make them better and make sure

9  more bad things don't happen.

10 Q.   Okay.  We'll also get to that later.

11 A.   Yeah.

12 Q.   Dr. Cotter-Lynch, I just want you to look at Plaintiff's

13 Exhibit 163.  I believe it is in the teal binder to your left.

14 And I believe there's a tab that will say "163."  You just

15 need to look at the first page.

16 A.   Okay.

17 Q.   Do you recognize that first page?

18 A.   Yes.

19 Q.   And what's that document?

20 A.   It looks like my tenure portfolio.

21 Q.   From the 2009-10 cycle?

22 A.   Yes, this is my -- the second page clarifies that.  It's

23 my tenure portfolio from 2009-2010.

24 Q.   Now, do you recall at some point keeping a copy of that

25 portfolio?

1  A.   Yes.  I've, to this day, kept it in my home.

2  Q.   Is that usual for a professor, to keep a copy of an old

3  application?

4  A.   No.  Most people -- what we call cannibalize it.  I mean,

5  it's all --

6  Q.   You can put it down.

7  A.   It's all documents that we use; right?  So syllabi,

8  articles we've written, stuff like that.  So it's not unusual

9  to pull stuff out of it and use it.

10      Most people, when they go up for full professor, which is

11  the next available promotion, most people, I think, like,

12  actually use the same binder and the same tabs and just update

13  it to be able to basically simplify things.

14  Q.   Why didn't you -- I think the word you used was

15  "cannibalize."

16      Why didn't you cannibalize your 2009 portfolio?

17  A.   It was suggested to me by Claire Stubblefield that I

18  might want to secure my tenure portfolio in case of legal

19  action.  So I did.

20  Q.   Do you know in what context that statement was made?

21  A.   In the investigation of a complaint that Rachel had made

22  about her process.

23  Q.   Okay.  Let's talk a little bit about what you know about

24  Dr. Tudor's attempt to apply for tenure in 2010.  So this was

25  after you already got tenure yourself.

Jury Trial – Volume 2
November 14, 2017

1      Easy question:  Do you recall if Dr. Tudor tried to apply
2 for tenure in 2010?
3 A.   Yes.
4 Q.   How did you first learn about that?
5 A.   I mean, I think I was always aware that she was going to.
6 I guess in -- so the way our procedures work, you can choose
7 to go up in your fifth, sixth, or seventh year.
8      Rachel started one year before I did.  So I went up in my
9 fifth year, which was her sixth year.  So -- and I was aware
10 that she had withdrawn early on in the prior year and was
11 planning on going up the same year as me.
12 Q.   At some point in the 2010-11 cycle, did you learn that
13 Dr. Tudor was banned from reapplying for tenure?
14 A.   Yes.
15 Q.   Okay.  I'm going to have you look in that binder, the
16 small one, the white one --
17 A.   Okay.
18 Q.   -- at something that should be marked P-84, Plaintiff's
19 Exhibit 84.
20      MR. YOUNG:  And I believe this has already been
21 admitted into evidence.
22      THE COURT:  Yes.
23 Q.   (BY MR. YOUNG)  Okay.  Dr. Cotter-Lynch, do you recognize
24 Plaintiff's Exhibit 84?
25 A.   Yes.

Jury Trial – Volume 2
November 14, 2017

```
1    Q.    When did you first see it?

2    A.    I believe Rachel showed it to me in October of 2010.

3    Q.    When you first saw this document, did you think there was

4    anything odd about it?

5    A.    Yes.

6          MR. JOSEPH:  Objection, Your Honor.  This witness

7    isn't qualified to give opinions about this letter.

8          THE COURT:  The question is permissible.

9          THE WITNESS:  I thought it seemed ridiculous because

10   what I saw in the letter did not at all match what I had

11   observed of Rachel's work and what I knew of what had

12   happened.

13   Q.    (BY MR. YOUNG)  Now I want to draw your attention to a

14   particular paragraph in this letter.

15         I'll let the jury find it so I don't waste their time.

16         In this letter, does it say something to the effect of

17   that allowing Dr. Tudor to apply in the 2010 cycle would,

18   quote, unquote, inflame the relationship between faculty and

19   administration?

20   A.    Yes.

21   Q.    What do you think about that statement?

22   A.    I find it laughable -- I did then; I do now -- for two

23   reasons.

24         One is the faculty and the administration did not get

25   along at that stage.  Dr. McMillan and Dr. Scoufos were not
```

Jury Trial – Volume 2
November 14, 2017

```
 1    popular.  And it was difficult to believe that things would
 2    get worse, and then, of course, they did because the faculty
 3    was so upset that Rachel was not allowed to reapply.
 4        So, in fact, not allowing her to reapply made things
 5    worse.
 6    Q.   Now, Dr. Cotter-Lynch, was it your understanding at the
 7    time of this letter, October 2010, that Southeastern's rules
 8    allowed professors to reapply for tenure?
 9    A.   That was my understanding.
10    Q.   Did you have any reason to think otherwise at that
11    point --
12    A.   No.
13    Q.   -- in time?
14        Had you ever heard of another professor not being allowed
15    to reapply?
16    A.   No, I had never heard of another professor being barred
17    from reapplying.
18    Q.   Dr. Cotter-Lynch, are you familiar with something at
19    Southeastern called the faculty appellate committee?
20    A.   Yes.
21    Q.   Okay.  Do you know whether Dr. Tudor filed any grievances
22    with the faculty appellate committee?
23    A.   Yes, she did.
24    Q.   Do you know if she filed one in response to
25    Dr. McMillan's letter projected up there?
```

1   A.   Yes, she did.

2   Q.   Did you write a letter to the faculty appellate committee

3   in support of Dr. Tudor?

4   A.   Yes, I did.

5   Q.   Okay.  I'm going to have you look at Plaintiff's

6   Exhibit 170.  It's also in that binder in front of you.

7          THE COURT:  Before you do, we're going to break for

8   lunch.

9          I will, of course, instruct the jury not to discuss the

10  case or permit others to discuss it with you.

11         Please be back -- if you want to eat your lunch over

12  here, you're welcome to; but if you don't, if you leave the

13  fifth floor, then be back in the jury assembly room on the

14  first floor at 1:30.

15         We'll be in recess.

16         (Jury exits.)

17         (Lunch recess from 12:30 p.m. to 1:30 p.m.)

18         (Jury enters.)

19         THE COURT:  Be seated.

20         We have Christy filling in for Linda, who is in a

21  meeting.  She'll be back in not very long.  We thank Christy

22  for joining us today.  And you may proceed.

23         MR. YOUNG:  Thank you, Your Honor.

24  Q.   (BY MR. YOUNG)  Before we get started again,

25  Dr. Cotter-Lynch, just a gentle reminder if you could slow

 1  down a teeny bit.  Thank you.

 2       I believe right before we broke for lunch, I was asking

 3  you about the faculty appellate committee.

 4       Do you know whether Dr. Tudor filed any complaints with

 5  the faculty appellate committee?

 6  A.   Yes, I believe she did.

 7  Q.   Okay.  Do you know if she filed one with regards to that

 8  letter that's still projected on that screen written by Doug

 9  McMillan?

10  A.   Yes.  It's my understanding that she appealed that to the

11  faculty appellate committee.

12  Q.   Did you participate in any way in that appeal process?

13  A.   I wrote a letter in support of Rachel to the appellate

14  committee.

15  Q.   Okay.  I'd like you to look in that binder that's in

16  front of you at something that should be marked Plaintiff's

17  Exhibit 170.

18  A.   Yes.

19  Q.   Okay.  Do you recognize this document?

20  A.   Yes.  That's the letter that I wrote to the appellate

21  committee.

22       MR. YOUNG:  Your Honor, may I introduce into

23  evidence Plaintiff's Exhibit 170?

24       MR. JOSEPH:  No objections.

25       THE COURT:  Admitted.

Jury Trial – Volume 2
November 14, 2017

```
 1              MR. YOUNG:  Thank you.
 2   Q.  (BY MR. YOUNG)  Dr. Cotter-Lynch, that's a two-page
 3   letter; is that right?
 4   A.   Yes, that is correct.
 5   Q.   Can you tell me why you wrote this letter?
 6   A.   Because, as I mentioned before lunch, I thought
 7   Dr. McMillan's decision was ridiculous and that there was
 8   clear evidence showing why what he said was not true.  And so
 9   I laid all of that out in a letter.
10   Q.   Had you ever written a letter like this before?
11   A.   No.
12   Q.   Have you written a letter like this since?
13   A.   Similar in type when I was president of the AAUP chapter,
14   but, after this, obviously.
15   Q.   Okay.  Is everything you wrote in this letter true?
16   A.   To my knowledge, yes.
17   Q.   So the jury later on will have the benefit of reading
18   this letter for themselves if they desire, but can you tell us
19   what you think are the most important points you make?
20   A.   Sure.  So Doug McMillan cited deficiencies in Rachel's
21   service and scholarship as reasons for, first of all, denying
22   her tenure in the 2009-2010 school year and then for not
23   allowing her to reapply.  His assertion was that her
24   qualifications were clearly not sufficient for promotion, and
25   so it would be a waste of everyone's time for her to reapply.
```

Jury Trial – Volume 2
November 14, 2017

1          So in this letter I laid out specifically her

2   qualifications in service and scholarship, clear evidence that

3   she was very active in service, took on -- she was chair of a

4   committee called the assessment, planning, and development

5   committee, which basically means writing all the reports.  It

6   was a really big thing to take on before tenure.

7          I remember, at the time that she took it on, I thought it

8   was kind of unfair to make someone who didn't have tenure do

9   something so time-consuming, writing all the assessment

10  reports, but she did it, and she did it well.

11         She was also on the faculty senate.  She brought in

12  something called OSLEP, Oklahoma Scholar-Leadership something

13  Program, but they're statewide classes where students from all

14  over the state come to a university to study with a particular

15  expert.

16         The only time in my memory or that I've heard of that one

17  of those took place at Southeastern -- usually, they're, like,

18  at OU -- but Rachel arranged to have one at Southeastern.  So

19  that was a big deal that she took that on.

20         And then in terms of scholarship, she published so many

21  more articles than anybody else.  It's -- I can't understand

22  why there would be any question about her scholarship.  She

23  clearly had more than I did -- I got tenure -- and more than

24  most other people who get tenure in our department.

25         So I laid all of that out.

1    Q.    Dr. Cotter-Lynch, are you aware that Claire Stubblefield

2    conducted an investigation into Dr. Tudor's complaints at

3    Southeastern starting in 2010?

4    A.    Yes.

5    Q.    Okay.  Why don't you tell me a little bit about what you

6    personally know about that investigation.

7    A.    She called me into her office at one stage -- I honestly

8    don't remember the date -- and asked me some questions about

9    Rachel's complaint.

10        I remember that Claire was sick.  She told me she was

11   sick when she got --

12              MR. JOSEPH:  Objection, Your Honor.  Hearsay.

13              THE COURT:  Please don't report what somebody said

14   to you.

15              WITNESS:  Okay.

16              THE COURT:  Just what you said or did.

17              WITNESS:  So the meeting was relatively short.  She

18   asked me some questions.

19              MR. JOSEPH:  Same objection, Your Honor.

20              THE COURT:  Overruled.

21   Q.    (BY MR. YOUNG)  You can keep going.

22   A.    She -- that's the meeting in which she told me that I

23   should save my tenure -- or secure my tenure portfolio --

24   which I was surprised by but paid attention to -- and then

25   also, at the end of the meeting, her demeanor kind of changed

```
 1   and she told me to look out for Rachel.
 2              MR. JOSEPH:  Same objection, Your Honor.
 3              THE COURT:  Sustained.
 4   Q.  (BY MR. YOUNG)  How did you first learn that this
 5   investigation was going on?
 6   A.   So I'm not sure about the question.  So how did I find
 7   out about Rachel's appeal or --
 8   Q.   Claire Stubblefield's investigation.
 9   A.   Oh.  I honestly don't remember.  I mean, I remember that
10   I was called into her office, obviously, and asked questions,
11   but I don't remember when I first learned about it.
12   Q.   That meeting with Claire Stubblefield, was it a formal
13   interview?  Was it -- do you have any idea what it was?
14   A.   I think it was a formal interview.  She took notes.  It
15   was in her office.
16   Q.   You said it was fairly short.  Do you have an estimate of
17   the length -- estimation of length?
18   A.   I don't.
19   Q.   Okay.  In your opinion, were you asked a lot of
20   questions?
21   A.   No, I don't think so.
22   Q.   Do you remember whether you were asked any follow-up
23   questions?
24   A.   Like after that initial meeting with her?
25   Q.   Well, during that first meeting.
```

Jury Trial – Volume 2
November 14, 2017

1  A.   Oh, during that meeting.

2       I honestly don't remember.  The two things I remember

3  really clearly about the meeting were when she told me about

4  the portfolio and about Rachel.

5  Q.   Was that the first time, to your awareness, that anyone

6  at Southeastern has been asked to preserve their portfolio?

7  A.   As far as I know, yes.

8  Q.   After your meeting with Claire Stubblefield, did you have

9  any impression, based upon that meeting alone, as to whether

10 Claire Stubblefield was prepared to resolve Dr. Tudor's

11 complaint in her favor?

12           MR. JOSEPH:  Objection, Your Honor.  She's not

13 qualified to evaluate Dr. Stubblefield's investigation.

14           THE COURT:  Sustained.

15 Q.   (BY MR. YOUNG)  Was there anything odd about the meeting

16 to you?

17 A.   Well, yes, that she told me to save my tenure portfolio.

18           MR. JOSEPH:  Objection, Your Honor, on hearsay.

19           THE COURT:  Please don't report what anyone said to

20 you.

21           THE WITNESS:  Okay.

22           THE COURT:  Only what you said or did.

23           THE WITNESS:  Okay.

24 Q.   (BY MR. YOUNG)  With that instruction, is there anything

25 else you can say about that meeting?

Jury Trial – Volume 2
November 14, 2017

1   A.   No.

2   Q.   Okay.  Was there any follow-up meetings between you and

3   Claire Stubblefield?

4   A.   No.

5   Q.   So, Dr. Cotter-Lynch, are you familiar with

6   Southeastern's harassment and nondiscrimination policies

7   generally?

8   A.   Yes.

9   Q.   Do you have any recollection of more or less what those

10  policies were when Dr. Tudor worked there?

11  A.   Yes.  I remember they did not include protections for

12  gender expression and identity, sexual orientation, because I

13  remember that was something that the faculty senate was trying

14  to get included, and they were not successful in doing that

15  until several years later.

16  Q.   Do you have an understanding of what protections for -- I

17  think you said gender identity and expression, what those

18  protections were supposed to do at Southeastern?

19  A.   Well, I know that my concern -- and, to my understanding,

20  the concern of the faculty senate -- was that the lack of

21  clear language in the policy was interpreted by some that that

22  would not be protected.

23       That was, to my understanding -- at least certainly why I

24  was hoping to have it included, and my understanding was that

25  other faculty were of the same opinion.

Jury Trial – Volume 2
November 14, 2017

1   Q.   Do you have a recollection of when you first became

2   concerned that Southeastern's policies didn't have specific

3   language to protect transgender people from sex

4   discrimination?

5   A.   I don't think I really thought about it until the faculty

6   senate proposed the change.  Then I was like, oh, yeah, of

7   course, that's a good idea.  But I hadn't really thought about

8   it before then.

9   Q.   Do you have any recollection of when the faculty senate

10  first proposed that?

11  A.   I know that Rachel was on the personnel policies

12  committee at that time.  So it was before her dismissal.

13  Q.   Okay.  Dr. Cotter-Lynch, when Dr. Tudor was still

14  employed at Southeastern, did you ever run into her in the

15  women's restroom on that third floor of Morrison where you-all

16  worked?

17  A.   No, I did not.

18  Q.   Was that unusual to not ever see a female faculty member

19  use the women's restroom near the offices?

20  A.   Not necessarily.  I mean, all of our offices are on the

21  same floor and most of our classrooms are in the same place,

22  so you do run into people because of -- we're teachers; right?

23  So there's certain times you can go and certain times you

24  can't.  So depending upon your schedule any given semester --

25  like, there are people this semester who I see all the time

1   and people who I never see just because of how schedules do or

2   don't line up.

3        So I never really thought of the fact that I didn't see

4   Rachel.

5   Q.   At some point did you talk with Dr. Tudor about which

6   restroom she used at Southeastern?

7   A.   Yes.  I believe it was during the 2010—2011 year when I

8   first found out that she had been instructed to use a

9   different restroom.

10       After that, I did notice her coming out of it sometimes.

11   But, honestly, it wasn't anything I ever paid attention to

12   prior to that.

13   Q.   Dr. Cotter-Lynch, I'm going to ask you a few questions

14   about how your life has changed after getting tenure, because

15   you applied the same year that Dr. Tudor applied.

16            MR. JOSEPH:  Objection, Your Honor.  Is this

17   relevant?

18            THE COURT:  What is the relevance of this?

19            MR. YOUNG:  I think it goes to —— potentially to

20   damages, Your Honor, to the extent that Dr. Tudor has a loss

21   from not getting tenure that she deserved and to have the jury

22   educated about what significance there is to get tenure.  And

23   how someone's life is changed because of it illustrates that.

24            THE COURT:  If you limit it to the issue of damages,

25   you may go ahead.

 1              MR. YOUNG:  Okay.

 2              MR. JOSEPH:  Just note an ongoing objection based on

 3     the fact that the expert already testified to that sort of

 4     thing.

 5              THE COURT:  Well, that's what I'm saying don't ask

 6     about.  We've heard about that.  Only as to the money.

 7              MR. YOUNG:  Your Honor, may we approach?

 8              THE COURT:  Yes.

 9              MR. YOUNG:  Thank you.

10        (The following proceedings were had at the bench and out

11     of the hearing of the jury.)

12              MR. YOUNG:  I just want to be cautious and do it out

13     of the earshot of the jury.  I'm agreeable as to the money,

14     but I believe professional reputation is also part of this, so

15     what impact does tenure have on someone's reputation.

16              THE COURT:  Dr. Parker has testified at length, as

17     has Dr. Tudor.  Unless this is something different --

18              MR. YOUNG:  I think Dr. Cotter-Lynch is well

19     positioned to say how someone who went up at the exact same

20     time with credentials she'll testify are the same --

21              THE COURT:  She'll testify as to what reputation is

22     worth --

23              MR. JOSEPH:  If there's a dollar --

24              THE COURT:  -- which she is she's likely to have

25     lost, that's okay.

Jury Trial – Volume 2
November 14, 2017

```
 1              MR. YOUNG:  Yes.
 2              THE COURT:  We haven't heard that yet.  This other
 3     stuff --
 4              MR. YOUNG:  I know, Your Honor.
 5              THE COURT:  All right.
 6              MR. YOUNG:  I just wanted to clarify.  Thank you.
 7              MR. JOSEPH:  Thank you, Your Honor.
 8         (The following proceedings were had in open court with
 9     all parties present and within the hearing of the jury.)
10     Q.  (BY MR. YOUNG)  So, Dr. Cotter-Lynch, I'm going to ask you
11     a few questions about some changes in your life since you got
12     tenure.  Okay?
13         Let's start with the money because that's probably the
14     easiest.
15     A.   Uh-huh.
16     Q.   Did you get a pay raise when you got tenure?
17     A.   Yes, I did.
18     Q.   Do you remember approximately what that was?
19     A.   I don't remember exactly.  It was -- it's on the salary
20     card.  It's standard for everyone.  Somewhere between 3,500
21     and 5,000, maybe.
22         I know that between pre-tenure, promotion to tenure, and
23     then promotion to full, the difference is about $10,000, so
24     the two promotions.
25     Q.   Is that a significant pay increase, given what your
```

Jury Trial – Volume 2
November 14, 2017

1   pay -- base salary is?

2   A.   Yes, it's about a 20 percent pay raise.

3   Q.   Okay.  For you, did getting tenure -- I don't know --

4   bolster your professional reputation in the academic

5   community?

6   A.   Oh, absolutely.  There's a clear difference in what are

7   called junior faculty versus senior faculty and in terms of

8   the kind of opportunities that are available to you.

9        So most scholarly activities -- so conferences,

10  publications -- they actively seek to have senior faculty

11  included, whether on a conference panel, in a book project,

12  something like that.

13       So there's been a clear shift for me post-tenure --

14  before tenure, I had to kind of apply and submit and ask to be

15  included in things.  And, after tenure, I'm usually asked.

16  And I'm invited often to more things than I can actually do.

17       So that's a very clear shift in how your career works

18  once you have that recognition.

19  Q.   In addition to those things, as a professor at

20  Southeastern, does getting tenure sort of change the way you

21  interact at the campus?

22  A.   It certainly did for me.

23       One of the purposes of tenure is to allow professors to

24  speak up and participate more.  You can say things that might

25  be unpopular or pitch ideas that might not work, but the idea

1    is that then you can be more actively involved in the

2    conversations on campus.

3         I certainly got very noisy after tenure.  Part of that

4    was, quite frankly, motivated by what had happened to Rachel

5    and my being upset about that, but...

6    Q.   Did you feel safer complaining at that point, after you

7    had tenure?

8    A.   Yes.  I mean, I figured that it would be harder for them

9    to fire me.  So that makes it a little easier.

10   Q.   When you were going up for tenure, did you have any

11   understanding of what would happen to you if you didn't get it

12   within the seven years you had allotted at Southeastern?

13   A.   So if I didn't get tenure at all at Southeastern and had

14   to leave?

15   Q.   (Nods head.)

16   A.   I mean, the year I was up for tenure, I did apply out.

17   So I applied to other universities, which is not unusual.

18        Honestly, I was not really worried about getting tenure.

19   My husband was going up the same year at a much more

20   competitive university.  So we both went on the market,

21   applied for other jobs, kind of as insurance.

22        But if you don't get tenure at all and just lose your

23   job, it looks bad, so --

24             MR. JOSEPH:  Objection, Your Honor.  Speculation.

25             THE COURT:  Overruled.

Jury Trial – Volume 2
November 14, 2017

1          THE WITNESS:  So, I mean, had I not gotten tenure
2    and had to leave, honestly, I would probably be teaching high
3    school at this stage, which is a fine thing to do, but it's a
4    different career.
5          I'm married.  I have two kids.  So moving is not super
6    easy.  So we may have looked elsewhere.  My husband's job
7    might have turned out to be more mobile if I didn't have a job
8    too.  It's easier to move.  I mean, I'm unemployed.
9          But, certainly, my professional life would be entirely
10   different and a lot of just my life generally would look very
11   different.
12   Q.   (BY MR. YOUNG)  Have you served on hiring committees at
13   Southeastern in the English department?
14   A.   Yes.
15   Q.   Can you just tell me generally how a hiring committee in
16   the English department looks at a candidate who has not gotten
17   tenure in a previous job?
18   A.   It looks very suspicious.  Hiring for a tenure-track job
19   in English is super competitive.  The hiring committees I have
20   been on at Southeastern, we've had in the neighborhood of plus
21   or minus 50 applicants for one job.
22        At other schools -- I know I applied for a job where
23   there were over 400 applicants.  I would say, average,
24   probably 100.  So it's really competitive to get a
25   tenure-track job.

Jury Trial – Volume 2
November 14, 2017

1     And when you're looking at applicants, there's kind of

2  the sense of –– what you're trying to do is judge whether this

3  person is going to be successful at your university.  What we

4  want to do is hire in someone who's going to do a good job and

5  who's going to get tenure and stay with us.  That's our goal.

6     So we're trying to judge that from the application that

7  we have in front of us.  If you see someone who has been at

8  another university for seven years –– we know that that's the

9  probationary period as assistant professor –– and then

10 nothing, what that tells us is that that's someone who went

11 through the probationary period, tried to get tenure, and

12 didn't.  I mean, that's a pretty easy thing to read from a

13 résumé.

14     So that then makes us suspicious; right?  If they

15 couldn't do it once, what makes us think that they could do it

16 again?  So that causes us pause.

17     Certainly, it's competitive enough that, if there's any

18 strike against you, you're not going to get an interview.

19 Q.  Okay.  I'm going to talk to you a little bit about what

20 you know about how Dr. Tudor's experience at Southeastern

21 those last couple of years, how it affected her.

22     You're good friends with Dr. Tudor; is that right?

23 A.  Yes.

24 Q.  And you've been friends with her both when she was at

25 Southeastern and continuing till today?

Jury Trial – Volume 2
November 14, 2017

1  A.    Yes.  Yes.

2  Q.    Okay.  When Dr. Tudor was at Southeastern, what kinds of

3  changes did you see after she was denied for tenure?

4  A.    She was -- so I guess I'll start in the fall of 2010,

5  which is when I found out about the issues with her being

6  denied tenure and not being allowed to reapply.

7       She seemed worried and kind of down.  But, initially, she

8  was kind of very determined to -- she would go through the

9  internal grievance policies.  Our hope at that stage is that

10  it would work; right?  So something wrong was done.  We will

11  get this corrected.  Policy wasn't followed.  Here's the

12  appeals process.  We'll go through it.

13      So at that stage she was very -- I think she was worried

14  and upset, a bit angry, but still hopeful with the process.

15      That changed over the course of that school year as it

16  became clear that those processes weren't working.  She was

17  really trying to do everything she could to work through the

18  established processes to try and get this fixed, and there was

19  all kinds of craziness going on.  The policies just weren't

20  being followed.  The appeals process was not being followed.

21          MR. JOSEPH:  Objection, Your Honor.  This witness is

22  not the arbiter of whether or not those policies were

23  followed.

24          THE COURT:  You can testify to things you know.

25          THE WITNESS:  Okay.

1       THE COURT:  Not to assumptions --

2       THE WITNESS:  Okay.

3       THE COURT:  -- or speculation or what someone told

4    you.  Just testify as to what you know.  If you know that,

5    then you can testify to it.

6       THE WITNESS:  Okay.

7    Yeah.  So I know that the appeals committee found in

8    Rachel's favor and that the -- the Academic Policies and

9    Procedures Manual at the time that the appeals committee

10   initially found in her favor, to my reading of the policies,

11   required the president to listen to that decision.

12      That Academic Policies and Procedures Manual was changed

13   in order to -- the language was changed so that the president

14   did not necessarily have to listen to that appeals decision.

15   And that happened -- that change happened, to my memory, on a

16   snow day in February when we weren't on campus, after the

17   appeals committee had made its decision but before the

18   president would have been expected to take his action.

19      So the appeals process went through, the committee found

20   in her favor, then policy was changed, and the president did

21   not abide by the decision of the appeals committee.

22   Q.  (BY MR. YOUNG)  To your recollection, has anything like

23   that happened ever at Southeastern?

24   A.  No.  We were all very taken aback by that.

25      MR. JOSEPH:  Objection, Your Honor.  The witness

1  continues to use the word "we" without declaring who those

2  "we" are.

3          THE COURT:  Overruled.

4  Q.  (BY MR. YOUNG)  Okay.  How would you describe Rachel after

5  her gender transition but before the tenure denial?

6  A.   She seemed happy.  I mean, not every day.  We all have

7  bad days; right?  But she -- she's always been a pleasant

8  person.

9          So, I mean, I remember seeing her in the hallways and

10  thinking that she kind of -- this is going to sound cheesy --

11  but kind of exuded positivity.  She was a pleasant presence.

12  She seemed happy.  She clearly loves teaching.  If you see her

13  in the classroom, there's no question that she really enjoys

14  working with students.  So that was certainly my impression of

15  her prior to all this.

16  Q.   Did she complain a lot?

17  A.   No, not at all.  She's very slow to complain.  I -- yes.

18          Even through all of this, I mean, through the appellate

19  process and all of that, I was -- I would say to her, "Can I

20  do something?  Can I go to complain to people?  Who else can

21  we get involved?"

22          And she was like, "No, we're going to follow the

23  process" --

24          MR. JOSEPH:  Objection, Your Honor.  Hearsay.

25          THE COURT:  Overruled.

Jury Trial – Volume 2
November 14, 2017

1    Q.   (BY MR. YOUNG)   You can continue.

2    A.   She asked me to basically not kick up a fuss.  She wanted

3    to follow the process and follow the rules.

4    Q.   After Dr. Tudor was denied tenure, do you remember any

5    particular changes about her demeanor, the way she interacted

6    with folks, anything like that?

7    A.   Clearly, 2010-2011, that school year, was very, very

8    difficult for her.  I mean, she started off kind of down and

9    angry.  I mean, not lashing out at people, but a wrong has

10   been done and not --

11          MR. JOSEPH:  Your Honor, what's the basis of this

12   witness's knowledge of the witness's -- of the plaintiff's

13   emotional state of anger or not?

14          THE COURT:  Is that an objection?

15          MR. JOSEPH:  It is an objection.  I'm sorry.

16          THE COURT:  Overruled.  You may cross-examine.

17   Q.   (BY MR. YOUNG)   You may continue.

18   A.   By the end of the school year, she was clearly

19   despondent, very, very down, obviously upset that she was

20   being fired.

21      There was one occasion when I remember calling her in the

22   evening.  When she picked up, she'd obviously been crying.

23   She was very kind and appreciative when I called, but she was

24   clearly upset.  And this was very difficult for her.

25   Q.   Have you kept in touch with Rachel regularly since she

Jury Trial – Volume 2
November 14, 2017

1   left Southeastern?

2   A.   Yes, I have.

3   Q.   In your opinion, based on when you knew Rachel before the

4   tenure denial happened and after --

5   A.   Uh-huh.

6   Q.   -- does Rachel seem like the same person that she used to

7   be?

8   A.   I mean, she's always been kind of a quiet, unassuming

9   person, very kind, very smart, very funny, but not -- shy.

10  She's definitely shy.

11       And she's become much more kind of reserved, kind of --

12  yeah, much more hesitant to interact with people in the world,

13  for understandable reasons.  This has been really tough.  I

14  mean, this has been hanging over her head for seven years now.

15  So I completely understand, but it's been very difficult.

16  Q.   Is Rachel the sort -- is Dr. Tudor the sort of person who

17  tries to pick a fight?

18  A.   No, not at all.  She's -- as I mentioned, she's quite

19  soft-spoken.  She is very much someone who wants to do her job

20  and not make waves.  She gets along with just about everybody

21  that I know, and she's not at all someone to pick a fight at

22  all.

23       This is -- she never would have wanted to be here.  This

24  is not her -- not what she would have chosen at all.

25  Q.   As a senior member of the English department at

Jury Trial – Volume 2
November 14, 2017

1   Southeastern, would you personally have any concerns if

2   Dr. Tudor were to return?

3   A.    None at all.  I'd be very happy to have her back.

4   Q.    Can you explain why you would be happy to have her back?

5   A.    She's really good at what she does.  She's an excellent

6   teacher.  When she was there, she taught -- she taught several

7   classes.

8        One of the classes that she taught very regularly was our

9   introduction to philosophy class, which our undergraduates can

10  take as part of their general education.  So whatever major

11  you are, this is one of the classes that fulfills your

12  requirements.

13       During the time that she was teaching it, our enrollments

14  in that class doubled.  We had to add another section because

15  so many people wanted to take that class with her.

16       I, at the time, was also teaching a course called

17  Critical Approaches to Literature, which is kind of the first

18  class that most English majors take as part of their English

19  major, and I regularly had a couple of students a semester on

20  average in that class.  When I asked them why did they choose

21  to become an English major, they would say "Dr. Tudor" and

22  say, "I took a class with her.  It was great.  This inspired

23  me to love books.  I want to be an English major."

24       So, clearly, she's a really gifted teacher.  She loves

25  books.  She's very empathetic.  She gets students.  She's not

1   just passionate about her topic but also passionate about

2   interacting with students.  And then she's just a pleasant

3   person to have around.

4        So if you have someone who's good at their job and you

5   like to hang out with, that's really what you hope for.

6   Q.   Have things at Southeastern changed since Rachel left?

7   A.   Yes, dramatically.

8   Q.   Will you explain?

9   A.   Sure.  I mean, they've changed in lots of ways.  The

10  administration has almost entirely turned over.

11       So Sean Burrage became president about two years ago.

12  Doug McMillan is gone.  Lucretia Scoufos is gone.  Our

13  administrative structure has completely changed.  That's all a

14  good thing from my perspective.

15       Going back to kind of sooner after Rachel's departure,

16  from my own –– for my own sake, I was super angry about what

17  happened to Rachel.  And I was very –– I was angry going to

18  school every day.  I hated going to my job that fall of 2011

19  because I was so angry about what had happened.

20       And, for my own sake, somewhere about halfway through

21  that fall, I came to the decision that I had to either get a

22  new job because I did not want to spend the next 25 years

23  going to a place I hated, or I had to try and help change the

24  place.  And those were really the only options that I was

25  willing to live with because I did not want to live my life

1    that angry.

2         So at that stage I started talking to some other faculty.

3    There was a lot of discontent amongst the faculty at that

4    time.  Many of us were very unhappy with the behavior of the

5    administration in Rachel's case but also for other reasons as

6    well.

7         In December of 2011, there was some administrative

8    restructuring so that Lucretia Scoufos, who had been dean of

9    arts and sciences, became dean of instruction.  So instead of

10   being one of three deans, she was then the only dean.  She was

11   the dean of everybody.

12        That was announced on a Friday.  Over the weekend, I sent

13   out an e-mail to some of my friends and said we need seven

14   people to start a chapter of the American Association of

15   University Professors; who's in?  By Monday, we had eight

16   members.

17        So we had our first meeting in January.  20 faculty --

18   I'm sorry -- 30 faculty members showed up, and we founded a

19   chapter that January.

20        The reason for doing that, the American --

21             MR. JOSEPH:  Your Honor, objection to relevance.

22             THE COURT:  Well, I think we've gone so far beyond

23   the question.

24             THE WITNESS:  Okay.

25             MR. YOUNG:  I can cut her off.

Jury Trial – Volume 2
November 14, 2017

1   Q.   (BY MR. YOUNG)   Thank you.   A lot of professors, AAUP

2   chapter.   Okay.

3        Dr. Cotter-Lynch, have you done anything personally to

4   try to bring Dr. Tudor back to Southeastern?

5   A.   Yes.   Obviously, I supported her through the appeals

6   process when she was there.

7        Starting in -- it would have been April, I guess, when it

8   was clear that everything internal at Southeastern wasn't

9   going to work, I had been asking Rachel repeatedly, but

10  finally she said, okay, you can talk to people.

11       So I wrote to the regents.   I spoke to some people in a

12  professional organization that I belong to, and I asked them

13  to look at what was going on and write letters to the regents.

14  I started an online petition.   I posted publicly on Facebook

15  about what was going on and basically talked to anybody I

16  thought would listen about what was going on.

17  Q.   I'm going to have you -- this is one that I have on me.

18            MR. YOUNG:   May I approach the witness, Your Honor?

19            THE COURT:   Yes.

20  Q.   (BY MR. YOUNG)   Dr. Cotter-Lynch, I just handed you an

21  exhibit that's marked as Plaintiff's Exhibit 25.

22       Do you recognize that?

23  A.   Yes.

24  Q.   What is it?

25  A.   It is the online petition that I started in, I believe,

Jury Trial – Volume 2
November 14, 2017

 1   April of 2011, when it was about a month before Rachel's

 2   ultimate -- she had been told that she would be fired

 3   effective May 30th at that stage.

 4        So I started this petition addressed to the regents to --

 5   Q.   I'll stop you right there for a sec.

 6            MR. YOUNG:  Your Honor, I'd like to move to enter

 7   into evidence Exhibit 25.

 8            MR. JOSEPH:  Your Honor, we'll object on the basis

 9   of relevance and hearsay.

10            THE COURT:  I will admit Plaintiff's 25.

11   Q.   (BY MR. YOUNG)  Okay.  Dr. Cotter-Lynch, let me try to

12   break up your testimony with some questions so we can put you

13   in the right direction.  Okay?

14        So I believe you testified that you're the one who

15   created this petition; is that right?

16   A.   Yes.  Yes.

17   Q.   Can you tell us all why you created this petition?

18   A.   Because I wanted to demonstrate to the regents that what

19   certain administrators at Southeastern were doing was not

20   popular, that it was both generally wrong on just kind of

21   basic what's right and wrong standards, but that also that

22   there was a lot of support amongst Rachel's colleagues, both

23   inside and outside Southeastern, and her students.  A lot of

24   students signed as well.

25   Q.   Did professors sign?

Jury Trial – Volume 2
November 14, 2017

1    A.    Yes.

2    Q.    Professors in and outside of Southeastern?

3    A.    Yes.

4    Q.    So what did you do with this petition once it was, I

5    guess, done?

6    A.    I printed it out -- well, I called Sheridan McCaffree at

7    RUSO and asked her how to have it delivered.  And I wanted

8    to -- I just think it makes more of an impression if you

9    deliver something physically instead of electronically.

10        So I -- I got from her the mailing address and that I

11   could send stuff to the individual regents at the address she

12   gave me in Oklahoma City.

13        So I printed out copies of the -- full copies -- like,

14   big ole copies -- for each of the regents and put them each

15   into individual envelopes addressed to the regents, but then

16   got one of those Priority Mail boxes and put them all in there

17   and sent it to Oklahoma City.

18   Q.    Did RUSO ever respond to you once you sent off that box

19   full of documents?

20   A.    No.

21   Q.    Never?

22   A.    (Shakes head.)

23   Q.    After you mailed off this petition to the regents, did

24   you do anything else to try to bring Dr. Tudor back to

25   Southeastern?

Jury Trial – Volume 2
November 14, 2017

```
 1    A.   I'm trying to remember.  I certainly kept talking to
 2    Rachel and talked to her about the various measures she took
 3    outside of Southeastern.
 4         The national AAUP sent a couple of letters to
 5    Southeastern.  I know she appealed to the EEOC.  At that
 6    stage, she was taking action outside the university.
 7    Q.   Do you recall having a conversation with the new
 8    president of Southeastern, Sean Burrage, in 2014?
 9    A.   Yes.  I talked to him more than once in 2014.
10    Q.   Sorry.  Bad question.
11         In 2014, did Douglas McMillan still work at Southeastern?
12    A.   Yes.
13    Q.   Do you recall having a conversation with now-President
14    Burrage about statements made by Doug McMillan?
15    A.   Yes.  So --
16              MR. JOSEPH:  I'm going to object to hearsay, Your
17    Honor.
18              THE COURT:  Well, you answered the question.  Ask
19    another.
20         And don't report what somebody said to you, only what you
21    said or did.
22              THE WITNESS:  Okay.
23    Q.   (BY MR. YOUNG)  What did you say to Sean Burrage in 2014?
24    A.   I went to see Sean Burrage with my colleague Virginia
25    Parrish.  We went on behalf of the AAUP chapter, which had
```

1  voted at our last meeting to send me and Virginia to talk to

2  Sean.

3      The concern that was discussed at the meeting, that was

4  voted on, was that he would -- Sean was the new president, and

5  the chapter was concerned that --

6          MR. JOSEPH:  Your Honor, objection.  This is not

7  responsive to the question counsel posed.

8          THE COURT:  I've forgotten the question.

9          MR. YOUNG:  Honestly, Your Honor, I did too.  Let me

10 just ask a new question and we'll get her back on track.

11 Okay?  I'm sorry.  It's a little awkward.

12 Q.  (BY MR. YOUNG)  What was the concern that you had that

13 drove you --

14 A.  I was concerned that Sean had been told, and perhaps

15 believed, by Doug McMillan that the faculty --

16          MR. JOSEPH:  Objection, Your Honor.  This is

17 hearsay.

18          THE COURT:  Counsel, come to the bench.

19          MR. YOUNG:  Yes, Your Honor.

20      (The following proceedings were had at the bench and out

21 of the hearing of the jury.)

22          THE COURT:  Ph.D.s.  We're only at the beginning of

23 the Ph.D.s.

24      What is it you want to elicit?

25          MR. YOUNG:  There's a statement against interest

Jury Trial – Volume 2
November 14, 2017

1    that I'm trying to get in, Your Honor, an exception to

2    hearsay.

3                THE COURT:  Whose?

4                MR. YOUNG:  Sean Burrage.

5                THE COURT:  So she's going to tell us what Sean

6    said?

7                MR. YOUNG:  To her.

8                MR. JOSEPH:  First of all, as far as we know, the

9    president -- I don't know what the statement is, Your Honor.

10       But in terms of -- that's still hearsay.  Unless he's got

11   some description of what this statement is and what this

12   statement is against which interest, I think it's still

13   hearsay.

14       Well, certainly the current president was not there at

15   the time of Tudor's tenure process.

16               THE COURT:  And that is the beginning of the

17   problem.  How do you get around that?

18               MR. YOUNG:  It has to do with what Sean Burrage

19   discovered when he became president of Southeastern.

20               THE COURT:  And so what you're really trying to get

21   in is that Mr. McMillan -- Doctor, whoever, McMillan -- is a

22   bad guy, a really bad guy?

23               MR. YOUNG:  Yes.  I think we're all clear on that at

24   least, even if we're not clear on the rules.

25               THE COURT:  You're going to have to have somebody

Jury Trial – Volume 2
November 14, 2017

1    testify that can testify to bad acts, not what people said.

2        I don't see --

3            MR. YOUNG:  There's -- I'm sorry, Your Honor.  There

4    is an act involved.  This is an action.

5            MR. JOSEPH:  An act that Parrish herself observed?

6    Without personal knowledge, she can't testify about that.

7            MR. YOUNG:  She's talking about a conversation that

8    she had, a statement against interest from the president of

9    Southeastern.

10           THE COURT:  Tell me what she's going to say he said.

11           MR. YOUNG:  Okay.  Not word for word, but more or

12   less she's going to say that Sean was told by Doug McMillan

13   that the faculty did not want Rachel Tudor back and that

14   influenced how they have dealt with things so far.

15       Meg is going to say that the faculty wanted to hold a

16   vote to decide whether it was -- what the faculty's position

17   was because they feared that their position was being lied to

18   about by Doug McMillan to influence Sean.

19           THE COURT:  Well, she can testify that they were

20   going to take a vote, if I heard you correctly, in response to

21   a concern --

22           MR. YOUNG:  Yes.

23           THE COURT:  -- Burrage raised.

24       She can't say -- it's just totally outside of time.  It's

25   two years later, if I understand correctly, new

 1   administration.

 2              MR. YOUNG:  Well, at that point, Your Honor,

 3   respectfully, Sean Burrage was the only new administrator.

 4   All of the other folks were still there.

 5        And defendants, part of their case is that Dr. Tudor

 6   wasn't needed there, she was a troublemaker, she wasn't

 7   supported by folks.  It's pretty strong that the faculty had

 8   this strong belief.

 9              THE COURT:  You can certainly have her testify about

10   what the faculty was proposing to do or didn't do or -- just

11   in response to what?  No.  It's too far outside the time

12   period we're talking about, and it's hearsay on hearsay.

13   So --

14              MR. YOUNG:  Okay.  I can limit it to the action of

15   the faculty.

16              THE COURT:  Right.

17              MR. YOUNG:  To her understanding.

18              THE COURT:  Yes.

19              MR. YOUNG:  I can do that.  Thank you, Your Honor.

20              MR. JOSEPH:  Thank you, Your Honor.

21        (The following proceedings were had in open court with

22   all parties present and within the hearing of the jury.)

23   Q.  (BY MR. YOUNG)  Okay.  Dr. Cotter-Lynch, I think we've

24   worked through it.

25        So I'm going to ask you a specific question.  If you can

Jury Trial – Volume 2
November 14, 2017

1   listen carefully --

2   A.   Okay.

3   Q.   -- to that question and only answer that question, not

4   the question I asked you earlier.  Okay?

5        In 2014, did the Southeastern faculty want to have a vote

6   on whether the faculty wanted Dr. Tudor back at Southeastern?

7   A.   In 2014, Chris Moretti, who was --

8             THE COURT:  No, no.

9   Q.   (BY MR. YOUNG)  No, no.  To your knowledge.

10       I think we scared her.

11  A.   I don't know how to answer the question because I can't

12  speak for every single faculty member I can -- can I say what

13  the AAUP chapter voted on?

14  Q.   Yes.

15  A.   Okay.  So the AAUP chapter voted that they would like me

16  and Virginia -- which we did.  Virginia and I, with the

17  approval of the chapter, met with President Burrage and told

18  him that we believed the faculty supported Rachel coming back

19  and that the faculty senate was willing to poll the faculty to

20  prove that.

21  Q.   Was there a particular reason why the AAUP chapter had

22  that vote?

23  A.   Yes.

24       I'm waiting for the objection.

25       We heard a rumor --

Jury Trial – Volume 2
November 14, 2017

```
 1              MR. JOSEPH:  Objection, Your Honor.  Hearsay.
 2              THE WITNESS:  Yeah.
 3              MR. YOUNG:  Yeah.
 4   Q.  (BY MR. YOUNG)  But there was a reason?
 5   A.  Yes.
 6   Q.  Okay.  At some point, were you the president of the AAUP
 7   chapter at Southeastern?
 8   A.  Yes, for four years from 2012 to 2016.
 9   Q.  While you were the president of the AAUP chapter, did you
10   have a general understanding of sort of the desires of the
11   faculty at Southeastern?
12   A.  I tried very hard to.  One of the explicit role of the
13   AAUP chapter is to serve as an advocate for the faculty.  So I
14   certainly made an effort to talk to faculty, get an idea of
15   what was going on.
16          Also, in my role as president, faculty knew -- and I had
17   several faculty do this -- come to me with concerns,
18   observations within the limits of what was permissible to me.
19   I would keep those confidential or allow people -- people came
20   and told me stuff that they might not tell everybody.
21   Q.  Okay.  Let's fast-forward a bit.
22          Today, would you recommend Southeastern as a good place
23   for transgender students to attend?
24   A.  I would be very hesitant to do that.
25   Q.  Why?
```

```
 1              MR. JOSEPH:  Objection, Your Honor.  This witness is
 2   not an expert on student life.
 3              THE COURT:  Well, it's just not relevant.
 4              MR. YOUNG:  Okay.  I believe the next one is
 5   relevant, though, Your Honor.
 6   Q.  (BY MR. YOUNG)  Today, Dr. Cotter-Lynch, would you
 7   recommend that transgender professors apply for positions at
 8   Southeastern?
 9              MR. JOSEPH:  Same objection, Your Honor.
10              THE COURT:  Overruled.
11              THE WITNESS:  No, I would not.
12   Q.  (BY MR. YOUNG)  Can you please explain why.
13   A.  Because of what happened to Rachel.  That has not been
14   made right, and I continue to have concerns.
15   Q.  What would it take for you to no longer have concerns?
16   A.  I want her to come back to her job.  She earned it.  That
17   would make it clear.
18   Q.  Has the Southeastern administration ever given the
19   English department a voice in the decision as to whether
20   Rachel Tudor can come back?
21              MR. JOSEPH:  Objection, Your Honor.  That's outside
22   this witness's knowledge.
23              THE COURT:  Overruled.
24      You may answer if you know.
25              THE WITNESS:  The English department specifically or
```

Jury Trial – Volume 2
November 14, 2017

1   the faculty in general?

2   Q.   (BY MR. YOUNG)   The English department specifically.

3   A.   There was the tenure vote in 2009–2010 that said that she

4   should get tenure.  Since then, there has been no official

5   query by the administration about whether or not they think

6   Rachel should come back.

7   Q.   Do you have any specific knowledge as to whether the

8   English department would vote to bring Rachel back –– I'm

9   sorry –– Dr. Tudor back if they could?

10   A.   There's seven tenured people in the department right now.

11   Five of them are testifying in her favor in this trial.

12           MR. JOSEPH:  Objection, Your Honor.  Assumes facts

13   not yet in evidence.  Also calls for speculation.

14           THE COURT:  Overruled.

15   Q.   (BY MR. YOUNG)   Is there anyone in Southeastern's English

16   department right now that you know for a fact does not want

17   Rachel Tudor to return to Southeastern?

18   A.   No.

19           MR. YOUNG:  Okay.  That's it.  Short and sweet.

20           THE COURT:  Mr. Joseph?

21           MR. JOSEPH:  Thank you, Your Honor.

22                   **CROSS–EXAMINATION**

23   BY MR. JOSEPH:

24   Q.   Dr. Cotter-Lynch, after Dr. Tudor's transition from

25   presenting herself as male to presenting herself as female,

Jury Trial – Volume 2
November 14, 2017

1    did she dress in a feminine way, in your opinion?

2    A.    Yes.

3    Q.    You never told Dr. Tudor how she should or shouldn't

4    dress, did you?

5    A.    No.

6    Q.    Okay.  I'm assuming, but I'll just ask, you never

7    criticized Dr. Tudor's attire?  Did you ever criticize her

8    makeup?

9    A.    No.

10   Q.    You never personally observed -- well, who is Dr. Randy

11   Prus?

12   A.    He is currently the department chair.

13   Q.    Okay.  And at the time of Dr. Tudor's 2009 application

14   for tenure and promotion in the English department, what role

15   did Dr. Randy Prus play in that process, to your knowledge?

16   A.    He was, at that point, not yet chair.  He was a professor

17   in the English department, and he was on the tenure and

18   promotion committee.

19   Q.    Okay.  And have you ever personally observed Dr. Randy

20   Prus, the current department chair and former member of

21   Dr. Tudor's committee on tenure and promotion, did you ever

22   personally observe him criticize Dr. Tudor's attire?

23   A.    No.

24   Q.    Did you ever personally observe him criticize Dr. Tudor's

25   makeup?

Jury Trial – Volume 2
November 14, 2017

1  A.    No.

2  Q.    Did you –– you never personally observed Dr. Lucretia

3  Scoufos, the former dean, criticizing Dr. Tudor's attire, did

4  you?

5  A.    No.

6  Q.    You never personally observed Dr. Douglas McMillan,

7  former vice president for academic affairs, criticizing

8  Dr. Tudor's attire either, did you?

9  A.    No.  I don't recall ever seeing the two of them interact.

10 Q.    You never personally observed Dr. Larry Minks, the former

11 president of the university, criticizing Dr. Tudor's attire or

12 makeup, did you?

13 A.    No.

14 Q.    But all of those people –– Dr. Randy Prus, Dr. Dean

15 Scoufos –– Lucretia Scoufos, Vice President McMillan, and

16 President Minks –– all agreed that Dr. Tudor's 2009–2010

17 tenure and promotion packet did not merit tenure that year;

18 isn't that correct?

19 A.    I believe so.

20 Q.    You never personally observed any member of the English,

21 Humanities, and Languages department criticizing Dr. Tudor's

22 attire, did you?

23 A.    No.

24 Q.    You never personally observed any staff members of the

25 EHL department criticizing Dr. Tudor's attire, did you?

Jury Trial – Volume 2
November 14, 2017

1    A.    No.

2    Q.    You never personally observed any students criticizing

3    Dr. Tudor's attire, did you?

4    A.    No.

5    Q.    If you had observed people at Southeastern criticizing

6    Dr. Tudor's attire, you would have said something to them,

7    wouldn't you?

8    A.    I believe so.

9    Q.    You probably would have even reported to the affirmative

10   action officer or an outside reporting entity, wouldn't you?

11   A.    Not necessarily, because I've observed other people being

12   criticized, and I speak up, but I don't file --

13   Q.    So you never made such a report to anybody, did you?

14   A.    No.

15   Q.    Okay.  You never personally observed anyone complaining

16   about which restroom Dr. Tudor used, did you?

17   A.    No.

18   Q.    Either before her transition or after?

19   A.    (Shakes head.)

20   Q.    You never personally observed anyone making fun of which

21   restroom Dr. Tudor used either before her transition or after,

22   did you?

23   A.    No.

24   Q.    If you had observed someone making fun of Dr. Tudor's

25   restroom choice or restroom usage, you would have spoken up

1    about that, don't you think?

2    A.   Yes.

3    Q.   In 2008-2009 academic calendar year –– or academic

4    year –– excuse me –– Dr. Tudor's tenure and promotion

5    application committee members voted unanimously to deny her

6    tenure application that year, didn't they?

7    A.   To my knowledge, yes.  I was not on the committee, but

8    that's what I've heard.

9    Q.   Okay.  Tenure track is a promotion –– is a probationary

10   appointment, isn't it?

11   A.   (Nods head.)

12            THE COURT:  Please answer yes or no.

13            THE WITNESS:  Yes.

14            MR. JOSEPH:  Thank you, Your Honor.

15   Q.   (BY MR. JOSEPH)  You're doing fine otherwise.  I

16   appreciate that, Dr. Cotter-Lynch.

17        I think I just asked, but let me make sure.

18        Tenure track is a probationary appointment; correct?

19   A.   Yes.

20   Q.   Okay.  So probationary suggests that it's not guaranteed;

21   correct?

22   A.   Yes.

23   Q.   Okay.  The committee, in 2008-2009, for Dr. Tudor's

24   tenure and promotion –– I think you just said, but I just want

25   to be clear –– you were not on that committee; is that

 1   correct?

 2   A.   That is correct.

 3   Q.   Okay.  Were you on Dr. Tudor's 2009–2010 tenure and

 4   promotion application committee?

 5   A.   I was not.  I did not have tenure yet --

 6   Q.   Okay.

 7   A.   -- and you can't be on a committee until you have tenure

 8   yourself.

 9   Q.   So you did not actually sit and review her tenure and

10   promotion application packet as it was submitted in 2008, did

11   you?

12   A.   No.

13   Q.   And you did not actually sit and review Dr. Tudor's

14   tenure and promotion application packet as it was submitted to

15   that committee in 2009, did you?

16   A.   No.

17   Q.   Do you have a complete copy of Dr. Tudor's tenure and

18   promotion application from 2008?

19   A.   No.

20   Q.   Do you have a complete copy of Dr. Tudor's tenure and

21   promotion application as it appeared to that 2009 tenure

22   committee?

23   A.   No.

24   Q.   Have you ever seen a complete copy of Dr. Tudor's tenure

25   and promotion application as it appeared to the 2009–2010

Jury Trial – Volume 2
November 14, 2017

1  committee?

2  A.   I have not.

3  Q.   If -- and I think you testified earlier, but I just

4  wanted to clarify.

5       You went up in 2009 and 2010; correct?

6  A.   That's correct.

7  Q.   And you still have a copy of the portfolio that you

8  submitted that year?

9  A.   I do.

10  Q.   Okay.  If Dr. Tudor didn't keep a copy of that, doesn't

11  that suggest that she wasn't particularly proud of it?

12  A.   No, because she put together -- she used it to put

13  together her 2010-2011 portfolio, which I have seen.

14  Q.   Dr. Tudor -- I mean -- excuse me.

15       The tenure and promotion review process at Southeastern,

16  both at the time that Dr. Tudor went up and now, is a

17  multilevel process, isn't it?

18  A.   It is.

19  Q.   Okay.  And I think you may have mentioned this briefly,

20  but -- or maybe not.  Excuse me.

21       The tenure and promotion process at most American

22  universities is a multilevel process, isn't it?

23  A.   Yes.

24  Q.   Okay.  And at Southeastern in particular, that process

25  begins in the subject area department with a committee

Jury Trial – Volume 2
November 14, 2017

```
 1    meeting; correct?
 2    A.    Yes.
 3    Q.    And then that moves up to the department chair?
 4    A.    Yes.
 5    Q.    And then to the dean?
 6    A.    Yes.
 7    Q.    Then to the academic vice president or --
 8    A.    In the 2009-2010 year, that was correct.  We no longer
 9    have a dean.
10    Q.    Okay.  But then after the dean to the vice president for
11    academic affairs; correct?
12    A.    Yes.
13    Q.    And then to the president?
14    A.    Yes.
15    Q.    And then, ultimately, the president has to make a
16    recommendation that goes up to the board of regents, doesn't
17    it?
18    A.    Yes.  In pretty much every case, the president is
19    considered a rubber stamp.
20    Q.    Okay.  So regarding your own tenure application process,
21    the former dean, Lucretia Scoufos, gave you fairly detailed
22    guidelines, I think you said earlier, about what to follow in
23    terms of the appearance, the content, that sort of thing, of
24    your application, didn't she?
25    A.    Yes.
```

Jury Trial – Volume 2
November 14, 2017

1  Q.   Did you follow those guidelines to the best of your

2  ability?

3  A.   To the best of my ability, yes.

4  Q.   Can professional people in a workplace have legitimate

5  differences of opinion without it being discriminatory?

6  A.   On some topics, yes.

7  Q.   Do you respect Dr. Randy Prus?

8  A.   I do.

9  Q.   Do you trust him?

10 A.   Yes.

11 Q.   Do you respect Dr. Claire Stubblefield, the former

12 affirmative action officer at the school?

13 A.   I have concerns about her.

14 Q.   Did you trust Dr. Stubblefield's word?

15 A.   Which word in particular?

16 Q.   In general, did you find Dr. Claire Stubblefield -- you

17 worked with Dr. Claire Stubblefield -- at least your tenure

18 there overlapped at the university; correct?

19 A.   Yes.  Yes.

20 Q.   Did you trust Dr. Stubblefield?

21 A.   I was aware that her job was --

22 Q.   Did you trust her?  It may be a yes-or-no question.

23 A.   If it has to be a yes-or-no question, the answer is no.

24 Q.   Okay.  If Dr. Claire Stubblefield testifies that she

25 conducted, in her opinion, a conscientious and thorough

1    investigation of Dr. Tudor's discrimination and retaliation
2    complaints, do you believe her?
3    A.    I really have no basis to know.
4    Q.    Okay.  Have you received any formal training on how to
5    conduct investigations into claims of discrimination?
6    A.    Yes.
7          I attended a Title IX training here in Oklahoma City with
8    several other faculty/administrator staff.
9    Q.    That was another yes-or-no question.
10   A.    Yes.
11   Q.    I'm sorry, Your Honor -- I mean, I'm sorry,
12   Dr. Cotter-Lynch.
13         When was that?
14   A.    After tenure, but Claire was still in charge of it.  So
15   I'm guessing three, four years ago.  I don't remember
16   precisely.
17   Q.    Did Dr. Stubblefield put on that training?
18   A.    It was put on by RUSO.  Charlie Babb led it.
19   Q.    Okay.  Did Dr. Stubblefield facilitate or make any
20   partial presentation in that seminar?
21   A.    Not that I recall.
22   Q.    Okay.  Did you ever observe any specific event of racial
23   discrimination at Southeastern?
24   A.    I've heard people say unpleasant things, but nothing
25   that's systemic.

1   Q.   Did you personally ever observe anything?

2        I'm sorry?

3   A.   I've heard people say unpleasant things but nothing that

4   I would consider systemic.

5   Q.   Okay.  But did you ever observe any specific event?

6   A.   I'm not sure what you mean by "event."

7   Q.   Well, did you -- I mean, you and I both know what an

8   event is, what that word means just at a basic level; right?

9   A.   Right.

10  Q.   Okay.

11  A.   Does it -- so, for instance, a student using language

12  that I do not like regarding people of color, yes, I have seen

13  that.  And I have said, "We need to talk about appropriate

14  language."

15  Q.   And did you speak directly with the person using that

16  language?

17  A.   Uh-huh.

18  Q.   And did you report it to the affirmative action officer?

19  A.   No.

20  Q.   Why not?

21  A.   Because I considered it part -- when it happens in a

22  classroom environment, I consider that part of my job as an

23  educator.

24       There was one occasion I did have a student in a

25  Composition II class once who was straight-up avowed white

Jury Trial – Volume 2
November 14, 2017

1  supremacist, and that got reported.  It went -- Charlie Babb
2  was involved in that one.
3  Q.   Okay.  Did you ever witness any event of specifically
4  gender discrimination at Southeastern?
5       And, again, I'm asking for witnessing an event, not
6  hearing unspecified rumors.
7  A.   I have both experienced myself and observed others be
8  subject to comments about appearance that I don't much like.
9       I have been --
10 Q.   Did you report those?
11 A.   No.
12 Q.   Why not?
13 A.   Because if you reported it every time it happened, you
14 wouldn't do anything else.  It happens --
15 Q.   You'll agree with me, won't you, Dr. Cotter-Lynch, that
16 things don't get fixed unless they're reported?
17 A.   No, I don't.  I mean, I think reporting things is one way
18 to do it.  In most cases, when someone says something
19 inappropriate, it's a one-time thing.
20      I would hope that usually it can be handled by a
21 conversation.  Perhaps you go one layer up.  Hopefully, you
22 can handle it that way.  As far as pulling all the alarm bells
23 and going all the way up the hierarchy, that's --
24 Q.   For a large -- I'm sorry.
25      For a large institution like a university to take action,

```
 1    doesn't someone have to say something?
 2    A.   Saying something and filing an official appeal are not
 3    the same thing.
 4    Q.   Okay.
 5         You and I have met before; correct?
 6    A.   Yes.
 7    Q.   And I think you told me in at least one of our visits
 8    that the specific issue of transgender rights is a personal
 9    cause for you; right?
10    A.   I mean, equality generally is something that is important
11    to me, and transgender rights is part of that.
12    Q.   Okay.  And didn't you describe yourself as -- and I'm
13    paraphrasing, so I apologize if I misquote you -- a gender
14    studies Ph.D. with a hyphenated last name that takes very
15    seriously this issue?
16    A.   My academic specialty is gender studies and early
17    Christianity.
18    Q.   Do you accept that the administration at any university
19    has a role to play in the tenure and promotion review process?
20    A.   Yes.
21    Q.   Okay.  Do you allow for the possibility that two
22    professional people at different levels in a hierarchy can
23    review the same tenure and promotion portfolio and come to two
24    different conclusions?
25    A.   Yes.
```

Jury Trial – Volume 2
November 14, 2017

1   Q.   Dr. Cotter-Lynch, you testified earlier this afternoon

2   that in roughly the time frame of 2010, you said the faculty

3   and administration did not get along at all, and Dr. Scoufos

4   and Dr. McMillan were not popular.

5        Do you remember saying that?

6   A.   Yes, I do.

7   Q.   Isn't it true that a rift between an academic side of an

8   institution and the administration side of an institution can

9   cause hurt feelings?

10  A.   Yes.

11  Q.   And isn't it true that those hurt feelings can be

12  legitimate hurt feelings but not discriminatory?

13  A.   Yes.

14  Q.   Did you ever advise Dr. Tudor to hold on to her 2009-2010

15  tenure and promotion portfolio?

16  A.   No, I did not.

17  Q.   Even after Dr. Stubblefield advised you to do so?

18  A.   By that point, Rachel had already put together her

19  2010-11 portfolio.  So that seemed relevant, the relevant one.

20  Q.   You testified earlier that if you hadn't gotten tenure at

21  Southeastern, you might be teaching high school, which,

22  although it's a noble thing to do, I think you said it's just

23  not your chosen career path; is that correct?

24  A.   Yes.

25  Q.   Did you ever suggest to Dr. Tudor that she teach at a

Jury Trial – Volume 2
November 14, 2017

1  high school level?

2  A.   I may have.  I honestly don't remember.  We've had

3  several conversations about her career possibilities and path.

4  Q.   Did you ever suggest to Dr. Tudor that she might apply at

5  a smaller school than Southeastern?

6  A.   I think she's applied to almost every kind of school.

7  Q.   I mean, did you ever give her that advice specifically?

8  A.   I don't think so.  There are not that many schools that

9  are smaller than Southeastern, obviously.  We're pretty small.

10  Q.   Okay.  Did you tell Dr. Tudor to turn down the chance

11  offered to her to withdraw her 2009-2010 application portfolio

12  and resubmit it in the following year or two?

13  A.   I had no knowledge of any of that until the following

14  fall.

15  Q.   The faculty appellate committee, you mentioned a couple

16  of times, its relationship to the administration is advisory,

17  not mandatory; correct?

18  A.   That depends upon your reading of the Academic Policies

19  and Procedures Manual and when you read it.

20       So it changed --

21  Q.   Would you agree with -- I'm sorry.  I didn't mean to cut

22  you off.

23  A.   Oh, it changed.

24  Q.   Would you agree with me that that is at least a

25  legitimate interpretation of that?

Jury Trial – Volume 2
November 14, 2017

1   A.   To my reading at the time that Rachel appealed, it was
2   the -- it looked to me like the decision of the appeals
3   committee was binding.
4   Q.   But to answer my question again, is it or is it not a
5   legitimate interpretation of that rule that it is advisory and
6   not mandatory?
7   A.   I don't think so.
8   Q.   Okay.  And on what do you base that?
9   A.   The -- in part, on the passage of the Academic Policies
10  and Procedures Manual that was entered into evidence saying
11  that the faculty should have deciding -- the deciding role in
12  these matters.
13       Also, it's my understanding that if you have an appeals
14  process, an appeals committee, you should abide by its
15  findings.  That's why it exists.
16       If you have the --
17  Q.   Could a nonfaculty member file an appeal with the faculty
18  appellate committee?
19  A.   There are separate structures for faculty and staff.  So
20  there is a structure for staff, but it would go through a
21  different committee.
22  Q.   A different body?
23  A.   Yes.
24  Q.   Okay.  You are not the chair of the department, are you,
25  currently Dr. Cotter-Lynch?

Jury Trial – Volume 2
November 14, 2017

1    A.    No.

2    Q.    Have you ever been the chair of the English, Humanities,

3    and Languages department there at Southeastern?

4    A.    I have not.

5    Q.    If the current chair of the department has a different

6    opinion about whether or not Dr. Tudor should return or would

7    be welcomed back at Southeastern, do you think that would be

8    for a discriminatory reason?

9    A.    In Randy's case, no.

10   Q.    So you'd accept that Dr. Prus could have a legitimate

11   different opinion of the situation than you and still be a

12   professional?

13   A.    He and I have discussed our difference of opinion over

14   Rachel's 2009-2010 portfolio.

15   Q.    And, again, if he has a different opinion about you --

16   about Dr. Tudor coming back to the university today --

17   A.    Uh-huh.

18   Q.    -- that's what I'm asking you.

19         Do you allow for the possibility that he holds that view

20   legitimately and for nondiscriminatory reasons?

21   A.    I would ask for his reasons, but I like him.  I would

22   hope he could come up with one that is nondiscriminatory.

23   Q.    Okay.

24         MR. JOSEPH:  May I have a moment with co-counsel,

25   Your Honor?

Jury Trial – Volume 2
November 14, 2017

1        THE COURT:  Yes.

2        MR. JOSEPH:  Thank you.

3   Q.  (BY MR. JOSEPH)  One quick question, Dr. Cotter-Lynch.

4   A.    Uh-huh.

5   Q.    If tenure is expected to be denied at Southeastern at any

6   level in that multilevel process you described, whether it's

7   the committee, like in Dr. Tudor's first case, that voted

8   unanimously to recommend against it, or if it happens at the

9   vice president's level, an applicant typically has the ability

10  to withdraw that application at that time, do they not?

11  A.    We have rewritten -- "we" being the faculty -- have

12  rewritten the tenure and promotion policy since Rachel went up

13  to specifically define that.  There is now a specifically

14  defined period when that can happen.

15        At the time that she went up, that was not defined.

16  Q.    But you know now, do you not, as you sit here today, that

17  the administration in 2009-2010 offered Dr. Tudor the

18  opportunity to withdraw her portfolio, beef it up, and file

19  it -- resubmit it in a year or two; isn't that correct?

20  A.    I was not in that meeting, and I have heard divergent

21  reports of that meeting.  So I cannot say what happened.

22  Q.    Do you have any reason to believe that that offer was not

23  made, anything you've actually observed?

24  A.    I don't think I have any way to judge that.

25        MR. JOSEPH:  Okay.  Nothing further for this witness

Jury Trial – Volume 2
November 14, 2017

1  at this time.  Thank you.

2      Thank you, Dr. Cotter-Lynch.

3          THE COURT:  Redirect?

4                  **REDIRECT EXAMINATION**

5  BY MR. YOUNG:

6  Q.   Thank you, Dr. Cotter-Lynch.  I believe on

7  cross-examination you were trying to share something with the

8  jury about Dr. Prus and his difference of opinion as to the

9  2009 application for Dr. Tudor.

10     Have you had any conversations with Dr. Prus or know

11 anything about Dr. Prus's opinions on Dr. Tudor's 2010

12 application?

13 A.   I believe that he -- to my knowledge, I have -- well, I

14 had a conversation with him about that a week or two ago, in

15 which he said that he --

16         MR. JOSEPH:  Objection, Your Honor.  Hearsay.

17         THE COURT:  Sustained.

18 Q.   (BY MR. YOUNG)  Do you have any reason to believe that

19 Dr. Prus would oppose Dr. Tudor returning to Southeastern?

20         MR. JOSEPH:  Objection, Your Honor.  That witness

21 can testify.

22         THE COURT:  Yes, he can.  Let's move on.

23         MR. YOUNG:  Okay.  Yes, Your Honor.

24 Q.   (BY MR. YOUNG)  Dr. Cotter-Lynch, based on what you know

25 about Dr. Tudor and how denial of tenure has affected her, how

Jury Trial — Volume 2
November 14, 2017

1   can we fix what happened?

2           MR. JOSEPH:  Objection, Your Honor.  Cumulative.

3           THE COURT:  Sustained.

4           MR. YOUNG:  Okay.

5   Q.  (BY MR. YOUNG)  Dr. Cotter-Lynch, do you have any reason

6   to doubt the truthfulness of Dr. Tudor?

7   A.    No.

8   Q.    Has she ever lied to you?

9   A.    No.

10  Q.    Has Dr. McMillan ever lied to you?

11  A.    Yes.

12  Q.    More than one time?

13  A.    Yes.

14  Q.    What about Dr. Scoufos?

15  A.    She has said things that are misleading.

16          MR. YOUNG:  Okay.  That's it.  Thank you.

17          MR. JOSEPH:  Nothing further for this witness, Your

18  Honor.  Thank you.

19          THE COURT:  You may step down.

20      (Witness excused.)

21          THE COURT:  Call your next witness.

22          MR. YOUNG:  Yes, Your Honor.  I believe, based upon

23  a recent filing from defendants, we would like to enter

24  deposition designations of Ms. Cathy Conway into the record.

25  but I need to confer with my colleague real quick because

1    that's not my job.

2           THE COURT:  Let's take our afternoon break.  Don't

3    discuss this case or permit others to discuss it with you.

4    Please be back in the room across the hall at five after 3:00.

5        Counsel, can you come up before they leave?

6        Sherri, I don't need this on the record unless they ask

7    me to.

8        (Jury exits.)

9        (Conference held at the bench with all counsel and out of

10   the hearing of the jury.)

11       (In recess from 2:50 p.m. to 3:10 p.m.)

12          THE COURT:  We've had a discussion behind the

13   courtroom.  Plaintiff's counsel are out of witnesses despite

14   their best efforts.  So I have sent the jury home with my

15   standard instruction, and we are beginning again tomorrow

16   morning at 9:15.

17       Unless it's due to the active interference of the

18   defendants, when you run out of witnesses the next time,

19   you'll be finished.

20          MR. YOUNG:  Yes, Your Honor.

21          THE COURT:  I don't mean finished; I mean through

22   with your case.

23          MR. YOUNG:  Yes.  I appreciate the clarification,

24   Your Honor.

25          THE COURT:  All right.  Is there anything -- I've

Jury Trial – Volume 2
November 14, 2017

1  given counsel instructions or post instructions that we will

2  begin discussing tomorrow sometime during the noon hour.

3      Anything else?

4          MS. COFFEY:  Your Honor, let me ask in advance,

5  because this is what happened last night when we went -- when

6  we got back to the office.  Our phones were shooting up with

7  Southeastern witnesses that had just been served yesterday

8  afternoon.

9      If the same instance arises this evening that somebody is

10  served today to show up tomorrow and they have full classes, a

11  full day of work --

12          THE COURT:  Well, I ruled this morning on this

13  morning's motion to quash that one day is not reasonable

14  notice.

15          MS. COFFEY:  Okay.

16          THE COURT:  That does not actually address the undue

17  burden.  So I would need some kind of proffer, whether it's in

18  court tomorrow morning, make sure the other side knows what

19  you're going to do or file something.

20          MS. COFFEY:  If I know -- I mean, at this point,

21  it's hypothetical.  I don't have that information.

22          THE COURT:  Okay.  Till tomorrow.

23          MR. YOUNG:  Thank you, Your Honor.

24          MS. COFFEY:  Thank you, Your Honor.

25      (In recess at 3:15 p.m.)

Jury Trial – Volume 2
November 14, 2017

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, SHERRI GRUBBS, Federal Official Court Reporter in

 4    and for the United States District Court for the Western

 5    District of Oklahoma, do hereby certify that pursuant to

 6    Section 753, Title 28, United States Code that the foregoing

 7    is a true and correct transcript of the stenographically

 8    reported proceedings held in the above-entitled matter and

 9    that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12          Dated this 14th day of November, 2017.

13

14          /S/ SHERRI GRUBBS_____

15          SHERRI GRUBBS, RPR, RMR, RDR, CRR
            State of Oklahoma CSR No. 1232.
16          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25
```