Jury Trial – Volume 3
November 15, 2017

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF OKLAHOMA

3

4
DR. RACHEL TUDOR,                    )
5                                    )
        Plaintiff,                   )
6                                    )
                vs.                  )   Case No. CIV–15–324–C
7                                    )
SOUTHEASTERN OKLAHOMA STATE          )
8  UNIVERSITY and THE REGIONAL       )
UNIVERSITY SYSTEM OF                 )
9  OKLAHOMA,                         )
                                     )
10      Defendants.                  )
                                     )
11

12

13                   VOLUME 3

14            TRANSCRIPT OF JURY TRIAL

15      BEFORE THE HONORABLE ROBIN J. CAUTHRON

16      WEDNESDAY, NOVEMBER 15, 2017; 9:15 a.m.

17            OKLAHOMA CITY, OKLAHOMA

18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography,
transcript produced by computer.
25

Jury Trial – Volume 3
November 15, 2017

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4        Ezra I. Young
          Law Office of Ezra Young
 5        30 Devoe 1A
          Brooklyn, New York 11211
 6        ezraiyoung@gmail.com

 7        Brittany M. Novotny
          401 North Hudson Avenue
 8        Oklahoma City, Oklahoma 73102
          brittany.novotny@gmail.com

 9

10        Marie E. Galindo
          1500 Broadway
11        Suite 1120
          Wellsfargo Building
12        Lubbock, Texas 79401
          megalindo@thegalindolawfirm.com

13

14   For the Defendants:

15        Dixie L. Coffey
          Jeb E. Joseph
16        Timothy M. Bunson
          Attorney General's Office
17        313 NE 21st Street
          Oklahoma City, Oklahoma 73105
18        dixie.coffey@oag.ok.gov
          jeb.joseph@oag.ok.gov
19        tim.bunson@oag.ok.gov

20

21

22

23

24

25
```

Jury Trial – Volume 3
November 15, 2017

```
 1                      C O N T E N T S

 2                                              VOLUME   PAGE

 3    PLAINTIFF WITNESSES:

 4    RACHEL TUDOR, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    1     37
 5    CROSS-EXAMINATION BY MS. COFFEY.............    1    130
      CONTINUING CROSS-EXAMINATION BY MS. COFFEY..    2    205
 6    REDIRECT EXAMINATION BY MR. YOUNG...........    2    209

 7    ROBERT PARKER, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    2    212
 8    CROSS-EXAMINATION BY MR. JOSEPH.............    2    275
      REDIRECT EXAMINATION BY MR. YOUNG...........    2    291
 9    RECROSS-EXAMINATION BY MR. JOSEPH...........    2    294

10    MEG COTTER-LYNCH, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    2    297
11    CROSS-EXAMINATION BY MR. JOSEPH.............    2    353
      REDIRECT EXAMINATION BY MR. YOUNG...........    2    371
12
      JOHN MISCHO, Ph.D.
13    DIRECT EXAMINATION BY MS. NOVOTNY...........    3    384
      CROSS-EXAMINATION BY MR. BUNSON............    3    409
14    REDIRECT EXAMINATION BY MS. NOVOTNY.........    3    427
      RECROSS-EXAMINATION BY MR. BUNSON..........    3    430
15
      MARK SPENCER, Ph.D.
16    DIRECT EXAMINATION BY MR. YOUNG.............    3    431
      CROSS-EXAMINATION BY MR. BUNSON.............    3    450
17    REDIRECT EXAMINATION BY MR. YOUNG...........    3    459

18    RANDY PRUS, Ph.D.
      DIRECT EXAMINATION BY MS. NOVOTNY...........    3    464
19    CROSS-EXAMINATION BY MR. JOSEPH.............    3    470
      REDIRECT EXAMINATION BY MS. NOVOTNY.........    3    481
20    RECROSS-EXAMINATION BY MR. JOSEPH...........    3    486

21    JAMES KNAPP, Ph.D.
      DIRECT EXAMINATION BY MR. YOUNG.............    3    488
22    CROSS-EXAMINATION BY MR. BUNSON.............    3    504
      REDIRECT EXAMINATION BY MR. YOUNG...........    3    507
23
      MELINDA HOUSE
24    DIRECT EXAMINATION BY MR. YOUNG.............    3    508
      CROSS-EXAMINATION BY MR. BUNSON.............    3    529
25    REDIRECT EXAMINATION BY MR. YOUNG...........    3    547
```

Jury Trial – Volume 3
November 15, 2017

1                    C O N T E N T S

2                                        VOLUME  PAGE

3    DEFENSE WITNESSES:

4    LUCRETIA SCOUFOS, Ph.D.
     DIRECT EXAMINATION BY MS. COFFEY..............  4   561
5    CROSS-EXAMINATION BY MS. GALINDO..............  4   597

6    CATHY CONWAY, Ph.D.
     DIRECT EXAMINATION BY MS. COFFEY..............  4   635
7    CROSS-EXAMINATION BY MS. NOVOTNY..............  4   656

8    DOUG McMILLAN, Ph.D.
     DIRECT EXAMINATION BY MR. JOSEPH..............  4   671
9    CROSS-EXAMINATION BY MS. NOVOTNY..............  4   689

10   CLAIRE STUBBLEFIELD, Ph.D.
     DIRECT EXAMINATION BY MR. JOSEPH..............  4   700
11   CONTINUING DIRECT EXAMINATION BY MR. JOSEPH...  5   726
     CROSS-EXAMINATION BY MS. GALINDO..............  5   734
12   REDIRECT EXAMINATION BY MR. JOSEPH............  5   754
     RECROSS-EXAMINATION BY MS. GALINDO...........  5   756
13
     JESSE SNOWDEN, Ph.D.
14   DIRECT EXAMINATION BY MR. JOSEPH..............  5   758
     CROSS-EXAMINATION BY MR. YOUNG................  5   777
15

16   PLAINTIFF REBUTTAL WITNESS:

17   CHARLES WEINER, Ph.D.
     REBUTTAL EXAMINATION BY MR. YOUNG............  5   806
18   CROSS-EXAMINATION BY MR. BUNSON..............  5   811

19   PLAINTIFF CLOSING STATEMENT...................  5   827

20   DEFENSE CLOSING STATEMENT....................  5   846

21   VERDICT......................................  6   869

22

23

24

25

Sherri Grubbs, CSR, RPR, RMR, RDR, CRR
United States District Court, Western District of Oklahoma
(405) 609-5203 – sherri_grubbs@okwd.uscourts.gov

 1        (Proceedings held on November 15, 2017.)

 2            THE COURT:  Be seated.

 3        I am prepared to rule on the Conway deposition.

 4        All objections made by defendant are overruled except

 5    those to -- on page 175 concerning healthcare.

 6        I will permit the counterdesignations to be read without

 7    limiting your direct examination of this witness because they

 8    are so brief and simply place some things in context.

 9        I will direct the plaintiff to read these in order.  Even

10    though they may not be what you have designated, I want them

11    just read straight through.

12        Ms. Coffey, I'm told you may have something before the

13    jury comes in?

14            MS. COFFEY:  Yes, Your Honor, a couple of procedural

15    matters.

16        When we concluded yesterday afternoon, there was the

17    issue of the availability of Judge Richard Ogden.  As I had

18    represented to the Court yesterday, Judge Ogden's schedule,

19    due to Judge Ogden having to take responsibility for his own

20    docket, Judge Stuart's docket, and Judge Dixon's Friday

21    morning docket, the judge is unavailable until -- at any

22    possible time would be Friday afternoon.  That would only be

23    if the morning docket doesn't have carry over for arguments to

24    be taken care of.

25        Late last night, I received an e-mail after I notified,

Jury Trial – Volume 3
November 15, 2017

1    early evening, plaintiff's counsel of Judge Ogden's schedule.

2    So I received an e-mail asking if we would agree that he could

3    be presented by deposition as a result of him being

4    unavailable.

5        I would represent to the Court that Judge Ogden's

6    schedule this week does not constitute unavailability under

7    the federal rules.  Had plaintiff's counsel done their job

8    diligently and served Judge Ogden in a timely manner, as

9    opposed to 24 hours before they asked for him to appear, any

10   conflict could have been taken care of, and they failed to do

11   so.

12       So his deposition designations -- I mean, we used defense

13   strategy of not questioning during there, so we don't have

14   that opportunity.  So it's extremely prejudicial, in addition,

15   to allow Judge Ogden to testify during our case on Friday

16   afternoon.

17       Now, I understand that if, for some reason, plaintiff's

18   case is still going on come Friday afternoon, that that would

19   be a different issue.

20            MS. NOVOTNY:  Yes, Judge.  In regards to the time of

21   the service, it wasn't until November 1st --

22            THE COURT:  Just step to the podium.  You don't have

23   to speak right into it.

24            MS. NOVOTNY:  Sure.

25       So it wasn't until November 1st that we even had a

 1  for-sure trial date.  The local rules require seven days

 2  between the filing of the subpoenas onto the docket to the

 3  time that they're allowed to be served.

 4      So with the late notice of all the dates in this trial,

 5  it was very difficult to get everybody served in any more

 6  timely manner.

 7          MS. COFFEY:  May I address that, Your Honor?

 8          THE COURT:  Well, it's just not reasonable.  It's

 9  not reasonable to –– and perhaps I am speaking from my own

10  experience more than I usually do, but you can't just uproot a

11  judge from a docket and misput hundreds of lawyers and clients

12  and witnesses and parties for your benefit.

13      You have to plan ahead with somebody like that.  The more

14  busy someone is, the more burden is placed on them with short

15  notice.  And you could have served him well before –– what is

16  today? –– well before Monday, is the day he was actually

17  served to appear here on Tuesday.

18      It places an undue burden on him, and it's not a

19  reasonable time.  I'll leave it open for now for whether he

20  can appear on Friday or, if some hole opens up in his

21  schedule, that he can come some other time.

22      So I'm not going to –– well, I will rule that he is not

23  unavailable.

24      Okay.  What else?

25          MS. COFFEY:  Your Honor, this morning at 7:30 a.m.,

Jury Trial – Volume 3
November 15, 2017

1    plaintiff filed a subpoena to appear and testify to

2    Dr. Charles Weiner.  That subpoena requires Dr. Weiner to

3    appear at 9:00 a.m. tomorrow morning.

4        We haven't had any opportunity to talk to Dr. Weiner, but

5    Your Honor ruled yesterday 24 hours' notice is not reasonable.

6    And plaintiff's counsel contradicted Your Honor's order and

7    went ahead and filed the subpoena anyway, which I think --

8            THE COURT:  I have to find not only that it's not

9    reasonable, but that it places an undue burden.  Without more

10   information, I can't find that.

11       If it is a burden to him, then my ruling will be he

12   cannot testify -- or will not be forced to testify.  But I

13   think it's premature to do that at this time.

14           MS. COFFEY:  Your Honor, my reading of the rule is

15   that unreasonable notice or undue burden, and definitely the

16   unreasonable notice is applicable in this case.

17           THE COURT:  It sounds like a marching band on the

18   roof.

19           MS. COFFEY:  They're having more fun.

20           THE COURT:  Well, let me just take a peek at the

21   rule.

22           MS. COFFEY:  Your Honor, we don't know that

23   Dr. Weiner has been served.  The subpoena was filed.  We had

24   communicated --

25           THE COURT:  Okay.  Let's not worry about something

Jury Trial – Volume 3
November 15, 2017

1  that hasn't arisen.

2          MS. COFFEY:  Right.

3          THE COURT:  Anything else?

4          MS. COFFEY:  No, Your Honor.

5          THE COURT:  Do you have witnesses this morning?

6          MR. YOUNG:  Yes, we do, Your Honor.  I'm going to --

7  also wanted to say that we do have a draft verdict form as you

8  requested.

9          THE COURT:  May I have it?

10          MR. YOUNG:  Yes, you may.

11      May I approach?

12          THE COURT:  Just hand it to her.

13          MR. YOUNG:  Thank you.

14          THE COURT:  Please have your next witness brought in

15  while the jury is coming in.

16          MS. NOVOTNY:  Plaintiff calls Dr. John Mischo.

17      (Jury enters.)

18          THE COURT:  Good morning.  Be seated.

19      Please face the clerk and be sworn, sir.

20      (Witness duly sworn.)

21          THE COURT:  Be seated.

22      WHEREUPON, JOHN MISCHO, Ph.D., after having been first

23  duly sworn, testifies in reply to the questions propounded as

24  follows:

25                    **DIRECT EXAMINATION**

Jury Trial – Volume 3
November 15, 2017

1  BY MS. NOVOTNY:

2  Q.   Good morning, Dr. Mischo.  Thank you for taking time out

3  of your schedule, as the jurors and our witnesses have all

4  done this week, to help us get a better understanding of some

5  things that took place at Southeastern Oklahoma State

6  University.

7          THE COURT:  Ms. Novotny, let me interrupt you.  In

8  case this noise is causing you some alarm, we are having it

9  checked into.  We think there may be either a marching band on

10  the roof or the air conditioner is struggling.  So it's being

11  checked.

12          All right.  Thank you.

13          MS. NOVOTNY:  Thank you.

14  Q.   (BY MS. NOVOTNY)  Dr. Mischo, what year did you first

15  begin working at Southeastern?

16  A.   1992.

17  Q.   What was your title at that time?

18  A.   Assistant professor.

19  Q.   And after some time, you gained tenure there.  And when

20  was that?

21  A.   1998.

22  Q.   Okay.  And when did you come to know Dr. Rachel Tudor?

23  A.   When she was hired as an assistant professor.

24  Q.   And did you have anything to do with that hiring?

25  A.   I was on the hiring committee and part of the department

Jury Trial – Volume 3
November 15, 2017

1    that voted on the hire.

2    Q.    Can you –– did you say you were on the hiring committee?

3    A.    Yeah, there was a hiring committee which I was on.  And

4    then the department as a whole then voted on the candidate.

5    Q.    Okay.  Great.

6          And so it's fair to say you're familiar with Dr. Tudor's

7    entire career at Southeastern?

8    A.    Yes.

9    Q.    And at the time that Dr. Tudor was hired, what was your

10   position at Southeastern?

11   A.    I would have been an –– I believe an associate professor.

12   Q.    And did you have tenure at that time?

13   A.    Yes.

14   Q.    Now, at some point after Dr. Tudor was hired, did you get

15   promoted again?

16   A.    I became department chair, yes.  Well, I was also

17   promoted to full professor.

18   Q.    And what were some of your duties as chair of the

19   department?

20   A.    The department chair would schedule classes, was the

21   primary responsibility; monitor faculty; advise students;

22   advise faculty.

23   Q.    Okay.  Did you have a role in tenure and promotion

24   decisions as chair of the department?

25   A.    Yes.

1    Q.   And just to clarify, what department was that?

2    A.   English, Humanities, and Languages.

3    Q.   Thank you.

4         Now, what was your role as a department chair as it

5    pertains to tenure and promotion decisions?

6    A.   The tenure and promotion committee would meet and either

7    recommend or not recommend a candidate applicant for promotion

8    and/or tenure and then would submit that recommendation to me

9    as department chair, and then I would myself then either

10   recommend or not recommend the promotion and/or tenure.

11   Q.   Great.

12        Now, I want to take you back to the summer of 2007.  Do

13   you recall a meeting in the summer of 2007 at Southeastern

14   regarding Dr. Tudor's gender transition?

15   A.   Yes.

16   Q.   And do you recall how many people were there and who was

17   there?

18   A.   I can remember that Dean Mangrum, and Cathy Conway, the

19   HR person, was there.  I'm not certain.  I think there were

20   about four other people besides me, but I can't recall

21   everyone who was there.

22   Q.   Okay.  And I know it was a long time ago, so I

23   understand.

24        Now, do you recall anything that stuck out to you about

25   that meeting?

Jury Trial — Volume 3
November 15, 2017

1   A.   The first thing I recall was that I was called to that

2   meeting without any indication of what the meeting was going

3   to be about was the first thing that surprised me that I can

4   recall, yes.

5   Q.   Did anything else about that meeting stick out to you?

6   A.   The meeting, as I recall, had had to do with Dr. Tudor's

7   use of restrooms.

8   Q.   And was any kind of decision or rule put in place

9   regarding Dr. Tudor's restroom usage at that time?

10  A.   It was determined that Dr. Tudor would use the, I guess,

11  unisex -- called unisex bathroom in the building.

12  Q.   Do you remember where that bathroom was?

13  A.   It's on the second floor of the building.

14  Q.   Do you recall if that was on the same floor where

15  Dr. Tudor taught her classes?

16  A.   No, it was one floor below.

17  Q.   Was it on the same floor that Dr. Tudor had her office?

18  A.   No.  Dr. Tudor's office was on the third floor, and her

19  classrooms are on the third floor.

20  Q.   Did you ever have any other meetings with administration

21  officials at Southeastern where other women in your department

22  were specifically directed to use a particular restroom?

23  A.   No.

24  Q.   So other women were allowed to use the ladies room

25  without the administration interfering?

Jury Trial – Volume 3
November 15, 2017

```
 1              MR. BUNSON:  Objection, Your Honor.  Leading.
 2              THE COURT:  Sustained.
 3   Q.  (BY MS. NOVOTNY)  Did administrators ever tell you to use
 4   a specific restroom?
 5   A.   No.
 6   Q.   Other than at that meeting in the summer of 2007, did
 7   anyone else ever raise any concern to you about where
 8   Dr. Tudor used the restroom?
 9   A.   No.
10   Q.   Would it be fair to say the administration was singling
11   Dr. Tudor out in regards to restroom usage?
12              MR. BUNSON:  Objection, Your Honor.  Leading.
13              THE COURT:  Overruled.
14              THE WITNESS:  Can you repeat the question, please.
15   Q.  (BY MS. NOVOTNY)  Yeah.
16       Would it be fair to say the administration seemed to be
17   singling Dr. Tudor out in regards to restroom usage?
18   A.   That would be hard to say.  I don't know of any other
19   situation like that that I'm aware of.  So I don't know that I
20   could say.
21   Q.   At any time in your tenure at Southeastern have you had
22   any other professors directed to use a specific restroom?
23   A.   Not that I know, no.
24   Q.   All right.  Let's go back to talking about Dr. Tudor's
25   work.
```

Jury Trial – Volume 3
November 15, 2017

1      Now, you testified earlier that as department chair you

2  were familiar with Dr. Tudor's work; is that correct?

3  A.   Correct.

4  Q.   Now, there's been testimony in this case that Dr. Rachel

5  Tudor applied for tenure and promotion a couple of times.

6      Does that strike you as out of the ordinary?

7  A.   No.

8  Q.   So is it common for professors to sometimes have to apply

9  a second time?

10  A.   I don't know that I would say it's common, but it does

11  occur that someone might apply twice or even three times.

12  Q.   All right.  I want to get into some exhibits here.

13          MS. NOVOTNY:  Your Honor, may I approach?

14          THE COURT:  Yes.

15  Q.   (BY MS. NOVOTNY)  I'd like to direct our attention to

16  Plaintiff's Exhibit 70, which is the first one there in that

17  packet there, Dr. Mischo.

18      Does that exhibit look familiar to you?

19  A.   Yes.

20  Q.   And could you tell us what this is.

21  A.   It is an e-mail recommending to the dean that Dr. Tudor

22  be awarded tenure and promotion to associate professor.

23  Q.   And did you send this e-mail?

24  A.   Yes.

25          MS. NOVOTNY:  Your Honor, I'd like to move that

Jury Trial – Volume 3
November 15, 2017

```
 1   Plaintiff's Exhibit 70 be entered into evidence.
 2              MR. BUNSON:  No objection, Your Honor.
 3              THE COURT:  Admitted.
 4   Q.  (BY MS. NOVOTNY)  Can you explain to the jury here today
 5   why you determined that Dr. Tudor should be awarded tenure and
 6   promoted to the rank of associate professor?
 7   A.   That would have come from several years of working with
 8   Dr. Tudor and then having looked through her portfolio,
 9   which -- basically the application for tenure and promotion,
10   which I looked at.  And I found that it was sufficient, that
11   it merited the promotion and tenure.
12   Q.   And did you find it was sufficient in all three
13   categories that were to be evaluated?
14   A.   Yes.
15   Q.   I'd like for you to turn to Exhibit 72 -- Plaintiff's
16   Exhibit 72.  I'm sorry.
17        Does Plaintiff's Exhibit 72 look familiar to you?
18   A.   Yes.  It's been a while, but this -- yeah, I do.  This
19   does look familiar.
20   Q.   Okay.  And can you tell us what that is.
21   A.   This is a memo to Dr. Tudor from the dean, Scoufos, of
22   arts and sciences recommending to deny tenure to Dr. Tudor and
23   to give Dr. Tudor a one-year terminal appointment.
24   Q.   And did you receive a copy of this letter at the time it
25   was sent as well?
```

Jury Trial – Volume 3
November 15, 2017

```
 1   A.   I don't recall.  I see my name cc'd at the bottom, so I
 2   imagine I did.
 3   Q.   So, typically, if you're cc'd on something and it's
 4   identified there in the normal course of business, you would
 5   have received that; correct?
 6   A.   Correct.
 7         MS. NOVOTNY:  Your Honor, I'd like to move that
 8   Plaintiff's Exhibit 72 be entered into evidence, if not
 9   already.
10         MR. BUNSON:  No objection, Your Honor.
11         THE COURT:  Admitted.
12   Q.   (BY MS. NOVOTNY)  Do you recall what you thought when you
13   got a copy of this memo?  I know it was a long time ago, so
14   take your time.
15   A.   I would have thought that this was extremely unusual --
16   certainly unprecedented, in my experience -- to offer a
17   one-year terminal position at the same time of denying tenure
18   or promotion.
19   Q.   Without any reasoning provided in that memo, did you have
20   any knowledge as to why your department's recommendation for
21   tenure should have been denied?
22   A.   No.
23   Q.   Was there anything about Dr. Tudor's reputation that
24   might have come into play?
25   A.   I don't think so.
```

Jury Trial – Volume 3
November 15, 2017

1   Q.   Now, do you see the date on this memo?

2   A.   Yes.

3   Q.   And that was January 12th, 2010?

4   A.   Correct.

5   Q.   Did you agree with Dean Scoufos's recommendation here?

6   A.   I don't know that it was my position to agree or disagree

7   with it.  Perhaps I don't understand the question.

8   Q.   Okay.  I'll withdraw.

9        Now, in that January 12th, 2010, memorandum we're looking

10  at, it says, "Based on the available documentation."

11       Do you have any idea what that would have meant?

12  A.   That would have meant the application portfolio or binder

13  that would have been submitted as part of the application.

14  Q.   When you reviewed that binder –– or portfolio, as you

15  call it –– did you feel like there was anything missing from

16  it?

17  A.   No.

18  Q.   I'd like to direct our attention now to the next exhibit

19  in your packet there, which is Plaintiff's Exhibit 77.

20       Now, do you recognize that memorandum?

21  A.   Yes, I've seen this before.  I'm not sure that I got a

22  copy of it at that time, but yes.

23       MS. NOVOTNY:  May I get clarification from the

24  Court?  I'm sorry.  I can't recall.

25       Had Plaintiff's Exhibit 77 been entered with a previous

Jury Trial – Volume 3
November 15, 2017

```
 1   witness?
 2           THE COURT:  No.  It was identified but never
 3   offered.
 4           MS. NOVOTNY:  Okay.
 5   Q.  (BY MS. NOVOTNY)  Now, just looking at that particular
 6   memorandum, is there anything about it that sticks out to you?
 7   A.   Yes.  I would say in the next-to-last paragraph there is
 8   a statement from the vice president for academic affairs
 9   about -- it says, "There are no letters of recommendation from
10   tenured faculty members in her department."
11   Q.   Now, why does that stand out to you, Dr. Mischo?
12   A.   That really was not a requirement, to get letters from
13   one's own colleagues.  And it's not really a procedure that we
14   followed at that time.
15           And, in fact, I thought it was inappropriate that members
16   of the tenure and promotion committee also write letters of
17   recommendation.
18           So it was not unusual at all for faculty to apply to
19   tenure and promotion without any letters of recommendation
20   from within the department from their colleagues.
21           So that strikes me as strange.
22           The same paragraph, it says, "The single-sentence
23   recommendations for promotion and tenure from the committee do
24   not give it justification."
25           And what strikes me as odd about that is that, at that
```

Jury Trial – Volume 3
November 15, 2017

1  point, the recommendation from that committee was supposed to
2  be simply a one-sentence statement as opposed to a
3  justification.
4  Q.   Thank you.
5        MS. NOVOTNY:  Your Honor, if defendants don't
6  object, I'd like to admit Plaintiff's Exhibit 77.  It is a
7  document created by them.
8        MR. BUNSON:  No objection, Your Honor.
9        THE COURT:  Admitted.
10  Q.  (BY MS. NOVOTNY)  And what is the date on this second
11  memorandum?
12  A.   January 12th, 2010.
13  Q.   So that's the same date as the previous memorandum that
14  just said that Dr. Tudor was being denied; correct?
15  A.   Okay.  Which other one?  I'm sorry.
16  Q.   The one we were looking at just before, Plaintiff's
17  Exhibit 72.  I'm sorry.
18  A.   72?
19  Q.   Yes.
20  A.   Okay.  I'm sorry.  We're looking at 72 and 77?
21  Q.   Yes.
22  A.   Okay.  Yeah, I –– we're looking at 77 and 72; is that
23  correct?
24  Q.   Yes.
25  A.   I want to make sure I have ––

Jury Trial – Volume 3
November 15, 2017

1    Q.    Yes, sir.

2    A.    Okay.

3          I'm sorry.  What was the question?

4    Q.    Now I forgot the question.

5                MS. NOVOTNY:  May I have the question read back?

6                THE COURT:  No.  Just ask another one.

7                MS. NOVOTNY:  All right.

8    Q.    (BY MS. NOVOTNY)  Those were both dated the same date;

9    correct?

10   A.    Correct.

11   Q.    Now, you already discussed the disagreement with the

12   assertion that Dr. Tudor would need faculty -- tenured faculty

13   recommendation letters as part of that packet; correct?

14   A.    Correct.

15   Q.    And there's also an assertion in here that there's little

16   documentation of service activity in Dr. Tudor's portfolio

17   other than routine departmental assignments.

18         Is that something you would agree with?

19   A.    Okay.  This is --

20   Q.    This short paragraph here.

21   A.    The second paragraph --

22   Q.    Yes.

23   A.    -- of the body?

24         I recall that Dr. Tudor was involved in some Native

25   American symposium events and organizing the conference.  I

Jury Trial – Volume 3
November 15, 2017

1    recall that.

2    Q.   Was the Native American symposium at Southeastern a

3    fairly big deal for the school?

4    A.   I would say yes.

5    Q.   So would it be pretty prestigious to be a part of that

6    symposium?

7            MR. BUNSON:   Objection, Your Honor.   Leading.

8            THE COURT:   Sustained.

9    Q.   (BY MS. NOVOTNY)   Let me phrase it another way.

10       How did you feel about the Native American symposium?

11   A.   I thought it was a very good thing for Southeastern to

12   have.   It was a national conference, and we brought in some

13   very well-respected and renowned Native American scholars and

14   speakers.

15   Q.   Thank you.

16       Okay.   I'd like to now direct your attention to

17   Plaintiff's Exhibit 76.

18       Do you recognize Plaintiff's Exhibit 76, Dr. Mischo?

19   A.   Yes.

20   Q.   And can you tell us what that document is?

21   A.   I need to review it here, please.

22   Q.   Sure.

23            THE COURT:   I'm sorry.   I can't hear you.

24            THE WITNESS:   I'm sorry.   I need to review the

25   e-mail.

Jury Trial – Volume 3
November 15, 2017

1          THE COURT:  Oh.

2          THE WITNESS:  Okay.  I'm not sure.  What is the

3   question?

4   Q.  (BY MS. NOVOTNY)  Do you recognize this document, and can

5   you tell us what it is?

6   A.   Yes.  Dr. Tudor had looked through her portfolio and

7   found that one of those letters from January 12th had been

8   taken out and a different one put in under that same date.

9   Q.   And those would have been the two memorandums we were

10  just looking at on the screens; is that correct?

11  A.   Yes.

12  Q.   And did you –– did you draft part of this e-mail and

13  receive the other part of this e-mail?

14  A.   I'm sorry?

15  Q.   You drafted the e-mail that's at the top of the exhibit;

16  correct?

17  A.   It says "from."  Yes, I did.

18  Q.   And you were the receiver of the e-mail from Dr. Tudor on

19  the bottom of this exhibit?

20  A.   Correct.

21          MS. NOVOTNY:  Your Honor, I'd like to ask that

22  Plaintiff's Exhibit 76 be entered into evidence.

23          MR. BUNSON:  No objection, Your Honor.

24          THE COURT:  Admitted.

25          MS. NOVOTNY:  I'm not sure I can read that now.

Jury Trial – Volume 3
November 15, 2017

1  Q.  (BY MS. NOVOTNY)  As we're looking at this e-mail exchange

2  between yourself and Dr. Tudor, can you recall how you felt at

3  the time that you drafted this e-mail?

4  A.  Well, obviously, I think I would have been concerned that

5  changes to the portfolio had been made, and apparently without

6  any notification to the candidate or to the department chair,

7  which -- I was not department chair at that time.  I had

8  resigned the year prior to this.

9  Q.  Okay.  And who was the department chair at the time?

10  A.  Dr. Randy Prus.

11  Q.  Is that the Randy that's mentioned in your e-mail here?

12  A.  Yes.

13  Q.  Okay.  Now, did Dean Scoufos ever talk to you about why

14  that letter was placed into Dr. Tudor's portfolio?

15  A.  No.

16  Q.  And this exchange between you and Dr. Tudor, this was in

17  September of 2010, and the previous documents we were looking

18  at were dated in January of 2010.

19      So this is -- this is nine months later; correct?

20  A.  Correct.

21  Q.  And so at no time, until September 14th or 15th of 2010,

22  at that time you were not aware of the second memorandum that

23  had a further explanation in there?

24  A.  No.  Once -- once the binder, the portfolio, is -- once

25  it leaves my office, I do not see it again.

Jury Trial – Volume 3
November 15, 2017

1   Q.   After you saw the reasoning provided by Dean Scoufos in

2   that second letter or memorandum, did you -- where Dean

3   Scoufos was denying your and your department's recommendation

4   of tenure and promotion, did you believe that Dr. Tudor was

5   being treated similarly to other faculty members at

6   Southeastern?

7              MR. BUNSON:   Objection, Your Honor.   She's

8   testifying for the witness and leading.

9              THE COURT:   Overruled.

10     You may answer.

11             THE WITNESS:   Okay.   Can I have the question again,

12  please?

13             MS. NOVOTNY:   Sure.   And I'll try to make it a

14  little better that time.

15     I'm sorry.   I'm a little nervous up here today, folks.

16  It's been a little while since I've been in front of a jury.

17  Q.   (BY MS. NOVOTNY)   Now, after you saw the reasoning

18  provided by Dean Scoufos for denying your department's

19  recommendation and your recommendation of tenure and

20  promotion, did you believe that Dr. Tudor was being treated

21  similarly to other faculty members at Southeastern?

22  A.   No.

23  Q.   What stood out to you about how she was being treated

24  differently?

25  A.   In my experience there at Southeastern, there had never

Jury Trial – Volume 3
November 15, 2017

1    been a tenure track faculty member that had been offered an

2    eighth year or an extra year.  The period of probation is

3    seven years.  And that is, as I understood it, absolute.  So

4    an extra or eighth year was very much, to my experience,

5    unprecedented.

6    Q.    Thank you.

7          I'd like to now direct your attention to Plaintiff's

8    Exhibit 92, which is the last exhibit in that packet I handed

9    you there.

10         Do you recognize Plaintiff's Exhibit 92?

11   A.    Yes.

12   Q.    And can you tell us what this is?

13   A.    This would be a department chair's yearly or annual

14   evaluation of Dr. Tudor as a faculty member.

15   Q.    And did you participate in the creation of this

16   evaluation?

17   A.    Yes.  This was mine.

18   Q.    And is that your signature on the second page of the

19   exhibit next to "Department Chair"?

20   A.    Yes.

21         MS. NOVOTNY:  Your Honor, I'd like to move that

22   Plaintiff's Exhibit 92 be entered into evidence.

23         MR. BUNSON:  No objection, Your Honor.

24         THE COURT:  Admitted.

25   Q.    (BY MS. NOVOTNY)  I'll first direct you to the first page

1  of this document, and I'll make sure it's all on here for

2  everybody.

3      Now, in this document here, it looks like it is set up in

4  some different categories.

5      Can you explain what those categories are there?

6  A.   The first is effective classroom teaching.  Category

7  No. 2 is scholarship or research.  Category 3, service to

8  institution, professional, and public.  Category 4,

9  performance of administrative duties, which did not apply to

10  Dr. Tudor.

11  Q.   Okay.  And looking at the first category, then, effective

12  classroom teaching, what was your conclusion about Dr. Tudor's

13  performance for the 2008-2009 year?

14  A.   I checked the "Commendable" box.

15  Q.   Is there a comment there?  Did you write that comment

16  there as well?

17  A.   It says, "Dedicated to developing online courses."

18  Q.   Okay.  And at the time of 2008-2009, was online courses

19  something new that was being done at Southeastern?

20  A.   I would say relatively new, yes.

21  Q.   Was it helpful to have a professor willing to engage in

22  something new and try to embark on that for the university?

23  A.   Yes.

24  Q.   Now, the second category there, scholarship, can you tell

25  us what conclusions you came to about Dr. Tudor's scholarship?

Jury Trial – Volume 3
November 15, 2017

1  A.   I checked "Outstanding" in that box.

2  Q.   And you also had some comments; correct?

3  A.   It says "Published article," and then in parentheses "in

4  press," which means that it had been accepted but had not

5  actually been printed, in print.

6  Q.   Okay.  And there's been some testimony in the case up to

7  now that getting peer-reviewed scholarly articles published is

8  something that's expected of somebody applying for tenure.

9       Does that sound accurate to you?

10  A.   Yes.

11  Q.   And do you know if Dr. Tudor had more than one article at

12  that time?

13  A.   I don't recall.

14  Q.   Okay.  Now, there's also a third box for service to

15  institution.

16      Can you explain why you checked the "Commendable" box

17  there?

18  A.   I don't recall.  It would have been based on another

19  document which would have listed some of Dr. Tudor's service

20  things, which I don't have in front of me, so I don't know

21  exactly --

22  Q.   Sure.

23  A.   -- why.

24      That was my evaluation, that it was commendable.  I don't

25  recall on what specifically it was based.

Jury Trial – Volume 3
November 15, 2017

1  Q.   Okay.  But do you generally agree that, had you

2  checked –– you checked the "Commendable" box because you had

3  reason to believe that she had been participating in service

4  to the institution and her profession?

5  A.   Yes.

6  Q.   I want to draw your attention to the second page of this

7  document now, and this is the signature page here.

8      Now, it looks like your signature's here, and the date is

9  11–20–2009.

10     Do you notice any other date on that page?

11  A.   Next to the dean's signature, it –– I can't read ––

12  excuse me.  I can't read it.  It looks like 04–06–10.

13  Q.   Does that date of April 6, 2010, stand out to you at all?

14  A.   No.

15  Q.   Well, do you recall a meeting that you attended with

16  Dr. Tudor and Dean Scoufos on or around April 6th, 2010?

17  A.   Yes.

18  Q.   This would have been a few months after the January memos

19  we were looking at a few moments ago.

20     Can you explain generally what you recall of that meeting

21  in April of 2010?

22  A.   I think there may have been more than one meeting with

23  Dr. Tudor and I and the dean, but the one I remember focused

24  on the denial of tenure and promotion and the offering of the

25  one–year terminal position.

Jury Trial – Volume 3
November 15, 2017

1   Q.   Was there any other kind of offer made in that meeting?

2   A.   I don't think so.  I don't remember.

3   Q.   Would it help to refresh your memory?

4   A.   Yes.

5   Q.   Okay.

6            MS. NOVOTNY:  Ezra, can you pull Dr. Mischo's

7   deposition?  I don't remember the number now.

8   Q.   (BY MS. NOVOTNY)  Okay.  Well, while he's looking for

9   that -- now, at the time that the meeting of April 6, 2010,

10  were you still department chair at that time?

11  A.   Yes.

12  Q.   And is that why you were accompanying Dr. Tudor to that

13  meeting?

14  A.   Yes.

15  Q.   Okay.  Do you remember at any time in that meeting

16  feeling like there was some kind of an ultimatum given to

17  Dr. Tudor?

18           MR. BUNSON:  Objection, Your Honor.  Leading.

19           THE COURT:  Overruled.

20           THE WITNESS:  An ultimatum?

21  Q.   (BY MS. NOVOTNY)  Yes.

22  A.   What I recall is that the dean made clear that

23  Dr. Tudor's application for tenure and promotion would be

24  denied and that Dr. Tudor should not go forward with it but

25  instead would -- or should take the one-year position, that

Jury Trial – Volume 3
November 15, 2017

1  either Dr. Tudor accepted the one-year position or she would
2  not be given that extra year.
3  Q.   So you would not describe that meeting as Dr. Tudor being
4  given a generous offer by Southeastern?
5  A.   No.
6  Q.   Okay.  Now, did this discussion of Dr. Tudor being asked
7  to withdraw and take the one-year terminal appointment, was
8  that ever put in writing to Dr. Tudor at that meeting?
9  A.   Not at the meeting.  I don't recall anything in writing.
10 Q.   Does that seem strange for something that would be --
11 that Southeastern would describe as a generous offer, that
12 they wouldn't be willing to put that in writing?
13 A.   Is it strange?
14 Q.   Yes.
15 A.   Yes.  I would say that's unusual.
16 Q.   Thank you.
17      Now, you mentioned earlier that you're no longer the
18 chair of the English, Humanities, and Language department at
19 Southeastern?
20 A.   Correct.
21 Q.   I might go back just a second.  I'm going to withdraw
22 that last question.
23      You'd previously testified at a deposition for this case;
24 is that correct?
25 A.   Correct.

1   Q.   Do you recall at that deposition testifying that the
2   administrators didn't have the power to give such an offer?
3   A.   I don't recall testifying to that.  It sounds like
4   something I would have said.
5   Q.   So you don't dispute that that was your testimony at that
6   time?
7   A.   If it's in the deposition, I don't dispute it, no.
8   Q.   Okay.  Let's go back to -- now, you stepped down as chair
9   of the English, Humanities, and Language department at
10  Southeastern.
11       When was that?
12  A.   That would have been after the spring of 2010, spring
13  semester.
14  Q.   Okay.  And was there a reason that you stepped down?
15  A.   There were several reasons.
16  Q.   Can you explain to the jury here today what your
17  reasonings for stepping down as chair were?
18  A.   I had been department chair for seven years, and one
19  thing, I wanted to return to full-time teaching.  And I was
20  not, at that point, really interested in continuing with all
21  of the administrative -- with the administrative duties that
22  came with being department chair.
23  Q.   Okay.  Do you recall anything else that led you to step
24  down as chair?
25  A.   The morale of the faculty was quite low at that point,

1  and I think we had -- at the university level, we had an

2  atmosphere which was not very pleasant or something I wanted

3  to continue dealing with.

4  Q.   Do you remember describing it as a lack of shared

5  governance?

6  A.   Yes.

7  Q.   And what do you mean by "a lack of shared governance"?

8  A.   A lack of shared governance would be something where

9  administration and faculty are not working together.  I would

10  say where administration makes decisions without notifying

11  or -- without notifying the faculty or justifying decisions.

12  Q.   And is shared governance something that's important to an

13  institution such as Southeastern, in your opinion?

14  A.   I think it is.  I think it is valuable, yes.

15  Q.   And do you recall also describing a lack of transparency

16  as well?

17  A.   Yes.

18  Q.   And can you explain why you felt there was a lack of

19  transparency?

20  A.   Going back to the exhibits, I would look to the letter or

21  memo from Dean Scoufos which denied tenure and promotion

22  without any justification as to why.  To me, that would be not

23  being transparent.

24  Q.   So this particular memorandum?

25  A.   Yes.

Jury Trial – Volume 3
November 15, 2017

1   Q.   Did the administration's treatment of the Dr. Tudor

2   matter, in regards to her tenure and promotion, have anything

3   to do with you stepping down as chair?

4   A.   I would say yes.  It was one of several things that

5   pretty much persuaded me that I was no longer interested in

6   any sort of administrative –– administrative role, and, again,

7   wanting to get back to full-time teaching.

8   Q.   Sure.

9        Now, did being a department chair come with a pay raise?

10  A.   A small one, yes.

11  Q.   Did stepping down from that role mean you had to give up

12  that small pay raise?

13  A.   Yes.

14  Q.   And so, because of a lack of shared governance, a lack of

15  transparency, and how Dr. Tudor was treated by the

16  administration, you voluntarily took a pay cut; is that

17  correct?

18  A.   Yes.

19  Q.   All right.  One more question before I hand you over.

20       Let's go back to that meeting we discussed earlier, the

21  one in 2007 concerning specific instruction for Dr. Tudor

22  regarding bathroom usage.

23       Looking back at that meeting, with all the context now

24  that you have of the kind of work that Dr. Tudor did after

25  bravely facing her colleagues as the woman she is, do you

Jury Trial – Volume 3
November 15, 2017

1    think that Dr. Tudor was just never going to get a fair shake

2    from the administration at Southeastern?

3            MR. BUNSON:  Objection, Your Honor.  Calls for

4    speculation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Okay.  Could you repeat the question?

7    Q.   (BY MS. NOVOTNY)  Sure.

8        So going back to that meeting that we were discussing

9    earlier, the meeting about the bathroom rules that were

10   specifically applied to Dr. Tudor, with all the context you

11   now have looking back at all those years and the kind of work

12   that Dr. Tudor did and bravely facing her colleagues as the

13   woman who she is, do you think that Dr. Tudor was just never

14   going to get a fair shake from the administration at

15   Southeastern?

16   A.   At that time, I did not know.  I could not say.

17           MS. NOVOTNY:  Okay.  Thank you.  I will pass you off

18   to the State.

19           THE COURT:  Mr. Bunson.

20           MR. BUNSON:  Thank you, Your Honor.

21                         **CROSS-EXAMINATION**

22   BY MR. BUNSON:

23   Q.   Good morning, Dr. Mischo.

24   A.   Good morning.

25   Q.   I'd like to start with the meeting that you just

1    referenced, the 2007 meeting regarding Dr. Tudor's transition.

2         Do you recall that?

3    A.    This is the one about the bathroom, using the bathrooms?

4    Q.    Yes, sir.

5    A.    Yes.

6    Q.    And in your testimony you indicated that it was

7    determined that Dr. Tudor would use the unisex restroom; is

8    that correct?

9    A.    Yes.

10   Q.    Were you part of that determination?

11   A.    No.

12   Q.    Do you know who made that determination?

13   A.    I do not know.

14   Q.    Do you know whether or not Dr. Tudor was offered the

15   privacy of a single-occupant restroom as a courtesy?

16   A.    I don't know.

17   Q.    Dr. Mischo, if you would, refer back to Exhibit 70,

18   Plaintiff's Exhibit 70.

19   A.    Okay.  I'm sorry.  70?

20   Q.    Yes, sir.

21   A.    Okay.

22   Q.    And you recall that was the e-mail from you to

23   Dr. Tudor --

24   A.    Right.

25   Q.    -- recommending her for tenure and promotion; correct?

Jury Trial – Volume 3
November 15, 2017

```
 1   A.    Right.
 2   Q.    Do you have your reasoning in there as to why you
 3   recommend her for tenure and promotion?
 4   A.    No.
 5   Q.    And you talked earlier about transparency being
 6   important.
 7         Do you recall that testimony?
 8   A.    Yes.
 9   Q.    And you see that there is no reasoning in there as well;
10   is that correct?
11   A.    Correct.
12   Q.    Would that also be considered, at least on some level, a
13   lack of transparency?
14   A.    I think the function of this letter was to -- was to
15   notify the candidate, not so much to justify or explain.
16   Q.    Did you ever give her an explanation as to why you
17   recommended her for tenure and promotion?
18   A.    There was a form, as part of the application that I
19   filled out, which would have involved some checking of boxes.
20   But other than that, I think that was it in terms of
21   explanation to Dr. Tudor.
22   Q.    Thank you, Dr. Mischo.
23         Is it fair to say that, during your time of Dr. Tudor's
24   tenure and promotion process as well as during your time as
25   department chair, that you disliked the role of administration
```

Jury Trial – Volume 3
November 15, 2017

1  in that process?

2  A.   Certainly some days I disliked administration.  Not every

3  day, but, yes, there was --

4  Q.   And if you had your way, you'd rather have a department

5  that was run by faculty rather than a chair or an

6  administration, wouldn't you?

7  A.   The -- yeah.  My sort of thinking is that a department

8  chair is not a head or boss but rather sort of a coordinator

9  and that it should be the faculty, rather than an individual,

10  making important decisions.

11  Q.   Do you recall how tenure and promotion committees were

12  formed at Southeastern?  And if so, how is it formed?

13  A.   At this point in time or back in the time we're looking

14  at, the tenure and promotion committees would be five tenured

15  faculty at associate or full-professor level.

16  Q.   And, Dr. Mischo, do you make the selection of those five

17  individuals?

18  A.   Yes.

19  Q.   Does anybody else give you feedback about those five

20  individuals?

21  A.   I can't remember, but I think the list of the tenure and

22  promotion committee might have gone to the dean.  I'm not

23  certain of that, though.

24  Q.   But you were the one who selects those five people;

25  correct?

Jury Trial – Volume 3
November 15, 2017

```
 1    A.    Correct.
 2              MR. BUNSON:  May I approach, Your Honor?
 3              THE COURT:  Yes.
 4    Q.  (BY MR. BUNSON)  Dr. Mischo, do you recognize that
 5    document?
 6    A.    Yes.
 7    Q.    What is that document, Doctor?
 8    A.    The first e-mail to Dr. Tudor is a notification of the
 9    constitution of her tenure and promotion.
10              MR. BUNSON:  At this time, Your Honor, I'd move for
11    Defendant's Exhibit 199 to be admitted.
12              THE COURT:  Any objection?
13              MS. NOVOTNY:  No objection.
14              THE COURT:  It will be admitted.
15              MR. BUNSON:  Thank you.
16    Q.  (BY MR. BUNSON)  Now, Dr. Mischo, with that document
17    specifically, do you recall who you appointed to Dr. Tudor's
18    2009 tenure and promotion committee?
19    A.    Yes.
20    Q.    Who are they?
21    A.    Dr. Coleman, the committee chair; Dr. Prus; Dr. Allen;
22    Dr. Spencer; Dr. Parrish.
23    Q.    And if you could, Dr. Mischo, again, in the e-mail that
24    you're writing to Dr. Tudor, you say that "I have appointed
25    your tenure and promotion committee."  Correct?
```

Jury Trial – Volume 3
November 15, 2017

1   A.    Correct.

2   Q.    Did anyone influence who you put in any of those

3   positions?

4   A.    I'm sorry.  Could I have the question again?

5   Q.    I'll ask it differently.

6         You are the one who made that determination; correct?

7   A.    Yes.

8   Q.    Did anyone tell you to put any one of those five members

9   on that committee?

10  A.    No.

11  Q.    Did anyone tell you who to put as the chair of that

12  committee?

13  A.    No.

14  Q.    Thank you.

15        Just taking a quick step back.  Do you recall

16  specifically who you appointed to Dr. Tudor's 2008 tenure and

17  promotion committee?

18  A.    No.

19  Q.    Thank you.

20        And in that same exhibit, do you see that Dr. Tudor has

21  objected to Dr. Coleman serving as chair of her committee?

22  A.    Correct.

23  Q.    And that's because Dr. Tudor accused Dr. Coleman of

24  discrimination; isn't that correct?

25  A.    I know Dr. Tudor objected to Dr. Coleman.  I'm not -- I

1    don't quite recall why.

2    Q.    So you don't recall Dr. Tudor ever accusing Dr. Coleman

3    of discrimination?

4    A.    Maybe not in those terms.  I don't recall, but I know

5    Dr. Tudor did not think Dr. Coleman -- from this e-mail and I

6    think subsequent discussion I think I had with Dr. Tudor, did

7    not think Dr. Coleman would be good or fair in that position.

8    Q.    But you left Dr. Coleman on her committee; correct?

9    A.    Yes.

10   Q.    Did you communicate your reasonings for leaving

11   Dr. Coleman on Dr. Tudor's tenure and promotion committee to

12   Dr. Tudor herself?

13   A.    I told Dr. Tudor that, in my opinion, that I thought

14   Dr. Coleman would be capable of being objective and being a

15   fair committee chair.  I recall discussing that in person.

16   Q.    Thank you, Doctor.

17        Would you agree that the process of evaluating tenure and

18   portfolio promotions -- let me strike that question.

19        Would you agree that the process of evaluating tenure and

20   promotion portfolios and each of the criteria within them is

21   inherently subjective?

22   A.    Yes.

23   Q.    And when judging scholarship, people can view the same

24   act, same piece of evidence, and view it differently; is that

25   correct?

Jury Trial – Volume 3
November 15, 2017

```
1    A.    Yes.
2    Q.    Can professionals have differing views but still be
3    respectful?
4    A.    Yes.
5    Q.    And two people can look at the same portfolio and come to
6    completely different conclusions, can't they?
7    A.    Yes.
8    Q.    When it comes to the area of scholarship, at the time you
9    were evaluating the portfolio, what was more important,
10   quantity or quality?
11   A.    In terms of scholarship?
12   Q.    Yes, sir.
13   A.    If I had to say, I would say they both mattered, but
14   certainly quantity in the sense of, I think, one or two
15   publications would be -- would be, to me, necessary; 1.5
16   maybe.
17         At an institution like ours, the quality of the journal
18   doesn't matter as much as it would at a research institution.
19   So I think it would be fair to say that I would look at it
20   certainly in terms of both quality and quantity, but
21   definitely there had to be kind of a minimal kind of output of
22   scholarship articles.
23   Q.    Dr. Mischo, you were asked earlier if you recall giving a
24   deposition in this case on May 5th, 2016.
25         Do you recall that?
```

Jury Trial – Volume 3
November 15, 2017

```
1    A.    Yes.
2              MR. BUNSON:  May I approach, Your Honor?
3              THE COURT:  Yes.
4              MR. BUNSON:  Page 66, lines 11 through 16.
5    Q.  (BY MR. BUNSON)  Doctor, would you please turn to page 66.
6    A.    Okay.
7    Q.    Just to yourself and not out loud, please read lines 11
8    through 16.
9    A.    Okay.
10   Q.    In that, didn't you testify that at the time, when you
11   were asked whether or not quantity or quality was more
12   important, your singular answer was "quantity"?
13   A.    Okay.  I think just prior to this we were talking about
14   scholarship.  I think I might not -- are we talking about --
15   this refers to service --
16   Q.    My apologies.
17   A.    -- as to quantity.
18   Q.    You're correct.
19   A.    Yes.
20   Q.    If you could, then, please turn to page 81.
21   A.    Okay.
22   Q.    And to yourself, please read lines 3 through 7.
23   A.    Okay.
24   Q.    Earlier you testified that one or two articles, maybe one
25   and a half publications, was enough.
```

Jury Trial – Volume 3
November 15, 2017

1       Do you recall that testimony?

2   A.   Yes.

3   Q.   After reading that, does that refresh your recollection

4   as to how much you insisted or --

5           MS. NOVOTNY:  Objection, Your Honor.  He already

6   testified to the one and a half without needing the

7   deposition.

8           THE COURT:  I don't know if you're impeaching or

9   refreshing his recollection.  Either read it or let him read

10  it and then ask him the question.

11  Q.   (BY MR. BUNSON)  Dr. Mischo, will you please -- in your

12  deposition, if you could follow along starting at Line 3, you

13  were asked:

14      "Question:  And what would you normally tell professors

15  about the type of scholarship they would have to get tenure?

16      Answer:  Typically, I would say you would need one and a

17  half publications."

18      Is that correct?

19  A.   Yes.

20          MS. NOVOTNY:  Objection.  Duplicative.

21          THE COURT:  Sustained.

22  Q.   (BY MR. BUNSON)  Dr. Mischo, do you recall talking to

23  Dr. Tudor about her opinion that she needed at least one and a

24  half publications in her portfolio?

25  A.   Did I talk to Dr. Tudor about that?

Jury Trial – Volume 3
November 15, 2017

1   Q.   Yes.

2   A.   We would have, as a course of procedure with every

3   untenured faculty member, the department chair, I would meet

4   with each one of them at the beginning of each academic year,

5   and we would go over their plan -- their development plan,

6   what they were going to do for that year.  And we would talk

7   about in terms of where are you in terms of the three

8   categories moving toward tenure?

9        So we would have talked about, again, service --

10  teaching, research, and service.

11  Q.   And at that meeting you would have instructed her that it

12  was your recommendation that at least one and a half

13  publications be in her portfolio; is that correct?

14  A.   That was --

15           MS. NOVOTNY:  Objection.  Asked and answered.

16           THE COURT:  Sustained.

17  Q.   (BY MR. BUNSON)  Did you have that meeting with Dr. Tudor

18  before she applied for tenure in 2008?

19  A.   The yearly meeting, I don't recall if it was before or

20  after the portfolio was submitted.

21  Q.   Well, you have an annual review with her every year; is

22  that correct?

23  A.   Well, we have a meeting at the beginning of the academic

24  year in August or September.  And then the evaluation is done

25  at the end of the semester, sometime in April or at the end of

Jury Trial – Volume 3
November 15, 2017

1    the academic year in April.  So there would be beginning and

2    ending discussions.

3    Q.    Doctor, do you know how many publications Dr. Tudor had

4    in her 2008 portfolio?

5    A.    I don't remember.

6    Q.    Do you remember reviewing that portfolio?

7    A.    I -- it's been a while.  I don't recall.  I know I looked

8    through it, of course, but I don't recall the details.

9    Q.    Do you know how many publications Dr. Tudor had in her

10   2009 portfolio?

11   A.    No, I don't remember.

12   Q.    But you recall looking at that portfolio too; correct?

13   A.    I must have.  I don't remember, again, looking at it.

14   There were, again -- there was more than one, so...

15   Q.    Earlier, you were asked to review the evaluation of

16   Dr. Tudor.

17         Do you recall that?

18   A.    The annual?

19   Q.    Yes, sir.  It's Plaintiff's Exhibit 92, if you'd like to

20   look at it.

21   A.    Right.

22   Q.    And under "publication" it says "published article"; is

23   that correct?

24   A.    Right.

25   Q.    That would imply it was one article; correct?

Jury Trial – Volume 3
November 15, 2017

1   A.   One article at that point which was scheduled, right.   It
2   was in press.   It was accepted to be published.
3   Q.   So, at that time, if you had known that Dr. Tudor had
4   more articles, you would have implied "articles," wouldn't
5   you?
6   A.   I think what the -- the comment that says "published
7   article" would refer to this academic year.   So what that
8   would refer to would be during this time period, '08-'09, that
9   there would have been one published.
10       Now, I don't recall if there were others before or not.
11   Q.   And if Dr. Tudor submitted a 2008 portfolio with zero
12   publications in it, that would not be following your
13   recommendation of at least one and a half; is that correct?
14   A.   Correct.
15   Q.   If she had submitted a 2009 portfolio with only one
16   article, that would still not be following your minimum of at
17   least one and a half publications; is that correct?
18   A.   Correct.
19   Q.   And yet you recommended Dr. Tudor for tenure even though
20   she didn't meet your own criteria for publications necessary
21   for tenure; is that correct?
22   A.   I think there may have been -- again, we get into that
23   issue of one and a half articles.
24       The one and a half, you can't publish a half an article.
25   So what the one-half would have referred to would have been

Jury Trial – Volume 3
November 15, 2017

1   maybe something else, maybe a book review or something which

2   was not an article, but it was a kind of publication if not an

3   article per se.

4   Q.   But if she had one, that would still be less than one and

5   a half, per your recommendation; correct?

6   A.   Right.

7   Q.   Dr. Mischo, do you recall a meeting you had with

8   Dr. Tudor in 2009 where you informed Dr. Tudor that you didn't

9   think she was on track for tenure because she was lacking in

10  both the areas of research and scholarship?

11  A.   Once again, please.

12  Q.   Do you recall a meeting you had with Dr. Tudor in 2009

13  where you informed her that you didn't think she was on track

14  for tenure because she was lacking in both the areas of

15  research and scholarship?

16  A.   I can't remember that.

17  Q.   Doctor, if you could turn to your deposition, page 136,

18  lines 4 through 22.

19  A.   Okay.

20  Q.   In that, you were asked specifically, "Did you ever tell

21  Dr. Tudor that you did not think she was going -- or she was

22  doing what she needed to do to become qualified for tenure?"

23       The answer you said was, "I think I did, yes."

24  A.   Okay, yeah.  At some point I would have in that five-year

25  period.  I think earlier in the five-year period, I had

Jury Trial - Volume 3
November 15, 2017

1    discussed with Dr. Tudor the necessity by the end of the

2    five-year period to again have something.

3    Q.   And at this time, you were asked, "What did you tell

4    Dr. Tudor she was not doing that she needed to do to become

5    qualified for tenure?"

6         And your answer was, "It would have been -- it would have

7    involved the research or scholarship."

8         Is that correct?

9    A.   Yes.

10   Q.   As the chair of the department, Dr. Mischo, do you review

11   the full portfolios of every candidate for tenure and

12   promotion?

13   A.   Yes.

14   Q.   Can you please turn to page 156 of your deposition,

15   please, lines 3 through 7.

16        You were asked, "Did you typically read the entire

17   portfolio of applicants for promotion and tenure?"

18        Did I read that question correctly?

19   A.   Yes.

20   Q.   Your answer was, "No, not if they included a syllabus or

21   something like that.  I'm not going to read all of those, no.

22   Scanned through them."

23        Is that accurate?

24   A.   Yes.

25   Q.   So you didn't necessarily review every portfolio for

Jury Trial – Volume 3
November 15, 2017

1   tenure and promotion; is that correct?

2   A.   I reviewed every portfolio but not every page, no.

3   Q.   Thank you for that clarification.

4          THE COURT:  Let me stop you here, and we will take

5   our morning recess.

6        Don't discuss the case or permit others to discuss it

7   with you.  Be back in the jury deliberation room at eleven

8   o'clock, and we'll be in recess.

9        (In recess from 10:40 a.m. to 11:05 a.m.)

10        (The following proceedings were had out of the presence

11   of the jury with all parties present.)

12          THE COURT:  Be seated.

13        Ms. Coffey, Linda has told me what you want to raise.  I

14   never gave any instructions in the courtroom because there

15   weren't any witnesses here.

16        Let me instruct all of you, had there been witnesses

17   present in the courtroom, my instruction to them would have

18   been, do not discuss your testimony with anyone except the

19   lawyers present in the courtroom today and make no attempt to

20   listen to or discover what any other witness testified to.

21        Now, I believe you can follow that instruction still

22   meeting in the same place with your witnesses or relaxing in

23   the same -- whatever you're doing down there, and you're

24   permitted to talk -- you-all are permitted to talk to the

25   witnesses.  They just can't talk to each other.

Jury Trial – Volume 3
November 15, 2017

1       So observe that order, please.

2       Anything else?

3            MS. COFFEY:  No.

4            THE COURT:  Okay.  Bring the jury in.

5       (Jury enters.)

6            THE COURT:  Be seated, please.

7       Please continue.

8   Q   (BY MR. BUNSON)  Dr. Mischo, we're almost done, but I

9   just have a few things that I need to clarify if you don't

10  mind.

11  A.   Okay.

12  Q.   Earlier, you testified that the offer from the

13  administration, from Dean Scoufos, for the eighth year of

14  tenure track was unusual; is that correct?

15  A.   Yes.

16  Q.   And it's unusual because typical tenure track is seven

17  years; correct?

18  A.   Correct.

19  Q.   So the offer to obtain an eighth year -- sorry.  The

20  offer for an eighth year to obtain tenure is what you felt was

21  unusual; is that correct?

22  A.   Yes.

23  Q.   Dr. Mischo, as department chair, did Dr. Tudor ever

24  complain to you about any restrictions placed on her?

25  A.   Not that I remember, no.

Jury Trial – Volume 3
November 15, 2017

1    Q.   No complaints of bathroom restrictions; is that correct?

2    A.   Correct.

3    Q.   No complaints of makeup restrictions; is that correct?

4    A.   Correct.

5    Q.   No restrictions of dress code restrictions; is that

6    correct?

7    A.   Yes.

8    Q.   And absolutely no complaint she was being mistreated

9    because she was transgender; is that correct?

10   A.   Yes.

11   Q.   Did you ever personally observe anyone criticizing the

12   way Dr. Tudor dressed?

13   A.   No.

14   Q.   Did you ever personally observe anyone criticizing

15   Dr. Tudor's makeup?

16   A.   No.

17   Q.   Did you ever personally observe anyone complaining about

18   which restroom Dr. Tudor used?

19   A.   No.

20   Q.   And if you had personally witnessed any of that

21   discrimination towards Dr. Tudor or had Dr. Tudor reported it

22   to you, you would have reported it; correct?

23   A.   Yes.

24        MR. BUNSON:   Thank you.  No further questions.

25        THE COURT:   Redirect?

Jury Trial — Volume 3
November 15, 2017

1          **REDIRECT EXAMINATION**

2   BY MS. NOVOTNY:

3   Q.    Thank you, Dr. Mischo.

4        When you were talking to Attorney Bunson from the AG's

5   office a moment ago, he asked about whether the unisex

6   restroom for Dr. Tudor was being provided as a courtesy.

7        Now -- just a second.  I lost my note.  Sorry.  Did

8   Dr. Tudor have any say in which restroom she could use?

9   A.    I don't think --

10          MR. BUNSON:  Objection, Your Honor.  Calls for

11  speculation.

12          THE COURT:  You may answer if you know.

13          THE WITNESS:  I don't think so.

14  Q.  (BY MS. NOVOTNY)  And at that 2007 meeting, it was not

15  indicated that she had been given a say in that; is that

16  correct?

17  A.    I didn't get the impression that Dr. Tudor had a say in

18  that, no.

19  Q.    Okay.  Now, another thing that you were being asked about

20  on cross-examination is, you know, whether Dr. Tudor had done

21  enough to earn tenure in 2008.

22       I don't think, you know, anybody is disputing it, but is

23  it possible for someone to have not earned tenure in 2008 but

24  corrected deficiencies in areas they may have been lacking in

25  so that they were qualified to earn tenure by 2009?

Jury Trial – Volume 3
November 15, 2017

1  A.    Yes.  There is the five- to seven-year probation period.

2  So one can apply for tenure fifth, sixth, and seventh year and

3  improve if necessary.

4  Q.    Okay.  And did Dr. Tudor publish articles between the

5  2008 application and the 2009 application for tenure?

6  A.    I can't remember.

7  Q.    Fair enough.

8        And is it possible that she did?

9  A.    Pardon?

10  Q.    Is it possible she did based on you looking at the

11  exhibit earlier of her '08-'09 review?

12  A.    Yes.  I know she did publish some after I resigned as

13  department chair, which I did -- which I did not know of as

14  chair.

15  Q.    Now, there was also some testimony on cross-examination.

16  You indicated that Dr. Coleman was on Dr. Tudor's committee

17  for tenure.

18        Now, did Dr. Coleman's tenure committee end up

19  recommending Dr. Tudor for tenure?

20  A.    I can't remember which -- which year was this?  I get the

21  years mixed up.

22  Q.    Sure.

23        I believe it was the Defendant's Exhibit 199.

24        MS. NOVOTNY:  I'm sorry, Tim.  I thought we'd be

25  done with your exhibits.

Jury Trial – Volume 3
November 15, 2017

```
 1              MR. BUNSON:  I'm happy to provide them.
 2   Q.  (BY MS. NOVOTNY)  Does this document refresh your memory a
 3   little bit?
 4   A.   Okay.  Yes.
 5   Q.   Was this the committee that ultimately determined that
 6   Rachel Tudor had earned tenure?
 7   A.   Yes.
 8   Q.   Thank you.
 9        Also, on cross-examination, there seemed to be some
10   discussion about tenure being inherently subjective.
11        When you say "subjective," do you mean arbitrary or do
12   you mean that in a different way?
13   A.   No, I don't mean subjective in the sense of arbitrary,
14   no, no.
15        There are -- it's subjective, but the subjective
16   judgments are based on some standards that are -- that we do
17   have in our policy and procedure manual.
18   Q.   If Dr. Tudor were to be awarded a return to Southeastern
19   University, would you welcome her back?
20   A.   Yes.
21   Q.   Do you feel like she did earn the tenure and deserves the
22   tenure she earned?
23   A.   I recommended that, yes.
24              MS. NOVOTNY:  Okay.  Nothing further.
25              THE COURT:  Redirect -- I mean, recross?
```

Jury Trial – Volume 3
November 15, 2017

1          MR. BUNSON:  Thank you, Your Honor.  Very brief.

2                   **RECROSS-EXAMINATION**

3   BY MR. BUNSON:

4   Q.   Dr. Mischo, you just testified on redirect that the

5   policy states that a candidate can apply in their fifth,

6   sixth, and seventh year; is that correct?

7   A.   Yes.

8   Q.   Now, if the policy were to say "fifth, sixth, or seventh

9   year," that would be different, wouldn't it?

10  A.   Yes.

11          MR. BUNSON:  Thank you.  No further questions.

12          THE COURT:  You may step down.

13                   (Witness excused.)

14          THE COURT:  Call your next witness.

15          MR. YOUNG:  Your Honor, Dr. Tudor's calling Dr. Mark

16  Spencer.  Co-counsel is running to our witness room to go grab

17  Dr. Spencer.

18          THE COURT:  Stand and stretch if you need it.

19          MR. YOUNG:  Sorry, Your Honor.  They're talking

20  about literature.  It's herding cats.

21          THE COURT:  Please step right up here next to the

22  witness stand -- right up here -- and then face the clerk and

23  be sworn.

24       (Witness duly sworn.)

25          THE COURT:  Be seated.

1          WHEREUPON, MARK SPENCER, Ph.D., after having been first

2    duly sworn, testifies in reply to the questions propounded as

3    follows:

4                        **DIRECT EXAMINATION**

5    BY MR. YOUNG:

6    Q.    Good morning again, Dr. Spencer.

7          You told me before we came in that you're a little hard

8    of hearing.  So if you can't hear me, let me know.  Okay?

9    Because I want to make sure that you hear me.  And do the same

10   for the lawyers at the attorney general's office.

11         So, Dr. Spencer, do you work at Southeastern?

12   A.    Yes.

13   Q.    What is your job title?

14   A.    Professor of English and Humanities.

15   Q.    Do you have tenure?

16   A.    Yes.

17   Q.    If you could slow down a little bit because the court

18   reporter needs to transcribe what we're saying.  It's easier

19   if it's a little bit slower.

20   A.    Okay.

21   Q.    When did you start working at Southeastern?

22   A.    2001.  August 2001.

23   Q.    And have you worked at Southeastern from 2001 to present?

24   A.    Correct.

25   Q.    Okay.  What department do you work in?

Jury Trial – Volume 3
November 15, 2017

1   A.   The department of English, Humanities, and Languages.

2   Q.   Have you been in the English department the whole time?

3   A.   Yes.

4   Q.   Okay.  So, Dr. Spencer, I want to talk a little bit with

5   you about your own experience applying for tenure.

6        Do you recall what year you applied for tenure?

7   A.   I guess it would have been 2006.

8   Q.   Do you recall how your department promotion and tenure

9   committee voted on your application?

10  A.   Yes.  They voted -- it was a bit of a split vote.  They

11  voted for tenure but not promotion to assistant professor.

12  Q.   Do you know what the vote was at the next level in the

13  process?  Do you know who would -- let me withdraw that

14  question.

15       What person or entity voted on the application after the

16  promotion and tenure committee?

17  A.   Who did it go to next?

18  Q.   Yes.

19  A.   Department chair, John Mischo.

20  Q.   Do you recall what Dr. Mischo's vote was on your

21  application?

22  A.   He concurred with the faculty committee.

23  Q.   Okay.  And we're just going to go through all the stages.

24  A.   Sure.

25  Q.   Okay.  Who does the application go to after the

Jury Trial – Volume 3
November 15, 2017

 1  department chair?

 2  A.   It goes to C.W. Mangrum, who was dean of arts and

 3  sciences.

 4  Q.   And do you recall what Dean Mangrum's decision was on

 5  your application?

 6  A.   Yes.  He was for both tenure and promotion to associate

 7  professor from assistant.

 8  Q.   Okay.

 9  A.   I may have misspoke and said assistant before.  You start

10  out as assistant, then you're promoted to associate.

11  Q.   Can you explain to the jury, is it typical that someone

12  applies for both tenure and promotion at the same time?

13  A.   Right, normally.  That was an unusual move for the

14  committee to do on my part, to split them.

15  Q.   Okay.  So after the dean, who does it go to?

16  A.   The academic vice president, who would have been Doug

17  McMillan at the time.

18  Q.   Okay.  So I want to ask you some questions about your

19  experiences with Doug McMillan and this tenure application in

20  particular.

21       So what was Doug McMillan's decision?

22  A.   It was negative on both, neither tenure nor promotion.

23  Q.   Was that surprising to you?  Was that surprising to you?

24  A.   I'm still not quite understanding what you're saying.

25  Q.   I'm sorry.

Jury Trial – Volume 3
November 15, 2017

1        Was that Dr. McMillan's decision on your application

2   surprising to you?

3   A.    Oh, yes.  Actually, the faculty one was surprising too.

4   So that was very surprise -- a shock, in fact.  I mean...

5   Q.    Once you found out about Doug McMillan's decision on your

6   application, did you do anything to try to get more

7   information?

8   A.    I spoke to John Mischo, who was the chair, a little bit.

9   And, at that time, there was not any requirement to provide a

10  written explanation, so I only got, oh, a little bit -- I

11  think it was, like, lack of collegiality or something, and

12  then later it was something to the effect of minimal

13  publications were the problem.

14       Then that's when I decided on my own to intervene in the

15  process.

16  Q.    Was it because tenure is important?

17  A.    Oh, yeah.  I mean, your future at the school hangs on it.

18  You either get tenure or you're out in a tenure-track

19  situation.

20  Q.    Okay.  So why don't we talk a little bit about what you

21  did to try to intervene.

22  A.    Right.

23  Q.    Who did you try to talk to after John Mischo?

24  A.    Well, I decided to start at the bottom, basically, with

25  John Mischo, the chair, going over it.  And then I went to

Jury Trial – Volume 3
November 15, 2017

1    talk to C.W. Mangrum.  And then I went to talk to Doug
2    McMillan.
3         And then I asked Doug McMillan -- I planned all along to
4    basically go over his ahead essentially to Snowden.  And I
5    asked him at that meeting if it was -- if he minded if I went
6    on to Snowden as well.
7         So that was my -- my intention from the beginning was
8    basically to start an appeal all the way in the process.
9    Q.   Appeal all the steps of the way because it was important?
10        You decided early on in the process that you would appeal
11   it all the way up because getting tenure is important?
12   A.   Oh, certainly.  Sure.
13   Q.   Okay.  So you talked to the dean, you talked to the vice
14   president for academic affairs.  And, eventually, you talked
15   to -- I think you said Jesse Snowden was the president at the
16   time?
17   A.   No.  It was -- Jesse Snowden was acting president.
18   Q.   Jesse Snowden held the position of president or fill-in
19   president for a while; right?
20   A.   Jesse Snowden was.
21   Q.   Okay.  Did the dean, the vice president, and the
22   president, they were all open to talking to you about your
23   application even though a final decision hadn't been made?
24   A.   Oh, yeah.  Yeah.
25   Q.   Was there any hesitancy?

Jury Trial – Volume 3
November 15, 2017

1   A.    No, none.  I didn't encounter any.  I simply –– at each

2   stage, you know, I would talk to the secretary, requested an

3   appointment, and it was given to me.

4   Q.    And that was the same for Vice President McMillan and

5   Jesse Snowden?

6   A.    Yes.

7   Q.    Okay.  I'm going to talk to you a little bit about your

8   conversations with Interim President Snowden.  Okay?

9         So you spoke with him; right?

10  A.    Uh-huh.  Yes.

11  Q.    In person?

12  A.    Yes.

13  Q.    Okay.  What did you speak about?  What did you tell him?

14  A.    I basically said that Doug McMillan had turned me down on

15  both cases, and I didn't really agree with that decision, you

16  know, because I wanted to find out reasons why.

17        Because, as I say, at that time –– you know, currently,

18  they're expected to give a written assessment, where at that

19  time they were not.

20        And so, you know, basically I was looking for an

21  explanation.  And then I was going to press my case if –– you

22  know, depending on what he said.

23  Q.    Did you feel like you had a right to try to make a case

24  for yourself?

25  A.    Yes.  Yeah.

Jury Trial – Volume 3
November 15, 2017

1    You know, especially –– I mean, tenure is such a critical

2    point in an academic career, that a person's –– you know, the

3    rest of their career is on the line.  And so they definitely

4    should get feedback on it.

5        As I say, at that time there was not even a written

6    statement.  You know, Doug McMillan's letter was just, like,

7    one line, "I do not" –– in capital letters –– "recommend

8    tenure, and I do not" –– capital letters –– "recommend

9    promotion."

10   Q.   So did you talk to interim president Snowden about your

11   qualifications in the area of scholarship and research?

12   A.   Right.

13   Q.   So can you just tell me generally what you talked about?

14   A.   Well, it was based on what I said to –– Doug McMillan's

15   response to me was to send a few ––

16              MR. BUNSON:  Objection, Your Honor.  Hearsay.

17              THE WITNESS:  Pardon?

18              THE COURT:  Do you have an argument this falls

19   outside the hearsay rule?

20              MR. YOUNG:  I do not, Your Honor.

21              THE COURT:  All right.

22       Don't testify as to what someone told you, only what you

23   did or said.

24              THE WITNESS:  Even in an interview with that person?

25              THE COURT:  Yes.

Jury Trial – Volume 3
November 15, 2017

1          THE WITNESS:  Okay.

2    Q.  (BY MR. YOUNG)  It's odd.  I'm sorry.

3    A.   Okay.

4    Q.   Just, as we're going forward, you're one of the few who

5    hasn't been questioned before.  When there's an objection,

6    just wait until the judge tells you --

7    A.   Okay.

8          Well, that was -- the whole pitch of my conversation to

9    Jesse was that this is what Doug said.

10   Q.   Uh-huh.

11   A.   And I had a -- so I had a remedy in which I had articles

12   in my second dissertation that I could send out.  So I

13   basically -- from the beginning, my intention with Jesse

14   Snowden was to tell him that why don't I just send these out

15   now?  You know, rather than waiting another year and

16   reapplying, I could have them out in a matter of weeks, you

17   know.  And I did, and a couple of them were accepted.

18         So he agreed with that, and he said he would have to talk

19   it over with Doug, basically, that would be okay with him, and

20   for me to give him a list of the articles I had sent out.  He

21   said that he didn't have to send on a decision to the regents

22   until about June 1st or something.  So this was in March.  So

23   there was a couple of months.

24         So I sent the articles out and compiled a list and sent

25   in -- sent it to him, and then he okayed the recommended

Jury Trial – Volume 3
November 15, 2017

1   tenure and promotion, also based -- partly based on the dean's

2   judgment is another reason why he was recommending both, in

3   addition to, you know, my proposal to send the articles out.

4   Q.   Okay.  So in your situation, it was possible, once you

5   got feedback from Interim President Snowden, to fix something

6   within a few months' time?

7   A.   Right.  To send articles, right.  He said there was --

8   this was in March or so, I believe, and he said he didn't have

9   to send the decision on --

10           MR. BUNSON:  Objection, Your Honor.  Hearsay again.

11           THE COURT:  Well, I'm not sure who the speaker even

12   is, but move on.

13           MR. YOUNG:  I will.

14   Q.   (BY MR. YOUNG)  So I know this was a long time ago, but do

15   you remember how many articles you had in your portfolio

16   before all these conversations with those administrators?

17   A.   Yeah.  I had a full published article, and I had a short

18   conference -- I mean, excuse me -- a short -- it's called

19   explicator.  It's a little short article explicating a small

20   point.  And I had conference papers I had delivered, and I had

21   proceedings from the Native American Symposium that I was the

22   principal editor for.

23       So I felt that was a sufficient body of scholarship

24   there, basically.

25   Q.   But when you were told that wasn't a sufficient body of

Jury Trial – Volume 3
November 15, 2017

 1  scholarship, you wanted to fix it; is that right?

 2  A.   Well, I was under the understanding that was enough.  In

 3  other words, that's why it was a bit of surprise to me, all

 4  this, you know, in terms of what the expectations were.

 5       Then if I had known that I needed more articles, I would

 6  have sent those out earlier because I basically had them ready

 7  in my second dissertation.

 8  Q.   Okay.

 9            MR. YOUNG:  Your Honor, may I approach the witness?

10            THE COURT:  Yes.

11  Q.   (BY MR. YOUNG)  Dr. Spencer, do you recognize the exhibit

12  that's been marked as Plaintiff's Exhibit 48?

13  A.   Yes.

14  Q.   Can you tell me what it is?

15  A.   It's the letter telling me —— informing me that he's

16  recommending my tenure and promotion.

17            MR. YOUNG:  I'd like to move to enter Plaintiff's

18  Exhibit 48 into evidence.

19            MR. BUNSON:  No objection, Your Honor.

20            THE COURT:  Admitted.

21  Q.   (BY MR. YOUNG)  So in your case —— then we'll move on from

22  this —— despite the vice president voting against you, you

23  were able to get tenure because you were able to fix things

24  before your application went to the interim president; is that

25  right?

Jury Trial – Volume 3
November 15, 2017

```
 1   A.    Right, yeah.  It was before he was required to give a
 2   decision.  I know what the time line was, so I went to see him
 3   before his decision would...
 4   Q.    So let's move on and let's talk a little bit about
 5   Dr. Tudor.  Okay?
 6         So you used to work with Dr. Tudor; right?
 7   A.    Correct.
 8   Q.    Okay.  Are you aware that Dr. Tudor applied for tenure in
 9   the 2009-2010 cycle?
10   A.    Yes.
11   Q.    Did you serve on Dr. Tudor's promotion and tenure
12   committee that year?
13   A.    Yes.
14   Q.    Do you recall reviewing her tenure portfolio?
15   A.    Recall reviewing it?  Yes.
16   Q.    Is there anything that sticks out in your mind about it?
17   Was it a typical portfolio for the department?
18   A.    This was the second time, right, in 2009?  Right?
19   Q.    Right.
20   A.    The letter was -- the letter of application was
21   unprofessionally written.  I mean, it basically did not -- I
22   mean, my heart sort of sank when I first read it.  It was
23   like, this is not the way you present a letter --
24   Q.    Uh-huh.
25   A.    -- in an application.
```

Jury Trial – Volume 3
November 15, 2017

1          And then –– but otherwise, I mean, I –– she now had

2     publications, an online article.  For me, that was sufficient.

3     So I more or less decided that I was going to vote in her

4     favor before I even went to the meeting, you know, based on

5     the portfolio.

6     Q.   I assume you've reviewed a lot of tenure portfolios by

7     now at Southeastern.  Is that true?

8     A.   What now?  I'm sorry.

9     Q.   I'll just assume, since you've been at Southeastern for a

10    while, that you've reviewed many tenure portfolios.  Is that

11    true?

12              MR. BUNSON:  Objection, Your Honor.  Leading.

13              THE COURT:  Overruled.

14         Go ahead and answer.

15    Q.   (BY MR. YOUNG)  Have you reviewed many tenure portfolios

16    as a professor at Southeastern?

17    A.   Reviewed many of them?  About four of them, I think,

18    perhaps, maybe five.  I can't ––

19    Q.   Okay.  At the time you reviewed Dr. Tudor's 2009–2010

20    portfolio, was there anything missing from it, like a section

21    missing, documents missing?

22    A.   No, not that I –– not that I recall.  There were three

23    binders, so it seemed, if anything, there was too much.  I was

24    under the impression that we had a set format we were supposed

25    to submit and –– but I think one binder contained student

Jury Trial – Volume 3
November 15, 2017

1   recommendations –– or, you know, student evaluations

2   basically.

3        So that was a bit unusual as well.  I didn't have a

4   multivolume portfolio to look over before or since.

5   Q.   Do you recall reviewing most of the documentation in that

6   portfolio?

7   A.   Well, there were a lot of, you know, evaluation letters.

8   It was all of them.  Would have been helpful.  I looked them

9   over.

10        And what I –– from my –– you know, talking to students

11   and other ways, I –– my impression was that she was doing, you

12   know, a good job in the classroom.  So I really had no reason

13   to –– you know, I certainly wasn't going to –– I mean, it was

14   this thick of every evaluation that had been done since she'd

15   been there.

16   Q.   That's fair, sir.

17        Other than the candidate letter, which you didn't

18   particularly like, you didn't see any other problems with the

19   application?

20   A.   No.  The only –– it wasn't a strong application because

21   there was just the one article.  But, as I said, my own

22   opinion is that an institution like ours, that the research

23   element is, you know, exaggerated.  We're primarily a teaching

24   institution.  That should be our focus.  So as long as there

25   was something.

Jury Trial – Volume 3
November 15, 2017

1          Jesse Snowden had had a remark on what he thought was
2    appropriate, and that's what I was going by.  I don't know if
3    it's appropriate for me to --
4               THE COURT:  Just wait for a question.
5               THE WITNESS:  Okay.  I was just trying to explain my
6    reasons behind my thought.
7               MR. YOUNG:  I'll try to help you.
8    Q.  (BY MR. YOUNG)  Had you been told at some point by Jesse
9    Snowden that there was a particular standard at Southeastern
10   when it came to scholarship and research?
11   A.   I had not been told personally, but I had heard it.
12   Q.   Was that standard that you only needed one publication?
13   A.   No.  It was that zero is not enough.  That's what he said
14   basically, that there needed to be some scholarly engagement,
15   you know --
16   Q.   Okay.
17   A.   -- essentially is what -- here again, I guess I'm
18   reporting that secondhand, you know.  So I -- he never told me
19   that personally, but...
20   Q.   Okay.  Do you personally believe that Dr. Tudor deserved
21   tenure in 2009-10?
22   A.   Yes.  I voted for her.  It was not a strong application,
23   but I voted for her.  It was, you know -- I would even say it
24   was weak, but it was adequate.
25   Q.   Okay.  But when you say it wasn't strong, that means it

Jury Trial – Volume 3
November 15, 2017

1  just wasn't way over the bar; is that right?

2  A.   Well, it was -- I mean, I've described it generally

3  speaking.  It was still weak, but it was adequate.  It was

4  enough for me to vote for her, you know.

5  Q.   Have you had other applications -- you said you reviewed

6  four to five -- other portfolios that were similarly -- that

7  they met the standard?

8  A.   Yes.  It's always weakness in publications, is the

9  weakness.  And it would be slicing it pretty thin to call hers

10  weaker than others that got tenure.

11  Q.   Would you agree that that would be singling her out?

12  A.   I'm not sure.  I wouldn't -- it's slicing it pretty thin

13  is the way I would describe it.  I mean, ultimately, it's a

14  bit of a judgment call, you know, but it's just -- the

15  other -- the other people in the department got tenure on --

16  they were not much stronger.  It's almost always weakness.

17  Not many publications is the weakness.

18  Q.   Okay.  I'm almost done with you, and then you're free.

19       I'd like to fast-forward to Dr. Tudor's 2010-11

20  application.

21       Did you write a letter of recommendation for Dr. Tudor

22  for that application?

23  A.   Yes.

24  Q.   Okay.

25            MR. YOUNG:  Your Honor, may I approach the witness?

Jury Trial – Volume 3
November 15, 2017

1                THE COURT:  Yes.

2    Q.   (BY MR. YOUNG)  Dr. Spencer, do you recognize the document

3    I just handed to you?

4    A.   Yes.

5    Q.   Can you tell me what it is?

6    A.   It's my recommendation letter I wrote in September 2010.

7    Q.   Your recommendation for Dr. Tudor?

8    A.   Right.  In applying -- well, it was for applying for

9    tenure, and I wrote a similar letter for other universities if

10   she needed it to apply for.  It was essentially the same

11   letter.

12   Q.   Okay.

13               MR. YOUNG:  I'd like to move to enter Plaintiff's

14   Exhibit 164 into evidence.

15               MR. BUNSON:  No objection, Your Honor.

16               THE COURT:  Admitted.

17   Q.   (BY MR. YOUNG)  So, Dr. Spencer, do you stand by what you

18   wrote in this letter?  Is this accurate, to your recollection?

19   A.   I would -- I'm trying to help her out a little bit, you

20   know, but as -- and, you know, I don't remember specifically

21   seeing -- in other words, this portfolio was never distributed

22   to us.  I think when she asked me to write the letter, I

23   probably must have -- she must have sent me a CV of some sort,

24   but I don't recall that.

25        But I had heard from other faculty members and knew that

1   she had sent some articles out and was -- in fact, judging --

2   when I see the letter again, I must have seen her CV and that

3   she had five or six articles listed there.  And then

4   subsequently that year she won the award for scholarship, you

5   know, I mean, from the faculty senate.  So, I mean, there was

6   a lot of -- there was a lot of scholarly activity.

7        As I said, in terms of teaching, I had -- I'd only had

8   favorable impressions.  So I was prepared to vote for her the

9   first time.  So this application was definitely stronger, so

10  there was no reason why I would change my mind.

11  Q.   At some point did you meet with Claire Stubblefield about

12  Dr. Tudor?

13  A.   Yes.

14  Q.   Do you remember generally what that meeting was about?

15  A.   Yes.  She just wanted to go over my -- just like we

16  pretty much did, in terms of what was my process, how did that

17  go, basically.

18  Q.   When you say "process," do you mean your tenure process?

19  A.   Right.  Well, the whole story of my intervention, you

20  know, which supposedly was unusual.  I mean, she was

21  definitely of the opinion that you shouldn't be allowed to

22  intervene like that.

23  Q.   Who is of that opinion?

24  A.   Claire.

25  Q.   Do you have any idea what she was basing that opinion on?

Jury Trial – Volume 3
November 15, 2017

```
 1   A.   She said to let the process play out, was the words
 2   that --
 3            MR. BUNSON:  Objection, Your Honor.  Hearsay and
 4   calls for speculation.
 5            THE COURT:  I'm not sure what we're talking about.
 6   Can you define what intervention we're talking about?
 7            MR. YOUNG:  Thank you, Your Honor.
 8   Q.  (BY MR. YOUNG)  Did you talk to Claire Stubblefield about
 9   your own tenure experience and the fact that you had talked
10   with administrators before Interim President Snowden made a
11   decision on your application
12   A.   Right.  Yes.
13   Q.   Okay.
14   A.   It's kind of a complicated story, you know, as I've just
15   detailed it.  So she wanted to hear the story from me,
16   essentially, what had happened.  That's what she was --
17   Q.   Okay.  And a moment ago, before -- it's a confusing
18   process.  I think -- were you trying to say that Claire
19   Stubblefield said that your opportunity to talk to the
20   administration was unusual or something like that?
21   A.   At least she --
22            MR. BUNSON:  Objection, Your Honor.  Leading and
23   calls for hearsay.
24            THE COURT:  Sustained.
25            MR. YOUNG:  Okay.
```

Jury Trial – Volume 3
November 15, 2017

1   Q.   (BY MR. YOUNG)   Did you talk to Claire Stubblefield about

2   anything else other than your own tenure application process?

3   A.   No, no.  I just...

4   Q.   Did Claire Stubblefield ask you any questions about the

5   quality of Dr. Tudor's portfolio?

6   A.   No.  All she wanted to know was my story, basically.

7   Q.   Do you recall whether she took notes during that meeting?

8   A.   I don't recall her taking notes, actually.  She may have,

9   but I don't remember seeing her do that.

10  Q.   Do you remember if she asked you follow-up questions?

11  A.   I -- I mean, as best as I can recall, it was mostly me

12  just rehearsing what I had done, essentially, and her

13  thinking -- I mean, the reason I -- because if you -- if you

14  can't intervene in the process, then it's all over when the

15  final decision comes down.  Then what can you do?  Where is

16  your appeal of any sort?

17       So that was my -- why I -- that's why I intervened, and

18  I'm not really sure that I can agree with the notion that a

19  person -- I think there should be some sort of appeal, you

20  know, especially when you're not getting a written -- you

21  know, you're not getting a detailed explanation of what the

22  deficiencies are, you know.

23       To me, that's academic malpractice, basically, to be

24  turning down someone and not giving them full explanation, and

25  preferably in writing, as to why the application is deficient.

Jury Trial – Volume 3
November 15, 2017

1  Q.   Okay.  One last -- or two questions for you.  Then I'll

2  turn you over to the State.

3       If you had a say in things, would you be okay with

4  Dr. Tudor returning to the English department at Southeastern?

5  A.   I don't have any particular problem.  I mean, I'm

6  retiring.  I don't know if that's relevant in another year or

7  so.  But, I mean, no.

8  Q.   Okay.

9           MR. YOUNG:  We can just let it cut off there, and

10  I'll turn you over to the State.  Okay?  And then I'll come

11  back up, couple more questions, and then you get to go back to

12  Durant.

13           THE COURT:  Mr. Bunson.

14           MS. COFFEY:  Thank you, Your Honor.

15                  **CROSS-EXAMINATION**

16  BY MR. BUNSON:

17  Q.   Dr. Spencer, you indicated and testified earlier that

18  your process was unusual.

19       Is that a fair characterization?

20  A.   Claire said that it was.  You know, I had no -- I had no

21  reason -- to me, it was perfectly natural, that you should be

22  able to go talk to whomever.  So it was news to me, you know.

23  That was the argument that she was presenting, that you should

24  not intervene in the process.

25  Q.   So it's not unusual for disagreement to occur at various

Jury Trial – Volume 3
November 15, 2017

1  levels, is it?

2  A.   No, not necessarily.  I mean...

3  Q.   And, in fact, in your case, there was lots of

4  disagreement, wasn't there?

5  A.   Oh, yeah, definitely.

6  Q.   And, Dr. Spencer, Plaintiff's Exhibit 48, the letter from

7  Jesse Snowden recommending you for tenure and promotion, do

8  you have that in front of you?

9  A.   Uh-huh.

10  Q.   Is there any reason Dr. Snowden gives for recommending

11  your tenure and promotion?

12  A.   Is there any reasoning?  I mean --

13  Q.   Correct.

14  A.   No, there's no explanation really.

15  Q.   Do you recall giving Dr. Tudor any advice on her

16  portfolio prior to its submission?

17  A.   Only -- the advice I gave was immediately after my

18  experience in 2006-2007, and I gave it to several other

19  faculty members as well.

20  Q.   And what was that advice?

21  A.   I wouldn't go up for tenure without two articles.

22  Q.   And you sat on her 2008-2009 application committee,

23  didn't you?

24  A.   Yes.

25  Q.   How many articles did she have in that one?

Jury Trial – Volume 3
November 15, 2017

1   A.   There were none in the first one.

2   Q.   So she ignored your advice?

3   A.   Apparently.  I was surprised.

4   Q.   How many articles did she have in her 2009 portfolio?

5   A.   There was one that was going to be -- I can't -- I think

6   it was -- it was accepted, which more or less counts as

7   published if you get a letter back from the, you know -- and

8   the two articles was not necessarily my opinion.  It was

9   merely just, this was my experience had been -- because it's

10  not just our department; you've got to get through the other

11  levels as well that I -- you know, I -- if anybody -- if I had

12  had any hint that I needed more than what I had had, I would

13  have done it.  But nobody -- I never got any -- I never had

14  any hint from anybody that I needed more.

15  Q.   Then you --

16  A.   Here, it's clear that you do.  So I told a couple of

17  other -- I told Jani -- the other faculty members who were

18  coming up for tenure, you know, to help out junior colleagues,

19  spare yourself the trouble, you know, that what -- you know,

20  that would be the safe level, and I wouldn't go up without

21  that.  Trying to help them out.

22  Q.   And you earlier classified Dr. Tudor's 2009-2010

23  portfolio as weak but adequate.  Is that accurate?

24  A.   Right.  Because I voted for her.  I mean, I've said it

25  was weak, but I voted for it in the end and was prepared to

Jury Trial – Volume 3
November 15, 2017

1    vote for it when I went into the meeting.

2    Q.   Dr. Spencer, I want to make sure that we're clear.  Some

3    of these questions are just yes or no.  I don't --

4    A.   Okay.  Okay.

5    Q.   I don't want to take too much time, if it's okay.

6         Did Dr. Tudor follow the format you expected in her

7    2009-2010 portfolio?

8    A.   No, not really.  I wasn't sure -- I'd only heard what the

9    format was to be, but it struck me that it wasn't following,

10   yeah.

11   Q.   And weren't those expectations of the formatting set by

12   the dean at the time?

13   A.   Yes.

14   Q.   Had you ever reviewed a multivolume portfolio other than

15   Dr. Tudor's?

16   A.   No, but Dr. Tudor may have been my first one.  I was

17   trying to think about that, you know, in the other questions.

18   I believe that may have been the first one that I sat on.

19   Q.   And, Dr. Spencer, the cover letter you talked about and

20   you referred to as unprofessional, that's the first impression

21   that a candidate's portfolio is presented to the committee;

22   isn't that correct?

23   A.   Yes.

24   Q.   Okay.  Do you recall any indication or suggestion made by

25   the chair, Lisa Coleman, or anyone else that stood out as a

Jury Trial – Volume 3
November 15, 2017

1  reason that the committee may have voted to give a weak but

2  adequate portfolio and a bizarre cover letter a vote for

3  tenure and promotion in 2009-10?

4  A.    Lisa Coleman did raise the transgender issue.

5  Q.    And do you feel that that had any influence on the

6  committee?

7  A.    Here -- it's just my impression.  If anything, I did feel

8  that it was going against -- against her, and then -- like

9  people -- this gets thrown out there and people talk about it

10  and you can't get a really clear sense.  No one says whether

11  they think that this should make a difference or not.  It sort

12  of sits there.

13       Then, finally, it's -- then you call an end to the

14  meeting and a vote is taken and it was the majority to

15  approve.  I can't remember the precise numbers on the vote.

16  It's anonymous, but it may have been 4-1, if I -- I think it

17  was 4-1, but I couldn't swear to that.

18  Q.    Doctor, you just testified it was going bad.  So what

19  were you talking about?

20  A.    That was just a general -- you know, I've seen this

21  before in other ones where, you know, the discussion is out

22  there and people are making negative comments and you're

23  getting kind of a sense of which way it's going to go before

24  the vote occurs.  And that's a very subjective sense, but that

25  was -- you know, I've seen that happen before, where it seems

1  that –– where at first people are being critical, and then you

2  get a sense that, well, this is, you know –– but then it goes

3  the other way.

4      It seems like it's almost always been a sense, first,

5  that it's critical and kind of negative and then it sort of

6  turns in favor.  I don't think I've ever been on one where

7  everybody comes out in the beginning and says that –– it's

8  very positive and then for later criticisms to have it go the

9  other way and deny.

10  Q.   But Dr. Tudor's transgender status was something that the

11  committee considered during their deliberations or at least

12  was brought up by Lisa Coleman?

13  A.   Lisa Coleman brought it up.  But to what extent anyway ––

14  it was irrelevant to me, I mean, that was for sure.  But to

15  what extent anyone else considered it, I can't say, you know,

16  for sure.

17  Q.   Dr. Spencer, we've talked a bit and we've heard quite a

18  bit of testimony about the Native American Symposium.

19      How were you involved with the Native American Symposium?

20  A.   I'm the primary organizer of it.

21  Q.   How many years have you been the primary organizer?

22  A.   Since –– oh, there was another faculty member named Chad

23  Litton.  He was one of the original founders.  So he was with

24  us from 2003.

25      From 2005 until the present, I've been the primary

Jury Trial – Volume 3
November 15, 2017

1  organizer of the academic portion of, you know, organizing the

2  papers, putting the conference together.

3       As a co-chair there was Dan Althoff and then another

4  person who ran the Native American Institute, Chris Wesberry

5  became co-chair, but the heart of it is the academic

6  conference, and I was always the primary organizer there.

7  Q.   Is it a lot of work to put on the Native American

8  Symposium?

9  A.   It's a fair amount.  Once I get all this in my computer,

10  it's, you know –– you know, it's a matter of e-mail addresses.

11  Once you've done it a few times, you know, the templates from

12  one symposium are in my computer, and then I just type in the

13  new version.

14       But, I mean, it lasts over a number of months.  I have to

15  maintain contact with the people who send proposals, you know.

16  Then when I get them, I put together a schedule, things like

17  that.

18       So, I mean, it's a significant –– it's been my primary

19  service contribution to the school, basically, in my own

20  tenure and promotion process.

21  Q.   Have you ever worked with Dr. Tudor on the Native

22  American Symposium?

23  A.   Yes.

24  Q.   And there's been testimony that Dr. Tudor was a co-editor

25  of the Native American Symposium.  Was that reflective of her

1  work, or was it mostly just in title?

2  A.   She read the papers.  That is pretty standard.  I mean, I

3  have no qualms about putting her as co-editor on it.

4       I mean, I did most of the actual sort of editing of the

5  individual ones and formatted them on my computer, but she --

6  you know, I gave her the papers, she read them, made some

7  comments, and that's pretty typical in academic settings.

8  Q.   You indicated that Dan Althoff was your co-chair.

9       So the years you worked with Dr. Tudor, was it you,

10  Dr. Tudor, and Dan Althoff only who worked on the Native

11  American Symposium?

12  A.   There were one or two other -- Jane McMillan, Doug

13  McMillan's sister, was on it.  There were a couple of other

14  people that would come and go, you know, over the years, a

15  number of symposiums.

16  Q.   Was the work evenly split amongst all of you?

17  A.   Most of the -- the other members primarily helped on the

18  event itself, which was crucial.  I mean, they needed to be

19  there and would show up for -- there would be several

20  meetings, at least, leading up to the event and -- so they

21  were very helpful, and I listed them as active members on the

22  committee.

23       But in the sense that, you know -- I was -- in terms of

24  organizing the academic conference, in particular -- sometimes

25  we did some additional more local events, and Chris Wesberry

Jury Trial – Volume 3
November 15, 2017

1  in particular was doing those.  And Dan was contacting our

2  primary speaker and, you know, arranging some of that.

3      But organizing the conference part itself, I was always

4  the person essentially doing it.

5  Q.  And, Doctor, I just want a number here.  If you had to

6  assess a percentage to the work you did yourself, what would

7  that percentage be?

8  A.  I would -- it would be over half.  It would be, you know,

9  maybe even as much as 60 percent perhaps, yeah.

10 Q.  If you had to assess a percentage of the work Dan Althoff

11 performed, what percentage would you give --

12 A.  Maybe around 20.

13 Q.  And just so that we aren't talking over each other, I'm

14 going to need you to let me finish my question, because she's

15 trying to get everything down.  Is that okay?

16 A.  Sure.

17 Q.  Thank you.

18     So you were at 60, and you put Dan Althoff at 20 percent;

19 is that correct?

20 A.  Yeah, give or take 5 or 10, you know, percent, maybe.

21 You know, 5 percent anyway.  I would say I did over half.

22 Q.  If you had to assess a percentage of the work Dr. Tudor

23 and everyone else performed, what would that percentage be?

24 A.  It would be in the 20 to 25 percent.

25 Q.  So are you saying that Dr. Tudor herself was responsible

1  for that 20 to 25 percent?

2  A.   No.   There would be some other people, but she -- I would

3  definitely put her -- she was the next most active, you know,

4  after -- me, Dan, and Rachel, I would say.

5          MR. BUNSON:   I have no further questions at this

6  time.

7          THE COURT:   Redirect?

8                **REDIRECT EXAMINATION**

9  BY MR. YOUNG:

10 Q.   Dr. Spencer, before you came into the courtroom, we were

11 having a conversation about odd things in tenure portfolios.

12      Do you remember that?

13 A.   Of -- which about the tenure portfolios?

14 Q.   That sometimes professors applying for tenure put odd

15 things in their portfolios.

16 A.   Oh, right, right.   Okay.

17          MR. BUNSON:   Objection, Your Honor.   Mr. Young is

18 testifying for him.

19          THE COURT:   Sustained.

20 Q.   (BY MR. YOUNG)   Okay.   Have you had occasion to review

21 portfolios other than Dr. Tudor's, where there were things in

22 the portfolio that didn't make sense to you?

23 A.   No, not really, because everyone else pretty closely

24 adhered to Lucretia Scoufos's model.   I mean, she was very

25 particular about how it had to be.   And I don't think I saw a

Jury Trial – Volume 3
November 15, 2017

1  single portfolio after that that didn't conform, you know,

2  slavishly, you know, in terms of which type of plastic folder

3  and which way it opened as opposed to -- even.

4      I know I certainly did when I went up for full professor.

5  Q.   So if Dean Scoufos hadn't clearly communicated her

6  preferences to someone, would it be hard for a portfolio to

7  look the way she wanted it to look?

8          MR. BUNSON:  Objection, Your Honor.  Calls for

9  speculation.

10          THE COURT:  Overruled.

11          THE WITNESS:  I didn't find -- I mean, it was a bit

12  of a pain, and, you know, I thought it was silly of her to

13  some extent, I mean, even to which way the plastic folder

14  should open.

15      But, in the end, it made -- it made kind of a nice

16  product in the end.

17  BY MR. YOUNG:

18  Q.   I understand that.  I asked you a different question.

19      It sounds like Dean Scoufos had very particular

20  preferences; is that right?

21  A.   Right.

22  Q.   If Dean Scoufos hadn't been really careful and explained

23  that to someone, would it be hard for them to comply with

24  those preferences?

25          MR. BUNSON:  Objection, Your Honor.  Calls for

Jury Trial – Volume 3
November 15, 2017

```
 1   speculation.
 2              THE WITNESS:  It wasn't for me when I did it.
 3              MR. YOUNG:  Okay.
 4              THE COURT:  Move on.
 5   Q.  (BY MR. YOUNG)  I think you said during cross-examination
 6   that Dr. Tudor was the co-editor of the Native American
 7   Symposium; is that right?
 8   A.   Yes.
 9   Q.   How would someone who wasn't deeply involved in the
10   symposium figure out who's a co-editor of the proceedings?
11   A.   Well, I -- I invited her to be, you know, basically.
12   Q.   Different question.
13        How would someone on the outside figure out if someone is
14   the co-editor of the Native American Symposium proceedings?
15   Is there a book?  Is there an announcement?
16   A.   Oh, someone on the outside trying to determine?
17   Q.   Yeah.
18   A.   Well, that would be a difficult publication, you know,
19   unless it's spelled out in the introduction sometimes.  Yeah,
20   they'd have to ask me.
21   Q.   If you were asked, would you have been able to identify
22   who your co-editors were?
23   A.   Sure.
24   Q.   Did the cover of the Native American Symposium
25   proceedings have the co-editors on it?
```

```
 1   A.    Yes.  Lucretia Scoufos was a co-editor of one -- you
 2   know, a symposium or two before.  I think I even had Chad
 3   Litton's name on there, but that was more -- I think he had
 4   just received papers and stuff, but....
 5   Q.    I think you testified during cross that during your own
 6   tenure application, that the vast majority of your service was
 7   the Native American Symposium; is that right?
 8   A.    For the most -- there was some other department service.
 9   I had been on committees.
10         I've never been -- I'm not as interested in university
11   politics, so I've actually more or less tried to stay out of
12   the university-wide-level things.
13         So the symposium was my kind of larger university.  But I
14   was very active in the department, so I don't think that my
15   service was deficient in any way.  But I definitely did not go
16   out of the way like other faculty members have and been -- you
17   know, I could have been more active at the university level,
18   but I didn't want to be.
19   Q.    Would it be unusual for a professor seeking tenure in the
20   English department to do service in a lot of different areas
21   instead of mainly in one?
22   A.    Sure.  I mean, it's -- the joke is that nobody is denied
23   tenure because of service, you know.  So, I mean -- so if
24   people want to be slackers, you can be a slacker in that
25   regard.
```

Jury Trial – Volume 3
November 15, 2017

```
1         But other people -- you know, some people have it more --
2    you know, their own personal sense of either obligation or
3    wanting to make a contribution and so forth.
4         So, yes, some people are -- I mean, in fact, you usually
5    wind up with kind of a core group that does most of the
6    university-wide things in the faculty senate and elsewhere.
7    Q.   Do you have any awareness as to whether Dr. Tudor's
8    service was cited as a reason to deny her tenure?
9    A.   I never heard anything to that effect or saw it.  It
10   wasn't -- I didn't see anything why it should be.
11             MR. YOUNG:  That's it.  Thank you.
12             THE COURT:  Any redirect?
13             MR. BUNSON:  No, Your Honor.
14             THE COURT:  You may step down.  Thank you.
15                         (Witness excused.)
16             THE COURT:  Call your next witness.
17             MS. NOVOTNY:  Plaintiff calls Dr. Randy Prus.
18             THE WITNESS:  Leave these here?
19             THE COURT:  Yes.
20        Please come right up here, face the clerk, and be sworn.
21        (Witness duly sworn.)
22             THE COURT:  Be seated.
23        WHEREUPON, RANDY PRUS, Ph.D., after having been first
24   duly sworn, testifies in reply to the questions propounded as
25   follows:
```

1    **DIRECT EXAMINATION**

2    BY MS. NOVOTNY:

3    Q.   Hello there, Dr. Prus.  Thank you for coming here and

4    taking time out of your schedule, as the jurors have had to do

5    and many other witnesses.

6         I'm going to try to keep this short for us.

7         When did you start working at Southeastern Oklahoma

8    State?

9    A.   August 1991.

10   Q.   And what was your title when you began?

11   A.   Assistant professor.

12   Q.   And what's your title at Southeastern currently?

13   A.   Professor and chair.

14   Q.   And what are you chair of?

15   A.   The department of English, Humanities, and Languages.

16   Q.   Great.

17        Now, when did you become chair of the department of

18   English, Humanities, and Languages?

19   A.   August 2010.

20   Q.   And as chair of the department and previously just being

21   a member of the department along with Dr. Tudor, would you say

22   you were pretty familiar with Dr. Tudor's work?

23   A.   Yes.

24   Q.   Okay.  And you were on, in fact, a committee that had

25   something to do with Dr. Tudor's tenure and promotion; is that

Jury Trial – Volume 3
November 15, 2017

1    correct?

2    A.    Correct.  I was on the tenure promotion committee in

3    2009.

4    Q.    And can you help explain for us here today what your role

5    on that committee in 2009 was?

6    A.    My role was to review the portfolio, attend the meeting,

7    discuss the merits of the portfolio and her work in the

8    department.  And a vote was taken, and the results were passed

9    on to the department chair.

10   Q.    Okay.  And do you recall what that vote was?

11   A.    Yes.

12   Q.    Okay.  And what was that vote?

13   A.    The vote was 4 to 1 in favor of tenure and promotion.

14   Q.    So the committee then at that point recommended tenure

15   for Dr. Tudor?

16   A.    The committee did, yes.

17   Q.    And who was the one dissenter?

18   A.    Me.

19   Q.    Okay.  And what was your reasoning for voting against

20   tenure at that time?

21   A.    Well, I -- the cover letter lacked professional

22   competence.  Dr. Tudor made an argument that three people on

23   campus who weren't qualified for tenure deserved tenure, and,

24   therefore, she did.

25        And as writing instructors, we teach for audience and

 1  purpose.  And she was addressing this to a group of people

 2  with doctorates and tenure -- and tenure.  It didn't make

 3  sense.

 4  Q.   I see.  And so you didn't -- you disagreed with the cover

 5  letter.

 6       Did you know of any publications that Dr. Tudor had at

 7  that time?

 8  A.   She had one.

 9  Q.   Okay.  And were there other professors who had earned

10  tenure that had only one publication at that time?

11  A.   I can't speak -- I don't remember.

12  Q.   Okay.  Now, ultimately, though, the committee votes and

13  takes a position as a committee; is that correct?

14  A.   Correct.

15  Q.   And do you stand behind the committee's decision to --

16  A.   Well, as part of the committee, yes.

17  Q.   Okay.  So you stand behind the committee's decision to

18  recommend tenure and promotion?

19          MR. JOSEPH:  Objection, Your Honor.  Leading.

20          THE COURT:  Sustained.

21  Q.   (BY MS. NOVOTNY)  Were you familiar with Dr. Tudor's work

22  other than publications and the cover letter you spoke of?

23  A.   In 2009?

24  Q.   Yes.

25  A.   Yes.  I visited her classroom once or twice.  Twice, I

Jury Trial – Volume 3
November 15, 2017

1   think.

2   Q.   What was your impression of Dr. Tudor as a teacher?

3   A.   Still had work to do.  She could have been more engaging,

4   energetic, but she was plugging away.

5   Q.   Are all tenured professors energetic and engaging?

6   A.   "Aren't all"?  I don't understand your question.

7   Q.   I said, "Are all tenured professors engaging and

8   energetic?"  Let me strike that and rephrase.

9        So you said that Dr. Tudor was not necessarily energetic

10   and engaging.  Are there tenured professors who are tenured

11   but are not engaging and energetic people?

12        MR. JOSEPH:  Objection, Your Honor.  That's just a

13   confusing question.

14        THE COURT:  I understand it.

15        Can you answer that?

16        THE WITNESS:  Are there tenured professors who

17   aren't engaging?

18   Q.   (BY MS. NOVOTNY)  Yeah.

19   A.   Sure.

20   Q.   Okay.  That's all I was asking.

21        All righty.  You know what?  That is -- well, no.  I had

22   a couple other questions.

23        Did administrators ever come to you and tell you which

24   bathroom you should use specifically?

25   A.   No.

Jury Trial – Volume 3
November 15, 2017

1   Q.   Did you know of any other English professors who were

2   told and given direction to use a specific restroom while they

3   were at work?

4   A.   No.

5   Q.   Did you know that Dr. Tudor was instructed to only use

6   one restroom specifically?

7   A.   At the time, no, but I've heard allegations since then.

8   Q.   Okay.  But you've never heard of any other professor

9   being told what specific restroom to use?

10  A.   That's correct.

11            MR. YOUNG:  Okay.  That's all I have.  Thank you.

12            THE COURT:  Mr. Joseph?

13            MR. JOSEPH:  Thank you, Your Honor.

14       Given the limited direct examination and the university's

15  intention to call this witness in its case in chief, we

16  request permission to examine outside the scope of plaintiff's

17  direct questioning at this time.

18            MS. NOVOTNY:  I'm going to object to that on

19  relevance and duplicativeness.

20       We've heard lots of testimony from many witnesses

21  about --

22            THE COURT:  I don't think you can actually lodge

23  that objection until you've heard any question asked.

24  Certainly, I will consider those on a case-by-case basis.

25       But for the convenience of both the witness and the jury,

Jury Trial – Volume 3
November 15, 2017

1    I think it's entirely logical, if you intend to recall this

2    witness, that you simply do your inquiry now so that it will

3    not be necessary to recall.

4            MR. JOSEPH:  That's precisely what I'd like to do,

5    Your Honor.

6            THE COURT:  I know.

7        Having said that, obviously, this is not going to be as

8    short as direct, so I think we'll go ahead and break for

9    lunch.

10       Let me instruct you not to discuss the case or permit

11   others to discuss it with you.

12       Until about 15 minutes ago, you were going to get a long

13   lunch hour because we had a criminal matter scheduled at one

14   o'clock, but that's now been continued.

15       So I'll ask you to be in the jury assembly room at 10

16   after 1:00.

17       Counsel, the meeting we had planned during lunch hour, I

18   will postpone until the end of the trial day.

19       We'll be in recess.

20       (In recess from 12:15 p.m. to 1:15 p.m.)

21       (Jury enters.)

22           THE COURT:  Be seated.

23       Please continue.

24           MR. JOSEPH:  Thank you, Your Honor.

25

Jury Trial – Volume 3
November 15, 2017

1    **CROSS-EXAMINATION**

2    BY MR. JOSEPH:

3    Q.    Dr. Prus, I'm not sure if this happened on the original

4    examination, but will you please state your name for the

5    record, please.

6    A.    Randy Thomas Prus.

7    Q.    Dr. Prus, I believe you testified earlier that you are

8    currently the chair of the EHL department at Southeastern; is

9    that correct?

10   A.    Correct.

11   Q.    What are your duties there as chair?

12   A.    My duties are to make schedules for full-time and

13   adjuncts, approximately 24 faculty; evaluate faculty, and

14   handle any kind of questions that come up.  I represent the

15   department on academic council and other committees as well.

16   Q.    And do you have any duties in the tenure and promotion

17   review and application process?

18   A.    Yes.  After it goes to the department committee, it comes

19   to the department chair, who provides an evaluation and passes

20   it on to now the vice president.

21   Q.    And do you teach any student classes in addition to these

22   other duties you mentioned?

23   A.    I teach two classes.

24   Q.    Okay.  And do you know the plaintiff, Dr. Rachel Tudor?

25   A.    Yes, I do.

Jury Trial – Volume 3
November 15, 2017

1  Q.   Okay.  And just very briefly, how do you know Dr. Tudor?
2  A.   She was -- she worked in the department from 2004 to
3  2011.
4  Q.   Okay.  Are you -- were you the chair at the department of
5  EHL when Dr. Tudor first applied for tenure?
6  A.   No, I wasn't.
7  Q.   And were you the chair of the EHL department the second
8  time she applied for tenure in 2009-2010?
9  A.   No, I wasn't.
10  Q.   Okay.  If you would, in brief, walk the jury through the
11  duties of a member of a tenure and promotion committee -- a
12  member of that committee -- in the EHL department during that
13  2009-2010 time frame.
14  A.   We were -- we'd review the portfolio and the candidate's
15  work in the department and the university.  We discussed the
16  merits, generally based on teaching, scholarship, and service.
17  Then we'd vote on whether to approve or -- to recommend or not
18  recommend tenure and promotion.
19       And the chair of that committee then writes up the report
20  and passes that on to the department chair and notifies the
21  candidate of the result.
22  Q.   Okay.  And in 2009-2010, when Dr. Tudor applied for
23  tenure, I believe you testified earlier that you individually
24  were not in favor of granting tenure.  Is that accurate?
25  A.   Yes.

Jury Trial – Volume 3
November 15, 2017

1   Q.   Okay.  And I believe you mentioned an application letter,
2   and you said it was poor.  Was that your word?
3   A.   It wasn't professionally competent.  I think that's the
4   term I used.
5   Q.   Okay.  Was –– can you expand briefly on what you mean by
6   that?
7          MS. NOVOTNY:  Objection.  He's already testified to
8   this.
9          THE COURT:  Sustained.
10          MR. JOSEPH:  Okay.
11   Q.   (BY MR. JOSEPH)  In terms of the letter, did it appear to
12   you that the letter understood its intended audience?
13          MS. NOVOTNY:  Objection.  He's already testified to
14   that.  Duplicative.
15          THE COURT:  Sustained.
16          MR. JOSEPH:  Okay.
17   Q.   (BY MR. JOSEPH)  In terms of her portfolio, was there a
18   collection of poetry included with that document?
19   A.   It was a collection of poems in a journal with "open mic"
20   put on top of it.
21   Q.   And by "open mic," do you know what that term means?
22   A.   I know it's in reference to sometimes open poetry
23   readings where people can just gather to read.
24          I wasn't sure –– it seemed as if she were passing off
25   journal –– a personal journal as a form of publication.

Jury Trial – Volume 3
November 15, 2017

1  Q.   And, in your opinion in 2009-2010, was that an

2  appropriate publication for a tenure and portfolio

3  application?

4  A.   No, it wasn't.

5  Q.   Okay.  Is Corey Delashaw a tenured member of the faculty?

6  A.   No, she isn't.

7  Q.   Okay.  Is Kim McGeehee?

8  A.   No, he wasn't -- he's retired since, but he wasn't at the

9  time.

10  Q.   Okay.  And was Theresa Anderson at that time a tenured

11  member of the faculty?

12  A.   No.

13  Q.   Okay.  So to the extent that Dr. Tudor's portfolio

14  referenced them, do you have an opinion about whether or not

15  that was appropriate?

16  A.   It wasn't appropriate.

17  Q.   What is a chapbook?

18  A.   A chapbook is a small collection of poetry, 20, 30, 40

19  pages maybe.

20  Q.   And is the chapbook the same thing as the open mic book

21  that you referenced a moment ago?

22  A.   No.  Chapbooks have their own publishers.

23  Q.   Okay.  Did Dr. Tudor include any chapbooks in her

24  portfolio?

25  A.   Not that I -- except for the open mic.  That's the only

Jury Trial – Volume 3
November 15, 2017

1    one I recall.

2    Q.    Okay.  And was there anything that you found problematic

3    with Dr. Tudor's actual publication or publications in the

4    2009-10 application committee meeting?

5    A.    It seemed to be -- there weren't very many recent

6    references, and the field is somewhat dynamic.  And it didn't

7    show -- didn't quite show promise; right?

8         As I think I might have mentioned -- maybe I didn't --

9    tenure for me is not just a reward but a promise of what

10   further work one is going to do in a field, and I didn't see

11   that promise.

12   Q.    And by that you mean a promise from the candidate

13   demonstrating potential?

14   A.    Yeah.

15   Q.    Okay.  Did you consider Dr. Tudor's work on Southeastern

16   University's Native American Symposium to be a work of

17   scholarship or was it a work of service?

18   A.    A work of service, I would categorize it.

19   Q.    Did you consider it to be noteworthy for appropriate

20   purposes of tenure and promotion?

21   A.    It certainly wasn't outstanding, but it was -- it added

22   to it.

23   Q.    Okay.  How many -- I believe you may have testified to

24   this; I just couldn't hear you earlier.

25        How many total professors were on Dr. Tudor's 2009-10

Jury Trial – Volume 3
November 15, 2017

1   application committee?

2   A.   Five.

3   Q.   Okay.  And was there discussion between the members of

4   the committee in meeting about whether or not to recommend

5   Dr. Tudor for tenure that year?

6   A.   Yes, there was discussion.

7   Q.   Okay.  Is there anything about that discussion you can

8   share with us?

9   A.   That I can share with you?

10       It was pretty extensive and it -- the meeting was

11   probably at least an hour or so.  It was discussed longer than

12   most committees.

13   Q.   Okay.  Earlier today we heard testimony from Dr. Mark

14   Spencer.

15       Was Dr. Mark Spencer on the same committee that you were

16   thinking of in 2009-2010?

17   A.   Yes.

18   Q.   Okay.  And Dr. Spencer testified that the issue of

19   Dr. Tudor's transgender status came up in that committee

20   discussion.

21       Do you remember that?

22   A.   Not directly.

23   Q.   Okay.

24   A.   But I think it was in the room.

25   Q.   Okay.  And was it in the room in a positive light?

Jury Trial – Volume 3
November 15, 2017

1   A.    Yes.

2   Q.    Do you remember anyone specifically mentioning it in a

3   positive light?

4   A.    I don't remember anyone mentioning it, but there were --

5   I know one colleague, and maybe two --

6            MS. NOVOTNY:  Objection.  Hearsay.

7            THE COURT:  Don't know.

8       I think you've answered the question.  Stop and wait for

9   another.

10           THE WITNESS:  Okay.

11  Q.    (BY MR. JOSEPH)  Dr. Prus, did you have an additional

12  thought that you wanted to share with us?

13  A.    Well, I was going to say that, in my sense, the

14  transgender issue was there because I know at least one

15  colleague who didn't read the portfolio and perhaps another

16  one as well based on their discussion of the portfolio.

17  Q.    And so when you say they didn't read the portfolio, what

18  does that mean?

19           MS. NOVOTNY:  Objection.  Calls for speculation.

20           THE COURT:  Overruled.

21      Go ahead.  You can answer.

22           THE WITNESS:  Oh, okay.

23      Repeat that.

24  Q.    (BY MR. JOSEPH)  Sure.  I think I -- I apologize.

25      I think you said it was in the room, and I think you said

Jury Trial – Volume 3
November 15, 2017

1    one or two people didn't read the portfolio.  And I asked you

2    what you meant by that, "didn't read the portfolio."

3    A.    Well, when discussing the letter, for example, they

4    didn't know what we were referring to.

5    Q.    Was there any sense on your part that other members of

6    the committee didn't understand the significance or the lack

7    thereof of the inclusion of the open mic material?

8    A.    Yeah.  I don't think they understood the nature of poetry

9    and poetry publications, yeah.

10   Q.    Okay.  And, Dr. Prus, is poetry one of the subjects that

11   you teach?

12   A.    Yes.

13   Q.    Okay.  Do you consider yourself fairly well versed in

14   poetry?

15   A.    Yes.

16   Q.    Okay.  So I believe you were telling us that one or two

17   members of the committee, you think, maybe didn't read the

18   portfolio, and that, as a result of that, what leads you to --

19   what leads you to connect that with the fact that there was

20   some consideration of Dr. Tudor's transgender status?

21              MS. NOVOTNY:  Objection.  Calls for speculation.

22              THE COURT:  Overruled.

23              THE WITNESS:  Because the support for Dr. Tudor

24   without considering the portfolio leads me to that conclusion.

25   Q.    (BY MR. JOSEPH)  Now, you still voted -- you individually,

Jury Trial – Volume 3
November 15, 2017

1   I mean, still voted within the committee not to recommend

2   Dr. Tudor for tenure that year, didn't you?

3   A.   Correct.

4   Q.   Were you worried about being accused of being transphobic

5   or a bigot?

6   A.   No.

7   Q.   Okay.  Ultimately, that committee did vote to recommend

8   Dr. Tudor's tenure, did it not?

9   A.   Correct.

10   Q.   After Tudor's tenure and promotion packet left your

11   committee, where did it go next?

12   A.   To the department chair.

13   Q.   And did you personally deliver it to the department

14   chair?

15   A.   No.  It would have been the chair of the committee.  I'm

16   thinking it might have been Dr. Coleman.  I'm not exactly sure

17   who chaired it, but I didn't.

18   Q.   Is that Dr. Lisa Coleman?

19   A.   Yes, yes.

20   Q.   Okay.  Was Dr. Lisa Coleman one of the one or two people

21   in the room that you felt like may not have read the

22   portfolio?

23   A.   Yes.

24   Q.   Okay.  Did Dr. Scoufos –– who was Dr. Scoufos at that

25   time?

Jury Trial – Volume 3
November 15, 2017

1    A.    At that time, she was the dean of Arts & Sciences.

2    Q.    And did Dr. Scoufos recommend Dr. Tudor's tenure and

3    promotion portfolio be recommended for tenure?

4    A.    She did not recommend.

5    Q.    Okay.  After Dean Scoufos reviewed the tenure and

6    promotion application, do you know where it went next?

7    A.    To Vice President McMillan.

8    Q.    Okay.  And did Dr. McMillan recommend tenure for

9    Dr. Tudor's application that year?

10   A.    No.

11   Q.    After Vice President McMillan had reviewed and made his

12   recommendation, where did Dr. Tudor's portfolio go then?

13   A.    To the president, President Minks.

14   Q.    And, to your knowledge, did then President Minks

15   recommend Dr. Tudor for tenure?

16   A.    He did not recommend.

17   Q.    Okay.  To your knowledge, did Dr. Tudor have the

18   opportunity to withdraw her tenure and promotion portfolio in

19   the '09-'10 year before it was denied?

20   A.    I don't have firsthand information on that, but that's

21   what I understand the situation to be.

22   Q.    Okay.

23         THE COURT:  Unlike the usual situation, both of you

24   are too close to the mics.  You're popping.  If you'll just

25   back up a little bit.

Jury Trial – Volume 3
November 15, 2017

1           MR. JOSEPH:  I'm sorry if I'm blowing anyone's

2    eardrums out, Your Honor.  I apologize.

3    Q.  (BY MR. JOSEPH)  Dr. Prus, did anyone in particular take

4    over any duties that were slotted for Dr. Tenure [sic] had she

5    been given tenure and promotion?

6    A.    No.

7    Q.    Okay.  As the current chair of the English, Humanities,

8    and Languages department at Southeastern, do you think it

9    would be a good thing for that department if Dr. Tudor came

10   back to work there now?

11   A.    No.

12   Q.    Do you think it would be a good thing for those students

13   if Dr. Tudor came back to work now?

14   A.    No.

15   Q.    Do you think it would be a good thing for the university

16   if Dr. Tudor came back to work there now?

17   A.    No.

18   Q.    Okay.

19           MR. JOSEPH:  Nothing further, Your Honor.

20       Thank you, Dr. Prus, ladies and gentlemen.

21           THE COURT:  Ms. Novotny.

22           MS. NOVOTNY:  Judge, if I may approach briefly just

23   to confer?

24           THE COURT:  Yes.

25       (The following proceedings were had at the bench and out

1    of the hearing of the jury.)

2            MS. NOVOTNY:  I just want to make sure to clarify

3    that, because of the strange situation under Rule 611, so I'm

4    allowed to cross on anything that he brought up?

5            THE COURT:  Yes.

6            MS. NOVOTNY:  Okay.

7            THE COURT:  Sure.

8            MS. NOVOTNY:  I just wanted to make sure we were

9    clear.  Thank you.

10           THE COURT:  Uh-huh.

11       (The following proceedings were had in open court with

12   all parties present and within the hearing of the jury.)

13                   **REDIRECT EXAMINATION**

14   BY MS. NOVOTNY:

15   Q.  All right.  Dr. Prus, thanks for sticking with us still

16   here.

17       On examination just a moment ago, you indicated that

18   there was a collection of poems in the journal that was part

19   of Dr. Tudor's portfolio.

20       Is poetry something that's part of the English,

21   Humanities, and Languages department?

22   A.  Yes.

23   Q.  Yeah.

24       And do you consider yourself more of a poetry expert or

25   more of a tenure expert?

Jury Trial – Volume 3
November 15, 2017

1    A.    Poetry expert.

2    Q.    Thank you.

3          And while you may have had issues with Dr. Tudor's

4    2009-2010 portfolio, isn't it true that you actually helped

5    Dr. Tudor improve her portfolio for the 2010-2011 cycle so

6    that she could have a better chance at meeting some of the

7    deficiencies that you felt were there?

8    A.    That is true.

9    Q.    And did she take direction from you and make improvements

10   that you felt were improving her chances of getting tenure

11   that next time around?

12   A.    If she made the changes I recommended.  I didn't see the

13   final portfolio because it never got to the chair.

14   Q.    Sure.

15         Were you aware that she was getting additional works

16   published between the 2009-10 application and the 2010-2011

17   publication?

18   A.    Yes.

19   Q.    Would that additional work -- publication of

20   peer-reviewed works, would that have been something that would

21   have strengthened her chances of tenure, in your eyes?

22   A.    Yes.

23   Q.    Now, you indicated that you thought your colleagues maybe

24   didn't fully read her 2009-2010 portfolio?

25   A.    That's correct.

Jury Trial – Volume 3
November 15, 2017

1    Q.   Isn't it true that many folks who review tenure

2    applications will, you know, skim certain parts of it and

3    focus on the parts that they think are most important?

4            MR. JOSEPH:  Objection, Your Honor.  Calls for

5    speculation.

6            THE COURT:  Overruled.

7            THE WITNESS:  I would hope not, but I'm sure they

8    do.

9    Q.   (BY MS. NOVOTNY)  Now, you indicated before that you were

10   not necessarily sure you would welcome Dr. Tudor back.

11       Do you think other faculty in the English department

12   would welcome Dr. Tudor back at Southeastern?

13           MR. JOSEPH:  Objection, Your Honor.  Calls for

14   speculation.

15           THE COURT:  Overruled.

16       You may answer if you know.

17           THE WITNESS:  I -- we didn't discuss it formally as

18   a department, but informally, I spoke with my colleagues, and

19   it might be split at best, you know.  There are a few -- there

20   are those who would object to it for a variety of reasons.

21   Q.   (BY MS. NOVOTNY)  Now, you are currently the chair of a

22   department at Southeastern.

23       Is your boss at Southeastern in the room right now?

24   A.   Yes.

25   Q.   So many professors move up the ranks and eventually move

Jury Trial – Volume 3
November 15, 2017

```
 1   into administration.

 2        I think we've heard testimony that Dr. Scoufos was a

 3   professor before she was dean.

 4        Do you have plans on a next move of getting into the

 5   administration?

 6   A.   No.

 7   Q.   I want to come back to that 2010-2011 tenure application.

 8        Did something happen at some point that stopped Dr. Tudor

 9   from being able to proceed with that application?

10   A.   Dr. Tudor and I were called into the dean's office, and

11   we had to sign for letters.  And I believe it was -- I can't

12   remember the exact wording, but she was stopped from -- told

13   that she couldn't come up for tenure.

14   Q.   Was this unusual to you?

15   A.   It was unusual being called into the dean's office to be

16   handed a letter, yes.

17   Q.   Were you given any notice before that meeting about what

18   the meeting would be about?

19   A.   No.

20   Q.   And hadn't you, in fact, been putting together

21   Dr. Tudor's committee to review her new tenure application?

22   A.   As per the policy and procedures manual, yes.

23   Q.   And so the policy and procedures, as you understood them,

24   allowed Dr. Tudor to correct any deficiencies that

25   Dean Scoufos found in the prior year and that she should have
```

Jury Trial – Volume 3
November 15, 2017

 1   the right to have that independently reviewed in 2010-2011;
 2   correct?
 3   A.   I'm not sure because I'm not sure -- when this situation
 4   happened in 2010 -- it was September, I think, and I started
 5   the job August 1st.  So much of this was ongoing with the
 6   prior chair.
 7   Q.   Were you aware that Dean Scoufos had been the person who
 8   issued the denial of Dr. Tudor's tenure application in
 9   2009-2010, when you were helping Dr. Tudor with her 2010-2011
10   application?
11            MR. JOSEPH:  Objection, Your Honor.  Misstates
12   evidence.
13            THE COURT:  I don't understand the question.
14   There's too much in there.  Break it down.
15            MS. NOVOTNY:  Understood.
16   Q.   (BY MS. NOVOTNY)  So in 2009-2010, you were on that
17   committee that voted to give Dr. Tudor tenure, and then
18   Dean Scoufos ended up issuing a recommendation not for tenure
19   after that came to her office; is that correct?
20   A.   Correct.
21   Q.   And was Dean Scoufos still the person who was going to be
22   getting the application after it moved through the committee
23   again?
24   A.   In 2009?
25   Q.   In 2010-2011.  I'm sorry.

Jury Trial – Volume 3
November 15, 2017

1    A.    Yeah.  She would have been part of the process.

2    Q.    When you applied for tenure, was your application and

3    portfolio perfect?

4          MR. JOSEPH:  Objection, Your Honor.  Relevance.

5          THE COURT:  Sustained.

6    Q.    (BY MS. NOVOTNY)  Do you think that Dr. Tudor's 2010-2011

7    application would have merited tenure?

8    A.    Certainly the department and the chair.  How the dean and

9    vice president would have perceived it, I'm not sure.

10   Q.    And you were, in fact, chair in 2010-2011?

11   A.    Yes.

12   Q.    And so you would have thought that that application did

13   merit tenure?

14   A.    Yes.

15         MS. NOVOTNY:  Nothing further.

16         THE COURT:  Anything else?

17         MR. JOSEPH:  Very briefly, Your Honor.

18                    **RECROSS-EXAMINATION**

19   BY MR. JOSEPH:

20   Q.    Dr. Prus, you mentioned, in examination by opposing

21   counsel, the policies and procedures.

22         Are you referring to the Academic Policies and Procedures

23   Manual?

24   A.    Correct, correct.

25   Q.    Okay.  And under the APPM, doesn't it say that applicants

Jury Trial – Volume 3
November 15, 2017

1    may apply in their fifth, sixth, or seventh year?

2    A.   I believe so.  The policy has been revised recently.

3    Q.   Well, thank you for that clarification.  Let me rephrase

4    my question, then.

5         Was it your understanding in 2009-2010 school year that

6    the academic policy and procedure manual said an applicant may

7    apply in their fifth, sixth, or seventh year?

8    A.   That sounds -- that sounds right.

9    Q.   And that's different than fifth, sixth, and seventh year,

10   isn't it?

11   A.   Sure.

12   Q.   Okay.

13        MR. JOSEPH:  Nothing further.  Thank you, Your

14   Honor.

15        THE COURT:  You may step down.

16             (Witness excused.)

17        THE COURT:  Call your next witness.

18        MR. YOUNG:  Your Honor, we're calling Dr. James

19   Knapp.  My co-counsel will get him.  For the benefit of

20   everyone in this room -- thank you, Dr. Prus; it's good seeing

21   you -- Dr. James Knapp will be the last doctor of the day.

22        THE COURT:  Good.

23        MR. YOUNG:  Yes.

24        THE COURT:  While we're waiting on him, let me see

25   counsel at the bench.

Jury Trial – Volume 3
November 15, 2017

1            MR. YOUNG:  Yes.

2        (The following proceedings were had at the bench and out

3    of the hearing of the jury.)

4            THE COURT:  So who else do you have?

5            MR. YOUNG:  Mindy House.  She's on the list.  I

6    think she's in the middle.

7            THE COURT:  And that's all?

8            MR. YOUNG:  Yes.

9            THE COURT:  Are you going to call Cathy Conway?

10       Sherri, let's be off the record.  This is just

11   scheduling.

12       (Bench conference held off the record with all counsel.)

13       (The following proceedings were had in open court with

14   all parties present and within the hearing of the jury.)

15           THE COURT:  Please come right up here.  Step right

16   up here beside the witness stand and face the clerk and be

17   sworn.

18       (Witness duly sworn.)

19           THE COURT:  Be seated.

20       WHEREUPON, JAMES KNAPP, Ph.D., after having been first

21   duly sworn, testifies in reply to the questions propounded as

22   follows:

23                      **DIRECT EXAMINATION**

24   BY MR. YOUNG:

25   Q.   Hi.  Good afternoon, Dr. Knapp.  Thanks for making the

Jury Trial – Volume 3
November 15, 2017

1   drive up here.
2        You can put that microphone -- it will move, and you can
3   bring it up to where it's comfortable.  If I can't hear you,
4   I'll just tell you.  And just like the deposition, ask,
5   answer.
6   A.    Okay.
7   Q.    Dr. Knapp, what's your occupation?
8   A.    Professor.
9   Q.    Where do you work?
10  A.    Southeastern Oklahoma State University.
11  Q.    When did you first start working at Southeastern?
12  A.    In the fall of 1995.
13  Q.    Are you a tenured professor?
14  A.    Yes.
15  Q.    So you yourself have gone through the tenure process at
16  Southeastern?
17  A.    Correct.
18  Q.    And what's your current job title?
19  A.    Professor of sociology.
20  Q.    Okay.  Dr. Knapp, are you familiar with, I guess, the
21  booklet titled the Academic Policies and Procedures Manual at
22  Southeastern?
23  A.    Yes.
24  Q.    What is it?
25  A.    It is a manual that guides the activities of the

Jury Trial – Volume 3
November 15, 2017

1    university.

2    Q.    Okay.  Does that manual have a section with policies on

3    the tenure process?

4    A.    Yes.

5    Q.    To your knowledge, are the policies in the -- can I call

6    it the APPM?

7    A.    Okay.

8    Q.    Okay.  So, to your knowledge, are the policies in the

9    APPM the only policies at Southeastern that govern the tenure

10   process?

11   A.    To the best of my knowledge, yes.

12   Q.    Are those the same policies you yourself replied upon

13   when you went up for tenure?

14   A.    Yes.

15   Q.    Okay.  Dr. Knapp, have you ever served on a faculty

16   appellate committee at Southeastern?

17   A.    Yes.

18   Q.    Do you happen to recall how many?

19   A.    I believe it was three.

20   Q.    You're smiling at me.  Okay.

21         Did all of those committees involve Dr. Rachel Tudor?

22   A.    Yes.

23   Q.    Are those the only committees you've ever served on?  Let

24   me withdraw that question.

25         Are those three committees the only faculty appellate

Jury Trial – Volume 3
November 15, 2017

 1  committees that you have served on at Southeastern?

 2  A.   Yes.

 3  Q.   Okay.  Let's talk about the first faculty appellate

 4  committee that you served on.  Okay.

 5       Do you know when about that grievance was filed?

 6  A.   No.

 7  Q.   Okay.  I believe during your deposition you testified

 8  that that grievance was filed in early 2010, but I'm going to

 9  give you an exhibit to help you out.  Okay?

10           MR. YOUNG:  Your Honor, may I approach?

11           THE COURT:  Yes.

12           MR. YOUNG:  Thank you.

13  Q.   (BY MR. YOUNG)  Do you recognize Plaintiff's Exhibit 32?

14  A.   Yes.

15  Q.   What is it?

16  A.   It is an e-mail written by me to Dr. Weiner.

17  Q.   Okay.

18           MR. YOUNG:  I would like to move to introduce into

19  evidence Plaintiff's Exhibit 32.

20           MR. BUNSON:  No objection, Your Honor.

21           THE COURT:  Admitted.

22           MR. YOUNG:  Okay.

23  Q.   (BY MR. YOUNG)  So does Plaintiff's Exhibit 32 refresh

24  your memory as to when exactly you were part of the first

25  appellate committee involving a grievance with Dr. Rachel

Jury Trial – Volume 3
November 15, 2017

 1   Tudor?

 2   A.    Yes.

 3   Q.    Okay.  You said that you -- I'm sorry.  For me to follow,

 4   you said you wrote this e-mail?

 5   A.    Yes.

 6   Q.    Okay.  I'm going to ask you some questions about this

 7   grievance.

 8         Do you recall what this first grievance was about?

 9   A.    Generally, yes.

10   Q.    Okay.  So why don't you explain to the jury what this

11   first grievance was about.

12   A.    Dr. Tudor had applied for tenure and promotion, and it

13   had been denied.  And it came to the faculty appellate

14   committee.

15   Q.    Okay.  Was Dr. Tudor seeking specific relief from the

16   faculty appellate committee?

17   A.    That, I don't recall.

18   Q.    Okay.  Was Dr. Tudor just grieving that she had been

19   denied tenure or was she asking for an explanation?

20   A.    No.  Can you give me a minute to read it?

21   Q.    Yes, of course.

22   A.    Would you ask your question again?

23   Q.    Yes.

24         Do you recall what Dr. Tudor was asking the faculty

25   appellate committee for when she filed in grievance?

Jury Trial – Volume 3
November 15, 2017

1  A.   The dean and vice president for academic affairs had

2  denied her application and were not providing a detailed

3  explanation for why they had denied it.

4  Q.   Okay.  So, I believe, in this exhibit, Plaintiff's

5  Exhibit 34, which you wrote, you state that you thought that a

6  policy in the Academic Policies and Procedures Manual,

7  Policy 3.7.4, required that the administrators provide an

8  explanation to Dr. Tudor for why they denied her tenure

9  application.  Is that right?

10  A.   Not required.

11  Q.   Can you explain?

12  A.   Recommended.

13  Q.   Recommended.  Okay.

14  A.   It says "should."

15  Q.   So can you explain how you are distinguishing between

16  "required" and "should"?

17  A.   Well -- and I had placed the emphasis on this in the

18  document.

19  Q.   Uh-huh.

20  A.   "Concur with the faculty judgment except in rare

21  instances and for compelling reasons which should be stated in

22  detail."

23       So I don't believe it was saying that it is a requirement

24  that they be stated in detail.  So that's why I would use the

25  word "recommended."

Jury Trial – Volume 3
November 15, 2017

```
1    Q.   Okay.  Let me give you another exhibit.

2         MR. YOUNG:  Your Honor, may I approach the witness

3    one more time?

4         THE COURT:  Yes.

5         MR. YOUNG:  Thank you.

6    Q.   (BY MR. YOUNG)  Dr. Knapp, do you recognize this exhibit?

7    A.   Yes.

8    Q.   What is it?

9    A.   It is an e-mail.

10   Q.   Did you send this e-mail?

11   A.   Yes, I did.

12   Q.   Okay.

13        MR. YOUNG:  I would like to move to enter

14   Plaintiff's Exhibit 34.

15        MR. BUNSON:  No objection, Your Honor.

16        THE COURT:  Admitted.

17   Q.   (BY MR. YOUNG)  Okay.  Dr. Knapp, so do you see that

18   e-mail at the bottom?  You can use that screen next to you or

19   the paper in front of you.  It's the same document.

20   A.   Okay.

21   Q.   Do you see the e-mail at the bottom of the second page of

22   that exhibit that I just handed you?

23   A.   Yes.

24   Q.   Okay.  And on that e-mail, it looks like -- I'm sorry.

25   It looks like there's a photocopy error.  It sounds like one
```

1    of the fellow members of your committee is saying that they

2    think that Dr. Scoufos and Dr. McMillan should provide a

3    rationale to Dr. Tudor; is that right?

4    A.    Yes.

5    Q.    Does that mean that Dr. Scoufos and McMillan had the

6    option to provide the rationale?

7    A.    I'm not sure about that.

8    Q.    Can you explain that?

9    A.    The committee is recommending ––

10   Q.    Uh-huh.

11   A.    –– that they provide their rationale.

12         As an individual, I would hope they would provide their

13   rationale, but I don't –– again, I don't know if they are

14   required to do so.

15   Q.    Would it be unusual for administrators, high-up

16   administrators at Southeastern, like the dean and the vice

17   president for academic affairs, to not follow the collegial

18   recommendation of the faculty appellate committee?

19         MR. BUNSON:  Objection, Your Honor.

20   Mischaracterizes testimony and calls for speculation.

21         THE COURT:  Overruled.

22   You may answer, if you know.

23         THE WITNESS:  Could you ask the question again?

24   Q.    (BY MR. YOUNG)  Well, I'll try.

25         Would it be unusual for high-up administrators at

1   Southeastern, like the dean and vice president for academic
2   affairs, to not follow the collegial recommendation of the
3   faculty appellate committee?
4   A.   I don't know.
5   Q.   Did you personally believe that Dr. McMillan and
6   Dr. Scoufos should provide an explanation to Dr. Tudor?
7   A.   Yes, I believe that personally.
8   Q.   Can you explain why you have that personal belief?
9   A.   If I had applied for tenure and promotion and had been
10  denied, I'd like to know why.
11  Q.   I'm going to go back to Exhibit 32.  That was, I believe,
12  the first page I handed you.  Okay.  I'm trying to make that
13  readable.
14       So Plaintiff's Exhibit 32, it says that you and the other
15  members of the faculty appellate committee together agreed
16  that you thought that dean -- I'm sorry, Dr -- McMillan and
17  Dr. Scoufos should give explanation to Dr. Tudor; is that
18  right?
19  A.   Yes.
20  Q.   When you -- did you discuss the faculty appellate -- did
21  you discuss as a group this issue before you issued this
22  decision as a group?
23       Let me withdraw that question.  It was a really bad
24  question.
25       You conversed with other members of the faculty appellate

Jury Trial – Volume 3
November 15, 2017

1   committee before the committee recommended that administrators

2   give –– give an explanation to Dr. Tudor; right?

3   A.    Yes.

4   Q.    Did anyone on the committee think that the administrators

5   should not give an explanation to Dr. Tudor?

6   A.    No.

7   Q.    Okay.  When the faculty appellate committee met and

8   discussed this, were there particular rules, policies,

9   precedents, anything that you looked at as a group to come to

10  your decision?

11  A.    We referred to the policies and procedures manual.

12  Q.    Do you think it would have been inappropriate for the

13  faculty appellate committee to look outside of the policies

14  and procedures manual to make its decision?

15  A.    I don't know why we would have wanted to.

16  Q.    Why is that?

17  A.    Well, we had a specific task in front of us, and it

18  seemed that the most –– the most logical point of reference

19  was the policies and procedures manual.

20  Q.    Do you think it's important that policies on tenure are

21  written down?

22  A.    Yes.

23  Q.    Do you think it's important that the tenure process is

24  transparent?

25  A.    As much as possible, yes.

Jury Trial – Volume 3
November 15, 2017

1    Q.    Sitting here today, do you still agree with the decision

2    that the faculty appellate committee made in this March 25th,

3    2010, document?

4    A.    Yes.

5    Q.    Okay.  I'd like to fast-forward to the 2010-11 term.  And

6    I'd like to -- because you were on three of these.  I'm only

7    going to talk about the third one now.  Okay?

8    A.    Okay.

9    Q.    So in the 2010-11 time frame, if a professor applied for

10   and didn't receive tenure at Southeastern, were they typically

11   allowed to reapply for tenure?

12   A.    Yes, unless the window had closed.

13   Q.    What's "the window"?

14   A.    Well, a person has a window of time to apply for tenure

15   and promotion.  Generally, they begin on a tenure track --

16   Q.    Uh-huh.

17   A.    -- and they have four years to demonstrate, for lack of a

18   better way of saying it, their worth to the university.

19   Q.    Uh-huh.

20   A.    And then, I believe it's beginning in the fifth year,

21   they can apply for tenure and promotion.  If they choose not

22   to, they could apply in their sixth year.  If they choose not

23   to or if they were denied, they could apply in their seventh

24   year.

25         But if they do not have tenure either because they didn't

Jury Trial – Volume 3
November 15, 2017

1   apply or because they were denied, if that's not complete by

2   the end of the seventh year, then generally they're asked to

3   move on.

4   Q.   I'm sorry.  Just to clarify something, so it was your

5   understanding in this time frame, 2010-11, that someone who is

6   denied on a tenure application but still had time left within

7   their seven-year term, they could reapply?

8   A.   Yes, within that window.

9   Q.   Is there anything specifically that informs your

10  understanding of what the policy or rule was at Southeastern

11  in that time frame?

12  A.   I believe the policies and procedures manual.

13  Q.   Did you look at the policies and procedures manual really

14  carefully when you were part of these faculty appellate

15  committees?

16  A.   That, I can't remember.

17  Q.   Fair enough.

18       So I'm going to introduce another exhibit.  Let's see if

19  I've got this right.

20            MR. YOUNG:  Your Honor, may I approach the witness

21  one more --

22            THE COURT:  Yes.

23            MR. YOUNG:  Thank you.

24  Q.   (BY MR. YOUNG)  Dr. Knapp, do you recognize Plaintiff's

25  Exhibit 116?

Jury Trial – Volume 3
November 15, 2017

1   A.    Yes.

2   Q.    What is it?

3   A.    It's my handwriting.

4   Q.    Okay.

5          MR. YOUNG:  Based on that alone, Your Honor, I'd

6   like to admit Plaintiff's Exhibit 116 into evidence.

7          MR. BUNSON:  No objection, Your Honor.

8          THE COURT:  Admitted.

9   Q.  (BY MR. YOUNG)  So can you describe to the jury what these

10  are -- I assume these are your handwritten notes.  So what are

11  these notes from?

12  A.    This would have been a meeting of another faculty

13  appellate committee in which I was summarizing our purpose for

14  meeting.

15  Q.    And what was the purpose of that meeting?

16  A.    Let me finish reading it.

17  Q.    No problem.

18  A.    And our response to Dr. Tudor's appeal.  That was all in

19  this document.

20  Q.    Do you remember what Dr. Tudor was appealing in this

21  instance?

22  A.    She wanted to apply again for tenure and promotion, and

23  Dr. McMillan had sent her a letter that said it was -- it was

24  too soon after being denied for her to apply again.

25          And Dr. Tudor appealed that decision, and the faculty

Jury Trial – Volume 3
November 15, 2017

1   appellate committee supported Dr. Tudor's appeal.

2   Q.   Can you educate the jury a little bit about why the

3   faculty appellate committee, in this third instance, supported

4   Dr. Tudor?

5   A.   There was not a policy that we could find that said she

6   couldn't.  And as a faculty appellate committee, we would

7   generally side with the faculty in matters where the policies

8   and procedures manual didn't say anything.

9   Q.   If there were a policy that foreclosed reapplication, do

10  you think that the faculty appellate committee would have

11  still sided with Dr. Tudor?

12  A.   If there was a policy that said she could not?

13  Q.   Yes.

14  A.   I can't speak for the whole committee, but if a policy

15  said she could not, then that's what I would have supported,

16  that she could not if the policy was in place.

17  Q.   Do you think it would have inflamed the relations between

18  the faculty and the administration if Dr. Tudor had been

19  allowed to reapply for tenure in 2010–11?

20  A.   No.

21       MR. BUNSON:  Objection, Your Honor.  Calls for

22  speculation.

23       THE COURT:  Overruled.

24       THE WITNESS:  Sorry.

25       No.

Jury Trial – Volume 3
November 15, 2017

1    Q.   (BY MR. YOUNG)   What's the basis of your answer?

2    A.   I voted for -- I thought she should be allowed to

3    reapply.  The faculty appellate committee thought she should

4    be allowed to reapply.  We weren't speaking for all the

5    faculty, but I didn't think it would create unnecessary

6    tension between the faculty and the administration.

7    Q.   Do you have any recollection of how the Southeastern

8    administration responded to the faculty appellate committee's

9    decision in this third appeal?

10   A.   I can't remember.

11   Q.   Okay.  I have one more exhibit for you, and it's out of

12   order.  I apologize.  I had it at the bottom of my stack.

13          MR. YOUNG:  May I approach, Your Honor?

14          THE COURT:  Yes.

15          MR. YOUNG:  Thank you.

16   Q.   (BY MR. YOUNG)  Dr. Knapp, do you recognize Plaintiff's

17   Exhibit 97?

18   A.   Yes.

19   Q.   Can you tell me what it is?

20   A.   May I have a moment to read it --

21   Q.   Yes.

22   A.   -- or glance through it?

23   Q.   Yes.

24   A.   It appears to be a summary of the faculty appellate

25   committee's response to a grievance dated October 11th of

Jury Trial – Volume 3
November 15, 2017

1   2010.
2          MR. YOUNG:  Your Honor, I would like to admit
3   Plaintiff's Exhibit 97 into evidence.
4          MR. BUNSON:  No objection, Your Honor.
5          THE COURT:  Admitted.
6   Q.  (BY MR. YOUNG)  Now, sitting here today, Dr. Knapp, do you
7   still agree with the decision that this third faculty
8   appellate committee made?
9   A.   Yes.
10  Q.   Okay.  I have a few more questions for you, and then
11  we're done.
12         Dr. Knapp, do you recall agreeing with me during your
13  deposition that you had never heard of a professor at
14  Southeastern encountering the sort obstacles that Dr. Tudor
15  did during her tenure and promotion process?
16  A.   Yes.
17  Q.   For you, is there anything that makes Dr. Tudor's process
18  stand out from other tenure processes -- or examples?
19  A.   Yes.
20  Q.   What is that?
21  A.   I had to be on the faculty appellate committee three
22  times.
23  Q.   So this isn't normal?
24  A.   Not for me.  And I don't think it's normal for the
25  faculty.

Jury Trial – Volume 3
November 15, 2017

1    Q.    Okay.  At the time that you sat on those faculty

2    appellate committees, was there ever any discussion about

3    Dr. McMillan's role in Dr. Tudor's tenure process?

4    A.    Yes.

5    Q.    Can you tell me just generally what those conversations

6    were about?

7    A.    It seemed that the application was stopping with

8    Dr. McMillan.

9    Q.    Are you aware of Dr. McMillan stopping any other faculty

10   member's tenure application at Southeastern?

11   A.    No.

12   Q.    Sitting here today, do you still believe that Dr. Tudor

13   should have been permitted to reapply for tenure in 2010-2011?

14   A.    Yes, as long as the window was not closed.

15   Q.    Okay.

16           MR. YOUNG:  Thank you, Dr. Knapp.  That's all I

17   have.

18                     **CROSS-EXAMINATION**

19   BY MR. BUNSON:

20   Q.    Good afternoon, Dr. Knapp.  I'm going to try to get

21   through this pretty quickly.

22           Did Dr. Tudor ever inform any of the three faculty

23   appellate committees you sat on that she was offered an

24   opportunity to withdraw her application and resubmit it?

25   A.    Not that I remember.

1    Q.    Did Dr. Tudor inform the committee that had she taken the

2    offer, she would have -- it would have granted her an eighth

3    year at the university in order to obtain tenure and

4    promotion?

5    A.    Not that I recall.

6    Q.    And you recall earlier testifying about the Academic

7    Policies and Procedures Manual; is that correct?

8    A.    Yes.

9    Q.    And that that manual describes the role of faculty and

10   administration in the tenure and promotion decision process?

11   A.    Yes.

12   Q.    And per the policies, do you think that faculty and

13   administration have an equal voice in the decision-making

14   process when it comes to tenure and promotion?

15   A.    Generally, yes.

16   Q.    Now, you were handed some exhibits about the denial of

17   Dr. Tudor's requests; correct?

18   A.    Yes.

19   Q.    And one of those was the faculty appellate committee's

20   determination that says that they should give their reasoning

21   for denying Dr. Tudor's tenure application; is that correct?

22   A.    Yes.

23   Q.    It doesn't say -- does the policy say when they should

24   give that feedback?

25   A.    Not the part that's in -- excuse me.  Not the part that's

Jury Trial – Volume 3
November 15, 2017

1   in the response that I wrote.

2   Q.   With your understanding of the Academic Policies and

3   Procedures Manual, is there anything that says when that

4   feedback should be coming?

5   A.   Not that I'm aware of.

6   Q.   Didn't the administration ultimately tell Dr. Tudor the

7   reasons for her denial?

8   A.   I don't recall.

9   Q.   Earlier, you also said that, as a member of the faculty

10  appellate committee, you generally side with the faculty.

11       Do you recall that?

12  A.   Yes.

13  Q.   And you especially side with the faculty if the policy is

14  silent; is that correct?

15  A.   Yes.

16  Q.   And, here, the policy was silent; correct?

17  A.   Yes.

18  Q.   So it wasn't that the policy wasn't being followed; it

19  was just that there was no guideline.  Is that also correct?

20  A.   Yes.

21  Q.   Do you know of anyone that has ever been denied tenure by

22  the president or at the president's level and then allowed to

23  reapply after that?

24  A.   No.

25  Q.   But you do know that faculty can withdraw their

1    applications or portfolios in the tenure and promotion process

2    and resubmit them at a later date; correct?

3    A.    I know that now.

4         MR. BUNSON:  Thank you, sir.  No further questions.

5         THE COURT:  Redirect?

6                    **REDIRECT EXAMINATION**

7    BY MR. YOUNG:

8    Q.    I'll try to make this real quick, and then you can drive

9    home.

10        Dr. Knapp, is there –– at the time you were on these

11   three faculty appellate committees, was there any policy in

12   the Academic Policies and Procedures Manual that specifically

13   said that, if application was denied by the president of the

14   university, that there was no possibility for reapplication?

15   A.    Not that I'm aware of.

16   Q.    Do you think, if there were such a rule, you would have

17   been aware of it after these three grievances?

18   A.    I think we would have looked pretty closely in the

19   policies and procedures manual ––

20   Q.    Okay.

21   A.    –– for something like that.

22   Q.    One last question.

23        Are you still confident that you still to this day agree

24   with your decision as part of the first faculty appellate

25   committee as well as the third faculty appellate committee?

Jury Trial — Volume 3
November 15, 2017

1   A.    Yes.

2            MR. YOUNG:  Okay.  Thank you.  Nothing further.

3            THE COURT:  You may step down.

4                        (Witness excused.)

5            THE COURT:  Call your next witness.

6            MR. YOUNG:  Calling Ms. Mindy House, Melinda "Mindy"

7   House.  One of my colleagues will go get her.

8            THE COURT:  Please come forward.  Come right up here

9   next to the witness box and face the clerk and be sworn.

10       (Witness duly sworn.)

11           THE COURT:  Be seated right here.  We need to be

12  able to hear you, so speak into that microphone.

13           THE WITNESS:  Yes, ma'am.

14      WHEREUPON, MELINDA HOUSE, after having been first duly

15  sworn, testifies in reply to the questions propounded as

16  follows:

17                   **DIRECT EXAMINATION**

18  BY MR. YOUNG:

19  Q.   Good afternoon, Ms. House.

20  A.   Good afternoon.

21  Q.   Thank you for being patient with us today.

22       Ms. House, did you used to work at Southeastern?

23  A.   Yes, sir.

24  Q.   Why don't we start back to when you first started working

25  at Southeastern.  Okay?

Jury Trial – Volume 3
November 15, 2017

```
 1        When about was that?
 2   A.   August of '98.
 3   Q.   Have you had other family members who have worked at
 4   Southeastern?
 5   A.   My husband worked there, when he went through his
 6   undergraduate and master's, as a campus police officer.
 7   Q.   Okay.  And when did you stop working for Southeastern?
 8   A.   February -- well, January, February of' 16.
 9   Q.   2016?
10   A.   2016.
11   Q.   Okay.  And did your husband stop working for Southeastern
12   at some point?
13   A.   Yes.  He got his master's in education, and then he
14   became a manager at a company in -- MEMC in Sherman, Texas.
15   Then he was going to come back to Southeastern and be a police
16   officer, but he passed away.
17   Q.   Okay.  Do you feel like you have deep ties to
18   Southeastern?
19   A.   Yes.
20   Q.   Can you share with the jury how strongly you feel about
21   Southeastern?
22   A.   When I started at Southeastern, I started in Upward
23   Bound, which is a TRIO program for low-income first-generation
24   students.  All those kids became my kids.  My boys -- in fact,
25   my husband would -- he was a swimmer.  So on all-sports
```

Jury Trial – Volume 3
November 15, 2017

1   weekend, he would do swimming with the kids.

2        When he passed away, my kids were raised with my Upward

3   Bound kids because they were 3 and 9.  So I had to take them

4   with me.

5        I went from there to academic affairs office, from

6   academic affairs to the dean of school of arts and sciences,

7   to the dean of instruction, which merged.

8        My mom worked for Southeastern per se.  She ran the

9   credit union, the teachers' credit union.  My dad has worked

10  at Southeastern back in the '80s.  So -- my sister graduated

11  from there.  My brother-in-law graduated from there.

12       My husband is buried in a Southeastern police uniform.

13  So I have very strong ties.

14  Q.   Thank you for sharing that with us.

15  A.   You're welcome.

16  Q.   Have you ever had conversations with Douglas McMillan,

17  the former vice president of academic affairs at Southeastern,

18  where he shared with you his religious beliefs?

19            MR. BUNSON:  Objection, Your Honor.  This is

20  hearsay.

21            THE WITNESS:  Do you contend this falls outside the

22  hearsay rule?

23            MR. YOUNG:  I merely asked if she ever had such

24  conversations, not what was said.

25            THE COURT:  All right.

Jury Trial – Volume 3
November 15, 2017

1          THE WITNESS:  Yes.

2  Q.  (BY MR. YOUNG)   Okay.   Did you think the conversations you

3  had with Douglas McMillan where religion was brought up were

4  appropriate?

5  A.   No.  It had to do with my employment.

6  Q.   Did Douglas McMillan make an employment decision --

7  A.   Yeah.

8  Q.   -- on the basis of his religion?

9  A.   Yes.

10  Q.   Did that make you feel uncomfortable?

11  A.   Yes.

12  Q.   Did Douglas McMillan frequently bring up his religion at

13  work?

14  A.   I don't know frequently, but, yes --

15  Q.   Okay.

16  A.   -- occasionally from time to time.

17  Q.   Okay.  I'm going to focus on the time that you worked

18  with Dean Lucretia Scoufos.  Okay?

19      Do you remember when about you started working for Dean

20  Lucretia Scoufos?

21  A.   I want to say it was '08.  Dr. Mangrum had retired, and

22  she came in as a -- from a chair of a department to the dean.

23  Q.   And when about did you stop working for Dean Scoufos?

24  A.   January, February 2016.

25  Q.   Okay.  What was your position when you worked with

Jury Trial – Volume 3
November 15, 2017

1    Dean Scoufos?

2    A.    I was her administrative assistant.

3    Q.    So as Dean Scoufos's administrative assistant, did you

4    have opportunity to be around her and talk with her a lot?

5    A.    Yes.

6    Q.    Did you overhear conversations?

7    A.    Yes.

8    Q.    Okay.  So I'm going to ask you about things you may have

9    witnessed having to do with Dr. Tudor's 2009-10 tenure

10   application.  Okay?

11   A.    Okay.

12   Q.    I think other folks in this trial have testified about

13   e-mails that you've been on.

14         Did you schedule meetings for Dean Scoufos?

15   A.    Yes.

16   Q.    Is that one of the big parts of your job?

17   A.    Yes.

18   Q.    Okay.  Do you recall Dr. Tudor meeting with Dean Scoufos

19   sometime in the tenure process?

20   A.    Yes.

21   Q.    What do you recall?

22   A.    I think she met with her twice.  I know she met with her

23   for a portfolio review.

24         The dean started meeting with all of the faculty.  She

25   adopted how she wanted each portfolio to look, you know, the

Jury Trial – Volume 3
November 15, 2017

 1   same.  And so she had them put them in sleeves, certain

 2   sleeves, books, binders, and in a certain category order.  So

 3   she met with her then.

 4        And then I recall that she met with her and -- I want to

 5   say it was Randy Prus, Dr. Prus, the chair.  I'm not sure what

 6   that meeting was about; I just know she had me write an

 7   acknowledgment form for her -- for Dr. Tudor to sign.

 8   Q.   Okay.  We'll get back to that later.

 9        So you worked for Dean Scoufos for a number of years?

10   A.   Yes.

11   Q.   What was Dean Scoufos's usual practice when a portfolio

12   came into the dean's office, a tenure portfolio for review?

13   A.   When they would all come in, then she would review them

14   one at a time.  And then she would write her recommendation of

15   whether to or against and put that in.  Then we were to send

16   those over to Dr. McMillan.

17   Q.   Because Dr. McMillan was the next step --

18   A.   Step.

19   Q.   -- on the process?

20   A.   Yes.

21   Q.   Okay.  Was there anything unusual that you recall about

22   how Dean Scoufos dealt with Dr. Tudor's tenure application?

23   A.   I know that there were conversations back and forth over

24   the phone with Dr. McMillan and there were some rewrites of

25   her letters as far as whether she wanted to agree or disagree.

Jury Trial – Volume 3
November 15, 2017

1   Q.   I'm sorry.  When you say "agree or disagree," agree or
2   disagree with whom, if you know?
3   A.   With the committee or with herself, you know, saying that
4   she agreed that she should get tenure or that she shouldn't
5   get tenure.  Her recommendation, I guess is what I'm saying.
6   Q.   Okay.  So did you ever see Dean Scoufos act like that
7   with a tenure application before or after?
8   A.   No.
9   Q.   So it was unusual for you?
10  A.   Yes.
11  Q.   Okay.  To your recollection, did Dean Scoufos get in
12  contact with Doug McMillan before Dean Scoufos wrote a letter
13  on Dr. Tudor's tenure application?
14  A.   Yes.  They spoke before the portfolio went over to his
15  office.
16  Q.   Was that, in your observation, unusual?
17  A.   Yes.
18  Q.   Did you ever see it happen at any other time she reviewed
19  a portfolio?
20  A.   No.
21  Q.   Do you know how Dean Scoufos ultimately voted on
22  Dr. Tudor's portfolio?  Do you know what Dean Scoufos's
23  decision was on Dr. Tudor's application?
24  A.   It was not to renew.
25  Q.   Okay.  I'm going to move you forward in time a little

Jury Trial – Volume 3
November 15, 2017

1  bit.  Okay?

2      Do you recall Dean Scoufos having a meeting with

3  Dr. Tudor a little bit after Dean Scoufos voted to deny

4  Tudor's application?

5  A.   I think that's when she came back and wanted the

6  acknowledgment paper that she wanted me to write saying that

7  whatever she was giving Dr. Tudor, that Dr. Tudor had received

8  it.

9  Q.   Okay.  I'm going to move you forward in time a little bit

10  again, in the 2010-11 school year.  Okay?

11      Do you recall any meeting between Dean Scoufos,

12  Dr. Tudor, and anyone else that school year?

13      I'll withdraw that question.

14      I believe earlier you mentioned that you recalled at some

15  point -- maybe you don't recall the date --

16  A.   Yeah.

17  Q.   -- that there was a meeting between Dr. Tudor, I think

18  you said Randy Prus, and Dr. Scoufos.

19      Do you recall that?

20  A.   Yes.

21  Q.   Do you recall anything unusual about that meeting?

22  A.   No.  I mean, Dr. Tudor didn't look happy when she left,

23  and the dean was upset after she left because she did not sign

24  a piece of paper.

25  Q.   Who didn't sign a piece of paper?

Jury Trial — Volume 3
November 15, 2017

```
 1   A.    Dr. Tudor.
 2   Q.    Okay.  I'll move you forward in time a little bit again.
 3         At some point while Dr. Tudor was still working at
 4   Southeastern, were you asked to monitor Dr. Tudor's blog?
 5   A.    Yes.
 6   Q.    Who asked you to monitor Dr. Tudor's blog?
 7   A.    Dean Scoufos.
 8   Q.    Do you know what the purpose of you monitoring that blog
 9   was?
10   A.    She had found out that some students and some faculty had
11   started a petition and a blog, and so she had me go through
12   and print those off on a daily basis and look up and see what
13   faculty were supporting and what students, if they were
14   students, were supporting.
15         And she, I'm assuming, kept those in a file.  I printed
16   them and gave them to her.
17   Q.    Was that an unusual thing for Dean Scoufos to tell you to
18   do?
19   A.    Yes.
20   Q.    Had you ever been asked to do anything like that before?
21   A.    No.
22   Q.    Did Dean Scoufos appear upset when you identified
23   students and faculty who supported Dr. Tudor?
24   A.    Yes.  She didn't know the students, but she knew the
25   faculty members.  And so she was upset that they were
```

Jury Trial – Volume 3
November 15, 2017

1    supporting Dr. Tudor.

2        I think it was Meg Cotter-Lynch and Dr. Spencer were two

3    of the ones that I recall.

4    Q.   Was Dean Scoufos very upset? annoyed?  How would you

5    describe her reaction?

6            MR. BUNSON:  Objection, Your Honor.  Calls for

7    speculation.

8            THE COURT:  Sustained.

9            MR. BUNSON:  Dean Scoufos can talk about that.

10           THE COURT:  Sustained.

11   Q.   (BY MR. YOUNG)  Did Dean Scoufos visibly show a reaction?

12   A.   Yes.

13   Q.   Could you describe the reaction you saw?

14   A.   She was very upset.  She was mad.  It became obvious to

15   myself and –– at the way that she spoke about these professors

16   from then on.

17   Q.   Okay.

18   A.   Is that what you mean?

19   Q.   Yes.  Thank you.

20       Either when Dr. Tudor still worked at Southeastern or

21   after she left, did you ever hear administrators say negative

22   things about Dr. Tudor because she is transgender?

23   A.   Yes.

24   Q.   Did you hear negative things from Douglas McMillan?

25   A.   Yes.

Jury Trial – Volume 3
November 15, 2017

1          MR. BUNSON:  Objection.  That's hearsay, Your Honor.

2   Q.  (BY MR. YOUNG)  Did you hear negative things --

3          THE COURT:  Wait a minute.

4      I'm sorry.  What?

5          MR. BUNSON:  The objection was this is hearsay.

6          THE COURT:  Come to the bench.

7      (The following proceedings were had at the bench and out

8   of the hearing of the jury.)

9          THE COURT:  How do you contend this is not hearsay?

10         MR. YOUNG:  Statements by party opponents.  These

11  are decision-makers in the high levels of the administration

12  who have said negative things about Dr. Tudor.  They are

13  contending that these people --

14         THE COURT:  All right.

15      Your response?

16         MR. BUNSON:  My response, Your Honor, is all of

17  these witnesses can testify as to what they said.  These

18  aren't -- I completely disagree that these are statements

19  against interests or statements that can't be cleared up --

20         THE COURT:  Why?

21         MR. BUNSON:  -- by the person themselves.  She's

22  saying she heard it.  It's still an out-of-court statement.

23         THE COURT:  Yes.  And it was said by Dr. McMillan

24  and Dean Scoufos, who are policymakers for your client.  That

25  makes them parties.  And any statement against interest by a

Jury Trial – Volume 3
November 15, 2017

1  party can be used against that party.  That makes it not

2  hearsay.

3       If you have an argument --

4          MS. COFFEY:  I don't think it's clear that she heard

5  these.  It sounded like she was repeating.

6          MR. YOUNG:  I can make it more clear, Your Honor.

7          THE COURT:  Yeah.  But I think it's important that

8  this is an exception to the hearsay rule.  If it's said by

9  Dean Scoufos or Dr. McMillan or Mr. Minks, I guess, or

10 Dr. Whoever -- Minks, you may cross on that.

11         MR. YOUNG:  Thank you, Your Honor.

12         MR. BUNSON:  Thank you, Your Honor.

13      (The following proceedings were had in open court with

14 all parties present and within the hearing of the jury.)

15 Q.  (BY MR. YOUNG)  Sorry for that interruption.  I tried to

16 warn you about objections.  Stop talking, and we'll try to

17 stop talking too.

18      Let me just backtrack one question so we can move on.

19      I believe what I was asking is, at any point either after

20 Dr. Tudor was working at Southeastern or after Dr. Tudor left

21 Southeastern, did you hear administrators at Southeastern say

22 negative things about Dr. Tudor because Dr. Tudor is a

23 transgender woman?

24 A.  Yes.

25 Q.  Okay.  Did you hear negative things from Dr. McMillan?

Jury Trial – Volume 3
November 15, 2017

1    A.    Yes.

2    Q.    Did you hear negative things from Dr. Scoufos?

3    A.    Yes.

4    Q.    Did you hear negative things from both of those persons

5    on more than one occasion?

6    A.    Yes.

7    Q.    Okay.  I'm going to ask you about some specific

8    statements.

9          Did Dr. Scoufos ever tell you that it was weird that

10   Dr. Tudor is a transgender woman?

11   A.    Yes.

12   Q.    Do you recall Dr. Scoufos showing you a picture of

13   Dr. Tudor and making fun of her?

14            MR. BUNSON:  Objection, Your Honor.  This is

15   leading.

16            THE COURT:  Sustained.

17            MR. YOUNG:  Okay.

18   Q.   (BY MR. YOUNG)  Do you recall having a -- do you recall

19   having a conversation with Dr. Scoufos where she was

20   referencing a picture of Dr. Tudor?

21            MR. BUNSON:  Objection, Your Honor.  Still leading.

22            THE COURT:  I'll give you that one.  Overruled.

23            MR. YOUNG:  Thank you.

24   Q.   (BY MR. YOUNG)  I'll ask it again.

25         Do you recall a conversation between you and Dr. Scoufos

Jury Trial – Volume 3
November 15, 2017

```
 1   where Dr. Scoufos was referencing a picture of Dr. Tudor?
 2   A.   Yes.  She was sitting in a chair, Dr. Tudor was, and she
 3   referenced that she was trying to look feminine but that she
 4   isn't.
 5   Q.   Did Dr. Scoufos ever criticize Dr. Tudor's clothing
 6   choices?
 7   A.   Yes.
 8   Q.   What do you recall?
 9   A.   The dean is very fashion-forward.  You know, she's very
10   well put together.  And she just said that Dr. Tudor was
11   trying to dress like a female but that she's not.
12   Q.   Did Dr. Scoufos ever criticize Dr. Tudor's voice?
13   A.   Yes.
14   Q.   On more than one occasion?
15   A.   Yes.
16   Q.   What was the criticism?
17   A.   That Dr. Tudor was trying to have a -- like a whispering
18   voice to not sound so -- like a male, and that it was very
19   raspy.
20   Q.   Did Dr. Scoufos ever mock Tudor's voice?
21   A.   Yes.
22   Q.   Did Dr. Scoufos ever imitate Tudor's voice?
23   A.   Yes.
24   Q.   On more than one occasion?
25   A.   Yes.
```

Jury Trial – Volume 3
November 15, 2017

1    Q.    Do you recall the period when Dr. Tudor started first

2    complaining about discrimination at Southeastern, just

3    generally?

4    A.    Generally, yes.

5    Q.    Okay.  Did Dr. Scoufos ever tell you that she,

6    Dr. Scoufos, thought that Dr. Tudor was using the fact that

7    she was transgender to complain unfairly about things?

8    A.    Yes.

9    Q.    Did Dr. Scoufos ever comment to you and ask you whether

10   Dr. Tudor had had "the surgery"?

11   A.    Yes.

12   Q.    Did you ever overhear Doug McMillan mocking, making fun

13   of, or making negative comments about Dr. Tudor?

14   A.    I didn't hear him making fun of Dr. Tudor.  I did hear

15   a -- not a nice comment.

16   Q.    Okay.  Did you ever hear Doug McMillan say that he didn't

17   agree with Dr. Tudor's lifestyle?

18   A.    Yes.

19   Q.    Did you ever overhear Doug McMillan tell Dean Scoufos

20   that he did not think that Dr. Tudor should be allowed to use

21   the women's restroom?

22   A.    Yes.  He said that he had never told Dr. Tudor that she

23   could not use the women's restroom, but that he did not

24   believe or feel like she should be allowed to.

25   Q.    From your perspective, as someone who is working around

Jury Trial – Volume 3
November 15, 2017

1  these administrators and on the Southeastern campus, did it

2  seem like Dr. Tudor was enduring hostilities?

3  A.   Yes.

4  Q.   If you were in Dr. Tudor's shoes, would you have found it

5  hostile?

6  A.   Yes.

7  Q.   I'm going to flash forward.

8       After this lawsuit was filed, did you ever witness

9  Dean Scoufos tell department chairs and other administrators

10 at Southeastern that they should not dig for documents needed

11 for the litigation?

12 A.   Yes.  She told -- I think it was Claire Stubblefield

13 asked for some information and that they needed it in a

14 certain amount of time frame.  And a few of those department

15 chairs came in and stated that, because of the timeline, they

16 didn't know if they could fulfill that deadline and some of

17 the people that were in certain positions were no longer in

18 those positions, so getting them to go back and pull stuff

19 would be hard as well.

20      So she told them that -- not to manufacture anything, but

21 that they also didn't have to dig for anything.

22 Q.   Were you concerned -- were you personally concerned by

23 that comment?

24 A.   Yes.

25 Q.   Can you explain to the jury why you were concerned?

Jury Trial - Volume 3
November 15, 2017

```
 1   A.   Because I didn't feel that hiding anything from anyone
 2   was going to do justice for either side.
 3   Q.   You mean Dr. Tudor or Southeastern?
 4   A.   Right.
 5   Q.   Okay.  After this lawsuit was filed, did you ever hear
 6   Dr. Scoufos tell someone at Southeastern that, if Dr. Tudor
 7   won her lawsuit and returned to Southeastern, that Dr. Scoufos
 8   and Dr. McMillan would quit?
 9   A.   Yes.
10         MR. BUNSON:  Objection, Your Honor.  This is
11   hearsay.
12         THE COURT:  Overruled.
13         THE WITNESS:  Oh, I can answer?
14   Q.  (BY MR. YOUNG)  You can answer.
15   A.   Yes.
16   Q.   What do you recall about that conversation that you
17   heard?
18   A.   Dr. Weger came into the office and was sitting in front
19   of my desk --
20         THE COURT:  I'm sorry.  I misunderstood who the
21   speaker was.
22      That objection is sustained.
23         MR. YOUNG:  Okay.  Let me reframe the question.
24   Q.  (BY MR. YOUNG)  What did you hear -- and only answer the
25   question I'm asking.
```

Jury Trial – Volume 3
November 15, 2017

1      What did you hear Dean Scoufos say to Dr. Weger?

2  A.    That if Dr. Tudor came back to the university to work,

3  that her and Dr. McMillan would quit and no longer work there.

4           MR. YOUNG:  May I approach, Your Honor?

5           THE COURT:  The witness or --

6           MR. YOUNG:  Approach you for a second with counsel.

7           THE COURT:  Yes.

8           MR. YOUNG:  Thank you.

9      (The following proceedings were had at the bench and out

10  of the hearing of the jury.)

11           MR. YOUNG:  I believe you held in abeyance so you

12  could see or hear in context whether witnesses could testify

13  about the circumstances of the retirement of some of the key

14  decision-makers at Southeastern.  This witness is prepared to

15  testify about those circumstances.

16      So I wanted to not ask it in front of the jury but to do

17  it here first.

18           MS. COFFEY:  Your Honor, the ruling was that they

19  could testify; they couldn't make any assumptions as to why

20  somebody retired.

21      This witness has laid no foundation for that whatsoever.

22  She just testified that if Dr. Tudor returned to campus, they

23  would quit.  Dr. Tudor hasn't returned to campus.  Those two

24  individuals retired, and it had nothing to do with this case,

25  and there's no evidence to show otherwise.

Jury Trial – Volume 3
November 15, 2017

1          MR. YOUNG:  That's not the context, Your Honor, and

2   I can share it here if you need that first.

3          THE COURT:  Context of what?

4          MR. YOUNG:  What the testimony is going to --

5          THE COURT:  What is her testimony going to be?

6          MR. YOUNG:  She is going to state that she does have

7   knowledge of the circumstances surrounding why Scoufos left,

8   and it was because she was fired because of what she had to do

9   with Dr. Tudor.

10          THE COURT:  Is Dr. Scoufos going to be a witness?

11          MS. COFFEY:  Absolutely, Your Honor.

12          THE COURT:  That can't come in through this witness.

13          MR. YOUNG:  May I reserve that?  Dr. Scoufos

14   testified at her deposition that she retired from Southeastern

15   of her own volition, that it was not discipline, and it

16   nothing to do with Dr. Tudor or this case.

17          THE COURT:  Okay.

18          MR. YOUNG:  So I need this witness to testify to

19   this so I can use it to impeach Dr. Scoufos.

20          THE COURT:  You can't impeach another witness with

21   this witness.

22          MR. YOUNG:  Okay.  Thank you, Your Honor.

23      (The following proceedings were had in open court with

24   all parties present and within the hearing of the jury.)

25   Q.  (BY MR. YOUNG)  Now, Ms. House, a few more questions.  I

Jury Trial – Volume 3
November 15, 2017

1   can only ask you a couple of questions about this issue, so

2   listen carefully to the questions I am asking you.  Okay?

3       When about did Dean Scoufos announce that she was going

4   to retire from Southeastern?

5   A.   It was towards the end of 2015.  She had been out with

6   open heart surgery.

7   Q.   Uh-huh.

8   A.   And so when she came back, she had a meeting with

9   Dr. McMillan, and then she –– day after that, she announced

10  that she was going to retire.

11  Q.   Do you have any reason to believe that Dean Scoufos did

12  not seek out retirement?

13  A.   Yes.

14  Q.   Can you share your reason for thinking that with the

15  jury?

16  A.   When she was out with her heart surgery and her rehab, I

17  specifically asked her, because they were doing buyouts, if

18  she was going to retire.  And she said, no, that she didn't

19  work that hard to come back to retire and had me working on

20  different things that were going to be in the future,

21  symposiums and lectureships and stuff.

22  Q.   Okay.  Did Dr. Scoufos ever tell you that she thought

23  Claire Stubblefield was an idiot who gave too much information

24  regarding Dr. Tudor's issues at Southeastern out to the EEOC

25  and through this lawsuit?

Jury Trial – Volume 3
November 15, 2017

```
 1   A.    Yes.
 2   Q.    Now, Ms. House, I know this part is sort of painful, but
 3   it's relevant.
 4         Were you fired from Southeastern?
 5   A.    Yes.
 6   Q.    Why do you believe you were fired from Southeastern?
 7   A.    I believe I was fired from Southeastern because of this
 8   case.
 9   Q.    And what informs your belief?
10   A.    Because the information that was given to me is not
11   factual.  All the appeals process that I went through, even
12   the committee said that there was no evidence to support.  And
13   I was vocal with the treatment of Dr. Tudor, that I didn't
14   think it was right.  And I had some professors tell me that
15   that's the reason, that anybody that was remotely around
16   higher admin during this is all gone.  So...
17   Q.    Sitting here today, do you regret being vocal about how
18   wrong it was what happened to Dr. Tudor at Southeastern?
19   A.    No.  I regret I lost my job.  I regret that –– I'm
20   sorry ––
21   Q.    It's okay.
22   A.    –– that there were certain things said about me that were
23   not true, said about my boys that were not true, that I'd
24   given my life to Southeastern and that this was the way that I
25   was going out the door.
```

Jury Trial – Volume 3
November 15, 2017

1    But, no, right's right.  So I don't regret it, saying

2  anything in support of Dr. Tudor.

3         MR. YOUNG:  Thank you so much, Ms. House.

4         THE WITNESS:  You're welcome.

5                  **CROSS-EXAMINATION**

6  BY MR. BUNSON:

7  Q.   Good morning -- or good afternoon, Ms. House.  How are

8  you?

9  A.   I'm okay.  How are you?

10  Q.   I'm wonderful.  Thank you.

11       You have a personal ax to grind here, don't you?

12  A.   No, sir.

13  Q.   You indicated you were terminated from Southeastern; is

14  that correct?

15  A.   Yes, sir.

16  Q.   And you were terminated on March 10th, 2016; isn't that

17  correct?

18  A.   Officially, yes, sir.

19  Q.   And the reason you are no longer at Southeastern and you

20  were terminated was because of a, quote, lack of academic

21  integrity and dishonesty; isn't that correct?

22  A.   No, sir.

23  Q.   Would it help if I showed you some documents to refresh

24  your recollection?

25  A.   No.  I know what I was told, but none of that happened.

 1   Q.   So you were told you were being terminated for lack of
 2   academic integrity and dishonesty; is that correct?
 3   A.   No.   I was told, when I was brought in, that there was an
 4   accusation that a student worker did my son's online math
 5   homework.   He didn't take an online math class.   And that was
 6   two years prior.
 7        And that -- Dean Scoufos told me that they -- I don't
 8   know who "they" are -- had settled with this letter she gave
 9   me saying that I had until three o'clock the next day to
10   either resign and get my vacation paid for or not resign and
11   get nothing.
12            MR. BUNSON:   Your Honor, may I approach?
13            THE COURT:   Yes.
14   Q.   (BY MR. BUNSON)   Ms. House, will you please turn to Tabs 2
15   and 3 of the documents I've handed you.
16   A.   Okay.
17   Q.   What is Tab 2?
18   A.   It's a second page of a letter from Dr. -- or from
19   Micah Kelly.
20   Q.   Who is -- I believe it's Micah D. Knight, isn't it, at
21   the very top?
22   A.   I'm sorry.   Yes.
23   Q.   Who is Micah D. Knight?
24   A.   She's a lawyer.
25   Q.   So you hired a lawyer to represent you in this process of

Jury Trial – Volume 3
November 15, 2017

1    your termination; correct?

2    A.   I hired a lawyer to get my vacation pay and to advise me

3    whether I could be terminated without any kind of cause.

4    Q.   If you'd like to go ahead and review that letter, I'm

5    happy to give you some time.

6    A.   Okay.  Yes, sir.

7    Q.   How long is that letter?

8    A.   A page and a half.

9    Q.   Anywhere on that first page it talks about you not

10   getting your back pay?

11   A.   On the first page?

12   Q.   Yes, ma'am.

13   A.   No.

14   Q.   And on the second page, about how long is the text on

15   that second page?

16   A.   A paragraph and two sentences and a half.

17   Q.   And does that talk about your back pay?

18   A.   It says -- yes, that I'm entitled to receive full

19   payment.

20   Q.   So in a page-and-a-half letter, one small paragraph that

21   talks about your back pay, you're saying you weren't informed

22   as to why you were being terminated?

23   A.   Not when I was -- what I was informed, when she gave me

24   the letter, was that there was an accusation made from a

25   student worker in our office.  And so that's when I went to

Jury Trial – Volume 3
November 15, 2017

1   Micah Kelly –– or Micah Knight.

2   Q.   What is this letter dated?

3   A.   The 27th of January.

4   Q.   And so you weren't terminated until March; correct?

5   A.   Correct.  Because I appealed.

6   Q.   Okay.  We'll get to that in a moment.

7       If you could, though, there is –– in that first

8   paragraph, there is a highlighted sentence.

9       Are you telling me that, based on that highlighted

10  sentence, you didn't know what you were being accused of on

11  January 27th, 2016?

12  A.   Yes.  I said Dr. Scoufos told me that I was accused of a

13  student worker doing my son's homework.

14  Q.   And that was considered an act of dishonesty and lack of

15  academic integrity, wasn't it?

16  A.   Per Southeastern's policy, I'm assuming.

17  Q.   You can look at Tab 3 if you'd like.

18  A.   "It was the opinion of the committee."  Is that what

19  you're looking at?

20  Q.   Yes, ma'am.

21  A.   Yes.

22  Q.   So per the policy, you had committed an act of

23  academic ––of dishonesty and lack of academic integrity;

24  correct?

25  A.   I was accused, yes.

Jury Trial – Volume 3
November 15, 2017

```
1   Q.   You appealed that decision, you said; correct?

2   A.   Yes.  I got the opportunity after I hired the lawyer.

3   Q.   And you accused Southeastern of retaliation against you

4   for being outspoken in your disagreement over how Dr. Tudor

5   was treated; isn't that correct?

6   A.   Yes.

7   Q.   And was there an investigation into your claims of

8   retaliation?

9   A.   I don't understand.

10  Q.   You accused the university of retaliating against you.

11  A.   I understand that part.

12  Q.   And there was an investigation as to whether or not

13  retaliation occurred, wasn't there?

14  A.   Are you talking about the meeting with the first

15  committee?

16  Q.   Just do me a favor, ma'am, if you wouldn't mind.  You can

17  turn to Tab 5.

18  A.   Yes, sir.

19  Q.   And that is the investigation by the affirmative action

20  office, isn't it -- or the determination of the affirmative

21  action office?

22  A.   Who is the affirmative action office?  I didn't meet with

23  an affirmative action office.

24  Q.   Who did you meet with, ma'am?

25  A.   I met with the dean and then my lawyer, and then they
```

Jury Trial – Volume 3
November 15, 2017

1  called me and said that -- I met with the committee, and they
2  asked questions.  And that's when they told me who was the one
3  that made the allegation.  They said that Dean Scoufos was the
4  one that made the allegation and gave me a Title IX piece of
5  paper.  So then I had -- that was it.
6       Then I met with -- after that, I met with Claire
7  Stubblefield and Dean Scoufos and asked them how I had did a
8  Title IX because I hadn't discriminated against anyone.
9       And Dr. Stubblefield told me that it was a "two-fo," that
10 the Title IX came in because of my letter from Micah on
11 Dr. Tudor.  And that was basically the only thing that was
12 asked or said about affirmative action there.
13 Q.   Did your attorney write this letter on your behalf?
14 A.   The first letter -- or the only letter?  Yes, sir.
15 Q.   If you would, go back to Tab 2, then, highlighted
16 section, second paragraph.  Read it to yourself.
17 A.   On the first page?
18 Q.   Yes, ma'am.  Does this refresh your recollection as to
19 whether or not you, through your attorney, accused Doug
20 McMillan of retaliating against you?
21 A.   No.  I said that he did.  I felt that he did.
22 Q.   Okay.  So you have -- now, you said that Doug McMillan
23 accused you of -- or retaliated against you because of your
24 outspoken support of Dr. Tudor; correct?
25 A.   Yes.  That's how I feel.

Jury Trial – Volume 3
November 15, 2017

1   Q.   And an investigation was conducted; correct?

2   A.   Not a full investigation.

3   Q.   Were you part of that investigation?

4   A.   I don't know what you're talking about.  Are you talking

5   about the meeting with the group of people?  They didn't ask

6   very much.  They just asked me why I felt that Dr. McMillan

7   would retaliate against me and had he ever done anything to --

8   on his belief system.  And I said, yes, that he was going

9   to --

10          THE COURT:  Stop, stop.  I don't believe this is

11   responsive.

12       Try again.

13          MR. BUNSON:  I'm sorry, Your Honor.  I lost my

14   place.

15   Q.  (BY MR. BUNSON)  Was there an investigation into your

16   claims of retaliation by Dr. McMillan?

17   A.   To my opinion, no.  To your opinion, I'm assuming yes.

18   Q.   And do you know what the determination was regarding your

19   accusation of retaliation by Dr. McMillan?

20   A.   No.

21   Q.   In fact, the committee found that there was no evidence

22   to indicate that the charges by you were instigated by

23   Dr. McMillan; isn't that correct?

24   A.   Yes, I'm assuming.

25   Q.   And this comment you made about Dr. Scoufos is the one

Jury Trial – Volume 3
November 15, 2017

```
 1   that had comments from the students.  Do you recall that?
 2   A.   The comments that -- when she told me in my first meeting
 3   with her?
 4   Q.   Bad question.
 5        Your lack of academic integrity and dishonesty had to do
 6   with the fact that you were accused of having work-study
 7   students do your son's homework; isn't that correct?
 8   A.   That was the allegation.
 9   Q.   And they provided testimony in forms of both personal and
10   written affidavits, didn't they?
11   A.   One did.  The other one sent an e-mail.  I guess that's
12   written.
13   Q.   So written and verbal/oral testimony to the fact that you
14   asked them to do this; is that correct?
15   A.   Yes.
16   Q.   If you could, turn to Tab 6, please.
17        Do you recall this document?
18   A.   The counseling report?
19   Q.   Yes, ma'am.
20   A.   Yes.
21   Q.   What is a counseling report?
22   A.   It's where they gave me the allegations in writing.
23   Q.   And if you could, just quickly flip over to page 2, red
24   box.
25        Is that your signature?
```

Jury Trial – Volume 3
November 15, 2017

```
 1    A.    Yes.

 2    Q.    What's the date?

 3    A.    February 12th.

 4    Q.    Of?

 5    A.    2016.

 6    Q.    And you indicate in there you do not agree; right?

 7    A.    Yes.

 8    Q.    But you were -- you received the fullest of the charges

 9    and accusations of your acts of dishonesty and lack of

10    academic integrity within this document, didn't you?

11    A.    Yes.

12    Q.    And after multiple investigations, a pretermination

13    hearing, you requested and were granted an appeal hearing,

14    weren't you?

15    A.    That was the meeting with Kyle Stafford, Claire

16    Stubblefield, and the dean.

17    Q.    You can turn to Tab 11 if you'd like.

18    A.    Yes.

19    Q.    Okay.  Do you recall getting that letter?

20    A.    Yes.

21    Q.    What was that letter dated?

22    A.    April 4th.

23    Q.    Who's the letter from?

24    A.    Dr. Bryon Clark.

25    Q.    And it indicates that you -- that he has been put in
```

Jury Trial – Volume 3
November 15, 2017

1  charge of putting together an appeals committee regarding your

2  discharge; correct?

3  A.   Yes.

4  Q.   And he tells you who's going to be on that committee;

5  right?

6  A.   Yes.

7  Q.   So you were granted an appeal.

8       If you could turn to Tab 12.

9       And the appeal committee determined you had committed an

10  act of academic dishonesty and that termination was

11  appropriate; isn't that correct?

12  A.   In the bottom -- in the last paragraph?

13  Q.   Yes.

14  A.   That's what this says, yes.

15  Q.   And is that signed by the people that were on your

16  appeals committee per the letter that you were sent?

17  A.   Yes.

18  Q.   So after a pretermination hearing, multiple

19  investigations, and now an appeal, all parties, all

20  committees, everybody, agreed that you committed lack of

21  academic integrity and acts of dishonesty; is that correct?

22  A.   That's what they say.

23  Q.   Okay.  Now, to get into some of your testimony from

24  earlier, you testified to reactions before and after meetings

25  between Dr. Tudor and Dr. --

Jury Trial – Volume 3
November 15, 2017

```
 1            THE COURT:  Let me stop you.  I was going to try to
 2   get through with this witness, but I think we all need a
 3   break.
 4       Please do not discuss the case.  Be back in your room at
 5   3:15.  And we'll be in recess.
 6       (Jury exits.)
 7       (In recess from 3:00 p.m. to 3:15 p.m.)
 8       (Jury enters.)
 9            THE COURT:  Be seated.
10       Please proceed.
11   Q.  (BY MR. BUNSON)  Ms. House, would you mind turning to
12   Tab 11 of that packet again just real quick?
13   A.   Yes.
14   Q.   On the third page of that, you'll see a bulleted list of
15   names.
16   A.   The list at the top?
17   Q.   It's a bulleted list of names about three-quarters down,
18   third page, Tab 11.
19   A.   Yes.
20   Q.   Okay.  Thank you.
21   A.   Uh-huh.
22   Q.   Those are the names of the appeals committee; correct?
23   A.   Yes.
24   Q.   And two of those committee members were secretaries like
25   yourself; correct?  Their title is right next to their name.
```

1    A.    Oh.  Yes.

2    Q.    The first name, Ms. Elizabeth Brittingham?

3    A.    Brittingham, yes.

4    Q.    Brittingham.  My apologies.

5    A.    No, that's okay.

6    Q.    Do you know who she is?

7    A.    Yes, sir.

8    Q.    You asked for her to be appointed to this committee,

9    didn't you?

10   A.    Yes.

11   Q.    Okay.

12   A.    That was the only name I got --

13   Q.    Okay.

14   A.    -- or the only position I got.

15   Q.    And the other two were a help desk director and

16   coordinator of disability services.

17         Do you see that?

18   A.    Yes.

19   Q.    So the secretaries on there, they were your peers,

20   weren't they?

21   A.    I did not work closely with Faith Huddleston.  She was in

22   a different division.  I was academic; she was student.

23   Q.    But a secretary would be your peer in terms of your level

24   at the university; correct?

25   A.    I would assume so.

1  Q.   Okay.  And Ms. Brittingham, you did know her; correct?

2  A.   Yes.

3  Q.   And if you could go to Tab 12, second page, the red box.

4  A.   Yes.

5  Q.   What's the second name signed on there?

6  A.   Elizabeth Brittingham.

7  Q.   And her signature would show that she concurs with the

8  appeals committee's decision; correct?

9  A.   You would have to ask her.

10 Q.   This is a report that was authored by her committee;

11 correct?

12 A.   Yes.

13 Q.   Okay.  Earlier, you talked about an employment decision

14 that Doug McMillan made about you based on his religion.

15 A.   Yes.

16 Q.   What employment decision was that?

17 A.   When I was moved over to the dean's for arts and

18 sciences.

19      I was vice president's administrative secretary, Jesse

20 Snowden, and he became interim president.  So when

21 Dr. McMillan was interim vice president, he said that he was

22 going to downsize the office, and so that meant that he was

23 going to do away with my position.

24      But because of his biblical belief that the Bible says

25 that we take care of our widows, that he would go talk with

Jury Trial – Volume 3
November 15, 2017

```
 1   Dr. C.W. Mangrum and see if I could transfer over there
 2   because their secretary was leaving.
 3   Q.   So that decision was a positive decision, wasn't it?
 4   A.   As far as?
 5   Q.   Either having a job or not having a job.
 6   A.   If you look at it that way, yes.
 7   Q.   You told us earlier that Dean Scoufos and Dr. McMillan
 8   said negative comments related to Dr. Tudor being transgender.
 9        Do you recall that?
10   A.   Yes.
11   Q.   You never repeated -- or reported these accusations
12   before you were under investigation or during your
13   investigation, did you?
14   A.   Report to who?
15   Q.   The equal employment opportunity officer.
16   A.   There was -- no.
17   Q.   And you knew the investigation into Dr. Tudor's tenure
18   denial; right?
19   A.   Yes.
20   Q.   This was in 2010, 2011, and 2012; right?
21   A.   Yes.
22   Q.   And yet you never reported any of these statements to
23   Southwestern -- Southeastern's affirmative action officer, did
24   you?
25   A.   No, because it would not have done any good.
```

1   Q.   You didn't report these statements to anyone, did you?

2   A.   My dean.

3   Q.   Lucretia Scoufos?

4   A.   Yes.

5   Q.   So six years after Dr. Tudor's tenure denial, you started

6   claiming your firing was because of your support for

7   Dr. Tudor; isn't that correct?

8   A.   Six years?

9   Q.   Yes, ma'am.

10  A.   You mean when I got let go, that I said it was -- I felt

11  that it was part of that?

12  Q.   Yes.  When you were terminated --

13  A.   Yes.

14  Q.   -- you are claiming that that was because you were

15  supporting Dr. Tudor; right?

16  A.   Yes.

17  Q.   And that was six years -- six years after her denial of

18  tenure; correct?

19  A.   Yes.

20  Q.   So you think that requiring student aides to do your

21  son's homework had nothing to do with your firing?

22  A.   I didn't do that.

23  Q.   So you're calling Justin Harp and Cristin Morgan liars?

24  A.   I guess so.

25  Q.   If you could turn to Tab 12, please.

Jury Trial — Volume 3
November 15, 2017

1        This is that appeals committee's determination; correct?

2    A.   Yes.

3    Q.   And in the final paragraph, it says, "One of the

4    students, Cristin Morgan, explained to us different versions

5    of events" —— or "a different version of events."  My

6    apologies.

7        "She asserted that over the course of at least two days

8    she was asked to spend between two and three hours on course

9    work that was not merely a study guide and completed

10   computer-based modules in a course-management system on

11   Ms. House's workstation computer, including at times when

12   Ms. House temporarily left the office.

13       "This claim is supported by a second student, Justin

14   Harp, who was unavailable to us at the time of the

15   informational hearing but whose corroborating statement was

16   available to us."

17       Did I read that correctly?

18   A.   Yes.

19   Q.   So you still maintain that they are liars?

20   A.   Yes.

21   Q.   Ms. House, so the appeals committee, pretermination

22   committee, and all investigating bodies determined that you

23   lied, didn't they?

24   A.   No.

25   Q.   Which one didn't?

1  A.   Well, they even state back here that it says, "The

2  mitigating factors in this case include that the facts in

3  question are from two years, cover relatively brief episode

4  over the course of overall employment, and that there is no

5  allegation of any ongoing or systematic issues with integrity

6  on the part of the appealing party.  For this reason, we

7  believe discharge was not the only possible course but only

8  one of the menu of options that could have reasonably been

9  pursued."

10 Q.   And the following paragraph, if you will, says, "That

11 said, committing an act of academic dishonesty while working

12 in the office of the executive dean of academic affairs is

13 particularly serious."

14      Did I read that correctly?

15 A.   Yes, sir.

16 Q.   "The conduct that we believe happened here meets the

17 handbook's list of actions that at least minimally qualify an

18 employee for discharge as a penalty."

19      Did I read that correctly?

20 A.   Yes, sir.

21 Q.   "With discharge being one of the appropriate options for

22 penalty and with it being exercised here in fair accordance

23 with the text of the handbook, we find it appropriate to

24 uphold the decision upon appeal."

25      Did I read that correctly?

1    A.    Yes.

2    Q.    So you still maintain that they did not say that you

3    lied?

4    A.    Yes.

5    Q.    Do you maintain that they hold that you committed acts of

6    academic dishonesty?

7             MR. YOUNG:  Objection.  Asked and answered, Your

8    Honor.

9             THE COURT:  Sustained.

10   Q.  (BY MR. BUNSON)  So based on all these findings of all of

11   these different committees --

12   A.    Two committees.

13            MR. YOUNG:  Objection.  Asked and answered.

14            THE COURT:  It hasn't been asked yet.  I don't know.

15   Q.  (BY MR. BUNSON)  So there is no reason -- sorry.

16        So based on the fact that the appeals committee,

17   pretermination committee, and all investigations into this

18   allegation against you determined that you were dishonest, is

19   there any reason to think that you wouldn't lie here today?

20   A.    Because I'm not dishonest.

21   Q.    Were you friends with Lucretia Scoufos?

22   A.    As far as close friends --

23   Q.    Yes.

24   A.    -- or business friends?

25   Q.    Friends.  You can decide.

Jury Trial – Volume 3
November 15, 2017

1    A.    Not "friend" friends.  I worked with her for many years.

2    Q.    Are you friends with her now?

3    A.    No.

4              MR. BUNSON:  No further questions.

5              THE COURT:  Redirect?

6                      **REDIRECT EXAMINATION**

7    BY MR. YOUNG:

8    Q.    Ms. House, is Dean Scoufos the one who first accused you

9    of dishonesty?

10   A.    Yes.

11   Q.    And is Dean Scoufos the one who first notified you that

12   you were going to be terminated?

13   A.    Yes.

14   Q.    And at some point did Claire Stubblefield conduct an

15   investigation?

16   A.    No, not till after they got my letter from Micah Knight.

17   Then they said –– they sent a letter –– Claire Stubblefield

18   sent an e-mail saying that they were extending my leave of

19   absence past the three o'clock the next day to another day.

20   And then that's when they had a committee.

21   Q.    Last year ––

22   A.    Uh-huh.

23   Q.    –– did you receive a subpoena in this case to testify at

24   a deposition?

25   A.    Yes.

Jury Trial – Volume 3
November 15, 2017

1   Q.    Were you prepared to tell the truth at that deposition?

2   A.    Yes.

3   Q.    Was that deposition canceled by the lawyers involved and

4   not you?

5   A.    Yes.

6   Q.    Did you tell the truth today, Ms. House?

7   A.    Yes.

8   Q.    Was it hard for you to come here today?

9   A.    Yes.

10  Q.    Are you losing money from work to be here today?

11  A.    Yes.

12  Q.    Sitting here today, do you regret your decision to bury

13  your husband in his Southeastern uniform?

14  A.    I do and I don't.

15  Q.    Can you explain that answer?

16  A.    I do because I never felt like the dishonesty that goes

17  on and that I've seen would get this bad.  And I don't because

18  I love Southeastern even after everything.  It's still home.

19  So no.

20          MR. YOUNG:  Nothing further, Your Honor.

21          MR. BUNSON:  Nothing further.

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you.

24                  (Witness excused.)

25          THE COURT:  Call your next witness.

Jury Trial – Volume 3
November 15, 2017

1           MR. YOUNG:  Your Honor, respectfully, plaintiff

2    rests.

3        May I approach?

4           THE COURT:  Yes.

5           MR. YOUNG:  Thank you.

6        (The following proceedings were had at the bench and out

7    of the hearing of the jury.)

8           MR. YOUNG:  Thank you, Your Honor.  Respectfully,

9    plaintiff would like to move for a directed verdict.  I'm

10   prepared to make arguments today or we can make them tomorrow.

11          THE COURT:  Well, I certainly don't want to hear

12   them today.

13       How -- what do you think is your best guess on your

14   evidence now?

15          MS. COFFEY:  Well, before I get there, defendants

16   also would like to move for a directed verdict.

17       Is it on the record, plaintiff has rested?

18          THE COURT:  Yes.

19          MS. COFFEY:  Okay.  So plaintiff is not going to

20   present deposition testimony of Cathy Conway during your case?

21          MR. YOUNG:  (Shakes head.)

22       But we reserve the right, if there's no directed verdict,

23   to present rebuttal.

24          MS. COFFEY:  I think that we --

25          THE COURT:  Sherri, we'll be off the record.

Jury Trial – Volume 3
November 15, 2017

1         (Bench conference held off the record with all counsel.)

2         (The following proceedings were had in open court with

3    all parties present and within the hearing of the jury.)

4              THE COURT:  This is a point in the trial where the

5    lawyers and I need to have some time to do several things, and

6    I don't want you to have to sit there and listen to us

7    whisper.  And it may take long enough that it will be by the

8    end of the day that we're finished anyway.

9         So, once again, I'm going to send you home early.  I

10   think it really is a nice day today, although I can't vouch

11   for that.

12        I will instruct you not to discuss the case, of course,

13   or permit anyone to discuss it with you.  Do not expose

14   yourselves to any media accounts.  Don't do any independent

15   research, Facebook, social media, Twitter, blog, or anything

16   else.  Please be in the jury assembly room downstairs by 9:15

17   tomorrow, and we will excuse you.

18        I will expect counsel in chambers.

19        And we'll be in recess.

20        (In recess at 3:45 p.m.)

21

22

23

24

25

551

Jury Trial – Volume 3
November 15, 2017

```
 1                     REPORTER'S CERTIFICATE

 2

 3          I, SHERRI GRUBBS, Federal Official Court Reporter in

 4   and for the United States District Court for the Western

 5   District of Oklahoma, do hereby certify that pursuant to

 6   Section 753, Title 28, United States Code that the foregoing

 7   is a true and correct transcript of the stenographically

 8   reported proceedings held in the above-entitled matter and

 9   that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12          Dated this 15th day of November, 2017.

13

14          /S/ SHERRI GRUBBS_____

15          SHERRI GRUBBS, RPR, RMR, RDR, CRR
            State of Oklahoma CSR No. 1232.
16          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25
```