1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF OKLAHOMA

3

4
DR. RACHEL TUDOR,                    )
5                                    )
        Plaintiff,                   )
6                                    )
                vs.                  )   Case No. CIV-15-324-C
7                                    )
SOUTHEASTERN OKLAHOMA STATE          )
8  UNIVERSITY and THE REGIONAL       )
   UNIVERSITY SYSTEM OF              )
9  OKLAHOMA,                         )
                                     )
10       Defendants.                 )
                                     )
11

12

13                  VOLUME 5

14           TRANSCRIPT OF JURY TRIAL

15     BEFORE THE HONORABLE ROBIN J. CAUTHRON

16      FRIDAY, NOVEMBER 17, 2017; 9:15 a.m.

17         OKLAHOMA CITY, OKLAHOMA

18

19

20

21

22

23

24     Proceedings recorded by mechanical stenography,
   transcript produced by computer.
25

Jury Trial – Volume 5
November 17, 2017

1                          A P P E A R A N C E S

2

3    For the Plaintiff:

4        Ezra I. Young
         Law Office of Ezra Young
5        30 Devoe 1A
         Brooklyn, New York 11211
6        ezraiyoung@gmail.com

7        Brittany M. Novotny
         401 North Hudson Avenue
8        Oklahoma City, Oklahoma 73102
         brittany.novotny@gmail.com

9

10       Marie E. Galindo
         1500 Broadway
11       Suite 1120
         Wellsfargo Building
12       Lubbock, Texas 79401
         megalindo@thegalindolawfirm.com

13

14   For the Defendants:

15       Dixie L. Coffey
         Jeb E. Joseph
16       Timothy M. Bunson
         Attorney General's Office
17       313 NE 21st Street
         Oklahoma City, Oklahoma 73105
18       dixie.coffey@oag.ok.gov
         jeb.joseph@oag.ok.gov
19       tim.bunson@oag.ok.gov

20

21

22

23

24

25

Jury Trial – Volume 5
November 17, 2017

| 1 | C O N T E N T S | | |
|---|---|---|---|
| 2 | | VOLUME | PAGE |

3   PLAINTIFF WITNESSES:

4   RACHEL TUDOR, Ph.D.
    DIRECT EXAMINATION BY MR. YOUNG............. 1    37
5   CROSS-EXAMINATION BY MS. COFFEY............ 1    130
    CONTINUING CROSS-EXAMINATION BY MS. COFFEY.. 2   205
6   REDIRECT EXAMINATION BY MR. YOUNG............ 2    209

7   ROBERT PARKER, Ph.D.
    DIRECT EXAMINATION BY MR. YOUNG............. 2    212
8   CROSS-EXAMINATION BY MR. JOSEPH............. 2    275
    REDIRECT EXAMINATION BY MR. YOUNG........... 2    291
9   RECROSS-EXAMINATION BY MR. JOSEPH........... 2    294

10  MEG COTTER-LYNCH, Ph.D.
    DIRECT EXAMINATION BY MR. YOUNG............. 2    297
11  CROSS-EXAMINATION BY MR. JOSEPH............. 2    353
    REDIRECT EXAMINATION BY MR. YOUNG........... 2    371
12
    JOHN MISCHO, Ph.D.
13  DIRECT EXAMINATION BY MS. NOVOTNY............ 3    384
    CROSS-EXAMINATION BY MR. BUNSON............ 3    409
14  REDIRECT EXAMINATION BY MS. NOVOTNY.......... 3    427
    RECROSS-EXAMINATION BY MR. BUNSON........... 3    430
15
    MARK SPENCER, Ph.D.
16  DIRECT EXAMINATION BY MR. YOUNG............. 3    431
    CROSS-EXAMINATION BY MR. BUNSON............. 3    450
17  REDIRECT EXAMINATION BY MR. YOUNG........... 3    459

18  RANDY PRUS, Ph.D.
    DIRECT EXAMINATION BY MS. NOVOTNY........... 3    464
19  CROSS-EXAMINATION BY MR. JOSEPH............. 3    470
    REDIRECT EXAMINATION BY MS. NOVOTNY.......... 3    481
20  RECROSS-EXAMINATION BY MR. JOSEPH........... 3    486

21  JAMES KNAPP, Ph.D.
    DIRECT EXAMINATION BY MR. YOUNG............. 3    488
22  CROSS-EXAMINATION BY MR. BUNSON............. 3    504
    REDIRECT EXAMINATION BY MR. YOUNG........... 3    507
23
    MELINDA HOUSE
24  DIRECT EXAMINATION BY MR. YOUNG............. 3    508
    CROSS-EXAMINATION BY MR. BUNSON............. 3    529
25  REDIRECT EXAMINATION BY MR. YOUNG........... 3    547

Jury Trial – Volume 5
November 17, 2017

1                    C O N T E N T S

2                                    VOLUME   PAGE

3   DEFENSE WITNESSES:

4   LUCRETIA SCOUFOS, Ph.D.
    DIRECT EXAMINATION BY MS. COFFEY.............   4   561
5   CROSS-EXAMINATION BY MS. GALINDO.............   4   597

6   CATHY CONWAY, Ph.D.
    DIRECT EXAMINATION BY MS. COFFEY.............   4   635
7   CROSS-EXAMINATION BY MS. NOVOTNY.............   4   656

8   DOUG McMILLAN, Ph.D.
    DIRECT EXAMINATION BY MR. JOSEPH.............   4   671
9   CROSS-EXAMINATION BY MS. NOVOTNY.............   4   689

10  CLAIRE STUBBLEFIELD, Ph.D.
    DIRECT EXAMINATION BY MR. JOSEPH.............   4   700
11  CONTINUING DIRECT EXAMINATION BY MR. JOSEPH...   5   726
    CROSS-EXAMINATION BY MS. GALINDO.............   5   734
12  REDIRECT EXAMINATION BY MR. JOSEPH...........   5   754
    RECROSS-EXAMINATION BY MS. GALINDO...........   5   756
13
    JESSE SNOWDEN, Ph.D.
14  DIRECT EXAMINATION BY MR. JOSEPH.............   5   758
    CROSS-EXAMINATION BY MR. YOUNG...............   5   777
15

16  PLAINTIFF REBUTTAL WITNESS:

17  CHARLES WEINER, Ph.D.
    REBUTTAL EXAMINATION BY MR. YOUNG............   5   806
18  CROSS-EXAMINATION BY MR. BUNSON..............   5   811

19  PLAINTIFF CLOSING STATEMENT...................   5   827

20  DEFENSE CLOSING STATEMENT.....................   5   846

21  VERDICT.......................................   6   869

22

23

24

25

Sherri Grubbs, CSR, RPR, RMR, RDR, CRR
United States District Court, Western District of Oklahoma
(405) 609-5203 – sherri_grubbs@okwd.uscourts.gov

Jury Trial – Volume 5
November 17, 2017

1          (Proceedings held on November 17, 2017.)

2          (The following proceedings were had outside the presence

3    of the jury with all parties present.)

4              THE COURT:  Be seated, please.  Our jury is missing.

5    We don't know where they are.  Since we have a little time

6    until they show up somewhere, I'll permit you now –– I would

7    state for the record that I've met with counsel this morning

8    on instructions.

9          Counsel are aware of what I intend to give, and this is

10   your opportunity to make a record on what you object to being

11   there and not being there, and we'll interrupt this if the

12   jury comes back.

13             MR. YOUNG:  I'm trying to find my notes.  One

14   second.

15             THE COURT:  Mr. Young?

16             MR. YOUNG:  Yes.

17         For the record, Your Honor, plaintiff has an objection to

18   the third paragraph of the Title VII instruction.  I actually

19   don't have the appropriate copy of that construction in front

20   of me, but the –– the third paragraph of the Court's Title VII

21   instruction.

22         In that paragraph, the instruction indicates that

23   Title VII does not protect people because they are transgender

24   and goes on to explain the grounds under which persons are

25   protected on account of gender under Title VII.

Jury Trial – Volume 5
November 17, 2017

1    Dr. Tudor objects to this because she believes, first and
2  foremost, this instruction is a bit confusing to the jury, and
3  she would suggest that a different instruction be given.
4    Dr. Tudor also objects to this instruction on the grounds
5  that defendants have waived, at the docket call on
6  November 1st, 2017, any quibbling over the meaning of "sex" in
7  this case.  Because defendants claimed that they would not
8  quibble over the meaning of "sex," plaintiff told the Court
9  that our expert witness on the issue of sex and what
10  transgender means and all of those terms was not relevant to
11  this case.
12    And, lastly, plaintiff objects because she believes that
13  this puts an additional burden on her as a transgender person
14  in violation of the Equal Protection Clause of the
15  Constitution.
16    That's plaintiff's only objection, Your Honor.
17    THE COURT:  All right.  And as I've indicated, I
18  don't agree and will give it as directed.
19    Ms. Coffey.
20    MS. COFFEY:  Your Honor, do I need to address any of
21  Mr. Young's arguments?
22    THE COURT:  No.
23    MS. COFFEY:  Your Honor, defendants believe that the
24  facts in evidence support jury instructions for spoliation of
25  evidence and for an instruction on failure to conform to sex

Jury Trial – Volume 5
November 17, 2017

1   stereotype.

2        Oh, I'm sorry.  Defendants also believe that the facts in

3   evidence support a jury instruction on mitigation of damages.

4             THE COURT:  As I've indicated, I don't think there

5   is a dispute about the missing evidence sufficient to support

6   a spoliation instruction.

7        I believe the second one, whatever it was you said --

8   what was the second one?

9             MS. COFFEY:  Failure to conform to sex stereotype.

10            THE COURT:  I think that's included in what is

11  given, and I don't believe there's any evidence to support the

12  defendants' burden on mitigation.  That's the reason those

13  were excluded.

14       While you're there, would you make a record --

15       (Discussion held off the record.)

16            THE COURT:  -- on your motion for judgment as a

17  matter of law.

18            MS. COFFEY:  Yes, Your Honor.  We believe the facts

19  in evidence support a motion for directed verdict on each of

20  plaintiff's claims:  plaintiff's claim of hostile work

21  environment, plaintiff's claim for discrimination in both

22  tenure denial and denial of reapplication for tenure, as well

23  as plaintiff's claim for retaliation.

24       Therefore, we request that the Court enter a directed

25  verdict in favor of defendants.

Jury Trial – Volume 5
November 17, 2017

```
 1              THE COURT:  All right.  Mr. Young, very quickly.
 2    We've found them.
 3              MR. YOUNG:  Thank you, Your Honor.
 4          Well, plaintiff argues the opposite, that Dr. Tudor is
 5    entitled to a directed verdict on all of her claims.  I will
 6    name them for the purposes of appeal.
 7          Dr. Tudor's claim for hostile work environment;
 8    Dr. Tudor's discrimination claim pertaining to the 2009-2010
 9    tenure application process on the basis of sex; Dr. Tudor's
10    discrimination claim on the basis of sex for the 2010-11
11    application when she wasn't permitted to reapply for tenure;
12    as well as Dr. Tudor's retaliation claim covering that same
13    time period, not being permitted to reapply for tenure in
14    2010-11.
15              THE COURT:  And viewing each motion -- viewing each
16    party's evidence in the light most favorable to the nonmoving
17    party, there is evidence on both sides which would require
18    submitting this to the jury.
19          So I will overrule both motions.
20          And now I've lost Linda.
21          Yes, no.
22              MR. YOUNG:  Thank you, Your Honor.
23          (Jury enters courtroom.)
24              THE COURT:  Be seated.  I welcome you once again.  I
25    bet you-all didn't even know you were lost, did you?  We
```

Jury Trial – Volume 5
November 17, 2017

```
 1    couldn't find you anywhere, but we're glad to have you back.
 2         And, Mr. Joseph, you may proceed.
 3              MR. JOSEPH:  Thank you, Your Honor.
 4                CONTINUING DIRECT EXAMINATION
 5    BY MR. JOSEPH:
 6    Q.   Good morning, Dr. Stubblefield.
 7    A.   Good morning.
 8    Q.   If you'll recall, yesterday afternoon I had handed you a
 9    document that was labeled Defendants' Exhibit 74.
10         And just to bring everyone back, I had asked you if you
11    recognized that document and, if so, what is that document?
12    A.   I do recognize the document, yes.
13    Q.   And what is that document, Dr. Stubblefield?
14    A.   This is an amended complaint sent to me by Dr. Tudor.
15              MR. JOSEPH:  And at this time, Your Honor, I will
16    move to admit Defendants' Exhibit 74.
17              MS. GALINDO:  No objection.
18              THE COURT:  Admitted.
19              MR. JOSEPH:  Thank you.
20    Q.   (BY MR. JOSEPH)  By the time you received Defendants'
21    Exhibit 74, that amended complaint, had you already finished
22    your investigation that you had initiated in Dr. Tudor's
23    complaint?
24    A.   No.
25    Q.   And did you, then, continue your investigation with
```

Jury Trial – Volume 5
November 17, 2017

1   Dr. Tudor's amended complaint in mind?

2   A.   Yes.

3   Q.   Did you ultimately make any findings or conclusions as a

4   result of your investigation?

5   A.   Yes.

6          MR. JOSEPH:  May I approach the witness, Your Honor?

7          THE COURT:  Yes.

8   Q.   (BY MR. JOSEPH)  Dr. Stubblefield, I have handed you what

9   I have labeled Defendants' Exhibit 34, and I'll ask you if you

10  recognize that document.

11  A.   Yes.

12  Q.   And could you tell the jury, please, what that document

13  is.

14  A.   This was communication sent from me to Dr. Tudor

15  explaining her –– the findings and conclusions on gender

16  discrimination complaint.

17  Q.   These are the findings and conclusions that you drafted

18  as a result of Dr. Tudor's complaints?

19  A.   Yes.

20         MR. JOSEPH:  Okay.  I'll move admission of this

21  exhibit also, Your Honor.

22         MS. GALINDO:  No objection, Your Honor.

23         THE COURT:  Admitted.

24         MR. JOSEPH:  Thank you, Your Honor.

25  Q.   (BY MR. JOSEPH)  Dr. Stubblefield, I'll direct your

Jury Trial – Volume 5
November 17, 2017

1    attention to page 1 under the heading of "Grievance."

2    A.    Uh-huh.

3    Q.    Do you see below that and then over on to page 2 there

4    are four bolded references to Complaint 1, Complaint 2,

5    Complaint 3, and then Complaint 4?

6    A.    Yes.

7    Q.    And did those four items cover the collective issues in

8    Dr. Tudor's multiple complaints that you were investigating?

9    A.    Yes.

10   Q.    If you will, please, turn to the fifth page of that

11   exhibit, Exhibit 34.

12   A.    Yes.

13   Q.    And do you see the heading "Conclusion"?

14   A.    Yes.

15   Q.    If you would, please, just read that first sentence under

16   "Conclusion" for the jury.

17   A.    "After considering all the evidence, it is my decision,

18   as the affirmative action officer for Southeastern Oklahoma

19   State University, that neither discrimination nor retaliation

20   is evident, and your claim is denied."

21   Q.    And did you provide this to Dr. Tudor?

22   A.    Yes.

23   Q.    Okay.  As someone who has experienced discrimination

24   yourself and someone who has received training on how to

25   identify discrimination, did you consider it to be a very

Jury Trial – Volume 5
November 17, 2017

1    important thing to do in this case?

2    A.   Considerably, yes.

3    Q.   Okay.  As a trained officer, affirmative action officer,

4    is it still your opinion today that Dr. Tudor was not

5    subjected to discrimination or retaliation at the university?

6    A.   Yes.

7    Q.   Okay.  Dr. Stubblefield, you can set that document aside,

8    and I want to switch gears with you just a little bit.

9         There's been a lot of talk in this case about tenure.

10   Did you yourself obtain tenure at Southeastern?

11   A.   Yes.

12   Q.   Okay.  And what academic department was that in?

13   A.   Educational instruction and leadership.

14   Q.   And do you remember, when you went up for tenure, did

15   your department committee think that you deserved tenure that

16   first year?

17   A.   There was an issue.

18   Q.   Did the committee vote as a committee to recommend you

19   for tenure?

20          MS. GALINDO:  I'm going to object to relevance, Your

21   Honor.

22          THE WITNESS:  I don't know.

23          THE COURT:  Overruled.

24          THE WITNESS:  I don't know.

25   Q.   (BY MR. JOSEPH)  Okay.  Do you remember whether or not

Jury Trial – Volume 5
November 17, 2017

1  your department chair thought that first time you applied for

2  tenure that you deserved tenure?

3  A.    Yes.

4  Q.    Okay.  And what was that department chair's opinion?

5  A.    That things looked good, looked good for it.

6  Q.    Okay.  And who was your dean at that time?

7  A.    The dean was Dr. Joseph Licata.

8  Q.    Okay.  And do you know if your dean, Dr. Licata, had an

9  opinion on your chances of tenure that first year?

10 A.    Yes, he did.

11 Q.    What was his opinion?

12 A.    He indicated that one of the books that I had provided

13 the ISBN number, the committee was not able to locate.  So

14 they assumed that that paper did not exist nor the book, and

15 that one more publication needed to be done to have it -- you

16 know, as robust as it could be.

17 Q.    Did Dr. Licata offer you any advice about what to do at

18 that situation?

19 A.    Yes.

20 Q.    And what was his advice?

21 A.    His advice was that I withdraw.  If I did, indeed, have

22 the copy of the book, to produce that.  And to make the

23 publication a little bit more robust, I needed to do another

24 one.

25 Q.    Beef up your publications?

Jury Trial – Volume 5
November 17, 2017

1   A.    Yes.

2   Q.    Okay.  How did that make you feel?

3   A.    I was extremely upset about it.  I thought I -- I thought

4   I had it.

5   Q.    You disagreed with the dean?

6   A.    No, I won't say I disagreed.  I was -- it bothered me

7   that I didn't get it.

8   Q.    Okay.

9   A.    I thought I was a winner on that one.

10  Q.    Okay.  Did you consult with anybody besides Dr. Licata

11  about whether or not you should withdraw at that time?

12  A.    Later in the day I did.  I think about an hour.  I spent

13  about 20 minutes in my car and, I guess, did the typical

14  thing.  I was kind of upset and sat there and listened to the

15  radio and cried.  And then I did go and speak to someone else.

16  Q.    Okay.  And what advice did you get then from that second

17  person?

18  A.    Basically the same information, that I had -- other than

19  the publication, I had a five-and-a-half-inch portfolio, so it

20  was a good one.  I had many presentations.  But I did need to

21  do publication, another publication.  And he felt that one

22  would be sufficient, one more.

23  Q.    Who was it that gave you that advice?

24  A.    Dr. McMillan.

25  Q.    That's Dr. Douglas McMillan?

Jury Trial – Volume 5
November 17, 2017

1  A.   That is correct.

2  Q.   And what was his position at the university at that time,

3  if you recall?  And I don't want you to guess if you don't.

4  A.   I don't recall.

5  Q.   Okay.  Did you value the professional opinions and

6  experience of Dean Licata at that time?

7  A.   Yes.

8  Q.   Did you value the professional opinion of Dr. McMillan at

9  that time?

10  A.   Yes.

11  Q.   What did you do with their advice?

12  A.   I did what both of them suggested that I do, that I

13  withdraw, resubmit the next year.  And I immediately did that.

14  Q.   After you withdraw, at that point did you then take steps

15  to beef up your publications?

16  A.   Yes.

17  Q.   And when you did finally resubmit your portfolio, what

18  was the result?

19  A.   I was able to secure tenure.

20  Q.   In a subsequent year?

21  A.   Yes.

22  Q.   Okay.  As you sit here today, do you think back and think

23  that Dean Licata and Dr. McMillan gave you good advice about

24  withdrawing at that juncture?

25  A.   Yes, I do.

Jury Trial – Volume 5
November 17, 2017

1   Q.   Even though you were very upset about it?

2   A.   Yes.

3   Q.   Are you glad you took their advice?

4   A.   Yes.

5   Q.   Do you feel that the advice that Dr. Licata and

6   Dr. McMillan gave you to withdraw was based on their desire to

7   discriminate against you?

8   A.   No.

9   Q.   Do you think they were trying to minimalize you?

10  A.   No.

11  Q.   Or marginalize you?

12  A.   No.

13       MR. JOSEPH:  Nothing further, Your Honor.

14       Thank you, Dr. Stubblefield.

15       THE COURT:  Ms. Galindo.

16       MS. GALINDO:  Your Honor, may we approach?

17       THE COURT:  Yes.

18       (The following proceedings were had at the bench and out

19  of the hearing of the jury.)

20       MS. GALINDO:  Your Honor, there's a number of

21  exhibits I wanted to admit.  I didn't know if you wanted us to

22  do it here and save time in front of the jury.  I didn't know

23  what your preference was.  I'm happy to do whatever Your

24  Honor --

25       THE COURT:  That would be great if you can agree on

Jury Trial — Volume 5
November 17, 2017

```
 1  them.
 2              MS. GALINDO:  Okay.
 3              MR. JOSEPH:  I don't know what the exhibits are.
 4              MS. GALINDO:  I do.  I brought them with me.
 5         Plaintiff's Exhibit 18.  I tried to pull the ones you --
 6              THE COURT:  Let's be off the record, for your sake,
 7  on this.
 8         (Discussion held off the record at the bench with all
 9  counsel.)
10         (The following proceedings were had in open court with
11  all parties present and within the hearing of the jury.)
12              THE COURT:  So this was to save time.  I can now
13  announce that the following exhibits have been admitted at the
14  bench.
15         Plaintiff's 18, 82, 83, 85, 86, 88, 89, and 90, 109.  And
16  I believe that's all.
17         All right.  You may proceed.
18              MS. GALINDO:  Thank you, Your Honor.
19                        CROSS-EXAMINATION
20  BY MS. GALINDO:
21  Q.   Good morning, Dr. Stubblefield.
22  A.   Good morning.
23  Q.   You and I met briefly yesterday afternoon; is that right?
24  A.   Yes.
25  Q.   Now, it's safe to say you have one of the most important
```

Jury Trial – Volume 5
November 17, 2017

1  jobs at –– you did have one of the most important jobs at
2  Southeastern; is that right?
3  A.    I thought it was important, yes.
4  Q.    Your mission, very admirable, to provide a safety net and
5  to protect those who feel they have been mistreated; correct?
6  A.    Yes.
7  Q.    And you investigated allegations regarding
8  discrimination?
9  A.    Yes.
10  Q.    Retaliation?
11  A.    Yes.
12  Q.    And hostile work environment; is that correct?
13  A.    That is correct.
14  Q.    And you also, on behalf of the university, facilitated
15  interaction between the employment –– Equal Employment
16  Opportunity Commission and the university; is that correct?
17  A.    Yes.
18  Q.    And there are policies and rules within the framework of
19  your job that allows individuals like Dr. Rachel Tudor to
20  exercise rights, to appeal, and file complaints and
21  grievances; correct?
22  A.    Yes.  All employees.
23  Q.    All employees.  Just like Dr. Rachel Tudor?
24  A.    That's correct.
25  Q.    And what you do requires confidentiality; right?  You're

Jury Trial – Volume 5
November 17, 2017

1   dealing with information that is entrusted to you on some very

2   delicate matters; is that correct?

3   A.   Yes.

4   Q.   You are very good friends with Dr. McMillan; correct?

5   A.   Yes.

6   Q.   In fact, I saw an e-mail in one of those.  You were

7   concerned about his -- you know there's something happening

8   with his daughter, and you're concerned about her; right?

9   A.   Yes.

10  Q.   Do you feel that Dr. McMillan is someone who respects

11  you?

12  A.   Yes.

13  Q.   Respects your work?

14  A.   Yes.

15  Q.   And respects your title?

16  A.   Yes.

17  Q.   And given that he sat down and spoke to you as the dean

18  when you applied for tenure, you probably feel a little

19  indebted to him; right?

20  A.   No.

21  Q.   You don't?

22  A.   No.

23  Q.   Okay.  In this instance, Dr. McMillan is at the center of

24  Dr. Rachel Tudor's complaints.

25         Did you disqualify yourself as the affirmative action and

Jury Trial – Volume 5
November 17, 2017

1    EEOC liaison from reviewing and investigating?

2    A.   No.

3    Q.   You've done lots of training; right?

4    A.   Extensive, yes.

5    Q.   Our tax dollars paid for that; right?

6    A.   Yes.

7    Q.   And nothing in all that training encouraged you to step

8    aside and remove what might be considered bias or give the

9    appearance of personal bias towards someone; is that right?

10   A.   Restate that, because I'm thinking there's a issue here.

11   Restate your question.

12   Q.   Are there rules that say you should be disqualified?

13   A.   Uh-huh.

14          THE COURT:  Yes or no, please.

15          THE WITNESS:  Can she repeat it?

16          THE COURT:  Well, I understood you to "uh-huh."  I

17   just need that to be a yes or no.

18          THE WITNESS:  Oh.  Yes, I will do that.

19   Q.  (BY MS. GALINDO)  Did you disqualify yourself from

20   Dr. Rachel Tudor's investigation?  Yes or no.

21   A.   No.

22   Q.   In fact, there were instances where you sought input from

23   various individuals, from the H.R. director, Ms. Conway;

24   correct?

25   A.   Input, yes.

Jury Trial – Volume 5
November 17, 2017

1    Q.   And you sought input from Dr. McMillan; isn't that right?

2    A.   On some parts, yes.

3    Q.   In fact, you did that prior to finishing your report;

4    right?

5    A.   Yes.

6    Q.   And when you started your investigation, there was no

7    retaliation complaint at that point; correct?

8    A.   I'd have to refresh.  I believe it was.  At that point --

9    I don't want to guess.  I would have to look at the paperwork.

10   Q.   Okay.  And we'll talk about that in a little bit.

11   A.   Okay.

12   Q.   So you don't recall that in the middle of it, Dr. Rachel

13   Tudor -- in the middle of your investigation -- I'm sorry --

14   Dr. Rachel Tudor said, Dr. Stubblefield, I think now I'm being

15   retaliated against in the midst of your investigation by

16   Dr. McMillan.

17        Do you remember that?

18   A.   Yes.

19   Q.   Based on your training, it is incumbent, it's the rules,

20   that Dr. Rachel Tudor had an obligation, as all other

21   employees at the university, to exhaust remedies available at

22   the university through your department; is that right?

23   A.   Yes.

24   Q.   She has to do that; correct?

25   A.   Yes.

Jury Trial – Volume 5
November 17, 2017

1   Q.   As other employees?

2   A.   Yes.

3   Q.   The complaint was filed on August -- the original

4   complaint was filed on August 30th of 2010; is that correct?

5        And I believe Mr. Joseph handed you the report.  And in

6   that first paragraph, I think, you list that date.  Am I

7   right?

8   A.   Yes.

9   Q.   I think it's Defendants' Exhibit 34 maybe?

10  A.   (Nods head.)

11  Q.   Thank you.

12       And so you identified the first date of the complaint as

13  August 30th, 2010; correct?

14  A.   Yes.

15  Q.   And you completed the report on January 19th of 2011; is

16  that right?

17  A.   Yes.

18  Q.   And in that report, you -- you were deposed -- I'm sorry.

19  I apologize.  I'm going to go back.

20       You were deposed probably about eight hours, right,

21  before testifying here today?

22  A.   Yes.

23  Q.   And in those eight hours, you did not find a finding that

24  you made with respect to the hostility claim, did you?

25  A.   I would have to see something that had that.

Jury Trial – Volume 5
November 17, 2017

```
 1   Q.    Okay.  And I apologize.
 2         You testified on direct examination -- Mr. Joseph
 3   directed you to look at the conclusory paragraph; correct?
 4   A.    Yes.
 5   Q.    In that conclusory paragraph, you determined there was no
 6   discrimination with regard to tenure and that there was no
 7   retaliation.
 8         Do you remember that?
 9   A.    Yes, I remember reading that.
10   Q.    But there is no mention of a hostile work environment;
11   correct?
12   A.    Is that still Exhibit 34?  May I ask that?
13   Q.    I believe so.  Is that your report?  That's your report;
14   right?
15   A.    Under "Conclusions," is that what we're referring to?
16   Q.    (Nods head.)
17   A.    Okay.  It says, "Neither discrimination nor retaliation
18   is evident, and your claim is denied.  You have the right to
19   appeal this determination.  The appeal is made" -- it gives
20   the process for which she could -- her appeal process.
21   Q.    Thank you.
22   A.    Yes.
23   Q.    Thank you for clarifying that.
24         And you mention in that conclusion that, based on your
25   investigation -- you didn't mention in the conclusion that
```

Jury Trial – Volume 5
November 17, 2017

1   after you consulted with Dr. McMillan, did you, in that
2   conclusion?
3   A.   No.
4   Q.   You didn't mention that, after talking to HR director,
5   you concluded that, did you?
6   A.   Nor did I mention any of the other individuals that I
7   talked to.  That is correct.
8   Q.   In fact, just before you wrote that report -- I believe
9   that was on January 19th, 2011; right?
10      Just before, about 10 days before, you contacted also an
11  attorney; correct?  Not Mr. Babbs [sic], another attorney?
12  A.   Yes.
13  Q.   And you said, "Dr. Rachel Tudor is a transgender woman.
14  Do we have to protect her?"  Isn't that what you asked her,
15  for that advice?
16  A.   I don't believe it was that verbiage.
17  Q.   She gave you an opinion on that; correct?
18  A.   Could you show me where I said that to her, please?
19           MS. GALINDO:  May I approach?
20           THE COURT:  Yes.
21  Q.  (BY MS. GALINDO)  And I apologize.  Did she give you that
22  opinion?
23  A.   Pardon?  I'm unclear about what you're asking me.  I did
24  communicate with --
25           MS. GALINDO:  I'm sorry, Your Honor.  I was trying

Jury Trial – Volume 5
November 17, 2017

```
 1   to expedite this.

 2   Q    (BY MS. GALINDO)  I believe -- and I apologize,

 3   Dr. Stubblefield, and to the Court and this jury.  It is

 4   Exhibit 88.

 5        Do you see that?

 6   A.   Yes.  This is her --

 7   Q.   Okay.

 8   A.   Uh-huh.

 9   Q.   And do you need a minute to look over that?

10   A.   Yes, please.

11        Okay.  I think I'm ready.  If I need to pause again, I

12   will ask.

13   Q.   Do you see the first sentence of that last paragraph?

14   A.   "Please remember"?

15   Q.   "In addition, being transgender is not a protected

16   status."  Do you remember that?

17   A.   The last paragraph is, "Please remember."  Is that the

18   one?

19   Q.   Last paragraph on the first page.  I'm sorry.

20   A.   The first page.  All right.

21   Q.   Yes, ma'am.

22        Just to be clear for the ladies and gentlemen of the

23   jury, this was sent from the lawyer you questioned to you;

24   correct?

25   A.   That is correct.
```

743

Jury Trial – Volume 5
November 17, 2017

1   Q.   And then, on the second page, your response was, "Thank
2   you so much for agreeing to lend a legal eye to a very
3   interesting case."
4   A.   Uh-huh.
5   Q.   Is that correct?
6   A.   That is correct.
7   Q.   And before you reached out to this lawyer, you had
8   exchanged -- I believe it was admitted yesterday --
9   Plaintiff's Exhibit 237.
10      Ms. Conway is the HR director; correct?
11  A.   Yes.
12  Q.   And you are the affirmative action EEOC representative --
13  or were -- I'm sorry -- at Southeastern?
14  A.   Yes.
15  Q.   And you exchanged an e-mail where she refers to
16  Dr. Tudor's complaint -- to Dr. Tudor as "him."  And you reply
17  "her"; correct?
18  A.   Is this the document?
19  Q.   Yes, ma'am.  And I apologize.
20      Can you see that?
21  A.   Okay.  Now.
22  Q.   And do you see where the HR director, November 18th,
23  2010, in the middle of your investigation, says, in the second
24  paragraph, second sentence, "If Dr. Tudor requests to see T&P
25  info in his personnel file, I will need to send him to

Jury Trial – Volume 5
November 17, 2017

1    Bridgette."

2         "His" and "him."

3         You then respond, "Now, now.  It's her" -- capital

4    letters -- "personnel file."

5         And then there's a strange little thing.  Was that meant

6    as a smiley face?

7    A.   I don't know even what that character is.

8    Q.   Okay.  Did you investigate the director for those

9    remarks?

10   A.   Investigate?  She was part of the investigation.  I did

11   ask her questions on numerous things, not just this.

12   Q.   And in that report that's been admitted as Defendants'

13   Exhibit 34 that is your final conclusion, did you note this

14   e-mail and its language in that report?

15   A.   No.

16   Q.   You didn't think it was relevant?

17   A.   I didn't think it was pervasive enough.  One mention, one

18   time, one document, no.

19   Q.   And you said that Dr. McMillan is a good friend; right?

20   A.   Yes.  Colleague, yes.

21   Q.   You had an instance where a professor insulted you in the

22   worst way with a racial slur; isn't that right?

23   A.   Yes.

24   Q.   And Dr. McMillan told you, "Don't complain about it."

25        Do you remember that?

1   A.   No.

2   Q.   You don't?  Did you complain about it?

3   A.   I remember -- I remember telling him the incident.  Yes,

4   I did tell him about the incident.

5   Q.   Do you need to refresh your memory from your testimony?

6   A.   I remember the situation.  You don't forget things like

7   that.

8          MS. GALINDO:  May I approach, Your Honor?

9          THE COURT:  Yes.

10         MR. JOSEPH:  Your Honor, at this time I'll object to

11  the question before on hearsay about what someone else told

12  this witness.

13         THE COURT:  Overruled.

14  Q.  (BY MS. GALINDO)  So do you remember testifying on

15  May 17th of 2016 under oath just as you are here today under

16  oath?

17  A.   Yes.  Is this the deposition?

18  Q.   Yes.

19  A.   Okay.

20  Q.   I'm sorry.  This is page --

21         MR. JOSEPH:  Your Honor, can we have counsel ask

22  questions from the lectern, please?

23         THE COURT:  Do you just have one copy of the

24  deposition?

25         MS. GALINDO:  We may have another.

Jury Trial – Volume 5
November 17, 2017

1          MR. YOUNG:  It's one of the plaintiff's exhibits.  I

2  can look up on our list and give them the number, but it's an

3  exhibit.

4          THE COURT:  Well, she needs to be at the podium

5  unless it's necessary to share the document.

6      My question is, do you have another copy of the

7  deposition?

8          MR. YOUNG:  Yes, we do, Your Honor.

9          MS. GALINDO:  Your Honor, I'm happy to go back to

10  the podium.  I'm happy with that.  I'll just get a copy of it.

11      Do you have a copy?

12          MR. YOUNG:  I'll pull it up.

13          THE COURT:  Just have her look at it before you go

14  back.

15          MS. GALINDO:  All right.  Thank you.

16  Q.  (BY MS. GALINDO)  Just to clarify, I'm looking at page

17  131, Line 3 and -- through 25.

18  A.   Uh-huh.

19          MS. GALINDO:  May I approach, Your Honor?  I'm

20  sorry.

21  Q.  (BY MS. GALINDO)  So the question was, "And you have

22  described him as a confidante.  Is there anything in

23  particular that he's helped you with in the past with respect

24  to your employment at Southeastern other than the instance

25  that you told me about earlier with your promotion and tenure

Jury Trial – Volume 5
November 17, 2017

```
 1   application?"
 2        You said, "Yes."
 3        "What is that?"
 4        "I'm trying to remember the first time, that there was an
 5   older faculty member -- oh, it was in early '97-'96 -- that
 6   made a racial slur.  That person retired actually the next
 7   year.  So they were old, older than I am, old.  And I
 8   discussed it with him."
 9        "And was he helpful?"
10        "Yes."
11        "How so?"
12        "He just indicated that, you know, the rules -- some
13   people had not moved on in the world.  He would be retiring.
14   And, you know, if it happened again, just to let him know."
15        So you let it go; right?
16   A.   No, I did not let it go.  I talked to the person who said
17   the racial slur.  And what I said is, "If you ever say
18   anything to me again, ever, it will be reported officially."
19   Q.   But you didn't share that in the eight hours of testimony
20   previously, did you?
21   A.   Eight hours?  Maybe not.
22   Q.   And you never filed a complaint?
23   A.   No.
24   Q.   And do you remember the notes of your witness interviews
25   that you turned over to the EEOC and the response from
```

Jury Trial – Volume 5
November 17, 2017

1   Southeastern?

2   A.   Some of them I do, yes.

3   Q.   Do you need to refresh your memory on those?

4   A.   If you have one specific one, yes.

5   Q.   Thank you.

6          MS. GALINDO:  May I approach, Your Honor?

7          THE COURT:  Yes.

8          MS. GALINDO:  Thank you.

9       Your Honor, I believe this was also admitted, 89.

10         THE COURT:  Yes.

11  Q.   (BY MS. GALINDO)  Here you go, Dr. Stubblefield.

12       Does that look familiar?

13  A.   Yes.  These are part of my personal notes, yes.

14  Q.   And those notes helped you reach your conclusions; is

15  that correct?

16  A.   These are some of the major ones, yes.

17  Q.   Well, this is what you provided as part of the response

18  from Southeastern University; correct?

19  A.   That is correct.

20  Q.   If you'll turn with me on Plaintiff's Exhibit 89, you

21  talked to Dean Scoufos; correct?

22  A.   Yes.

23  Q.   And I believe on the third page you said you met with her

24  at 9:30 on September 17th of 2010.

25       Do you remember that?

Jury Trial – Volume 5
November 17, 2017

```
 1              MR. JOSEPH:  Objection, Your Honor.  That misstates
 2   this document.
 3              THE COURT:  The witness can speak for herself.
 4              THE WITNESS:  I'm trying -- where are you referring
 5   to, the date?
 6              MS. GALINDO:  May I approach?
 7   Q.  (BY MS. GALINDO)  Oh, I'm sorry.  September 17th, 2010.
 8   That would be the third page.
 9   A.   Yes, I see that.
10   Q.   Okay.  You said you met with doctor -- I'm sorry -- with
11   Dean Scoufos at 10:30; is that correct?
12   A.   Yes.
13   Q.   What does this mean?
14       "In Dr. Scoufos's characteristic low, slow, southern
15   dialect, imparted what she felt was a possible solution to
16   address the deficiencies."
17   A.   And your question is?
18   Q.   How was that helpful to determine if there was
19   discrimination, hostility in the workplace, and whether
20   Dr. Tudor had been retaliated against?
21   A.   What my personal notes are telling me is that
22   Dr. Scoufos -- and you saw her yesterday and you heard her
23   yesterday.
24       Would you not agree that it's a slow southern dialect
25   that she speaks with?
```

1       And we were talking about the deficiencies and the

2   solution to the deficiencies.  It did not elaborate on every

3   single thing that was discussed in that meeting.  These are

4   notes to refresh my memory.

5   Q.   How long did you work with Dean Scoufos?

6   A.   For this instance --

7   Q.   In your --

8   A.   -- or this --

9   Q.   In your career, ma'am.  I'm sorry for the confusion.

10  A.   Since she got at Southeastern.  Since she arrived at

11  Southeastern.  She was on committees and other things.

12  Q.   How long approximately?

13  A.   One of the first committees that we were on, I think was

14  the Native American symposium.  I was a committee member -- on

15  one of the committees for that.  I think that's where I

16  actually met her.

17  Q.   And in that same report on September 13th of 2010, on

18  that same page --

19  A.   Uh-huh.

20  Q.   -- you talked to Dr. Spencer; isn't that right?

21  A.   Yes.

22  Q.   And he said he had given Dr. Tudor some advice --

23  A.   Yes.

24  Q.   -- correct?

25  A.   Yes.

1   Q.   And then he said, "Now that I understand the process

2   better, maybe I would not have advised Dr. Tudor that my

3   request for time was atypical, but maybe a gift.  I guess I'll

4   have to recant my prior recommendation for her."  Right?

5   A.   That's what he said, yes.

6   Q.   So she was getting different interpretations on the

7   rules; correct?

8   A.   That was -- this is what Dr. Spencer said to me.  I don't

9   know what she got.

10  Q.   And he was treated differently; correct?

11  A.   This is what Dr. Tudor said, yes.

12  Q.   And in that same report, if you'll follow with me -- this

13  is page 3.  You sent this off as a representative; right?  You

14  sent it from Southeastern to the Equal Employment Opportunity

15  Commission; is that correct?

16  A.   Yes.

17  Q.   And you Bates-stamped it; correct?

18  A.   Yes.

19  Q.   Now, if you'll follow with me -- that was page 3 before.

20  And that page 3 has "1185" at the bottom.

21       Do you see that?

22  A.   Yes.

23  Q.   And then page 2, 1184, for date September 8th, 2010, it

24  says, "my" -- the last word is "my" in that last bullet point.

25       Do you see that?

Jury Trial – Volume 5
November 17, 2017

1    A.    Yes.

2    Q.    And it's on your screen as well, I believe.

3    A.    Oh, okay.  Yes.

4    Q.    It says "my."  And then if you go to 1185, there's a new

5    entry, and that sentence is missing.

6          Do you see that?

7    A.    Yes.

8    Q.    So something's missing there; right?

9    A.    It would appear so.

10         MS. GALINDO:  I believe we've got what's been marked

11   as 17, Your Honor, Exhibit 17, and it's been admitted.

12         THE COURT:  Yes.

13   Q.    (BY MS. GALINDO)  Do you have that up there or -- I

14   apologize.

15         MS. GALINDO:  May I approach, Your Honor?

16         THE COURT:  Yes.

17         MS. GALINDO:  Thank you, Your Honor.

18         Let me get it here for you.  Okay?

19         Your Honor, I believe this had previously been admitted.

20         THE COURT:  Yes.

21   Q.    (BY MS. GALINDO)  Do you recognize that e-mail,

22   Dr. Stubblefield?

23   A.    Yes.

24   Q.    That's an e-mail between you and Cathy Conway; is that

25   correct?

Jury Trial — Volume 5
November 17, 2017

```
 1   A.    Correct.
 2   Q.    And you responded to Cathy Conway that you shared this
 3   with Dr. McMillan; is that correct?
 4   A.    Yes, among others.
 5   Q.    You -- in your report, I noticed the heading that -- at
 6   the top, your department.
 7   A.    Oh.  Yes.
 8   Q.    That changed, correct, the name of your office?  And I
 9   apologize.
10   A.    Yes, at some point.
11   Q.    I noticed you made a decision with respect to the
12   complaints against Mindy House, Melinda house; correct?
13   A.    That's correct.
14   Q.    And that correspondence seemed to be under -- in 2016, I
15   believe, under office of equity, compliance, and diversity;
16   correct?
17   A.    Yes.
18   Q.    But when Dr. Rachel Tudor was going through these
19   challenges and interacting with your office, the word
20   "equality" wasn't part of the department, was it, the title?
21   A.    True, yes.
22         May I address that or let it go?
23              THE COURT:  Wait for another question.
24   Q    (BY MS. GALINDO)  Is that a "yes"?
25   A.    Yes.
```

Jury Trial – Volume 5
November 17, 2017

1    MS. GALINDO:  I'll pass the witness, Your Honor.

2    THE COURT:  Redirect?

3    MR. JOSEPH:  Thank you, Your Honor.

4                **REDIRECT EXAMINATION**

5    BY MR. JOSEPH:

6    Q.   Dr. Stubblefield, plaintiff's counsel showed you what

7    they labeled Plaintiff's Exhibit 89 and admitted that.  And

8    I'm going to just put -- this is the timeline document.

9    A.   Yes.

10   Q.   Do you have that in front of you?

11   A.   Yes.

12   Q.   Now, counsel asked you if you put these -- what she

13   called Bates numbers on the document.  And I believe that

14   means the "EEOC" and a series of digits in the lower

15   right-hand corner.

16        Did you actually put those numbers on there, or did

17   someone else do that?

18   A.   I did not put them on --

19   Q.   Okay.

20   A.   -- no.

21   Q.   Dr. Stubblefield, you had a question about whether or not

22   you made reference in your findings and conclusions to a

23   particular e-mail.

24        Did you put every single document in your findings and

25   conclusions?

Jury Trial — Volume 5
November 17, 2017

1   A.    No.

2   Q.    Is it fair to say that you spoke to people and reviewed

3   evidence that wasn't necessarily mentioned by name in your

4   final report?

5   A.    Yes.

6   Q.    Did the rules actually require you to disqualify yourself

7   if there were merely an appearance to some people of bias?

8   A.    No.

9   Q.    Okay.  Did you feel you could do your job fairly and

10  effectively?

11  A.    Yes.

12  Q.    Did you ever tell anyone that you didn't have to protect

13  Dr. Tudor?

14  A.    No.

15  Q.    Did your finding of no discrimination in your report

16  encompass any hostile work environment claims, as you saw it?

17  A.    Yes.

18  Q.    Now, plaintiff's counsel asked you about whether or not

19  you talked to Cathy Conway, the HR director, or talked to Doug

20  McMillan, the vice president for academic affairs.

21        Didn't you also talk to Dr. Tudor?

22  A.    Yes.

23  Q.    Was it important, as part of your investigation, to hear

24  from all sides involved?

25  A.    Yes.

Jury Trial - Volume 5
November 17, 2017

1   Q.   And plaintiff's counsel also asked you some questions, I
2   believe, about Mindy House.
3   A.   Yes.
4   Q.   Did you find that Mindy House had engaged in acts of
5   dishonesty and lack of academic integrity?
6   A.   Yes.
7            MS. GALINDO:  May I object, Your Honor.  That isn't
8   what I -- I just asked about the document.
9            THE COURT:  Sustained.  Outside the scope.
10           MR. JOSEPH:  Thank you, Your Honor.
11       Thank you, Dr. Stubblefield.  No further questions.
12           THE COURT:  Any recross?
13           MS. GALINDO:  Briefly, Your Honor.
14                      **RECROSS-EXAMINATION**
15   BY MS. GALINDO:
16   Q.   You did not investigate the hostile work environment, did
17   you?
18   A.   I did.
19   Q.   It's not in your report, is it?
20           MR. JOSEPH:  Objection.  Asked and answered.
21           THE COURT:  Sustained.
22   Q.   (BY MS. GALINDO)  You --
23           MS. GALINDO:  Your Honor, may I approach?
24           THE COURT:  Yes.
25           MS. GALINDO:  I can do it from here, Your Honor.

Jury Trial – Volume 5
November 17, 2017

```
1    Q.   (BY MS. GALINDO)  Can you identify that in the report?
2    A.   It was encompassed within it.  There's not a –– from what
3    I saw, no, I cannot put –– the word is not there, but it was
4    part of the investigation.
5    Q.   And you concluded there was no hostile work environment;
6    is that correct?
7    A.   That is correct.
8    Q.   You're saying that all these years later in this
9    courtroom for the first time; is that correct?
10             MR. JOSEPH:  Asked and answered, Your Honor.
11             THE COURT:  Overruled.
12             THE WITNESS:  Yes.
13             MS. GALINDO:  I'll pass the witness.
14             THE COURT:  You may step down.
15             THE WITNESS:  Thank you.
16             THE COURT:  Call your next witness.
17                       (Witness excused.)
18             MR. JOSEPH:  Thank you, Your Honor.  The defendants
19   will call Dr. Jesse Snowden to the stand.
20             THE COURT:  Please stand.  I'm sorry.
21             THE WITNESS:  Okay.
22             THE COURT:  I didn't catch you soon enough.  Face
23   the clerk and be sworn.
24       (Witness duly sworn.)
25             THE COURT:  Now be seated.
```

Jury Trial - Volume 5
November 17, 2017

```
1              THE WITNESS:  Okay.
2              MS. GALINDO:  May we approach?
3              THE COURT:  Yes.
4         (The following proceedings were had at the bench and out
5    of the hearing of the jury.)
6              MS. GALINDO:  I don't know if this is going to be
7    helpful or not.  I was just handed a stack of exhibits.  So I
8    didn't know -- did you want to --
9              MR. JOSEPH:  I think those are the exhibits that you
10   took to the witness.  I was just handing them back to you.
11             MS. GALINDO:  Oh, okay.  I was just trying to --
12             THE COURT:  All right.
13             MR. JOSEPH:  Thank you, Your Honor.
14             MS. GALINDO:  Thank you, Your Honor.
15        (The following proceedings were had in open court with
16   all parties present and within the hearing of the jury.)
17             THE COURT:  I appreciate the effort.
18             MS. GALINDO:  Thank you, Your Honor.
19        WHEREUPON, JESSE SNOWDEN, Ph.D., after having been first
20   duly sworn, testifies in reply to the questions propounded as
21   follows:
22                        DIRECT EXAMINATION
23   BY MR. JOSEPH:
24   Q.   Dr. Snowden, please state your name for the record.
25   A.   My name is Jessie Snowden, S-N-O-W-D-E-N.
```

Jury Trial – Volume 5
November 17, 2017

```
1    Q.    And, Dr. Snowden, do you hold a doctorate degree?

2    A.    Yes.

3    Q.    In what subject?

4    A.    Geology.

5    Q.    And where did you receive that doctorate degree?

6    A.    When did I receive it?

7    Q.    Where.

8    A.    Oh, University of Missouri at Columbia.

9    Q.    And in what year did you receive that Ph.D.?

10   A.    1966.

11   Q.    Dr. Snowden, did you previously work at Southeastern

12   Oklahoma State University?

13   A.    Yes, I did.

14   Q.    And are you now retired from that school?

15   A.    Yes.

16   Q.    What year did you first start working at Southeastern?

17   A.    In 1999.

18   Q.    Into what position were you first hired at that school?

19   A.    As vice president for academic affairs.

20   Q.    Were you hired at Southeastern with tenure?

21   A.    Yes.  I also held faculty rank in the department of

22   physical sciences.

23   Q.    And as a faculty member, did you have teaching duties?

24   A.    No, I did not.

25   Q.    Not at that time?
```

Jury Trial – Volume 5
November 17, 2017

```
 1   A.    No.
 2   Q.    Okay.  When you were hired with tenure at Southeastern,
 3   did you already have tenure from other schools?
 4   A.    Yes.
 5   Q.    And what were those schools, sir?
 6   A.    Let's see.
 7         I first got tenure at Millsaps College in Jackson,
 8   Mississippi; then at the University of New Orleans; then at
 9   Southeast Missouri State University; and then at University of
10   Arkansas at Little Rock; and then at Southeastern.
11   Q.    Any of those schools you mentioned, did you ever serve as
12   the dean?
13   A.    Yes.
14   Q.    Which ones?
15   A.    I was dean of the college of science and engineering
16   technology at University of Arkansas at Little Rock, and I was
17   dean of the college of science and technology at Southeast
18   Missouri State University.
19   Q.    And I think I mentioned or alluded to it just a moment
20   ago, but did you ever, at any point in your career at
21   Southeastern, teach classes also?
22   A.    After I retired, I taught one class in rural regional
23   geography.
24   Q.    Did you ever serve as interim president at Southeastern
25   Oklahoma State University?
```

Jury Trial – Volume 5
November 17, 2017

1  A.    Yes, I did.

2  Q.    And what was the time period of your service in that

3  position?

4  A.    From January 2007 to January 2008.

5  Q.    So roughly a year?

6  A.    Roughly a year.

7  Q.    During your time as Southeastern's interim president, did

8  you learn that Dr. Tudor, one of the faculty members on your

9  campus, was undertaking a gender transition?

10 A.    Yes.

11 Q.    And do you remember how and when you found that out?

12 A.    I believe it was in the fall of 2007.  I don't remember

13 exactly when.  And the dean of the school of liberal arts told

14 me, just informed me of it.

15 Q.    And what was that dean's name?

16 A.    Dean C.W. Mangrum.

17 Q.    Dr. Snowden, do you have any understanding of what it

18 means to be transgender?

19 A.    Yes.

20 Q.    Just in your own words, could you please tell the jury

21 what your understanding of that is.

22 A.    I think it's the -- when a person assumes a gender

23 different from the one that's on their birth certificate.

24 Q.    Dr. Snowden, before you came to work at Southeastern

25 Oklahoma State University, did you personally know any people

Jury Trial – Volume 5
November 17, 2017

1  who identified as transgender?

2  A.    Yes, I did.

3  Q.    And where was that?

4  A.    At the University of New Orleans, where I taught for 21

5  years.

6  Q.    Were those people that you knew as transgender, were any

7  fellow faculty?

8  A.    There were, I believe, two on the faculty who identified

9  as transgender and a number of students during that period.

10  Q.    Did you teach any of those students?

11  A.    I don't recall that I did, but I may well have.

12  Q.    Did you consider any of those folks to be your friends?

13  A.    The faculty, yes.

14  Q.    Did you have any transgender –- strike that.  I'm sorry.

15       Dr. Snowden, in 2007 was it your understanding that

16  Dr. Tudor was involved in a discussion about her opportunity

17  to use a single-occupancy restroom?

18  A.    Yes, that was brought to my attention.

19  Q.    And did Dr. Tudor ever complain to you about what

20  restroom she should or shouldn't use?

21  A.    No.

22  Q.    Dr. Snowden, when you were serving that year as interim

23  president at Southeastern, did you send out birthday cards to

24  employees?

25  A.    Yes.  I sent birthday cards to faculty and also Christmas

Jury Trial – Volume 5
November 17, 2017

1   cards to faculty and staff.

2   Q.   Do you recall sending one of those Christmas cards to

3   Dr. Tudor?

4   A.   Yes, I do.

5   Q.   And does anything about the content of that note stand

6   out in your memory?

7   A.   I don't remember --

8           MS. GALINDO:  Objection, relevance, Your Honor.

9           THE WITNESS:  -- exactly what I said.

10          THE COURT:  Just a moment.

11      I'm sorry?

12          MS. GALINDO:  I'm going to object to relevance.

13          MR. JOSEPH:  I think the relevance will be very

14   clear with his answer, Your Honor.

15          THE COURT:  All right.  Overruled.

16          THE WITNESS:  I don't remember exactly what I said,

17   but I made some reference to her gender change and just wished

18   her well with that process.

19   Q.   (BY MR. JOSEPH)  Would you characterize your note as a

20   note of encouragement and support?

21   A.   Yes.

22   Q.   And, again, that was December of 2007?

23   A.   Yes.

24   Q.   Dr. Snowden, did Dr. Tudor ever complain to you about any

25   dress code restrictions that were supposedly imposed upon her?

Jury Trial – Volume 5
November 17, 2017

1  A.    No.

2  Q.    Did Dr. Tudor ever complain to you about any supposed

3  restrictions on her makeup or how she should style her hair?

4  A.    No.

5  Q.    Now, Dr. Snowden, after you sent Dr. Tudor that Christmas

6  card with the personal note of support and encouragement, did

7  she ever come to you with any complaints about the conditions

8  of her work environment?

9  A.    No.

10  Q.    Do you think she was afraid of you, sir?

11  A.    I don't think so.

12  Q.    Dr. Snowden, are you familiar with the term "shared

13  governance" as it applies in higher education?

14  A.    Yes.

15  Q.    Very briefly, tell the jury what shared governance in

16  higher ed means to you.

17  A.    It means that there is faculty participation in the

18  policy development, and also it means that faculty have a say

19  in certain areas, such as promotion and tenure and other

20  policies of the university.  It's in the form of

21  recommendations to the administration.

22  Q.    And then the administration also plays a role in those

23  things?

24  A.    Absolutely.  It's a tiered system so that decisions or

25  recommendations go up the line from faculty to administration

Jury Trial – Volume 5
November 17, 2017

1    and, ultimately, to the president of the university.

2    Q.    Now, in terms of the tenure and promotion process

3    specifically, is that also a multitiered process of shared

4    governance?

5    A.    Yes, it is.

6    Q.    And as the interim president at Southeastern during that

7    2007 to 2008 time frame, what role, if any, did you play in

8    the tenure and review process?

9    A.    The president is the final –– at that time, actually made

10   the final decision on promotion and tenure and reported that

11   to the board.

12        So after the faculty committee, the department chair, the

13   dean, and the vice president for academic affairs had all made

14   their recommendations, I made the final call and reported that

15   to the board.

16   Q.    And, Dr. Snowden, when you weren't serving as the interim

17   president, but when you were vice president of academic

18   affairs, what duties in the tenure and promotion process did

19   you perform?

20   A.    I was the next–to–the–last reviewer of the promotion

21   tenure materials, and I reviewed them very carefully and made

22   a recommendation to the president.

23   Q.    By that point in your career, had you reviewed a lot of

24   tenure and promotion portfolios over the years at all of these

25   different universities you worked?

Jury Trial – Volume 5
November 17, 2017

```
1    A.    Hundreds.

2    Q.    Okay.

3    A.    Maybe a thousand.  I don't know.

4    Q.    At some point you just stopped counting; right?

5    A.    Yes.

6    Q.    At each of these colleges where you worked, aside from

7    Southeastern, did faculty and administration have a similar

8    multitier review process?

9    A.    Yes.  This is a standard procedure.

10   Q.    Is this fairly common across the United States?

11   A.    Yes, I believe it is.

12   Q.    Dr. Snowden, is part of the reason that administration

13   reviews tenure and promotion portfolios to allow for some

14   separation between colleagues in a department to get an

15   outside view of things?

16   A.    Yes.  Each administrator has the responsibility of

17   reviewing these independently and making the best decision

18   that they can based on everything they see.

19   Q.    Dr. Snowden, in your vast experience, have you observed

20   any problems at smaller schools with faculty just kind of

21   giving their colleagues a free pass?

22   A.    I have noticed that because, you know, a small

23   department, faculty tend to be good friends with one another,

24   and it's difficult to make a negative recommendation in those

25   kind of cases.  And that's precisely why there's multiple
```

Jury Trial – Volume 5
November 17, 2017

1   review.

2   Q.   Dr. Snowden, is a university's –– let me ask you this.

3        At the time that you were working there at Southeastern,

4   was the RUSO board pushing you or pushing the school to have

5   more faculty accountability in that regard?

6   A.   Yes, they were.

7   Q.   Is a university's granting of tenure essentially a

8   commitment to a lifetime contract with a professor?

9   A.   Essentially, it is.  Of course, their –– tenured faculty

10  can be dismissed, but it's a very complicated procedure.

11  Q.   At the time you were interim president, about how much

12  did a full professor at Southeastern earn each year?

13  A.   I'm just guessing at this because I really don't

14  remember, but I would guess in the 80- to $90,000 range.

15  Q.   Then in terms of a commitment by the university, on top

16  of that for benefits, all totaled, what was the university's

17  commitment per year, salary and benefits, to a tenured

18  professor?

19  A.   You can add another 40 percent or so to that.  So it

20  would be well over 100,000, roughly $125,000 total commitment.

21  Q.   And how many years would a typical tenured professor

22  teach at Southeastern?

23  A.   Could be 30 to 40 years.  I don't know what the average

24  is, but 30-year and 40-year faculty are common.

25  Q.   So considering the course of a 30- or 40-year commitment,

Jury Trial – Volume 5
November 17, 2017

1  how important is it for the school to make the best choices
2  about who gets tenure the first time?
3  A.   It's absolutely important because it's a
4  multimillion-dollar commitment on the part of the university.
5  And those dollars are going to be paid by the taxpayers and
6  also by future students at the university in the form of
7  tuition.
8  Q.   Now, Dr. Snowden, another term that's been used in this
9  case is "tenure track."
10      Does "tenure track" mean that a professor is guaranteed
11  tenure at the end of that track?
12  A.   No.   In fact, tenure track is a misnomer.
13      Faculty that come into a university are under
14  probationary status, just as in businesses and industry, when
15  you first start a job, you usually have a probationary period.
16  For faculty, that can be up to seven years, which is probably
17  longer than most things.   But it's a year-to-year appointment
18  at that time based on performance.
19  Q.   Dr. Snowden, do you have any knowledge about Dr. Lisa
20  Coleman, who served as the chair of Dr. Tudor's 2009 tenure
21  committee, about Dr. Coleman promoting Dr. Tudor's transgender
22  status as a reason to give her a pass to tenure?
23  A.   No, I don't.
24  Q.   Okay.   Dr. Snowden, do you know anything about the
25  faculty senate teaching award at Southeastern?

1    A.    Yes.

2    Q.    Okay.  What do you know about that, in brief?

3    A.    Unlike some other universities where I've been, it's

4    strictly by a vote of the faculty senate.

5          And I don't think it's quite as meaningful as if it were

6    reviewed by an outside panel, for example, as it is at some

7    universities.  And in some cases, I think it's probably based

8    on friendships and that sort of thing.  So probably not as

9    weighty as it is in some institutions.

10   Q.    In fact, people can nominate themselves for it --

11   A.    Yes.

12   Q.    -- can't they?

13   A.    They can nominate themselves, that's right.  I've never

14   seen that anywhere before.

15   Q.    Dr. Snowden, who was Joe Licata?

16   A.    He was dean of the school of education and behavioral

17   sciences at Southeastern Oklahoma State University.

18   Q.    And what was your opinion of Dr. Licata?

19   A.    Had a very high opinion of him.  He was hired from the

20   outside while I was vice president for academic affairs.

21   Q.    So you were involved in his hiring?

22   A.    Yes, I was.

23   Q.    Okay.  Did he do a good job there?

24   A.    I felt he did.

25   Q.    Was Dean Licata an effective reviewer in that multitier

Jury Trial – Volume 5
November 17, 2017

1  tenure and promotion process we discussed?

2  A.   Yes.  He had been an administrator at a number of

3  universities also, including Ohio State and Louisiana State

4  University.

5  Q.   We won't talk about LSU football.  We'll just talk about

6  the school.

7  A.   Okay.

8  Q.   Did you have any opinion about the work product or the

9  character of Dr. Douglas McMillan?

10  A.   No.

11  Q.   You didn't have any opinion one way or the other?

12  A.   Oh, I have an opinion.  I think he was a very

13  professional man, man of very high principles.

14  Q.   You base that on your personal observation?

15          MS. COFFEY:  Excuse me.  Your Honor, I'm sorry.  A

16  witness has entered the room, one of plaintiff's witnesses,

17  Dr. Weiner.

18          THE COURT:  Okay.

19          MR. YOUNG:  Thank you.

20          MS. COFFEY:  Sorry for the interruption.

21          THE COURT:  Go ahead.

22          MR. JOSEPH:  Thank you, Your Honor.

23  Q.   (BY MR. JOSEPH)  I think I just asked you, what was your

24  opinion of Dr. McMillan based on?

25  A.   He served as my associate vice president for most of the

Jury Trial – Volume 5
November 17, 2017

```
 1  time I was vice president for academic affairs.  So I worked
 2  with him on a daily basis.
 3  Q.    And he was your subordinate?
 4  A.    Yes.
 5  Q.    When you were interim president, were you the one that
 6  ultimately elevated Dr. McMillan to interim vice president of
 7  academic affairs?
 8  A.    Yes.
 9  Q.    Dr. Snowden, as the vice president of academic affairs,
10  did you provide any guidance or training to your department
11  chairs about how tenure portfolios should be reviewed?
12  A.    Yes, I did.  And I also did that with new faculty during
13  their orientation process.
14        But I worked primarily with deans at that time but also
15  department chairs.
16  Q.    And were you fairly detailed about that?
17  A.    Fairly.
18  Q.    Dr. Snowden, are you -- in full disclosure to the jury,
19  are you currently married to Dr. Lucretia Scoufos?
20  A.    Yes.
21  Q.    But she never served as dean when you were vice president
22  for academic affairs or interim president; is that correct?
23  A.    No.
24  Q.    Okay.  She didn't serve in that capacity?
25  A.    No, she did not.
```

Jury Trial – Volume 5
November 17, 2017

1  Q.   Okay.  Were you, in fact, married to someone else at the
2  time?
3  A.   Yes.
4  Q.   Okay.  And when you first retired from Southeastern in
5  2008, did you move away from Durant at that time?
6  A.   Yes, I did.
7  Q.   And where did you go?
8  A.   To Norman, Oklahoma.
9  Q.   And why did you go to Norman?
10 A.   My wife at that time was on the faculty at the University
11 of Oklahoma.
12 Q.   And when you moved away to follow your then wife to
13 Norman, did you make any recommendations to your successor
14 about who should replace former Dean Mangrum?
15 A.   Yes, I did.  I learned shortly before I was going to
16 retire that Dean Mangrum was also going to retire that year.
17 And so I met with Dr. Larry Minks, who was the incoming vice
18 president for academic affairs, and told him that Dean Mangrum
19 was retiring.
20      And I also knew the financial conditions of the
21 university at that time, and I said, you probably won't be
22 able to do an outside search for a dean, which would be the
23 ideal thing.  And I felt that there was one person that was
24 uniquely qualified to replace Dean Mangrum.
25 Q.   And did you then recommend Dr. Scoufos?

Jury Trial – Volume 5
November 17, 2017

1   A.    Yes, I did.

2   Q.    And just very briefly, based on what observations?

3   A.    Based on her performance as department chair, primarily,

4   and the way that department had flourished under her

5   leadership.

6   Q.    Dr. Snowden, during the period of a year, roughly, when

7   you were interim president, did you typically give feedback to

8   tenure and promotion candidates before you had finalized your

9   decision on the portfolio?

10  A.    No.

11  Q.    And during the time that you were interim vice president

12  for academic affairs, did you typically give candidates

13  feedback before the process had concluded?

14  A.    I wasn't interim vice president.

15  Q.    I'm sorry.  I misspoke.

16        When you were vice president for academic affairs.

17  A.    Yes.  With President Johnson's permission, I copied the

18  candidates, the department chair, and, I believe, the chair of

19  the promotion and tenure committee on my decision and also the

20  reasons for that.

21  Q.    And would you give that to the candidates before the

22  president had made his decision?

23  A.    Yes.

24  Q.    Okay.  Was that required?

25  A.    It was not required.  I just felt that that was a good

1    thing to do.  It was a courtesy to the candidates either way.

2    If they were being granted tenure, they could relax a little

3    bit, because usually my recommendation was the one that ended

4    up being -- in fact, it was in every case.

5    Q.    And --

6    A.    And if they were not going to be granted tenure, they

7    needed all the time to prepare for that eventuality.

8    Q.    To start looking for a job elsewhere?

9    A.    Yes, to look for a job.

10   Q.    And if another person, another professional in your same

11   position at that point, made the business decision that they

12   wouldn't give feedback until the process had concluded, would

13   that be a legitimate decision?

14   A.    It would be.  And that is the way it's done at some

15   places.

16   Q.    Okay.  Dr. Snowden, do you think that the faculty senate

17   is the appropriate place for a faculty member to appeal a

18   tenure decision?

19   A.    No, I do not.

20   Q.    Okay.  Do you think the faculty sometimes regards the

21   administration as nonacademic and interlopers?

22   A.    I can't really speak to that, but I've seen some evidence

23   of that from time to time.

24   Q.    Dr. Snowden, in your vast career in higher education, was

25   it your observation or experience that tenure applications are

Jury Trial – Volume 5
November 17, 2017

1   either granted, withdrawn, or denied?

2   A.   Yes.

3   Q.   And if they are actually denied and not withdrawn before

4   that, does the applicant then get to apply again?

5   A.   No.

6   Q.   And was that your experience at multiple schools in

7   multiple states?

8   A.   Absolutely, yes.

9   Q.   Dr. Snowden, you remember that there's a document at

10  Southeastern called the Academic Policies and Procedures

11  Manual?

12  A.   Yes, I do.

13  Q.   Sometimes it's referred to as the APPM?

14  A.   Yes.

15  Q.   Okay.  Under Southeastern's APPM at the time that you

16  were vice president for academic affairs and interim

17  president, did the policies say that an applicant could apply

18  in the fifth, sixth, or seventh year, or did it say fifth,

19  sixth, and?

20  A.   It was fifth, sixth, or --

21  Q.   Or.

22  A.   -- seventh year.

23       MR. JOSEPH:  No further questions, Your Honor.

24  Thank you, Dr. Snowden.

25       THE COURT:  We'll take our morning break before we

Jury Trial – Volume 5
November 17, 2017

1    resume.  Let me instruct you not to discuss the case or permit

2    others to discuss it with you.

3        Please be back in your room at 20 after, and we'll be in

4    recess.

5            MR. YOUNG:  Your Honor, may we briefly approach?

6            THE COURT:  Yes.

7            MR. YOUNG:  Thank you.  Sorry.

8            THE COURT:  You-all go on.

9        (Jury exits courtroom.)

10        (The following proceedings were had at the bench and out

11    of the hearing of the jury.)

12            MR. YOUNG:  With all honesty, my overzealous

13    co-counsel jumped up for an objection of the cross-examination

14    that I had prepared to handle for Dr. Snowden.  Marie –– Ms.

15    Galindo can't handle it because I'm the one who prepared it.

16        We're very tired.

17            THE COURT:  Okay.

18            MR. YOUNG:  Thank you.  I just wanted to disclose

19    that.  Thank you, Your Honor.

20            MS. COFFEY:  What was that, Your Honor?

21            THE COURT:  Somebody else objected and it's his

22    witness.  He's asking permission to take the witness.

23        (In recess from 11:04 a.m. to 11:25 a.m.)

24        (Jury enters courtroom.)

25            THE COURT:  Be seated.

Jury Trial – Volume 5
November 17, 2017

1  You may proceed.

2          MR. YOUNG:  Thank you, Your Honor.

3                    **CROSS-EXAMINATION**

4  BY MR. YOUNG:

5  Q.   Good morning, Dr. Snowden.  It's good to see you again.

6  A.   Good morning.

7  Q.   I have a few questions for you.

8          Dr. Snowden, you were deposed for this case I think about

9  a year and a half ago; is that right?

10 A.   That's right.

11 Q.   And do you remember at that deposition that, after some

12 other attorneys asked you some questions, I asked you some

13 questions?

14 A.   Yes.

15 Q.   Okay.  I'm going to do my best to not give you a

16 transcript from that deposition but to just help you recall

17 things if you don't recall them.  Okay?

18 A.   (Nods head.)

19 Q.   Thank you.

20         So I believe a few minutes before we did the break,

21 towards the beginning of your testimony today, you mentioned

22 the fact that Dr. Tudor never complained to you about restroom

23 restrictions at Southeastern.  Is that right?

24 A.   Yes.

25 Q.   And that was even though you were the president -- or

Jury Trial – Volume 5
November 17, 2017

```
1   interim president of Southeastern in 2007?
2   A.   Yes.
3   Q.   Okay.  Is the president or interim president at
4   Southeastern the appropriate person for a faculty member to
5   make a complaint of discrimination to?
6   A.   Could be.  The president usually has an open-door policy
7   for those kinds of things, although there are other avenues,
8   of course.
9   Q.   Explain to the jury what the open-door policy is for the
10  president.
11  A.   If a faculty member or anyone, a student, wants to see
12  the president, they can make an appointment and do that.  And
13  I'm sure that's the same policy now.
14  Q.   Do you think that the open-door policy has been a
15  consistent policy at Southeastern, to your knowledge?
16  A.   To my knowledge, it has.
17  Q.   So if a faculty member had a discrimination complaint, a
18  retaliation complaint, they could knock on the door of the
19  president of the university and ask for a meeting?
20  A.   Yes.
21  Q.   Is that how you conducted yourself when you were interim
22  president?
23  A.   Yes.
24  Q.   Did you ever talk with Dr. McMillan about that open-door
25  policy?  I know you mentored him for a bit when he worked
```

Jury Trial – Volume 5
November 17, 2017

1    under you.

2    A.    I'm sure I did or he was certainly aware of it.

3    Q.    Do you think the open-door policy at Southeastern is an

4    important part of shared governance?

5    A.    I hadn't thought of it that way, but, yes, it could be.

6    Q.    Can you explain to the jury?

7    A.    Well, if someone wants to speak directly to the president

8    of the university, they can.  They can make an appointment and

9    do that.  They don't have to go through an intermediary.

10   Q.    Okay.  So at your deposition you told me a little bit

11   about some policies that you considered when you were interim

12   president at Southeastern.  I want to ask you about a

13   particular one.

14         Did you testify at your deposition that you thought

15   external peer review of tenure portfolios might be a good way

16   to ensure that there's not bias in the tenure and promotion

17   process?

18   A.    I did say that.  And that is a policy that's used at many

19   universities.

20   Q.    Can you explain to the jury why you think that's a good

21   policy?

22   A.    Well, if someone, during that probationary period, is

23   expected to produce a body of work that will be known in their

24   field, then people from other universities should know about

25   their work.

Jury Trial – Volume 5
November 17, 2017

1        And it's a practice at some schools to send those –– send
2   their vitae around to maybe five or six external people maybe
3   at five or six different universities and just ask them what
4   they think of their work.  Have they heard of it?  What do
5   they think the quality is?
6        You don't ask them whether the person should be promoted
7   or tenured, but it's just a way to assess the quality.
8   Q.   Do you think that gives you an important different
9   perspective than the sort of perspective you might get from
10  people at the same university reviewing that portfolio?
11  A.   That's possible, yes.
12  Q.   Just –– I believe you said that at your deposition; you
13  can correct me if I'm wrong.  But if you did external peer
14  review in the matter that you just described, would you send
15  those portfolios to people who were professors in the same
16  discipline as the applicant?
17  A.   Not only the same discipline but the same specialty
18  within that discipline.
19       And it's really more appropriate for larger, more
20  research–oriented universities, where, literally, a person is
21  expected to develop a national reputation in their discipline
22  before they're granted tenure.
23       And at a smaller school like Southeastern, that would not
24  be the expectation necessarily.
25  Q.   Okay.  I'm not sure if you recall this part of your

Jury Trial – Volume 5
November 17, 2017

1  deposition either, so you can correct me.

2      I think we talked about possibilities for problems in the

3  abstract happening at the different levels of tenure review

4  process.

5      Do you sort of vaguely recall that?

6  A.   I vaguely do.  I don't remember it exactly, but...

7  Q.   Okay.  So let's see if you remember.  And if you don't,

8  I'll move on.

9      Do you recall telling me that it's possible that if, at

10  the dean level at Southeastern, the dean doesn't particularly

11  like you, that bias might factor in -- into the decision?

12  A.   I don't recall saying that, but, again, if that were the

13  problem -- and I'm not saying it was in any case that I know

14  of -- but that's another reason for the multitiered review.

15  Q.   Okay.  And then do you recall telling me that if, at the

16  vice president for academic affairs level, the next step in

17  the review process, there were a vice president who were a bit

18  inexperienced or didn't like you, that bias or some other

19  problem might factor into the decision?

20  A.   I've never seen that at that level.

21  Q.   But is that something that could happen?

22  A.   Sure, it could.  Everybody is human.

23  Q.   Okay.  And I just want to take you one more step in the

24  process --

25  A.   Okay.

Jury Trial – Volume 5
November 17, 2017

1    Q.    -- as president.  Okay?  A position that you're familiar
2    with.
3         If at Southeastern, at the time you worked there -- not
4    after -- bias or some other issue arose at the president's
5    level, was there any check on the president's decision on that
6    tenure application?
7    A.    Not when I was there.  I think the board is the final --
8    final body that receives that.  And, at that time, the board
9    had given that authority to the president, and the president
10   simply reported it to the board.
11        It's my understanding that has changed and that the board
12   now also reviews those, but I'm not sure exactly how that
13   works.
14   Q.    Do you generally recall when about that change in policy
15   happened, that the RUSO board reviews the process?
16   A.    I don't know.
17   Q.    I believe at your deposition you told me it was sometime
18   in 2012 when a system called EthicsPoint was developed or
19   adopted.
20   A.    Again, I don't recall.
21   Q.    Okay.
22   A.    It was after 2008.
23   Q.    Okay.  Definitely after 2008.
24        Okay.  A little bit earlier today, when Mr. Joseph was
25   asking you questions, you talked a little bit about

Jury Trial – Volume 5
November 17, 2017

1   probationary status for tenure-track faculty, and I have a few
2   questions for you on that.
3   A.    Okay.
4   Q.    I think you said tenure-track faculty have about seven
5   years before they can -- have to get tenure or leave.  Is that
6   right?
7   A.    That's the maximum.
8   Q.    Maximum.  Okay.
9         And did you say that your experience at Southeastern was
10  that, if someone applied for tenure at any point during the
11  probationary period and did not get it, that they would have
12  to leave?
13  A.    Yes.
14  Q.    Was that a written rule at Southeastern?
15  A.    I believe it is, and board policy.
16  Q.    I'm sorry.  Can you clarify for the jury when you say
17  "board policy"?
18  A.    The Regional University System of Oklahoma policy, which
19  is the basis for all the universities' promotion and tenure
20  policy.
21  Q.    And if other schools in the Regional University System of
22  Oklahoma allowed professors to reapply for tenure after being
23  denied, would that, to you, suggest that it isn't RUSO policy
24  that you can't reapply?
25  A.    That's my understanding of it.

Jury Trial – Volume 5
November 17, 2017

1   Q.   Okay.  But just speaking between us, would -- if -- other

2   RUSO schools, if they allowed their professors to reapply for

3   tenure after they had been denied, would that suggest to you

4   that RUSO policy does not prohibit reapplication?

5           MR. JOSEPH:  Objection.  Asked and answered.

6           THE COURT:  Overruled.

7   Q.   (BY MR. YOUNG)  That means you can answer.  We have a

8   judge now.  It's a little bit different than the deposition.

9       I'll ask the question again.  Sorry.

10      If there were professors at different schools and they

11  were allowed to reapply for tenure after being denied, would

12  it suggest to you that RUSO policy does not prohibit

13  reapplication?

14  A.   It might.  I would have to see examples of that.

15  Q.   Examples of folks who were allowed to reapply?

16  A.   Right.

17  Q.   Okay.

18  A.   My interpretation is that you cannot.

19  Q.   Is your interpretation based upon a policy at

20  Southeastern?

21  A.   Yes.

22  Q.   Is that policy contained in the Academic Policies and

23  Procedures Manual?

24  A.   Yes.

25  Q.   Okay.  Is that something that you're familiar with?

Jury Trial – Volume 5
November 17, 2017

```
 1   A.   I was familiar with it at the time I was there.  Now I
 2   would not be familiar with any changes that have taken place.
 3   Q.   Okay.
 4             MR. YOUNG:  May we approach, Your Honor?
 5             THE COURT:  The bench or the witness?
 6             MR. YOUNG:  The bench, Your Honor.
 7             THE COURT:  Yes.
 8        (The following proceedings were had at the bench and out
 9   of the hearing of the jury.)
10             MR. YOUNG:  As a frank courtesy, Mr. Joseph, I was
11   wondering if we could agree to admit Plaintiff's Exhibit 4.
12   It's the section of the Academic Policies and Procedures
13   Manual.  I'll be honest.  We misplaced our duplicate copy.  I
14   just wanted to be able to project one page of it.  I don't
15   think you guys dispute authenticity.  I see no objections to
16   it on the --
17             MR. JOSEPH:  Is this the one you gave us?  Which
18   year is it?
19             MR. YOUNG:  This is the one you gave the EEOC saying
20   it was in place, last revised 1998, and, in fact, the time
21   Dr. Tudor applied for promotion and tenure.  It's the version
22   we've used throughout all the depositions.
23             MR. JOSEPH:  And so what is it --
24             MR. YOUNG:  I was wondering if you would just agree
25   that we could admit because I don't think anyone reasonably
```

Jury Trial – Volume 5
November 17, 2017

1    disputes the authenticity.

2              MR. JOSEPH:  No.  I mean, the policy is the policy.

3              THE COURT:  It will be admitted.

4              MR. YOUNG:  Thank you, Your Honor.

5         (The following proceedings were had in open court with

6    all parties present and within the hearing of the jury.)

7              THE COURT:  Linda, I just admitted Plaintiff's 4.

8              MR. YOUNG:  Okay.

9    Q.  (BY MR. YOUNG)  Sorry.  I can't just hand you things in

10   court.  A few things are different.

11        Dr. Snowden, I'm going to show you a portion of the

12   Academic Policies and Procedures Manual.

13        And you said that you thought the rule about when you

14   could apply is in that manual; is that right?

15   A.   I'm sorry?

16   Q.   Sorry.  Let me withdraw that line of questioning.  I'm

17   going to put something on this overhead here.  Okay?

18        Can you see that on the screen next to you?

19   A.   Yes.

20   Q.   I'm going to try to make it a little bit bigger for you

21   and the jury.

22              MR. JOSEPH:  What exhibit number is this?

23              MR. YOUNG:  This is Plaintiff's Exhibit 4.  It's --

24   for the benefit of defendants, it's EEOC page 332.

25   Q.   (BY MR. YOUNG)  So, Dr. Snowden, is this the policy that

Jury Trial – Volume 5
November 17, 2017

1    you were talking about in the Academic Policies and Procedures
2    Manual where it says you can't reapply after you've been
3    denied for tenure?
4    A.    Yes.
5    Q.    Okay.  Can you tell me where exactly it says you can't
6    reapply if you're denied?
7    A.    It says, "During the fifth, sixth, or seventh year."
8    Q.    So what would the wording be if it didn't have a bar on
9    reapplication?  Is there something --
10   A.    It would say "and."
11   Q.    Okay.  So I have a question for you about that.
12         If we replaced the word "or" with "and," would that make
13   sense?  Wouldn't that sentence read that you apply for tenure
14   in the fifth, sixth, and seventh year?
15   A.    To me, that would mean that you could reapply.
16   Q.    But would someone who got tenure reapply after they got
17   tenure?
18   A.    There would be no need.
19   Q.    I just don't understand why putting an "and" there makes
20   any more sense than an "or."
21               MR. JOSEPH:  Objection, Your Honor.  Relevance,
22   speculation, asked and answered.
23               THE COURT:  Overruled.
24               THE WITNESS:  I will say this:  At the seven
25   universities where I've worked, I don't know of any case where

Jury Trial – Volume 5
November 17, 2017

```
 1   someone has been able to reapply for tenure after they've been
 2   denied.  I'll just say that.
 3   Q.   (BY MR. YOUNG)   And I respect --
 4   A.   And my interpretation of this policy is that you cannot.
 5   Q.   Because the "or" isn't an "and"?
 6   A.   Correct.
 7   Q.   Is there any reason -- other reason beyond that that's
 8   specific to Southeastern that makes you believe that this
 9   written policy specifically says you cannot reapply for tenure
10   after you're denied?
11   A.   I think the "or" says it.
12   Q.   Okay.  I have another question about this policy, so I'm
13   going to leave this up like this.  Okay?  If you need me to
14   move it around, just let me know.  Okay?
15        Is your interpretation of this policy that, if you're
16   denied at any level of the tenure and promotion process at
17   Southeastern, that that ends things, you can't keep going?
18   A.   Yes, that would be my interpretation.
19   Q.   So if you're denied at the dean level, your application
20   stops?
21   A.   No.  I'm sorry.  I retract that.
22        No, it goes through all the levels.  And it can be
23   changed at any succeeding level going up.  For example, if the
24   dean -- and this happened to me as a dean a couple of times --
25   Q.   Uh-huh.
```

Jury Trial – Volume 5
November 17, 2017

```
 1  A.    -- did not recommend promotion and tenure, the vice
 2  president could recommend it or the president could.
 3  Q.    Okay.  Let's talk about one of those situations.  You
 4  don't have to give any specific professor's name.  We'll just
 5  talk about the general predicament, someone being denied at
 6  one level but their application continuing to go.  Okay?
 7        Do you think it would be important to a candidate who was
 8  denied at some point in one of those levels before the
 9  application was done for them to be able to speak to someone
10  at one of those lower levels who denied them to figure out if
11  there was a problem?
12  A.    Not necessarily, no.
13  Q.    Didn't you say a little bit earlier that Southeastern had
14  an open-door policy?
15  A.    Well, an open-door policy to discuss things with the
16  president.
17        Now, if -- the candidate is not supposed to know what the
18  recommendation was at any level.  It's important to state that
19  these are only recommendations until it gets to the president.
20  Q.    So the candidate is not supposed to know the decision at
21  any level before the president votes on it?
22  A.    Yes.
23  Q.    But didn't you just testify earlier that you sent --
24  A.    Yes --
25  Q.    -- candidates letters with explanation and --
```

Jury Trial – Volume 5
November 17, 2017

1    A.    As vice president, I did do that, yes.

2    Q.    I'm sorry.  We need to respect our court reporter, so we

3    don't talk over each other.

4    A.    That was late in the process.  It was at the same time it

5    was going to the president.

6    Q.    But before the president made a decision?

7    A.    Yes.

8    Q.    And you did that so that the candidate would know why a

9    decision was made at a lower level?

10   A.    That's correct.

11   Q.    If a candidate didn't get an explanation, let's say at

12   the vice president's level, and their application was going on

13   to the president's level, at that time, under Southeastern's

14   open-door policy which we talked about earlier, would it be

15   appropriate for the professor to go to the vice president for

16   academic affairs to find out why that person denied their

17   application?

18   A.    Why the person below the vice president did?

19   Q.    Yeah, or the vice president.

20   A.    Oh, sure.  They can go and discuss that.  With me, they

21   could.

22   Q.    Do you think it would violate Southeastern's open-door

23   policy if the vice president or the dean refused to meet with

24   a professor in that sort of situation?

25   A.    That is optional with the person.  The policy did not

Jury Trial – Volume 5
November 17, 2017

 1  require that.

 2  Q.    Okay.

 3  A.    That was my policy.

 4  Q.    Did you train Doug McMillan on that policy?

 5  A.    I believe I did.  He was not directly involved with

 6  promotion and tenure when I was at Southeastern until the year

 7  I was interim president, but I believe he was aware of what I

 8  was doing.

 9  Q.    Did you talk to him about what you were doing?

10  A.    I'm sure I did.

11  Q.    Okay.  You said it's not required by policy; it was

12  optional, this open-door policy.  Is it permissible, to your

13  understanding at Southeastern, for someone to treat candidates

14  for tenure and promotion inconsistently?

15        Let me give you an example.  To talk to some candidates

16  about a decision made on their application but not to talk to

17  other candidates?

18  A.    I'm not aware of that happening.

19  Q.    Do you think it would be fair?

20  A.    Not especially.

21  Q.    Okay.  Do you recall telling me at your deposition that

22  you thought that wouldn't be fair?

23  A.    I don't remember what I said, but...

24  Q.    I think you said that, when you were still at

25  Southeastern -- I believe you meant interim president -- that,

Jury Trial – Volume 5
November 17, 2017

1  at that time, Doug McMillan didn't have a lot of experience

2  reviewing tenure portfolios as an administrator.  Is that

3  right?

4  A.    That's correct.

5  Q.    And I know that you were interim president from --

6  correct me if I'm wrong -- January 2007 to January 2008;

7  right?

8  A.    Yes.

9  Q.    Okay.  Did Doug McMillan review any tenure portfolios

10  that year?

11  A.    No, they had already been reviewed.  I had already done

12  them as vice president for academic affairs.  And they -- I

13  had already sent them to the president's office, as a matter

14  of fact.

15       What I did do is sit down with Dr. McMillan and go

16  through those and explain what had happened just so he would

17  have the -- kind of see how it was done, because, the

18  following year, of course, he would be required to do that.

19  Q.    When you -- would you characterize those kinds of

20  conversations with Doug McMillan as attempts to train Doug

21  McMillan on how to handle the tenure process as an

22  administrator?

23  A.    My recollection of that -- and, remember, this is 10

24  years ago, so --

25  Q.    I understand.

Jury Trial – Volume 5
November 17, 2017

1    A.    -- is that we simply went through those, and I showed him

2    the various points in each of the portfolios and showed him

3    what I had looked at.  And that was really about it.

4         I don't think there was much else that we did.

5    Q.    I think you testified earlier that you have a lot of

6    experience reviewing tenure portfolios.  I think you said

7    something like hundreds, maybe a thousand?

8    A.    Yes, certainly hundreds.

9    Q.    So you feel like you're pretty comfortable in how you go

10   about reviewing those portfolios; yeah?

11   A.    Yes.

12   Q.    Okay.  And you tried to share that wisdom with Doug

13   McMillan?

14   A.    Well, yes.

15   Q.    Okay.  Do you feel like he was receptive to what you were

16   telling him?

17   A.    I -- I don't recall exactly, but he was listening, of

18   course.

19   Q.    Okay.  Now, do you recall dealing with a professor,

20   Dr. Mark Spencer, while you were interim president during his

21   tenure and promotion cycle?

22   A.    No.  I dealt with him when I was vice president.

23   Q.    I'm sorry?  You dealt with him as vice president?

24   A.    Yes.

25   Q.    What do you recall about that application?

Jury Trial – Volume 5
November 17, 2017

1  A.   I recall his -- when his portfolio came up, he had two

2  publications that had been submitted but not -- were not in

3  print yet, and I thought he was really on the borderline of

4  being an acceptable candidate.

5       So I called him and asked him about those two

6  publications.  And he said, "I think they're going to be

7  published within the period of the consideration of promotion

8  and tenure."

9       And so I told him when the schedule was, when the

10 recommendations were going to the president, and to let me

11 know if those were published, because I was reluctant to

12 recommend him without more evidence of scholarship.

13 Q.   Okay.  You said you were reluctant because two

14 unpublished but written articles --

15 A.   Yes.

16 Q.   -- weren't enough scholarship?

17 A.   Submitted for publication.

18 Q.   Okay.

19 A.   And maybe he even said accepted, but I'm not sure.  I

20 don't -- again, we're talking about 10 years ago.

21 Q.   Okay.  That's perfectly fine.

22      So you were the vice president for academic affairs at

23 the time; right?

24 A.   Yes.

25 Q.   I just want to make sure I got the title right.

Jury Trial – Volume 5
November 17, 2017

1      And you got the portfolio from Mark Spencer, and you had
2   a concern --
3   A.   Yes.
4   Q.   -- that he was close to the mark but not quite clearly
5   over it?
6   A.   Correct.
7   Q.   Do you think it was appropriate for you to reach out to
8   Mark Spencer and point that out to him?
9   A.   I did.
10  Q.   Can you explain why to the jury?
11  A.   This was a borderline case.  And, again, this is a big
12  decision to make, both for the faculty member and for the
13  university.
14      And, with those additional publications, he would clearly
15  be eligible for promotion and tenure.  Without them, I
16  probably would have recommended against it.  So it was
17  critical, if those were going to be published that year,
18  before the recommendation went to the president, for me to
19  know about it.
20      And, indeed, at least one of them, maybe both, were
21  published.  So...
22  Q.   So just to clarify, you sought out extra information from
23  Mark Spencer that wasn't part of his CV or otherwise in his
24  portfolio?
25  A.   It was there; it just was there in a form that was

Jury Trial – Volume 5
November 17, 2017

1    incomplete in that they had not been published.

2        I didn't allow him to add anything to the portfolio, but

3    I wanted to know the status of those two publications.

4    Q.   Okay.  Well, let me ask you a slightly different

5    question, because I think we might have talked past each other

6    there.

7        So I understand that you're saying that you didn't let

8    him add anything --

9    A.   Right.

10   Q.   -- but you were seeking from Mark Spencer at that point,

11   before you made an important decision, additional information

12   from him just to clarify what the status of those articles was

13   because that was the issue?

14   A.   Yes.

15   Q.   Do you think that was the right thing to do, to ask for

16   clarification from a professor?

17   A.   Yes, in that case.

18   Q.   Would it be in all cases if there was a borderline case

19   like that?

20   A.   That's the only one -- of those hundreds I've looked at.

21   That's the only one I've seen that was exactly that way.

22   Q.   Okay.  But if there had been another case, a similar

23   one --

24   A.   Yes.

25   Q.   -- where you just needed a little bit more --

Jury Trial – Volume 5
November 17, 2017

```
 1   A.    Yes.
 2   Q.    -- information --
 3   A.    I would have done the same thing.
 4   Q.    I'll just remind you, sir, if we can try to not speak
 5   over each other.  I'll try to pause a little bit too; I speak
 6   a little fast.
 7         Did you talk to Doug McMillan about Mark Spencer's
 8   borderline case?  Is that one of the ones you handled when you
 9   were trying to show Doug McMillan how you were going through
10   these applications?
11   A.    I believe I did, yes.
12   Q.    Okay.  So do you think you ever discussed with Doug
13   McMillan why you reached out to the person with this
14   borderline case and why it was important to do that?
15   A.    I'm sure it would have come up as we reviewed those
16   portfolios.  I don't remember specifically doing that.
17   Q.    But it was a big enough point?
18   A.    Yes.
19   Q.    Okay.
20   A.    It was a very unusual situation, so I would have
21   definitely pointed that out.
22   Q.    And you might not recall, because I realize that was many
23   years ago, but do you happen to recall whether you told Doug
24   McMillan that he should never do something like that?
25   A.    I wouldn't have told him that.
```

Jury Trial – Volume 5
November 17, 2017

1   Q.   Okay.

2   A.   He --

3   Q.   Sorry, sir.  Were you going to say something more?

4   A.   No.  I -- he would be qualified to make his own

5   decisions, but I gave him that illustration of what could

6   happen --

7   Q.   Uh-huh.

8   A.   -- in a borderline case.

9   Q.   Just to clarify, that advice you gave him when you were

10  commenting on what you did with Mark Spencer's application,

11  was that based upon all of your experience in reviewing all of

12  those hundreds of tenure portfolios?

13  A.   Yes.

14  Q.   At that point, how many portfolios had Doug McMillan

15  reviewed as an administrator?

16  A.   I don't really know.  He had been a department chair, so

17  he had done it at that level, but I don't know.

18  Q.   Do you have any understanding as to whether he ever

19  reviewed a tenure portfolio at that time, up to that time,

20  outside of the department in those higher levels of

21  administration?

22  A.   No, I don't.

23  Q.   Okay.  Well, at Southeastern, the only levels outside of

24  the department, right, are the dean, the vice president for

25  academic affairs at the time, and the president; right?

Jury Trial – Volume 5
November 17, 2017

```
 1   A.    That's correct.
 2   Q.    When you were interim president, had Doug McMillan ever
 3   held any of those positions:  dean, vice president for
 4   academic affairs, or president?
 5   A.    No.
 6   Q.    Okay.  So is it likely that, at that point in time, Doug
 7   McMillan had no experience reviewing those portfolios as a
 8   higher-level administrator?
 9   A.    Yes.
10   Q.    Okay.  Now, I think you said a few moments ago that you
11   feel pretty confident that you made the right decision with
12   Mark Spencer's application; right?
13         That it was a borderline case and it was okay to reach
14   out to the candidate; right?
15   A.    Yes.
16   Q.    Okay.  Did your decision to reach out to Mark Spencer
17   create any precedent at Southeastern, that that was now from
18   that day forward the proper way to deal with a situation like
19   that?
20   A.    I wasn't aware of any before or after.  That was my
21   decision.
22   Q.    Okay.  So, to your understanding -- because I know you
23   were at Southeastern for quite some time -- just because some
24   administrators happened to do things a certain way for a
25   certain amount of time, does that change the written rules
```

Jury Trial – Volume 5
November 17, 2017

1   that are in the APPM, the Academic Policies and Procedures

2   Manual?

3   A.    No.

4   Q.    Okay.  Have you ever heard of an administrator at

5   Southeastern citing precedent, something that's unwritten in

6   the rules, as a basis to make a decision on how to treat a

7   tenure application?

8   A.    I'm not aware of that, no.

9   Q.    To your knowledge -- and you were at Southeastern for

10  quite some time -- do you think that would be an appropriate

11  thing to say, that a precedent could be created that created a

12  rule that was outside of those written rules in the APPM?

13  A.    No, I'm not aware of --

14  Q.    Well, I'm not asking whether you're aware; I'm saying

15  based upon your judgment.

16        You're a very seasoned administrator.  Do you think that

17  would be appropriate to --

18  A.    No, because each new generation of administrators,

19  they're required to follow policy, but exactly how they do

20  that is a personal preference oftentimes, and they're not

21  bound by the precedent of their predecessor.

22  Q.    Okay.  So if the written rules at Southeastern on tenure

23  applications in the APPM don't clearly say -- and I know we

24  might have different interpretations -- but don't clearly say

25  that someone is not allowed to reapply for tenure after

Jury Trial – Volume 5
November 17, 2017

1    they've been denied, is an administrator at Southeastern

2    allowed to make up a rule based upon precedent?

3    A.    I would think not.

4    Q.    Have you ever heard of such a thing happening at

5    Southeastern?

6    A.    No.

7    Q.    Do you think that would be inappropriate?

8    A.    I do.

9    Q.    Can you explain why?

10   A.    Simply because, again, this is such an important -- they

11   say this is the most important decision that an academic

12   administrator makes, whether to keep a faculty member as a

13   tenured faculty member.  And if there's a question about that,

14   you probably should not do it.  And allowing them to apply

15   again and again, to me, violates that principle, whether it's

16   written or not.

17        Again, I've been at seven universities.  I've never seen

18   or heard of people being allowed to reapply after they've been

19   denied tenure.

20   Q.    But would you agree that there might be rare cases, like

21   Mark Spencer's, exceptional cases, where things are done a

22   little bit differently?

23   A.    I didn't view that as being done differently.

24   Q.    Well, how would you characterize Mark Spencer's

25   application?

Jury Trial – Volume 5
November 17, 2017

```
1   A.   He -- he was very strong in the other areas.  It was his
2   scholarship, his research, that was borderline.  But with
3   those two publications, it would have been perfectly
4   acceptable.
5        And that was the basis for my decision to talk to him.
6   And my only request is if these are going to be published by a
7   certain date -- and I cannot remember what that was; it was
8   probably January of the next year -- let me know because it's
9   important.
10       I told him at the time that I'm really -- without those
11  two, I don't think I can recommend you.
12  Q.   Would just two publications be enough?
13  A.   Well, he had others, but --
14  Q.   But the two --
15  A.   -- two peer-reviewed, as I recall.  Again, 10 years ago
16  and I haven't seen it since, but...
17            MR. YOUNG:  Just a couple of questions, and then
18  I'll pass the witness, and we can be done with him and move
19  on.
20  Q.   (BY MR. YOUNG)  Do you recall at your deposition telling
21  me that at some point Doug McMillan asked you to write a
22  letter explaining what you did with Mark Spencer's
23  application?
24  A.   Yes, he did.
25  Q.   When Doug McMillan asked you to write that letter, did he
```

Jury Trial – Volume 5
November 17, 2017

1    provide you with any of the materials that were part of Mark
2    Spencer's application or documents?
3    A.    No, nothing.
4    Q.    Did you write that letter from memory?
5    A.    Yes.
6    Q.    Are you certain about everything that you wrote in that
7    letter is accurate?
8    A.    I'm not certain.  Again, that was about eight years out
9    as well.
10   Q.    Okay.  Did Doug McMillan tell you why he was asking you
11   to write that letter?
12   A.    I don't believe he did.  I don't recall that he did.  I
13   assumed that he was -- had another case similar to it.
14   Q.    A borderline case?
15   A.    Yes.
16   Q.    Okay.  Just one last question.
17         To your recollection, based upon your interactions with
18   Dr. Mark Spencer, did you find him to be a truthful person?
19   A.    As far as I know.  I had very little interaction with
20   him.
21   Q.    But based on the interactions you had with him -- because
22   you sat with him a few times; right?
23   A.    I had no reason to believe he was not.
24   Q.    Has anything changed since the last time you spoke to
25   him?

Jury Trial – Volume 5
November 17, 2017

```
 1   A.    No.   I don't think I have spoken to him since then.
 2              MR. YOUNG:   Okay.   Fair enough, sir.
 3         No further questions.
 4              THE COURT:   Redirect?
 5              MR. JOSEPH:   None, Your Honor.   Thank you.
 6              THE COURT:   You may step down.
 7                           (Witness excused.)
 8              THE COURT:   Call your next witness.
 9              MS. COFFEY:   Defendants rest, Your Honor.
10              THE COURT:   Does plaintiff have rebuttal?
11              MR. YOUNG:   We have a rebuttal witness.   We're going
12   to call --
13              MR. JOSEPH:   Your Honor, may the witness step down,
14   please?
15              MR. YOUNG:   Oh, yes.   I'm sorry.
16              THE COURT:   I'm sorry.   I thought I told you.
17              MR. YOUNG:   Thank you, Mr. Joseph.
18              THE COURT:   Yes.   Call your witness.
19              MR. YOUNG:   Dr. Charles Weiner.
20              THE COURT:   While we're waiting, counsel come up.
21              MR. YOUNG:   Yes, Your Honor.
22         (The following proceedings were had at the bench and out
23   of the hearing of the jury.)
24              THE COURT:   Tell me exactly the two areas of
25   inquiry.
```

Jury Trial – Volume 5
November 17, 2017

```
 1              MR. YOUNG:  Dr. Weiner's conversations with Cathy
 2    Conway about Dr. Tudor's restroom use.
 3         And then, I believe, the other area is limited to Dr.  --
 4    the subject matter of an e-mail that Dr. Weiner wrote.  I
 5    think it's two e-mails in a chain.  I think, off the top of my
 6    head, it's Plaintiff's Exhibit 35.
 7              MS. COFFEY:  No idea.
 8              MR. YOUNG:  I believe it's Plaintiff's Exhibit 35.
 9    I believe it's April 1, 2010.
10              THE COURT:  Okay.  Well, I assume that will take no
11    more than 10 minutes.
12              MR. YOUNG:  I think so, Your Honor.  Maybe eleven,
13    but short.
14              THE COURT:  Don't tell the witness what you're going
15    to ask them.
16              MR. YOUNG:  I will not.
17              THE COURT:  Don't thank the witness for answering.
18    Don't ask him what they said in their deposition unless you're
19    going to use it to impeach.
20              MR. YOUNG:  I will, Your Honor.
21              THE COURT:  You-all are driving me crazy.
22              MR. YOUNG:  Understood, Your Honor.  Thank you.
23         (The following proceedings were had in open court with
24    all parties present and within the hearing of the jury.)
25              THE COURT:  Please face the clerk and be sworn.
```

Jury Trial – Volume 5
November 17, 2017

```
1    (Witness duly sworn.)
2         THE COURT:  I just have to ask because I can't see.
3    Are those palm trees or marijuana plants?
4         THE WITNESS:  I hope they're palm trees.
5    WHEREUPON, CHARLES WEINER, Ph.D., after having been first
6    duly sworn, testifies in reply to the questions propounded as
7    follows:
8                      REBUTTAL EXAMINATION
9    BY MR. YOUNG:
10   Q.   Okay.  I have a few questions for you, Dr. Weiner, and
11   we're going to try to keep this as brief as possible.  Okay?
12        So I want to ask you a little bit about what you recall
13   regarding conversations that you had with Cathy Conway, the
14   former director of human resources at Southeastern around the
15   time that Dr. Tudor went through a gender transition.  Okay?
16        Do you recall talking to Cathy Conway about what
17   Southeastern should do about what restroom Dr. Tudor should
18   use?
19   A.   Yes.
20   Q.   What do you recall?
21   A.   I just recall that there were issues with her using the
22   restroom on the third floor and that we should ask her to use
23   the restroom on the second floor.
24   Q.   Was there a difference between the restroom on the third
25   floor and the second floor?
```

Jury Trial – Volume 5
November 17, 2017

1    A.    The second floor restroom was unisex and one person could

2    use it at a time.   The third floor restroom was communal and

3    many people could go in.

4    Q.    A communal women's restroom?

5    A.    Yes.

6    Q.    Okay.   Would you mind moving your mic a little bit

7    closer.   I'm just having a little bit of trouble hearing you.

8    A.    Is that better?

9    Q.    Thank you.   Yes.

10          Did Cathy Conway tell you that there had been any

11   complaints about Dr. Tudor's restroom use?

12   A.    The complaints were that people in the department, other

13   professors, other female professors in the department were

14   complaining that she was using the bathroom on the third

15   floor.

16   Q.    Did Cathy Conway specify which professors made those

17   complaints?

18   A.    No.

19   Q.    Was your only understanding of the existence of those

20   complaints what you gleaned from what Cathy Conway told you?

21   A.    Yes.

22   Q.    Okay.   Did you direct Cathy Conway to do anything after

23   she told you about those complaints?

24   A.    I could not direct Cathy to do anything.

25   Q.    Okay.

Jury Trial – Volume 5
November 17, 2017

```
1   A.    So...
2   Q.    Did you give her any advice?
3   A.    No.
4   Q.    I believe at your deposition you told -- you said
5   something to the effect of -- that you told Cathy Conway that
6   it would be best that Dr. Tudor not use the women's restroom.
7         Do you recall that?
8   A.    No.
9   Q.    Okay.  Were you telling the truth when you took your
10  deposition about a year and a half ago?
11  A.    Yes.
12  Q.    Okay.  Did you talk to Cathy Conway about anything else
13  with regards to Dr. Tudor's restroom use?
14  A.    I -- I can't recall.
15  Q.    Okay.  You might not recall this, but do you recall what
16  your position was in 2007 at Southeastern?
17  A.    In 2007, assistant vice president for academic affairs.
18  Q.    So that's within the higher levels of the administration;
19  is that right?
20  A.    Yes.
21  Q.    Okay.  In 2007 did you personally think that Dr. Tudor
22  should not use the women's restroom before having sex
23  reassignment surgery?
24  A.    Yes.
25  Q.    Can you explain that?
```

Jury Trial – Volume 5
November 17, 2017

1  A.   I just thought it would be in the -- in her best interest
2  and everybody else's best interest if she used the unisex
3  bathroom on the second floor.
4  Q.   Did you tell Cathy Conway that?
5  A.   Probably.  I really cannot recall exactly what was said
6  between the two of us.
7  Q.   Okay.  That's all I'm going to ask you about on that
8  subject.  And one other subject I'm going to ask you some
9  questions about.
10      So, Dr. Weiner, do you recall having conversations with
11 Charlie Babb in 2010 about tenure and promotion rules at
12 Southeastern with regard to Dr. Tudor?
13 A.   I remember having conversations with him.  I don't
14 remember what year it was.
15 Q.   Okay.  Fair enough.
16      I'm going to put something up on the projector -- you
17 have a screen in front of you -- that has been previously
18 entered, I believe, as Plaintiff's Exhibit 35.  Okay?
19      Do you remember this e-mail right here, April 1, 2010?
20 A.   Repeat your question, please.
21 Q.   Do you recall at all writing this e-mail?
22 A.   Yes.
23 Q.   Okay.  I'm going to show you -- sorry.  It's a printed
24 e-mail.  I'm going to show you the rest of the e-mail.
25          THE COURT:  Do you have a question?

Jury Trial – Volume 5
November 17, 2017

```
 1            MR. YOUNG:  I was just letting him read the e-mail
 2   first, Your Honor.
 3            THE COURT:  Well, ask your question.
 4            MR. YOUNG:  Okay.
 5   Q.  (BY MR. YOUNG)  I'm going to draw your attention to this
 6   bullet point at the end of this e-mail.  Okay?
 7   A.   Okay.
 8   Q.   Do you recall how you arrived at the conclusions in this
 9   bullet point?
10   A.   I do.
11   Q.   How did you arrive at that conclusion?
12   A.   It's in the policies and procedures manual.
13   Q.   Okay.  I'm going to put on a page of Plaintiff's
14   Exhibit 4.  And I apologize, sir.  I had written on it for
15   someone else.  So apologies.  Just ignore that.  That's an
16   "or" there.
17        Dr. Weiner, was it your understanding, at the time that
18   you wrote that e-mail that was Plaintiff's Exhibit 35, that
19   this policy, Policy 4.6.3, allowed a professor to reapply for
20   tenure, even if they had been denied, so long as they did so
21   within the seven probationary years they had at Southeastern?
22   A.   The window was for three years, not seven years.
23        So they had a -- you know, they had the fifth, sixth, and
24   seventh year in which they could apply.
25        And if they applied and were denied, they could apply
```

Jury Trial – Volume 5
November 17, 2017

1   again.
2   Q.   Okay.
3   A.   That was my understanding.
4   Q.   Okay.  You worked in the academic affairs office?
5   A.   Yes.
6   Q.   Was it your job to know what these rules meant?
7   A.   Yes.
8   Q.   Are you confident, sitting here today, that you still
9   understand or recall what these rules meant to you at the time
10  you wrote that e-mail that's Plaintiff's Exhibit 35?
11  A.   Yes.
12  Q.   No uncertainty?
13  A.   No uncertainty.
14  Q.   Okay.
15       MR. YOUNG:  That's all, Your Honor.
16       THE COURT:  Cross.
17                   **CROSS-EXAMINATION**
18  BY MR. BUNSON:
19  Q.   Good afternoon, Dr. Weiner.
20       In your conversations with Cathy Conway, isn't it true
21  that Cathy Conway just wanted to give Dr. Tudor as many
22  restroom options as possible?
23  A.   We discussed what would be the best possible option.
24  Q.   To your knowledge, did Cathy Conway ever talk to
25  Dr. Tudor after your discussion?

1  A.   I'm not aware if she did.

2          MR. BUNSON:  Your Honor, may I have one brief moment

3  with my co-counsel?

4          THE COURT:  Ever so brief.

5          MR. BUNSON:  Ever so brief, Your Honor.

6      No further questions.

7          THE COURT:  You may step down.

8                      (Witness excused.)

9          THE COURT:  Any additional witnesses?

10         MR. YOUNG:  No additional witnesses, Your Honor.

11         THE COURT:  Does the defendant have surrebuttal?

12         MS. COFFEY:  No, Your Honor.

13         THE COURT:  All right.  Members of the jury, that

14  concludes the evidence in this case.

15     The next step is for me to instruct you as to the law,

16  following which counsel will make their closing arguments to

17  you.

18     I am ready to do that now or I'm ready to send you to

19  lunch and come back all fresh and well fed.

20     My instructions probably will take about 20 minutes and

21  then counsel have a total of 40 minutes for closing arguments.

22  So that may influence your decision.

23     Do you want to go to lunch now?

24     We can see how the verdict is going to go in this case.

25  I think I finally got a deciding vote down there.

Jury Trial – Volume 5
November 17, 2017

 1          Okay.  We'll break for lunch.

 2          Don't discuss the case, don't permit others to discuss it

 3     with you.

 4          Understand that, when we come back, we'll probably have

 5     at least an hour and a half without a break.  So do what you

 6     need to do before you come back in.

 7          Please be in -- wherever you want to be.  You do leave

 8     this floor to go to lunch, don't you?

 9          Okay.  Be in the jury assembly room downstairs at 1:15,

10     and we'll be in recess.

11          (Jury exits courtroom.)

12              THE COURT:  I've been meaning to rule on the

13     remaining issue and plaintiff's motion to strike affirmative

14     defenses.

15          The defendants have not asked for a *Faragher/Ellerth*

16     instruction.  I don't believe the law would support one.

17          I've permitted evidence of policies because it bears on

18     so many issues, plaintiff's credibility among others.

19          I have -- so that motion is granted as to the defense but

20     denied as to the evidence.

21          I have final instructions for counsel.

22          Linda.

23          We'll be in recess.

24          (Lunch recess from 12:15 p.m. to 1:15 p.m.)

25              THE COURT:  Be seated.

Jury Trial – Volume 5
November 17, 2017

1    (Jury enters courtroom.)

2         THE COURT:  Be seated.  I invited you in before I

3    realized we didn't have all the parties.  Sorry.

4         Well, it's three minutes past the appointed time.

5    Plaintiff and counsel are not here, but I'm going to go ahead.

6         Members of the jury, you have heard the evidence in this

7    case and, in a few minutes, you will hear the arguments of

8    counsel.

9         It is now the duty of the Court to instruct you as to the

10   law applicable to this case.

11        You will be provided a written copy of these instructions

12   for your use during deliberations.

13        You are the judges of the facts, the weight of the

14   evidence, and the credibility of the witnesses.

15        The weight of the evidence is not determined by the

16   number of witnesses testifying on each side.

17        In determining weight or credibility, you may consider

18   the interest, if any, that a witness may have in the result of

19   the trial; the relation of the witness to the parties; the

20   bias or prejudice, if any has been apparent; the candor,

21   fairness, intelligence, and demeanor of the witness; the

22   ability of the witness to remember and relate past

23   occurrences; the witness's means of observation and the

24   opportunity of knowing the matters about which the witness has

25   testified; and the inherent probability or improbability of

Jury Trial – Volume 5
November 17, 2017

1    the testimony; and the extent to which the witness has been

2    supported or contradicted by other credible evidence.

3              (Plaintiff and all plaintiff counsel enters courtroom.)

4              THE COURT:  From all the facts and circumstances

5    appearing in evidence and coming to your observation during

6    the trial and aided by the knowledge that you each possess in

7    common with other persons, you will reach your conclusions.

8        The arguments and statements of the attorneys are not

9    evidence.

10       At times during trial, you saw lawyers make objections to

11   questions asked by other lawyers and to answers by witnesses.

12   This simply meant the lawyers were requesting that I make a

13   decision on a particular rule of law.

14       Do not draw any conclusion from either the objections or

15   my rulings.  These are only related to the legal questions

16   that I had to determine and should not influence your

17   thinking.

18       If you remember the facts differently from the way the

19   attorneys have stated them, you should base your decision on

20   what you remember.

21       It is my job to decide what rules of law apply to the

22   case and all the applicable laws contained in these

23   instructions.

24       You must not follow some and ignore others.  Even if you

25   disagree or do not understand the reasons for some of the

Jury Trial – Volume 5
November 17, 2017

1   rules, you are bound to follow them.

2       You should also ask yourself whether there was evidence

3   that at some other time a witness did or said something or

4   failed to do or say something which was different from or

5   inconsistent with the testimony the witness gave during the

6   trial.

7       You should keep in mind, of course, that a simple mistake

8   by a witness does not necessarily mean the witness was not

9   telling the truth because people naturally tend to forget some

10  things or remember some things inaccurately.

11      If a witness made a misstatement, you need to consider

12  whether that misstatement was simply an innocent lapse of

13  memory or an intentional falsehood.  The significance of that

14  may depend on if it had to do with an important fact or only

15  with an unimportant detail.

16      The burden is upon plaintiff in a civil action such as

17  this to prove every essential element of her claim by a

18  preponderance of the evidence.  If the proof should fail to

19  establish any essential element of plaintiff's claim by a

20  preponderance of the evidence, the jury should find for

21  defendants.

22      To establish by preponderance of the evidence means to

23  prove that something is more likely so than not so.  In other

24  words, a preponderance of the evidence means evidence as, when

25  considered and compared with that opposed to it, has more

Jury Trial – Volume 5
November 17, 2017

1  convincing force and produces in your minds a belief that what

2  is sought to be proved is more likely true than not true.

3      In determining whether any fact in issue has been proved

4  by a preponderance of the evidence in the case, you may,

5  unless otherwise instructed, consider the testimony of all

6  witnesses, regardless of who may have called them, and all

7  exhibits received into evidence, regardless of who may have

8  produced them.

9      This case should be considered and decided by you as an

10  action between persons of equal standing in the community, of

11  equal worth, and holding the same or similar stations in life.

12      All persons stand equal before the law and are to be

13  dealt with as equals in a court of justice.  The fact that

14  plaintiff is an individual and defendants are governmental

15  entities should not influence your thinking either for or

16  against either party.

17      The fact that a governmental entity or agency is involved

18  as a party must not affect your decision in any way.  When a

19  governmental agency is involved, it may act only through

20  people as its employees; and, in general, a governmental

21  agency is responsible under the law for the acts and

22  statements of its employees that are made within the scope of

23  their duties as employees of the governmental agency.

24      Witnesses who, by education and experience, have become

25  expert in some art, science, profession, or calling may state

Jury Trial – Volume 5
November 17, 2017

1    an opinion as to relevant and material matters in which they

2    profess to be expert and may also state their reasons for the

3    opinion.

4         You should consider each expert opinion and give it such

5    weight as you think it deserves.  If you should decide that

6    the opinion of an expert witness is not based upon sufficient

7    education and experience or if you should conclude that the

8    reasons given in support of the opinion are not sound or that

9    the opinion is outweighed by other evidence, you may disregard

10   the opinion entirely.

11        Plaintiff's claim of discrimination based on gender is

12   brought under a Federal law known as Title VII of the Civil

13   Rights Act of 1964 as amended, often called Title VII.

14        Title VII makes it an unlawful employment practice for an

15   employer:

16        1.  To discriminate against any individual with respect

17   to the terms, conditions, or privileges of employment because

18   of such individual's gender;

19        2.  To limit, segregate, or classify employees in any way

20   which would deprive or tend to deprive any individual of

21   employment opportunities or otherwise adversely affect her

22   status as an employee because of such individual's gender;

23        3.  Title VII does not protect people because they are

24   transgender.  Thus, for plaintiff to prevail, you must find

25   any wrongful action occurred because of her gender or because

Jury Trial – Volume 5
November 17, 2017

1   of a perception that that person does not conform to a typical

2   gender stereotype.

3       Plaintiff alleges multiple claims against defendants.

4   Each of the claims and the evidence applicable to the claims

5   should be considered separately.  A verdict for plaintiff or

6   defendants as to each claim should, likewise, be considered

7   separately.

8       Some evidence may pertain to more than one claim.  The

9   fact that you may find in favor of a party on one claim should

10  not control your verdict with reference to the other claims.

11      Plaintiff claims that defendants intentionally

12  discriminated against her because of her gender during the

13  2009-10 application cycle for tenure and by denying her the

14  opportunity to apply during the 2010-11 tenure cycle.

15      Title VII prohibits an employer from intentionally

16  discriminating against an employee by failing to promote her

17  because of her gender.

18      In order to prevail on her claim, plaintiff must

19  establish by a preponderance of the evidence the following

20  elements:

21      First, that defendant denied plaintiff tenure or the

22  opportunity to reapply for tenure;

23      Second, plaintiff's gender was a motivating factor for

24  defendants' actions;

25      And, third, that plaintiff suffered damages as a result

Jury Trial – Volume 5
November 17, 2017

1   of defendants' unlawful discrimination.

2       If plaintiff fails to prove any of the above elements by

3   a preponderance of the evidence, your verdict must be for

4   defendants and you need not proceed further in considering

5   this claim.

6       Plaintiff claims that she was subject to a hostile work

7   environment based upon her gender.  Title VII makes it

8   unlawful for an employee to be subject to a hostile or abusive

9   work environment based upon the employee's gender.

10      In order to prevail on her Title VII claim for hostile

11  work environment based on gender, plaintiff must establish by

12  a preponderance of the evidence the following essential

13  elements:

14      First, plaintiff was subjected to conduct by workers or

15  supervisors at Southeastern Oklahoma State University

16  consisting of harassment, inappropriate comments, or physical

17  violence;

18      Second, such conduct was unwelcome;

19      Third, such conduct was based on plaintiff's gender;

20      Fourth, such conduct was sufficiently severe or pervasive

21  that a reasonable person in plaintiff's position would find

22  the work environment to be hostile or abusive;

23      Fifth, at the time such conduct occurred and as a result

24  of such conduct, plaintiff believed her work environment to be

25  hostile or abusive;

Jury Trial – Volume 5
November 17, 2017

1        Sixth, defendants knew or should have known of the

2   conduct;

3        Seventh, defendants failed to take prompt and appropriate

4   corrective action to end the conduct;

5        And, eighth, plaintiff suffered some injury or damage,

6   even if merely nominal damage, as a result of defendants'

7   failure to take prompt and appropriate corrective action to

8   end the conduct.

9        If plaintiff has not proven any of the above essential

10  elements by a preponderance of the evidence, your verdict must

11  be for defendants and you need not proceed further in

12  considering plaintiff's claim for a hostile work environment.

13        In determining whether a reasonable person would find

14  plaintiff's work environment hostile or abusive, you must look

15  at all of the circumstances.

16        These circumstances may include the frequency of the

17  conduct, its severity, its duration, whether it was physically

18  threatening or humiliating, and whether it unreasonably

19  interfered with plaintiff's work performance.

20        Conduct that amounts only to ordinary socializing in the

21  workplace, such as occasional horseplay, sporadic or

22  occasional use of abusive language, gender-, or age-related

23  jokes, and occasional teasing, does not constitute an abusive

24  or hostile environment.  You must consider all of the

25  circumstances and the context in which the conduct occurred.

Jury Trial – Volume 5
November 17, 2017

1     Only conduct amounting to a material change in the
2   conditions of employment amounts to an abusive or hostile work
3   environment.
4     Plaintiff is not required to prove that her gender was
5   the sole or exclusive reason for defendants' decisions.
6   Plaintiff must prove only that her gender was a motivating
7   factor in defendants' decisions.
8     Defendants assert there were legitimate,
9   nondiscriminatory reasons for not promoting plaintiff.  You
10  are instructed that defendants do not have any burden of proof
11  with respect to the reasons for their actions.
12    Thus, plaintiff can prevail on her claim of gender
13  discrimination only if she proves by the greater weight of the
14  evidence that her gender was a motivating factor in
15  defendants' decisions to not promote her in addition to or
16  instead of any legitimate nondiscriminatory reason or reasons.
17    It is not your role to second-guess defendants' business
18  judgment.  Even if you were to decide that the failure to
19  grant tenure was neither fair nor wise nor professionally
20  handled, that would not be enough.
21    In order to succeed on a discrimination claim, plaintiff
22  must persuade you by a preponderance of the evidence that,
23  were it not for gender discrimination, she would have been
24  granted tenure in 2009-10 or the opportunity to reapply for
25  tenure in 2010-11.

Jury Trial – Volume 5
November 17, 2017

1    If you find that the stated reason or reasons given by

2 the defendants are inconsistent or implausible or if you find

3 that, in the actions against plaintiff, defendants

4 substantially deviated from their own practices or customs,

5 then you may conclude that defendants' offered explanations

6 are a mere pretext or sham or cover-up for gender

7 discrimination.

8    If you find pretext, you may also infer that plaintiff's

9 gender was a motivating factor in defendants' employment

10 decision.  However, you are not required to draw such an

11 inference.

12    If you find that defendants' explanations are not a mere

13 pretext, you must still consider whether defendants'

14 employment decisions were motivated by gender discrimination.

15    Plaintiff claims that defendants retaliated against her

16 by denying her the opportunity to apply for tenure during the

17 2010-11 tenure cycle because she complained of unlawful gender

18 harassment in the workplace.

19    Title VII prohibits an employer from retaliating against

20 an employee for complaining of actions that violate Title VII.

21    In order to prevail on her Title VII claim for

22 retaliation, plaintiff must establish by a preponderance of

23 the evidence the following elements:

24    First, defendants were aware plaintiff had engaged in

25 protected activity prior to the deadline for her tenure

Jury Trial — Volume 5
November 17, 2017

1    application during the 2010-11 cycle;

2        Second, defendants prohibited plaintiff from submitting a

3    tenure application during the 2010-11 tenure cycle;

4        Third, defendants' actions occurred because plaintiff

5    engaged in protected activity;

6        And, fourth, that plaintiff suffered damage as a result

7    of defendants' action.

8        "Protected activity" as used in this instruction means

9    that plaintiff made complaints to a defendant about the

10   alleged gender discrimination.

11       Alternatively, a plaintiff engages in protected activity

12   when he or she makes complaints about discrimination to an

13   enforcement body such as the Equal Employment Opportunity

14   Commission and a defendant is aware of those complaints.

15       If plaintiff has failed to prove any of the above

16   elements by a preponderance of the evidence, your verdict must

17   be for defendants and you need not proceed further in

18   considering this claim.

19       If you find the plaintiff has established all of the

20   elements of any of her claims, then you must determine the

21   damages, if any, to which she is entitled.

22       The fact that I instruct you on damages should not be

23   taken by you as indicating one way or another whether

24   plaintiff is entitled to recover anything.  This is entirely

25   for you to decide.

Jury Trial – Volume 5
November 17, 2017

1      Damages must be reasonable and not speculative.  You may

2  award only such amount of damages as will reasonably and

3  fairly compensate plaintiff for any injury or loss that is

4  legally compensable.

5      If you should find that plaintiff is entitled to an award

6  of damages on one or more of her Title VII claims, you may

7  award her only such damages as you find will reasonably

8  compensate her for the losses and injuries which you find that

9  she sustained as a result of defendants' unlawful conduct.

10      You may not award damages on plaintiff's separate claim

11  in a manner which results in a double or multiple recovery for

12  the same harm.

13      Any award must fairly compensate plaintiff for her losses

14  and injuries but must have a basis in the evidence and be

15  reasonable in light of the evidence.

16      If you should find that plaintiff is entitled to damages,

17  the following categories should be considered in determining

18  the amount that will reasonably and fairly compensate

19  plaintiff for her injury or loss:

20      Back pay damages are to compensate plaintiff for the

21  economic injuries or losses she sustained as a result of

22  defendants' illegal discrimination or retaliation.

23      You are provided a separate instruction providing you

24  with the items that may be considered as part of any damage

25  award for back pay.

826

Jury Trial – Volume 5
November 17, 2017

1      You may also award damages for any physical or mental

2  distress or anguish that plaintiff suffered as a result of

3  defendants' wrongful conduct.

4      In evaluating the physical or mental distress of

5  plaintiff, if any, you may consider any mental anguish,

6  emotional pain and suffering, inconvenience, loss of enjoyment

7  of life, damage to professional reputation, or other

8  nonpecuniary losses which you find plaintiff experienced as a

9  result of defendants' unlawful conduct.

10      Conduct by defendants that does not cause harm does not

11  entitle plaintiff to damages.  By the same token, harm to

12  plaintiff which is not the result of unlawful conduct by

13  defendants does not entitle plaintiff to damages.

14      You have heard argument that plaintiff also seeks

15  reinstatement to employment with defendants.

16      You are instructed that issues of reinstatement are for

17  the Court and you should not consider that issue during your

18  deliberations.

19      Back pay damages may be awarded to compensate for the

20  economic injuries or losses sustained as a result of

21  defendants' unlawful conduct.

22      You may consider the earnings to which plaintiff proves

23  she would have been entitled if her employment had not ended

24  measured from the time her employment with defendants ended in

25  May of 2011 until she began employment with Collin County --

Jury Trial – Volume 5
November 17, 2017

 1    Collin College in September of 2012.  These damages are

 2    intended to put plaintiff in the economic position she would

 3    have been in if her employment with defendant had not ended.

 4         If you find that plaintiff was retaliated against but did

 5    not suffer any actual injuries or losses, you may award

 6    nominal damages in the amount of $1.

 7         You may not award nominal damages and back pay, emotional

 8    distress, or other compensatory damages.

 9         I'll recognize the plaintiff for closing argument.

10              MR. YOUNG:  Thank you, Your Honor.  I'm going to

11    move the podium.  Is that okay?

12              THE COURT:  Of course.

13              MR. YOUNG:  Ms. Goode, do I press it or does it

14    start running?

15              THE CLERK:  It just starts running.

16              MR. YOUNG:  Okay.  Thank you.  I'm just checking.

17    Thank you.

18         The State broke the law, they violated the rules, they

19    changed the rules so that they could break the law.  They made

20    up new rules that were only ever imposed on Rachel Tudor.

21         We have been here all week because a few misguided

22    administrators did not want to accept Dr. Tudor's truth, that

23    she is a woman, or at the very least respect her enough to let

24    her live that truth in peace.

25         Instead of honoring Rachel's request, backed up by a

Jury Trial — Volume 5
November 17, 2017

1    therapist's letter which the defendant showed you, they

2    continued to treat Rachel as if she was a man despite her

3    being a woman who happens to be transgender.

4         In all honesty, if Rachel Tudor were not a transgender

5    woman, we would not all be here today.

6         With evidence like this, with witnesses like the ones

7    that you saw this week, any other case would have been settled

8    a long, long, long time ago.

9         The State has gambled that all of you will look the other

10   way and excuse what they did and what they let happen to

11   Rachel Tudor just because of who she is.

12        As I told you on Monday, we've taken a different bet.

13        We have bet that you can't look away from this, that you

14   see what happened down in Durant and can't stand it, that

15   you're disgusted that, after all of these years, the State is

16   still unwilling to step up and take responsibility for doing

17   wrong.

18        Now, I know this week has been very long.  There have

19   been more Ph.D.s than you can shake a stick at.  You've

20   learned about how university tenure is supposed to work and

21   what it looks like when everything goes wrong.

22        You've met a lot of folks from Durant.  Indeed, most of

23   Southeastern's English department has testified at some point

24   during this week.  I'm honestly not sure who's teaching

25   classes down in Durant this week, but we appreciate all of

1    them being up here.

2         You have also had to hear a lot of hard things —— and

3    none of us discount that —— a lot of ugly truths that the

4    State has worked very hard to keep under wraps for many years

5    at this point.

6         You heard a good number of folks straight—up lie to your

7    face, a courtesy they didn't even extend to Rachel Tudor when

8    she was still at Southeastern.

9         There are also a good number of exhibits, some that you

10   closely inspected on those fancy screens, and, in all

11   honestly, many that we couldn't figure out how to project to

12   you.  Apologies.

13        Don't worry.  You'll get all those exhibits when you

14   deliberate.  You can look at them closely and carefully and

15   inspect then for yourselves and decide what happened.

16        Now, before we get deeper into the evidence, I want to

17   share a little bit of something with you.  But I promise I'll

18   circle back to it and you'll understand why.

19        Trial is hard.  It's hard on real people like Rachel

20   Tudor.  She has waited many years to tell her story to all of

21   you, to help other folks see the truth of what they —— what

22   she has lived through.

23        Trial is also hard on the witnesses, especially folks

24   like Mindy House, who you met a few days ago.

25        Now, Mindy House walked bravely into this courtroom

Jury Trial – Volume 5
November 17, 2017

1   knowing full well that, if she told the truth, the State would
2   do its best to tear her apart.
3       She did it anyway.  She knew she was going to be punished
4   to tell the truth, and she walked into this courtroom, and she
5   told you what her truth is.
6       Now, for my own part, I can say I was absolutely
7   terrified when I stood up here in front of you all on Monday.
8   You probably saw that.  And I'll be honest, this is my first
9   jury trial.  I'm a civil rights lawyer.  We don't do these
10  very often.  So I want to come clean with you.
11      But I have worked on this case for three and a half
12  years.  This has been everything to me.  Rachel Tudor has been
13  everything to me.
14      Now, I want nothing more but to help Rachel get a bit of
15  justice.  That's part of what makes this so scary .
16      I've learned a lot this week working with my fabulous
17  co-counsel, Marie Galindo and Brittany Novotny, who have
18  helped me tell you Rachel's story.  And I am deeply
19  appreciative of them.
20      I've grown a lot this week.  It's gotten less scary over
21  time; I've understood things better over time.  And I feel
22  like we've gotten to know each other maybe a little bit better
23  over time.
24      I had to grow because Rachel Tudor and her story are too
25  important to not share with you all.  And I hope over the

1    course this week that you grew a bit with me.

2         Okay.  You have a job to do.  Let's talk a little bit

3    about the evidence that you've seen.

4         Really, the only way I can characterize it is, where

5    there's smoke, there's fire.

6         After all these years with all of this evidence, the

7    State has stood in this court this week and lied to your face

8    over and over again.  This is what we all saw.

9         Dr. Tudor is an unassuming English professor, the type of

10   person who wanted just nothing more but to do her job in

11   peace.  But because she is a different kind of woman, she was

12   subjected to hostilities, she was denied tenure because of her

13   gender, and she was pushed to the curb because she had the

14   gall to complain.

15        Rachel did her best in a bad situation.  She endured

16   things that she shouldn't have had to until she reached a

17   breaking point.

18        For four years -- four years -- Rachel was banned from

19   the women's restroom and endured other daily indignities.

20        Of course, things got worse partway through.  Things got

21   worse when Rachel had the gall to apply for tenure just like

22   every other professor at Southeastern wants to do.

23        Rachel entered into a waking nightmare in 2009 and 2010.

24   And, like anyone, and like many of the professors that you

25   heard speak on that stand this week, Rachel complained because

Jury Trial – Volume 5
November 17, 2017

1    tenure is important.  It's something that's worth stepping up

2    for.  It's something worth putting everything on the line for.

3         And when Rachel complained, as you've heard, things got

4    worse and worse.

5         Now, Doug McMillan banned her from applying for tenure in

6    2010-11.  That's textbook retaliation.  You complain,

7    something is taken away from you because you complained.

8         Eventually, as you heard, Rachel was kicked to the curb,

9    and she has been fighting ever since to fix this wrong.  And

10   she'll need your help to do that.

11        Now, Rachel told you the truth.  She followed all the

12   rules, and they broke those rules.  She even followed the

13   rules that were unfair because it is important to follow

14   rules.

15        She did her best.  She had to work harder and do more

16   than everyone else at Southeastern, and she did it anyways.

17   Nevertheless, she was singled out and treated differently

18   because of who she is.

19        Rachel followed the complaint processes, but they were

20   pointless, completely futile.  Things were rigged down in

21   Durant.

22        She was never going to get a fair shake.  From the moment

23   in 2007 when Rachel was subjected to the bathroom rules and

24   all those other rules that we talked about on Monday morning,

25   it was clear that Rachel was never going to get a fair shake

Jury Trial – Volume 5
November 17, 2017

1     at Southeastern.

2          Those high-up administrators at Southeastern didn't want

3     a different kind of woman like Rachel to be a permanent part

4     of that university.  They made that clear to her, and they

5     made that clear to all of us this week.

6          So rather than uplift and mentor her, nurture Rachel,

7     like they did with other faculty, like Meg Cotter-Lynch, who

8     you saw on Tuesday, like Mark Spencer, who you saw later on on

9     Tuesday.

10         Rather than uplift, nurture, and mentor Rachel, they

11    messed with her.  They ridiculed her.  They joked about her

12    amongst themselves.  They mocked her.  They played fast and

13    loose with her future, her career, and her good name.

14         Now, you heard from Dr. Meg Cotter-Lynch.  Meg is a loyal

15    friend who was so shaken by what she saw happen to Rachel that

16    she was on the verge of quitting her tenured job.  That's a

17    huge deal after you've learned how much it means to have a

18    tenured job; right?

19         So shaken on the verge of quitting, but, instead of

20    quitting, Dr. Cotter-Lynch has poured herself into trying to

21    make Southeastern a better place.

22         In spite of all Dr. Cotter-Lynch's efforts, she told you

23    all that things still aren't right at Southeastern.

24    Professors who are transgender women are still scared to apply

25    there, to go there.  Things can't ever be right down at

Jury Trial – Volume 5
November 17, 2017

1    Southeastern if Rachel Tudor doesn't get justice.

2        Later on, you met Dr. Robert Parker.  I have to admit,

3    I'm a bit smitten with Dr. Parker.  He's a really bright guy

4    who's incredibly passionate about his subject area.  He's

5    obviously thought more deeply about tenure and those giant

6    portfolios that you saw him juggling than all of those high-up

7    administrators down at Southeastern who you heard from later

8    this week.

9        Dr. Parker told us all that a fair tenure review is

10   supposed to be confined to just those portfolios.  He also

11   taught us how to read those portfolios and why those

12   portfolios can speak for themselves.

13       Now, he wrote you-all a 20-plus-page report, Plaintiff's

14   Exhibit 160.  Very important.  Dr. Parker told us that he

15   ranked those portfolios for you and that chart that you saw

16   him point to all during his testimony.

17       Now, if you believe in Dr. Parker's logic and his

18   analysis, then all of those folks in the English department

19   earned tenure.  And, all things being equal, it's puzzling why

20   Dr. Scoufos and Dr. McMillan singled out Rachel for denial.

21       Of course, other witnesses helped us understand why it's

22   not puzzling at all, why it's not puzzling that Scoufos and

23   McMillan did what they did.

24       They didn't like Rachel Tudor.  They didn't want her to

25   be there.  They broke the rules, they broke the law, they made

Jury Trial – Volume 5
November 17, 2017

1    new rules so that they could break the law.

2         Now, you also heard from John Mischo.  He was the former

3    chair of the English department.

4         John Mischo wanted to give Rachel a chance to prove

5    herself.  He wanted to foster success in his department just

6    like any administrator should.

7         But those other Southeastern administrators wouldn't let

8    Dr. Mischo do that.  They wouldn't let Dr. Mischo treat Rachel

9    just like everyone else.  They wanted her to be treated

10   different.  They needed her to be treated differently.

11        Now, I'll be honest with you again.  It takes a little

12   bit for you to get used to Dr. Randy Prus.  He is a bit of a

13   curmudgeon, but he's an honest curmudgeon.  Randy critiqued

14   Rachel, but he ultimately stood behind the department's vote

15   in 2009-10.  A true mark of a collegial and respectful

16   colleague is to respect differences of opinion, which Randy

17   does.

18        Now, Dr. Prus also told us a little bit about how he

19   tried to help Rachel when she tried to reapply in 2010-11.

20        He told us that he helped edit her cover letter, gave her

21   specific advice on things that should and shouldn't go in that

22   portfolio.

23        He also told us something very important, that in

24   2010-11, he looked at those materials, and he thought that if

25   Rachel did what she did, did what he said, that she merited

Jury Trial – Volume 5
November 17, 2017

1  tenure.

2      Dr. Prus also told us something else.  He told us that,

3  when Rachel and he were called into that meeting with Dean

4  Scoufos in October 2010, he felt blindsided.  He was surprised

5  by that meeting.  He had no idea that Doug McMillan was going

6  to ban her from applying for tenure again.

7      In fact, he had already composed the committee that was

8  supposed to vote on this new application.  He thought it was

9  going all the way.  There was no rule at Southeastern that you

10  couldn't reapply.  There was only a special rule that was made

11  for Rachel Tudor.

12      Now, you also got to know very briefly Dr. Mark Spencer.

13  And he was a bit eager to tell his story, so you might have

14  missed a little bit.  He talked really fast, and he talked

15  over me and I talked over him a few times.

16      But Dr. Spencer did have a few things to share with us.

17  When Dr. Spencer talked about his experience, when he told you

18  his story, he told you that, just a few years prior to all of

19  this, Doug McMillan and then-President Jessie Snowden gave

20  Spencer feedback midstream so that Spencer could improve his

21  own portfolio before the president's vote.

22      Because of that feedback –– and you heard this today from

23  Dr. Snowden –– Spencer ultimately won tenure.

24      Spencer also told us something else that was really

25  important.  He told us all and reminded us all how important

Jury Trial – Volume 5
November 17, 2017

1    tenure is, what a big deal it is, that it's something that you

2    fight for if you have to.

3        Spencer also told us that it's academic malpractice what

4    they did down there in Durant, what they did to Rachel Tudor.

5        And Spencer joked that no one gets denied tenure at

6    Southeastern because of service, but, of course, then there

7    was Rachel Tudor.  Rachel was treated differently because of

8    her gender.

9        Now, James Knapp is probably the easiest one for you-all

10   to relate to given your current predicament.

11       Knapp drew what is essentially faculty jury duty three

12   times in 2010, all in the faculty appellate committees dealing

13   with Rachel Tudor's grievances regarding the tenure process at

14   Southeastern.

15       Now, you saw Dr. Knapp.  He's a careful guy.  He read the

16   Academic Policies and Procedures Manual very carefully, just

17   like all of you-all are going to have to do back in that jury

18   room.

19       He knew those rules really well.  It was important for

20   him that the faculty got a fair shake, that tenure is that

21   important.  There should be transparency when the stakes are

22   that high.

23       Knapp saw many years ago what we all saw this week.  All

24   of this, it all went back to Doug McMillan.

25       After Knapp –– after Dr. Knapp, you-all had the privilege

1    of getting to know Mindy House.

2         Do you know how we know that Mindy House is telling the

3    truth?  And, again, I'll be honest with you.  The truth is

4    powerful and the State knows it.

5         Did you wonder for a while why they kept trying to

6    demonize secretaries?  It's because of Mindy House.  They knew

7    what she was going to tell you.

8         Now, undercutting those folks, the secretaries, the folks

9    in the offices who get the work done, who are helpful, the

10   same folks who Rachel Tudor lauded when she worked at

11   Southeastern because she cared -- because she respected folks

12   that she worked with and they respected her, tearing down

13   folks like that, hard workers, just because they're

14   secretaries, that's suspicious.  It stinks.

15        This is why they did it:  I think we all know secretaries

16   see things.  A lot of people don't think secretaries are

17   important, and sometimes they're in visible.  They see things,

18   and, as Mindy House shared with us all, they most definitely

19   hear things.

20        Well, we saw Mindy House walk into this courtroom.  I

21   chatted with her for a bit, and the State then bullied her

22   relentlessly for a really long time.

23        And here's the thing about Mindy House:  I warned her

24   before that day exactly how bad it would be, and she told me

25   that was okay.

Jury Trial – Volume 5
November 17, 2017

1    Mindy House can't be bullied.  She loves Southeastern.

2  You heard that from her herself.

3    Her husband is buried in a Southeastern security uniform.

4  Her family members have worked and graduated from

5  Southeastern.  She was raised and lives her life in Durant,

6  Oklahoma.

7    Mindy House drove up here from Durant, losing pay to do

8  it even though she really couldn't afford it.  She paid that

9  penance.  And she told us all why, because what's right is

10  right.

11    She had to tell the truth because what happened to Rachel

12  Tudor -- and, by extension, what happened to Mindy, because

13  she wouldn't stop complaining about what happened to Rachel

14  Tudor -- was wrong.  It had to be fixed.

15    Mindy is a good, strong woman.  Few people can do what

16  Mindy did this week.  But, as Mindy taught us all, what's

17  right is right.

18    After Mindy House spilled the beans, we knew we were done

19  with our case.  That's why we rested.  You had enough right

20  there to see that.  Where there's smoke, there's fire.

21    Now I would like to talk to you all a little bit about

22  what the defendants did next.

23    The defendants made a lot of promises to you on Monday

24  morning, none of which they kept.  They didn't even try to

25  keep them.

Jury Trial – Volume 5
November 17, 2017

1    The defendants told you this wasn't about Dr. Tudor's

2 gender or her complaints, and they tried to tell you not to

3 look too hard at anything, that there was no problem with what

4 happened down there in Durant.  Their witnesses didn't help

5 them much.

6    Dr. Lucretia Scoufos told you it was all Doug McMillan's

7 fault.  She was just following orders.  Curiously, she told

8 you-all -- and I do believe this -- that Mindy House once

9 saved her life and you could trust her.

10    Now, Mrs. Cathy Conway is an interesting person.  She

11 told you point-blank that she is -- it is she that had the

12 issue with Rachel Tudor and the bathrooms.

13    Conway told you that she didn't dislike Rachel, but the

14 evidence shows otherwise.  Conway projected her own animus of

15 transgender women onto other folks at Southeastern.

16    Conway was worried that Rachel would use bathrooms, and

17 that would upset other people.  But you know the only person

18 who that was going to upset?  Cathy Conway.

19    Cathy Conway did something that was really gross.  She

20 used the power that she had to push Rachel to the side, to

21 treat her differently, and even privately made fun of her with

22 Claire Stubblefield, the affirmative action officer.

23    Now, when your human resources director and the

24 affirmative action officer are the ones making fun of you --

25 on their work e-mails, no less, as they discuss a draft report

1   on a discrimination investigation involving you -- something

2   has gone horribly wrong.  That's not fair.

3       Now, Doug McMillan is the type of guy who obviously sends

4   other people out to do his dirty work.  He doesn't take

5   responsibility for his actions.

6       He told you how hurt he supposedly was by Rachel's

7   accusations.  And after everything he did to Rachel, he has

8   the gall to tell you that it was he who was hurt, it was his

9   family that was suffering.

10      It's been a decade since Conway and McMillan first

11  conspired to make Rachel miserable.  It's been seven years

12  since McMillan pulled the puppet strings to push Rachel out of

13  that university.

14      Frankly, you'd think that a true man of faith might just

15  come out and confess to doing the obvious.  Something was

16  rotten at Southeastern.  I guess he's not yet ready to admit

17  it.  But we all saw it.  As Knapp told us, it all went back to

18  McMillan.

19      Now, Claire Stubblefield is friends with Doug, and,

20  ultimately, she did his bidding.  She investigated some of

21  Rachel's complaints, but, ultimately, we all saw those were

22  never going to go anywhere.

23      She went through the motions.  She didn't follow the

24  trail.  This all happened on Claire Stubblefield's watch.  She

25  let it happen.  She looked the other way.

Jury Trial – Volume 5
November 17, 2017

1        In the middle of her investigation, Rachel was retaliated

2   against by Doug McMillan, Claire Stubblefield's friend.

3        What did Stubblefield do?  She waited two and a half more

4   months before she finished that investigation, and she wrote a

5   report that didn't even address the things that Rachel

6   complained about.  And she sat there on that stand today and

7   told you, after an eight-hour deposition, after all the prep

8   she had for this trial, that, to date, she can't even point

9   out the things she said she did in that report.

10       You'll see it in the jury room.  It's not that long.

11  It's not that hard.  She also doesn't want to take

12  responsibility.

13       Rachel was never going to get a fair shake at

14  Southeastern.  It was rigged.

15       Now, Dr. Snowden testified earlier today --

16            THE COURT:  Mr. Young --

17            MR. YOUNG:  Yes.

18            THE COURT:  Your time is up.

19            MR. YOUNG:  Thank you.

20            THE COURT:  I need to see counsel at the bench,

21  please.

22        (The following proceedings were had at the bench and out

23  of the hearing of the jury.)

24            THE COURT:  You used up all your time too.

25            MR. YOUNG:  I'm sorry, Your Honor.

Jury Trial – Volume 5
November 17, 2017

1           THE COURT:  It's your time.

2           MR. YOUNG:  Thank you, Your Honor.

3           THE COURT:  No, no, no.  That's not the reason we're

4    up here.

5       I confess, I hadn't even looked at the verdict form

6    because nobody objected to it, but I object to it.

7       I don't see -- I mean, they're permitted to give a

8    different amount of damages for each claim.  And if they do --

9    if they came back with, like, $50,000 for hostile work

10   environment and 10,000 for the 2009-10 -- how will we know if

11   those are --

12      I would propose that we just ask the A questions.  And

13   then at the end, we have a thing that said, "If you find for

14   plaintiff on any of 1, 2, 3, 4," set the amount for damages,

15   because there's no claim that has a different measure of

16   damages, is there?

17          MS. COFFEY:  No.

18          THE COURT:  Do you-all understand what I'm talking

19   about?

20          MS. COFFEY:  Yes, Your Honor.

21          MR. JOSEPH:  Yes, Your Honor.  That makes sense.

22          THE COURT:  Mr. Young is still thinking.

23          MR. YOUNG:  So they're all subject to the same cap,

24   Your Honor.  But to the extent that -- I'm just saying in the

25   event that the damages go over that cap and you have to decide

Jury Trial – Volume 5
November 17, 2017

1   on a remittitur, I'm not sure if it's relative to you if
2   they're under different things.
3           THE COURT:  I'm talking about if they come back --
4   if they came back with the same amount of damages on all four
5   claims, we'd be fine.  That's a fair amount of damage.
6           MR. YOUNG:  Yes.
7           THE COURT:  Juries sometimes do things you don't
8   expect them to do.  If they come back with four different
9   amounts of damages, did they mean those should be totaled or
10  did they mean they found different damages for different
11  claims?  I don't know.
12      I told them earlier in the instructions that they can't
13  award essentially a double recovery.  So this is what this
14  would look like, Mr. Young.
15          MR. YOUNG:  Yes.
16          THE COURT:  Question 1A.  Yes, no.  This would come
17  out.
18      Question 2A.  Yes, no.  This comes out.
19      And, likewise, all that.
20      And at the end there would be the instruction, if you
21  found for plaintiff on one or more of those claims, set the
22  amount of her damages here.
23          MR. YOUNG:  We're fine with it, Your Honor.
24          THE COURT:  Did you hear all of that?  Can you get
25  that done?

Jury Trial – Volume 5
November 17, 2017

1        MR. JOSEPH:  Yes.

2        THE COURT:  I wonder also why we —— why we call it

3   monetary damages.  When I read that the first time, I thought,

4   oh, okay, this is the pecuniary damages and we're going to get

5   to nonpecuniary later, and I thought maybe that word would

6   confuse them.  I don't understand why we don't use it.

7        MR. YOUNG:  I don't recall, honestly, Your Honor.

8   I'm sorry.

9        MS. GALINDO:  I'm sorry, Your Honor.  One additional

10  matter while we're up here.  I couldn't see very well, but I

11  understand that the 20 minutes may have been ——

12       THE COURT:  It's gone.

13       MS. GALINDO:  Your Honor, I would respectfully ask

14  for a short rebuttal.

15       THE COURT:  Well, yesterday I asked you if you

16  wanted —— you wanted to use your time or if you wanted a red

17  light or you wanted time to sit down.  You said the red light

18  would be fine.  The red light has been on five minutes and the

19  yellow light for two minutes before that.  And that's it.  You

20  got 20 minutes, and you took 20 minutes.  Sorry.

21       MS. GALINDO:  I wanted to put that on the record.

22       MR. YOUNG:  Thank you, Your Honor.

23     Your Honor, may I thank the jury before I sit down, and

24  that's it?

25       THE COURT:  No.

Jury Trial – Volume 5
November 17, 2017

1       (The following proceedings were had in open court with

2  all parties present and within the hearing of the jury.)

3           MS. COFFEY:  Ladies and gentlemen, as I told you

4  during opening, this case is not about transgender

5  discrimination.  This case is about someone, Dr. Rachel Tudor,

6  that had not yet earned her tenure, and she refused the

7  opportunity to do so.

8       In opening statement, counsel said Oklahomans don't care

9  about people's differences.

10      Our witnesses showed you this week that Oklahomans care

11 more about a job well done than worrying about picking on

12 someone who's just different.

13      Southeastern did the right thing.

14      President Minks had the offer made to Dr. Tudor.  Your

15 tenure is going to be denied.  Please don't make me deny you

16 tenure.  Withdraw it.  Withdraw it.  We will give you an extra

17 year so you will have 18 months to strengthen that portfolio

18 so that you can come back and reapply for tenure.

19      I also said that, throughout this trial, you're going to

20 wonder, why would anyone refuse that?  What was the reason?

21 And I said then and I say now, there was no justifiable

22 reason.

23      As Dr. Scoufos said, what did she have to lose?  She had

24 nothing to lose.  She only had her career to gain.  However,

25 she had an awful lot to lose.

Jury Trial – Volume 5
November 17, 2017

1      She knew the ramification.  She knew her career would be

2  over, yet she refused.  She just refused the opportunity to

3  strengthen her portfolio.

4      I will direct you that, when you're back deliberating, to

5  look at Defendants' Exhibit 59.  That is Dr. Tudor's letter

6  rejecting the offer made.

7      Dr. Tudor testified that one of the reasons that she

8  turned the offer down, a significant reason, was because they

9  refused to put it in writing.

10     Dr. Tudor never asked for it to be in writing.  And if

11 she had, surely she would have set forth that complaint in the

12 letter in which she's rejecting the offer.

13     Dr. Scoufos and Dr. Mischo were both present at that

14 meeting.  Neither of them testified that she had requested

15 that that offer be made in writing.

16     And Dr. Tudor knew, if she were to reject that offer and

17 tenure was ultimately denied, she was done.  It is a

18 one-and-done.  You are not given the opportunity, if you are

19 denied tenure at the president's level, to reapply.

20     If you were, there would be no reason why all these other

21 people that have testified about times when they withdrew

22 their applications, including Dr. Tudor in 2008, if you could

23 always reapply, no matter where the denial occurred, then why

24 would anybody withdraw it?

25     You would always keep it in there under the hopes that

Jury Trial – Volume 5
November 17, 2017

1   somebody along the way would just decide to recommend it, and

2   ultimately it was.

3        Southeastern's tenure process of one-and-done is the same

4   as nationwide.  You heard in particular Jesse Snowden talking,

5   after being at seven different universities, the process is

6   always the same.  You can withdraw your portfolio.  But if you

7   don't and if it's denied, that's it.

8        Southeastern's administrators also concurred, they

9   testified.  Doug McMillan and Lucretia Scoufos.

10       Now, Chip Weiner just told you earlier today that he

11  thought you could reapply, but neither Chip Weiner nor anybody

12  else has given a single example of anybody at Southeastern

13  that was ever denied tenure at the president's level and was

14  not allowed to -- and then was allowed to reapply.

15       Now, Dr. Tudor's tenure process, you heard an awful lot

16  about it.  And I will take pity on you, and I will not go back

17  through and rehash everybody's testimony.

18       But what I will tell you or remind you that it was a

19  multilevel process, that many, many people were involved, most

20  of whom concluded that she wasn't qualified.  She was -- no

21  one concluded that she would never be qualified for tenure,

22  but she was not qualified based upon her 2009 portfolio

23  application.  Randy Prus told you in detail why he believed

24  that she didn't merit tenure.

25       These are some of the descriptions that the people that

Jury Trial – Volume 5
November 17, 2017

1    reviewed Dr. Tudor's portfolio said about her portfolio.

2          It was sloppy.  It was lacking.  It was weak.  It was

3    insufficient.  It was unprofessional.  It was inadequate.

4          She turned down the offer, and she decided she was going

5    to stand by, as she said in her letter of April 6th of 2010,

6    "I will stand by the decision" of her tenure and promotion

7    committee.

8          Well, that tenure and promotion committee included

9    Dr. Prus.  You heard his criticisms of her portfolio.

10         It also -- you heard Dr. Spencer's description, that

11   Dr. Tudor had ignored his advice.  He told her she needed two

12   publications to go up for tenure.  She ignored it.  She only

13   had one publication, and everybody determined that that wasn't

14   sufficient.

15         Two of Dr. Tudor's tenure review committee members

16   testified that the tenure review committee vote was getting

17   ready to go south.  It seemed, based on the conversation in

18   the room, that they were going to vote as a committee to deny

19   tenure.  But then the topic of Dr. Tudor's transgender status

20   came up, and she received a positive vote.

21         Southeastern is not criticizing that vote today, but that

22   decision was -- that decision, based upon her transgender

23   status, was a positive decision.  It wasn't a negative one.

24         Now, you heard from Dr. Tudor's closest friend, Meg

25   Cotter-Lynch.  She did her best to convince you that

Jury Trial – Volume 5
November 17, 2017

1    Southeastern discriminated against Dr. Tudor.

2         But you also heard Dr. Cotter-Lynch tell you that she

3    never once witnessed anything discriminatory toward Dr. Tudor.

4    Yes, she tells you that, in her mind, her opinion, the

5    decision to deny her tenure was discriminatory.

6         Yet, when specifically asked, "Did you ever witness

7    anything discriminatory toward Dr. Tudor?" her answer was no.

8    "Did Dr. Tudor ever come to you and complain of any type of

9    discrimination at Southeastern?"  The answer was no.

10        The conditions supposedly placed on Dr. Tudor, that I'll

11   readdress in just a moment, Dr. Cotter-Lynch never heard about

12   a single one of those conditions being placed on Dr. Tudor.

13        You heard a lot about -- in plaintiff's opening statement

14   and in closing, about the villain, Doug McMillan.

15        Dr. McMillan is no evil person.  He is no villain.  He's

16   the empathetic person that made sure that Mindy House wouldn't

17   be without a job.

18        Now, plaintiff brought in Mindy House, and they asked

19   her -- you heard her testify -- "Did Dr. McMillan rely upon

20   his faith in making an employment decision about you?"

21        And she sat up there and she looked at everyone and she

22   said, "Yes," as if Dr. McMillan had done something so awful.

23        But when asked what that decision was -- not by

24   plaintiff's counsel, of course, but when Ms. House was asked

25   what that decision was, she said, "Dr. McMillan said you are

Jury Trial – Volume 5
November 17, 2017

1   to take care of widows," and Dr. McMillan found Mindy House a

2   job.

3       And then Mindy House refused to acknowledge that that was

4   a positive thing.

5       Dr. McMillan testified, sure, he has a strong faith.  He

6   also testified that he considers himself professional, and

7   other witnesses testified how professional he is and that he

8   would never let his faith get in the middle of making a

9   professional decision.

10      He's a kind man that played a role in giving Dr. Tudor

11  another opportunity to earn her tenure.  He's also the kind

12  man that works every day with handicapped children.  He's not

13  the evil person that Dr. Tudor's attorneys are trying to

14  convince you that he was.  And you heard that.

15      You also heard from a tenure expert, Dr. Robert Parker.

16  Dr. Robert Parker testified he was basing his opinions that

17  Dr. Tudor was qualified to receive tenure from Southeastern in

18  2009 on his belief that Dr. Tudor had two qualified -- quality

19  published -- I'm sorry.  Two significant publications.

20      Now -- and that was the reason.  That was the reason he

21  believed that she was qualified for tenure.  However,

22  Dr. Parker admitted the portfolio that he was given by

23  Dr. Tudor was incomplete.

24      You'll see, when you go back in the jury room, the other

25  portfolios that Dr. Parker had reviewed, very thick.

1    Dr. Tudor's portfolio, 27, 28 pages.

2        He acknowledges he reviewed an incomplete portfolio, and

3    he has no idea how accurate or inaccurate the document he

4    reviewed was compared to what Dr. Tudor actually submitted in

5    2009.

6        However, you heard Dr. Scoufos testify she could

7    specifically identify things that were missing and things that

8    had been added.

9        More importantly, Dr. Parker's opinion that she was

10   qualified because of two publications, you heard testimony

11   from several witnesses that were involved with that review of

12   her portfolio.

13       Dr. Spencer.  Dr. Spencer said, She had one publication.

14   I told her she needed two, she had one, but I went ahead and

15   voted for her anyway.

16       Dr. Prus:  She had one publication.  That wasn't enough.

17       Dean Scoufos:  She only had one publication.  That wasn't

18   enough.

19       Dr. McMillan:  She only had one publication.  That wasn't

20   enough.

21       So there is no legitimate basis for Dr. Parker's opinion

22   regarding whether or not she was qualified.

23       Dr. Parker also said, though, that it was a really big

24   deal to have peer letters of review -- I mean, peer letters of

25   recommendation, but Dr. Tudor had none.  You may recall the

Jury Trial – Volume 5
November 17, 2017

1    testimony –– and you'll see it back there –– she had no

2    recommendations from any professor in the English department.

3         She had recommendations from staff at Southeastern.  And

4    contrary to what plaintiff's counsel said, we certainly

5    haven't demonized department secretaries this week.  They are

6    wonderful people.  They are –– play significant roles at

7    Southeastern.  And I daresay the work every day could not be

8    done without their work.

9         But what you have heard is that they are not qualified to

10   determine whether somebody deserves tenure.  And, therefore,

11   inclusion of that type of letter in a portfolio was

12   inappropriate; it was unprofessional.

13        But as Dr. Scoufos said, it's not so much what was in

14   there as what wasn't.  And that was recommendations from

15   tenured professors.

16        Contrary to what counsel said in closing, there has been

17   no evidence of hostilities that Dr. Tudor was subjected to, no

18   evidence at all.

19        Cathy Conway testified that shortly after she learned of

20   Dr. Tudor's transition –– in fact, that very same day –– she

21   consulted with legal counsel so that she would address with

22   Dr. Tudor issues that need to be addressed with her to do what

23   was right for Dr. Tudor.

24        She dealt with the situation with empathy.  She was

25   highly concerned about Dr. Tudor.  But it was a new situation

Jury Trial – Volume 5
November 17, 2017

1   for them.  As she said, she'd never dealt with a transgender

2   faculty member, and she wanted to get it right.

3       Dr. Tudor sat up there on that witness stand and told you

4   that she received this threatening, scary call, dark one

5   night, dark, and the call was from Southeastern's human

6   resources office.

7       Now, honestly, I mean, does anybody really think the

8   Southeastern human resources office was making calls late at

9   night?

10      But more importantly, you saw Cathy Conway's notes.  She

11  called at 3:45 in the afternoon on a summer day.

12      Cathy Conway told you that in that call she dealt with

13  various issues.  And her notes go over each policy that she

14  discussed with Dr. Tudor.  She discussed the discrimination

15  and sexual harassment policy with Dr. Tudor because she wanted

16  Dr. Tudor to know that, if she was suffering problems, she

17  would know how to address those.

18      Cathy Conway said she never heard another word from

19  Dr. Tudor about that.  And she also said that she believed

20  that, as a result of that phone call, had Dr. Tudor had

21  questions or concerns, she would have felt comfortable coming

22  to her and talking to her about it.

23      Dr. Tudor testified –– well, I'll just –– Cathy Conway

24  refuted all these conditions that were supposedly placed on

25  Dr. Tudor.

Jury Trial – Volume 5
November 17, 2017

1       Nobody told Dr. Tudor how to wear her makeup.  Nobody

2   told Dr. Tudor how to dress.  And nobody testified that they

3   ever heard about that -- either heard from Dr. Tudor about it

4   or heard any complaints about it.

5       Yes, Cathy Conway admits she discussed the use of the

6   bathroom with Dr. Tudor.  She thought she was presenting

7   Dr. Tudor with options.  She told Dr. Tudor it was her choice.

8   She felt like she was doing -- handling it in the best way

9   that it could be handled.

10      At the end of that call, Dr. Tudor thanked Cathy Conway

11  for her professionalism.

12      Now, Dr. Tudor told you on the witness stand that that

13  wasn't really what she said.  She said that she thanked Cathy

14  Conway for her professionalism for not firing her.

15      Nobody does that.

16      She claims that Dr. McMillan -- or that Cathy Conway told

17  her Dr. McMillan said, "Can we fire her?"  And when Cathy told

18  him no, according to Dr. Tudor, that Dr. McMillan said, "Okay.

19  Well, if we can't fire her, then let's place these three

20  conditions on her."

21      Dr. Tudor said Cathy Conway said, "As long as you live by

22  these conditions, you can keep your job at Southeastern."

23  That was the makeup, the dress, and the bathroom.

24      That conversation never took place.

25      You've heard several people talk about the environment at

Jury Trial – Volume 5
November 17, 2017

1    Southeastern, that it's –– there's open-door policies.  You

2    heard Cathy Conway talk.  You heard Jesse Snowden talk about

3    it.  If Dr. Tudor really had been experiencing some of these

4    issues, this discrimination, why would she not have complained

5    to anybody?

6          Hopefully, she would have –– if it had really happened,

7    one would think she would have complained and Southeastern

8    would have had the opportunity to address it.

9          Why didn't she complain?  Because it just didn't happen.

10         I told you that one reason why the case wasn't about her

11   transgender status is because it's about her refusal to take

12   the opportunity that Southeastern offered her.

13         The second reason, though, that it is not about

14   transgender status is because, as the judge has instructed you

15   in jury instruction No. 6, transgender itself is not a

16   protected class under Title VII.

17         In this case, Dr. Tudor complains that she was

18   discriminated against because she's female or that she failed

19   to conform to traditional notions of the female stereotype.

20         I ask you to think long and hard what possible evidence

21   was there presented in this courtroom of any of that.

22         There was none.  There was no discrimination against

23   Dr. Tudor.  Every decision made was based upon legitimate

24   reasons.  She just had not earned her tenure.

25         This is a case where opportunity and advice were ignored.

Jury Trial – Volume 5
November 17, 2017

 1   When Dr. Tudor was faced with the likelihood of tenure denial,

 2   she simply refused to take advantage of the opportunity that

 3   they offered her.  And, by doing so, Dr. Tudor made the

 4   choice, only Dr. Tudor.  And that choice was to end her career

 5   at Southeastern.

 6       Ladies and gentlemen, plaintiff has failed to prove her

 7   case.  She's failed to prove hostile work environment, she's

 8   failed to prove discrimination, and she's failed to prove that

 9   Southeastern retaliated against her.  Therefore, we ask that

10   you return a verdict in favor of defendants.

11       Thank you.

12            THE COURT:  Counsel, come up.  My apologies.

13       (The following proceedings were had at the bench and out

14   of the hearing of the jury.)

15            THE COURT:  I have a closing instruction to read,

16   and then the bailiff will be sworn, and then I will give them

17   some informal instructions.

18       If you have any objection to this, you let me know before

19   I send the jury out.  I'm not going to call on you because I

20   don't want to interrupt us again, but let me know before any

21   leave here.

22            MS. COFFEY:  Okay.

23            MR. JOSEPH:  Thank you, Your Honor.

24       (The following proceedings were had in open court with

25   all parties present and within the hearing of the jury.)

Jury Trial – Volume 5
November 17, 2017

1           THE COURT:  When you retire to the jury room to

2    deliberate, you should elect one person as your presiding

3    juror.  That person will preside over your deliberations and

4    speak for you with the clerk.  You will then discuss the case

5    with your fellow jurors to reach agreement if you can do so.

6           Each of you must decide the case for yourself, but you

7    should do so only after you've considered all the evidence,

8    discussed it fully with the other jurors, and listened to the

9    view of your fellow jurors.

10          Do not be afraid to change your opinion if the discussion

11   persuades you that you should, but do not come to a decision

12   simply because other jurors think it is right.

13          Your verdict must be based solely on the evidence and on

14   the law as I have given it to you in these instructions.

15   However, nothing that I have said or done is intended to

16   suggest what your verdict should be.  That is entirely for you

17   to decide.

18          You must not use any method of chance in arriving at your

19   verdict nor let sympathy or prejudice affect the outcome.

20          A verdict form will be sent to the jury room with you,

21   along with these written instructions of the Court and the

22   exhibits admitted into evidence during the trial.

23          I suggest you study the verdict form early in your

24   deliberations so you know what you must decide.

25          The verdict must be unanimous; that is, all of you must

Jury Trial – Volume 5
November 17, 2017

1   agree on a verdict.  And when you do, presiding juror will

2   sign the verdict.  Notify the bailiff when you have arrived at

3   a verdict so that you may return it in open court.

4        In a few moments you will go with the bailiff to the jury

5   room to begin your deliberations.

6        If any of you have cell phones or similar devices with

7   you, you are instructed to be sure that they are to be turned

8   off and then turn them over to the bailiff as you enter the

9   jury deliberation room.  They will be held by the bailiff for

10  you and then returned to you after your deliberations are

11  completed and during any break or period when you are not

12  deliberating.

13       The purpose of this requirement is to avoid any

14  interruption or distraction during your deliberations and to

15  avoid any question of outside contact with the jury during

16  your deliberation.

17       If it becomes necessary during your deliberations to

18  communicate with me, you may send a note through the bailiff

19  signed by your presiding juror.

20       In the message, do not tell me how you stand on your

21  verdict.  No member of the jury should ever attempt to

22  communicate with me except by a signed writing.

23       You will note from the oath about to be taken by the

24  bailiff that the bailiff, as well as other persons, is

25  forbidden to communicate in any way or manner with any member

Jury Trial – Volume 5
November 17, 2017

1    of the jury on any subject touching the merits of the case.

2         If the bailiff will come forward and be sworn.

3         (Jeff Lynch duly sworn as bailiff.)

4         THE COURT:  I am sending with you one copy of my

5    written instructions and one copy of the verdict form.  I am

6    happy to make additional copies.  I just don't kill that tree

7    until you ask me to.

8         So if you want more of either or both, just hand these

9    originals out to the bailiff and tell him how many copies you

10   want and we'll get those made.

11        You will also have with you all of the exhibits that have

12   been admitted into evidence.

13        We would normally take an afternoon break were we in open

14   court, and I will permit you to declare a break if you want

15   to.  But just let me caution you that you are never to discuss

16   the case until all eight of you are behind the closed door of

17   your jury deliberation room.  If somebody leaves, then you

18   quit talking about the case until somebody comes back.

19        We need to know if you take a break so that we'll know we

20   can take a break too.

21        I will instruct you to follow the bailiff and begin your

22   deliberations.

23        Oh.  And you can take your notes with you now.

24        (Jury exits courtroom to begin deliberations 2:25 p.m.)

25        THE COURT:  If you are not in the hall outside there

1   or somewhere —— I don't know.  Linda may know where you hang
2   out, but we need to be able to find you quickly if we get a
3   note or a verdict.
4        So if you're not where Linda expects you to be, make sure
5   she knows where you are or has a good number for you.
6        Are any of you leaving the courthouse?
7            MR. YOUNG:  No, Your Honor.
8            MS. COFFEY:  Your Honor, I may go out to my car
9   briefly, but it would take less than five minutes.
10           THE COURT:  It's okay.
11           MS. COFFEY:  Okay.  Well, I didn't want the
12   representation of "no" when she left.
13           THE COURT:  Is there anything else from counsel
14   before we recess?
15           MR. YOUNG:  No, Your Honor.
16           MS. COFFEY:  No, Your Honor.
17           THE COURT:  We'll be in recess.
18       (In recess at 2:25 p.m.)
19       (Jury deliberations from 2:25 p.m. to 4:30 p.m.  Jury to
20   return Monday, November 20, 2017, at 9:00 a.m. to resume
21   deliberations.)
22
23
24
25

Jury Trial – Volume 5
November 17, 2017

REPORTER'S CERTIFICATE

        I, SHERRI GRUBBS, Federal Official Court Reporter in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 17th day of November, 2017.


        /S/ SHERRI GRUBBS_____

        SHERRI GRUBBS, RPR, RMR, RDR, CRR
        State of Oklahoma CSR No. 1232.
        Federal Official Court Reporter