IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DR. RACHEL TUDOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:15-CV-00324-C |
| | ) | |
| SOUTHEASTERN OKLAHOMA STATE UNIVERSITY, | ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE REGIONAL UNIVERSITY SYSTEM OF OKLAHOMA, | ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DR. TUDOR'S MOTION
AND INCORPORATED BRIEF FOR RECALCULATION OF DAMAGES**

I.      **FRONT PAY SHOULD BE RECALCULATED AT $317,174.74.**

A.  **The Tenth Circuit Opinion Requires Use of Annual Compensation Amounts
From the Date of Verdict Through Reinstatement.**

In its Opinion and Order of September 13, 2021 [ECF 357], the Tenth Circuit directed as
follows:

> Accordingly, we reverse the $60,040.77 front pay award and remand for the district
> court to recalculate front pay consistent with this opinion including the annual
> compensation amount, the cutoff date and any other matters in mitigation.

Id. at 35. In Exhibit 1, Dr. Tudor has provided the annual compensation amounts that she would

have received during the period November 17, 2017,[1] the date of the verdict, through November

1, 2021, the date on which she has been reinstated by Defendants. See Exhibit 1.

---

[1] Tenth Circuit noted that, while front pay technically begins at the date of judgment in June 2018, it is the district court's responsibility under its equitable power and discretion to add an additional amount to the front pay award beginning at the close of evidence in November 2017 when backpay ceased, to account for that gap. Id. at 37.

Exhibit 1 follows the ruling of the Tenth Circuit in its calculations. Previously, this Court had determined that the appropriate time period was 14 months, based on Dr. Tudor's ability to obtain a position at Collin College, and that the annual compensation amount was appropriately calculated at $51,463.52. However, the Tenth Circuit found these determinations to be in error, noting that:

> [T]he amount used by the court as the front pay annual compensation rate was verifiably incorrect and [] her untenured position at Collin College was not substantially equivalent to a tenured professorship at Southeastern.

Id. at 36. Therefore, the use of the 14 month period was in error. Id. at 45-46. The Tenth Circuit also noted that the annual compensation amount for 2017-2018 should be closer to $74,000. Id. at 44, n. 17. As set forth in Exhibit 1, the 14 month period has been removed, and the annual compensation amount tracks the Tenth Circuit's estimate more closely, with appropriate increases for years subsequent to the 2017-2018 academic year. Exhibit 1 includes the annual compensation rate (Columns C through G, totaled in Column H), for the periods listed in Column B, discounted in Column I, with cumulative amounts in Column J. The total front pay calculated by this method is $317,174.74.

Exhibit 1 was produced by the use of Southeastern's "salary card" and benefits spreadsheet, both of which have been authenticated by Dr. Cotter-Lynch See Exhibit 2 ¶ 5(a) (previously submitted declaration authenticating salary card, attached thereto as Exhibit A); id. ¶ 7(a) (authenticating benefits spreadsheet, attached thereto as Exhibit B). At the time of her termination in May 2011, Southeastern paid Tudor a salary of $51,279 per year not accounting for summer courses, class overages, traditional and professor benefits, or retirement (Exhibit 3 ¶ 6, previously submitted declaration of Dr. Tudor). Tudor's base salary was computed on "salary card," wherein her degree, seniority (termed "experience"), and rank were key factors. Id. If Tudor had not been

illicitly denied tenure, her salary would have, at the very least, closely tracked that of Dr. Cotter-Lynch (Exhibit 3 ¶ 9).

Dr. Tudor would also have had the opportunity to teach summer courses and class overages, both of which significantly boost salary. Most tenured professors at Southeastern have the opportunity to teach summer courses, which are compensated at a rate of $3,700 per course (Exhibit 3 ¶ 6(b)(iii)). Additionally, most tenured professors also have the opportunity to teach class overages—an extra class beyond the required four during the Fall or Spring terms—which are compensated at a rate of $2,100 per course (id. ¶ 6(b)(ii)). If an evidentiary hearing were held, Tudor would attest that she would have at the very least taken on one class overage and one summer course per year (Exhibit 3 ¶(b)–(c)). Lastly, the retirement contributions Tudor would be due from Southeastern are significantly affected by the above noted adjustments to her base salary. Under Southeastern's current benefit scheme, Southeastern contributes 7% of all wages and fringe benefits that exceed $25,000 per year. See Exhibit 3 at appended Exhibit B. Thus, as Tudor's projected salary increases, so too do Southeastern's contributions increase.

Any uncertainties in calculation should be construed in Dr. Tudor's favor. *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1180 (10th Cir. 2003) (quoting *Prudential*, 763 F.2d at 1173 ("[T]he mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.")); *Metz v. Merrill Lynch*, 39 F.3d 1482, 1494 (10th Cir. 1994) ("uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer") (cleaned up); *id.* (employee's own testimony regarding front pay damages is adequate evidence to support claim).

### B.  Dr. Tudor Made Reasonable Attempts At Mitigation of Damages

Dr. Tudor's efforts to mitigate her damages were reasonable under the circumstances, and it would be Defendants' burden to show that they were not. *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1576 (10th Cir. 1992). Dr. Tudor made many attempts to obtain alternate employment after the Court denied reinstatement. Submitted herewith as Exhibit 4 is the Declaration of Dr. Tudor detailing her applications to 162 institutions of higher education after denial of reinstatement. Trial testimony and other evidence shows that, despite diligent efforts, Tudor had little chance of obtaining a tenured professorship at any other institution. Dr. Parker's and Dr. Cotter-Lynch's testimony shined a light on the double-bind Tudor found herself in. Most schools would likely deem Tudor's tenure denial from Southeastern as disqualifying her for tenure-track jobs (Exhibit 5 at 332–33). Even if a school did not deem the tenure denial disqualifying, given Tudor's long work history at Southeastern, she would likely be deemed too advanced for tenure-track jobs (Exhibit 5 at 277). Because Tudor could not get any tenure-track job, she had no means of securing a job equivalent to the one the jury held she was illicitly denied. Testimony from Southeastern employees aligned with Parker's testimony. For example, Dr. Scoufos testified that tenure denial and ejection from one university almost always marks the end of one's career as a university professor and ruins a professor's professional reputation (Exhibit 6 at 596). Dr. Spencer also testified that denial of tenure puts one's entire career in jeopardy (Exhibit 7 at 437; id. at 434). Tudor's mitigation efforts also evidence that it was unrealistic for her to obtain an equivalent tenured position at another university. Since her termination from Southeastern in May 2011, Tudor applied to more than one-hundred universities and colleges, seeking tenure-track positions where available (see, e.g., Exhibit 3 ¶ 4(b). In roughly eight years of searching for a job, Tudor was only able to obtain one year-to-year contract position with Collin College, a two-year

community college that does not offer tenure (Exhibit 3 ¶ 4(b)). Tudor continued to apply for tenure track jobs while she was at Collin College and after Collin non-renewed her contract (id.). Tudor also continued to apply for new jobs and follow up on other outstanding applications after the trial (id. ¶ 3(a) and Exhibit 4. Dr. Tudor was born in Oklahoma and received her doctorate from the University of Oklahoma (Exhibit 3 ¶ 4(d)(ii)). Persons with Tudor's background, roots, and school-network predominantly live and work in Oklahoma (id.). Even though Tudor has cast a wide net, her best chance of a new job was at a university in Oklahoma (id. ¶ 4(d)(iii)), a path closed to her until the Tenth Circuit's ruling.

### C.  The Discount Rate Is Appropriately Set at 1.5%.

Dr. Tudor has reduced the requested front pay to present value by adopting a modified net discount rate. A net discount rate is a means to adjust a lump sum award, accounting for the difference that investing that award in the market makes as well as the effects of inflation will have on the net amount. To calculate the net discount rate, one takes the prevailing interest rate and subtracts from it the rate of inflation; the resulting figure is the net discount rate. The future lump sum is then multiplied by the net discount rate, thereby reducing the award by a value that approximates the effects of both inflation and investment. *Hoskie v. United States*, 666 F.2d 1353, 1355 n.2 (10th Cir. 1981) (explaining calculation method of net discount rate). At present, the rate of inflation in the United States is 5.4%. See Exhibit 8 (excerpt from Bureau of Labor Statistics report). At present, the prevailing interest rate on Treasury backed marketable debt is 1.470%. See Exhibit 9 (U.S. Treasury report). The difference between the rate of inflation and the interest rate is a negative number. If applied, this negative net discount rate would increase rather than reduce the lump sum award due to Tudor. Therefore, it would be appropriate to adopt a modified net interest rate of +1.5% rather than -0.096%. A net discount rate of +1.5% falls within the range

approved by the 10th Circuit in other cases. See, e.g., *Hull by Hull v. United States*, 971 F.2d 1499, 1511–12 (10th Cir. 1992) (observing that courts typically employ a 1– 3% net discount rate).

**II.      BACK PAY SHOULD BE RECALCULATED.**

This Court found that the jury could have awarded a measure of back pay. ECF 292 at 4. Therefore, the Court awarded Plaintiff $60,040.77 in back pay, based on the 14 month time period until which Dr. Tudor was able to find the lesser job at Collin College, and based on the approximately $51,000 this Court found to be Dr. Tudor's salary. Id. The Tenth Circuit's Opinion addressed the issue of back pay, noting,

> Although we grant Dr. Tudor reinstatement, she is also entitled to monetary damages for the period that she would have worked at Southeastern as a tenured professor had she been granted tenure when she applied in 2009-10 until the time of her reinstatement (subject, of course, to mitigation obligations and cutoffs).

ECF 357 at 35. The Tenth Circuit also noted that the annual compensation figure used by this Court should have been higher, approximately $74,000. Id. at 44, n. 17. "The district court's front pay award was premised upon an annual compensation of $51,463.52. This figure is clearly erroneous, and it was reversible error to rely on it." Id. at 41. Plaintiff has calculated the amounts referenced by the Tenth Circuit in the spreadsheet attached as Exhibit 11.  Exhibit 11 shows that, based on the time periods and amounts referenced by the Tenth Circuit, the back pay figure for Dr. Tudor is $496,909.62. See Exhibit 10.

Dr. Tudor had mitigation income at Collin College for the years 2011 through 2016 of $276,677 as follows:

| | |
|---|---|
| 2011-2012 | $51,184 |
| 2012-2013 | $52,720 |
| 2013-2014 | $54,829 |
| 2014-2015 | $58,022 |
| 2015-2016 | $59,922 |

| TOTAL | $276,677 |
|---|---|

See ECF 270-6 (setting forth salary amounts for Collin College). After mitigation, Dr. Tudor would be entitled to $220,232 in back pay damages. Dr. Tudor respectfully requests that the backpay damages be recalculated as figured by the Tenth Circuit in its Opinion.

## III.   INCLUSION OF PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND TAX OFFSET AMOUNTS IS APPROPRIATE.

As set forth in Dr. Tudor's separately filed motion for pre-judgment and post-judgment interest and tax offset amounts, ECF 371. Dr. Tudor requests that the recalculated damages include pre-judgment interest, post-judgment interest and tax offset amounts.

## IV.   CONCLUSION

For the foregoing reasons, Dr. Tudor respectfully requests that the Court recalculate her damages as set forth herein.

November 2, 2021

Respectfully submitted,

/s/ Jillian T. Weiss
Jillian T. Weiss
LAW OFFICE OF JILLIAN T. WEISS, PC
775 Fourth Avenue, No. 320173
Brooklyn, New York 11232
Telephone: (845) 709-3237
Facsimile: (845) 684-0160
jweiss@jtweisslaw.com

Attorney for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 2, 2021, I electronically filed a copy of the foregoing with the Clerk of Court by using the CM/ECF system, which will automatically serve all counsel of record.

<u>/s/ Jillian T. Weiss</u>
Jillian T. Weiss (Pro Hac Vice)
